**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br>                    Plaintiffs,<br><br>    v.<br><br>FEDERAL AVIATION<br>ADMINISTRATION, *et al.*,<br>                    Defendants,<br><br>    and<br><br>SPACE EXPLORATION TECHNOLOGIES<br>CORP.,<br>                    Intervenor-Defendant. | Civil Action No. 1:23-cv-1204-CJN |

**INTERVENOR-DEFENDANT SPACE EXPLORATIONTECHNOLO-
GIES CORP.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO
DISMISS PLAINTIFFS' AMENDED COMPLAINT OR FOR A
MORE DEFINITE STATEMENT**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.      BACKGROUND ................................................................................................. 2

     A.      The FAA's regulation of commercial space launches. ........................... 2

     B.      NEPA review and development of the Boca Chica launch site. ............ 3

     C.      Programmatic NEPA review of Starship-Super Heavy launch operations. ............ 4

     D.      FAA licensing and review of Starship-Super Heavy launches. .............. 6

     E.      Plaintiffs' Complaint and Amended Complaint. ................................... 7

III.      ARGUMENT ..................................................................................................... 8

     A.      Because the Amended Complaint combines multiple claims into one count, SpaceX seeks partial dismissal. ...................................... 8

     B.      The Court should dismiss Plaintiffs' NEPA supplementation claims. ................. 10

     C.      The Court should dismiss Plaintiffs' claims based on alleged unintentional harm to migratory birds in violation of the MBTA. .......................... 13

          1.      The MBTA's plain language prohibits only intentional, hunting-related actions. ...................................... 14

          2.      Both the treaty that the MBTA implements and the common law apply only to intentional harm. .......................... 14

          4.      Expanding the MBTA to include unintentional harm would have absurd results. ...................................... 18

          5.      SpaceX's launches cannot violate the MBTA because they are not intentional, hunting-related actions. .......................... 19

          6.      Plaintiffs fail to state a claim that alleged MBTA violations require supplemental NEPA review. .......................... 20

          7.      The Court should dismiss any claim that the FAA must ensure SpaceX's compliance with the MBTA .......................... 21

     D.      In the alternative, the Court should require Plaintiffs to file a more definite statement of their claims. .......................... 23

IV.      CONCLUSION .................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Babbitt v. Sweet Home Chapter Cmtys. For a Great Or.*,
515 U.S. 687 (1995)...............................................................17, 18

*BBL, Inc. v. City of Angola*,
809 F.3d 317 (7th Cir. 2015) ...............................................10

*Beecham v. United States*,
511 U.S. 368 (1994)...............................................................16

*Bond v. United States*
572 U.S. 844 (2014)...............................................................17

*Center for Biological Diversity v. Salazar*,
706 F.3d 1085 (9th Cir. 2013) ...............................................12

*Cheeks v. Fort Myer Constr. Corp.*,
71 F. Supp. 3d 163 (D.D.C. 2014)...............................................23

*Citizens Interested in Bull Run, Inc. v. Edrington*,
781 F. Supp. 1502 (D. Or. 1991) ...............................................20

*City of Olmsted Falls v. FAA*,
292 F.3d 261 (D.C. Cir. 2002)...............................................10

*Cold Mountain v. Garber*,
375 F.3d 884 (9th Cir. 2004) ...............................................13

*Curry v. U.S. Forest Serv.*,
988 F. Supp. 541 (W.D. Pa. 1997)...............................................20

*Friends of the Cap. Crescent Trail v. Fed. Transit Admin.*,
255 F. Supp. 3d 60 (D.D.C. 2017)...............................................22

*George v. McDonough*,
596 U.S. 740 (2022)...............................................................15

*Goodyear Atomic Corp. v. Miller*,
486 U.S. 174 (1988)...............................................................15

*Greater Yellowstone Coalition v. Tidwell*,
572 F.3d 1115 (10th Cir. 2009) ...............................................12, 13

*Griffin v. Oceanic Contractors,*
458 U.S. 564 (1982) ........................................................................................................19

*Humane Soc'y v. Glickman,*
217 F.3d 882 (D.C. Cir. 2000) .......................................................................................22

*Kepner v. United States,*
195 U.S. 100 (1904) ........................................................................................................15

*loanDepot.com v. CrossCountry Mortg., Inc.,*
399 F. Supp. 3d 226 (D.N.J. 2019) ...........................................................................10, 23

*Marsh v. Or. Nat. Res. Council,*
490 U.S. 360 (1989) ........................................................................................................10

*McAllen Grace Brethren Church v. Salazar,*
764 F.3d 465 (5th Cir. 2014) ..........................................................................................14

*In re Mont. Wilderness Ass'n,*
No. CV-09-95-GF-SEH, 2010 WL 11470325 (D. Mont. Dec. 6, 2010) .........................13

*Newton Cnty. Wildlife Ass'n v. U.S. Forest Serv.,*
113 F.3d 110 (8th Cir. 1997) ............................................................................16, 19, 20

*Norton v. S. Utah Wilderness All.,*
542 U.S. 55 (2004) ...............................................................................................10, 12, 21

*Powers-Bunce v. District of Columbia,*
479 F. Supp. 2d 146 (D.D.C. 2007) ................................................................................24

*Protect Our Cmtys. Found. v. Jewell,*
825 F.3d 571 (9th Cir. 2016) ..........................................................................................22

*Pub. Emps. for Envtl. Resp. v. Beaudreau,*
25 F. Supp. 3d 67 (D.D.C. 2014) ....................................................................................22

*Seattle Audobon Soc'y v. Evans,*
952 F.2d 297 (9th Cir. 1991) ....................................................................................16, 18

*Stewart v. Nat'l Educ. Ass'n,*
471 F.3d 169 (D.C. Cir. 2006) ..........................................................................................8

*Third Nat'l Bank v. Impac, Ltd.,*
432 U.S. 312 (1977) ........................................................................................................16

*United States v. Apollo Energies, Inc.,*
611 F.3d 679 (10th Cir. 2010) ........................................................................................16

*United States v. Brigham Oil & Gas, L.P.*,
    840 F. Supp. 2d 1202 (D. N.D. 2012) ........................................................17, 18, 20

*United States v. CITGO Petroleum Corp.*,
    801 F.3d 477 (5th Cir. 2015) ....................................................... *passim*

*United States v. Ray Westall Operating, Inc.*,
    2009 WL 8691615 (D. N.M. Feb. 25, 2009) .........................................................20

*United States v. Shabani*,
    513 U.S. 10 (1995) ...............................................................................................15

*Verizon Wash., D.C., Inc. v. United States*,
    254 F. Supp. 3d 208 (D.D.C. 2017) .............................................................10, 23

*Western Organization of Resource Councils v. Zinke*,
    892 F.3d 1234 (D.C. Cir. 2018) ...............................................................11, 12, 21

## Federal Statutes

5 U.S.C.
    § 704 ...................................................................................................................9
    § 706 ...................................................................................................................9

