UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, <br><br> *Plaintiffs* <br><br> v. <br><br> FEDERAL AVIATION ADMINISTRATION, *et al.*, <br><br> *Defendants* <br><br> and <br><br> SPACE EXPLORATION TECHNOLOGIES CORP., <br><br> *Defendant-Intervenor*. | Civil Case No. 1:23-cv-1204-CJN |

**PLAINTIFFS' OPPOSITION TO INTERVENOR-DEFENDANT'S MOTION
TO DISMISS PLAINTIFFS' AMENDED COMPLAINT
OR FOR A MORE DEFINITE STATEMENT**

**I.   INTRODUCTION**

This case concerns the Federal Aviation Administration's (FAA) failure to comply with the requirements of the National Environmental Policy Act (NEPA) for the permitting of Starship/Super launches at the SpaceX facility at Boca Chica, Texas. Plaintiffs initially brought a claim under NEPA regarding the FAA's decision not to conduct a full Environmental Impact Statement (EIS) when approving 10 Starship/Superheavy launches per year over 5 years. Given the clearly significant impacts associated with launching the largest rockets known to humankind directly adjacent to protected wildlife refuge lands that provide critical habitat for protected

1

species, SpaceX's history of rocket explosions at Boca Chica (called anomalies), as well as the harm from the intense noise, heat, and light associated with launches, and the impacts of frequent closures of the area that adversely affect the local community, an EIS was clearly required.

Plaintiffs have now amended their Complaint to include additional violations of NEPA stemming from the FAA's failure to provide supplemental NEPA analyses to address the disastrous first launch of the Starship/Superheavy rocket, as well as new information pertaining to harm to protected wildlife from the fourth launch in June of 2024. The first launch of the Starship/Superheavy rocket took place on April 20, 2023, and resulted in the explosion of the launch pad, which spewed chunks of concrete and metal, as well as ash and sand, over a large area, including adjacent tidal flats that provide habitat for protected species such as piping plovers and other migratory birds. First Amended Complaint (FAC) ¶ 65. And on June 6, 2024, a report was issued by the Coastal Bend Bays & Estuaries Program documenting extensive damage to active migratory bird nests at Boca Chica State Park as a result of debris caused by the fourth launch of the rocket. *Id.* ¶ 107. As set forth in Plaintiffs' FAC, Plaintiffs claim that these events constitute new information or circumstances resulting in significant environmental impacts that were never evaluated by the FAA, requiring the agency to provide supplemental NEPA review. *See id.* ¶¶ 51, 121-23; 40 C.F.R. § 1502.9(d), FAA Order 1050.1F, 9-3.

Defendant-Intervenor SpaceX has moved to dismiss Plaintiffs' claims regarding the need for supplemental NEPA review (but has not sought dismissal of Plaintiffs' claim that an EIS was required when the FAA initially approved the Starship/Superheavy launch program). However, the FAA—against which the NEPA claims are asserted—did not bring any such challenge, and instead provided an Answer to the FAC, indicating that the government recognizes that Plaintiffs have formulated claims that can be resolved on summary judgment.

For its part, SpaceX's motion is merely a tactic designed to delay and distract. For example, Space X begins its motion with a pointless assertion that Plaintiffs somehow "waited to sue" until many years after the Boca Chica site was built and almost a year after the FAA approved the Starship/Superheavy launch program. Mot. at 1. While SpaceX does not assert an actual defense of laches in its Rule 12(b)(6) motion – and therefore the Court should disregard any such argument in any event – this false narrative paints a totally misleading picture of the events that have led to this point. To clarify: in 2014, the FAA *did* produce an EIS to support its decision regarding SpaceX's application for licenses and/or experimental permits to conduct launches of the Falcon 9 and Falcon Heavy orbital launch vehicles and a variety of reusable suborbital launch vehicles at Boca Chica. FAC ¶ 76. This evidences the FAA's understanding that a full EIS *is* warranted for these types of large rocket programs, given the significant impacts they have on the surrounding environment. It was therefore unnecessary for Plaintiffs to bring the NEPA claims at issue in this litigation for the *prior* launch program, since an EIS was indeed produced. Thus, SpaceX's assertion that Plaintiffs "waited" to bring a NEPA claim that did not previously exist is a legal and logical non sequitur.

