# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, AMERICAN BIRD CONSERVANCY, SURFRIDER FOUNDATION, SAVE RGV, and THE CARRIZO/COMECRUDO NATION OF TEXAS, INC., | ) ) ) ) ) ) |  |
| *Plaintiffs,* | ) ) | Civil Case No. 23-cv-1204-CJN |
| v. | ) ) | **Plaintiffs' Memorandum in Support** |
| FEDERAL AVIATION ADMINISTRATION, and BILLY NOLEN, in his official capacity, | ) ) ) | **of Motion for Partial Summary Judgment** |
| *Defendants,* | ) ) |  |
| and | ) ) |  |
| SPACE EXPLORATION TECHNOLOGIES CORP., | ) ) ) |  |
| *Defendant-Intervenor.* | ) ) |  |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………..………………….....iii

INTRODUCTION .................................................................................................................1

LEGAL BACKGROUND ....................................................................................................2

STATEMENT OF FACTS ...................................................................................................5

    SpaceX's Activities at Boca Chica ...................................................................................5

    Boca Chica's Importance to Wildlife and the Community ...................................................6

    Harm from SpaceX's Activities ......................................................................................7

    The FAA's NEPA determination……………………………………………………...9

STANDARD OF REVIEW ................................................................................................10

STANDING………………………………………………………………………………11

ARGUMENT ....................................................................................................................12

  I.  The Significant Environmental Impacts of the Starship/Superheavy Launch Program Requires an EIS……………………………………………………………………….12

    A.  Expert Agencies Told the FAA that the Proposed Action Would Have Significant Adverse Impacts and Required an EIS ......................................................................12

    B.  The FAA did not Sufficiently Analyze or Mitigate the Significant Environmental Impacts of the Launch Program to Support a FONSI...................................................19

        1.  Noise and lighting cause significant environmental impacts that have not been adequately analyzed or mitigated......................................................................19

            a.  The FAA failed to take a "hard look" at the significant impacts of noise and lighting on wildlife.....................................................................19

            b.  The impacts of noise and lighting on wildlife have not been sufficiently mitigated to support a FONSI.......................................23

            c.  Noise has significant adverse impacts on the community.........................................................................................26

        2.  Access closures have significant impacts that have not been adequately analyzed or mitigated......................................................................................27

i

a.  Closures have significant adverse impacts on the Carrizo/Comecrudo Tribe......................................................................................................28

b.  Closures significantly affect Refuge resources and wildlife..............29

c.  Closures have significant impacts on the community.......................33

3.  Anomalies cause significant environmental harm that cannot be sufficiently mitigated, requiring an EIS ...........................................................................35

a.  History and environmental impacts of anomalies ………………...36

b.  Inadequate mitigation for the impacts of anomalies ………………40

C. The FAA Unlawfully Delegated the Decision Whether to Prepare an EIS to SpaceX…………………………………………………………………………42

II.  The Presumptive Remedy for the FAA's NEPA Violations is Vacatur …………………44

CONCLUSION………………………………………………………………………..45

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Al Otro Lado v. Wolf*,
  952 F.3d 999 (9th Cir. 2020) ............................................................................45

*Alliance for the Wild Rockies v. Bradford*,
  720 F. Supp. 2d 1193 (D. Mont. 2010) ............................................................21

*Allied-Signal, Inc. v. United States Nuclear Regulatory Commission*,
  988 F.2d 146 (D.C. Cir. 1993) ….......................................................44, 45

*American Great Lakes Ports Association v. Schultz*,
  962 F.3d 510 (D.C. Cir. 2020)…………………………………………………...44

*American Rivers and Alabama Rivers Alliance v. Federal Energy Regulatory Commission*,
  895 F.3d 32 (D.C. Cir. 2018) .......................................................12, 36, 40, 42

*Anderson v. Evans*,
  314 F.3d 1006 (9th Cir. 2002) ............................................................................3

*Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*,
  462 U.S. 87 (1983) ......................................................................................3, 18

*Birckhead v. FERC*,
  925 F.3d 510 (D.C. Cir. 2019) .........................................................................10

*Bluewater Network v. EPA*,
  370 F.3d 1 (D.C. Cir. 2004) .............................................................................11

*Bridgeport Hosp. v. Becerra*,
  108 F.4th 882 (D.C. Cir. 2024)…………………………………………………..44

*Butte Cty. v. Hogen*,
  613 F.3d 190 (D.C. Cir. 2010)…………………………………………………...32

*Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*,

685 F.2d 678 (D.C. Cir. 1982) ..........................................................4

*City of Dania Beach v. Federal Aviation Administration*,

485 F.3d 1181 (D.C. Cir. 2007) ……….......................................................27

*City of Port Isabel v. FERC*,

No. 23-1174 (D.C. Cir. 2024) ..........................................................18

*Coalition for Healthy Ports v. United States Coast Guard*,

2015 U.S. Dist. LEXIS 159090, *70-71 (D.C. Cir. 2021)…………………………….16

*Davis v. Mineta*,

302 F.3d 1104 (10th Cir. 2002) ..........................................................18

*Foundation for North American Wild Sheep v. U.S. Department of Agriculture*,

681 F.2d 1172 (9th Cir. 1982) ……….......................................................19

*Friends of Animals v. Culver*,

610 F. Supp. 3d 157 (D.D.C. 2022) ..........................................................3, 14, 18

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,

528 U.S. 167 (2000) ..........................................................12

*Friends of the Earth, Inc. v. United States Army Corps of Engineers*,

109 F. Supp. 2d 30 (D.D.C. 2000) ..........................................................15, 17

*Fund for Animals v. Norton*,

281 F. Supp. 2d 209 (D.D.C. 2003) ..........................................................3

*Gerber v. Norton*,

294 F.3d 173 (D.C. Cir. 2002)……………………………………………………...44

*Government of the Province of Manitoba v. Norton*,

398 F. Supp. 2d 41 (D.D.C. 2005) ..........................................................4

*Hausrath v. United States Department of the Air Force*,

    491 F. Supp. 3d 770 (D. Idaho 2020) ...............................................................27

*Idaho v. Interstate Commerce Commission*,

    35 F.3d 585 (D.C. Cir. 1994) ..........................................5, 19, 23, 28, 30, 42, 43

*Illinois Commerce Commission v. Interstate Commerce Commission*,

    848 F.2d 1246 (D.C. Cir. 1988) ....................................................................44

*Illinois Public Telecommunications Association v. Federal Communications Commission*,

    123 F.3d 693 (D.C. Cir. 1997) ......................................................................44

*Marin Audubon Soc'y v. FAA*,

    2024 U.S. App. LEXIS 28621, *33, __ F.4th __ (D.C. Cir. 2024)...........................45

*Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.,*
    463 U.S. 29 (1983) ..........................................................11, 23, 27, 29, 32, 40

*National Audubon Society v. Hoffman*,

    132 F.3d 7 (2d Cir. 1997) ............................................................................41

*National Committee for the New River v. Federal Energy Regulatory Commission*,

    373 F.3d 1323 (D.C. Cir. 2004) ...........................................................3, 18, 23

*National Parks Conservation Association v. Semonite*,

    916 F.3d 1075 (D.C. Cir. 2019) ......................................12, 13, 14, 16, 19, 42

*National Parks Conservation Association v. United States Forest Service*,

    177 F. Supp. 3d 1 (D.D.C. 2016) ...................................................................33

*New York v. Nuclear Regulatory Commission*,

    681 F.3d 471 (D.C. Cir. 2012)......................................................5, 16, 26, 40, 42

*North Carolina v. Federal Aviation Administration*,

    957 F.2d 1125 (4th Cir. 1992).........................................................................18

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,

    402 F.3d 846 (9th Cir. 2005)……………………………………………………..40

*Robertson v. Methow Valley Citizens Council*,

    490 U.S. 332 (1989)…………………………………………………………...2, 5, 42

*Sierra Club v. Marsh*,

    769 F.2d 868 (1st Cir. 1985)…………………………………………………3, 4

*Sierra Club v. Peterson*,

    717 F.2d 1409 (D.C. Cir. 1983)…………………………………...12, 36

*Sierra Club v. United States Army Corps of Eng'rs*,

    803 F.3d 31, 46 (D.C. Cir. 2015)…………………………………………...15

*Sierra Club v. Van Antwerp*,

    719 F. Supp. 2d 77 (D.D.C. 2010)……………………………………………44

*South Fork Band Council of W. Shoshone v. United States DOI*,

    588 F.3d 718 (9th Cir. 2009)……………………………………………..41

*Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*,

    985 F.3d 1032 (D.C. Cir. 2021)…………………………………...4, 19, 28

*Susquehanna Int'l Grp., LLP v. SEC*,

    866 F.3d 442 (D.C. Cir. 2017)…………………………………………...43

*Theodore Roosevelt Conservation P'ship v. Salazar*,

    661 F.3d 66 (D.C. Cir. 2011)……………………………………………10

*Town of Cave Creek v. FAA*,

    325 F.3d 320 (D.C. Cir. 2003)……………………………………5, 26, 35

*Vecinos Para El Bienestar De La Comunidad Costera v. FERC*,

    6 F.4th 11321 (D.C. Cir. 2021)…………………………………………...14

**Statutes**

42 U.S.C. § 4331 ...................................................................................................2, 43

42 U.S.C. § 4332.............................................................................................2, 12, 14

5 U.S.C. § 706(2)(A) .......................................................................................11, 44

**Other Authorities**

FAA Order 1050.1F…………………………………………...3, 4, 13, 15, 16, 18, 19, 28, 39, 42, 43

## INTRODUCTION

This case concerns the Federal Aviation Administration's (FAA) failure to comply with the National Environmental Policy Act (NEPA) when it approved SpaceX's plan to test and launch dozens of the largest rockets known to humankind over 5 years at its facility at Boca Chica, Texas, without first undertaking a comprehensive analysis of the environmental impacts of the launch program in an Environmental Impact Statement (EIS), as the law requires.

Boca Chica is a biologically diverse and essential habitat area for many species. The SpaceX facility is surrounded by ecologically critical lands that are of extraordinary conservation value, including State Parks and a National Wildlife Refuge that provides designated critical habitat for federally protected wildlife. These lands are fragile, particularly the tidal flats directly adjacent to the SpaceX launch pad that are relied on by federally protected migratory birds.

SpaceX's activities result in significant harm to these surrounding lands. The administrative record shows that, when the FAA authorized the new Starship/Superheavy Launch Program, noise and lighting associated with construction, testing, and launches had already harmed the wildlife that depend on Boca Chica. The FAA knew that these impacts would only intensify with the new launch program. The surrounding habitat has also been adversely affected by many explosions (called "anomalies") from testing and launching rockets—which were likely to continue for the new launch program—with devastating impacts from debris and brush/forest fires. The FAA also knew that the frequent closures of the Boca Chica area to accommodate SpaceX had hindered, and would continue to hinder, the management of wildlife refuge lands, prevent the Carrizo/Comecrudo Nation from accessing sacred areas to undertake ceremonies, and block regular use of an important beach to community residents. These significant environmental impacts were emphasized to the FAA by expert agencies, including the Fish and Wildlife Service

(FWS), the Environmental Protection Agency (EPA), and the Texas Parks and Wildlife Department (TPWD).

