# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, | ) ) ) ) |
| *Plaintiffs* | ) ) ) |
| v. | ) ) |
| FEDERAL AVIATION ADMINISTRATION, *et al*., | ) ) ) |
| *Defendants* | ) ) ) |
| and | ) ) ) |
| SPACE EXPLORATION TECHNOLOGIES CORP., | ) ) ) ) |
| *Defendant-Intervenor.* | ) ) |

Civil Case No. 23-1204

## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

LEGAL BACKGROUND ................................................................................................ 2

    I.      The National Environmental Policy Act. ............................................................ 2

    II.    The Commercial Space Launch Act. .................................................................. 4

STATEMENT OF FACTS .............................................................................................. 7

STANDARD OF REVIEW ........................................................................................... 10

ARGUMENT ................................................................................................................. 11

    I.      FAA Took the Requisite "Hard Look" at Various Effects of Starship Launches and Landings. ...................................................................................... 12

          A.    FAA Reasonably Assessed the Impacts of Noise and Light. ........... 13

                1.    FAA Took A Hard Look At The Impacts On Wildlife. ............... 14

                2.    FAA Took A Hard Look At The Potential Impact Of Noise On The Community. ..................................................................... 20

          B.    FAA's Methodological Analysis of Anomalies Was Reasonable and Well-Supported. ..................................................... 21

          C.    FAA Adequately Considered the Impact of the Temporary Access Restrictions Related to the Proposed Act. .......................... 24

                1.    The Access Restrictions in the PEA are Reasonable. .................. 24

                2.    FAA Took a Hard Look at the Impacts of Access Restrictions. ............................................................................... 27

                3.    Plaintiffs' Objection That FAA Wrongly Relied On SpaceX's Closure Estimates Is Baseless. ..................................... 33

    II.    The Mitigated FONSI/ROD Incorporated Significant Mitigation Measures to Reduce Any Adverse Effects of the Proposed Action. .................................... 34

          A.    FAA Incorporated Significant Mitigation for Noise and Light Effects. ............................................................................................. 35

          B.    Mitigation for Anomalies Was Tied to FAA's Reasonable Methodology. .................................................................................. 38

C.    FAA Imposed Extensive Access-Related Mitigation Measures. ...... 40

    1.    FAA's Mitigation Measures. ......................................... 40

    2.    The Access-Related Mitigation Measures Show Why Plaintiffs Are Mistaken in Contending That an EIS Was Required. ...................................................................... 41

III.    FAA Thoroughly Considered and Responded to Comments From Other Agencies. ........................................................................................... 43

IV.    The Court Should Order Further Briefing on Remedy. ........................................ 46

CONCLUSION ........................................................................................................ 48

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allied-Signal, Inc. v. United States Nuclear Regul.Comm'n,*
  988 F.2d 146 (D.C. Cir. 1983) ................................................................ 47

*Braidwood Mgmt., Inc. v. Becerra,*
  104 F.4th 930 (5th Cir. 2024) ................................................................ 47

*Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson,*
  685 F.2d 678 (D.C. Cir. 1982) ................................................................ 46

*Citizens Against Burlington, Inc. v. Busey,*
  938 F.2d 190 (D.C. Cir. 1991) ................................................ 22, 24, 30, 43

*Citizens Concerned About Jet Noise, Inc. v. Dalton,*
  48 F. Supp. 2d 582 (E.D. Va. 1999) ........................................................ 23

*City of Bridgeton v. F.A.A.,*
  212 F.3d 448 (8th Cir. 2000) ................................................................ 35

*City of Williams v. Dombeck,*
  151 F. Supp. 2d 9 (D.D.C. 2001) ............................................................ 34

*Coal. on Sensible Transp., Inc. v. Dole,*
  826 F.2d 60 (D.C. Cir. 1987) ................................................................ 27

*Conn. Dep't of Pub. Util. Control v. FERC,*
  593 F.3d 30 (D.C. Cir. 2010) ................................................................ 32

*Corner Post, Inc. v. Bd. of Governors of the Fed. Reserve Sys,*
  144 S. Ct. 2440 (2024) ...................................................................... 47

*Corridor H Alternatives, Inc. v. Slater,*
  166 F.3d 368 (D.C. Cir. 1999) ................................................................ 27

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs,*
  941 F.3d 1288 (11th Cir. 2019) .............................................................. 45

*Earthworks v. U.S. Dep't of Interior,*
  105 F.4th 449 (D.C. Cir. 2024) ................................................................ 3

*El Puente v. U.S. Army Corps of Eng'rs,*
  100 F.4th 236 (D.C. Cir. 2024) .............................................................. 43

*El Puente v. U.S. Army Corps of Eng'rs,*
  683 F. Supp. 3d 1 (D.D.C. 2023) ............................................................ 20

*Friends of Animals v. Pendley,*
  523 F. Supp. 3d 39 (D.D.C. 2021) ............................................................ 11

*Gov't of Province of Manitoba v. Zinke,*
 273 F. Supp. 3d 145 (D.D.C.) ........................................................................... 42

*Grand Canyon Trust v. FAA,*
 290 F.3d 339 (D.C. Cir. 2002) ......................................................................... 22

*Grunewald v. Jarvis,*
 776 F.3d 893 (D.C. Cir. 2015) ........................................................................... 3

*Highway J Citizens Grp. v. Mineta,*
 349 F.3d 938 (7th Cir. 2003) ........................................................................... 13

*Int'l Dark-Sky Ass'n v. FCC,*
 106 F. 4th 1206 (D.C. Cir. 2024) ..................................................................... 43

*Iowaska Church of Healing v. Werfel,*
 105 F.4th 402 (D.C. Cir. 2024) ........................................................................ 45

*Japanese Vill., LLC v. Fed. Transit Admin.,*
 843 F.3d 445 (9th Cir. 2016) ........................................................................... 35

*Kleppe v. Sierra Club,*
 427 U.S. 390 (1976) ........................................................................................... 2

*Lee v. U.S. Air Force,*
 354 F.3d 1229 (10th Cir. 2004) ....................................................................... 22

*Marsh v. Oregon Nat. Res. Council,*
 490 U.S. 360 (1989) ......................................................................................... 38

*Mayo v. Reynolds,*
 875 F.3d 11 (D.C. Cir. 2017) ........................................................................... 11

*Metro. Edison Co. v. People Against Nuclear Energy,*
 460 U.S. 766 (1983) ......................................................................................... 13

*Minisink Residents for Env't Pres. & Safety v. FERC,*
 762 F.3d 97 (D.C. Cir. 2014) ........................................................................... 11

*Mulgrew v. U.S. Dep't of Transp.,*
 — F. Supp. 3d. —, 2024 WL 3251732 (S.D.N.Y. June 20, 2024) ..................... 46

*Nat'l Parks Conservation Ass'n v. United States,*
 177 F. Supp. 3d 1 (D.D.C. 2016) ................................................................ 34, 35

*Nevada v. Dep't of Energy,*
 457 F.3d 78 (D.C. Cir. 2006) ........................................................................... 12

*New York v. Nuclear Regul. Comm'n,*
 681 F.3d 471 (D.C. Cir. 2012) ..................................................................... 3, 22

*NRDC v. Kempthorne,*
 525 F. Supp. 2d 115 (D.D.C. 2007) ................................................................. 31

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
  45 F. 4th 291 (D.C. Cir. 2022)................................................................ 11, 27, 33, 34

*Protect Our Communities Found. v. Jewell*,
  825 F.3d 571 (9th Cir. 2016) ............................................................................ 17, 38

*Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*,
  636 F. Supp. 3d. 33 (D.D.C. 2022) ................................................................ 12, 18, 33

*Riverkeeper Network v. FERC*,
  753 F.3d 1304 (D.C. Cir. 2014) ............................................................................. 3

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ................................................................................... passim

*Sierra Club v. Fed. Energy Regul. Comm'n* (*FERC*),
  867 F.3d 1357 (D.C. Cir. 2017) ................................................................... 2, 10, 11

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  803 F.3d 31 (D.C. Cir. 2015) .................................................................................. 2

*Sierra Club v. U.S. Dep't of Energy*,
  867 F.3d 189 (D.C. Cir. 2017) ............................................................................... 23

*Sierra Club v. U.S. Dep't of Transp.*,
  125 F.4th 1170 (D.C. Cir. 2025) ........................................................................... 39

*Sierra Club v. U.S. Dep't of Transp.*,
  753 F.2d 120 (D.C. Cir. 1985) ...................................................................... 3, 22, 34

*Sierra Club v. Van Antwerp*,
  661 F.3d 1147 (D.C. Cir. 2011) ................................................................... 36, 37, 39

*Sierra Club v. Watkins*,
  808 F. Supp. 852 (D.D.C. 1991) ............................................................................ 38

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  255 F. Supp 3d. 101 (D.C. Cir. 2017) ..................................................................... 39

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,
  100 F.3d 1443 (9th Cir. 1996) ............................................................................... 44

*Theodore Roosevelt Conservation P'ship v. Salazar*,
  605 F. Supp. 2d 263 (D.D.C. 2009) ........................................................................ 24

*Theodore Roosevelt Conservation P'ship v. Salazar*,
  616 F.3d 497 (D.C. Cir. 2010) ........................................................................... 24, 34

*Tinicum Twp., Pa. v. U.S. Dep't of Transp.*,
  685 F.3d 288 (3d Cir. 2012) .................................................................................. 43

*United States v. Texas*,
  599 U.S. 670 (2023) ............................................................................................. 47

*W. Watersheds Project v. Salazar,*
  993 F. Supp. 2d 1126 (C.D. Cal. 2012) ................................................................... 20

*WildEarth Guardians v. Jewell,*
  738 F.3d 298 (D.C. Cir. 2013) ..................................................................................... 2

*WildEarth Guardians v. Salazar,*
  880 F. Supp. 2d 77 (D.D.C. 2012) .............................................................................. 31

**Statutes**

42 U.S.C. § 4332(2)(c) ....................................................................................................... 13

42 U.S.C. § 4332(C) ............................................................................................................. 2

49 U.S.C. § 303(c) .............................................................................................................. 28

5 U.S.C. § 706 ..................................................................................................................... 11

51 U.S.C. § 50901 ................................................................................................................ 4

51 U.S.C. § 50903(b) ............................................................................................................ 4

51 U.S.C. § 50904(a)(1) ........................................................................................................ 5

51 U.S.C. § 50905(a)(1) ........................................................................................................ 5

51 U.S.C. § 50905(b)(2) ........................................................................................................ 5

51 U.S.C. § 50921 ................................................................................................................ 4

51 U.S.C. § 50922 ................................................................................................................ 5

**Regulations**

14 C.F.R. § 401.1 .................................................................................................................. 4

14 C.F.R. § 413.11(a) ............................................................................................................ 5

14 C.F.R. § 415.201 .............................................................................................................. 5

14 C.F.R. § 437.9 .................................................................................................................. 6

14 C.F.R. § 450.133(a) ........................................................................................................ 25

14 C.F.R. § 450.3(a) ............................................................................................................. 5

14 C.F.R. § 450.3(b) ............................................................................................................. 6

14 C.F.R. § 450.3(b)-(c) ....................................................................................................... 6

14 C.F.R. § 450.3(c) ............................................................................................................. 6

14 C.F.R. § 450.47 .................................................................................................... 5, 6, 47

14 C.F.R. § 450.7 .................................................................................................................. 6

14 C.F.R. part 420 ................................................................................................................ 5

14 C.F.R. part 450 ............................................................................................................. 6

40 C.F.R. § 1506.5(6) (2020) ........................................................................................... 47

49 C.F.R. § 1.83(b) ............................................................................................................ 4

**Other Authorities**

65 Fed. Reg. 62,812 (Oct. 19, 2000) ................................................................................. 5

87 Fed. Reg. 39,199 (June 15, 2022) ............................................................................... 10

# INTRODUCTION

Pursuant to the Federal Aviation Administration's ("FAA") statutory directive to promote and license commercial space flight operations, FAA performed an environmental review of Space Exploration Technologies Corporation's ("SpaceX") application to conduct launches and landings of the Starship/SuperHeavy ("Starship") vehicle at SpaceX's private launch facility located in Boca Chica, Texas ("Proposed Action"). That review resulted in the preparation of a Programmatic Environmental Assessment ("PEA") under the National Environmental Policy Act ("NEPA") and the issuance of a Mitigated Finding of No Significant Impact/Record of Decision ("Mitigated FONSI/ROD") that included more than 75 specific mitigation measures intended to ensure Starship operations have no significant impact on the environment.