16 U.S.C.
    § 703 .................................................................................................................16
    § 703(a) .......................................................................................................14, 15
    § 1532(19) ........................................................................................................17
    § 1538(g) ..........................................................................................................22

42 U.S.C.
    § 4332(C) ............................................................................................................3
    § 4336 .................................................................................................................3

51 U.S.C.
    §§ 50901-23 .......................................................................................................2
    § 50901 ...............................................................................................................3
    § 50904(a)(1) .....................................................................................................2
    § 50905(a)(1) .....................................................................................................2

Convention between the United States and Great Britain for the Protection of
    Migratory Birds, Aug. 16, 1916, 39 Stat. 1702 ..................................................14

## Other Authorities

14 C.F.R. § 450.3(a) .....................................................................................................3

14 C.F.R. § 450.3(b) .....................................................................................................3

40 C.F.R. § 1501.3(d) ..............................................................................................21

40 C.F.R. § 1502.9(d) ..............................................................................................10

50 C.F.R. § 10.12 ...............................................................................................15, 18

50 C.F.R. § 10.13 ....................................................................................................18

86 Fed. Reg. 54642 (Oct. 4, 2021) ...........................................................................16

Fed. R. Civ. P. 10(b) ...............................................................................9, 10, 23, 24

Fed. R. Civ. P. 12(b)(6) ...................................................................................8, 10

Fed. R. Civ. P. 12(e) ...............................................................................................23

## I.   INTRODUCTION

SpaceX owns and operates a private space launch site on private land in Boca Chica, Texas. The Federal Aviation Administration (FAA) authorized SpaceX to build and operate the launch site more than ten years ago, after extensive environmental review. SpaceX currently uses its Boca Chica launch site to develop a revolutionary, fully reusable launch system called Starship-Super Heavy. One of its first missions will be to land astronauts on the Moon for the first time since the Apollo program ended in 1972.

Yet Plaintiffs waited to sue. They waited until many years after SpaceX built the site and began launching rockets from it. They waited until almost a year after the FAA reviewed and approved the Starship-Super Heavy Program. And then they waited until after the FAA reviewed and decided to license the first proposed Starship-Super Heavy launch. Now, Plaintiffs assert a single cause of action alleging numerous claims that the FAA violated the National Environmental Policy Act (NEPA) and other laws in taking (or not taking) several actions. SpaceX moves to dismiss two of those claims or to require Plaintiffs to file a more definite statement.

First, Plaintiffs fail to state a supplemental NEPA claim. Plaintiffs seek to force the FAA to prepare a supplemental Programmatic Environmental Assessment (EA) supporting its 2022 decision to approve the Starship-Super Heavy Program. But NEPA and controlling precedent are clear that supplemental NEPA review is only required for proposed major federal actions, not actions an agency has already taken. The FAA completed the proposed agency action evaluated in the Programmatic EA—approval of the Starship-Super Heavy Program—when it approved the Program in 2022. Plaintiffs miss the fact that the FAA has since taken separate licensing actions authorizing each Starship-Super Heavy launch after completing further review under NEPA and other laws, including review of "new circumstances and information" alleged in Plaintiffs'

complaint. Plaintiffs may challenge the NEPA compliance of those license decisions based on each action's administrative record, which may include the Programmatic EA. But they cannot state a NEPA supplementation claim challenging NEPA review of completed FAA decisions based on information that arose after the FAA completed the review and acted.

Second, Plaintiffs' claims alleging violations of the Migratory Bird Treaty Act (MBTA) should also be dismissed. The MBTA applies only to intentional, hunting-related activities that harm migratory birds. Here, any effects launches have on migratory birds are purely accidental, rendering the MBTA inapplicable. And since there are no violations of the MBTA, Plaintiffs' allegations of harm to migratory birds cannot trigger additional environmental review requirements under NEPA, as Plaintiffs claim.

In sum, the Court should dismiss both Plaintiffs' claims for supplemental NEPA review and their claims based on alleged violations of the MBTA. But if Plaintiffs' single-count Amended Complaint remains too murky for the Court to rule on a motion to dismiss, SpaceX respectfully requests that the Court require Plaintiffs to file a more definite statement. A more definite statement of Plaintiffs' various claims would not only enable targeted motions practice on dispositive threshold issues but also clarify what agency actions and associated administrative records are at issue and thus facilitate orderly litigation on remaining claims.

## II.    BACKGROUND

### A.   The FAA's regulation of commercial space launches

The FAA regulates SpaceX's commercial space launch operations at Boca Chica under the Commercial Space Launch Act (CSLA). 51 U.S.C. §§ 50901-23. That Act requires a license for launches, reentries, and launch and reentry sites. *Id*. § 50904(a)(1). But it says that the FAA "*shall* issue or transfer a license" within 180 days if an applicant complies with the Act and the rules issued under it. *Id.* § 50905(a)(1) (emphasis added). Consistent with this quick, congressionally

2

imposed deadline, the Act is meant to "encourage private sector launches, reentries, and associated services" with "stable, minimal, and appropriate" requirements that are "fairly and expeditiously applied." *Id.* § 50901(a)(6), (7).

The FAA's rules reinforce the narrowness of its authority. The "vehicle operator licenses" it issues to commercial space operators like SpaceX simply "authorize[] a licensee to conduct one or more launches or reentries using the same vehicle or family of vehicles." 14 C.F.R. § 450.3(a). As part of that licensing, the FAA also regulates launch-related infrastructure. *Id.* § 450.3(b).

Before the FAA decides whether to license launches and the use of supporting launch infrastructure, it prepares an environmental review under NEPA. NEPA tells agencies that are proposing "major Federal actions significantly affecting the quality of the human environment" to prepare a "detailed statement" that identifies the proposed action's "reasonably foreseeable environmental effects," as well as "a reasonable range of alternatives." 42 U.S.C. § 4332(C). Those detailed statements are called "environmental impact statements," or EISs. *Id.* § 4336(b)(1). When a proposed agency action "does not have a reasonably foreseeable significant effect on the quality of the human environment," the agency need only prepare an "environmental assessment," or EA. *Id.* § 4336(b)(2).

### B.   NEPA review and development of the Boca Chica launch site

Over ten years ago, with its launch cadence at other launch sites increasing rapidly, SpaceX began seeking to build and operate a private launch site that would provide needed launch capacity. After extensive evaluation of technological, economic, environmental, and other constraints, SpaceX ruled out other locations and selected a launch site on private land near Boca Chica, Texas. SpaceX then took its proposed launch site to the FAA, which prepared an EIS that evaluated "the

environmental consequences of issuing SpaceX licenses" for launch operations at the site. PEA[1] at 2; Am. Compl., ECF No. 36 ¶ 76. After completing review under NEPA and numerous other laws, the FAA then issued a July 9, 2014 Record of Decision approving SpaceX's construction and operation of the Boca Chica launch site. *See* PEA at 2; Am. Compl. ¶ 76.[2] Since then, SpaceX has invested several billion dollars in the launch site, which now has significant infrastructure installations, including a vertical launch area, launch and landing control center, and other supporting structures that have been in use for many years. *See* Mem. in Supp. of SpaceX's Mot. to Intervene, ECF No. 13-1 at 4. SpaceX has used the site to launch rockets for over five years. *See id.*; Am. Compl. ¶ 64.