However, as SpaceX well knows, things have changed dramatically since the FAA produced the 2014 EIS. SpaceX ultimately chose other locations for Falcon 9 launches. Instead, the FAA began preparing Written Reevaluations to determine whether SpaceX's extensive modifications to the launch site and operations, including a Starship experimental test program, even fell within the scope of that EIS. PEA at 2.[1] And since the 2014 EIS was produced, multiple "anomalies" have caused extensive harm to surrounding habitat from ground tests and suborbital

---

[1] "PEA" refers to the FAA's 2022 Programmatic Environmental Assessment (available at https://www.faa.gov/sites/faa.gov/files/202206/PEA_for_SpaceX_Starship_Super_Heavy_at_Boca_Chica_FINAL.pdf and FAA00011354-536.

launches at Boca Chica. *See* FAC ¶¶ 64-69. Furthermore, SpaceX has failed to comply with many of the protective measures contained in the 2014 EIS, raising significant new concerns for the larger rockets of the new Starship/Superheavy launch program. FAC ¶ 64. Plaintiffs therefore claim that a new EIS is necessary, and Plaintiffs brought their timely challenge shortly after the FAA determined (erroneously) that the Starship/Superheavy rockets would not cause significant environmental impacts, issued a new decision not to produce a full EIS on that basis—in the form of a new Programmatic EA/Finding of No Significant Impact (FONSI)—and authorized a launch of the Starship/Superheavy rocket. Hence, SpaceX's assertion that Plaintiffs somehow "waited" to bring the NEPA claims now before the Court is specious.

Regardless, SpaceX has now challenged Plaintiffs' claims as they relate to supplemental NEPA review. SpaceX has put forth several arguments in its motion, none of which provide any basis for dismissing Plaintiffs' supplemental NEPA claims. SpaceX's arguments regarding the FAA's need to supplement the PEA are mistaken, given that the FAA has continued to rely on that document for NEPA compliance when issuing new launch licenses through Written Reevaluations that specifically address the need for supplementation of the PEA. And Plaintiffs properly plead a legal violation of NEPA as it pertains to the FAA's NEPA review for the second launch license. SpaceX's arguments regarding the Migratory Bird Treaty Act (MBTA) are entirely inapposite. While the MBTA does indeed apply to SpaceX's activities, that is irrelevant given that the specific claim at issue is not for a violation of the MBTA, but rather a NEPA claim based on the need to provide additional analysis following new information on harm to migratory bird species protected under the MBTA, which was not previously considered by the agency.

SpaceX's feeble attempt to cause further delay in this matter, and its effort to prevent the Court from considering the clear harms from its activities that go above and beyond what it

initially divulged to the FAA and was considered in the PEA, should be denied so that this case can proceed to summary judgment disposition.

## II.     ARGUMENT

### A. Standard of Review.

When reviewing a motion to dismiss pursuant to Rule 12(b), courts must accept as true all factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be drawn from the facts alleged. *See Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005) (At the motion to dismiss stage, complaints "are to be construed with sufficient liberality to afford all possible inferences favorable to the pleader on allegations of fact"); *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (In considering a motion to dismiss, the court must construe all reasonable inferences in favor of the plaintiff).

### B. There is no basis for dismissing Plaintiffs' NEPA supplementation claims.

#### 1. Plaintiffs properly plead their NEPA claim.

Plaintiffs' FAC presents one claim regarding Defendants' violations of NEPA, which sets forth three aspects of the Defendants' failure to comply with the law: 1) the failure to produce an EIS when the FAA approved the Starship/Superheavy launch program even though the activities at issue clearly would have significant environmental impacts; 2) the FAA's decision not to conduct a new or supplemental NEPA analysis before issuing a second launch license following the failed April 20, 2023, launch, which caused significant environmental harm; and 3) the FAA's failure to undertake a supplemental NEPA review regarding new information pertaining

to harm to the nests and eggs of birds protected by the MBTA from debris from the June 2023 launch, which had not been previously considered by the agency.[2]

These are straightforward and readily comprehensible allegations, which certainly meet the notice pleading requirements. *See Arent v. Shalala*, 70 F.3d 610, 618 (D.C. Cir. 1995) (explaining that under the notice pleading regime of the Federal Rules of Civil Procedure, a defendant must simply be afforded "'fair notice' of the plaintiff's claim") (citing *Conley v. Gibson,* 355 U.S. 41, 47 (1957)); *see also* FED. R. CIV. P. 8(a)(2) (Pleadings must contain "a short and plain statement of the claim"). The several ways in which the FAA has violated NEPA were combined into one count simply because they all involve violations of the same statute and reflect an ongoing failure to come into compliance. In any event, the company provides no actual reason how or why it was "prejudiced" by Plaintiffs' form of pleading. Mot. at 9.[3]