Yet, the FAA ignored the clear statements from these agencies and comments from the public regarding the ongoing and future significant environmental harm from SpaceX's activities. Instead, it approved the Starship/Superheavy Launch Program without fully analyzing the significant environmental and related social and environmental justice impacts. Nor did the agency require mitigation sufficient to offset those impacts. Instead of producing an EIS, which is required for any "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), the FAA unlawfully delegated the decision as to what level of NEPA review was required to SpaceX, which unsurprisingly pushed the FAA to conclude that uncertain and unproven mitigation measures could somehow reduce the environmental impacts of the Launch Program such that they would not be "significant" and an EIS was therefore not required. That determination was unlawful and arbitrary and capricious.

## LEGAL BACKGROUND

NEPA declares a broad national commitment to protecting and promoting environmental quality. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989) (citing 42 U.S.C. § 4331). NEPA requires that agencies fully consider the environmental and related cultural impacts of their actions before they occur, thereby ensuring that the agency, and the public, is provided with the relevant information to support the decision-making process. *Id*. at 349. To fulfill these purposes, NEPA requires federal agencies to prepare a "detailed statement"—known as an environmental impact statement (EIS)—for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

To determine whether a proposed action significantly affects the environment and thus requires an EIS, the federal agency may first prepare an environmental assessment (EA). *See* FAA Order 1050.1F Parts 3-1 and 4-3 (FAA00057660, FAA00057666).[1] An EA must provide sufficient evidence and analysis to determine whether to prepare an EIS. *See Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 171 (D.D.C. 2022) (An EA "is reviewed to ensure that the agency took a hard look at the environmental consequences of its decision to go forward with the project") (citing *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004)). In determining whether to prepare an EIS, the agency must "consider every significant aspect of the environmental impact of a proposed action." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). A determination that significant effects will in fact occur is not essential: an EIS must be prepared if substantial questions are raised as to whether a project *may* have a significant effect upon the environment. *See Friends of Animals*, 610 F. Supp. 3d at 171 (citing *Pub. Citizen v. Nuclear Regulatory Comm'n*, 573 F.3d 916, 929 (9th Cir. 2009)); *see also Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 233 (D.D.C. 2003) (same) (citing *Anderson v. Evans*, 314 F.3d 1006, 1019-21 (9th Cir. 2002)).

Under NEPA, courts "cannot accept [an EA] as a substitute for an EIS—despite the time, effort, and analysis that went into their production—because an EA and an EIS serve very different purposes." *Sierra Club v. Marsh*, 769 F.2d 868, 875 (1st Cir. 1985) (Breyer, J.). "To treat an EA as if it were an EIS would confuse these different roles, to the point where neither the agency nor those outside it could be certain that the government fully recognized and took proper account of environmental effects in making a decision with a likely significant impact on the

---

[1] FAA Order 1050.1F provides the FAA's policies and procedures for compliance with NEPA (i.e., implementing regulations). *See* FAA Order 1050.1F at 1-1 (FAA00057638).

environment." *Id*. An EA aims only to identify (and assess the "significance" of) potential impacts on the environment to see whether an EIS is needed, but it is not intended to provide the full analysis that NEPA requires in an EIS when the action will have significant impacts. *Id.* Where there clearly are significant effects, officials must make their decision "in light of an EIS." *Id*. (noting that "the purpose of an EA is simply to help the agencies decide if an EIS is needed"); *see also Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 985 F.3d 1032, 1050 (D.C. Cir. 2021) (affirming district court decision vacating an EA and ordering Corps to prepare an EIS to address oil pipeline spills).

If an EA concludes that there are no potentially significant impacts to the environment, the federal agency must prepare and sign a Finding of No Significant Impact (FONSI) that explains why the proposed action will not have a significant environmental impact. FAA Order 1050.1F Part 6-3 (FAA00057702-03). Courts have allowed agencies to rely on a "mitigated FONSI," if the action would otherwise have significant impacts, but the agency can show that such impacts will be mitigated so that they will not pose significant environmental harm. *See e.g., Gov't of the Province of Manitoba v. Norton,* 398 F. Supp. 2d 41, 65 (D.D.C. 2005) ("[A] mitigated FONSI fulfills NEPA's requirements when it 'completely compensates for any possible adverse environmental impacts stemming from the original proposal' or reduces the possibility to a minimum.") (quoting *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 682 (D.C. Cir. 1982)).

In reviewing an agency's decision not to produce an EIS, the court must determine whether the agency (1) has accurately identified the relevant environmental concerns, (2) has taken a "hard look" at the problem in preparing its EA, (3) is able to make a convincing case for its FONSI, and (4) has shown that even if there is an impact of true significance, an EIS is

unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum. *Idaho v. ICC*, 35 F.3d 585, 595 (D.C. Cir. 1994); *see also Robertson*, 490 U.S. at 350. Thus, when reviewing a mitigated FONSI, the court's role is to determine whether due to the imposition of mitigation, the "probability [of harm] is so low as to be remote and speculative, or if the combination of probability and harm is sufficiently minimal." *New York v. NRC*, 681 F.3d 471, 477-79 (D.C. Cir. 2012); *see also Town of Cave Creek v. FAA*, 325 F.3d 320, 327 (D.C. Cir. 2003) (an EIS is only unnecessary where "'changes or safeguards in the project sufficiently reduce the impact to a minimum'") (quoting *Sierra Club v. DOT*, 753 F.2d at 127).

## STATEMENT OF FACTS

### SpaceX's activities at Boca Chica

SpaceX began developing the Boca Chica launch site in Cameron County, Texas, in 2014, and in June of that year the FAA published an EIS that analyzed SpaceX's plans to use the area for Falcon 9 and Falcon Heavy launch operations. FAA00011364. The 2014 EIS determined that the use of the Boca Chica launch site for testing and launching the Falcon rockets—which are considerably smaller than the Starship/Superheavy rockets—would result in unavoidable and significant direct and indirect impacts to several natural and cultural resource categories. FAA00046057. After the 2014 EIS was issued, SpaceX changed course and decided to use the site to test the Starship launch vehicles and has developed additional infrastructure to support such operations. FAA00011365.

The agency action at issue is the FAA's approval of SpaceX's new plan to test and launch 10 Starship/Superheavy rockets per year (5 orbital and 5 suborbital launches) over a 5-year period, along with related construction activities for additional infrastructure to support the Launch Program. FAA00011373-74, FAA00011379. The Starship/Superheavy rocket is the

largest rocket known to humankind, and SpaceX's plan is to conduct testing (i.e., tank tests and static fire engine tests) and launches—which could occur either day or night—from its Boca Chica launch facility. FAA00011373, FAA00011379.

### The Boca Chica area's importance to wildlife and the community

The SpaceX Boca Chica launch facility sits on a small property surrounded by some of the most important habitat for migratory birds in the U.S.[2], considered "one of the most biologically diverse regions in North America." FAA00043885; FAA00051552. It is smack in the middle of publicly owned conservation, park, and recreation lands, including two National Wildlife Refuges, two State Parks, a State Wildlife Management Area, and a State Coastal Preserve. FAA00011450-53. These lands are of extraordinary conservation value for a range of federally and state listed wildlife and other protected species such as migratory birds. *See e.g.,* FAA00045265-66; FAA00046038; FAA00046045-45; FAA00046054; FAA00046091; FAA00051087; FAA00051552. Bird species from both the Central and Mississippi flyways converge there, making it an essential wintering and stopover area for these migratory birds. FAA00051552, FAA00051572. Not only does Boca Chica provide habitat for protected migratory birds, such as piping plovers and red knots, but also "is one of the few places where the Kemp's Ridley sea turtle, the most critically endangered sea turtle in the world, comes ashore to nest on refuge beaches in the spring and summer." FAA00043885.

---

[2] The area surrounding the SpaceX facility is an essential habitat area for many species, including federally protected wildlife such as the critically endangered ocelot and threatened piping plover. *See* FAA00011490 ("[T]he SpaceX Boca Chica Launch Site is located within piping plover critical habitat Unit TX-1."); FAA00056835 (the Laguna Atascosa National Wildlife Refuge near the SpaceX facility is one of only two remaining ocelot populations in the U.S.); FAA00046054 (TPWD noting that "[t]idal and algal flats provide important feeding and nesting habitat to shorebirds in general, and critically important feeding habitat to short-legged shorebirds, such as plovers").

Boca Chica beach is also used as a source of recreation and subsistence fishing for the Brownsville community—a low-income area with a large minority population that relies on the area as a source of food. FAA00010609; FAA00011528-29; FAA00004088. Furthermore, the area is sacred to the Carrizo/Comecrudo Tribe, which relies on access to the area for important cultural and ancestral purposes. FAA00004088-89; FAA00003260.

### Harm from SpaceX's activities

Since SpaceX began using the Boca Chica facility in 2014 for testing rockets, it has caused significant environmental harm to the surrounding habitat. *See* FAA00051087; FAA00046057-58. Lighting and noise generated by construction activities, tank and engine testing, and launches (including 24/7 operations that light up the entire launch area with bright lighting) has harmed and displaced wildlife—including protected species—that rely on the adjacent habitat. FAA00044991; FAA00046068; FAA00044991. And since 2014 there have been at least 10 explosions (i.e., anomalies), that have resulted in debris, including concrete and metal, spread across the adjacent Refuge lands—including designated critical habitat for ESA-listed species—and several brush fires. FAA00043885; FAA00051014 (FWS noting that several explosive incidents resulted in debris and wildfires on refuge managed lands that damaged sensitive habitats). These events have caused considerable direct harm to sensitive tidal flat habitat, as has debris retrieval efforts that cause rutting that interrupts tidal water sheet flow across the tidal flats. FAA00010609; FAA00044981.

According to expert wildlife and environmental protection agencies, SpaceX's activities at Boca Chica have caused, and were likely to continue to cause under the new program authorized by FAA, significant environmental harm. FWS described the impacts of SpaceX's activities at Boca Chica as having "both 'adverse' and 'severe' impacts to Refuge public use,

management, wildlife, and habitat." FAA00051014. According to FWS, SpaceX activities have prevented public access year-round, hampered wildlife monitoring and sea turtle patrols, interfered with refuge management and law enforcement patrols, increased road mortality of wildlife at all hours of daytime and nighttime, damaged sensitive habitats such as the wind tidal flats and the salt prairie from explosions and fires, and adversely impacted nesting habitat for sensitive species. *See* FAA00051014; FAA00043885.

It was clear that such harm would continue and worsen for the new Starship/Superheavy Launch Program, since SpaceX proposed increasing the use of Boca Chica through testing even larger experimental rockets at a greater frequency. *See* FAA00046057-58 (TPWD stating that the "unavoidable and significant" impacts would increase in severity for a new launch program testing even larger vehicles at an increased frequency). TPWD explained that the cumulative impacts of the new Launch Program—including from construction, closures, loss of habitat, noise, lighting, and the impacts associated with unexpected anomalies (explosions)—would result in "direct and indirect impacts to and disturbance of wildlife and wildlife habitat on adjacent properties." FAA00051087; *see also* FAA00014244 ("Damages [from anomalies] are thus objectively demonstrable and should be considered certainly possible in the future given the nature of past debris fields."). The EPA similarly explained that the proposed project would result in substantial unacceptable adverse impacts to aquatic resources of national importance (ARNI) due to the loss of aquatic resource functions and ecosystem values for unique habitats with limited distributions that are essential foraging habitats for wintering and migrating shorebirds, including ESA-listed species. FAA00046039-40.