Plaintiffs challenge FAA's conclusions and analysis, asserting that the agency underestimated the effects of the project on wildlife and cultural resources, among others, and failed to require appropriate mitigation measures. But the record demonstrates FAA took the requisite "hard look" at the effects of the proposed Starship operations, including as to potential anomalies from those operations, reached reasonable and well-supported conclusions, and required the implementation of numerous mitigation measures, all of which are intended to reduce any effects below the threshold of significance. In so doing, FAA engaged with the relevant federal and state agencies, responded to their concerns, and reached consensus wherever possible. That is all NEPA requires, and the Court should accordingly grant summary judgment to Defendants.

# LEGAL BACKGROUND

## I.     The National Environmental Policy Act.

Under NEPA, federal agencies are required to prepare an environmental impact statement for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  "NEPA's mandate, which incorporates notice and comment procedures, serves the twin purposes of ensuring that (1) agency decisions include informed and careful consideration of environmental impact, and (2) agencies inform the public of that impact and enable interested persons to participate in deciding what projects agencies should approve and under what terms."  *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 36-37 (D.C. Cir. 2015).  As such, an agency must "take a 'hard look' at the environmental consequences of its actions."  *Sierra Club v. Fed. Energy Regul. Comm'n* (*FERC*), 867 F.3d 1357, 1367 (D.C. Cir. 2017).  NEPA's "hard look" standard is designed to ensure that "in reaching its decision, [an agency] will have available, and will carefully consider, detailed information concerning significant environmental impacts" such that "important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *see also Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).

However, "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."  *Robertson*, 490 U.S. at 350; *see also id*. at 351 ("NEPA merely prohibits uninformed–rather than unwise–agency action.").  In other words, NEPA "requires informed decisionmaking 'but not necessarily the best decision.'"  *WildEarth Guardians v. Jewell*, 738 F.3d 298, 314 (D.C. Cir. 2013) (quoting *New York v. Nuclear Regul.*

*Comm'n*, 681 F.3d 471, 476 (D.C. Cir. 2012)).  As a result, "[c]ourts may not use their review of

an agency's environmental analysis to second-guess substantive decisions committed to the

discretion of the agency."  *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir.

2014).  So too, "NEPA is 'not a suitable vehicle' for airing grievances about the substantive

polices adopted by an agency, as 'NEPA was not intended to resolve fundamental policy

disputes.'"  *Grunewald v. Jarvis*, 776 F.3d 893, 903 (D.C. Cir. 2015) (citation omitted).

    With that framework in mind, NEPA requires that one of three classes of review be

conducted, depending upon, in part, the expected extent of the environmental impact.  *See*

*Earthworks v. U.S. Dep't of Interior*, 105 F.4th 449, 458 (D.C. Cir. 2024); *see also* FAA Order

1050.1F (FAA_57631-57762).[1]  First, actions that do not individually or cumulatively have a

significant environmental effect may be assessed under a categorical exclusion from further

environmental analysis.  FAA_57660.  Second, where an action may have a significant impact

on the environment, an agency must prepare an environmental analysis ("EA") to determine

whether preparation of a further environmental impact statement ("EIS") is necessary.

FAA_57660-662.  The EA is a concise document intended to help the agency "[d]etermine

whether a proposed action has the potential to significantly affect the human environment."

FAA_57660.  If the agency decides that an EIS is not required, it must document its reasons in a

finding of no significant impact ("FONSI").  FAA_57702-03.  To that end, and notwithstanding

identification of significant effects, an agency may forego preparation of an EIS if the "agency

finds that changes or safeguards in the project sufficiently reduce the impact to a minimum."

*Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 127 (D.C. Cir. 1985); *see also* FAA_57701

---

[1]    FAA Order 1050.1F provides FAA's "policy and procedures for compliance with"
NEPA."  FAA_57631.

("If the responsible FAA official determines that mitigation measures can reduce potentially significant adverse impacts below the level of significance, these mitigation measures can be used to support a FONSI . . . .").  So too, an agency may prepare a "programmatic" EA "to cover (1) a broad group of related actions; or (2) a program, policy, plan, system, or national level proposal that may later lead to individual actions, requiring subsequent NEPA analysis." FAA_57662.

Finally, if "one or more environmental impacts of a proposed action would be significant and mitigation measures would not reduce the impact(s) below significant levels," the agency must prepare an EIS.  FAA_57705.

## II.    The Commercial Space Launch Act.

In 1984, Congress passed the Commercial Space Launch Act ("CSLA"), currently codified in relevant part at 51 U.S.C. §§ 50901-50923.  The CSLA directs the Secretary of Transportation to act with three overarching goals in mind: (1) regulate the U.S. commercial space transportation industry to ensure compliance with international obligations and to protect the public health and safety, safety of property, and national security and foreign policy interests of the United States; (2) "encourage, facilitate, and promote commercial space launches and reentries by the private sector"; and (3) facilitate the expansion of the U.S. space transportation infrastructure.  *See* 51 U.S.C. §§ 50901, 50903(b).[2]

---

[2]    The CSLA refers to the creation of an "Associate Administrator for Commercial Space Transportation." 51 U.S.C. § 50921.  Pursuant to 49 C.F.R. § 1.83(b), the authority to carry out the directives of the CSLA is delegated to the FAA, which is where the Office of Commercial Space Transportation (led by an Associate Administrator) is housed.  14 C.F.R. § 401.1.  The Office's acronym is "AST."

Relevant here, the CSLA requires a person to obtain a license before launching or reentering a vehicle in the United States.  51 U.S.C. § 50904(a)(1).  A vehicle operator using a private site exclusively for launches and reentries of its own vehicles (such as SpaceX here) does not need to obtain a separate launch or reentry site operator license because its vehicle operator license addresses the safety issues associated with the site, as well as those of the attendant launches and reentries.  *Licensing and Safety Requirements for Operator of a Launch Site*, 65 Fed. Reg. 62,812, 62,815 (Oct. 19, 2000); *see also* 14 C.F.R. part 420.  In accord with Congress's intent in passing the CSLA and "[c]onsistent with the public health and safety, safety of property, and national security and foreign policy interests of the United States," FAA "shall issue . . . a license" "180 days after accepting an application," "if [it] decides in writing that the applicant complies . . . with this chapter and the regulations prescribed under this chapter."  51 U.S.C. § 50905(a)(1).  An application is only deemed accepted when "it is complete enough for the FAA to start its review."  14 C.F.R. § 413.11(a).  Thus, an application that is complete enough for the FAA to begin its review necessarily includes "information provided by an application [ ] sufficient to enable the FAA to comply with the requirements of [NEPA]."  *Id*. § 415.201; *see also* 14 C.F.R. § 450.47 ("An applicant must provide the FAA with information needed to comply with [NEPA's] requirements.").

Pursuant to the CSLA, AST is authorized to issue regulations prescribing the content of any launch license.  51 U.S.C. §§ 50905(b)(2), 50922.  As provided in AST's regulations, a vehicle operator license authorizes a licensee to conduct one or more launches or reentries using the same vehicle or family of vehicles, operating out of one or more launch or reentry sites, within a range of authorized parameters and transporting specified classes of payloads.  14 C.F.R. § 450.3(a).  A vehicle operator license may authorize launch from a U.S. launch site,

which includes the flight of a launch vehicle and pre- and post-flight ground operations.  *Id*. §
450.3(b).  The license may also authorize reentry, which includes activities conducted in Earth
orbit or outer space to determine reentry readiness, or activities necessary to return the reentry
vehicle to a safe condition on the ground after the vehicle's impact or landing.  *Id*. § 450.3(c).[3]
A vehicle operator license is valid for the period determined by AST to be necessary to conduct
the licensed activities, but in any event "may not exceed five years from the date of issuance."
*Id*. § 450.7.

AST's regulations also require, among other things, a safety review of the proposed
launch or reentry, a determination of whether a licensed action jeopardizes international
obligations and/or any national security or foreign policy interests of the United States, and
consideration and documentation of the potential environmental effects associated with issuing a
license.  *See* 14 C.F.R. part 450; *see also* 14 C.F.R. § 437.9.  As to the last requirement, AST's
regulations provide that "[t]he FAA is responsible for complying with the procedures and
policies of [NEPA] and other applicable environmental laws, regulations, and Executive Orders
prior to issuing a launch or reentry license," and that "[t]he FAA will consider and document the
potential environmental effects associated with issuing a launch or reentry license."  14 C.F.R. §
450.47.

---

[3]     AST may issue a vehicle operator license for a reentry separate from the vehicle operator
license that authorizes a launch.  For example, an operator previously authorized to launch and
reenter from one location may want to add the capability to land the vehicle at a different site to
account for mission-specific requirements.  AST could issue a vehicle operator license
authorizing only reentry of that vehicle to that specific site.  *See* 14 C.F.R. § 450.3(b)-(c).

## STATEMENT OF FACTS

In 2012, SpaceX began working with FAA to obtain a license to conduct launches of the Falcon 9 and Falcon Heavy orbital launch vehicles and a variety of reusable suborbital launch vehicles from a new launch site in Boca Chica, Texas.  As part of the process, FAA conducted a comprehensive review of the environmental impacts associated with: (1) the development of the Boca Chica launch site; (2) the launch from Boca Chica of the Falcon 9 and Falcon Heavy; and (3) the use of other reusable suborbital launch vehicles.  On June 6, 2014, FAA published a *Final Environmental Impact Statement for the SpaceX Texas Launch Site* ("2014 EIS"), FAA_36291-682, and an associated Record of Decision assessing the impacts of these three actions. FAA_13068-99; *see also* FAA_13130 (Federal Register notice).  The 2014 EIS determined, in relevant part, that unavoidable adverse effects would result from noise impacts, impacts to visual resources, and impacts to habitats, among others.  FAA_9304.  SpaceX proceeded to develop the Boca Chica launch site as evaluated in the 2014 EIS, but did not apply for or obtain licenses and permits for launches of the Falcon vehicles.  *See* FAA_9984; *see also* FAA_9307-24 (November 2014 Written Reevaluation ("WR")); FAA_9325-87 (November 2017 WR) (both assessing changes to size and design of the launch site).

Instead, in May 2019, SpaceX informed FAA that rather than using Boca Chica to launch Falcon 9 and Falcon Heavy rockets, it intended to use the launch site to test the Starship vehicle. *See* FAA_9388-9410 (May 2019 WR).  The Starship is a fully reusable vehicle that, on its own, is designed to reach only suborbital levels of the atmosphere.  FAA_9390.  The May 2019 WR documented that the 2014 EIS was sufficient to support the issuance of: (1) an experimental permit for an early iteration of the Starship (known as the Starship Hopper or Starhopper); and (2) a vehicle operator license for the next iteration of the vehicle, known as the Starship

Prototype. FAA_9409; *see also* FAA_9434-38 (August 2019 addendum to WR); FAA_9439-41

(November 2019 addendum to WR). Accordingly, in 2019 FAA issued one experimental permit

to SpaceX for the Starship Hopper and, in 2020, one reusable launch vehicle license to SpaceX

for the Starship Prototype. *See* FAA_9439; FAA_9484. Under the 2019 experimental permit,

SpaceX conducted two launches of the Starship Hopper (on July 25, 2019 and August 27,

2019).[4] Under the 2020 reusable launch vehicle license, SpaceX conducted seven launches of

the Starship Prototype (on August 4, 2020; September 3, 2020; December 9, 2020; February 2,

2021; March 3, 2021; March 30, 2021; and May 5, 2021). *See id.*

    In July 2019, SpaceX informed FAA that it wished to conduct launch activities with the

Starship that would require a vehicle operator license. FAA_9984-85. However, because of

major differences in specifications between the Starship and Falcon vehicles, FAA determined

that the 2014 EIS could not support the issuance of a vehicle operator license for SpaceX's new

Proposed Activities. FAA_50991-51992; 50989-90. Accordingly, in February 2021, SpaceX

submitted an application to FAA for a vehicle operator license authorizing suborbital and orbital

Starship launches and landings and associated pre-flight activities, which required a new

environmental review.