### C.   Programmatic NEPA review of Starship-Super Heavy launch operations

SpaceX used the Boca Chica launch site to develop and launch Starship-Super Heavy. Starship-Super Heavy is a fully reusable, super-heavy-lift launch system comprising the Super Heavy first stage, or booster, and the Starship second stage, or spacecraft. PEA at 6, 15-16. By increasing lift capacity, reducing costs by an order of magnitude or more, using liquid methane for fuel, and enabling in-orbit refueling, among other capabilities, Starship-Super Heavy will facilitate advances in science, technology, and space exploration for generations. *See id.* at 6; ECF No. 13-1 at 4. And, after NASA selected Starship for the job in April 2021, those advances will include landing the first astronauts on the moon in a half-century. PEA at 6, 20.

Starting in 2019, SpaceX completed a series of suborbital launches and landings of Starship

---

[1] "PEA" refers to the Programmatic EA that Plaintiff challenge. It is available at https://www.faa. gov/sites/faa.gov/files/2022-06/PEA_for_SpaceX_Starship_Super_Heavy_at_Boca_Chica_FIN AL.pdf and in the existing administrative record at FAA00011354-536.

[2] The 2014 EIS and Record of Decision are available at https://www.faa.gov/space/environmenta l/nepa_docs/spacex_texas_eis and at FAA00035385-36290, FAA00036291-682, and FAA00036683-960.

under launch operator licenses issued by the FAA. *See id.* at 6-7; ECF No. 13-1 at 4. During this time, SpaceX also began developing Super Heavy to take Starship to orbit. ECF No. 13-1 at 4. In early 2021, SpaceX began the process of applying for a license to launch Starship-Super Heavy. *See* PEA at 6-7; ECF No. 13-1 at 5.

To provide a comprehensive review of SpaceX's potential Starship-Super Heavy launch operations and help facilitate NEPA review of subsequent proposed licensing actions, the FAA decided to complete a programmatic NEPA review. PEA at 1-2 (explaining programmatic reviews). Rather than evaluating the effects of granting a license for a single proposed Starship-Super Heavy launch, the FAA reviewed a program of potential launch operations and associated launch infrastructure that SpaceX may pursue, which the FAA called the Starship-Super Heavy Program in its Programmatic EA. The FAA defined the program to include up to five integrated Starship-Super Heavy launches and five suborbital Starship launches annually; landings of both stages; and added launch infrastructure on the existing launch site. *Id.* at 11-12; *see* Am. Compl. ¶¶ 3, 61. The Programmatic EA further recognized that "SpaceX may require a number of new or modified" licenses for future launches and explained that any new or supplemental NEPA review for those future launch licenses could build on the Programmatic EA. PEA at 1-2. On June 13, 2022, after completing this broad review, the FAA issued a Finding of No Significant Impact/Record of Decision (FONSI/ROD)[3] documenting its decision to approve the Starship/Super Heavy Program and proceed to consider proposed launch operator licenses that would authorize launch activities within the scope of the evaluated program, subject to subsequent FAA review confirming compliance with NEPA, the CSLA, and other laws. FONSI/ROD at 40; *see* Am. Compl. ¶¶ 3, 61.

---

[3] *Available at* https://www.faa.gov/sites/faa.gov/files/2022-06/20220613%20SpaceX%20Starship%20Super%20Heavy%20at%20Boca%20Chica_FONSI_ROD%20Final.pdf and FAA00010295-334.

### D.   FAA licensing and review of Starship-Super Heavy launches

SpaceX received its first FAA license to launch Starship-Super Heavy from Boca Chica on April 14, 2023, after the FAA prepared a "Written Reevaluation" of potential environmental effects finding no new or supplemental NEPA review was needed. Apr. 2023 WR at 1-2.[4] That license allowed one launch on a specific trajectory, with water landings of Super Heavy offshore in the Gulf of Mexico and of Starship in the Pacific Ocean. *See* Am. Compl. ¶ 94.[5]

Before it could launch Starship-Super Heavy again, SpaceX had to ask the FAA for a license modification authorizing its second launch and several improvements to the launch system. Those improvements included a reinforced pad foundation capped with a steel plate, a cooling element called a deluge water system, and a forward heat shield interstage to protect Super Heavy against heat produced by the Starship engines during the separation of Super Heavy from Starship. Nov. 2023 WR at 2-3;[6] *see* Am. Compl. ¶¶ 101-06 (discussing improvements to the launch system and vehicle evaluated in the Nov. 2023 WR). In reviewing the request, the FAA considered whether new information about the first launch or changes to proposed launch operations for the second launch required more NEPA review. The agency documented its analysis in another Written Reevaluation, which concluded that additional NEPA review was not needed. Nov. 2023 WR at 1-2; Am. Compl. ¶ 101. The FAA also completed additional safety review under the CSLA, and both the FAA and the U.S. Fish and Wildlife Service completed additional review under the

---

[4] *Available at* https://www.faa.gov/media/27271 and FAA00010405-526. Under Order 1050.1F ¶ 9-2, the FAA prepares Written Reevaluations to determine whether additional NEPA review is required before taking a major federal action that may be supported by prior review. *See* https://www.faa.gov/documentLibrary/media/Order/FAA_Order_1050_1F.pdf.

[5] The license is available at https://www.faa.gov/about/office_org/headquarters_offices/ast/licenses_permits/media/VOL_23-129_SpaceX_Starship-Super_Heavy_License_and_Orders_2023-04-14.pdf and FAA00009261-65.

[6] *Available at* https://www.faa.gov/media/72816.

Endangered Species Act. Based on this thorough review, the FAA modified the license to authorize a second Starship-Super Heavy launch. *See* Am. Compl. ¶ 14. SpaceX then launched Starship-Super Heavy a second time in November 2023. *Id.*

For its third launch, SpaceX proposed landing Starship-Super Heavy in the Indian Ocean. Because the FAA had not considered the Indian Ocean as a potential landing area in its Programmatic EA, it prepared a new, "tiered" EA to study the proposed license modification. When that tiered EA found no significant environmental effects, the FAA modified SpaceX's launch license again. Tiered EA at 2.[7]

In June 2024—after the FAA completed another Written Evaluation and license modification—SpaceX launched Starship-Super Heavy a fourth time.[8] *See* Am. Compl. ¶ 15.