Contrary to SpaceX's suggestion, pleading the various aspects of the FAA's NEPA violations in the same claim is entirely consistent with the Federal Rules. Fed. R. Civ. P. 10(b) states that each claim founded on a separate transaction or occurrence should be in a separate count "if doing so would promote clarity." Here, there is nothing unclear about Plaintiffs' NEPA

---

[2] While SpaceX suggests that Plaintiffs have improperly combined pleadings under NEPA and the Administrative Procedures Act (APA) in their claim for relief, Mot. at 8-9, this ignores that because NEPA itself does not provide for a cause of action, NEPA claims are properly brought under the APA. *See Western Organization of Resource Councils v. Zinke*, 892 F.3d 1234, 1241 (D.C. Cir. 2018). Thus, for Plaintiffs' claim regarding the FAA's initial refusal to produce an EIS for the launch program—as embodied in the PEA/FONSI—as well as the decision in the written reevaluation for the issuance of the second launch license finding that no NEPA supplementation was required, Plaintiffs properly plead those as arbitrary and capricious agency action in violation of 5 U.S.C. § 706(2). *See* FAC ¶¶ 116, 120-22. For the FAA's failure to provide a supplemental NEPA analysis following the new information in the June 6 report regarding harm to protected bird eggs from debris, Plaintiffs properly plead that as a violation of 5 U.S.C. § 706(1) for agency action unlawfully withheld or unreasonably delayed. *Id*. ¶ 123.

[3] The lack of prejudice is readily apparent from SpaceX's own Motion, which states that a single count with multiple claims may be treated as separate claims for purposes of a 12(b) motion. Mot. at 10.

claim as reflected by the fact that the government had no difficulty providing an Answer to the FAC. Indeed, it is readily apparent that SpaceX itself does not actually require any further clarity, given it set forth in its motion the three aspects of Plaintiffs' NEPA claim with sufficient specificity to show it understands the nature of the claims at issue. *See* Mot. at 23.

Plaintiffs therefore properly provided a short and plain statement of the claim, which gave fair notice as to the NEPA/APA violations Plaintiffs are alleging. *See Swierkiewicz v. Sorema*, 534 U.S. 506, 512 (2002) ("Such a statement must simply give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." (internal quotation marks omitted)). As discussed below, these are viable NEPA-based claims that should be resolved on summary judgment following production of the full administrative record.[4]

### 2. The FAA continues to rely on the PEA, which must be supplemented where new information shows impacts from launches not previously considered.

SpaceX argues that the PEA only pertains to the approval of the Starship/Superheavy launch program, which it believes is a distinct agency action that ended once the launch program was approved, and therefore there is no further agency action associated with the PEA that would require supplementation of that document. Mot. at 10-11. Aside from the fact that this is a merits argument best resolved on summary judgment, it is contrary to the record. In fact, the FAA continued to not only rely on the PEA when issuing further launch licenses, but provided Written Reevaluations specifically intended to determine whether supplementation of the PEA was warranted. SpaceX's categorization of the PEA as a final document that cannot now be supplemented is therefore erroneous.

---

[4] The government has previously produced an administrative record regarding the PEA/FONSI. It is Plaintiffs' understanding that the FAA is in the process of compiling a record concerning the agency's decision not to supplement the PEA following the April 2023 launch.

SpaceX's reliance on *Western Organization of Resource Councils v. Zinke*, 892 F.3d 1234 (D.C. Cir. 2018), and *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004), is misplaced as the reasoning in those cases actually supports the viability of Plaintiffs' supplemental NEPA claim here. In *Zinke,* the Department of the Interior had produced a Programmatic EIS for the Federal Coal Management Program, which was a "planning system to decide which areas would be listed for coal production." *Zinke*, 892 F.3d at 1238. Similarly, in *SUWA* the Court was considering NEPA review for a broad land use management plan for BLM lands in Utah. *SUWA*, 542 U.S. at 59. In both cases, the broad management plans did not cover site-specific actions to be taken pursuant to the plan, and so did not analyze specific projects or activities—which would be analyzed in *separate, subsequent* NEPA documents. *See e.g., SUWA*, 542 U.S. at 70 (noting the preliminary nature of such plans and that "land use plans are normally not used to make site-specific implementation decisions"). Rather, they set forth an approach for managing resources, the approval of which was deemed a final action that the courts found precluded the need for supplemental NEPA review, since the approval of the plans themselves had already occurred, and any subsequent actions with on-the-ground effects would be subject to review in separate NEPA documents (either an EA or EIS). *See Zinke*, 892 F.3d at 1240; *SUWA*, 542 U.S. at 73.