SpaceX's testing and launch activities also require hundreds of hours of access restrictions to the Boca Chica area, including temporary road closures for launch operations and

construction activities. FAA00011445. These closures hinder Refuge management,

FAA00010609, FAA00056934-35, FAA00051014-15, prevent the community from accessing

public lands that low-income and minority populations rely on, FAA00000699, FAA00003261,

FAA00000535, FAA00004088, FAA00003737-38, and inhibit the Carrizo/Comecrudo Tribe

from accessing their sacred lands to perform vital cultural ceremonies. FAA00003973;

FAA00003260; FAA00004088-89 (closures restrict access by the Tribe to an area that is an

"extremely important sacred cultural, ancestral, and historic site").

### The FAA's NEPA determination

The FAA imposed several mitigation measures to purportedly address the myriad impacts

of the proposed Starship/Superheavy Launch Program. FAA00011464-FAA00011467. However,

none of those measures is able to prevent many of the direct, significant adverse environmental

impacts from occurring. As TPWD explained, the "significant adverse effect" on adjacent habitat

from anomalies "cannot be satisfactorily mitigated," FWS00014248-49. Indeed, the ability to

rehabilitate such habitat is "unproven." FAA00007574; FAA00014242 (TPWD stating that the

FAA's conclusion that algal flats and lomas habitat can recover from disturbances associated

with debris from anomalies and debris removal activity is "not supported"). The FAA also failed

to require standard mitigation measures to address the impacts of lighting, such as seasonal

restrictions to avoid harm during turtle nesting season, prohibiting night-time launch activities,

and restricting the use of metal halide lights that harm migratory birds and sea turtles.

FAA00014247; FAA00046068; FAA00011379; FAA00011379. Rather, the FAA has allowed

SpaceX to conduct night launches, with no seasonal restrictions, and has allowed SpaceX to light

up the entire area with bright lighting 24/7, contrary to the recommendations of the expert

wildlife agencies. FAA00011379; FAA00047163; FAA00045953. The FAA has also not

imposed sufficient mitigation to address the impacts of closures on Refuge management or on the Tribe, merely prohibiting closures during peak vacation times. *See* FAA00011466.

The FAA nevertheless concluded that mitigation measures would reduce the adverse environmental impacts of the Starship/Superheavy Launch Program below the level of "significance" for purposes of NEPA and that an EIS was not required. *See* FAA00012352 (The FAA conceding that, "[a]bsent implementation of the mitigation measures, significant impacts related to some environmental impact categories would occur and an EIS would be required"). The decision not to conduct an EIS, however, was actually delegated to SpaceX. When the FAA was initially asked whether a new EIS would be produced for the Starship/Superheavy Launch Program, the FAA's Chief of Staff for the Office of Commercial Space Transportation said that the FAA *would* do a new EIS. FAA00051671. However, the agency subsequently changed its position, and gave SpaceX the choice as to what level of NEPA review should be required. FAA00051672. The company unsurprisingly chose the cheaper, faster option: an EA/FONSI.

The FAA published the Final Programmatic Environmental Assessment (PEA) (prepared by SpaceX, FAA00011363), and Mitigated Finding of No Significant Impact/Record of Decision (Mitigated FONSI/ROD) on June 13, 2022. FAA00011354-536; FAA00010295-334.

## STANDARD OF REVIEW

The APA governs judicial review of agency action taken under NEPA. *See Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 72 (D.C. Cir. 2011) (applying the APA's standard of review to NEPA). The APA instructs the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Birckhead v. FERC*, 925 F.3d 510, 515 (D.C. Cir. 2019) (The Court's role is "to ensure that the agency has

adequately considered and disclosed the environmental impact of its actions and that its decision

is not arbitrary or capricious") (citations and quotation marks omitted). The court is "principally

concerned with ensuring that [the Agency] has 'examine[d] the relevant data and articulate[d] a

satisfactory explanation for its action including a rational connection between the facts found and

the choice made,' that the Agency's 'decision was based on a consideration of the relevant

factors,' and that the Agency has made no 'clear error of judgment.'" *Bluewater Network v. EPA*,

370 F.3d 1, 11 (D.C. Cir. 2004) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State

Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## STANDING

Plaintiffs are a coalition of non-profit conservation groups and the Carrizo/Comecrudo

Tribe, and bring this lawsuit on behalf of their members, who are harmed by FAA's inadequate

environmental review of the Starship/Superheavy Launch Program. *See* First Am. Compl. ¶¶ 19-

36; Ex. 1 (Mancias Decl.); Ex. 2 (Branch Decl.); Ex. 3 (Adkins Decl.); Ex. 4 (Nixon Decl.); Ex.

5 (McQueen Decl.); Ex. 6 (Williams Decl.). Specifically, Plaintiffs have recreational, aesthetic,

preservation, and cultural interests in the wildlife and habitat of Boca Chica, and those interests

have been, and will continue to be, adversely affected by SpaceX's activities authorized by the

FAA. *See e.g.,* Ex. 1 ¶¶ 7, 11; Ex. 2 ¶¶ 7-20; Ex. 3 ¶¶ 5-13; Ex. 4 ¶ 20 Ex. 5 ¶¶ 18-19.

Furthermore, SpaceX's construction, testing, and launch activities require hundreds of

hours of access restrictions to the Boca Chica area, which harm Plaintiffs' member's interests in

accessing public lands for recreation—*see* Ex. 2 ¶ 14; Ex. 4 ¶ 19; Ex. 5 ¶ 19—and inhibit the

Carrizo/Comecrudo Tribe from accessing their sacred ancestral lands. Indeed, the Tribe has been

prevented from accessing Boca Chica beach several times—the sacred origin site of their

people—to undertake ceremonies and leave offerings to their ancestors because of the frequent

beach closures that have occurred for purposes of SpaceX activities. Ex. 1 at ¶¶ 8-9. These are concrete and particularized harms that are the direct result of SpaceX's activities authorized by the FAA. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). A Court order vacating FAA's authorization pending further NEPA review would redress Plaintiffs' injuries.

<u>**ARGUMENT**</u>

I.  **The Significant Environmental Impact of the Starship/Superheavy Launch Program Requires an EIS.**

    A.  **Expert Agencies Told the FAA that the Proposed Action Would Have Significant Adverse Impacts and Required an EIS.**

An EIS was required before the FAA could permit SpaceX to test and launch the largest rockets known to humankind in the middle of an area of extraordinary conservation value. The FAA's approval of the SpaceX Starship/Superheavy Launch Program is a quintessential "major federal action that might 'significantly' affect the human environment," requiring an EIS. *Am. Rivers & Ala. Rivers All. v. FERC*, 895 F.3d 32, 49 (D.C. Cir. 2018) (citation omitted); 42 U.S.C. § 4332(2)(C). Given the history of environmental harm from SpaceX's activities at Boca Chica, the FAA was well aware that the new Launch Program was likely to cause significant environmental impacts. *See Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983) ("If *any* 'significant' environmental impacts might result from the proposed agency action, then an [EIS] must be prepared *before* the action is taken.").

Indeed, FWS, EPA, and TPWD—the expert agencies who "serve as stewards of the exact resources at issue," *National Parks Conservation Association v. Semonite,* 916 F.3d 1075, 1085 (D.C. Cir. 2019)—told the FAA that the environmental impacts of SpaceX's activities were

significant.[3] For example, while the FAA downplayed many of the impacts of SpaceX's activities—characterizing them as merely intermittent and/or short-term[4]—FWS described SpaceX's operations as having "both 'adverse' and 'severe' impacts to Refuge public use, management, wildlife, and habitat," FAA00051014, which have "significantly diminished [FWS'] ability to maintain the biological integrity, diversity, and environmental health of Refuge resources" at the Boca Chica tract of the adjacent Wildlife Refuge, FAA00051014.

TPWD likewise stated that the Starship/Superheavy Launch Program "would result in *extensive environmental impacts*" to "adjacent [] public lands *containing rare and unique ecosystems*." FAA00046091 (emphasis added). TPWD described the cumulative impacts of SpaceX's activities—including from construction, closures, loss of habitat, increased traffic, noise, nighttime lighting, and anomalies (with fires and scattered debris)—as adversely affecting the integrity of surrounding conservation lands and ecologically critical habitat. FAA00051087. And the EPA similarly noted that SpaceX's activities would cause "significant degradation," including "to [the] surrounding habitat area due to launch and post-launch activities."

---

[3] Pursuant to FAA Order 1050.1F Part 4-3, in determining whether the action is significant for purposes of NEPA, and thus an EIS is required, the FAA must consider such things as "the unique characteristics of the geographic area" (e.g., proximity to parks, wetlands, ecologically critical areas); "[a]dverse impacts on endangered or threatened species or critical habitat"; environmental justice impacts; and "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." *See* FAA00057666. That determination requires consideration of both the context and intensity of the agency action, and for a site-specific action, significance depends upon local impacts, with both short and long-term impacts being relevant. *Id*. "Implicating any one of the [significance] factors may be sufficient to require development of an EIS." *National Parks Conservation Association,* 916 F.3d at 1082.

[4] *See e.g.,* FAA00011420, FAA00011460, FAA00011494 (discussing the supposed "intermittent and temporary" or "short duration" nature of noise impacts); FAA00011445 (stating the impacts of closures are not significant because "access restrictions would be intermittent, temporary, and short").

FAA00046041.[5] These statements raise, at the very least, a "substantial question" as to whether the Launch Program would have significant environmental impacts and thus require an EIS. *See Friends of Animals*, 610 F. Supp. 3d at 171 (agencies must prepare an EIS when there are "substantial questions [as to] whether a project may have a significant effect").[6]

Furthermore, these impacts concern ESA-listed species and ecologically critical habitat. *See* FAA00051015 (FWS stating "[t]here is documented evidence that the debris and its removal has impacted and scarred various habitats in the area, including tidal flats which are foraging habitat for the threatened piping plover and red knot"). The EPA stated that the "impacted mudflats, estuarine and non-tidal wetlands" are "aquatic resources of national importance [ARNI]," and these "unique habitats with limited distributions" are essential foraging habitats for wintering and migrating shorebirds, including listed species. FAA00046039. The EPA concluded that "the proposed project activities, magnitude of impacts, and subsequent loss of aquatic resource functions and ecosystem values may result in *substantial unacceptable adverse effects* to the ARNI." FAA00046040 (emphasis added).[7]

---

[5] Statements from FAA itself also show that the agency *knew* the impacts of SpaceX's activities were significant, noting the "more extensive than usual" review needed to address anomalies, as well as the fact that "[m]any agencies have expressed concerns" regarding closures and the impacts on public lands. FAA00046933-34. Thus, the FAA was well aware that there were substantial questions about the impacts of the launch program. *See National Parks Conservation Association,* 916 F.3d at 1083 (an EIS is required where the agency's assessment of the project's effects has "drawn consistent and strenuous opposition, often in the form of concrete objections," particularly from other expert agencies with subject-matter expertise).

[6] The FAA never meaningfully responded to these pointed concerns raised by the expert agencies, even though the NEPA process requires the lead agency to respond to opposing viewpoints concerning the adequacy of the analyses at issue. 42 U.S.C. § 4332(C); *see also Vecinos Para El Bienestar De La Comunidad Costera v. FERC*, 6 F.4th 11321, 1328-39 (D.C Cir. 2021) (recognizing the essential role of other federal agencies with expertise with respect to the environmental impacts involved in a proposed action).