    Because SpaceX's proposal "may require a number of new or modified" permits or

licenses "over time," FAA decided to prepare a PEA, which is "a type of general, broad NEPA

review from which subsequent NEPA documents can be tiered, focusing on the issues specific to

[those] specific actions." FAA_9983. That PEA looks at SpaceX's "mission profile of proposed

launch operations" with the understanding that "[i]f SpaceX modifies or adds operations as part

---

[4]    *See* FAA, *Commercial Space Data*,
https://www.faa.gov/data_research/commercial_space_data.

of its [Starship] program in the future, the FAA would analyze the environmental impacts of those activities in a tiered environmental documents, which would summarize the issues in the PEA that remain applicable (e.g., the environment around the Boca Chica launch site) and concentrate on the issues specific to the subsequent action (e.g., a mission profile involving a new landing site)."  FAA_9984.

FAA conducted a 30-day public scoping process for the draft PEA between December 22, 2020, and January 22, 2021.  FAA_9988.  On March 16, 2021, FAA published a report summarizing the public's input during the scoping process.  *Id*.  On September 17, 2021, the agency made a draft of the PEA available for public review and comment; the comment period was extended once and concluded on November 1, 2021.  FAA_9989.  FAA also held two virtual public meetings on October 18 and 20, 2021.  FAA_9990.  In response to those outreach efforts, the agency received over 17,000 comments, which are included, along with FAA's topical responses, in Appendix I of the PEA.  FAA_12347-84.

In addition, FAA consulted with a range of other federal and state agencies, including the U.S. Fish and Wildlife Service ("FWS" or "USFWS"), the National Marine Fisheries Service ("NMFS"), the National Aeronautics and Space Administration ("NASA"), the National Parks Service ("NPS"), the U.S. Army Corps of Engineers ("Corps"), the Texas Parks and Wildlife Department ("TPWD"), and the Texas Historical Commission ("THC").  FAA_9986-87.  Those agencies provided "special expertise," including as to issues surrounding "threatened and endangered species," "historic properties," "operation of a [space] launch site," and "impacts on waters of the United States, including wetlands."  *Id*.

The final PEA was issued on June 13, 2022.  FAA_9975.  The PEA compared the action to the no-action alternative in which SpaceX would continue "production and manufacturing,"

"[n]on-licensed operations, including tank tests and static fire engine tests," and "missions of the Starship prototype launch vehicle as authorized by the current license," which expired on May 27, 2023.  FAA_10019-20.  The PEA assesses "tank tests, pre-flight operations, suborbital launches, and orbital launches" of the Starship.  FAA_9998.  As to the last element, the PEA examines the effects of "up to five [Starship] orbital launches annually."  FAA_10002.  Particularly relevant here, the PEA assesses the impacts of Starship launches on noise, visual effects, and cultural resources, and also looks at the effects from potential anomalies.  *See* FAA_9977-79 (PEA table of contents).

Finally, on June 13, 2022, FAA issued a Mitigated FONSI/ ROD for the PEA.  *See* 87 Fed. Reg. 36,199 (June 15, 2022); FAA_10295-10334.  In that document, FAA explained that the proposed Starship launches "would not significantly affect the quality of the human environment," FAA_10295, and were "consistent with [FAA's] statutory mission and policies." FAA_10334.  As part of its findings, the Mitigated FONSI/ROD includes numerous mitigation conditions.  FAA_10311-10333.  For example, and among many more, the Mitigated FONSI/ROD requires SpaceX to retain a biologist to conduct "biological monitoring," FAA_10322, obtain "sea turtle survey data," FAA_10325, and "conduct lighting inspections to eliminate unnecessary lighting before [sea turtle] nesting season and weekly during the nesting-hatching season."  FAA_10312.  Those mitigation conditions were also carried forward to SpaceX's license, which incorporates those terms by reference and requires SpaceX's compliance.  FAA_9269.

## STANDARD OF REVIEW

"The role of the courts in reviewing agency compliance with NEPA is [ ] limited," given "NEPA-based challenges" are considered "only under the [APA] and its deferential standard of

review." *FERC*, 867 F.3d at 1367.  Accordingly, a court's "mandate is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Id.* (quotation and citation omitted).  To that end, a court should not "supplant an agency's technical judgments and predictions so long as the agency's decision is reasoned and rational." *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F. 4th 291, 299 (D.C. Cir. 2022) (quotations and citation omitted).  "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson*, 490 U.S. at 350; *see also Mayo v. Reynolds*, 875 F.3d 11, 20 (D.C. Cir. 2017) (reviewing court should "ensure that no arguably significant consequences have been ignored" (quotation and citation omitted)).  Finally, the D.C. Circuit reviews FONSIs based on mitigation measures without employing a special standard of review.  *See, e.g., Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 112 (D.C. Cir. 2014).

"Summary judgment is the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Friends of Animals v. Pendley*, 523 F. Supp. 3d 39, 52 (D.D.C. 2021) (alteration, quotation, and citation omitted).  A court reviewing an agency's decision "review[s] the whole record or those parts of it cited by a party." 5 U.S.C. § 706.

## ARGUMENT

Plaintiffs raise four claims to the sufficiency of the PEA.  First, they argue that FAA failed: (a) to take the required "hard look" at the effects of the proposed action on wildlife; (b) underestimated the likelihood of anomalies and the effects of any anomalies; and (c) failed to adequately assess the impact of temporary access restrictions that are necessitated for launch

safety.  Second, notwithstanding that the Mitigated FONSI/ROD includes over 75 specific mitigation measures, Plaintiffs argue that FAA should have prepared an EIS because the selected mitigation was insufficient to ameliorate adverse effects.  Third, they challenge the degree to which FAA was responsive to the comments of other interested federal and state agencies.  And, fourth, they argue FAA improperly permitted SpaceX to prepare draft NEPA documents.

As described below, each argument is without merit.  Section I shows how FAA took the requisite hard look at the Proposed Action, including analyzing the effects on wildlife, properly estimating the likelihood and effects of anomalies, and the impacts of any proposed temporary access restrictions.  Section II demonstrates that the Mitigated FONSI/ROD requires numerous and significant binding mitigation measures, including many which were recommended by the very agencies Plaintiffs claim FAA ignored during the NEPA process.  Section III rebuts Plaintiffs' claim that FAA ignored other agencies' comments.  And Section IV shows how Plaintiffs' argument regarding SpaceX's participation in the NEPA process is erroneous.

## I.    FAA Took the Requisite "Hard Look" at Various Effects of Starship Launches and Landings.

"Although the contours of the hard look doctrine may be imprecise, [a court's] task is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."  *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006) (quotations and citation omitted).  "An agency satisfies its obligation to take a 'hard look' at the environmental impacts of a proposed action if its 'statement contains sufficient discussion of the relevant issues and opposing viewpoints,' and the agency's decision is 'fully informed' and 'well-considered.'"  *Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, 636 F. Supp. 3d 33, 56 (D.D.C. 2022) (citation omitted).  Here, the PEA's analysis of effects more than satisfies that standard.

12

A.      **FAA Reasonably Assessed the Impacts of Noise and Light.**

Plaintiffs challenge FAA's evaluation of the impacts of noise and light from Starship

launches.  Specifically, although FAA acknowledged that "the Proposed Action may affect and

is likely to adversely affect" certain "species and critical habitat[s]," FAA_10120 (emphasis

omitted), Plaintiffs contend that FAA nonetheless overlooked the impacts of noise and light on:

(1) ocelot populations, Pls.' Mem. in Supp. of Mot. for Summ. J. at 20 (ECF No. 45-1) ("Pls.'

Mem."); (2) sea turtles, *id*.; and (3) migratory birds, *id*. at 20-22.  Plaintiffs also claim that FAA

improperly concluded that community noise impact would not be significant, *id*. at 21.  But, as

described below, the record shows that FAA adequately analyzed the potential impacts of noise

and light on each challenged area.

By way of background, the PEA was not required to assess the effects of all SpaceX

activities at Boca Chica, only those new activities in the Proposed Action that had not been

analyzed in the 2014 EIS and FAA's follow-on re-evaluations.  This is because, an agency's

obligation is only to ensure that the "adverse environmental effects of the proposed action are

adequately identified and evaluated."  *Methow Valley*, 490 U.S. at 349-50.  Indeed 42 U.S.C. §

4332(2)(c) explicitly states that NEPA applies only to the "environmental impact *of the proposed*

*action*." (emphasis added); *see also Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 954 (7th

Cir. 2003) ("[T]he key question is whether there is a nexus between the [] Project, which the

defendants are implementing and which NEPA and its regulations govern, and the *preexisting*

contamination … which, apart from the Project, NEPA and its regulations do not affect.").  Said

differently, NEPA "does not create a remedial scheme for past federal actions.  It was enacted to

require agencies to assess the future effects of future actions."  *Metro. Edison Co. v. People*

*Against Nuclear Energy*, 460 U.S. 766, 779 (1983).  Thus, as FWS explained in its Biological

Conference Opinion ("BCO") accompanying the PEA, "[t]he environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the Action Area, the anticipated impacts of all proposed Federal projects in the action that have already undergone . . . consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." FAA_40173. Indeed, "[s]ince 2019, SpaceX has been conducting static fire tests and suborbital launches and landings of Starship prototypes under an existing license[ ] at [Boca Chica] as part of its Starship experimental test program . . . . These activities will occur even if the FAA does not license the [Starship] launch operations that are part of the Proposed Action." FAA_40175.

With that baseline in mind, FAA identified the threshold for significance used in the PEA. Specifically, "[a] significant impact on biological resources would occur if the USFWS or NMFS determines that the action would be likely to jeopardize the continued existence of a federally listed threatened or endangered species, or would result in the destruction or adverse modification of federally designated critical habitat." FAA_10111. Against that standard, FAA reasonably concluded that "[b]ecause impacts from operations would be intermittent and of short duration, they are not expected to significantly affect wildlife." FAA_10114. That conclusion was supported by FWS's concurrence with the findings in FAA's Biological Assessment ("BA"). *See* FAA_40124 (FWS BCO).

> 1.    *FAA Took A Hard Look At The Impacts On Wildlife.*

As to light's effects on ocelots, FAA explained that "[s]ince the 2014 EIS, no sightings of ocelots have been documented, and a recent study by expert biologists in the area that included 36,000 camera trap nights found no ocelots or jaguarundi . . . . The last documented occurrence of an ocelot in the area of [State Highway] 4, that borders SpaceX facilities, occurred over

twenty years ago, in 1998." FAA_10109; *see also* FAA_40194 (ocelot population 8 miles away). Thus, the agency reasonable concluded "it is unlikely that SpaceX's activities will have a significant impact on these species." *Id*. Plaintiffs' citation to studies regarding ocelot habitats, Pls.' Mem. at 20 (citing FAA_56556, among others), are too generalized to contradict that discrete explanation in the record.