### E.    Plaintiffs' Complaint and Amended Complaint

Plaintiffs sued the FAA in May 2023, almost six months after the FAA approved the launch program and after the FAA licensed and SpaceX conducted the first Starship-Super Heavy launch. Compl., ECF No. 1. They alleged that "[t]he FAA's authorization of the Starship-Super Heavy Launch Vehicle Program at Boca Chica, Texas is a major federal action that requires compliance with NEPA." *Id.* ¶ 96. In Plaintiffs' incorrect view, the FAA failed to follow NEPA when it licensed the launch. *Id.* ¶¶ 97-101.

Plaintiffs' original Complaint also argued that the FAA's "failure to supplement" its environmental review in light of what they called the "failed" April 2023 launch violated NEPA. *Id.* ¶ 102. The effects of the April 2023 launch, they said, "reinforce[] the need for an EIS for the Starship-Super Heavy Launch Program." *Id.* At the same time, Plaintiffs admitted that the April

---

[7] *Available at* https://www.faa.gov/media/76836.

[8] The license modification issued in June 2024 is available at https://drs.faa.gov/browse/excelExternalWindow/DRSDOCID17389121862023110214050 6.0001.

2023 launch was authorized by a separate license supported by a Written Reevaluation, not by the FONSI/ROD that followed the Programmatic EA. *Id.* ¶¶ 93-94.

More than a year after filing their original Complaint, Plaintiffs filed an Amended Complaint. ECF No. 36. Plaintiffs added a series of new allegations about the FAA's Nov. 2023 WR, which preceded the FAA's authorization of the second Starship-Super Heavy launch. *See id.* ¶¶ 101-06, 122. Plaintiffs also continue to claim that the FAA must supplement the Programmatic EA in light of information arising after the FAA finalized that document and issued the 2022 FONSI/ROD approving the launch program. *Id.* ¶ 122. Plaintiffs also claim that a third party's report on monitoring of the fourth launch showed "destruction of migratory bird nests" in violation of the MBTA, which requires supplemental NEPA review and an EIS. *Id.* ¶¶ 107, 123-24.

### III.    ARGUMENT

SpaceX moves to dismiss Plaintiffs' claim for NEPA supplementation and claims based on alleged violations of the MBTA. Although SpaceX disputes many of the factual allegations in the Amended Complaint, this motion assumes they are all true and explains why Plaintiffs' claims nonetheless fail as a matter of law. In ruling on this Rule 12(b)(6) motion, the court may consider the facts alleged in the complaint; documents attached as exhibits or incorporated by reference in the complaint; and matters about which the court may take judicial notice, such as "official court records" and other publicly available government records. *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006).

### A.    Because the Amended Complaint combines multiple claims into one count, SpaceX seeks partial dismissal.

Plaintiffs' 40-page, 124-paragraph Amended Complaint contains just one "claim for relief." That claim's heading alleges that the FAA "has violated" NEPA, "applicable regulations," and the Administrative Procedure Act. Am. Compl. at 36. After realleging "each and every

allegation contained in the preceding paragraphs," Plaintiffs appear to assert a jumbled list of different FAA actions that violated these laws, including when the FAA "unlawfully delegate[ed]" a NEPA determination to SpaceX; when the FAA issued a FONSI/ROD approving the Starship-Super Heavy program; when, after a launch in April 2023, the FAA did not "prepare a supplemental" environmental review document in preparing the Nov. 2023 WR and licensing the third launch; and when, after the fourth flight in June 2024 allegedly harmed migratory bird nests, the FAA did not "supplement its NEPA analysis." *Id.* ¶¶ 114-24. They also allege claims under section 706(1) of the Administrative Procedure Act seeking to compel the FAA to supplement the Programmatic EA based on information that arose after it was finalized. *Id.* ¶¶ 121-24 (citing 5 U.S.C. § 706(1)). On top of all that, Plaintiffs assert that SpaceX's "routine operations . . . are causing and will continue to cause violations of the MBTA," and that those violations must be reviewed in an EIS instead of an EA. *Id.* ¶ 123.

Under Rule 10(b), "each claim founded on a separate transaction or occurrence . . . must be stated in a separate count" if such separation "would promote clarity." Fed. R. Civ. P. 10(b). Here, in Plaintiffs' own telling, their varied legal claims rest on different agency actions, including the FAA's Programmatic NEPA review and FONSI/ROD approving the Starship-Super Heavy Program, and at least two of the FAA's four separate decisions to license different launches to date and their associated NEPA documentation, along with alleged failures to act untethered to any final agency action. Because Plaintiffs assert their claims under the Administrative Procedure Act, each of these agency actions must be challenged and reviewed based on their own administrative records. 5 U.S.C. §§ 704, 706. By cramming their challenges to different agency actions and alleged inactions into a single count, Plaintiffs prejudice SpaceX by burying their legally deficient claims, seemingly to make it harder to dismiss them.

When faced with similar situations, other courts have allowed defendants to treat a single count with multiple claims as if the claims had been properly separated under Rule 10(b). So while it may be true that Rule 12(b)(6) does not contemplate "piecemeal dismissals of *parts* of claims," *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (emphasis in original), SpaceX is not moving to dismiss parts of Plaintiffs' claim. SpaceX is moving to dismiss entire claims that have been improperly combined into one count. And courts have regularly allowed motions to dismiss the distinct pieces of such "portmanteau claims." *loanDepot.com v. CrossCountry Mortg., Inc.*, 399 F. Supp. 3d 226, 236 (D.N.J. 2019) (discussing cases); *see also Verizon Wash., D.C., Inc. v. United States*, 254 F. Supp. 3d 208, 219 (D.D.C. 2017) (dismissing certain counts "only to the extent the claims arise from" duties with no legal basis). This Court should do the same.

**B.   The Court should dismiss Plaintiffs' NEPA supplementation claims.**

While NEPA does not address "post-decision" environmental review, the Supreme Court has recognized that agencies must supplement a NEPA document in certain, narrow circumstances. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 370-71 (1989). When an action is "completed," the agency's NEPA responsibilities are over. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 73 (2004). But when an agency action remains "incomplete or ongoing," the agency may have to supplement its EA or EIS where new information or changes to the proposed federal agency action "provides a *seriously* different picture of the environmental landscape." *City of Olmsted Falls v. FAA*, 292 F.3d 261, 274 (D.C. Cir. 2002) (emphasis in original); *see* 40 C.F.R. § 1502.9(d); *Marsh*, 490 U.S. at 374 (asking first whether "there remains major Federal action to occur" (brackets and internal quotation marks omitted)). Here, Plaintiffs seek to compel supplementation of the Programmatic EA when the FAA already took the relevant proposed action that document reviewed.