Here, however, the FAA's Starship/Superheavy PEA does *not* provide a general plan for managing resources. Rather, the PEA analyzes the potential harm from the specific activities that FAA is licensing – the launching of 50 Starship/Superheavy rockets over 5 years. In other words, the PEA for the Starship/Superheavy launch program did not provide an "overarching scheme" for an approach to "managing resources in the future," as was the case in *Zinke* and *SUWA*. *See Zinke*, 892 F.3d at 1243. Rather, the major federal action at issue is the approval of launching 10

Starship/Superheavy rockets per year for five years, and therefore the federal action remains incomplete, since further launches will take place, akin to the situation in *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 (1989), where the Court found that supplementation was warranted since the action (building a dam) was not complete. *See Zinke*, 892 F.3d at 1243.[5]

As the Court in *Zinke* noted, "the supplementation inquiry turns on how the 'propos[ed] . . . Federal action' is defined. 892 F.3d at 1243 (citing 42 U.S.C. § 4332(2)(C)). SpaceX attempts to define the action under the PEA as merely a decision on the approval of the launch program, which was complete when the PEA and Record of Decision (ROD) was issued. Mot. at 10. But the major federal action at issue was *not* the approval of a general plan regarding how rocket launches would be managed, but rather the approval of a specific plan to launch specific rockets. This is clear from the ROD itself, which states that the proposed action at issue is FAA's decision "to issue an experimental permit(s) and/or a vehicle operator license to SpaceX that would allow SpaceX to take its Proposed Action, the launching of Starship/Super Heavy from the Boca Chica Launch Site."[6] Thus, while in *Zinke* there was no "specific pending action, apart from the Program's continued existence, that qualifies as a 'major Federal action' under NEPA,"

---

[5] The same analysis applies to the other cases SpaceX relies on, such as *Center for Biological Diversity v. Salazar*, 706 F.3d 1085 (9th Cir. 2013) and *Greater Yellowstone Coalition v. Tidwell*, 572 F.3d 1115 (10th Cir. 2009), Mot. at 12-13, which likewise concerned broad management plans, the approval of which were found to be final action that did not allow for supplementation of the initial programmatic NEPA review. Here, however, the PEA does not concern a broad management plan, but rather specific actions, for which there is remaining federal action (i.e., the issuance of individual launch licenses for the launches contemplated in the PEA). These cases are therefore inapposite.

[6] *Available at* https://www.faa.gov/sites/faa.gov/files/202206/20220613%20SpaceX%20Starship%20Super%20Heavy%20at%20Boca%20Chica_FONSI_ROD%20Final.pdf and FAA00010295-334.

892 F.3d at 1243, here the ROD specifically contemplates further action under the PEA – the issuance of licenses for rocket launches in reliance on that NEPA analysis.

Furthermore, the decision in *Zinke* turned on the fact that the agency, in administering the program at issue, prepared project-specific EISs or environmental assessments for each activity before they were approved. *See Zinke*, 892 F.3d at 1240. The FAA, however, has not prepared a license-specific NEPA analysis for each launch, but rather has issued Written Reevaluations, which do not provide a valid NEPA review in their own right but are *only intended to determine whether supplemental NEPA review is required*. *See* Paragraph 9-2.c of FAA Order 1050.1F ("A written re-evaluation is a document used to determine whether the contents of a previously prepared environmental document (i.e., a draft or final EA or EIS) remain valid or a new or supplemental environmental document is required.").[7]

Indeed, while the Council on Environmental Quality's (CEQ) current NEPA regulations allow for the use of Written Reevaluations, it only does so for the purposes of determining whether a supplemental NEPA analysis is required.[8] Thus, if SpaceX is correct and the PEA was *only* for the programmatic review of the launch program and does not pertain to the individual launch licenses, the only way the FAA could have complied with NEPA when issuing the licenses was to undertake a new EA or EIS, which it did not do for the second launch license following the explosion of the launch pad during the first launch. In fact, if the Court were to accept SpaceX's position that the PEA only pertained to the approval of the launch program itself and therefore cannot now be supplemented because each launch license undergoes a separate NEPA analysis, the FAA would be put in a totally untenable legal position because

---

[7] Available at https://www.faa.gov/documentLibrary/media/Order/FAA_Order_1050_1F.pdf.
[8] *See* 89 Fed. Reg. 35442, 35558, 35477, 35500 (May 1, 2024).