[7] The EPA also explained that the impacts to the area from SpaceX's activities undermine the investment that has been made in protecting the sensitive habitats surrounding the launch facility,

TPWD likewise stated that it "has concern for significant secondary and cumulative impacts to . . . fish and wildlife resources, including jurisdictional special aquatic sites," from operations at the project site, and had "reason to believe that these secondary and cumulative impacts will increase in both frequency and magnitude as a result of the proposed project." FAA00046054.[8] Thus, an EIS was clearly required. *See* FAA Order 1050.1F at 4-2 (FAA00057665) ("If the proposed action would cause significant incremental additions to cumulative impacts, an EIS is required."); *Id.* at 4-3 (FAA00057666) (whether an activity is significant requires a consideration of adverse impacts to ecologically critical areas and protected species); *Friends of the Earth, Inc. v. United States Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 43 (D.D.C. 2000) (impacts to an ecologically critical area "impels the preparation of an EIS"); *Sierra Club v. United States Army Corps of Eng'rs*, 803 F.3d 31, 46 (D.C. Cir. 2015) (Allowing an activity that would take (i.e., harm) endangered species, even on the condition that the permittee take mitigating measures, "amount[s] to *significant* federal action" under NEPA).

And as discussed in detail below, the record shows that the significant impacts of the Starship/Superheavy Launch Program have not been mitigated to the extent that an EIS is no longer required, and the FAA never actually addressed how the proposed mitigation could possibly reduce the impacts of the Launch Program below the level of significance. *See*

─────────────

noting that "[i]mpacts to the local water quality in this region may jeopardize [] large-scale restoration investments" within the Bahia Grande coastal corridor. FAA00046046.

[8] As TPWD explained, ecologically critical areas such as "[t]idal and algal flats provide important feeding and nesting habitat to shorebirds in general, and critically important feeding habitat to short-legged shorebirds, such as plovers," and the history of "anomalies/explosions with debris landing in special aquatic sites and cultural sites located on TPWD-owned property located north of the project site," pose "significant secondary and cumulative impacts" to "fish and wildlife resources." FAA00046054 (discussing rutting, trampling, and compaction of tidal flat habitat, as well as rutting and denuding of native plant communities from the use of heavy equipment, drag lines, and foot traffic).

FAA00012352 (The FAA conceding that, "[a]bsent implementation of the mitigation measures, significant impacts related to some environmental impact categories would occur and an EIS would be required"); *New York*, 681 F.3d at 477-79 (When reviewing a mitigated FONSI, the Court's role is to determine whether the "probability [of harm] is so low as to be remote and speculative, or if the combination of probability and harm is sufficiently minimal"). Rather, many of the impacts have not been mitigated at all, and even with the mitigation set forth in the PEA/ROD/FONSI the Starship/Superheavy program poses significant environmental harm, including to protected species.[9] Thus, it does not matter whether the agency "attempted to resolve the controversy" with unproven mitigation. *National Parks Conservation Association*, 916 F.3d at 1085-86. "Indeed, an EIS is perhaps especially warranted where an agency explanation confronts but fails to resolve serious outside criticism, leaving a project's effects uncertain." *Id*.

Here, the expert agencies made clear that an EIS was required. FWS staff stated unequivocally that an EIS should be required because of the nature of the Launch Program's impacts. *See* FAA00013275, FAA00045961 (Comment stating that due to the "significant changes" to the launch program from what was analyzed in the 2014 EIS and the "extended impacts" from SpaceX's activities at Boca Chica, the FAA "should require an[] EIS and not just

---

[9] It was also arbitrary and capricious for the FAA to rely on SpaceX implementing *any* of the proposed mitigation measures to avoid the need to provide an EIS. *See* FAA Order 1050.1F at 6-7 (FAA00057702) (stating the FAA must ensure that the mitigation measures will be implemented by the applicant to support a mitigated FONSI). SpaceX has a history of failing to implement such measures: According to FWS, SpaceX failed to abide by the terms of its prior agreements to mitigate harm to the environment. *See* FAA00045112. Thus, even if the proposed mitigation measures *could* reduce the impacts of the Launch Program below the level of "significant," which they cannot, the FAA has failed to provide "substantial evidence" to support the mitigated FONSI. *See Coalition for Healthy Ports v. United States Coast Guard*, 2015 U.S. Dist. LEXIS 159090, *70-71 (D.C. Cir. 2021) (the adequacy of mitigation measures to reduce the impacts below the level of significance must be supported by "substantial evidence").

an EA" to consider the impacts to wildlife, including endangered species and migratory birds). TPWD likewise stated that an EA is "insufficient" to evaluate "all the potential impacts associated with the proposed action." FAA00046275. Thus, TPWD recommended "preparing an EIS" to address the short- and long-term impacts of the Starship/Superheavy launch program. FAA00046057.

TPWD was also critical of FAA's decision not to do an EIS given that the 2014 EIS for the prior SpaceX launch program at Boca Chica *already* "*determined*" that SpaceX activities result in "*unavoidable and significant* direct and indirect impacts to several natural and cultural resource categories." FAA00046057 (emphasis added). As TPWD explained, evaluating the original project with an EIS set a precedent and acknowledged significant impacts. FAA00046282 (An EA "is incongruous with the original NEPA process," and this proposal "warrant[s] a more comprehensive and critical review of environmental impacts"). TPWD emphasized that the Starship/Superheavy Launch Program will be even more environmentally damaging than what was previously considered in 2014—with much larger experimental rockets and more infrastructure—and that SpaceX is conducting activities that were not planned and included in the 2014 EIS. FAA00046057-58; *see also* FAA00046287 ("[A]s evidenced by the number of Written Re-evaluations prepared since 2014, the ongoing and proposed activities are much greater in both size and duration. TPWD has concerns that an EA may not adequately address all environmental issues associated with a project that is larger in scope than it was when evaluated with an EIS.").

The FAA, however, arbitrarily concluded that an EIS was not required despite these clear findings from expert agencies. *See Friends of the Earth, Inc.*, 109 F. Supp. 2d at 43 (finding that an EIS was required where expert agencies took issue with the action agency's evaluation of

effects); *Davis v. Mineta*, 302 F.3d 1104, 1123 (10th Cir., 2002) (while NEPA does not require a lead agency to agree with the comments of other agencies, a reviewing court "may properly be skeptical" if the agency "has apparently ignored the conflicting views of other agencies having pertinent expertise") (citation omitted). In making this determination, the FAA failed to take the required "hard look" at the impacts of the launch program. *See* FAA Order 1050.1F at 6-6 (FAA00057701) (to support a mitigated FONSI, the FAA must take a "hard look" at the problem); *Nat'l Comm. for the New River*, 373 F.3d at 1327 (the agency must take a "hard look at the environmental consequences of its decision to go forward with the project"). As discussed below, the FAA clearly failed to "consider every significant aspect of the environmental impact of a proposed action," *Baltimore Gas & Elec. Co.*, 462 U.S. at 97, and the determination not to prepare an EIS was not "fully informed and well considered," *City of Port Isabel v.* FERC, No. 23-1174 (D.C. Cir. 2024).

    In sum: Given the statements from expert agencies confirming that the environmental impacts of SpaceX's activities at Boca Chica are "adverse" and "severe," FAA00051014, as well as "unavoidable and significant," FAA00046057; that they were likely to get worse from a new launch program testing larger vehicles at an increased frequency, FAA00046054, FAA00046057-58; and explicit statements from those expert agencies regarding the need for an EIS, there is simply no way that FAA could have reasonably concluded that an EIS was not required for the Starship/Superheavy Launch Program. *See Friends of Animals*, 610 F. Supp. at 157 (an EIS is required if "substantial questions" were raised regarding impacts); *North Carolina v. Federal Aviation Administration*, 957 F.2d 1125, 1131-33 (4th Cir. 1992) (finding "legitimate controversy" present where "[s]tate, local and federal officials, interested individuals," and a federal agency "expressed concern"); *Foundation for North American Wild Sheep v. U.S.*

*Department of Agriculture*, 681 F.2d 1172, 1182 (9th Cir. 1982) (finding that criticism from

experts and agencies demonstrated the need for an EIS); *Standing Rock Sioux*, 985 F.3d at1043

("Congress created the EIS process to provide robust information in situations . . . where,

following an environmental assessment, the scope of a project's impacts remains both uncertain

and controversial.") (citing *National Parks,* 916 F.3d at 1087-88).

**B. The FAA did not Sufficiently Analyze or Mitigate the Significant Environmental Impacts of the Launch Program to Support a FONSI.**

The FAA knew that SpaceX's Starship/Superheavy Launch Program would harm the

surrounding environment through the noise, lighting, and closures associated with SpaceX's

activities, and had the potential for catastrophic harm from an anomaly. *See* FAA00012352 (FAA

conceding that, "[a]bsent implementation of the mitigation measures, significant impacts related

to some environmental impact categories would occur and an EIS would be required"). Many of

these significant environmental impacts were not fully analyzed in the FAA's PEA, as NEPA

requires. *See Idaho*, 35 F.3d at 595-96 (discussing NEPA's "hard look" requirement); FAA Order

1050.1F at 6-6 (FAA00057701) (same). Nor were these impacts mitigated to an extent that the

FAA could reasonably conclude that an EIS was not warranted. The FAA's mitigated FONSI is

therefore arbitrary and capricious.

**1. Noise and lighting cause significant environmental impacts that have not been adequately analyzed or mitigated.**

**a. The FAA failed to take a "hard look" at the significant impacts of noise and lighting on wildlife.**

The FAA acknowledged in the PEA that noise and lighting from the Launch Program can

adversely affect wildlife in the vicinity of the launch pad, including protected species and

designated critical habitat. *See e.g.,* FAA00011493-96, FAA00011499, FAA00011501-02. The

impacts, however, go beyond what the FAA contemplated. For example, one study found that

"night lighting along the Rio Grande River may be reducing the availability of Ocelot prey and restricting movements of Ocelots themselves." FAA00056556-57. And since the population of ocelots known to occupy the Laguna Atascosa National Wildlife Refuge near the SpaceX facility is one of only two remaining ocelot populations in the U.S., *see* FAA00056835, this raises serious concerns. Indeed, the lowest genetic diversity for ocelots has been observed in Cameron County Texas, which is "the only breeding population occurring on a US federal or state refuge," FAA00056841, and the affected ocelot population is "well below the minimum population viability size recommended for long-term survival," FAA00056843. Accordingly, any impacts to this population are clearly significant to the continued existence of the species.

Lighting at the SpaceX facility also affects endangered sea turtles that rely on the Boca Chica beach for nesting. "Lighting on beaches may disrupt hatchling emergence from sea turtle nests. Hatchlings that crawl toward artificial light sources are following the same instinctive response that leads them seaward. This effect may result in harassment or harm to sea turtle species." FAA00011493. Lighting at the SpaceX facility has similar adverse impacts on migratory birds, which can "result in abandonment of nesting and roosting areas. . . ." FAA00011496-97. Indeed, it is "well documented that artificial night lighting is a cause of mortality among migratory birds and hatchling sea turtles (Salmon 2006)," and that "Skyglow can disorient hatchlings as they emerge on the beach, directing them into the dunes rather than toward the ocean, resulting in mortality." FAA00051076.