Second, as to the effects of light on sea turtles, context is crucial. Pursuant to a permit from FWS, Sea Turtle, Inc. conducts "sea turtle surveys in the Action Area" from "April through August of each year." FAA_40178. "During sea turtle nesting season, it is Sea Turtle Inc.'s practice to conduct daily inspections of Boca Chica Beach, where Kemps' ridley, loggerhead, green, leatherback, or hawksbill sea turtles may lay eggs, and identify nests and collect eggs and bring them to a facility until they hatch." FAA_40224. This facility is "within a fenced off corral for protection." FAA_40178. Once the eggs are ready to hatch, "Sea Turtle, Inc. then returns the hatchlings to Boca Chica Beach for release into the Gulf." FAA_40224; *see also* FAA_40204.[5] Thus, only if a Sea Turtle, Inc. misses a nest would turtles "potentially be affected by the nighttime lighting." FAA_10016; *see also* FAA_10113 ("Lighting on beaches may disrupt hatchling emergence from sea turtle nests. Hatchlings that crawl toward artificial light sources are following the same instinctive response that leads them seaward. This effect may result in harassment or harm to sea turtle species, [sic] however, Sea Turtle Inc. conducts nesting surveys on Boca Chica beach to collect sea turtle eggs, so only nests that were missed by surveys

---

[5]    "Kemp's ridley sea turtles are the only sea turtle species that have been documented to nest on Boca Chica Beach with any regularity (Sea Turtle, Inc 2020). This species primarily nests on windy days (Sea Turtle, Inc. 2012). SpaceX is not likely to conduct launch operations during windy days. The remaining sea turtle species nest during the night, when 20 percent of operations, including 1 launch, could occur." FAA_11729.

would potentially be affected by the nighttime lighting.").  Thus, FAA took a hard look at the impacts of the Proposed Action on the sea turtle population and reasonably concluded that, with the application of various lighting mitigation measures (described below) to avoid harm to those turtles missed by any surveys, any adverse impacts would be "minimized."  FAA_10117.

Third, Plaintiffs argue that the PEA underestimated the noise effects on birds from Starship launches and tests.  Pls.' Mem. at 20-21.  Plaintiffs particularly take issue with the PEA's conclusion that impacts resulting from launch noises "are not expected to significantly affect wildlife" because, even though the noise is "expected to interrupt normal wildlife behavior periodically," the impacts of the noise "would be intermittent and of a short duration." FAA_10144; *see also* FAA_10155 (noting vibrations and sonic booms "would not result in impacts at the population level"); Pls' Mem. at 21 (alleging that FAA's conclusion regarding the effects of rocket noise was "never actually examined").

But FAA's analysis of the impacts of noise on birds was reasonable.  In the BA, FAA stated that "[t]he primary concern with rocket launches, and the associated noise, is the startle effect," FAA_11708; *see also* FAA_11909,[6] but that the impacts from this effect will be "[i]ntermittent" and "short-term," FAA_10115.  As a result, the "impacts are not expected to substantially harm or disturb wildlife, which are expected to resume normal behavior after a launch operation."  *Id*.

---

[6]      SpaceX conducted noise engine modeling, FAA_11710, as well as modeling of overpressure effects from sonic booms.  FAA_11712-13.  The PEA uses a 105 decibel ("dB") "maximum A-weighted instantaneous noise level ($L_{Amax}$)" metric, FAA_10101, which is the "reasonable noise level at which wildlife might exhibit a response (e.g., startle response) to the short-term noise associated with operations."  *Id*.  "The sonic boom component of the study area includes those areas exposed to overpressures greater than 1 pound per square foot (psf).  An overpressure of 1 psf is similar to a clap of thunder; overpressures less than 1 psf are not expected to affect animals."  FAA_10102.

To reach this conclusion the agency compared, among other things, the predicted noise from Starship launches and tests against monitoring data from similar activities at Cape Canaveral, Florida, which did not observe "long-term impacts" on birds despite an "initial flight response." FAA_11709. FAA also relied on the conclusions in FWS's BCO, which incorporates detailed noise modeling, FAA_40198-99, and explains that "[t]he primary impact associated with noise generated from construction, traffic, and vehicle launches is the startle effect, when birds or other wildlife are surprised by sudden, unexpected loud noises and leave the area abruptly. Noise can cause stress in animals and the range of autonomic responses to noise could range from no reaction to alerting, disruption of feeding and/or breeding and flight. It could also arouse defensive behaviors or masking." FAA_40200. Hearing damage would only result, however, from "continuous noise level[s] above 110 dbA SPL." FAA_40202 (emphasis added). But that quantity of noise is not expected from the project here, given those levels would only result during the intermittent launches. FAA_10115 ("the noise events are infrequent and short-term and would not result in impacts at the population level"). Indeed, FAA's conclusion is all the more reasonable when compared to the baseline activities, given the "license for activities under the Proposed Action would reduce the number of annual launches to 10 (5 orbital and 5 suborbital) and reduce the number of seconds of static fire to 285 seconds per year (each static fire would still be approximately 15 seconds)" from SpaceX activities that preceded the PEA. FAA_40175. Thus, FAA's analysis complied with NEPA. *See, e.g.*, *Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 583 (9th Cir. 2016) ("analysis of the likelihood of various bird species frequenting the Project area, as well as the potential impacts of the Project on bird populations, is reasonable and satisfies NEPA's 'hard look' requirement").

Plaintiffs appear most concerned about the piping plover, but this concern is misplaced as the record reveals that FAA took a hard look at the potential impacts of the Proposed Action on this species. For example, the record includes a prior Endangered Species Act consultation between FWS and NASA "for proposed launches at the Wallops Flight Facility, Virginia." FAA_11725. In that consultation, FWS "concluded that launches were not likely to jeopardize the continued existence of the piping plover." *Id*. The record also references monitoring of plovers at Vandenberg Air Force Base, which showed that while plovers react to "helicopters or launch vehicles that mimic avian predators," they "soon return to normal behavior." FAA_40201-02. FAA's reliance on prior studies was more than reasonable. *See Red Lake Band*, 636 F. Supp. 3d at 56 ("Moreover, review of relevant caselaw supports the Corps' position that it was not required to duplicate studies or analyses already completed . . . to consider certain effects its activities associated with the Project.").

The record also shows that to the extent the Proposed Action will impact piping plovers, that impact will only be to a small percentage of the species' total population. *See* DOT_40221 (explaining that "approximately 2 percent to 5 percent of the estimated range-wide breeding population [of piping plovers] would be affected by the Proposed Action"); *see also* FAA_40215 ("The action area encompasses a relatively small portion of the rangewide habitat of each of the species addressed in this opinion and small portion of each species' population."). One study that examined bird populations at Boca Chica from 2015 through 2021 showed "little to no strong evidence of a downward trend in piping plover observations through time." FAA_39560; *see also* FAA_40230 ("No dead or wounded piping plovers have been detected in connection with biological monitoring and other activity monitoring for SpaceX activities."). Thus, FAA

reasonably relied on FWS "conclusion "that the Proposed Action is not likely to adversely

modify piping plover designated critical habitat."  FAA_10124.[7]

Plaintiffs' citations to the contrary are inapposite.  For example, Plaintiffs rely on an

April 1, 2020 email, but that communication refers to the timing of construction pre-dating the

Proposed Action, and which was assessed under environmental reviews that are not the subject

of this lawsuit.  FAA_44991.  Similarly, Plaintiffs cite to comments from TPWD regarding

lighting at the launch site.  Pls.' Mem. at 21-22 (citing FAA_46068).  However, Plaintiffs ignore

that the state agency recommended development of a new lighting plan, *id*., and that FAA

required that SpaceX do so.  FAA_10126 (mitigation measure #14).  Plaintiffs also cite to a FWS

letter (that again pre-dated the issuance of FWS's BCO) that proposed "reinitiat[ing]

consultation" pursuant to Section 4(f) of the Department of Transportation Act of 1966.

DOT_10609.  But this proposal, too, happened: consultation was reinitiated during the

development of the PEA.  *See* FAA_40291-94 (consultation history).  And though Plaintiffs

claim FAA did not adequately consider FWS's comments regarding potential harm to bird

species in close proximity to the launch site, Pls.' Mem. at 21 (citing FAA_43875), they

overlook that FWS's concurrence states that it "does not expect that the proposed action will

reduce the overall reproduction, numbers, or distribution of the piping plover . . . so that the

---

[7]        "This temporary habitat loss would occur during each static fire, launch, and landing and
would likely [only] last less no more than a few days.  This would result in a temporary loss of
feeding and roosting habitat available to piping plovers."  FAA_40228; *see also* FAA_40229
(calculating total amount of access restrictions and hourly loss of habitat).

likelihood of survival and recovery in the wild of any of these species is appreciably reduced." FAA_40222.[8]

In sum, the record demonstrates that FAA reached reasonable conclusions as to the possible impacts of the Proposed Action on wildlife based on detailed consultations with the relevant expert agencies.  Therefore, an EIS was not required.  *See, e.g.*, *El Puente v. U.S. Army Corps of Eng'rs*, 683 F. Supp. 3d 1, 22-23 (D.D.C. 2023) (holding that preparation of EIS not required where "the Corps thoroughly considered the impacts on endangered species, engaged in formal and informal consultation as required, and reasonably determined that the effects on corals and manatees would not be significant"); *W. Watersheds Project v. Salazar*, 993 F. Supp. 2d 1126, 1135-36 (C.D. Cal. 2012) (agency reasonably relied on significance determination in Biological Opinion accompanying NEPA analysis).

> 2.    *FAA Took A Hard Look At The Potential Impact Of Noise On The Community.*

Plaintiffs allege that community noise effects were left unaddressed.  Pls.' Mem. at 26-27.  But Plaintiffs overlook that the Noise Assessment (Appendix B) accompanying the PEA examined the possibility of both hearing loss and structural damage due to noise emanating from Starship launches and landings.  FAA_11547-11602; FAA_10048 (sonic boom noise contour analysis).  As to the former, the PEA explained that "[n]o residents (including Boca Chica Village residents) or members of the public will experience [noise] above OSHA's 115-dbA threshold [the threshold mandated by FAA guidance] during an orbital launch."  FAA_10041; *see also* FAA_10041 (no impact from launches); FAA_10045 (no impact from landings).  As to

---

[8]    Plaintiffs' citation to FAA_14246 is similarly inapposite given it is related to human uses as to beach access, not bird effects.

the latter, given the noise modeling and assumptions in Appendix B,[9] "approximately one damage claim will result per 100 households exposed at 120 dB and one damage claim per 1,000 households exposed at 111 dB1."[10]  *Id*.  Accordingly, "no structural damage or significant impact to third-party structures is expected from launch operations."  FAA_10043.  Thus, though Plaintiffs argue the PEA should have included specific mitigation measures for community impacts (so-called "damage and health impacts"), Pls.' Mem. at 27, the PEA did not find significant impacts for those effects, and mitigation was accordingly not warranted.  *See* FAA_57677 (FAA Order 1050.1F § 4-4).

**B.    FAA's Methodological Analysis of Anomalies Was Reasonable and Well-Supported.**

FAA: (1) acknowledged and addressed the possibility that anomalies might occur and spread debris; (2) applied a reasonable methodology to assess possible anomalies, including examining historical data and studies, reviewing the procedures and policies under the Anomaly Response Plan contained in the September 2021 Memorandum of Agreement between TPWD and SpaceX[11] and SpaceX's Anomaly Response Plan; and (3) reached the reasonable conclusion that anomalies and any debris and debris-response activities would be temporary and thus would not cause any permanent effects.  That conclusion accords with the principle that an agency may

---

[9]    "Starship orbital launch noise events will last a few minutes at most, at a single location, with the highest noise levels occurring for less than a minute . . .  noise levels (LAmax) are less than OSHA's 115 dBA upper noise limit guideline at distances greater than approximately 2.3 miles from the launch pad."  FAA_11556.

[10]    "[T]he 120 dB contour would be north of Port Isabel and approximately four miles north of the southernmost point of South Padre Island.  The 111 dB contour would extend approximately 19 miles from the launch pad and encompass Port Isabel, Laguna Vista, the southernmost 15 miles of South Padre Island, and the easternmost areas of Brownsville."  FAA_10043.

[11]    Attached as Appendix K to the PEA.  *See* FAA_12387-91.

use its "expertise to determine the best method to evaluate the significance of an impact to a

particular resource, so long as that method is reasonable." *Sierra Club,* 753 F.2d at 128 ("It is

clearly within the expertise and discretion of the agency to determine proper testing methods.");

*Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 201 (D.C. Cir. 1991) (the deferential

rule of reason guides the agency's "choice of scientific method").

      Plaintiffs contend that FAA improperly concluded that there were no significant impacts

from anomalies because of two, somewhat contradictory reasons: first, they claim that because

historical effects from anomalies were significant, the possibility of anomalies itself creates a

significant environmental impact; and second, that the impacts from the past anomalies have not

been fully analyzed. *See* Pls.' Mem. at 35-42. For several reasons, Plaintiffs' arguments fail.