As Plaintiffs admit, the FAA's Programmatic EA studied SpaceX's proposed "Starship-Super Heavy Launch Vehicle Program"—a broad "plan to launch [] Starship-Super Heavy rockets

. . . over the next 5 years."[9] Am. Compl. ¶ 3. When the FAA approved that plan, it found that

SpaceX's expected launch operations and additional launch infrastructure would not significantly

affect the environment. *Id.* ¶ 61. But approving the Starship-Super Heavy Program did not itself

license any specific launches. Instead, as Plaintiffs also recognize, the FAA has acted separately

to approve a launch vehicle operator license for each subsequently proposed Starship-Super Heavy

launch. *Id.* ¶¶ 14, 94, 101. And before taking each of those launch-approval actions, the FAA has

considered the need for additional NEPA review. The result of that consideration was either a

Written Reevaluation explaining why more review was unnecessary or, for one launch, an EA

addressing potential new effects.[10]

This distinction between agency action approving the Starship-Super Heavy Program as a

whole and later licensing individual launches parallels the situation addressed by the D.C. Circuit

in *Western Organization of Resource Councils v. Zinke*, 892 F.3d 1234 (D.C. Cir. 2018). There, a

coalition of environmental groups sought to force the Department of the Interior to supplement the

programmatic EIS it had prepared for its decision to operate a coal leasing program on federal

lands. *Id.* at 1236-37. In support of their claims, the groups argued that the programmatic EIS for

the coal leasing program failed to account for the effects of climate change. *Id.* at 1240.

The D.C. Circuit rejected the environmental groups' argument. It reasoned that because the

---

[9] Plaintiffs allege incorrectly that the Programmatic EA evaluated "20 Starship-Super Heavy rocket per year." Am. Compl. ¶ 3. The Programmatic EA states that the FAA evaluated up to ten launches per year, including up to five orbital Starship-Super Heavy launches and five suborbital Starship launches. PEA at 17.

[10] The FAA's process was consistent with CEQ guidance on use of programmatic NEPA reviews, which recommends screening new information to decide whether additional review is needed before taking subsequent major federal actions. CEQ, Mem. from Michael Boots, Effective Use of Programmatic NEPA Reviews at 43-44 (Dec. 18, 2014), *available at* https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Effective_Use_of_Programmatic_NEPA_Reviews_Final_Dec2014_se archable.pdf.

agency had "established an approach for managing resources," its action was complete when it adopted the *program*. *Id.* at 1243. And no supplemental review is required after a major federal action is completed. *Id.* True, the agency had since "continued to engage in activities governed by the overarching scheme," including "specific licensing decisions." *Id.* at 1243-44. But the environmental groups remained free to "challenge" those subsequent licensing decisions under NEPA, and each would be evaluated on their own record of NEPA compliance. *Id.* at 1244-45.

In reaching these conclusions, the D.C. Circuit leaned heavily on the Supreme Court's decision in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004). That decision similarly emphasized that "approval of a land use plan is a major Federal action" that "is completed when the plan is approved." *Id.* at 73 (brackets, emphasis, and internal quotation marks omitted). "It did not matter that the plan continued to govern actions that took place after the [plan's] approval." *Zinke*, 892 F.3d at 1243 (citing *Norton*, 542 U.S. at 73).

Other courts have reached the same conclusion. For example, in *Center for Biological Diversity v. Salazar*, when the Department of the Interior first approved an overall mining operation plan for a private uranium mine on federal land, and later made additional approvals needed before the mining company could restart mining operations, the Ninth Circuit held plaintiffs could not state a supplemental NEPA claim challenging the mining plan approval. 706 F.3d 1085, 1094-95 (9th Cir. 2013). The court explained that even though the later agency actions were "a prerequisite" to the fulfillment of the larger plan, those actions did not undercut "the validity or completeness" of the agency's decision to approve the larger plan. *Id.* at 1095. "These additional, independent actions thus did not trigger NEPA supplementation . . . ." *Id.* Similarly, in *Greater Yellowstone Coalition v. Tidwell*, the Tenth Circuit held that plaintiffs could not state a supplemental NEPA claim challenging a Forest Service's decision to issue a permit allowing Wyoming to feed elk on

federal lands based on new information then emerged about disease threats at the feedground. 572 F.3d 1115, 1122-23 (10th Cir. 2009). The Court explained that "the Forest Service's approval and issuance of the [] permit, like BLM's approval of the land use plan . . . was the major federal action contemplated by NEPA," and because that action "was completed when the permit was approved and issued," no federal action remained. *Id.* at 1123. Indeed, even though the Forest Service "retain[ed] discretion to amend the permit," this did not mean there was "ongoing major federal action or major federal action to occur" that could support a NEPA supplementation claim. *Id.*[11]

As in these cases, Plaintiffs' supplementation claim must fail here. The FAA's Programmatic EA evaluated its proposed decision to approve SpaceX's five-year launch *plan*. That proposed decision to approve a plan was completed when the FAA issued the FONSI/ROD. It does not matter that the FAA later made separate decisions authorizing individual SpaceX launches. Plaintiffs cannot compel the FAA to complete a supplemental EA or EIS because the FAA already made its decision to approve the Starship-Super Heavy Program.

### C.    The Court should dismiss Plaintiffs' claims based on alleged unintentional harm to migratory birds in violation of the MBTA.

Plaintiffs' Amended Complaint also seems to claim that the FAA violated the Migratory Bird Treaty Act. But they again blur the lines between their arguments. In some places they suggest that "evidence of MBTA violations" simply "underscores the need for additional environmental review under NEPA." Am. Compl. ¶ 112. Elsewhere—including in the part of the Amended Complaint labeled "First Claim for Relief"—Plaintiffs say that "the routine operations of SpaceX are

---

[11] *See also, e.g.*, *Cold Mountain v. Garber*, 375 F.3d 884, 894 (9th Cir. 2004) (similar); *In re Mont. Wilderness Ass'n*, No. CV-09-95-GF-SEH, 2010 WL 11470325, at *2 (D. Mont. Dec. 6, 2010) (dismissing a NEPA supplementation claim because no major federal action remained after the agency approved a Resource Management Plan and renewed a livestock grazing permit, and explaining that Plaintiffs must direct their challenge at "future [actions] approving separate grazing permits," which "are not to be challenged until they are final, and . . . must be reviewed based upon their own, distinct administrative record").

causing and will continue to cause violations of the MBTA." *Id.* ¶ 123. To the extent these allega-tions are meant to state a claim under the MBTA or a NEPA claim based on MBTA violations, that claim must fail. The MBTA does not bar harm to migratory birds that is the unintended by-product of lawful commercial activity like SpaceX's. Nor is the FAA responsible for ensuring SpaceX's activities comply with the MBTA.

### 1. The MBTA's plain language prohibits only intentional, hunting-related actions.

The MBTA was enacted over a century ago to implement a treaty aimed at over-hunting, as discussed below. To that end, the Act's plain language bars direct, intentional harm to protected migratory birds. *See* 16 U.S.C. § 703(a).  It does not cover incidental harm that may result from lawful commercial activity—and that sort of incidental harm is all that Plaintiffs allege here.