FAA did not prepare *any* new NEPA document (contrary to the situations in the cases relied on by SpaceX) and instead *relied on the PEA* itself and Written Reevaluations to conclude that the PEA/FONSI remained valid and *continued to adequately cover the impacts from the launches in the absence of supplementation*. FAC ¶¶ 95, 101.[9] Plaintiffs are challenging that conclusion in the November 14, 2023, Reevaluation as arbitrary and capricious—which must be resolved at summary judgment following production of a record—but the critical fact for purposes of SpaceX's motion is that the FAA is continuing to rely on the programmatic PEA for NEPA coverage in connection with the launches.[10]

SpaceX's contention that the PEA cannot now be supplemented because it only pertained to the initial approval of the launch program and is not being used as the basis for NEPA compliance for the individual launch licenses is in fact *directly contradicted* by the plain language of the Written Reevaluation that the FAA issued for the second launch (to which SpaceX provides a link, *see* Mot. at 6, fn. 6). That Written Reevaluation specifically states that it is not intended to be a distinct NEPA analysis, but rather is intended "to determine whether the contents of a previously prepared environmental document remain substantially valid or whether

---

[9] *See also* the November 15, 2023, Written Reevaluation at 1 (Available at https://www.faa.gov/media/72816).

[10] CEQ's guidance document on programmatic NEPA reviews makes clear that the duty to supplement a NEPA document, regardless of whether it is characterized as programmatic, can be triggered by significant new information of relevance to the proposed action or its impacts. *See* CEQ Memorandum for Heads of Federal Departments and Agencies, "Effective Use of Programmatic NEPA Reviews," at 43-44 (Dec. 18, 2024) (Available at: https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Effective_Use_of_Programmatic_NEPA_Reviews_Final_Dec2014_searchable.pdf) ("If the new information is relevant to a future decision for which the agency intends to rely upon the original programmatic NEPA review to meet all or a portion of its NEPA compliance responsibilities, then the new information may be reviewed in order to determine if it has any potential effect on the content of the original programmatic review, either in terms of: (a) the accuracy of the previously analyzed impacts (direct, indirect or cumulative); or (b) the feasibility of the alternatives presented or their comparative analysis.").

significant changes to a previously analyzed proposed action require the preparation of a supplemental Environmental Assessment or Environmental Impact Statement (EIS)."[11] Indeed, the entire point of the Written Reevaluation is to determine "whether the contents, analyses, and conditions of approval *in the PEA* remain current and substantially valid." *Id.* (emphasis added). And the Reevaluation makes clear that it is providing documentation for the factors used to determine whether the preparation of *supplemental EA or EIS* is necessary pursuant to Paragraph 9-2.c of FAA Order 1050.1F. *Id*. Thus, it is readily apparent that the FAA continued to rely directly on the PEA when issuing the launch licenses and is not somehow precluded from supplementing that document as SpaceX now contends. Mot. at 10. Rather, the FAA's entire NEPA analysis when issuing the second launch license pertained to the potential need for supplementation of the PEA.[12]

Moreover, even if SpaceX were correct in its understanding of *Zinke* and *SUWA* such that Plaintiffs may only challenge the license-specific decision for the second launch rather than the need to supplement the PEA, Plaintiffs FAC clearly complies by expressly challenging the November 14, 2023, Written Reevaluation *itself* as arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in contravention of the APA, 5 U.S.C. § 706(2). *See* FAC ¶ 122 ("FAA's finding in its November 14, 2023 'written reevaluation' that no supplemental NEPA analysis is required in connection with the April 20, 2023 launch failed to

---

[11] *See* the November 15, 2023, Written Reevaluation at 1-2 (Available at https://www.faa.gov/media/72816).