Noise from SpaceX's activities also has significant impacts on the wildlife in the area. The FAA concedes that noise from launches *will* displace plovers from their critical habitat as well as the many other migratory birds that rely on Boca Chica. *See* FAA00011496. And, while the FAA acknowledged that wildlife displacement from such noise "can affect normal foraging,

migratory, and breeding behaviors," FAA00011492, and that noise could "interrupt normal wildlife behavior periodically in the study area during [] operations," FAA00011494, it never actually examined how this would affect the wildlife that depend on Boca Chica, concluding without sufficient support that the impacts would be insignificant. *Id*. (concluding that "[b]ecause impacts from operations would be intermittent and of short duration, they are not expected to significantly affect wildlife"). But FWS found that "[l]isted species within 1,600 feet to 1,800 feet from the launch site would be subjected to high intensity sounds that may cause tissue damage or deafening and may be debilitating and cause disorientation or loss of balance (Leventhall et al 2003)." FAA00043875. Likewise, outside experts noted that tank tests and launches generate "extreme noise that could potentially deafen birds or cause brain damage." FAA00051626 (letter from Dr. Rob Clay, Director of the Western Hemisphere Shorebird Reserve Network). That is certainly a significant environmental impact—even if the source is intermittent—yet the PEA never discusses it. *See Alliance for the Wild Rockies v. Bradford*, 720 F. Supp. 2d 1193, 1212-13 (D. Mont, 2010) (discussing harassment and displacement of wildlife as a significant impact).

The FAA therefore failed to take the requisite "hard look" at the harm from noise and lighting. Rather, it asserted that there are merely intermittent and/or short-term impacts, and thus not expected to substantially harm or disturb wildlife. *See e.g.,* FAA00011420, FAA00011460, FAA00011494. This conclusion is not supported by the record, which shows that significant noise and lighting impacts at Boca Chica are ongoing and continuous. Indeed, FWS stated that construction occurs "24 hours a day and night, seven days a week, increasing noise, lighting and human impacts to threatened and endangered species." FAA00044991. TPWD likewise stated that it "continues to be concerned with the wildlife impacts created by *continuous* noise and

lighting associated with the project area," which "can disrupt ecosystems and alter organisms'

behavior and physiology." FAA00046068 (emphasis added). TPWD also noted that "the VLA is

often illuminated at night when launches/testing are not occurring, and employees/contractors

allow vehicle lights to be directed laterally into public land for hours at a time." FAA00046290-

91. As TPWD stated, this is not consistent with accepted standards for nighttime lighting. *Id.* The

PEA, however, failed to adequately address these concerns.

According to FWS, expert studies show that the noise and light from SpaceX's activities

at Boca Chica are *already* adversely affecting ESA-listed piping plovers that rely on the adjacent

algal flats—designated as critical habitat—and would continue to do so due to the species' high

site fidelity (i.e., dependence on the area).[10] FWS noted that surveys showed a decline in plovers

coinciding with the major buildout and testing of SpaceX infrastructure from 2019-2021, which

suggests that SpaceX has "negatively impacted the threatened piping plover and other non-listed

shorebirds beyond the applicant's property boundaries." FAA00043854. As FWS explained,

"noise from launches and equipment may disrupt groups of birds foraging on the tidal flats and

cause them to expend energy" to move away from the noise. FAA00046013.[11]

FWS has also affirmed that the impacts of noise from SpaceX's activities have not been

sufficiently analyzed. *See* FAA00010609 ("The effect of both existing and anticipated noise

levels on wildlife, such as nesting sea turtles or birds, resulting from these tests has not been

adequately analyzed and there has been no demonstration that the noise levels pose no harmful

---

[10] *See* FAA00039572 ("[T]he established literature document[s] very high site fidelity for the species; in other words, it is exceedingly rare that Piping Plovers change wintering areas once they have survived their first nonbreeding season.").

[11] FWS has affirmed that Boca Chica is "one of the single most important wintering areas" for piping plovers. FAA00043854. "If SpaceX activities have resulted in the loss of over half the Boca Chica wintering population [as surveys showed,] then the entire critical habitat within the Action Area is likely being impacted." *Id*.

effect."). As TPWD explained, the FAA "does not account for or distinguish between the very different intensity, volume, and kinds of human uses being compared." FAA00014246. The PEA simply does not grapple with the actual short- and long-term impacts of wildlife displacement and harassment in this vital habitat area from the intense noise generated by SpaceX.

It is therefore readily apparent that the noise and lighting associated with SpaceX's activities cause significant adverse impacts, yet the FAA failed to take the required "hard look" at the short- and long-term impacts on wildlife that depend on Boca Chica. *See Idaho*, 35 F.3d at 595 (In reviewing an agency's decision not to issue an EIS, the court must determine whether the agency has accurately identified the relevant environmental concerns, and has taken a "hard look" at the problem); *Nat'l Comm. For the New River*, 373 F.3d at 1327 (the agency must take a hard look at the environmental consequences of its decision). The FAA's dismissal of noise and lighting impacts as insignificant is simply not supported by the record evidence. *See State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious if agency "offered an explanation for its decision that runs counter to the evidence before the agency").

### b. The impacts of noise and lighting on wildlife have not been sufficiently mitigated to support a FONSI.

Although the FAA failed to fully analyze the significant impacts of noise and lighting, it is clear that such impacts have not been adequately mitigated to support a FONSI. Indeed, the significant impacts associated with noise *cannot* be mitigated such that they could be rendered "insignificant," since there is simply no way to prevent noise from construction activities and rocket testing/launches (including explosions) from impacting the surrounding habitat. Moreover, none of the mitigation measures set forth in the PEA addresses the significant noise impacts identified by the expert wildlife agencies discussed above. The mitigated FONSI was therefore arbitrary and capricious. *See State Farm*, 463 U.S. at 43 (agency action is arbitrary and

capricious if agency "failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency").

As for the impacts of lighting, the FAA failed to require basic mitigation measures to address the significant adverse impacts identified by the expert agencies, and instead relied on unsupported assumptions. For example, the FAA relied on surveys that gather sea turtle eggs for hatching in a facility to suggest that impacts to sea turtles from nighttime lighting would be insignificant. FAA00011493. As TPWD explained, however, this does "not justify the use of nighttime lighting during construction and operation activities," as it still poses a threat to Kemp's Ridley sea turtles, the most endangered species of sea turtle in the world. FAA00014247.

Rather, the proven way to avoid and minimize impacts to sea turtles is, as TPWD explained, by limiting nighttime construction and operations "to the period outside the sea turtle nesting season which is typically understood to be April through September." *Id.*[12] Thus, citing "the well-documented deleterious effects of artificial night lighting on wildlife," TPWD recommended that "nighttime construction and testing . . . be discontinued [or] severely limited. . . ." FAA00046068. FWS expressed similar concerns over SpaceX's plans for night launches, which could have significant adverse impacts on sea turtles. FAA00045953, FAA00046006.

The FAA, however, ignored the expert's admonitions, and did not implement measures to limit nighttime lighting, and has allowed night launches to take place without any seasonal restrictions. FAA00011379 (showing launches may occur day or night). Further, TPWD has observed that the launch pad, "1,000 feet from the nesting beach of one of the world's most

---

[12] This is consistent with measures employed at the Kennedy Space Center (KSC), where the use of exterior lights is precluded between 9 p.m. and dawn from May 1 through October 31 to protect endangered sea turtles. *See* FAA00001831; FAA00003022 (Cape Canaveral Spaceport Development Manual).

endangered sea turtles, is frequently brightly lit to accommodate nighttime construction, when neither night launches nor testing are occurring." FAA00047163. Indeed, "[n]ight lighting for construction now appears to be a permanent component of operations." *Id*. FWS likewise noted that nighttime activity appears to be occurring "24/7 year round," which FWS believed should be "avoided as much as possible." FAA00045953.[13]

Furthermore, while at the Kennedy Space Center (KSC)—which is also situated near turtle nesting beaches—metal halide and mercury vapor lights with wavelengths between 320-560nm may not be used because of the impact on turtles, FAA00003022, the FAA ignored this mitigation measure for the Boca Chica site in the PEA. Rather, FAA has expressly allowed SpaceX to use metal halide spotlights. *See* FAA00011379 ("These spotlights are typically metal halide."). And while the PEA states that lighting should be shielded from the beach, this "mitigation" measure was also contained in the 2014 EIS, yet the FAA was well-aware that unshielded "white lighting" spotlights have been used to light up the entire area—including the beach—nearly 24 hours a day, 7 days a week throughout the year. FAA00045953; FAA00046290-91.

Nothing in the PEA would alter or restrict the ongoing impacts of lighting. While the PEA includes as a vague "mitigation measure" that SpaceX "minimize lighting effects on wildlife" by shielding lights and "turning the lights off *when not needed*," FAA00011434 (emphasis added), that is meaningless given that unshielded lighting has been, and will continue to be, used continuously. FAA00046068; FAA00011379 (PEA stating that "[i]n addition to nighttime launch activity, SpaceX would need to perform ground support operations 24 hours a

---

[13] SpaceX itself has acknowledged that it has "24/7 ops going on both at the pad and the production area," and therefore the lights will likely be on "constantly" to work on ground systems and launch vehicles. FAA00044986-87.

day, 7 days a week, throughout the year. White lighting is needed to ensure the protection and safety of SpaceX personnel"). In fact, SpaceX appears to have rejected any mitigation that would preclude such lighting, stating in an email to the FAA that it was willing to comply with any mitigation measures deemed appropriate by FAA and FWS, other than "operational constraints" including "lighting at the pad throughout the year to support operations." FAA00046104. This undermines any argument that the impacts from lighting have been adequately mitigated.

Thus, it is readily apparent that the significant adverse impacts of noise and lighting have not been sufficiently mitigated to avoid significant impacts. *See Town of Cave Creek*, 325 F.3d at 327 (when examining a mitigated FONSI, the court's job is to determine whether an EIS is unnecessary because "'changes or safeguards in the project sufficiently reduce the impact to a minimum'") (quoting *Sierra Club v. DOT*, 753 F.2d at 127). Accordingly, the FAA's decision to issue a mitigated FONSI, rather than produce an EIS, was arbitrary and capricious. *See New York*, 681 F.3d at 477-79 (finding of no significant impact is appropriate only if a grave harm's "probability is so low as to be remote and speculative, or if the combination of probability and harm is sufficiently minimal") (internal quotation marks omitted).

### c. Noise has significant adverse impacts on the community.

Noise from rocket launches also causes significant impacts to the community. The SpaceX Noise Assessment shows that dozens of homes in Port Isabel are within the area where exposure can be expected to result in damage—clearly a significant impact on the surrounding community. *See* FAA00046418-24 (showing many homes in Port Isabel within the Lmax of 111 dB and 120 dB contour estimate areas, where damage is expected to occur). However, the FAA failed to adequately analyze this significant impact of the Launch Program, since it never discusses the potential health and safety effects, particularly as they relate to anomaly

explosions, sonic booms/overpressure, and high decibel noise in proximity to populated areas and schools. *See State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious if agency "failed to consider an important aspect of the problem").

Furthermore, the only "mitigation" identified is the requirement that SpaceX announce launch and landing events—leaving it to the public to figure out how to protect themselves— along with a required $500,000,000 insurance coverage per launch, which may serve to compensate for damage, but only *after* it takes place. FAA00011430. There is no mitigation that can *prevent* damage or health impacts (i.e., significant harm) from occurring, and thus no basis for avoiding the need to fully analyze this issue in an EIS. *See City of Dania Bach v FAA*, 485 F.3d 1181 (D.C. Cir. 2007) (stating that "piercing" and "severe" noises "are exactly the type of injuries that NEPA's procedural requirements were intended to mitigate"); *Hausrath v. U.S. Dep't of the Air Force*, 491 F. Sup. 3d 770 (D. Idaho 2020) (EA was arbitrary and capricious because it failed to take a hard look at potential interference with residents' sleep and speech and failed to adequately consider noise impacts on environmental justice communities).