      As an initial matter, the mere fact that anomalies have occurred does not create a per se

significant impact going forward. *See, e.g.*, *Lee v. U.S. Air Force*, 354 F.3d 1229, 1245 (10th

Cir. 2004) ("The fact that an accident has since occurred does not indicate that the EIS's analysis

was flawed, nor does it make necessary further discussion of the secondary effects of such an

accident."). Nor does an agency's conclusion that there is a nonzero probability of an impact

occurring mandate completion of an EIS. *See New York v. NRC*, 681 F.3d 471, 478-79 (D.C.

Cir. 2012) (explaining that "an agency conducting an EA generally must examine both the

probability of a given harm occurring *and* the consequences of that harm if it does occur").

Instead, agencies have significant discretion to decide whether a proposed action may have a

significant impact. *See Grand Canyon Trust v. FAA*, 290 F.3d 339, 341-342 (D.C. Cir. 2002);

*see also* FAA Order 1050.1F at 4-3 (FAA_57666 (defining significant impact)). Thus, an agency

may examine the consequences of the harm in proportion to the likelihood of its occurrence in

determining whether the absence of significant impacts supports the issuance of a FONSI.  *See New York*, 681 at 478-79, 482.

Here, FAA fully analyzed the effects of historical anomalies and, using its choice of methodology, reasonably determined that no significant impacts were likely to result. FAA_10080-82; FAA_13243-46.  FAA considered the possibility of an anomaly and the related impacts, including potential debris and debris-response activities, looked at historical anomalies, including SpaceX's SN11 anomaly,[12] reviewed the MOA with TPWD to mitigate and restore any impacts from anomalies, and evaluated procedures for assessment and removal of debris. FAA_10080-81.  After consideration of all that information, FAA used a reasonable methodology to conclude that no significant impact from anomalies would likely occur.  *See, e.g.*, *Citizens Concerned About Jet Noise, Inc. v. Dalton*, 48 F. Supp. 2d 582, 599 (E.D. Va. 1999) (deferring to agency's methodology for "measur[ing] the safety risks").

Plaintiffs' brief does not demonstrate otherwise.  *See* Pls.' Mem. at 36-39.  Indeed, Plaintiffs' contentions regarding significant impacts rest heavily on various comments about anomalies, but this is precisely how the NEPA process is intended to proceed—the agency received comments, considered them, determined what, if any, mitigation is appropriate, and collaborated with relevant agencies.  *See, e.g.*, *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 196 (D.C. Cir. 2017) (explaining that the purpose of NEPA is "to ensure fully informed and well-considered decision[s] by federal agencies . . . by requiring federal agencies to take a hard look at their proposed actions' environmental consequences in advance of decision whether and how to proceed" (quotations and citations omitted)).  For example, Plaintiffs make much of

---

[12]    On March 30, 2021, a SpaceX Starship prototype (referred to as SN11) test launch at the Boca Chica Launch Site resulted in anomaly. That launch was unrelated to the launch license at issue in this case. FAA_10066.

TPWD's comments regarding anomalies; however, significant portions of the mitigation described and planned in the Mitigated FONSI/ROD comes from measures explicitly outlined in TPWD's May 11, 2022 concurrence letter.  FAA_10084.  Moreover, Plaintiffs erroneously highlight other agencies' comments about anomalies as evidence of significant affects.  But FAA is not required to adopt wholesale other agencies' concerns or comments.  *Theodore Roosevelt Conservation P'ship v. Salazar*, 605 F. Supp. 2d 263, 276 (D.D.C. 2009) ("Although an agency should consider the comments of other agencies, it does not necessarily have to defer to them when it disagrees." (citation omitted)), *aff'd*, 616 F.3d 497 (D.C. Cir. 2010); *Citizens Against Burlington*, 938 F.2d at 201 ("[U]nder the rule of reason, a lead agency does not have to follow [another agency's] comments slavishly—it just has to take them seriously.").  Consideration of other agency comments is exactly what FAA did.  *See, e.g.*, FAA_39234-416 (draft anomaly response plan including track changes reflecting discussions between FAA, FWS, and TPWD); FAA_39427- 37 (draft anomaly response plan with agency comments).  Moreover, FAA reasonably determined that any potential anomaly, including debris and debris-related effects, would be temporary, and both TPWD and FWS ultimately concurred.  FAA_10302; FAA_74900-01.  Thus, a full reading of the record demonstrates that FAA reviewed and took seriously the comments regarding anomalies, including those made by other agencies.

In sum, FAA applied a reasonable methodology to assess the possibility of anomalies, including examining historical data, comments, and studies, and exercised its discretion in concluding that there would be no significant impacts.

C.    **FAA Adequately Considered the Impact of the Temporary Access Restrictions Related to the Proposed Act.**

1.    *The Access Restrictions in the PEA are Reasonable.*

In the PEA, FAA identified three types of access restrictions associated with the Proposed Action: (1) ground access restrictions; (2) waterway hazard warnings; and (3) airspace closures. *See* FAA_10004-10. FAA's analysis of all three restriction types easily meets NEPA's requirements. However, because Plaintiffs only challenge FAA's ground access restrictions, *see* Pls.' Mem. at 27-35, this is the only restriction type addressed here. As described below, this restriction is reasonable and circumscribed to the degree necessary to permit safe Starship operations.

By way of background, for safety reasons a limited area surrounding SpaceX's facilities—referred to as "the access restriction area,"[13] FAA_10004—will be closed to the public for a narrow window of time during certain Starship operations.[14] FAA defined an operational access restriction as "begin[ning] when local law enforcement, under the direction of an order from the Cameron County Commissioners Court, shuts down [State Highway 4] and Boca Chica Beach to support the FAA-permitted or FAA-licensed activity" and ending "when the operation [of that licensed activity] is completed, and local law enforcement opens [State Highway 4] and Boca Chica Beach." FAA_10005. SpaceX was "assume[d]" not to "exceed 500 hours of nominal access restriction[s] per year." FAA_10006. The length of the access restriction would depend on the licensed activity, with shorter restrictions for pre-launch operations and tests, and longer restrictions for launches and landings. *Id.*

---

[13]     The size of the access restriction area is determined, in significant part, by the regulations in 14 C.F.R. Part 450. For example, the access restriction area includes the "flight hazard area," which is "any region of land, sea, or air that must be surveyed, publicized, controlled, or evacuated in order to control the risk to the public." 14 C.F.R. § 450.133(a). FAA includes this information as background for the Court as Plaintiffs have not challenged the scope of the access restriction area and thus cannot do so now.

[14]     These operations include, "[t]anks tests, wet dress rehearsals, static fire engine tests, and launches (suborbital and orbital)." FAA_10004.

Under FAA's guidance, SpaceX developed a three-part "Access Restriction Notification Plan," which SpaceX must follow "prior to a planned access restriction." FAA_10005. That Plan requires that SpaceX, will, first, "[p]rovide a forecast of planned access restrictions one to two weeks in advance of the access restriction on [Cameron] County's website," which is publicly available, "and send [the forecast] to [an] agency distribution list." *Id*. This list will include the agencies that own or manage the publicly available land surrounding the launch site, including FWS, TPWD, THC, and the Texas General Land Office. FAA_10077. Second, SpaceX will "[s]end access restriction notifications to the regulatory and public land-managing agencies as plans finalize 48 hours prior to the access restriction." FAA_10005. SpaceX will update the agencies "when the access restrictions go into place and when the access restrictions end." *Id*. Third, SpaceX will "[s]end real time status updates on access restrictions through a text message alert service" to the County, the land-managing agencies, and members of the public who sign up for the alerts. *Id*. "Prior to an operation requiring an access restriction, the public would be notified through local media and through the use of NOTMARs and NOTAMs," and SpaceX "would also inform the cities of Brownsville and South Padres Island."[15] FAA_10006.

---

[15]    A NOTAM is a "notice containing information essential to personnel concerned with flight operations" when there is an "abnormal status of a component of the National Airspace System." Federal Aviation Administration, *What is a NOTAM?*, https://www.faa.gov/about/initiatives/notam/what_is_a_notam (last updated Feb. 10, 2025). A NOTMAR "provides timely marine safety information for the correction of all US Government navigation charts and publications." National Geospatial-Intelligence Agency, *Notice to Mariners*, https://msi.nga.mil/NTM.

### 2. FAA Took a Hard Look at the Impacts of Access Restrictions.

In the PEA, FAA thoroughly analyzed the impacts, if any, of those temporary access restrictions on cultural resources (pursuant to Section 106 of the National Historic Preservation Act), Section 4(f) properties, and the Carrizo/Comecrudo Tribe.[16]  Each is addressed below.

First, FAA examined the impacts of these temporary access restrictions on seventeen different cultural resources.[17]  FAA concluded that for fifteen of the seventeen resources, SpaceX's temporary access restrictions would not impact the properties.  FAA_10066.  While FAA believed the temporary access restrictions may "inhibit" or "diminish" visits to the other two properties—the Palmito Ranch Battlefield and the Palmetto and Cypress Bridge Pilings—the agency ultimately concluded that the restrictions "would have *no adverse effect*."  FAA_10065.  FAA reached this conclusion for two reasons.  One, assuming that the properties were open twelve hours a day, 365 days a year, and SpaceX used all 500 hours of its temporary access restrictions during the properties' open hours, the site "would still remain accessible to the public

---

[16]    Plaintiffs do not challenge FAA's analyses pursuant to Section 106 or Section 4(f).  Nonetheless, FAA discusses these analyses here as they are relevant to showing the sufficiency of the agency's assessment under NEPA and why Plaintiffs' NEPA challenges are misplaced.  *See Oglala Sioux Tribe*, 45 F.4th at 296 (discussing the overlap between analyses pursuant to Section 106 and NEPA); *Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368, 373 (D.C. Cir. 1999) (stating that there is "obvious merit to coordinating environmental review of the kind required by NEPA and section 4(f)"); *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 67 (D.C. Cir. 1987) (looking to the agency's Section 4(f) analysis in holding that the agency satisfied NEPA).

[17]    The seventeen resources are: Palmito Ranch Battlefield, a National Historic Landmark; Palmetto and Cypress Bridge Pilings; Palmetto Pilings Centennial Marker; Queen Isabella Memorial Causeway; Long Island Swing Bridge; Queen Isabel Inn; Alta Vista Apartments; Point Isabel Lighthouse; the historical marker for the Point Isabel Lighthouse; Charles Champion Building; Port Isabel Cemetery; Point Isabel Coast Guard Building; Port Isabel Firemen's Hall; Former Baia Mar and Bahia Grande Condominiums; Former Sea Island Resort Hotel; Former Ship Café Building; and White Sands Motel.  FAA_10060-61.  Plaintiffs do not challenge how FAA identified these historic resources.  However, FAA's explanation for how it did so can be found in the PEA from FAA_10055-60.

89% of the time." *Id*. Two, SpaceX agreed to an extensive set of mitigation measures that would avoid restrictions during times of high visitation, minimize disruption to agency management, and provide the public with advanced notice.[18] *Id*.

Second, for the Section 4(f) properties,[19] FAA analyzed the access restrictions for a subset of seven properties because the other properties are not "subject to access restrictions." FAA_10076.[20] The seven properties are: (1) Boca Chica State Park; (2) Brazos Island State Park; (3) South Bay Coastal Preserve; (4) Palmito Ranch Battlefield; (5) Lower Rio Grande National Wildlife Refuge; (6) the Palmetto and Cypress Bridge Pilings; and (7) Palmetto Pilings Historic Marker. *Id*. Two of the properties, the Battlefield and the Lower Rio Grande National Wildlife Refuge ("the Refuge"), would be subject only to access restrictions for launch operations; the other five properties would be subject to restrictions for both launch operations and anomalies. *Id*. FAA began its analysis of the access restrictions by contextualizing them. It explained:

> Assuming public access would [ ] be available [to these properties] only 12 hours per day, 365 days per year, and that all temporary access restrictions occurred during those open hours and all of the 500 hours for launch operations and 300

---

[18]    FAA also determined that these properties should not "be subject to access restrictions for anomalies given the distance of the [properties] from" SpaceX's launch facility. FAA_10065.