### 2. Both the treaty that the MBTA implements and the common law apply only to intentional harm.

The MBTA implements a 1916 treaty between the United Kingdom—acting on behalf of Canada—and the United States. *See* Convention between the United States and Great Britain for the Protection of Migratory Birds, Aug. 16, 1916, 39 Stat. 1702. That treaty sought to prevent unsustainable hunting and to save migratory birds "from indiscriminate slaughter . . . ." *Id.* at 1701. To achieve that purpose, the treaty required its signatories to establish "close[d] seasons" during which hunting is not allowed, *id.* at 1703 (art. II); to prohibit the "taking of nests or eggs," *id.* at 1704 (art. V); and to provide for permits that would allow the killing of protected birds only under specific circumstances, *id.* at 1704 (art. VII).[12]

Consistent with these treaty provisions, the MBTA's text focuses first on hunting-related

---

[12] Since its enactment, the MBTA has been amended to reflect similar treaties and conventions regarding the hunting and commercial use of migratory birds with Japan, Mexico, and the Soviet Union. *See McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 469 n.1 (5th Cir. 2014).

actions that are intended to harm migratory birds. The Act's key part, section 2(a), prohibits five main types of conduct: "pursuing," "hunting," "capturing," "killing," or "taking," as well as related actions like "selling," "bartering," "importing," or "exporting" birds. 16 U.S.C. § 703(a). The meaning of the words "pursuing," "hunting," and "capturing" is so plain that neither Plaintiffs nor anyone else would suggest that the activities described in the Amended Complaint qualify. That leaves "taking" and "killing." But those terms do not describe SpaceX's alleged conduct either.

The MBTA lacks a definition for "taking," but that term has a deeply rooted common law meaning: to "reduce . . . animals, by killing or capturing, to human control." *United States v. CITGO Petroleum Corp.*, 801 F.3d 477, 489 (5th Cir. 2015) (quoting *Babbitt v. Sweet Home Chapter Cmtys. For a Great Or.*, 515 U.S. 687, 717 (1995) (Scalia, J., dissenting)). Thus, "taking" at common law meant something intentional. And because courts presume that "Congress intends to adopt the common law definition of statutory terms," *United States v. Shabani*, 513 U.S. 10, 13 (1995), the use of the word "taking" in the MBTA must carry its common law meaning.[13] That presumption is consistent with the applicable MBTA rules, which define "take" to mean "pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to [do so]." 50 C.F.R. § 10.12. As used in the MBTA, then, "taking" refers to intentional, hunting-related actions. *CITGO*, 801 F.3d at 491 (finding that "take" "assumes its common law definition" under the MBTA).

The term "killing" lacks a similar common-law history. In the abstract, it could suggest something unintentional. But in the MBTA, the term "killing" appears in a list with four other

---

[13] *See also Kepner v. United States,* 195 U.S. 100, 124 (1904) ("[L]anguage used in a statute which has a settled and well-known meaning . . . is presumed to be used in that sense[.]"); *George v. McDonough*, 596 U.S. 740, 746-47 (2022) (explaining that when Congress uses an undefined term of art in a statute that had a specific meaning and history prior to the statute's enactment, courts will assume that term carries its traditional meaning in the statute); *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-185 (1988) ("[W]e generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.").

terms, each of which refers to intentional, hunting-related actions. And in general, "words grouped in a list should be given related meaning." *Third Nat'l Bank v. Impac, Ltd.*, 432 U.S. 312, 322 (1977); *see Beecham v. United States,* 511 U.S. 368, 371 (1994) (The fact that "several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well.").[14] So when Congress put the word "killing" in a list with four other words that describe intentional, hunting-related actions, it makes sense that Congress intended "killing" that way too.

Most circuits facing this question have agreed that the MBTA applies only to intentional, hunting-related actions. The Eighth Circuit held that "the ambiguous terms 'take' and 'kill' in 16 U.S.C. § 703 mean physical conduct of the sort engaged in by hunters and poachers, conduct which was undoubtedly a concern at the time of the statute's enactment in 1918." *Newton Cnty. Wildlife Ass'n v. U.S. Forest Serv.*, 113 F.3d 110, 115 (8th Cir. 1997). The Ninth Circuit similarly concluded that habitat destruction was not "taking" under the MBTA, even if it led indirectly to migratory bird deaths. *Seattle Audobon Soc'y v. Evans,* 952 F.2d 297, 303 (9th Cir. 1991). And the Fifth Circuit has held that "taking" under the MBTA "is limited to deliberate acts done directly and intentionally to migratory birds." *CITGO*, 801 F.3d at 488-89.[15] By contrast, "lawful

---

[14] This is sometimes called the "associated words canon" or *noscitur a sociis*. *See* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 195-98 (2012).

[15] The Tenth Circuit, finding itself bound by circuit precedent that addressed mens rea under the MBTA, has reached the opposite conclusion. *See United States v. Apollo Energies, Inc.*, 611 F.3d 679, 685-86 (10th Cir. 2010) (holding that the MBTA is violated when "unprotected oil field equipment" takes or kills migratory birds). The court distinguished *Newton County* as "test[ing] the far reaches" of the MBTA, but did not address the substance of the Eighth Circuit's argument, much less the other arguments presented here. The Fish and Wildlife Service's most recent rule implementing the MBTA sides with the courts that have found the MBTA applicable to "incidental takes"—reversing the previous administration's position. *See* 86 Fed. Reg. 54642, 54644 (Oct. 4, 2021). At the same time, the Service's new rule commits to enforcing the MBTA "consistent with applicable case law." *Id.* at 54647. Since Boca Chica, Texas is in the Fifth Circuit, the "applicable case law" for any MBTA enforcement action would be *CITGO*, which rejects incidental takes under the MBTA.

commercial activity, such as logging, that is unrelated to hunting or poaching and not directed at birds does not constitute a crime under the [MBTA]." *United States v. Brigham Oil & Gas, L.P.*, 840 F. Supp. 2d 1202 (D. N.D. 2012).

Underscoring these holdings, the Supreme Court has emphasized that laws enacted to implement a treaty must be interpreted based on that treaty's purpose. *See Bond v. United States*, 572 U.S. 844, 855-56 (2014) (holding that a treaty's focus on "war crimes and acts of terrorism" meant that it did not apply to an individual's "common law assault" with household chemicals). Thus, any fair reading of the MBTA must account for the 1916 treaty's goal of creating a closed season during which hunting and transporting birds is prohibited, and for the fact that the treaty never even mentions the sort of unintentional conduct or incidental harms to birds targeted by the Amended Complaint. 39 Stat. at 1704-05 (art. III-VI). Applying the Supreme Court's holding in *Bond*, the 1916 treaty's focus on intentional, hunting-related actions confirms that the MBTA does not extend to commercial activity that only incidentally harms migratory birds.