[12] Contrary to SpaceX's argument that the review of FAA's NEPA compliance for individual launch licenses would require its "own administrative record," Mot. at 9, 12, Plaintiffs' supplemental NEPA claims would only require a supplement to the existing administrative record, documenting the FAA's decision not to provide a supplemental NEPA analysis as set forth in the Written Reevaluation.

take the requisite hard look at multiple aspects of the launch and its aftermath . . ."").[13] SpaceX suggests no reason (and there is none) as to why, even given SpaceX's own mistaken understanding of FAA's ongoing reliance on the PEA, Plaintiffs cannot challenge the *conclusion* in the Reevaluation that the destruction of the launch pad and adoption of a new wastewater discharge system did not necessitate any additional NEPA review. In any event, Plaintiffs' ability to do so is fully consistent with *Zinke* and *SUWA*.

The same is true for Plaintiffs' contention that the June 6 report documenting harm to MBTA-protected bird eggs/nests requires supplemental NEPA review. FAC ¶ 123. Again, SpaceX's contention that the PEA is a final document that cannot now be supplemented because there is no further agency action to be taken pursuant to that document is directly contradicted by the plain language of the written reevaluations, which specifically state that supplementation of the PEA is warranted when there is "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts," consistent with Paragraph 9-2.c of FAA Order 1050.1F. Clearly, then, Plaintiffs may pursue a claim that supplementation of the PEA is warranted where, as here, such new information has come to light, and further agency action is forthcoming (i.e., licenses for additional launches). *See* FAC ¶ 123; *Kareem v. Haspel*, 986 F.3d 859, 865 (D.C.C. 2021) (at the motion to dismiss stage, the court must accept Plaintiffs' factual allegations as true and draw all reasonable inferences from those allegations in Plaintiff's favor).

SpaceX's argument that Plaintiffs cannot seek to compel supplementation of the PEA appears to be a thinly veiled attempt to paint Plaintiffs into a corner, making it impossible to

---

[13] The claim focusses on the agency's failure to provide a supplemental NEPA review is consistent with the fact that the Written Reevaluation *itself* states that the purpose of the document is to determine whether supplementation of the PEA was required, as discussed above.

challenge the FAA's failure to comply with NEPA. Since the launch-specific reviews for the issuance of individual launch licenses (i.e., Written Reevaluations considering the need to supplement the PEA) have routinely been provided by the FAA mere days before each issuance of a license and the subsequent launch,[14] SpaceX is evidently attempting to put Plaintiffs into a bind in which it can argue that any challenge to the FAA's failure to comply with NEPA is either too early or too late: too early if it is brought before FAA has approved a specific launch but too late after the launch has occurred.

That transparent gamesmanship aside, SpaceX provides no valid basis for dismissing Plaintiffs' NEPA supplementation claims. SpaceX clearly wants to avoid having the Court consider the ongoing harm from Starship/Superheavy rocket launches, because it shows that either the FAA and SpaceX knew of the potential for such harm and an EIS was therefore required at the outset, or a supplemental EIS is now needed to address significant environmental impacts as new information on the harm from its activities comes to light. The misguided and erroneous arguments set forth in its motion are nothing more than a clear attempt to cause undue delay in this litigation and prejudice Plaintiffs. The motion should therefore be denied, and this matter should move forward expeditiously to summary judgment briefing.

**C. Plaintiffs have not brought a claim under the MBTA, but rather a valid NEPA claim regarding new information on harm to protected migratory bird species that has not been previously addressed.**

The plain language of the FAC shows that Plaintiffs have not brought a separate claim under the MBTA, but rather a valid NEPA-based APA claim under 5 U.S.C. § 706(1) for the

---

[14] For example, the Written Reevaluation for the first launch was made available on April 14, 2023, the same date as the issuance of the license. The Written Reevaluation for the second launch was signed on Friday, Nov. 15, 2023, and the license was issued on Monday, Nov. 18, 2023.

14

FAA's failure to undertake a supplemental NEPA analysis to address the harm evidenced in the June 6 report. *See* FAC ¶ 123. Plaintiffs have merely pointed to the June 6 report as evidence of harm to federally protected wildlife that was not previously considered by the FAA in its review of the Starship/Superheavy launch program and that must be considered in the agency's NEPA analysis prior to any new launches. This is apparent from the claim itself, *see* FAC ¶ 123 (alleging that "FAA's failure [to supplement its NEPA analysis to address destruction of migratory bird nests] *violates NEPA* and constitutes agency action that has been unlawfully withheld and unreasonably delayed, in violation of 5 U.S.C. § 706(1)), as well as the request for relief, which seeks declaratory and other relief based exclusively on NEPA violations. *Id*. at pp. 39-40.