### 2. Access closures have significant impacts that have not been adequately analyzed or mitigated.

SpaceX's operations at Boca Chica necessitate hundreds of hours of access closures (i.e., road closures and other access restrictions) for the area surrounding the facility, which includes public beaches, state parks, and wildlife refuge lands. The PEA contemplates as many as 500 hours per year of closures to accommodate construction and launch activities, with another 300 potential hours to respond to anomalies. FAA00011374. That, however, is an unsupported assumption, since the history of closures at Boca Chica shows that the actual closure hours will likely drastically exceed these predictions. Regardless, access closures have a significant impact on the community and hinder wildlife research and refuge management. This loss of access

disproportionately impacts low income communities and infringes upon the ability of the

Carrizo/Comecrudo Nation of Texas to access lands and waters that are part of their ancestral

heritage. These significant impacts have not been fully analyzed or addressed through mitigation

measures. As a result, the FAA failed to take the requisite "hard look" at closures, and the

impacts of closures remain "significant," requiring an EIS. *See Idaho*, 35 F.3d at 595-96.

### a. Closures have significant adverse impacts on the Carrizo/Comecrudo Tribe.

There can be no doubt that the hundreds of hours of access closures at Boca Chica—

which are likely to drastically exceed the 500 hours contemplated in the PEA[14]—significantly

disrupt the ability of the Carrizo/Comecrudo Tribe to hold their traditional cultural ceremonies.

Boca Chica beach is sacred to the Tribe, and the frequent closures prohibit Tribal members from

accessing an area of vital cultural, social, religious, and spiritual importance. *See* FAA00004088-

90 (Group comment letter—including the Tribe—discussing the impacts of closures on areas of

"cultural significance" to the Tribe that are "extremely important sacred cultural, ancestral, and

historic site[s]"); FAA00003260 (comment letter from Tribal member discussing the "sacred

sites" of Boca Chica and how access closures "restrict indigenous access to these sites and sacred

lands"); FAA00003973 (comment letter from Tribal member discussing impacts from SpaceX's

activities to "sacred land"). This is indisputably a significant impact. As the D.C. Circuit Court

held in *Standing Rock Sioux Tribe*, 985 F.3d at 1050, context is key: where the impacts will occur

in "a place of extraordinary importance to the Tribes," and in a "landscape of profound cultural

importance," that context "weighs in favor of requiring an EIS." *Id.*

---

[14] SpaceX closures have regularly exceeded 500 hours per year. *See* FAA00010609 (FWS "conservatively quantified" more than 1,000 closure hours in 2019); FAA00045949 (FWS noting that even though SpaceX was supposed to be limited to 500 hours of annual closures, in just 3 months FWS calculated there had been "well over 1,000 hours" of closures).

The record shows that the FAA failed to even consider this significant impact, let alone take a "hard look" at the impacts of closures on the Tribe, as NEPA requires. While the FAA claims to "respect the ancestral ties" of tribes to the Lower Rio Grande Valley, including the Carrizo/Comecrudo people, FAA00012360, and claims to have invited the Tribe to participate in a tribal consultation process,[15] the PEA is devoid of *any* acknowledgment that the Tribe considers Boca Chica beach to be an extremely important sacred area, and never discusses the impacts of SpaceX's closures on the Tribe, including their inability to access sacred lands for religious and cultural ceremonies. This neglect is fatal to the PEA. *See State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious if agency "failed to consider an important aspect of the problem").

Furthermore, none of the mitigation measures set forth in the PEA addresses this impact. SpaceX is not even required to communicate with the Tribe to ensure that closures do not affect tribal access to sacred lands for ceremonies. Further, no efforts have been made by the FAA or SpaceX to connect with the Tribe's chairman to discuss these issues. Ex. 1 at ¶ 12. Since this significant impact remains unaddressed and unresolved, the mitigated FONSI was arbitrary and capricious, and a full EIS is required to address the significant impacts of closures on the Tribe.

**b.  Closures significantly affect Refuge resources and wildlife.**

Closures also have significant impacts on the environment, including on the ability of Refuge managers to manage public lands and to conduct essential research and manage Refuge

---

[15] This claim is belied by communications in the record, including a March 2022 email from the Advisory Council on Historic Preservation to the FAA stating that the FAA could not possibly have made a "good faith effort to identify all potential consulting parties . . . given that one Indian tribe (the Carrizo/Comecrudo Tribe of Texas), was identified and invited to participate so late in the process." FAA00048785; *see also* FAA00003260 (comment from Tribal member discussing lack of consultation with the Tribe).

resources. The FAA, however, failed to address or mitigate concerns raised by the expert wildlife agencies over the significant impacts of closures, providing only scant discussion that never grappled with the effects on Refuge resources, including wildlife management. The FAA thus failed to take the "hard look" that NEPA requires, and the impacts of closures remain "significant," requiring the preparation of an EIS. *See Idaho*, 35 F.3d at 595-96.

The record shows that the FAA knew that the impacts of closures on adjacent Refuge lands are "significant." For example, the Coastal Bend Bays and Estuaries Program (CBBEP)— which conducts much of the piping plover and other wildlife research on the adjacent Refuge on behalf of FWS—told the FAA and FWS how research is impeded by closures, making it difficult to determine the actual impacts that SpaceX activities are having on wildlife: "Due to the near-constant closure notifications from SpaceX, there does not seem to be a way to continue the work going forward under anything resembling the current situation." FAA00045258, FAA00045259 (stating that research "will no longer be even remotely possible given the magnitude and frequency of the closures, and the last-minute (and after-the-fact) notices")*.* It was also clear that the situation would only get worse with the development of the Starship/Superheavy program: "As unworkable as the situation is at present, it seems likely to only get worse with the ongoing increase in activities and the major industrial expansion that SpaceX seeks to implement in a revised permit from FAA." *Id*. Thus, the FAA was well-aware that closures were having, and would continue to have, significant impacts on important wildlife research at Boca Chica.

FWS conveyed similar concerns to the FAA. *See e.g.,* FAA00056934-35 (discussing how closures "*severely impact*[]" public use and wildlife resources, and "*severely impair*" the ability

of FWS to manage Refuge lands) (emphasis added).[16] According to FWS, these closures have significant impacts: "Frequent closures caused by SpaceX activities are *already substantially impairing* both the Refuge's ability to adequately manage the Refuge and the public's enjoyment of the Boca Chica Beach area for wildlife-dependent recreation." FAA00010609 (emphasis added); *see also* FAA00051014 (same language). FWS described the frequent closures as having "adverse" and even "severe" impacts "to Refuge public use, management, wildlife, and habitat from SpaceX activities." *Id*. Thus, there can be no doubt that the impacts of closures are significant. According to FWS, "features and attributes of the Refuge that have *already been substantially impaired* include the sensitive tidal flats, salt prairies, wildlife, and sensitive bird nesting and wintering sites." *Id.* (emphasis added). Moreover, "these features and attributes will [continue to] be substantially impaired by increased closures." FAA00051015.

FWS also specifically noted that the Starship/Superheavy Launch Program "will only exacerbate the levels of impairment of Refuge properties," FAA00010609*,* and the impacts are likely to be much greater than FAA has contemplated, since the actual number of closure hours is likely to drastically exceed SpaceX's prediction of 500 hours. *See* FAA00010609 (FWS noting SpaceX's history of not abiding by the limitations on closures). FWS noted that there had been "well over 1,000 hours" of closures in just three months, and that over the past few years, closures "have been beyond 500 hours each year." *Id*.; *see also* FAA00051015 ("In 2019, the FWS recorded over 1,000 closure hours."). Thus, FWS described the estimate of 500 hours for closures as "unrealistic," FAA00045955, and a "gross misstatement" of what will actually occur,

---

[16] *See also* FAA00044991-92 (email from FWS stating that closures impede access to monitor species and described the closures as "excessive"); FAA00013295 (FWS stating that the closures "affect the folks surveying for sea turtles on the beach," and that piping plover researchers are affected by such closures); FAA00044966 (discussing how closures prevent researchers from scheduling activities).

FAA00045959. The FAA therefore "failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious if agency offered only "[c]onclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict….") (quoting *Union United Mine Workers v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010)).

TPWD likewise stated that closures impact its "ability[y] to conduct [] day-to-day activities and fulfill [its] mission to provide outdoor recreational opportunities to the public, conduct and collect scientific research and imperiled species monitoring data, and to protect and preserve the state's natural resources." FAA00050994. According to TPWD, "[t]hese [access] restrictions result in actual, measurable impacts." FAA00046281. TPWD also stated that the increase in closures—from 180 in the 2014 EIS to 500 now—raises "serious concerns." FAA00046282. And TPWD similarly noted that the actual number of closures would likely "far exceed[]" the number of hours authorized by FAA. *See* FAA00046282-83 (TPWD found that "[a]ctual closures, as calculated by TPWD and others, have far exceeded the number of hours authorized by FAA to date").[17]

Moreover, TPWD criticized the FAA for only considering closures in an EA, rather than an EIS, stating that it was "incongruous with the original [2014] NEPA process and for this reason alone should warrant a more comprehensive and critical review of environmental impacts." FAA00046282. FWS likewise noted that the closures required a full review in an EIS,

---

[17] TPWD also raised concerns about the "lack of consequences for exceeding authorized activities," which the agency believes "will result in continued disregard for licensing authorization requirements and the process associated with NEPA." FAA00046284-85. As TPWD notes, "[h]istorical compliance by SpaceX is relevant to evaluating future authorizations." *Id.* The FAA, however, failed to address this critical issue in the PEA. *See Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[A]n agency cannot ignore evidence contradicting its position.").

stating that when closures occur, "wildlife-dependent recreational uses are *substantially impaired* because they are not available to the public," and thus "the impacts of the increased road closures are *significant as that term is defined by NEPA*." FAA00051015 (emphasis added). This should leave no doubt that an EIS was required.

In sum, the statements from the expert agencies demonstrate that closures have significant impacts on Refuge resources, including ecologically critical areas and protected wildlife. None of the PEA's proposed mitigation measures addresses these impacts of closures. Hence, the PEA/FONSI was arbitrary and capricious. *Nat'l Parks Conservation Ass'n v. United States Forest Serv*., 177 F. Supp. 3d 1, 33 (D.D.C. 2016) (holding an EA invalid because it "did not establish the intensity of that impact, nor the efficacy of the mitigation measures designed to offset that unquantified impact") (quoting *National Parks & Conservation Association v. Babbitt*, 241 F.3d 722, 736-37 (9th Cir. 2001).

### c.  Closures have significant impacts on the community.

Closures also disrupt the use of the area as a resource for recreation and subsistence fishing.[18] As TPWD stated, the frequent closures of access to Boca Chica "do[] not allow adequate planning by the public or landowners and their authorized users. Closure notifications continue to be provided either the same day or as little as one to four days prior to closures, and notification of closure extensions have occurred after the extension period has begun. Also, revocation of closures occur well into the authorized closure window after [people] may have

---

[18] *See e.g.,* FAA00000535 (comment letter from community member discussing how the "overwhelming constant beach access closures have been an inconvenience and nuisance," affecting his ability to access the area for fishing); *see also* Ex. 2 (Branch Decl.) at ¶ 14; Ex. 3 (Adkins Decl.) at ¶¶ 9-10; Ex. 4 (Nixon Decl.) at ¶ 19; Ex. 5 (McQueen Decl.) at ¶ 19.

abandoned their plans for the day." FAA00046066; *see also* FAA00046278 ("The applicant should address compensation to the public for restricting beach and public land access.").