[19]    Under Section 4(f), FAA (as a constituent part of the Department of Transportation) "may approve a transportation program or project . . . requiring the use of publicly owned land . . . only if (1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the [public resource] resulting from the use." 49 U.S.C. § 303(c). "Constructive use occurs when the impacts of a project on a Section 4(f) property are so severe that the activities, features, or attributes that qualify the property for protection under Section 4(f) are substantially impaired." FAA_10069.

[20]    FAA conducted a full Section 4(f) analysis on the properties potentially impacted by the licensed activities. *See* FAA_10068-88; FAA_10527-645. Because Plaintiffs did not bring a Section 4(f) claim, this analysis will not be discussed further herein.

hours for anomalies were used (which is not expected), the properties would still remain accessible to the public 82% of the time.

FAA_10076-77.  FAA also explained that the temporary access restrictions "would not impede" FWS "from completing habitat or species management activities within Boca Chica State Park" because SpaceX provided funding to FWS to "hir[e] an employee to assist with coordination between [the Service] and SpaceX."  FAA_10077.  Further, when the operational access restrictions are in place, SpaceX agreed pursuant to the mitigation measures to provide access to all the properties for those individuals who require it through a series of tiered checkpoints, discussed *infra*, except for the limited period when it is unsafe to do so.  *Id*.  The other mitigation measures also "minimize[d] the impacts of the temporary access restrictions."  *Id*.

Specific to the Refuge, Plaintiffs maintain that the temporary access restrictions will "have significant impacts on the" Refuge because it will make it more difficult for "Refuge managers to manage public lands and to conduct essential research and manage Refuge resources."  Pls.' Mem. at 29-30.  In support, Plaintiffs cite to comments submitted by federal and state agencies supposedly raising concerns "over the significant impacts of the closures" that FAA "failed to address or mitigate."  *Id*. at 30.  But FAA responded to the concerns Plaintiffs raise, often directly.  For example, Plaintiffs point to an August 23, 2021 letter from the FWS Manager of the Lower Rio Grande Valley National Wildfire Refuge to FAA.  Pls.' Mem. at 31 (citing FAA_10609).  In that letter, FWS described why, in its opinion, Starship operations qualified as "constructive use" under Section 4(f).  FAA_10699 (italics omitted).  FAA responded less than a month later, *see* FAA_10612-14, explaining why it disagreed and addressing FWS's concerns about the potential impacts form closure, FAA_10613.

Similarly, Plaintiffs also rely on a September 30, 2020 letter from TPWD to FAA, Pls.' Mem. at 32 (citing FAA_50994), where the state agency explained its views about the impacts of

the proposed temporary access restrictions on its operations, FAA_50994.  FAA responded

approximately a month later, explaining that it considered the concerns raised by TPWD in the

PEA.  FAA_50996.  FAA satisfied its NEPA obligations.  *See Citizens Against Burlington*, 938

F.2d at 201.  And though Plaintiffs claim that TPWD and FWS's comments "demonstrate that

closures have significant impacts on Refuge resources," both agencies ultimately concluded that

the impacts of the Proposed Action would be *de minimis* under Section 4(f).  *See* FAA_10589

(TPWD "concur[ring] with the [FAA's] specific *de minimis* determination); FAA_10616 (FWS

"concur[ring] in the FAA's" finding of "*de minimis* temporary physical occupancies of the

Refuge").

      As such, "[b]ased on the temporary and short duration of the access restrictions, the

notification and planning with the applicable land-management agencies, and the avoidance of

days of higher public use, the FAA determined that the access restrictions associated with launch

operations and anomalies would not substantially impair the activities, features, or attributes that

qualify" the seven properties "for protection under Section 4(f)."  FAA_10077.

      Third, Plaintiffs wrongly claim that the temporary access restrictions will "significantly

disrupt the ability of the Carrizo/Comecrudo Tribe to hold their traditional ceremonies" as the

"Boca Chica beach is sacred to the Tribe, and the frequent closures prohibit Tribal members

from accessing an area of vital cultural, social, religious, and spiritual importance."  Pls.' Mem.

at 28.  Further, Plaintiffs maintain that "the PEA is devoid of *any* acknowledgement that the

Tribe considers Boca Chica beach to be an extremely important sacred area," and that "no efforts

have been made by the FAA or SpaceX to connect with the Tribe's chairman to discuss these

issues."  *Id*.

Plaintiffs' arguments are without merit. FAA conducted a robust analysis of cultural resources, including Native American resources, potentially impacted by the Proposed Action. This analysis included: (a) consulting with interested parties (including the Texas State Historic Preservation Officer, Tribal Historic Preservation Officer and Native American tribes), *see* FAA_10055; (b) hiring a third-party firm "to identify and document all buildings, structures, canals, ditches, bridges, and roads built before 1975" within the area potentially affected by the Proposed Action, and conferring with the State Historic Preservation Officer and the THC about the resources identified, *see* FAA_10056-58; (c) hiring the same third party to inventory previously identified archaeological resources, look for potential new archaeological resources, and confer with the relevant Texas officials about this work, *see* FAA_10058-60; and (d) studying the environmental consequences of, *inter alia*, the proposed access restrictions on these resources, *see* FAA_10060-67. This multi-step, detailed analysis more than satisfies NEPA's hard look standard. *See WildEarth Guardians v. Salazar*, 880 F. Supp. 2d 77, 88 (D.D.C. 2012) ("It is of course always possible to explore a subject more deeply and to discuss it more thoroughly, but the line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts." (cleaned up)); *NRDC v. Kempthorne*, 525 F. Supp. 2d 115, 122 (D.D.C. 2007) (holding that NEPA does not require consideration of every possible consequence of an action, but rather only the "reasonably foreseeable environmental effects of the action" (cleaned up)).

Further, Plaintiffs simply claim that the temporary access restrictions will "significantly disrupt" the Tribe's ceremonial practices. But nothing in the record supports this assertion. For example, Plaintiffs cite to a comment submitted by nine groups discussing the potential impact on the Tribe. Pls.' Mem. at 28 (citing FAA_4088-90). While the comment states that the

"patterns of archaic burials in the area show" that it is possible that there are archeologically significant sites in the area, the comment also acknowledges that "there has been no archeological study in the immediate construction site" showing the presence of such sites. FAA_4089. Similarly, an email cited by Plaintiffs talks vaguely of "multiple ancestral village sites throughout the region and the area." FAA_3260. This lack of specificity about the potential disruption is unsurprising given that SpaceX's access restrictions are limited in scope, and it has agreed to significant mitigation measures that lessen the impact of the restrictions when they are imposed. *See Conn. Dep't of Pub. Util. Control v. FERC*, 593 F.3d 30, 36 (D.C. Cir. 2010) (courts do not have jurisdiction to address arguments when the petitioners raise them only "in a general way").

To that end, FAA contacted the Tribe on March 9, 2022 to discuss the Tribe's concerns. FAA_51173-74. James Repcheck, then Manager for AST's Safety Authorization Division, sent a letter to Chairman Juan Mancias of the Carrizo/Comecrudo Tribe of Texas "recogniz[ing] that [his] Tribe has possible interests within the Area of Potential Effects [ ] for this undertaking" and "inviting [the] Tribe to be a consulting party to the Section 106 review." FAA_51173. Mr. Repcheck asked Chairman Mancias to identify any historic properties that the Tribe "attaches religious and cultural significance to" and "that may be affected by the SpaceX Boca Chica Launch Site." *Id*. Mr. Repcheck also sent the Chairman a copy of the draft PEA and other background materials, and encouraged him to contact FAA's environmental protection specialist to begin the formal consultation. FAA_51174. This letter also responded to some of the Tribe's key concerns. For example, the letter acknowledged that the Tribe was concerned about the potential impacts to an area known as Garcia Pasture. However, Mr. Repcheck confirmed that the "Pasture is located outside of the archeological resources study area for the ground-disturbing

activities of the project and would not be impacted by ground-disturbing activities or potential launch anomalies." *Id.*[21]  The Tribe did not respond to AST's letter.  Accordingly, this letter satisfies FAA's NEPA obligations with respect to this tribal consultation.  *See Oglala Sioux*, 45 F.4th at 306 (finding that the agency reached out to the Tribe and that, while the tribe refused to participate in the relevant inquiry, the agency satisfied its consultation obligations via outreach).

In sum, and as set forth above, FAA took a hard look at the impact of the temporary access restrictions related to the Proposed Action.  *See Methow Valley*, 490 U.S. at 350 (explaining that NEPA's procedures require only agencies to take a "hard look" at environmental consequences).

3.    *Plaintiffs' Objection That FAA Wrongly Relied On SpaceX's Closure Estimates Is Baseless.*

Plaintiffs' arguments as to why FAA should have prepared an EIS rather than the PEA are based on a faulty assumption that SpaceX's estimates as to the number of hours it would ask Cameron County to impose temporary access restrictions were "unsupported . . . since the history of closures at Boca Chica shows that the actual closure hours will likely drastically exceed these predictions."  Pls.' Mem. at 27.  As a result of FAA's reliance on these estimates, Plaintiffs argue that the agency's hard look analysis was flawed.  *See id.*

Plaintiffs' critique is incorrect.  In the PEA, FAA explained the methodology that it used to calculate the number of hours.  Plaintiffs do not point to an alternative methodology for calculating the number of hours the access restrictions may be imposed.  In the absence of such an alternative, Plaintiffs' challenge must fail.  *See Red Lake Band of Chippewa Indians*, 636 F.

---

[21]    This concern was raised in one of the comments cited by Plaintiffs.  *See* FAA_4089.

Supp. 3d at 60 (rejecting a challenge to a NEPA analysis where plaintiffs failed to show the impacts they allege will result from the proposed action).  Moreover, even if Plaintiffs had suggested an alternative methodology, their argument would still fail as FAA is not required to adopt a specific methodology, and Plaintiffs have not shown that the agency's chosen methodology was an unreasonable exercise of its discretion.  *See City of Williams v. Dombeck*, 151 F. Supp. 2d 9, 23 (D.D.C. 2001) (holding that the Forest Service did not violate NEPA by failing to adopt plaintiffs' preferred methodology where plaintiffs did "not demonstrate[ ] that the Forest Service's methodology violated agency regulations or were somehow beyond agency discretion").

## II.    The Mitigated FONSI/ROD Incorporated Significant Mitigation Measures to Reduce Any Adverse Effects of the Proposed Action.

"NEPA does not require agencies to discuss any particular mitigation plans that they might put in place, nor does it require agencies—or third parties—to effect any." *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 503 (quotes and citation omitted); *see also Oglala Sioux*, 45 F.4th at 305 ("Fairly evaluating mitigating strategies does not, however, require an agency to have actually formulated and adopted a fully developed plan that will mitigate harm before an agency can act."  (quotation, citation, and alteration omitted)).  Instead, an agency's mitigation approach "must be adequately considered."  *Oglala Sioux*, 45 F.4th at 305 (quotation and citation omitted).  Said differently, "an agency is required to 'discuss mitigation measures in sufficient detail to ensure that environmental consequences have been fairly evaluated.'"  *Nat'l Parks Conservation Ass'n v. United States*, 177 F. Supp. 3d 1, 23 (D.D.C. 2016) (quoting *Methow Valley*, 490 U.S. at 353) (alterations omitted); *see also Sierra Club*, 753 F.2d at 127 ("preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum").

34

Plaintiffs make a variety of unsuccessful arguments regarding the sufficiency of mitigation measures as to: (1) noise and light effects; (2) anomalies; and (3) access restrictions. As described below, each is misplaced.

**A.      FAA Incorporated Significant Mitigation for Noise and Light Effects.**

First, Plaintiffs claim noise impacts can never be mitigated below the threshold of significance because "there is simply no way to prevent noise from construction activities and rocket testing/launches (including explosions) from impacting the surrounding habitat." Pls.' Mem. at 23.  But that flies in the face of numerous cases finding that an agency may mitigate for noise effects.  *See, e.g.*, *Japanese Vill., LLC v. Fed. Transit Admin.*, 843 F.3d 445, 459 (9th Cir. 2016); *City of Bridgeton v. F.A.A.*, 212 F.3d 448, 459 (8th Cir. 2000); *Nat'l Parks Conservation Ass'n*, 177 F. Supp. 3d at 25 (approving of agency's efforts to "sufficiently reduce[ ]" noise effects).  And it assumes, contrary to the record, that FAA found significant noise effects would result.  But, as explained above, that was not the case.