### 3.   The contrast with the Endangered Species Act shows that the MBTA does not apply to unintentional harm.

Unlike the MBTA, the Endangered Species Act (ESA) includes a statutory definition for the word "take." That definition includes more than just intentional, hunting-related terms. 16 U.S.C. § 1532(19). Indeed, the ESA's use of the word "harm" to define "take" led the Supreme Court to conclude that the ESA expands "take" beyond its common-law meaning to include indirect or incidental harm to protected species. *See Babbitt v. Sweet Home Chapter of Cmtys. For a Great Or.*, 515 U.S. 687, 701-04 (1995); *CITGO*, 801 F.3d at 489-90 (citing the ESA and *Sweet Home*'s interpretation of "harm" and observing that "Congress well knew how to expand 'take' beyond its common law origins to include accidental or indirect harm to animals"). The Court further reasoned that the ESA's permitting provisions suggest a broader meaning for "take"

because they expressly contemplate permits for "incidental" takes. *Sweet Home*, 515 U.S. at 700. Such permits would not be necessary, the Court concluded, unless the ESA "prohibit[ed] indirect as well as deliberate takings." *Id.*

The contrast between the ESA and the MBTA on these key points is stark. The MBTA— which predates the ESA by more than a half-century—does not define the word "taking," nor does it contemplate "incidental take" permits. Even the regulations implementing the MBTA do not define "take" using the broader terms like "harass" or "harm" that are found in the ESA definition. *See* 50 C.F.R. § 10.12. These "differences in the proscribed conduct under the ESA and MBTA are," as the Ninth Circuit put it, "distinct and purposeful." *Evans*, 952 F.2d at 303. Congress knew "how to expand 'take' beyond its common-law origins," but in the MBTA, it chose not to. *CITGO*, 801 F.3d at 490.

### 4. Expanding the MBTA to include unintentional harm would have absurd results.

If the MBTA were read to prohibit unintentional, incidental harm to migratory birds, it would create a degree of liability that is "hard to overstate." *CITGO*, 801 F.3d at 493; *see also Brigham Oil*, 840 F. Supp. 2d at 1213. The MBTA protects hundreds of bird species, including some of the most common and least endangered species, like the pigeon and sparrow. *See* 50 C.F.R. § 10.13. And since the leading causes of bird deaths include windows, cars, and household cats, an expansion of the MBTA to include unintentional actions would impose liability on "owners of big windows, communication towers, wind turbines, solar energy farms, cars, cats, and even church steeples." *CITGO*, 801 F.3d at 493-94. That cannot be what Congress wanted.

Criminalizing millions of accidental migratory bird deaths would violate the established canon against interpreting statutes in a way that brings absurd results, along with the cannon requiring a law that imposes criminal penalties to be strictly construed. *See Griffin v. Oceanic*

*Contractors,* 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *CITGO*, 801 F.3d at 482 (explaining that "where, as here, a regulatory violation carries criminal penalties, the regulation must be strictly construed and cannot be enlarged by analogy or expanded beyond the plain meaning of the words used" (internal quotation marks omitted)). If the MBTA criminalized "everyday lawful activities" like driving, operating an airline, or even owning a cat, it would be absurd. *Id.* As the Eighth Circuit put it, reading the MBTA to bar an action that "indirectly results in the death of migratory birds" would "stretch" the statute "far beyond the bounds of reason." *Newton Cnty.*, 113 F.3d at 115.

### 5. SpaceX's launches cannot violate the MBTA because they are not intentional, hunting-related actions.

Plaintiffs' claim that SpaceX's launches violate the MBTA by harming migratory birds and thus the FAA must prepare an EIS under NEPA fails. Plaintiffs never allege that SpaceX is hunting migratory birds or otherwise trying to harm them. Every harm they allege is instead an incidental byproduct of SpaceX's permitted operations. A launch from Boca Chica could incidentally affect migratory birds in the same way as an airplane passing through a flock of geese or a car hitting a bird on a freeway. But such unintentional harm does not violate the MBTA.

Applying this common-sense interpretation of the MBTA, courts have regularly refused to find violations in ordinary commercial activity (or inactivity) that unintentionally harms migratory birds. The Fifth Circuit, for example, held that an oil company did not violate the MBTA when birds died after landing in the company's uncovered oil-water separator tanks. *CITGO*, 801 F.3d at 480, 488-94. The court explained that the MBTA could not be violated "accidentally or by

19

omission." *Id.* at 489. Other courts have taken the same view.[16]

Plaintiffs' MBTA claims against SpaceX are no different from the failed claims in these other cases. Even taking the facts in the Amended Complaint as true, they do not allege intentional harm to migratory birds. They assert only that SpaceX's "launch program" has "increased vehicle traffic causing mortality" to migratory birds; that the "debris field" from an April launch "included designated critical habitat" for a migratory bird; that "fast flying debris associated with" another launch may have damaged migratory bird nests and eggs; and, more broadly, that SpaceX's "routine operations" "are causing and will continue to cause violations of the MBTA." Am. Compl. ¶¶ 70, 96, 107, 123. None of those assertions comes close to the kind of intentional, hunting-related harm to migratory birds that the MBTA prohibits. Thus, any claim based on SpaceX allegedly violating the MBTA must be dismissed.

### 6. Plaintiffs fail to state a claim that alleged MBTA violations require supplemental NEPA review.

Plaintiffs also see their claims of an MBTA violation as leverage for winning supplemental NEPA review. They wrote a letter to the FAA arguing that "evidence of MBTA violations underscores the need for additional review under NEPA," *id.* ¶ 112, and they assert that "the destruction of migratory bird nests in violation of the MBTA constitutes substantial new circumstances or information" requiring the FAA "to supplement its NEPA analysis," *id.* ¶ 123. This claim is incorrect as a matter of law.

---

[16] *See Curry v. U.S. Forest Serv.*, 988 F. Supp. 541, 549 (W.D. Pa. 1997) (concluding that the loss of migratory birds as a result of logging operations did not violate the MBTA); *Citizens Interested in Bull Run, Inc. v. Edrington*, 781 F. Supp. 1502, 1510 (D. Or. 1991) (holding that diminishment of owl habitat under Forest Service's proposed timber sale would not cause a "taking" under the MBTA); *Newton Cnty.*, 113 F.3d at 115 (holding timber sale would not violate the MBTA); *United States v. Ray Westall Operating, Inc.*, 2009 WL 8691615, *7 (D. N.M. Feb. 25, 2009) (holding that oil company did not violate the MBTA when birds died after flying into company's oil pit); *Brigham Oil*, 840 F. Supp. at 1213-14 (same).

To start, even if SpaceX had violated the MBTA during one of its separately licensed launches, this would not require preparation of a supplemental Programmatic EA. As explained above, the Programmatic EA supported the FAA's decision to approve the Starship-Super Heavy Program. Because that decision was complete when made, there is no proposed agency action to be reviewed, and thus no supplementation is required. *See Norton*, 542 U.S. at 73; *W. Org. of Res. Councils*, 892 F.3d at 1241-43. Later actions—in this case, later decisions to license proposed launches—have their own NEPA processes. *See W. Org. of Res. Councils*, 892 F.3d at 1243. Those separate NEPA processes for subsequent agency actions are the proper place for Plaintiffs' claims.