Accordingly, it is readily apparent that Plaintiffs have alleged that the June 6 report shows "new information [] sufficient to show that the remaining action will 'affect the quality of the human environment' . . . to a significant extent not already considered," and therefore NEPA supplementation is warranted. *Marsh*, 490 U.S. at 374; FAC ¶ 123 (stating that the June 6 report demonstrates "new circumstances or information about the significance of the adverse effects that bear on the analysis in the PEA," and that such harms were "not anticipated and/or not addressed in the PEA"). Indeed, the PEA *never* discusses the potential for bird eggs (protected by the MBTA, the ESA, or otherwise) to be harmed by debris from a rocket launch event, particularly from a non-anomaly event like the Fourth launch that resulted in the harm shown in the June 6 report. Even for an anomaly event, the PEA asserts that a "direct wildlife strike [from debris] would be very unlikely." FAA00011497. Thus, the PEA *never* addressed the potential for harm to nests and eggs from a debris strike, and how such debris strikes may affect wildlife, including birds protected under the ESA and MBTA.

Because the June 6, 2024, report issued by the Coastal Bend Bays & Estuaries Program—immediately following the fourth test launch of the SpaceX rocket—documents extensive damage to active migratory bird nests at Boca Chica,[15] which was never considered or analyzed in the PEA, Plaintiffs have asserted a viable claim that a supplemental NEPA review is required consistent with Paragraph 9-2.c of FAA Order 1050.1F. Plaintiffs have therefore brought a valid, NEPA-based APA claim for agency action unlawfully withheld and unreasonably delayed, in violation of 5 U.S.C. § 706(1).

The Court should therefore disregard SpaceX's attempts to reframe Plaintiffs' NEPA claim as a separate MBTA claim. Simply put, irrespective of whether SpaceX (or the FAA) could be held liable for violating the MBTA, Plaintiffs' claim as pled turns on whether the destruction of protected migratory bird nests from launch debris supports the need for FAA to engage in supplemental NEPA review. Since this seems clear enough from the FAC, what SpaceX is evidently seeking to obtain here is a preemptive advisory opinion from the Court on whether the company can be held liable under the MBTA, which broadly prohibits (in relevant part) the "killing" of migratory birds without authorization from the Fish and Wildlife Service (FWS). *See* 16 U.S.C. § 703.[16]

The Court should not oblige. Aside from the fact that SpaceX's potential for liability is legally distinct from whether Plaintiffs can pursue a NEPA claim against FAA, SpaceX has

---

[15] *See* Shorebird nest fates at Boca Chica after rocket test launch (Available at CBBEP_Boca-Chica-shorebird-nests-losses-June-6-2024.pdf) (noting that "[a]ll 9 shorebird nests monitored following the rocket launch on June 6 were either missing eggs, had damaged eggs, or both.").

[16] SpaceX's desire for such an opinion may be explainable by the fact that FWS has stated that it is currently investigating SpaceX for violations of the MBTA. *See New Flight Plan, Environmental Concern Could Slow SpaceX Flight* (July 11, 2024) (Stating that the U.S. Fish and Wildlife Service's office of law enforcement "is investigating the nest damage") (available at https://www.govtech.com/products/new-flight-plan-environmental-concern-could-slow-spacex-flight).

presented a badly skewed view of MBTA liability that conflicts with the relevant caselaw and recent agency rulemaking establishing that foreseeable harm inflicted on migratory birds (and active nests) by industrial activity may be covered by the MBTA's prohibitions, even when that is not the specific purpose of the activity. Tellingly, for example, SpaceX does not even mention a recent ruling that exhaustively analyzed the statute's language, history, and precedents in rejecting the same interpretation that SpaceX proffers here, i.e., that companies such as SpaceX may kill protected migratory birds with impunity when that is an incidental, albeit entirely foreseeable, result of their activities. *See Natural Res. Def. Council v. U.S. Dep't of the Interior*, 478 F. Supp. 3d 469 (S.D.N.Y. 2020).

Likewise, buried in a footnote in SpaceX's motion is the admission that the FWS issued a rule in 2021 that directly undermines SpaceX's assertions regarding the applicability of the MBTA. In the Service's 2021 rule implementing the MBTA, FWS found that the MBTA *is* applicable to foreseeable incidental take, based on the plain language of the statute, embracing the court's analysis set forth in the *NRDC* case. *See* 86 Fed. Reg. 54642, 54644 (Oct. 4, 2021). Thus, SpaceX's assertions squarely conflict with the expert agency's own determination and analysis of the MBTA's plain language and applicable case law.