As one commenter noted, access to Boca Chica is essential as a food source for the community, and the closures "deny [the] community access to free food," which is "especially egregious in a community that is considered a 'food swamp' which means that we don't have access to affordable healthy food." FAA00047520; *see also* FAA00000699 (comment letter discussing impacts to "historically marginalized people of color" due to access restrictions affecting the ability to fish and recreate at Boca Chica beach); FAA00003261 (same); FAA00004088 (Group comment letter discussing impacts of closures on the primarily low-income and minority community, including "for many residents who use the beach to fish"); FAA00003737-38 (comment letter discussing the impacts of closures on low-income and minority population that relies on the area "for economic and familial subsistence"). Depriving the community of a much-needed natural resource is undoubtedly a "significant" impact.

FWS in fact advised the FAA that closures "affect a population with limited income and few options to recreate. Boca Chica is the only beach that is free to the nearby and largely Hispanic communities." FAA00010609. According to FWS, closures have therefore had a significant impact on the local community: "Over the past six years, closures of the road to Boca Chica Beach have become increasingly frequent and may occur for one or more days due to delays or problems occurring during testing. the extended closures occurring for hazardous explosion- and debris-related events or delays are deterrents for public access to the Boca Chica tract and its beaches for the duration of all published closure timeframes." *Id.*

None of the mitigation measures in the PEA address the impacts of the closures on the community, other than avoiding the busiest holidays. FWS has suggested that the FAA require

SpaceX to "utilize predictive scheduling with a minimum of two-week advance notice for road closures," and to require SpaceX to "comply with a specific road closure window." FAA00010610. For example, FWS explained, closures should be "limited to a single day rather than a proposed date with two coinciding back up days." FAA00010611. However, the FAA did not include any of these measures to address or mitigate the significant impacts of closures on the community. Thus, the impacts remain significant, and an EIS was required. *See Town of Cave Creek*, 325 F.3d at 327 (when examining a mitigated FONSI, the court's job is, *inter alia*, to determine whether an EIS is truly unnecessary because "'changes or safeguards in the project sufficiently reduce the impact to a minimum'") (quoting *Sierra Club v. DOT*, 753 F.2d at 127).

### 3. Anomalies cause significant environmental harm that cannot be sufficiently mitigated, requiring an EIS.

There is simply no legitimate argument that SpaceX's plan to test and launch the largest rockets known to humankind in the middle of ecologically critical lands could not result in *any* significant environmental impacts given SpaceX's history of explosions at Boca Chica. *See* FAA00046054 (TPWD noting the area affected by prior anomalies is "critically important feeding habitat" for birds protected under the MBTA and ESA).[19] Indeed, the PEA acknowledged that Starship/Superheavy anomalies were *expected* to occur, which could result in damage to critically important wildlife habitat. *See* FAA00011460 (PEA noting "[a] Starship/Super Heavy anomaly could result in an explosion on the launch pad, which would spread debris," including in the adjacent preservation lands, causing direct harm to wildlife habitat); FAA00011516 (PEA

---

[19] As the EPA noted, the habitat affected by anomalies is an especially sensitive wetland type known as tidal flats, which are "aquatic resources of national importance" and "unique habitats with limited distributions in the world." FAA00046039. Furthermore, the area is designated as a Site of International Importance, critical to the survival of many species of shorebirds and waterfowl. "Due to their importance, losses to these habitat types should be avoided or greatly minimized." FAA00046040.

stating that SpaceX anticipates the need for up to 300 hours of closures per year to address anomalies). And none of the mitigation measures set forth in the PEA can prevent or adequately address the significant environmental harm from explosions. An EIS was therefore required. *See Sierra Club*, 717 F.2d at 1415 (it is well-settled that "[i]f any 'significant' environmental impacts might result from the proposed agency action then an EIS must be prepared before agency action is taken"); *see also Am. Rivers & Ala. Rivers Alliance*, 895 F.3d at 50 ("For the type of site-specific action at issue in this case, significance typically depends on the action's effects in the immediate locale, rather than in the broader ecosystem or world as a whole.").

### a. History and environmental impacts of anomalies.

The history of anomalies and explosions at Boca Chica—with debris repeatedly landing in the adjacent Refuge, including designated critical habitat—shows that the FAA knew that the Starship/Superheavy Launch Program was likely to result in anomalies that would cause significant environmental harm. *See* FAA00046054 (TPWD noting "significant secondary and cumulative impacts" from prior anomalies); FAA00014248 ("Because such impacts have actually occurred on conservation lands located within the vicinity of the project, it would seem both logical and appropriate for FAA to base its evaluation of potential future anomalies on measurable effects that have yet to be restored."); FAA00043885 ("previous anomalies have resulted in the spreading of debris and other impacts to surrounding lands, including the [Wildlife Refuge]."); FAA000047305 ("9 out 16 tank tests have resulted in anomalies, spreading debris over the refuge and TPWD managed lands.").[20]

---

[20] The record even contains photos that FAA had in its possession, showing the harm that an anomaly can have on the surrounding habitat, including from fires. *See* FAA00044238 (photo showing burn area following Starship mishap); FAA00044675-77 (photos of debris damage from a 2019 mishap); FAA00044970-75 (photos of debris on surrounding lands).

Indeed, anomalies that affect the surrounding habitat occur often at SpaceX: at the time of the PEA, "out of 16 SpaceX events or actions at Boca Chica," there had been 10 anomalies (i.e., "explosions of test vehicles during lifts or landings, static fires, or explosions or failures of test tanks during pressure testing"). FAA00049039-41.

These anomalies often result in substantial debris fields, including at least one explosion in March of 2021 that resulted in debris being ejected 500-1,000 meters into habitat for protected species on State lands. FAA00045861-62.[21] At least three separate explosions in 2020 alone resulted in the spread of debris on and off Refuge lands, with FWS finding "evidence of different species of birds being impacted. . . ." FAA00051015. As TPWD observed, "[p]ast anomalies demonstrate that debris lands on surrounding conservation lands, including sensitive aquatic habitats," which can "adversely affect" the functions and values of the tidal flat habitat. FAA00014247 (discussing debris impacts). Prior mishaps also resulted in damage to the launch pad itself, with concrete debris ejected into the adjacent tidal flats—a source of environmental harm that was not adequately considered in the 2022 PEA, even though FWS asked whether "this is something that is likely to keep occurring." FAA00050687-88 (discussing a November 14, 2022, static fire test explosion resulting in concrete debris, as well as a November 29, 2022, mishap resulting in concrete debris scattered in the Refuge). In addition, several fires have occurred from these anomalies—including in the adjacent piping plover critical habitat.[22]

---

[21] In an email discussing that incident, an FWS biologist stated that "[d]ebris was raining down everywhere." FAA00045861. And in another similar incident, debris fell at Isla Blanca Park, which FWS notes is "way beyond the hazard area outlined" by FAA in the PEA. FAA00045960. And this was an explosion of a smaller prototype, with FWS noting that "it would seem that a fully functional rocket or ship would result in way more damage." *Id.* The FAA, however, ignored these concerns.

[22] As TPWD explained, due to the launch sites "location among grasslands susceptible to fire," and due to several fires from launch failures that occurred in 2019 that burned "approximately 140 acres of TPWD property," there was substantial concern "about the potential impacts of

As TPWD noted, the FAA "substantially understated" the impacts of anomalies. FAA00014242. While the PEA/FONSI determined that no significant impacts would occur from anomalies, that ignores the fact that explosions can create "large collision impact craters" and "deep, wide, linear trenches" that harm the sensitive habitat adjacent to the launch pad. *Id.*; *see also* FAA00046054 (TPWD noting that "[f]rom December 9, 2020 to March 3, 2021 alone, three suborbital test flights [] resulted in anomalies/explosions with debris landing in special aquatic sites and cultural sites located on TPWD-owned property located north of the project site"); FAA00043885 (noting that piping plover and red knot critical habitat have been damaged by fallen rocket debris); FAA00010609 (FWS noting that "debris that has fallen onto the Refuge has damaged sensitive wind tidal flats"). As TPWD stated, "[d]amages are thus objectively demonstrable and should be considered certainly possible in the future given the nature of past debris fields." FAA00014244.[23]

Debris cleanup also results in significant harm. FWS found that debris-removal causes "[d]estruction, modification and loss of habitat [that] continue[s] affecting listed species in the Action Area. Direct and indirect loss of habitat reduces a species' ability to reproduce, find food, find shelter, and survive." FAA00043866.[24] As FWS explained to the FAA, debris removal

---

unintentional fires resulting from launch failures and other SpaceX operations on the sensitive natural resources on adjacent properties." FAA00046067. Fires from anomalies—such as a 2019 blaze resulting from a tank test that burned approximately 74 acres of coastal prairie habitat—have occurred within the area designated as critical habitat for the piping plover, evidencing the significant environmental impacts of these events. *See* FAA00039418-25.

[23] The impacts from these past anomalies have not been fully analyzed, and thus the full scope of harm remains uncertain. FWS stated that the impacts remain "unknown" because while "[t]here is documented evidence that the debris and its removal has impacted and scarred" the tidal flat habitat, the degree of harm is unclear because of the agency's "inability to enter the action area immediately to survey the area," which has hindered efforts to document impacts. FAA00051015.

[24] FWS found that piping plover and red knot critical habitat were previously damaged by fallen rocket debris and removal efforts. FAA00043885-86. FWS specifically stated that damage from

creates rutting and damage that interrupts tidal water sheet flow across these flats. FAA00010609; FAA00044981 (discussing harm from debris removal associated with multiple explosions that resulted in debris in the same area of the refuge).[25] TPWD likewise commented that "[d]ebris removal activities associated with recent anomalies have resulted in the compaction, rutting, trenching, and trampling of algal flats and other special aquatic sites located within public park and refuge lands, designated critical habitat, and cultural resource sites." FAA00046294.[26] TPWD expressed significant concerns over activities associated with debris recovery, which "reduce the affected wetland's ability to retain floodwaters or storm runoff; and alter hydrology needed to sustain the affected wetland system's values and functions or those of a wetland to which it is connected." FAA00014244.

Anomalies are therefore "significant" for purposes of NEPA because they have caused, and were likely to continue to cause, extensive harm to ecologically critical wildlife refuge lands and federally protected wildlife that rely on them.[27] *See* FAA Order 1050.1F at 4-3

---

removal of debris may "destroy or alter abundance and distribution of benthic organisms," which results in the "loss and degradation of foraging and roosting habitat, which could result in decreased fitness and survivorship of wintering piping plovers." FAA00043869.

[25] According to FWS, prior impacts to the surrounding habitat from debris removal were not addressed by SpaceX, even though the company had agreed to mitigate such impacts: "[N]one of the damage to the sensitive tidal flats from debris pickup and motorized equipment and human access has been adequately addressed. These features and attributes will likely continue to be substantially impaired because explosions, debris, traffic, building construction, and invasive plant species will continue to threaten the health and diversity of the Refuge's habitats and wildlife." FAA00010610.

[26] TPWD further stated that "[d]ebris and debris removal activities can also adversely affect ecologically important algal mats through algal mat compaction (caused by collision impacts as well as vehicular and foot traffic) and physical removal of algal mats (caused by collision impacts and removal methods which scrape the substrate). Removal of algal mats can lead to erosion which also adversely affects critical elevations." FAA00014247.