Second, Plaintiffs allege none of the mitigation measures in the PEA address noise impacts.  Pls.' Mem. at 23.  Not so.  SpaceX is required to implement measures to, among other things, "minimize noise from generators that may be used during construction and/or operations," FAA_10130, "[i]mplement[ ] measures to reduce noise levels generated by construction equipment," FAA_10067, "[c]onduct[ ] a vibration monitoring program," *id*., and use a "notification plan" to "announce when a launch or landing event would occur," which would "reduce human adverse reactions."  FAA_10050.  Further, "SpaceX would be responsible for resolving any structural damage caused by a sonic boom."  *Id*.

Third, Plaintiffs claim FAA "relied on unsupported assumptions" regarding the efficacy of lighting mitigation measures and arbitrarily failed to require certain measures, such as limiting

nighttime lighting and the use of metal halide lights.  Pls.' Mem. at 24-25.   But Plaintiffs once

again overlook the record—specifically, the Lighting Management Plan which accompanied

FWS's BCO, describes the design of lighting at the Boca Chica site, and requires various

operational guidelines for the mitigation of light effects.  FAA_39652-64.  Because these

"protective measures [ ] are intended to minimize incidental take of individual sea turtles or

damage to [their] habitat," FAA_40215, FWS reasonably concluded that "[a]dverse effects

would be minimized by implementation of the conservation measures included in the [P]roposed

[A]ction," FAA_40218 (listing mitigation measures); *see also* FAA_40232 ("implementation of

the conservation measures proposed should ultimately result in avoidance and minimization of

adverse effects"); FAA_40120-22 (sea turtle monitoring plan).  Accordingly, issuance of the

Mitigated FONSI/ROD was appropriate.  *See Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1156

(D.C. Cir. 2011) (explaining that a "project with a potentially significant impact will not require

an EIS if changes or safeguards sufficiently reduce the impact" (quotation, citation, alteration

omitted)).

Against that detailed explanation, Plaintiffs cite to a comment on the draft PEA from

TPWD, which recommended that "nighttime construction and operations should be limited to the

period outside the sea turtle nesting season which is typically understood to be April through

September."  Pls.' Mem. at 24 (citing FAA_14274); *see also id*. (citing FAA_45953,

FAA_46006).  Plaintiffs claim FAA ignored those "admonitions" and "did not implement

measures to limit nighttime lighting."  *Id*.  But the Lighting Plan explicitly addresses these

comments, identifying "best management practices to reduce lighting."  FAA_39655.  Among

other measures, "a qualified biologist will conduct lighting inspections before nesting season and

biweekly during the nesting-hatching season," and "[a] set of daytime and nighttime lighting

inspections will be done before nesting season." FAA_39565. Further, metal halide lights will only be used "for short durations when illuminating the launch vehicle on the launch pad." FAA_11379. More broadly, launch site lighting mitigation required by FAA includes: (1) the "minimum number and configuration" of "exterior lights used expressly for safety or security purposes" "required to achieve their functional roles"; (2) "directing, shielding, or positioning lighting to avoid visibility from the beach, minimiz[ing] lateral light spread, and decreas[ing] uplighting; turning off lights when not needed; [and] using low-pressure sodium to the extent practicable"; (3) issuance of "annual notices to all complex personnel prior to sea turtle nesting season reminding personnel of light use requirements and responsibilities"; and (4) "evening inspections between 9:00 p.m. and 5:00 a.m. monthly during sea turtle nesting season." FAA_10054.[22] So too, the mitigation includes a mechanism for compliance verification. FAA_39656-57; *see also* FAA_40232-37 (monitoring measures). Those measures are more than sufficient. *See Van Antwerp*, 661 F.3d at 1154-44 ("even assuming that general attacks on the [agency's] monitoring of wetlands mitigation could ever justify its or our disregard of specific mitigation measures, here in fact the Corps verified that the measures were proceeding").

Plaintiffs also conflate SpaceX's "need" to perform ground support operations that require white halide lighting with the fact that such operations do not occur continuously. *See* FAA_11493 (referring only to construction occurring at night). And Plaintiffs similarly misread SpaceX's response to mitigation measures, which indicated a need for the *ability* to light the launch pad throughout the year, not that such lighting would be used continuously throughout the

---

[22]    Sea Turtle Inc.'s work shows that SpaceX's operations have not had a significant impact on the local turtle populations. Sea Turtle Inc. has detected no "meaningful change[ ] in the nesting data" as "[n]est numbers on Boca Chica Beach remained consistent during the 2020 and 2021 nesting seasons." FAA_10109.

year.  FAA_46104.  In sum, the PEA "includes non-discretionary Reasonable and Prudent Measures and associated Terms and Conditions to avoid, minimize, and mitigate the impacts to listed species and critical habitat."   FAA_10120; *see also* FAA_101124-32 (mitigation for biological resources); FAA_40105 (species monitoring plan); FAA_40109 (aviation monitoring plan includes annual and launch-specific monitoring).  Those measures more than meet NEPA's requirements.  *See Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016) (affirming use of mitigation plan that included a "comprehensive set of mitigation measures relying, in part, on field studies . . . [that], in combination with scientific research, informed the [agency's] development of a number of mitigation measures, including the creation of the lengthy Protection Plan").

### B.    Mitigation for Anomalies Was Tied to FAA's Reasonable Methodology.

Plaintiffs' contention that potential harm from anomalies cannot be mitigated likewise fails.  Plaintiffs' argument is premised on the assumption that FAA is obliged to impose mitigation measures to prevent anomalies.  This assumption is not correct.  NEPA does not prescribe particular results; thus, it does not mandate that an agency choose a proposed action that poses no potential adverse effects.  *See Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 361 (1989) (agencies are not required to include "worst case analysis" in their EA or EIS's); *Sierra Club v. Watkins*, 808 F. Supp. 852, 868-72 (D.D.C. 1991) (holding that an agency need not consider every possible effect for a given action nor select a particular alternative, but must at least "admit that such accidents are possible," determine the probability of occurrence, and "discuss[ ] their potential effects"); *see also* FAA_57701 (explaining that the use of a FONSI can be "support[ed]" when "the mitigation measures can reduce potentially significant adverse impacts below the level of significance").

FAA satisfied the relevant standard because it acknowledged that "accidents" are possible, examined the probability of such accidents occurring, and discussed the potential effects in sufficient detail. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 255 F. Supp 3d. 101, 132-33 (D.C. Cir. 2017) (finding the Army Corps of Engineers adequately discussed the impacts of an accidental oil spill event in an EA); *see also Van Antwerp*, 661 F.3d at 1156. Specifically, FAA provided a detailed explanation of the mitigation measures in the event of an anomaly, including an assessment of whether the mitigation measures can be effective, and the monitoring required to evaluate the measures. FAA_10066; FAA_10080; FAA_10084-85. FAA outlined all the agreed upon mitigation with respect to anomalies, including, but not limited to, following the SpaceX Anomaly Response Plan, conducting debris removal, mandating the restoration of impacted areas, contracting with TPWD and/or parts of the Texas A&M University system to develop protocols to evaluate the efficacy of restoration efforts after anomalies, ensuring that SpaceX collaborates with FWS to conduct wildlife and fishing objectives for the area, and requiring SpaceX to, at its expense, hire a qualified environmental firm to undertake restoration evaluations and monitor the success of restorations. FAA_10084-87; FAA_11464-67. FAA also outlined mitigation related to anomalies involving debris recovery, removal, and cleanup, and hazardous material releases. FAA_10128; FAA_10142.

As such, FAA provided a reasonably detailed description of mitigation measures, fully demonstrating that the agency had considered the environmental consequences of potential anomalies, and reasonably determined there were no significant effects. *Cf. Sierra Club v. U.S. Dep't of Transp.*, 125 F.4th 1170, 1185 (D.C. Cir. 2025) ("Although [the agency] adopted some safety measures . . . it never explained why those safety measures were adequate to address the extreme dangers associated with a derailment.").

### C.      FAA Imposed Extensive Access-Related Mitigation Measures.

#### 1.      *FAA's Mitigation Measures.*

The PEA imposes extensive geographic and temporal measures to circumscribe the scope of the access restrictions and to mitigate any disruption caused by the restrictions.  In terms of geography, SpaceX proposed a tiered restriction system around the flight hazard area.  The system is comprised of four "pre-defined checkpoints on [State Highway 4]," each one imposing more stringent constraints than the prior one.[23]  FAA_10006.  This approach helps ensure that the potential access-related impacts of its licensed activities are as minimal as possible.

In addition, SpaceX agreed to five temporal-mitigation measures.[24]  First, SpaceX agreed not to close State Highway 4 on sixteen major holidays[25] and, if the holiday falls on a Monday or Friday (either annually or for a specific calendar year), SpaceX also agreed not to close the Highway over the adjacent weekend.  For Thanksgiving, SpaceX may not restrict access to the State Highway starting on Thanksgiving Day and ending on the following Sunday.  FAA_10007.  Second, from Memorial Day to Labor Day, SpaceX may not limit access to State Highway 4 from Friday at 6:00 a.m. local time through Sunday.  This "schedule ensures the public access to

---

[23]      The first checkpoint permits "[g]overnment personnel, SpaceX personnel, emergency personnel, and anyone with property beyond this [ ] checkpoint [to] pass," but does not allow the general public access.  FAA_10006.  The second permits "SpaceX personnel, government personnel, emergency personnel involved in SpaceX operations, and anyone with property beyond" it to pass.  *Id.*  Beyond the third checkpoint, only SpaceX and FAA support personnel can pass, and "[n]o one could pass" the final checkpoint.  *Id.*

[24]      These measures do not apply to "activities deemed to be anomalies per FAA regulations."  FAA_10007.

[25]      The holidays are Memorial Day, Labor Day, July 4th, Martin Luther King Jr. Day, Presidents' Day, Texas Independence Day, Cesar Chavez Day, Juneteenth, Veterans' Day, Good Friday, Easter, Father's Day, Mother's Day, Thanksgiving Day, Christmas Day, and New Year's Day.  FAA_10007.

all open areas of the [Lower Rio Grande Valley National Wildlife Refuge] (e.g., Boca Chica Beach) from Friday at 6:00 a.m. through Sunday" during "the times of greatest [annual] visitor beach uses and enjoyment." *Id*. Third, from the day after Labor Day until the day before Memorial Day, SpaceX cannot limit access to State Highway 4 on either Saturdays or Sundays. *Id*. Fourth, SpaceX may restrict access, however, (1) from Fridays at 6:00 a.m. through Sunday from Memorial Day to Labor Day, or (2) from Saturday through Sunday from Labor Day to Memorial Day "up to five times per calendar year." *Id*. Fifth, SpaceX shall transmit its request for an access restriction to the Cameron County Commissioners Court "at least 48 hours prior to the start of the access restriction period." *Id*. "This notice requirement is intended to give the public a minimum 48-hour notice to reduce impacts to recreational users." *Id*.

### 2. The Access-Related Mitigation Measures Show Why Plaintiffs Are Mistaken in Contending That an EIS Was Required.

Plaintiffs claim that FAA did not sufficiently mitigate the impacts of the access restrictions on (1) the Carrizo/Comecrudo Tribe, (2) the "Refuge," and (3) the "community." But Plaintiffs' arguments are incorrect. As described above, FAA took the required hard look at the impacts on these groups, and the extensive mitigation measures imposed on SpaceX directly address the impacts Plaintiffs cite.