Beyond that insurmountable obstacle, Plaintiffs' claim that MBTA violations require more NEPA review fails for the same reason that their MBTA claims themselves do: SpaceX did not violate the MBTA. CEQ's NEPA rules may require agencies to consider potential violations of other environmental laws when deciding whether effects are significant, *see* 40 C.F.R. § 1501.3(d), but when no violation occurs, that rule is irrelevant.

### 7. The Court should dismiss any claim that the FAA must ensure SpaceX's compliance with the MBTA.

Most of Plaintiffs' MBTA-related allegations turn on a June 6, 2024, report that Plaintiffs sent to the FAA, and that supposedly "documents" harm to migratory bird nests. *See, e.g.*, Am. Compl. ¶¶ 110, 112, 123. But the FAA's knowledge of those allegations cannot support an MBTA claim either. Rather, because the MBTA applies only to intentional, hunting-related harm, the MBTA cannot apply to a federal agency's decision to permit private commercial conduct unrelated to hunting.

If a party engaged in commercial activity does not violate the MBTA when it unintentionally harms a migratory bird, then, even more so, the agency that permitted the commercial activity does not violate the law. That is why the Ninth Circuit has held that "the MBTA does not

contemplate attenuated secondary liability on agencies" acting as regulators, even if the activities they permit "will inevitably result in migratory-bird fatalities." *Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 585 (9th Cir. 2016). The situation is different, of course, when an agency acts *directly* to harm migratory birds. *Humane Soc'y v. Glickman*, 217 F.3d 882, 887-88 (D.C. Cir. 2000) (reviewing Agriculture Department program to capture and kill Canadian geese). But when there is "no allegation that" the agency's action "will directly result in the taking of migratory birds," the MBTA does not apply. *Friends of the Cap. Crescent Trail v. Fed. Transit Admin.*, 255 F. Supp. 3d 60, 75 (D.D.C. 2017); *see also Pub. Emps. for Envtl. Resp. v. Beaudreau*, 25 F. Supp. 3d 67, 117 (D.D.C. 2014) (holding that agency "did not violate the [MBTA] by merely approving a project that, if ultimately constructed, might result in the taking of migratory birds.").

Again, a comparison with the ESA is helpful. Under the ESA, it is "unlawful for any person" to "solicit another to commit or cause to be committed" any violation of the ESA. 16 U.S.C. § 1538(g). But the MBTA has no such "solicitation" rule. All that matters under the MBTA is "whether someone has killed or is attempting to kill or capture or take a protected bird." *Glickman*, 217 F.3d at 885. In other words, the MBTA imposes liability only for direct actions, not permissive ones.

Plaintiffs' allegations in the Amended Complaint fail to state a claim that the FAA has violated the MBTA. They claim to have sent a letter to the FAA complaining about "conclusive evidence of MBTA violations" and arguing for "additional review under NEPA." Am. Compl. ¶ 112. And they argue that the "destruction" of migratory bird nests requires "supplemental NEPA analysis." *Id.* ¶ 124. But neither of those assertions makes out a claim under the MBTA because the MBTA does not apply to the FAA's permitting decisions. *Protect Our Cmtys.*, 825 F.3d at 585. Thus, any MBTA claim against the FAA should be dismissed.

**D.   In the alternative, the Court should require Plaintiffs to file a more definite statement of their claims.**

If the Court decides not to address Plaintiffs' "portmanteau claims" separately, *loanDepot.com*, 399 F. Supp. 3d at 236, it should still require Plaintiffs to file a more definite statement under Rule 12(e). That rule offers relief when a defendant cannot "understand the precise nature of the claims against it." *Cheeks v. Fort Myer Constr. Corp.*, 71 F. Supp. 3d 163, 169 (D.D.C. 2014). Plaintiffs' Amended Complaint is a prime example of such a failure.

For the sake of "clarity," Rule 10(b) requires that "each claim founded on a separate transaction or occurrence . . . must be stated in a separate count or defense." Fed. R. Civ. P. 10(b). Yet Plaintiffs' Amended Complaint contains just one count, even though it appears to contain claims tied to at least: (1) the FAA's environmental review supporting its original decision to approve the Starship-Super Heavy Program; (2) the FAA's decision not to conduct new or supplemental environmental review after SpaceX's April 2023 launch before deciding to license a subsequent proposed launch; (3) the FAA's decision not to prepare a new or supplemental environmental review after SpaceX's June 2023 launch in deciding to license a subsequent proposed launch; and (4) the FAA's and SpaceX's alleged violations of the MBTA. Am. Compl. ¶¶ 114-124. Each of these claims involves a separate transaction and occurrence—in this case, an agency action—and each would have its own administrative record.

SpaceX believes moving to dismiss part of Plaintiffs' single-count Amended Complaint is the most efficient way to address those separate claims that fail as a matter of law. But if the Amended Complaint remains too murky for a motion to dismiss, a more definite statement is the best remedy. Indeed, courts in this district have regularly ordered more definite statements when they could help resolve a dispositive threshold issue. *See, e.g.*, *Verizon Wash., D.C.*, 254 F. Supp. 3d at 219 (ordering a more definite statement to decide whether the complaint sufficiently alleged

a claim not barred by the independent contractor exception to the Federal Tort Claims Act); *Powers-Bunce v. District of Columbia*, 479 F. Supp. 2d 146, 155 (D.D.C. 2007) (ordering a more definite statement when the complaint's allegations were "too vague and conclusory" to address the threshold issue of qualified immunity). SpaceX's motion to dismiss addresses similar threshold issues involving Plaintiffs' claims for NEPA supplementation and violations of the MBTA. Requiring Plaintiffs to file more definite statement of their claims in separate counts, as required by Rule 10(b), would not only enable targeted motions practice on dispositive threshold issues but also clarify what agency actions and associated administrative records are at issue, facilitating orderly litigation. Thus, if the Court needs more information from Plaintiffs before it can address SpaceX's arguments, it should order a more definite statement.

## IV.    CONCLUSION

Plaintiffs' claims that FAA should supplement its Programmatic EA and that SpaceX and the FAA have violated the Migratory Bird Treaty Act should be dismissed. In the alternative, Plaintiffs should be directed to file a more definite statement of their claims.

Dated: September 13, 2024                             Respectfully submitted,

                                                      /s/ Tyler G. Welti
                                                      Tyler G. Welti (D.C. Bar No. 1015691)
                                                      VENABLE LLP
                                                      101 California St. Suite 3800
                                                      San Francisco, CA 94111
                                                      Phone: 415-653-3714
                                                      Fax: 415-653-3755
                                                      tgwelti@venable.com

                                                      Jay C. Johnson (D.C. Bar No. 487768)
                                                      VENABLE LLP
                                                      600 Massachusetts Ave., N.W.
                                                      Washington, DC 20001
                                                      Phone: 202-344-4698

Fax: 202-344-8300
jcjohnson@venable.com

*Attorneys for Intervenor-Defendant Space
Exploration Technologies Corporation*