Instead of demonstrating that FWS got it wrong (which, again, is not properly before the Court at this juncture in any event), SpaceX relies heavily on a case that *preceded* FWS's recent authoritative construction—*United States v. CITGO Petroleum Corp.*, 801 F.3d 477 (5th Cir. 2015)—and that did not even "present an opportunity to interpret 'kill'" within the statutory prohibitions. *United States v. CITGO Petroleum Corp.*, 801 F.3d 477, 489 n.10; *see also* 86 Fed. Reg. 54643 (explanation by FWS in its 2021 rulemaking that "*CITGO* does not provide legal precedent for construing 'kill' narrowly" under the MBTA" because that decision "is limited by

17

its terms to addressing the meaning of the term 'take' under the MBTA"). As FWS has now made clear, the MBTA does indeed require FWS authorization for the foreseeable killing of migratory birds (or their eggs), even when such killing was incidental to otherwise lawful activities, consistent with the court's decision in *NRDC*. *Id*.[17]

In sum, the Court should rebuff SpaceX's request for an advisory opinion on whether SpaceX may be held liable under the MBTA for killing migratory birds, both because the viability of Plaintiffs' claim for supplemental NEPA review does not turn on that issue and, in any event, SpaceX has ignored or misstated the relevant case law and agency pronouncements.

### D.  There is no need for a more definite statement.

SpaceX's own motion makes it clear why a more definite statement is not needed for this litigation to move forward to summary judgment briefing. After lamenting that SpaceX is somehow incapable of understanding the precise nature of the claims at issue, Mot. at 23, it then goes on to provide a concise summary of the three aspects of Plaintiffs' NEPA claim that is perfectly understandable and consistent with the FAC. As SpaceX notes, at issue are three NEPA violations concerning (1) the adequacy of "FAA's environmental review supporting its original decision to approve the Starship-Super Heavy Program"; (2) the "FAA's decision not to conduct new or supplemental environmental review after SpaceX's April 2023 launch before deciding to license a subsequent proposed launch"; and (3) the FAA's failure "to prepare a new or

---

[17] SpaceX baselessly suggests that the Fifth Circuit's interpretation of the MBTA is somehow binding on this Court because the SpaceX launches are taking place in Texas. *See* Mot. at 16 n.15. To point out the obvious, this case is being litigated in the D.C. Circuit. Thus, even if *CITGO* set forth an authoritative construction of "kill" in the MBTA—which it did not—it would have no binding effect on this case. Although the D.C. Circuit has yet to definitively rule on the issue, it has recognized that FWS's "'longstanding position' has been that the [MBTA] also applies to harm that 'occurs incidental to, and which is not the purpose of, an otherwise lawful activity. . . .'" *Public Emps. For Env't. Resp. v. Hopper,* 827 F.3d 1077, 1088 (D.C. Cir. 2015) (quoting 80 Fed. Reg. 30,032, 30,034 (May 26, 2015)) (internal citation omitted).

supplemental environmental review after SpaceX's June 2024 launch" resulted in the destruction of migratory bird nests. *Id*. These indeed are the facets of Plaintiffs' NEPA claim that are at issue, and which should be resolved on summary judgment. As the FAA (against which the claims are asserted) has recognized by providing an Answer to the FAC, nothing would be gained by putting Plaintiffs through the make-work exercise of providing a more "definitive" statement—especially in view of this response brief providing any clarification that might conceivably have been called for.

### III.   CONCLUSION

For the foregoing reasons, Intervenor-Defendants' Motion should be denied so that the matter can move forward to summary judgement briefing as expeditiously as possible.

September 26, 2024                                        Respectfully submitted,

/s/ Jared Margolis
Jared Margolis (Pro Hac Vice)
Center for Biological Diversity
2852 Willamette St. # 171
Eugene, OR 97405
(802) 310-4054
jmargolis@biologicaldiversity.org

/s/ Eric Glitzenstein
Eric Glitzenstein (D.C. Bar No. 358287)
Center for Biological Diversity
1411 K Street, NW, Suite 1300
Washington, DC 20005
(202) 849-8401
eglitzenstein@biologicaldiversity.org

/s/ Dinah Bear
Dinah Bear (D.C. Bar No. 351817)
300 N. Indian House Road
Tucson, Arizona 85711
(202) 906-9407
bear6@verizon.net

*Attorneys for Plaintiffs*

19