[27] FWS stated the launch program was likely to result in "1 explosion a month with debris spread across the Refuge," which according to FWS "is *unacceptable*." FAA00039205 (emphasis added). FWS advised the FAA that SpaceX activities would continue to result in debris being

(FAA00057666) (whether an activity is significant requires a consideration of adverse impacts on ecologically critical areas and endangered or threatened species ad their critical habitat); *Am. Rivers & Ala. Rivers Alliance*, 895 F.3d at 50 ("Considering context is critical because the significance of an action can vary based on the setting and surrounding circumstances."). The FAA's disregard of the significant harm from anomalies, which was likely to escalate with the new Launch Program testing even larger experimental rockets, was arbitrary and capricious. *State Farm*, 463 U.S. 29 at 43 (agency action is arbitrary and capricious if agency "failed to consider an important aspect of the problem"); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864-65 (9th Cir. 2005) (An EIS must be prepared if there are "substantial questions" regarding whether the proposed action may have significant impacts).

### b.  Inadequate mitigation for the impacts of anomalies.

The FAA did not impose sufficient mitigation to address anomalies in order to support a FONSI. First, there is simply no feasible way for the FAA to impose mitigation to prevent anomalies from occurring in the first instance (as history has shown), and none of the mitigation measures in the PEA purport do so. And second, the mitigation that was imposed to address harm to tidal flats from explosions is patently insufficient. Rather, the record shows that this sensitive habitat cannot be sufficiently restored. The FAA's conclusion that the impacts of anomalies would be adequately mitigated was therefore arbitrary and capricious. *See New York*, 681 F.3d at 477-79 (When reviewing a mitigated FONSI, the Court's role is to determine whether the "probability [of harm] is so low as to be remote and speculative").

---

scattered in the Refuge, referring to it as a "regular reoccurring risk of their activity," which FWS had not been aware of when the FAA licensed the initial launch program at Boca Chica. FAA00045021. Thus, the record shows that the FAA knew impacts from anomalies would continue under the new Launch Program.

As TPWD explained, "it is unlikely that algal flats will recover naturally after such disturbances." FAA00014243. And the primary measure that the FAA relied on for mitigating harm to habitat from debris—restoration of the tidal flat[28]—is not certain to occur because "such restoration efforts are as yet unproven." FAA00007574. As TPWD stated, the "significant adverse effect" on this critical habitat "*cannot be satisfactorily mitigated*." FWS00014248-49 (emphasis added); *see also* FAA00014242 (TPWD stating that the FAA's conclusion that algal flats and lomas habitat can recover from disturbances associated with debris from anomalies and debris removal activity is "not supported").[29] The EPA likewise noted the inability to provide adequate compensation for these impacts due to their "ecologically sensitive nature" and the "demonstrated challenges in replacing them." FAA00046042.

The adequacy of the proposed mitigation is therefore not supported by substantial evidence. *See Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 17 (2d Cir. 1997) (the adequacy of mitigation measures to reduce the impacts below the level of significance must be supported by "substantial evidence"); *S. Fork Band Council of W. Shoshone v. United States DOI,* 588 F.3d 718, 727 (9th Cir. 2009) ("An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective.")

---

[28] *See* FAA00011497 (describing the impacts from debris as temporary because impacted land would be restored: "By implementing, monitoring, and adapting restoration efforts, it is expected that any affected land can be restored and long-term impacts to wildlife habitat would not be expected").

[29] As TPWD explained, "proposed algal flat restoration activities are conceptual and have not been tested in Texas or the Boca Chica area. Therefore, it is unclear if algal flat impacts (from rutting, trampling, falling debris, scraping, and noise) can be restored to achieve an equivalent level of aquatic resource function that occurred prior to the impact." FWS00014249; FAA00014243 ("proposed algal flat restoration measures . . . have not been successfully demonstrated in the Boca Chica region"). TPWD stated it is not aware of *any* algal flat restoration projects with documented success in Texas; therefore, "[a]ny proposal to restore algal flats at this site would be considered experimental and the probability of success would be unknown." *Id*.

41

(citing *Robertson*, 490 U.S. at 351-52); FAA Order 1050.1F at 6-7 (FAA00057702) (to support a mitigated FONSI, the FAA must ensure that the mitigation measures will be sufficient).

As the D.C. Circuit made clear in *New York*, "[u]nder NEPA, an agency must look at both the probabilities of potentially harmful events and the consequences if those events come to pass," and may only "find no significant impact [is likely to occur] if the probability is so low as to be 'remote and speculative,' or if the combination of probability and harm is sufficiently minimal." 681 F.3d at 478-79. Here, the history of harm to adjacent habitat from explosions at Boca Chica shows that the FAA knew there was a high likelihood of further, potentially catastrophic, impacts to ecologically critical lands, and that such harm cannot be adequately mitigated. Thus, the FAA's decision to issue a mitigated FONSI rather than produce an EIS was arbitrary and capricious. *See Am. Rivers & Ala. Rivers Alliance*, 895 F.3d at 50; *see also National Parks Conservation Association,* 916 F.3d at 1083-85 (the issue is significant for purpose of NEPA if a "substantial dispute exists as to the size, nature, or effect" of the action).

### C.  The FAA unlawfully delegated the decision whether to prepare an EIS to SpaceX.

An agency itself must ensure that it complies with the requirements of NEPA and cannot delegate its NEPA responsibilities to the applicant. *See Idaho*, 35 F.3d at 595. Here, however, the FAA unlawfully allowed SpaceX to determine what level of NEPA review was warranted.

The record shows that after initially saying that the FAA *would* do a new EIS for the Starship/Superheavy Launch Program, FAA00051671, the Manager for the Office of Commercial Space Transportation's Safety Authorization Division stated, "[u]nder our NEPA policies, applicants have the right to choose whether to conduct an Environmental Assessment (EA) under FAA oversight or work with the FAA to initiate the EIS process. If an applicant believes the proposed action would have no significant environmental impacts, or that they can

mitigate any potential impacts, then the applicant typically chooses an EA." FAA00051672. The company unsurprisingly chose the cheaper, faster option—an Environmental Assessment with a mitigated FONSI, which as discussed above did not comply with the requirements of NEPA.[30]

However, the FAA's NEPA regulations clearly state that "[o]nce the FAA determines that NEPA applies to proposed action, *it* [FAA] needs to decide on the appropriate level of review" (i.e., a categorical exclusion, EA or an EIS). FAA Order 1050.1F at 3-1 (FAA00057660) (emphasis added). The Order does allow the FAA to request an that applicant *prepare* the NEPA documents, but even then, the Order states that "[b]ased on final review of an applicant submitted EA, *the FAA determines whether to issue a FONSI or prepare an EIS.*" FAA00057649 (emphasis added). Thus, the FAA violated its own Orders when it delegated the determination of what level of NEPA review was required to SpaceX.

In any event, "[a]n agency cannot delegate its NEPA responsibilities in this manner. . . ." *Idaho*, 35 F.3d at 595; *see also Susquehanna Int'l Grp., LLP v. SEC,* 866 F.3d 442, 446 (D.C. Cir. 2017) (an agency "effectively abdicat[ing]" its responsibility for decisionmaking to the proponent fails the kind of "reasoned decisionmaking" required by the APA). As NEPA and the FAA's own NEPA Order make clear, it is the FAA that bears the responsibility for determining the level of NEPA compliance that is required. *See* 42 U.S.C. 4331(2)(C); FAA00057660. The FAA's delegation of decision-making authority to the applicant was therefore unlawful under

---

[30] The record shows that FAA warned SpaceX about the delay in doing an EIS, stating that "[i]f the FAA identifies significant impacts that cannot be mitigated to below significant levels, then the FAA must prepare an EIS. *This may significantly delay SpaceX's schedule.* However, if the FAA identifies mitigation measures to reduce the potential impacts below significance thresholds, the FAA would prepare a Mitigated FONSI." FAA00045211 (emphasis added). Based on this advice, the *company* determined that, with the mitigation it was willing to implement, the FAA could find that the environmental impacts would not be "significant," and no EIS was required.

both the APA and NEPA. *See Ill. Commerce Comm'n v. ICC*, 848 F.2d 1246, 1259 (D.C. Cir. 1988) (the agency "may not delegate to parties and intervenors its own responsibility to independently investigate and assess the environmental impact of the proposal before it"); *see also Gerber v. Norton*, 294 F.3d 173, 184-86 (D.C. Cir. 2002) (holding an agency may not delegate its statutory responsibility to a private party).

## II.    The Presumptive Remedy for the FAA's NEPA Violations is Vacatur

Pursuant to the plain language of the APA, 5 U.S.C. § 706(2) (a reviewing court "shall . . . hold unlawful and set aside" agency action that violates the APA), "the practice of the court is ordinarily to vacate unlawful agency action." *Ill. Pub. Telecomms. Ass'n v. FCC*, 123 F.3d 693, 693 (D.C. Cir. 1997); *see also Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 78 (D.D.C. 2010) ("[B]oth the Supreme Court and the D.C. Circuit Court have held that remand, along with vacatur, is the presumptively appropriate remedy for a violation of the APA."). Remand without vacatur is therefore an "exceptional remedy," *American Great Lakes Ports Association v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020), that is allowable "only if an agency's error is 'curable.'" *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) (quoting *U.S. Sugar Corp. v. EPA*, 844 F.3d 269, 270 (D.C. Cir. 2016)); *see also Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 151 (D.C. Cir. 1993) (allowing remand without vacatur only when "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand").

As discussed above, the FAA's failure to conduct a clearly required EIS is not "curable." FAA will now need to conduct the EIS it should have (and knew it should have) produced before approving the Starship/Superheavy Launch Program. Because FAA cannot show "at least a serious possibility" that it will be able to reach the same outcome on remand—*i.e.*, that it can

authorize the program without conducting an EIS—the Court "must vacate" FAA's decision.

*Marin Audubon Soc'y v. FAA*, 2024 U.S. App. LEXIS 28621, *33, __ F.4th __ (D.C. Cir. 2024)

(quoting *Allied-Signal, Inc.*, 988 F.2d at 151).[31]

## **CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiffs' motion for partial summary

judgment; declare that the PEA/FONSI/ROD violate NEPA and the APA and vacate those

documents; and vacate and remand the FAA's decision to approve SpaceX's application for a

vehicle operator license to the FAA with instructions that an EIS is required for the

Starship/Superheavy Launch Program.

November 27, 2024                                    Respectfully submitted,

/s/ Jared Margolis
Jared Margolis (Pro Hac Vice)
Center for Biological Diversity
2852 Willamette St. # 171
Eugene, OR 97405
(802) 310-4054
jmargolis@biologicaldiversity.org

/s/ Eric Glitzenstein
Eric Glitzenstein (D.C. Bar No. 358287)
Center for Biological Diversity
1411 K Street, NW, Suite 1300
Washington, DC 20005
(202) 849-8401
eglitzenstein@biologicaldiversity.org

---

[31] Given that FAA cannot demonstrate a "serious possibility" that it could take the same approach to its NEPA obligations on remand, the Court need not consider whether any disruptive consequences would result from vacatur within the meaning of *Allied-Signal*. But if the Court were to do so, the fact that FAA was on clear notice that it needed to conduct an EIS and yet unlawfully delegated that decision to SpaceX would cut strongly against remand without vacatur in any event. *See, e.g. Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) (Where the asserted harm is largely self-inflicted, it "severely undermines [the] claim for equitable relief") (citation and quotation marks omitted).

/s/ Dinah Bear
Dinah Bear (D.C. Bar No. 351817)
300 N. Indian House Road
Tucson, Arizona 85711
(202) 906-9407
bear6@verizon.net

*Attorneys for Plaintiffs*