First, as to the Tribe, Plaintiffs claim the mitigation measures are insufficient because, among other things, "SpaceX [is not] required to communicate with the Tribe." Pls.' Mem. at 29. But Plaintiffs give no explanation as to why the mitigation measures do not address the Tribe's concerns regarding notice. The measures bar SpaceX from imposing access restrictions during the busiest times of the year and require SpaceX to give both predictive schedules and advance notice to third parties that sign up for alerts (such as the Tribe) so that visitors can plan appropriately. *See Methow Valley*, 490 U.S. at 353 (explaining that NEPA does not impose a

duty on agencies to include a detailed explanation of specific mitigation measures); *Gov't of Province of Manitoba v. Zinke*, 273 F. Supp. 3d 145, 155 (D.D.C.), *aff'd sub nom.*, *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173 (D.C. Cir. 2019) ("NEPA does not require that a complete mitigation plan be fully formulated and adopted, and that the agency need not present a mitigation plan that is legally enforceable, funded or even in final form to comply with NEPA's procedural requirements." (quotation and citation omitted)).

Second, Plaintiffs' allegation that "[n]one of the PEA's proposed mitigation measures addresses the [ ] impacts of closures" flagged by the state and federal agencies, Pls.' Mem. at 33, is simply (and similarly) incorrect. Many of the mitigation measures specifically address those agencies' concerns, including SpaceX: (1) giving access restriction notifications to the agencies 48 hours prior to the restriction, FAA_10085-86; (2) permitting agency personnel to pass through certain checkpoints and access the Refuge (assuming it is safe to do so), FAA_10077; (3) providing funds to FWS to hire an employee to assist with coordinating between FWS and SpaceX, *id.*; and (4) agreeing to the terms of an MOU entered into between TPWD and SpaceX, including "tak[ing] all necessary measures to make TPWD-owned lands at Boca Chica accessible to researchers and all TPWD and/or USFWS-authorized personnel at all times except during ignition events," FAA_10589-90.

Third, Plaintiffs are wrong that an EIS was "required" because the chosen mitigation measures do not address "the significant impacts of closures on the community." Pls.' Mem. at 34-35.[26] In addition to the measures discussed elsewhere in this brief (such as providing forecasted access restrictions, notice of actual restrictions, and limiting restrictions during the

---

[26]     See *supra* for a discussion of FAA's analysis of temporary access restrictions on the community.

busiest times of the year for recreating), SpaceX also agreed to recreation-specific mitigation measures.  These measures are focused on some of the main recreational uses of the public lands in the area, including fishing, photography, and environmental education.  *See* FAA_10071-72 (detailing the recreational uses of the public lands).  The mitigation measures are designed to help FWS and TPWD meet their fishing and environmental education objectives and increase access for the public to fishing, wildlife photography, and educational opportunities.  *See* FAA_10087-88 (detailing the recreation-specific mitigation measures); *see also Int'l Dark-Sky Ass'n v. FCC*, 106 F. 4th 1206, 1219 (D.C. Cir. 2024) (upholding FCC's NEPA determination when it "reasonably concluded [that] SpaceX's mitigation efforts would help minimize any environmental impact").

In sum, based on the mitigation measures imposed on SpaceX, FAA reasonably determined that it was required only to generate an EA, and not an EIS.  *See El Puente v. U.S. Army Corps of Engineers*, 100 F.4th 236, 255 (D.C. Cir. 2024) (holding that the Corps properly prepared an EA and did not need to prepare an EIS where the EA "provided the contours" of the mitigation measures, "[t]hough not every detail").

### III.    FAA Thoroughly Considered and Responded to Comments From Other Agencies.

Plaintiffs also contend that FAA overlooked comments from other federal and state agencies.  But the record demonstrates FAA took those comments seriously, engaged in a dialogue, and responded accordingly.  That is all NEPA requires.  *See Citizens Against Burlington*, 938 F.2d at 201 ("the FAA, not the EPA, bore the ultimate statutory responsibility for actually preparing the [EIS], and under the rule of reason, a lead agency does not have to follow the EPA's comments slavishly—it just has to take them seriously"); *see also Tinicum Twp., Pa. v. U.S. Dep't of Transp.*, 685 F.3d 288, 298 (3d Cir. 2012) ("In sum, the FAA gave

serious consideration and reasonable responses to each of the EPA's concerns.  As the lead

agency, the FAA has some latitude to determine the level of analytical detail necessary to

support an informed decision and to adequately disclose [ ] impacts to the public.").

Plaintiffs first contend that FAA was required to prepare an EIS because it received

critical comments from federal and state agencies during the development of the PEA.  Pls.'

Mem. at 12.  But that argument overstates a lead agency's obligation to consider comments and

would essentially give participating and cooperating agencies veto power over an agency action.

*See Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996)

(noting "deference owed to the Forest Service despite substantial interagency disagreement and

considerable evidence that . . .  project poses severe environmental risks").  Instead, an agency

must only consider critical comments from other agencies, not adopt them wholesale.  The

record demonstrates FAA did so here.

Plaintiffs first cite to FWS comments from the PEA scoping period regarding proposed

access closures stemming from SpaceX activities FWS believed fell outside the scope of the

2014 EIS.  FAA_51014.  But Plaintiffs omit that FWS later issued a letter concurring in the

FAA's Section 4(f) determination finding *de minimis* use.  FAA_52629.  Thus, FAA satisfied

FWS's concerns on the issue raised in the citation provided by Plaintiffs.

Next, Plaintiffs reference a TPWD comment on FAA's determination that siting the

Starship at Boca Chica would be less disruptive than finding a new site for those operations.

FAA_46091.  But that issue was addressed in the PEA wherein FAA explained that alternative

launch sites were dismissed from consideration for a variety of programmatic, logistic, and

technical reasons (an explanation Plaintiffs do not challenge).  FAA_10022-24.  So too, TPWD

recommended a full evaluation of effects of the Proposed Action, as well as consideration of

mitigation measures.  FAA_51087.  But that, too, is precisely what the PEA did; and indeed, TPWD indicated its concurrence at the conclusion of the NEPA process.  FAA_52626.  And EPA's comments, too, simply referenced the "potential" for water quality "degradation," and recommend further analysis.  FAA_46041.[27]  Those concerns were addressed through the requirement that, among other things, SpaceX be required to develop a mitigation plan if it obtains any permits from the Army Corps of Engineers.  FAA_10100.  Many of Plaintiffs' other assertions fall into the same bucket, and similarly overlook later correspondence from those same agencies.  See Pls.' Mem. at 14-15 (citing, among others, FAA_46039-40 (EPA concerns), FAA_51015 (FWS explaining concerns with debris removal process), FAA_46054 (TPWD concerns).

The crux of Plaintiffs' argument is buried in a footnote—their claim, without any supporting record citations, that "[t]he FAA never meaningfully responded to those pointed concerns raised by the expert agencies."  Pls.' Mem. at 14 n.6.  As an initial matter, arguments raised in a footnote are deemed waived.  *See Iowaska Church of Healing v. Werfel*, 105 F.4th 402, 414 (D.C. Cir. 2024).  And, in any event, as described above, the record demonstrates FAA engaged with the commenting agencies and required SpaceX to implement mitigation measures to address concerns that were raised.  *See* FAA_48723 (conveying response to agency

---

[27]    EPA's concerns largely related to the need for SpaceX to "obtain a Clean Water Act (CWA) Section 404 permit for filing wetlands associated with the construction of some of the proposed infrastructure" at Boca Chica.  FAA_9987.  As to that permit, the Corps "will conduct a separate analysis for practicability of impacts to waters of the United States" and "issue its decision on SpaceX's proposal after completion of its review and compliance with its own procedures."  *Id*.  Thus, FAA's more limited response to EPA's concerns was reasonable in light of this forthcoming secondary review.  *See, e.g.*, *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288, 1296 (11th Cir. 2019) ("The Corps accordingly properly relied upon the fact that [those] effects are primarily regulated by other agencies in its determination not to consider those effects, and did so without violating NEPA.").

comments); FAA_40103 (FAA strategy to respond to comments); FAA_49126-34 (incorporating responses to agency comments); *see also, e.g.*, *Mulgrew v. U.S. Dep't of Transp.*, — F. Supp. 3d. —, 2024 WL 3251732, at *38 (S.D.N.Y. June 20, 2024) ("Simply put, the NEPA process worked precisely as it should.  The EPA brought its expertise to bear at an early phase of the [agencys] review, enabling the [agency] and Project Sponsors to consider the EPA's concerns and benefit from its input.").

In sum, Plaintiffs hang their hat on the fact that certain agencies recommended preparation of an EIS.  Pls.' Mem. at 16-17 (citing, for example, FAA_46057 (dating from January 27, 2021)).  But that concern alone, raised during the development of the PEA, is not dispositive and instead reflects another collateral attack on the efficacy of the mitigation measures implemented by the Mitigated FONSI/ROD.  Indeed, as the D.C. Circuit explained:

> NEPA's EIS requirement is governed by the rule of reason . . . and an EIS must be prepared only when significant environmental impacts will occur as a result of the proposed action.  If, however, the proposal is modified prior to implementation by adding specific mitigation measures which completely compensate for any possible adverse environmental impacts stemming from the original proposal, the statutory threshold of significant environmental effects is not crossed and an EIS is not required. To require an EIS in such circumstances would trivialize NEPA and would "diminish its utility in providing useful environmental analysis for major federal actions that truly affect the environment."

*Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 682 (D.C. Cir. 1982) (citation omitted).  Here, similarly, Plaintiffs ask the Court to rely on communications preceding final development of the PEA and its associated mitigation measures, which runs contrary to the text and purpose of of NEPA.

## IV.    The Court Should Order Further Briefing on Remedy.

Last, Plaintiffs argue that the the presumptive remedy for FAA's alleged NEPA violations is vacatur.  Pls.' Mem. at 44.  But, for the reasons sketched out briefly below, such

categorical relief is inappropriate, and FAA respectfully requests that the Court order supplemental briefing on remedy in the event it grants summary judgment to Plaintiffs, since the proper remedy will be contingent on which claims the Court finds meritorious, if any. Regardless, Plaintiffs' contention is incorrect for the reasons described briefly below.

First, the remedy of vacatur is not found in the APA's text and contravenes the principles that should guide the selection of remedy. *See United States v. Texas*, 599 U.S. 670, 693-704 (2023) (Gorsuch, J, concurring); *but see Corner Post, Inc. v. Bd. of Governors of the Fed. Reserve Sys*, 144 S. Ct. 2440, 2461-65 (2024) (Kavanaugh, J., concurring). Second, even if vacatur is available under the APA, it is an equitable remedy that should only be imposed after weighing the "seriousness" of the agency's error against the "disruptive consequences of vacatur." *Allied-Signal, Inc. v. United States Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1983). Third, and similarly, wholesale injunctive relief requires a careful balancing of the equities and should be no broader than needed to give relief to Plaintiffs. *See Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 954 & n.17 (5th Cir. 2024) (universal "injunctions are not 'required or even the norm,' and several justices on the Supreme Court have viewed them with conspicuous skepticism").[28]

---

[28]    Plaintiffs also argue that FAA unlawfully delegated certain NEPA responsibilities to SpaceX. Pls.' Mem. at 42-44. However, AST's NEPA regulations explicitly provide that an applicant "submit environmental information," 14 C.F.R. § 450.47, and provide FAA with "information for the FAA to analyze the environmental impacts associated with a proposed launch" *id*. SpaceX did so here, with FAA maintaining the ultimate responsibility for the NEPA analysis and reaching the conclusion that the Proposed Action was not likely to cause significant effects. This process fully complied with the NEPA-implementing regulations in place at the time the Mitigated FONSI/ROD was issued. *See* 40 C.F.R. § 1506.5(6) (2020).

**CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' cross-motion for summary judgment and deny Plaintiffs' cross-motion for summary judgment.

Respectfully submitted this 21st day of February, 2025,

LISA LYNNE RUSSELL
Deputy Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

*/s/ Gregory M. Cumming*
Gregory M. Cumming (D.C. Bar No. 1018173)
Matthew P. Rand (N.Y. Bar No. 4937157)
Sarah R. Ruckriegle (D.C. Bar No. 1658781)
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
150 M St., N.E.
Washington, D.C. 20002
(202) 305-0457 (office)
(202) 598-0414 (cell)
gregory.cumming@usdoj.gov

*Counsel for Defendants*