# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br>                    Plaintiffs,<br><br>    v.<br><br>FEDERAL AVIATION<br>ADMINISTRATION, *et al.*,<br>                    Defendants,<br><br>    and<br><br>SPACE EXPLORATION TECHNOLOGIES<br>CORP.,<br>                    Intervenor-Defendant. | Civil Action No. 1:23-cv-1204-CJN |

**INTERVENOR-DEFENDANT SPACE EXPLORATION
TECHNOLOGIES CORP.'S COMBINED MEMORANDUM
IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY
JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION .............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

    A.    SpaceX's launch operations benefit the federal government and the public. .............. 2

    B.    SpaceX's Starship launch vehicle will expand SpaceX's service to both the private
        sector and the United States government. ................................................................... 3

    C.    The FAA authorized SpaceX to build its Texas launch facility in 2014. .................... 4

    D.    The FAA carefully considered the effects of SpaceX's Starship launch program. ...... 4

ARGUMENT ..................................................................................................................... 6

    I.    By limiting the FAA's discretion over launch licenses, the Commercial Space Launch
        Act also limited the FAA's NEPA obligations, which the FAA met. ............................ 6

    A.    An agency's obligations under NEPA turn on the scope of its statutory authority. ..... 6

    B.    The Commercial Space Launch Act's limited discretion and decision deadlines do not
        allow for the kind of detailed NEPA review Plaintiffs demand. ................................. 9

    C.    Given its limited discretion under the Commercial Space Launch Act, the FAA
        complied with NEPA, and it should not be faulted for doing more than NEPA
        required. ................................................................................................................. 12

    II.    To the extent NEPA applies, Plaintiffs must show that the FAA's finding of no
        significant impact was arbitrary and capricious. ............................................................ 13

    III.    The FAA's finding of no significant impact was not arbitrary and capricious. ............. 17

    A.    The FAA was free to rely on restorative mitigation measures in its FONSI. ............. 17

    B.    The activities that the FAA approved after its 2014 EIS serve as the baseline for its
        2022 Programmatic EA ............................................................................................ 18

    C.    The FAA properly accounted for other agencies' input during the NEPA process. .. 19

        1.    Critical agency comments do not automatically require an EIS. ............................ 20

        2.    The FAA considered and worked to resolve other agencies' comments. ............... 21

    D.    The FAA reasonably concluded that any significant noise and lighting effects would
        be mitigated. ........................................................................................................... 24

        1.    The FAA reasonably found that noise from SpaceX's operations will not have a
        significant effect on wildlife. .................................................................................... 24

        2.    The FAA reasonably found lighting from SpaceX's operations will not have a
        significant effect on wildlife. .................................................................................... 28

        3.    Noise from SpaceX's operations will not significantly affect the community. ...... 30

E.    The FAA reasonably found that impacts from access restrictions would not be significant given required mitigations. ........................................................ 34

F.    The FAA reasonably concluded that any impacts from anomalies would not be significant with required mitigation. ............................................................ 38

G.    The FAA did not delegate any decision-making power to SpaceX. ........................ 42

IV.    Even if Plaintiffs prevail, the FAA's decision should not be vacated. ........................... 43

CONCLUSION ............................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama v. U.S. Army Corps of Eng'rs,*
  704 F. Supp. 3d 20 (D.D.C. 2023) ..................................................................19, 21

*Alaska Wilderness League v. Jewell,*
  788 F.3d 1212 (9th Cir. 2015) ............................................................................8, 10

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ..................................................................................43

*AT&T Corp. v. FCC,*
  448 F.3d 426 (D.C. Cir. 2006) ..................................................................................16

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
  462 U.S. 87 (1983) .....................................................................................................17

*Cascadia Wildlands v. BIA,*
  801 F.3d 1105 (9th Cir. 2015) ..................................................................................19

*Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu,*
  626 F.3d 483 (9th Cir. 2010) ........................................................................31, 33, 34

*Citizens Against Burlington, Inc. v. Busey,*
  938 F.2d 190 (D.C. Cir. 1991) ......................................................................19, 20, 21, 24

*Citizens Against Rails-to-Trails v. Surface Transp. Bd.,*
  267 F.3d 1144 (D.C. Cir. 2001) ....................................................................8, 9, 10, 12

*Dep't of Transp. v. Pub. Citizen,*
  541 U.S. 752 (2004) ........................................................................................... *passim*

*E. Band of Cherokee Indians v. U.S. Dep't of the Interior,*
  534 F. Supp. 3d 86 (D.D.C. 2021) ............................................................................36

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.,*
  426 U.S. 776 (1976) ...........................................................................................6, 7, 9, 11

*Fuel Save Wash. v. FERC,*
  389 F.3d 1313 (10th Cir. 2004) ................................................................................24

*Hughes River Watershed Conservancy v. Johnson,*
  165 F.3d 283 (4th Cir. 1999) ....................................................................................21

*Idaho v. ICC,*
    35 F.3d 585 (D.C. Cir. 1994) ........................................................................16

*Int'l Dark-Sky Ass'n v. FCC,*
    106 F.4th 1206 (D.C. Cir. 2024) ..................................................................17

*Marin Audubon Soc'y v. FAA,*
    121 F.4th 902 (D.C. Cir. 2024) ....................................................................15

*Marsh v. Oregon Nat. Res. Council,*
    490 U.S. 360 (1989) ..........................................................................16, 20, 21

*Mo. Coal. for the Env't v. FERC,*
    544 F.3d 955 (8th Cir. 2008) .......................................................................21

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) .....................................................................................44

*Myersville Citizens for a Rural Cmty., Inc. v. FERC,*
    783 F.3d 1301 (D.C. Cir. 2015) ...................................................................15

*Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n,*
    879 F.3d 1202 (D.C. Cir. 2018) ...................................................................30

*Nat'l Archives & Recs. Admin. v. Favish,*
    541 U.S. 157 (2004) .....................................................................................43

*Nat'l Fisheries Inst., Inc. v. Mosbacher,*
    732 F. Supp. 210 (D.D.C. 1990) .................................................................19

*Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.,*
    177 F. Supp. 3d 1 (D.D.C. 2016) ...........................................................18, 20

*National Parks Conservation Ass'n v. Semonite,*
    916 F.3d 1075 (D.C. Cir. 2019) ...................................................................20

*New York v. U.S. Nuclear Regul. Comm'n,*
    824 F.3d 1012 (D.C. Cir. 2016) ...................................................................29

*Ohio Valley Envt. Coal. v. Aracoma Coal Co.,*
    556 F.3d 177 (4th Cir. 2009) .......................................................................18

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) .......................................................................................6

*Save RGV v. Space Expl. Techs. Corp,*
    No. 1:24-CV-00148, 2024 WL 5357188 (S.D. Tex. Nov. 21, 2024) .....................44

*Sierra Club v. FERC (Sabal Trail)*,
    867 F.3d 1357 (D.C. Cir. 2017) ...................................................................7, 12

*Sierra Club v. Van Antwerp*,
    661 F.3d 1147 (D.C. Cir. 2011) .................................................................16, 17

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
    985 F.3d 1032 (D.C. Cir. 2021) ........................................................................20

*Theodore Roosevelt Conserv. P'ship v. Salazar*,
    616 F.3d 497 (D.C. Cir. 2010) ..........................................................................18

*TOMAC v. Norton*,
    433 F.3d 852 (D.C. Cir. 2006) ..........................................................................16

*United States v. Texas*,
    599 U.S. 670 (2023) ...........................................................................................43

*Utahns for Better Transp. v. U.S. Dep't of Transp.*,
    305 F.3d 1152 (10th Cir. 2002) ........................................................................21

*Village of Barrington v. Surface Transp. Bd.*,
    636 F.3d 650 (D.C. Cir. 2011) ..........................................................................11

*WildEarth Guardians v. Zinke*,
    368 F. Supp. 3d 41 (D.D.C. 2019) ...................................................................21

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008) ...........................................................................................8, 44

*Wisconsin v. EPA*,
    938 F.3d 303 (D.C. Cir. 2019) ..........................................................................17

**Federal Statutes**

5 U.S.C.
    § 706 ..............................................................................................................16, 43

42 U.S.C.
    § 4321 .................................................................................................................6
    § 4332(C) ..........................................................................................................14
    § 4336(b) ...........................................................................................................15
    § 4336a ......................................................................................................11, 42

51 U.S.C.
    § 50905(a) ...................................................................................5, 9, 10, 11, 12

**Other Authorities**

14 C.F.R. § 450.47(d) ..............................................................................................11

29 C.F.R. § 1910.95(b)(2) ........................................................................................32

40 C.F.R. § 1501.3(d)(2) ..........................................................................................20

40 C.F.R § 1501.5(a) ................................................................................................15

40 C.F.R. § 1501.6(a) ...............................................................................................14

40 C.F.R. § 1502.16(a) .............................................................................................19

40 C.F.R. § 1506.5(b)(3) ..........................................................................................42

40 C.F.R. § 1508.1(y) ...............................................................................................17

29 C.F.R. § 1910.95 ..................................................................................................32

43 Fed. Reg. 55,978 (Nov. 29, 1978).......................................................................14

89 Fed. Reg. 944 (Jan. 8, 2024)................................................................................23

## INTRODUCTION

When Congress told the Secretary of Transportation to start licensing private commercial space flights, it sought to encourage exactly the kind of progress and innovation that SpaceX has achieved. Consistent with its Federal Aviation Administration (FAA) licenses, SpaceX developed Falcon 9 and Falcon Heavy. These innovative, partially reusable launch vehicles have cut the cost of access to space and become the safest, most reliable rockets in history, successfully performing hundreds of missions. But the best is yet to come: At its private launch site in Texas, SpaceX is now developing Starship, which is both fully reusable and the most powerful rocket ever built. Starship will again revolutionize access to space and soon will take humanity back to the Moon, then to Mars and beyond.

Plaintiffs filed this case because they think that the National Environmental Policy Act (NEPA) required the FAA to prepare an Environmental Impact Statement (EIS) before approving SpaceX's Starship launch program. On multiple levels, their arguments are wrong.

To start, an agency's NEPA obligations are always bounded by its statutory powers. It would be futile, the Supreme Court has held, for an agency to prepare a NEPA review for environmental effects it lacks statutory discretion to stop. So when Congress gives an agency little discretion and sets strict deadlines, it necessarily limits the scope of the agency's NEPA review. And Congress did just that in the Commercial Space Launch Act, ordering the FAA to expedite private launch licenses, as long as the license applicant meets specific, narrow criteria. That statutory command cabins the FAA's NEPA obligations. Because the FAA not only met those obligations here, but also went above and beyond them, it cannot have violated NEPA.

Even if NEPA required a full review of SpaceX's launch program, the record supports the FAA's finding of no significant environmental effects. As Plaintiffs admit, they are suing under the Administrative Procedure Act, which requires courts to uphold agency findings unless they are

1

arbitrary and capricious. Nothing about the FAA's NEPA review fails that test. Most relevant here, the FAA took seriously the comments it received from other agencies and responded appropriately. Neither those comments nor anything else in the record shows that the FAA was arbitrary and capricious to conclude that a limited number of launches—from an existing, private launch facility that has been operating for years—would not cause significant harm to the environment. Thus, Plaintiffs' partial summary judgment motion fails on the merits.

## BACKGROUND

After nearly two years of astounding progress, including the unprecedented landing of the 20-story reusable Super-Heavy in the arms of the Mechazilla launch tower, Plaintiffs want to shutter SpaceX's Starship program. They claim, falsely, that Starship's operations are causing "significant harm" to the environment. But their story about SpaceX's operations and the Boca Chica environment omits key facts.

### A. SpaceX's launch operations benefit the federal government and the public.

When SpaceX was founded, its ambition to make humans a multiplanetary species may have seemed lofty, but in the 23 years since, SpaceX has sparked a space-travel revolution.

SpaceX's achievements start with its Falcon 9 and Falcon Heavy launch vehicles and its Dragon spacecraft. Falcon 9 is the world's first orbital-class rocket with a reusable first stage. That means the same Falcon 9 rocket can safely and reliably perform many missions and deliver many payloads to space. So far, SpaceX has successfully launched Falcon 9 rockets more than 400 times, landed them more than 380 times, and re-flown first stages more than 350 times (and counting).[1] Building on that success, SpaceX created Falcon Heavy, which uses three Falcon 9 reusable booster cores to create one of the world's most powerful rockets, capable of carrying nearly 64

---

[1] *See* https://www.spacex.com/vehicles/falcon-9/.

metric tons into orbit. Falcon Heavy has so far successfully performed 11 missions, landed 19 booster cores, and re-flown them 16 times.[2] SpaceX also uses its Falcon 9 rocket to launch its Dragon spacecraft, which is the first private spacecraft to carry cargo and crew to the International Space Station (ISS)—something it has now done more than 40 times.[3]

SpaceX delivers satellites and other payloads to orbit for, among others, telecommunications companies, satellite operators, and government agencies, including NASA and the U.S. defense and intelligence communities. For instance, NASA relies on Falcon 9 and Falcon Heavy to take essential supplies and astronauts to and from the ISS, and to deliver scientific missions, including the Europa Clipper, which left Earth in October 2024 to study Europa, Jupiter's fourth-largest moon. On top of its work for NASA, SpaceX is one of just two private companies certified to perform the most critical national security space launches.

**B. SpaceX's Starship launch vehicle will expand SpaceX's service to both the private sector and the United States government.**

Building on its experience with Falcon 9, Falcon Heavy, and Dragon, SpaceX is now developing an even more capable launch system: Starship. Combining a first-stage rocket (known as Super Heavy) and a second-stage spacecraft, Starship is the most powerful launch vehicle ever developed. Because it can carry more mass and volume than any other launch system, Starship will be able to transport larger and more sophisticated payloads. And Starship will be the world's first fully reusable rocket, making it both more cost effective and more sustainable.

Starship will continue SpaceX's record of service to both private companies and the United States government. As part of its Artemis program, NASA has named Starship as the vehicle that will carry the first humans to the Moon in more than 50 years. That launch—dubbed Artemis III—

---

[2] *See* https://www.spacex.com/vehicles/falcon-heavy/.

[3] *See* https://www.spacex.com/vehicles/dragon/.

is set for 2027. Starship is also part of the Air Force's "Rocket Cargo" program, which would use Starship to quickly deliver cargo anywhere in the world.

SpaceX is developing Starship the same way it developed its Falcon rockets and its Dragon spacecraft, with a hardware-rich approach emphasizing flight testing and real-world data. This means that the ongoing test-launch program in Texas is essential to readying Starship for the vital missions it will soon perform. As of January 16, 2025, SpaceX has launched Starship seven times, collecting data and making improvements with each launch.

### C. The FAA authorized SpaceX to build its Texas launch facility in 2014.

SpaceX is not launching Starship from a greenfield or on public property. It is testing Starship at its global headquarters, Starbase, which it built entirely on private property, miles away from any population centers. SpaceX chose this site near Boca Chica, Texas only after considering technological, economic, environmental, and other constraints at a variety of other sites. It started building Starbase in 2014, after the FAA prepared an EIS that studied the potential effects of building the facility and launching Falcon 9, Falcon Heavy, and experimental rockets there. FAA11364 (PEA at 2). SpaceX has since invested several billion dollars at Starbase, which now includes a vertical launch area, launch and landing control center, and other supporting structures that have been in use for years.

### D. The FAA carefully considered the effects of SpaceX's Starship launch program.

When SpaceX proposed using its Boca Chica facility to test and develop Starship, the FAA prepared a Programmatic Environmental Assessment (EA) that comprehensively considered the potential effects of SpaceX's proposed launch program. That NEPA review process began when SpaceX applied for a launch license, though the FAA and SpaceX both knew that actual launches would likely "require a number of new or modified" permits and licenses "over time." FAA11363 (PEA at 1). So instead of starting from scratch each time SpaceX proposed a launch, the FAA

4

prepared the Programmatic EA as a "general, broad NEPA review from which subsequent NEPA documents can be tiered"—meaning that the NEPA reviews for later launches could start with the Programmatic EA, adding to it if needed. *Id.* at 1–2; *see id.* at S-1 ("If SpaceX modifies or adds operations as part of its Starship/Super Heavy program in the future, the FAA would analyze the environmental impacts of those activities in a tiered environmental document . . . .").

The Programmatic EA recognizes that, since the FAA prepared its 2014 EIS, SpaceX has built the Texas launch site and has been testing "Starship prototypes" there for years. FAA11364–65 (PEA at 2–3). Not until SpaceX proposed licensing Starship and its Super Heavy rocket booster did the FAA start the Programmatic EA process. FAA11363 (PEA at 3). That process included public scoping, a draft Programmatic EA in September 2021, public and agency comments on the draft Programmatic EA, revisions to both the Programmatic EA and SpaceX's proposal, and, in June 2022, a final version of the Programmatic EA. FAA11368–71 (PEA at 6–9).

Despite the FAA's limited discretion over launch licenses—the applicable statute says that it "shall issue" licenses if a narrow set of conditions is met, 51 U.S.C. § 50905(a)—the Programmatic EA broadly considers the potential effects of Starship's annual operations, including a variety of testing, up to five Starship suborbital launches, up to five combined Starship-Super Heavy orbital launches, and all associated Starship and Super Heavy landings. FAA11378–79 (PEA at 16–17). The result is over 1,000 pages of documentation that considers a wide range of potential environmental effects and concludes that, with mitigation, no effect is environmentally significant. FAA11354–536. The FAA then issued a finding of no significant impact (FONSI) and a record of decision (ROD) authorizing the issuance of experimental permits and launch licenses for SpaceX's Starship launch program. FAA10336 (ROD at 2).

**ARGUMENT**

Plaintiffs' partial summary judgment motion should be denied for two separate reasons. To start, Plaintiffs never address how the FAA's narrow statutory authority under the Commercial Space Launch Act (CSLA)—which *requires* the FAA to license a launch in under six months if the Act's limited, safety-focused criteria are met—narrows its environmental review obligations under NEPA. Because the FAA fulfilled those obligations, its review must be upheld. Second, even if the FAA had to study the full range of potential environmental effects, it did, and the record shows that its finding of no significant impact was neither arbitrary nor capricious.

I.    **By limiting the FAA's discretion over launch licenses, the Commercial Space Launch Act also limited the FAA's NEPA obligations, which the FAA met.**

The FAA took a close look at all aspects of SpaceX's Starship-Super Heavy launch program in its 2022 Programmatic EA. But just because the FAA scrutinized the program does not mean that NEPA required it. NEPA requires review only to the extent that an agency has "statutory authority"; when Congress gives an agency "no discretion" over certain effects, the agency need not study them. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 770 (2004). Here, the FAA's Programmatic EA studied everything that was within the agency's narrow discretion under the CSLA, and more. On those grounds alone, Plaintiffs' partial summary judgment motion fails.

A.    **An agency's obligations under NEPA turn on the scope of its statutory authority.**

NEPA is an unusual statute. Its goal, to "encourage productive and enjoyable harmony between man and his environment," 42 U.S.C. § 4321, is accomplished not by "mandat[ing] particular results," but by creating a process by which federal agencies take a "hard look" at the "environmental consequences" of their actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). At the same time, NEPA was not "intended to repeal by implication any other statute." *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*, 426 U.S. 776, 788 (1976)

6

(quoting *United States v. SCRAP*, 412 U.S. 669, 694 (1973)). Instead, when "a clear and unavoidable conflict in statutory authority exists, NEPA must give way." *Id.*

These bedrock principles mean that agencies must account for statutory limits on their power as they comply with NEPA's procedural mandate. If "an agency has no ability to prevent a certain effect due to its limited statutory authority," it "need not consider those effects" in its NEPA review. *Pub. Citizen*, 541 U.S. at 770. Or, as the D.C. Circuit has put it, "[a]n agency has no obligation to gather or consider environmental information if it has no statutory authority *to act on that information*." *Sierra Club v. FERC (Sabal Trail)*, 867 F.3d 1357, 1372 (D.C. Cir. 2017) (emphasis in original).[4]

Congress can limit an agency's statutory authority, and thus its NEPA obligations, in any number of ways. In *Flint Ridge*, the Supreme Court considered a statute under which property reports submitted to the Department of Housing and Urban Development became "effective automatically" 30 days after they were filed. 426 U.S. at 781. The Department "had only limited discretion to reject" filings that were "incomplete or inaccurate." *Id.* at 784. Given this statutory scheme, the Court held that the Department did not have to conduct a NEPA review. The Court explained that applying NEPA would involve "a clear and unavoidable conflict in statutory authority," because the Department could not comply with the 30-day report-effectiveness deadline while preparing a NEPA review that would take much longer. *Id.* at 788–89. The Court thus held that "NEPA must give way." *Id.* at 788.

The Court faced a similar situation in *Public Citizen*, where the Federal Motor Carrier

---

[4] The U.S. Supreme Court is currently considering a case that asks whether the D.C. Circuit's decision in *Sabal Trail* interprets the Court's *Public Citizen* case too narrowly. *See Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, No. 23-975 (argued Dec. 10, 2024). But even *Sabal Trail*'s narrow reading of *Public Citizen* limits the scope of the FAA's NEPA review here.

Safety Administration (FMCSA) was being asked to prepare a wide-ranging NEPA review even though it had "only limited discretion" under its organic statute. 541 U.S. at 758. Because FMCSA could not impose conditions "unrelated to motor carrier safety," the Court held, it properly limited its NEPA review to environmental effects stemming from safety inspections. *Id.* at 759, 761, 770. FMCSA did not have to address effects over which it had "no discretion." *Id.* at 770.

Consistent with these Supreme Court decisions, the D.C. Circuit has concluded that "[t]he touchstone of whether NEPA applies is discretion." *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001). A statutory scheme that—through mandatory language, strict deadlines, or both—gives the agency a more "ministerial" role, makes NEPA "in-applicable." *Id.* Put another way, when an agency lacks "significant discretion" over an issue, it "removes" that issue "from the reach of NEPA." *Id.* at 1152; *see also Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1226 (9th Cir. 2015) (finding NEPA does not apply where a statute "restricts" an agency's "discretion").

Of course, NEPA does not *prohibit* an agency from including in its environmental review issues that it is not required to study. Instead, NEPA reviews are governed by a "rule of reason" that gives agencies leeway in deciding what to study. *See Pub. Citizen*, 541 U.S. at 767–68. So even if an agency studies something that NEPA does not require it to, that does not expand the agency's legal obligations under NEPA. *Cf. Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 30–31 (2008) (explaining that an agency's voluntary actions do not create new legal duties). It is impossible—both logically and under NEPA's rule of reason—for an agency to violate NEPA by discussing something that it never had to discuss in the first place.

**B.  The Commercial Space Launch Act's limited discretion and decision deadlines do not allow for the kind of detailed NEPA review Plaintiffs demand.**

Like the statutes in *Flint Ridge*, *Public Citizen*, and *Citizens Against Rails-to-Trails*, the CSLA limits the FAA's discretion in ways that curtail the agency's NEPA responsibilities. Those limits appear first in the Congressional findings that open the CSLA. There, Congress finds that private launches "are consistent with the national security and foreign policy interests of the United States and would be facilitated by stable, minimal, and appropriate regulatory guidelines that are fairly and expeditiously applied." 51 U.S.C. § 50901(a)(6). Congress also finds that "the United States should encourage" private launches, regulating them "only to the extent necessary" for compliance with international obligations and the protection of "public health and safety, safety of property, and national security and foreign policy interests of the United States." *Id.* § 50901(a)(7). The CSLA then explains that its purposes include "encourag[ing]" private launches by "simplifying and expediting the issuance" of launch licenses. *Id.* § 50901 (b)(2)(A); *see id.* § 50903(b)(1) (directing the Secretary to "encourage, facilitate, and promote commercial space launches and reentries by the private sector"). To advance those purposes, the CSLA directs the FAA to "establish procedures and timetables that expedite" license review and "reduce the regulatory burden for an applicant." *Id.* § 50905(d).

Against this backdrop, the CSLA creates a quick and straightforward process for securing a launch license that leaves the FAA little discretion: The FAA "*shall* issue" a license to any applicant that "complies, and will continue to comply," with the FAA rules issued under the CSLA. 51 U.S.C. § 50905(a) (emphasis added). This licensing decision, the statute presumes, will normally happen in fewer than 120 days—otherwise, the FAA must tell the applicant why it has not yet issued the license and explain what "action" is "required to resolve the issue." *Id.* And even

9

when the FAA takes longer than 120 days, it *must* issue the license to a qualified applicant "not later than 180 days" after it receives an application. *Id.*

In line with Congress's intent to "encourage private sector launches, reentries, and associated services" and to "regulate" such activities "only to the extent necessary," *id.* § 50901(a)(7), these statutory limits constrain the FAA's NEPA obligations in at least two ways. First, the CSLA makes issuance of launch licenses the FAA's default decision. Licenses "shall issue," the CSLA says, unless they violate the FAA's launch rules. *Id.* § 50905(a). Because those rules are meant to focus on security, foreign policy, public health and safety, and safety of property, *id.* §§ 50905(a)(2), (b)(2), they create the same kind of "limited discretion" that led to the narrowly tailored NEPA review upheld in *Public Citizen*. 541 U.S. at 758. In that case, the statute said that the agency "shall register a person" as a motor carrier "if it finds that person is willing and able to comply with" the relevant safety and financial responsibility requirements. 541 U.S. at 766 (quoting 49 U.S.C. § 13902(a)(1) (emphasis and brackets omitted)). Other statutes found to limit agencies' NEPA obligations have used similar "shall" language. For example, the statute in *Citizens Against Rails-to-Trails* said that the agency "shall not permit abandonment or discontinuance" of a rail line "[i]f a State, political subdivision, or qualified private organization is prepared to assume full responsibility for management" of the line. 267 F.3d at 1150 (quoting 16 U.S.C. § 1247(d)). And the statute in *Alaska Wilderness* said that the agency "shall . . . approve any plan that meets" the statute's "requirements." 788 F.3d at 1225 (quoting 33 U.S.C. § 1321(j)(5)(E)). As with the CSLA, the statutes in these cases involved mandatory limits on agency discretion that curbed the agency's NEPA responsibilities.

Second, the CSLA's strict, 180-day deadline for the FAA's licensing decision creates a "clear and unavoidable" timing conflict just like the one that limited the agency's NEPA

obligations in *Flint Ridge*. 426 U.S. at 788–89. True, the D.C. Circuit has found under a different statutory scheme that a 180-day deadline did not create a clear and unavoidable conflict with NEPA, especially since the agency had been able to meet the deadline in "several" similar cases. *Village of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 662–63 (D.C. Cir. 2011). But the FAA has shown no such ability to complete its NEPA reviews in six months, as shown by the protracted process leading to the 2014 EIS.[5] *See* FAA36306 (2014 EIS at ES-8, explaining the FAA issued a Notice of Intent to prepare an EIS in April 2012); FAA13068 (July 2014 ROD). And broader data on EIS timelines across the federal government show that an EIS like the one Plaintiffs seek here is seldom, if ever, finished in 180 days—much less within the 120-day timeline that the CSLA aspires to. The median time for an EIS in 2024 was 2.2 years, "a 28 percent time savings since 2020 and a 20 percent time savings since 2010." *See* CEQ, Env't Impact Statement Timelines (2010–2024) at 1 (Jan. 13, 2025), *available at* https://ceq.doe.gov/docs/nepa-practice/CEQ_EIS_Timeline_Report_2025-1-13.pdf (noting that the median time for an EIS in 2024 was 2.2 years).[6] In any case, the statute at issue in *Village of Barrington* did not rest on express Congressional intent to impose minimal regulatory requirements that must be expeditiously applied, like the CSLA does. *See* 51 U.S.C. § 50905(a).

---

[5] Indeed, the FAA's rules flout the CSLA's deadlines by purporting to require the completion of NEPA review before a license application is submitted. *See* 14 C.F.R. § 450.47(d). The Supreme Court has rejected this type of end run around statutory timelines. *Flint Ridge*, 426 U.S. at 791 n.13 ("It is no answer to suggest, as respondents do, that the limit could be met if the Secretary ordered the developer not to file its statement of record until HUD completed an environmental impact statement. This proposal is no more than a circumvention of the statute's language, and is equally violative of its purpose.").

[6] The underlying data on the time it took to go from a notice of intent to prepare an EIS to a ROD show that virtually no EIS process for *any* type of proposed agency action during the last 15 years has been completed in 120 days. https://ceq.doe.gov/docs/nepa-practice/CEQ_EIS_Timeline_Data_2024_1_13_2025.xlsx. Recognizing how long EIS usually takes, Congress recently amended NEPA to set a two-year deadline for preparing an EIS like the one Plaintiffs seek here. 42 U.S.C. § 4336a(g)(1)(A).

The FAA's doubly constrained discretion defeats Plaintiffs' claims here. Because the FAA can deny a launch license only for a limited set of reasons—none of which involve the environmental impacts on which Plaintiffs' NEPA claims focus—it "simply lacks the power to act on whatever information might be contained in the EIS," *Pub. Citizen*, 541 U.S. at 768. As a result, the FAA "has no obligation to gather or consider" the information that Plaintiffs seek. *Sabal Trail*, 867 F.3d at 1372. And even if, despite the CSLA's "shall issue" statutory command, the FAA did have the power to deny a launch license for environmental reasons, the FAA's NEPA review must fit within the CSLA's statutory deadlines. Plaintiffs' effort to force an interminable EIS should thus be denied as inconsistent with both the CSLA and the Congressional intent behind it.

### C.  Given its limited discretion under the Commercial Space Launch Act, the FAA complied with NEPA, and it should not be faulted for doing more than NEPA required.

Plaintiffs are asking the Court to set aside the Programmatic EA and vacate SpaceX's launch license on the grounds that the FAA should have prepared an EIS before it approved the Starship launch program. Pls. Br. at 45. But they fail to account for the statutory limits on the FAA's licensing authority and how those limits constrain its NEPA obligations.

Again, the CSLA says that the FAA "shall issue" a launch license "[c]onsistent with the public health and safety, safety of property, and national security and foreign policy interests of the United States." 51 U.S.C. § 50905(a)(1). Because this statutory language constricts the FAA's licensing discretion, its NEPA obligations are similarly constricted. *See Citizens Against Rails-to-Trails*, 267 F.3d at 1151. Yet Plaintiffs' summary judgment brief mentions "health and safety effects" just once, in the context of noise impacts.[7] Pls. Br. at 26. The rest of their brief argues about

---

[7] Plaintiffs' claim that the FAA "failed to adequately analyze" these effects does not hold up under scrutiny. The Programmatic EA describes the effects of noise on public health in detail. *See* FAA11419–30 (PEA at 57–68); *infra* at 24–27 (discussing the PEA's noise analysis).

issues that fall outside the FAA's discretion under the CSLA: the alleged effects of noise and lighting on wildlife (*id*. at 19–26); the cultural, wildlife, and community impacts from temporary access restrictions (*id*. at 27–35); and the environmental effects of anomalies (*id*. at 35–42). None of these arguments goes to the CSLA's safety demands for issuance of a launch license. So, the FAA could not decline to issue SpaceX a launch license or condition issuance of a license based on any of them.

That said, one look at the Programmatic EA shows that the FAA did address the environmental issues that Plaintiffs raise. *See, e.g.*, FAA11494–95 (PEA at 132–33) (comparing the potential noise effects on wildlife from launches and landings with Cape Canaveral's "long history of launches with limited impacts to wildlife located in the surrounding wildlife refuge"); FAA11496–97 (PEA at 134–35) (noting that only sea turtle nests "missed by [extensive, SpaceX-facilitated] surveys would potentially be affected by the nighttime lighting" from SpaceX's operations); FAA11497 (PEA at 135) (explaining that SpaceX would restore any effects from anomalies to prevent long-term wildlife habitat impacts); *see also infra* at 24–42 (discussing Plaintiffs' challenges to the adequacy of the PEA's effects analysis in detail). But even if something were lacking in that analysis, it could not violate NEPA because NEPA did not demand the analysis in the first place. *See Pub. Citizen*, 541 U.S. at 764 (holding that a FONSI "cannot be arbitrary and capricious" if the effects at issue were beyond the scope of NEPA). Thus, the FAA's limited discretion under the CSLA means that its Programmatic EA did not—and could not—violate NEPA for the reasons Plaintiffs offer.

## II.    To the extent NEPA applies, Plaintiffs must show that the FAA's finding of no significant impact was arbitrary and capricious.

Even if Plaintiffs were right that NEPA obligated the FAA to look at a wide range of potential environmental effects before issuing a launch license to SpaceX, it does not follow that

documenting its review in an EIS was the FAA's only option. As Plaintiffs see it, the FAA "must" prepare an EIS "if substantial questions are raised as to whether a project *may* have a significant effect upon the environment." Pls. Br. at 3 (emphasis in original). But Plaintiffs' rule misreads both NEPA and the Administrative Procedure Act (APA).

NEPA's main procedural requirement is simple: Agencies must prepare a "detailed statement" of environmental impacts for all "major Federal actions *significantly* affecting the quality of the human environment." 42 U.S.C. § 4332(C) (emphasis added). This "detailed statement" is commonly called an environmental impact statement, or EIS. The key point is that NEPA does not require a "detailed statement"—or any other kind of statement—if the agency action will not "significantly" affect the environment. In short, no significant environmental effect means no EIS.

Agencies have long used environmental assessments (EAs) like the one the FAA prepared here to decide whether an action's environmental effects are significant. *See* 43 Fed. Reg. 55,978, 55,978, 55,992 (Nov. 29, 1978). When an EA concludes there are no significant environmental effects, the agency can make a Finding of No Significant Impact (FONSI) and then act without preparing a "detailed statement" (EIS). *See id.* at 55,979; 40 C.F.R. § 1501.6(a) (2022). In this way, agencies use EAs to decide whether their actions have significant environmental effects, and thus whether NEPA's EIS requirement applies at all.

Drawing on a line of cases that started in the Ninth Circuit, Plaintiffs take a different view of how EAs should work. To them, "[a] determination that significant effects will in fact occur is not essential" to trigger NEPA's EIS mandate. Pls. Br. at 3. Instead, they say that "an EIS must be prepared" if an EA raises "substantial questions" about "whether a project *may* have" significant environmental effects. *Id.* (emphasis in original). But this formulation's heavy thumb on the EIS

side of the scale finds no support in NEPA, the applicable agency rules or guidance, or the APA's bedrock principles of deference to the findings of expert agencies.

Until recently, NEPA itself had nothing to say about EAs. Its only rule, as explained above, was that agencies must prepare an EIS when their actions "significantly" affect the environment. After the FAA prepared its Programmatic EA, Congress amended NEPA so that it now requires agencies to prepare an EA for actions that do not "have a reasonably foreseeable significant effect on the quality of the human environment." 42 U.S.C. § 4336(b). Thus, under NEPA today, "substantial questions" about possible significant effects cannot trigger an EIS. But even under the Council on Environmental Quality (CEQ) rules that were in effect when the FAA prepared its Programmatic EA, agencies had to prepare an EA "for a proposed action that is not likely to have significant effects or when the significance of the effects is unknown . . . ." 40 C.F.R § 1501.5(a) (2020).[8] This is the opposite of Plaintiffs' proposal: Rather than defaulting to an EIS if significant effects are possible, as Plaintiffs would have it, the CEQ rules told agencies to use an EA unless significant effects are "likely." The CEQ rules thus required EAs, not EISs, when significant effects are merely possible.

Plaintiffs similarly err in their discussion of findings of no significant impact that are supported by mitigation measures. They admit, as they must, that agencies can conclude that any significant environmental effects will be mitigated below the level of significance. Pls. Br. at 4; *see Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015) ("To issue a FONSI and decline to prepare an EIS, an agency must have concluded that there would be no significant impact or have planned measures to mitigate such impacts." (internal

---

[8] The D.C. Circuit has since held that the CEQ rules "are *ultra vires*." *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 908 (D.C. Cir. 2024).

quotation marks omitted)). But they fail to recognize which party has the burden of proving the effect of mitigation. In Plaintiffs' view, "the agency" has to "show" that significant impacts "will be mitigated." Pls. Br. at 4. The D.C. Circuit disagrees: When challenging an agency decision under the APA, "the burden lies with [the challenger] to show that [the agency] failed to consider relevant factors or made a manifest error in judgment." *AT&T Corp. v. FCC*, 448 F.3d 426, 431 (D.C. Cir. 2006).

Plaintiffs' mistakes about NEPA procedure spill over into their discussion of the APA standard of review. There is no question that the APA's arbitrary and capricious standard of review governs here. Pls. Br. at 10–11. But, believing that NEPA demands an EIS any time significant effects are conceivable, Plaintiffs fail to apply the APA's standard to the FAA's finding of no significant impact. Indeed, Plaintiffs suggest that it is somehow the FAA's burden to prove that it has mitigated effects below the level of significance. *See id.* at 4–5. A proper application of the APA's deferential standard to the FAA's FONSI instead asks whether the agency acted arbitrarily and capriciously in concluding that its licensing decision would have no significant effects on the environment. *TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006) ("This Court will overturn an agency's decision to issue a FONSI—and thus not to prepare an EIS—only if the decision was arbitrary, capricious, or an abuse of discretion." (internal quotation marks omitted)); *see also Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 376 (1989) (holding that review of an agency decision not to prepare a supplemental EIS "is controlled by the 'arbitrary and capricious' standard of § 706(2)(A)").

In a final effort to dodge the deference owed to the FAA's FONSI, Plaintiffs cite the D.C. Circuit's decision in *Idaho v. ICC*, which said that a reviewing court must decide whether an agency "is able to make a convincing case for its FONSI." Pls. Br. at 4 (quoting *Idaho v. ICC*, 35

16

F.3d 585, 595 (D.C. Cir. 1994)). But the D.C. Circuit has since clarified that while it has used the phrase "convincing case," its "scope of review is in fact the usual one." *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011). A FONSI can be overturned only if it is shown to be arbitrary, capricious, or an abuse of discretion. *Id.*

### III.    The FAA's finding of no significant impact was not arbitrary and capricious.

The APA's arbitrary or capricious standard of review is not the only source of deference to the FAA's FONSI. When an agency "is making predictions, within its area of special expertise," as the FAA was in this NEPA review, "a reviewing court must generally be at its most deferential." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). Thus, Plaintiffs not only must show that the FAA's conclusions were arbitrary and capricious, but they must also do so in the face of deference to the agency's factual "predictions and scientific determinations." *Wisconsin v. EPA*, 938 F.3d 303, 320 (D.C. Cir. 2019). Plaintiffs cannot surmount this high bar.

### A.    The FAA was free to rely on restorative mitigation measures in its FONSI.

Before turning to Plaintiffs' technical arguments, one preliminary legal matter remains. The FAA found no significant impacts here based in part on plans to mitigate environmental effects. Plaintiffs suggest in several places that this mitigation is only valid if it "prevent[s]" effects, as opposed to ensuring their insignificance by remediating them. Pls. Br. at 9; *see id.* at 23, 27, 40. This suggestion finds no support in the law.

Plaintiffs do not dispute that "an agency may consider mitigation when weighing the significance of potential environmental effects." *Int'l Dark-Sky Ass'n v. FCC*, 106 F.4th 1206, 1219 (D.C. Cir. 2024). Their claim, instead, is that the mitigation must be preventative—that mitigation can support a FONSI only if it will stop an effect from happening in the first place. *See* Pls. Br. at 9, 23, 27, 40. They are wrong.

By definition, "mitigation" includes "measures that avoid, minimize, *or compensate for* adverse effects." 40 C.F.R. § 1508.1(y) (emphasis added). An agency can make a mitigated finding of no significant impact, as the FAA did here, if it concludes that "the proposed action will not have significant effects due to mitigation"—that is, "measures that avoid, minimize, or compensate for" significant effects. *Id.* § 1501.6(a)(2). Consistent with these rules, the D.C. Circuit has rejected the claim that adaptive management—mitigation that can be changed based on monitoring—violates NEPA. *Theodore Roosevelt Conserv. P'ship v. Salazar*, 616 F.3d 497, 517 (D.C. Cir. 2010) ("The procedural requirements of NEPA do not force agencies to make detailed, unchangeable mitigation plans for long-term development projects."). And courts have regularly upheld FONSIs that rely on restorative, rather than preventative, mitigation. *See, e.g.*, *Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*, 177 F. Supp. 3d 1, 28–29 (D.D.C. 2016) (upholding a FONSI where the mitigation would "restore the natural contours of the land" after mining); *Ohio Valley Envt. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 202, 206 (4th Cir. 2009) (upholding a FONSI based in part on "stream restoration" and "stream creation"). The mitigation measures supporting the FAA's FONSI are the same.

### B. The activities that the FAA approved after its 2014 EIS serve as the baseline for its 2022 Programmatic EA.

From the start of Plaintiffs' technical arguments, it is crucial to recognize the FAA's environmental review baseline—the "no action alternative," in NEPA terms. The Programmatic EA rightly recognized that SpaceX's Boca Chica launch site is no greenfield. Thus, even if the FAA had declined to license any Starship launches, SpaceX would continue "production and manufacturing" at its Starbase facility. FAA11399–400 (PEA at 37–38); *see* FAA12351–52 (PEA Response to Comments at I-4 to I-5). SpaceX could also continue suborbital Starship launches under its existing license. FAA11400 (PEA at 38). In fact, consistent with the 2014 EIS and subsequently

issued Written Reevaluations, SpaceX could also launch up to 12 "Falcon 9 and Falcon Heavy orbital vertical launch vehicles and a variety of reusable suborbital launch vehicles" per year through 2025. FAA36301 (2014 EIS at ES-3). This baseline is important because the impacts of a proposed action must be judged in comparison to "the known impacts of maintaining the status quo." *Alabama v. U.S. Army Corps of Eng'rs*, 704 F. Supp. 3d 20, 100–01 (D.D.C. 2023); *see* 40 C.F.R. § 1502.16(a) ("The no action alternative should serve as the baseline against which the proposed action and other alternatives are compared."). Here, because the no action alternative already involves noise, lighting, and launch operations, the FAA's determination that SpaceX's Starship program would not have significant environmental effects beyond the "no action alternative" baseline is entirely sound. *See Cascadia Wildlands v. BIA*, 801 F.3d 1105, 1111–12 (9th Cir. 2015) (allowing an agency to incorporate the expected impact of a previously approved project into the environmental baseline "against which the incremental impact of a proposed project is measured").

## C. The FAA properly accounted for other agencies' input during the NEPA process.

Plaintiffs' lead argument against the FAA's FONSI rests on other agencies' comments during the NEPA process. This argument suffers from two basic flaws. One, as Plaintiffs must admit, the FAA was not required to "slavishly" follow other agencies' comments—"it just has to take them seriously." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 201 (D.C. Cir. 1991); *see* Pls. Br. at 18 ("NEPA does not require a lead agency to agree with the comments of other agencies."). Two, Plaintiffs cherry-pick critical statements that often do not reflect the other agencies' final views on the issue. And even where interagency disagreement remains, it is to be expected: "[A] certain amount of disagreement among the countless individuals involved" in the agency review process is "inevitable" and simply "indicates that the debate was open and vigorous as Congress intended." *Nat'l Fisheries Inst., Inc. v. Mosbacher*, 732 F. Supp. 210, 227 (D.D.C.

1990). In the end, none of the comments that Plaintiffs cite show that the FAA acted arbitrarily or capriciously.

### 1. Critical agency comments do not automatically require an EIS.

Plaintiffs' legal argument leans heavily on the D.C. Circuit's decisions in *National Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019), and *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 985 F.3d 1032 (D.C. Cir. 2021). As Plaintiffs see them, those cases mean that when "expert agencies" identify potentially significant environmental effects, the lead agency cannot "reasonably conclude[]" that an EA is appropriate. Pls. Br. at 18. But both cases involved a specific "intensity" factor that Plaintiffs do not raise (and that is no longer part of the NEPA rules): whether a project's effects are "likely to be highly controversial." *Compare Standing Rock*, 985 F.3d at 1042, 1049 (holding that "several serious scientific disputes mean that the effects of the [agency action] are likely to be 'highly controversial'") *and Nat'l Parks*, 916 F.3d at 1083, 1086 (finding that other agencies' "consistent and strenuous opposition" shows that the project's effects are "highly controversial") *with* 40 C.F.R. § 1501.3(d)(2) (omitting the "controversy" factor applied in *Standing Rock* and *National Parks*). Since Plaintiffs do not and cannot argue that alleged interagency controversy justifies an EIS here, those cases do not help them.

More important, neither *National Parks* nor *Standing Rock* overrides the D.C. Circuit's consistent view that a lead agency "owes no obligation to bend to the will of others." *Nat'l Parks*, 916 F.3d at 1085 (citing *Citizens Against Burlington*, 938 F.2d at 201). To the contrary, it is enough that the lead agency has "considered" other agencies' "criticisms" and "decided that enough ha[s] been done." *Citizens Against Burlington*, 938 F.2d at 201. This rule is consistent with the U.S. Supreme Court's discussion in *Marsh v. Oregon Natural Resources Council*, which emphasizes that "an agency must have discretion to rely on the reasonable opinions of its own qualified

experts," even if the court might disagree. 490 U.S. at 378.[9] Thus, the sole question here is whether the FAA took seriously the comments it received from other agencies. The record shows that it did.

## 2.    The FAA considered and worked to resolve other agencies' comments.

The record shows that the FAA not only took other agencies' comments seriously, but it also worked to resolve them. So, even if Plaintiffs' interagency dispute argument were viable, it would fail on its own terms.

Plaintiffs rely on comments from the Texas Parks and Wildlife Department (TPWD) recommending an EIS and suggesting that temporary access restrictions, noise, and construction could have significant effects. FAA46282, FAA46290, FAA46298–99, FAA46300 (TPWD draft PEA comments); FAA51074 (TPWD scoping comments); *see* Pls. Br. at 13, 15, 17. But those comments came during the early stages of the NEPA process. Before the Programmatic EA was finalized, TPWD signed a Memorandum of Agreement with SpaceX that addressed TPWD's concerns by adopting a long list of mitigation measures, including fire suppression, monitoring, debris retrieval, and post-response site restoration. FAA7573–77 (PEA Appendix K – Sept. 2021 Memorandum of Agreement). The Agreement is detailed and specific, providing for such things as "grooming of tracks and other scars using hand tools and native soils, establishing desired slopes

---

[9] Other circuits apply the same rule. *See, e.g.*, *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 288–89 (4th Cir. 1999) ("Although an agency should consider the comments of other agencies, it does not necessarily have to defer to them when it disagrees."); *Mo. Coal. for the Env't v. FERC*, 544 F.3d 955, 959 (8th Cir. 2008) ("It is up to FERC to determine the value of another agency's comments."); *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1174–75 (10th Cir. 2002) ("NEPA requires agencies preparing an EIS to consider and respond to the comments of other agencies, not to agree with them."). Courts in this district have also consistently followed *Citizens Against Burlington*. *See, e.g.*, *Alabama v. U.S. Army Corps of Eng'rs*; 704 F. Supp. 3d 20, 108 (D.D.C. 2023) (citing *Citizens Against Burlington* on this point); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 82 (D.D.C. 2019) (quoting *Citizens Against Burlington* on this point).

and contours, and potentially inoculating the soils with appropriate species of algae and microbes." FAA7576. More broadly, it requires an "adaptive management approach to restoration" pursuant to which "the most beneficial restoration methodologies" identified through monitoring must be applied "to restoration of habitats following any future impacts." *Id*. With the measures required under the Agreement, TPWD and the FAA found that anomalies and anomaly-response activities would cause no more than a de minimis impact on TPWD-managed parklands. FAA10589–91 (TPWD Section 4(f) concurrence); *see* FAA10355–56 (incorporating mitigation measures into the FONSI). In so doing, TPWD added even more mitigation: traffic control fencing along the highway to protect TPWD's land and SpaceX funding for a study aimed at protecting and restoring algal flats. FAA10589–91.

The FAA also considered and resolved concerns raised by the U.S. Fish and Wildlife Service (FWS). Like TPWD, FWS had suggested an EIS during the early-stage scoping process. FAA51013–15 (FWS scoping comments); FAA13275 (FWS official saying in a 2020 meeting that an EIS is required); *see* Pls. Br. at 13–14, 16, 17. FWS also had initial concerns about impacts on listed species and habitat. *See, e.g.*, FAA44991 (temporary access restrictions and nighttime construction); FAA44980 (alkaline flats). But after preparing a detailed Biological and Conference Opinion (BCO), FWS concluded that the Starship launch program was unlikely to jeopardize the continued existence of any listed species or adversely modify critical habitat. FAA9904 (BCO at 109); *see also* FAA9887 (BCO at 92) (no significant effects on ocelot or jaguarundi), FAA9889 (BCO at 94) (no significant effects on sea turtles), FAA9891–92 (BCO at 96–97) (no significant effects on birds). These conclusions rested on mitigation measures that minimize habitat modification, implement monitoring and reporting protocols, manage noise and lighting, and clean up the beach. FAA9904–09 (BCO at 109–14); *see* FAA10366–72 (incorporation of BCO mitigation

measures into the FONSI). And when FWS recommended additional mitigation, including predictive scheduling and accommodating weekend and holiday beach use, FAA10616–17 (FWS Section 4(f) concurrence), the FAA incorporated them into its FONSI. *See* FAA10357–58. Between the BCO's careful study and the FAA's suite of mitigation measures, FWS's earlier concerns were resolved.

The FAA addressed EPA's comments too—even when those comments were directed to another agency.[10] To resolve EPA's concerns about potential impacts on wetlands, the FAA incorporated the terms of SpaceX's Memorandum of Agreement with TPWD into its FONSI. So, when EPA commented on the draft Programmatic EA, it did not even hint that the FAA should have instead prepared an EIS. *See* FAA47508–10 (EPA comments on draft PEA).

Finally, when the Advisory Council on Historic Preservation (ACHP) asked about the involvement of the Carrizo/Comecrudo Tribe, the FAA invited the tribe to participate in the historic preservation process—even though the tribe is not federally recognized. *See* Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs, 89 Fed. Reg. 944 (Jan. 8, 2024). Out of that process, ACHP signed a Programmatic Agreement that requires SpaceX to mitigate effects on historic resources. FAA9748 (Programmatic Agreement in PEA Appendix C). The long list of avoidance, minimization, and mitigation includes: installing a utility line underground, installing interpretive signs describing the history and significance of historic properties in the area, preparing a historical context report and a Historic American Landscapes Survey, improving a historic marker, implementing noise-reduction measures, conducting vibration monitoring, and restoring and protecting historic pilings. FAA9755–62. And when the

---

[10] Plaintiffs quote from EPA's letter to the U.S. Army Corps of Engineers regarding SpaceX's Clean Water Act permit. Pls. Br. at 13–14. EPA's comments on the Programmatic EA appear in the record at FAA47507.

Texas Historical Commission (THC) asked about effects on historic resources, the FAA also worked with THC to identify and mitigate those effects, to the point that THC agreed that SpaceX's Starship program would have no more than a de minimis effect on historic resources. FAA10569–70 (THC Section 4(f) concurrence); FAA52304 (THC comments on the draft PEA); FAA10562–64 (THC Section 4(f) comments). Here again, other agencies' early-stage questions were answered.

*    *    *

In sum, the FAA readily met its obligation to take other agencies' comments seriously. *Citizens Against Burlington*, 938 F.2d at 201. And even though it did not have to do more, it still incorporated many of the other agencies' suggestions into its FONSI, from which no agency dissented. Plaintiffs' overemphasis on early questions that were later answered thus offers no reason to find the FAA's decision arbitrary and capricious.

### D.   The FAA reasonably concluded that any significant noise and lighting effects would be mitigated.

Turning to the substance of the FAA's findings, Plaintiffs argue that noise and lighting from SpaceX's operations would have significant effects on wildlife, and that noise would significantly affect the community. *See* Pls. Br. at 19–27. The administrative record shows that these arguments do not render the FAA's decision arbitrary and capricious.

### 1.   The FAA reasonably found that noise from SpaceX's operations will not have a significant effect on wildlife.

As a key regulator of both airplanes and rockets—vehicles that tend to be loud—the FAA has vast experience with noise effects. Under FAA guidance, noise effects on wildlife can be assessed using "established scientific practices," including "[s]tudies on specific species" or, if necessary, "studies of similar species." FAA38124 (FAA Desk Reference at 2-19); *accord Fuel Save Wash. v. FERC*, 389 F.3d 1313, 1327 n.8, 1329–31 (10th Cir. 2004) (acknowledging the use of

24

scientific studies to assess pipeline's noise impacts on marine species). Here, the FAA considered studies showing how noise from space launches affects wildlife, as well as wildlife monitoring data around the launch site, in reasonably concluding that noise effects would not be significant.

The FAA started its review in an obvious place: studies of how rocket launches from Cape Canaveral and Vandenberg Space Force Base affected birds. FAA11494–95 (PEA at 132–33).[11] Those studies showed that launch noise and sonic booms did not permanently displace birds, damage their eggs, or stop them from breeding. FAA11495 (PEA discussion of studies); *see also* FAA10866 (Biological Assessment discussing studies of the potential effects of sonic booms on birds, including a study finding that "it is physically impossible for a sonic boom to crack an egg"). Indeed, the world's busiest spaceports—Kennedy Space Center, Cape Canaveral Space Force Station, and Vandenberg Space Force Base—all adjoin thriving wildlife areas. Kennedy Space Center overlaps with a national wildlife refuge and national seashore, Cape Canaveral Space Force Station adjoins these areas, and Vandenberg borders a marine reserve and is near a national park.[12] Since the rockets and the birds in the studies of these spaceports were similar to the rockets and birds in Boca Chica, the FAA reasoned that noise and sonic booms from Starship would have similar effects. Specifically, the FAA found that the noise would cause nothing more than a "startle response," such as birds leaving their nests for a short time but returning soon after. FAA11495 (PEA at 133); *see* FAA10866–67 (Biological Assessment at 52–53) (discussing noise studies and

---

[11] FAA64766 (Ecological Impacts of the Space Shuttle Program at John F. Kennedy Space Center, Florida); FAA60275, FAA60279, FAA60285 (Monitoring Direct Effects of Delta, Atlas, and Titan Launches from Cape Canaveral Air Station); FAA237343–44, FAA237462 (Supplement to Environmental Impact Statement, Space Shuttle Program, Vandenberg Air Force Base, California)

[12] *See* FAA67016–17 (noting that Kennedy Space Center is collocated with the Merritt Island National Wildlife Refuge and Canaveral National Seashore); FAA238026 (noting that Merritt Island National Wildlife Refuge, Canaveral National Seashore, and numerous other parks are located near Cape Canaveral); FAA237402–05 (describing numerous species of wildlife residing on Vandenberg Space Force Base and in the nearby Channel Islands National Park).

concluding that most showed effects so "mild" that they "may never be detectible"). Such occasional, short-term impacts, the FAA concluded, would not be significant. FAA11494 (PEA at 132).[13]

Also consistent with studies of other rocket launches, the FAA found that impacts on other terrestrial wildlife would also be temporary and insignificant. *See* FAA11494–95 (PEA at 132–33). For marine wildlife, the FAA considered a different study of sonic boom impacts near Cape Canaveral, as well as prior consultation with the National Marine Fisheries Service, in concluding that sonic booms would not have significant effects. FAA11498 (PEA at 136); FAA238021 (Finding of No Significant Impact, Vertical Landing of the Falcon Vehicle and Construction at Launch Complex 13 at Cape Canaveral Air Force Station, Florida, explaining that sonic booms "would not be expected to adversely affect marine species"); FAA58604 (Request for Initiation of Informal Consultation under Section 7(a)(2) of the Endangered Species Act for the SpaceX Landing and Recovery Operations in the Atlantic Ocean, Gulf of Mexico, and Pacific Ocean, explaining that the sonic boom effects on listed species will be insignificant). The FAA also explained that sonic booms, along with other noise, would not result in impacts to marine species beneath the surface because of "the substantial attenuation of a sonic boom at the air/water interface." FAA11498 (PEA at 136). Additionally, at the ocean's surface, where booms may be felt, species are present in "low densities." *Id*. And even where wildlife is present, "[s]onic boom events associated with landings would remain relatively infrequent and are not expected to negatively affect the survival of any marine species." *Id*.

---

[13] The FAA also considered avian monitoring data collected since 2015 in a 3-mile area around the Boca Chica launch site. It explained that monitoring "has not shown any piping plovers or other species harmed by launch operations," and "found little to no evidence of meaningful trends, either increasing or decreasing, in the number of birds observed through time." FAA39566.

Moreover, the FAA required numerous mitigations to minimize and offset effects on wild-life. To name just a few, the FAA required SpaceX to: incorporate many measures to reduce construction and operational effects on wildlife; contribute to the Friends of Laguna Atascosa National Wildlife Refuge Adopt-an-Ocelot Program and the Peregrine Fund; work with FWS and other agencies to fund any identified wildlife crossing along State Highway 4, as well as habitat protection, restoration, or enhancement projects; install additional wildlife crossing signs; continue to collaborate with Sea Turtle, Inc. to remove eggs and "support[] activities that reduce the likelihood of death or injury to individual sea turtles;" perform "quarterly beach cleanups of Boca Chica Beach to reduce the likelihood of attracting predators;" and remove vegetation along State Highway 4 to "minimize[] the likelihood of vehicle collisions with ocelots or jaguarundis." FAA10361–72 (FONSI at 27-38). On top of all that, the FAA also imposed monitoring and reporting requirements to backstop its finding of no significant effects. FAA10362, FAA10365–71 (FONSI at 28, 31–37).

Ignoring these studies, data, mitigations, reasoning, and the deference owed to the FAA's expertise, Plaintiffs point to early-stage comments from TPWD and FWS. Pls. Br. at 21–23. But as already explained, neither TPWD nor FWS ultimately objected to the FAA's FONSI.[14] Plaintiffs thus do not show that the FAA's noise conclusions were arbitrary or capricious.

---

[14] Plaintiffs go so far as to claim that "FWS found" that launch sounds could "cause tissue damage or deafening" of birds. Pls. Br. at 21. But FWS found no such thing. Plaintiffs are quoting from qualified language in a draft, redline version of the BCO that does not appear in FWS's final opinion. *See* FAA43875 (BCO redline at 80). Plaintiffs' claim that FWS "affirmed" that noise effects were not "sufficiently analyzed," Pls. Br. at 22, similarly draws on an early consultation letter. *See* FAA10609 (Aug. 2021 FWS Letter). FWS's final concurrence letter does not question the adequacy of the FAA's noise analysis. *See* FAA10616–17.

### 2. The FAA reasonably found lighting from SpaceX's operations will not have a significant effect on wildlife.

The FAA likewise worked with other agencies to take a hard look at the potential effects of lighting on wildlife, including ocelots and sea turtles. The FAA acknowledged that the existing launch site and launch events are already a source of lighting, but they are far from the only light sources in the area. Roadway lighting, nearby residences, oil rigs, the Port of Brownsville, tall buildings at South Padre Island, Boca Chica village, and other sources already have lighting effects. FAA11431–32, FAA11455 (PEA at 69–70, 93). The FAA also acknowledged that lighting on beaches may disrupt hatchling emergence and may result in abandonment of nesting and roosting areas by terrestrial birds. FAA11496–97 (PEA at 134–35). And it acknowledged that construction and nighttime launch operations "would increase light emissions." *Id.*; FAA11493 (PEA at 131). But the FAA and its partner agencies also found that the proposed action's lighting effects would be insignificant, particularly given mitigation. *See* FAA11433–35 (PEA at 71–73), FAA11506–07 (PEA at 144–45) (addressing lighting mitigation).

FWS found that using certain lighting combined with lighting control and timers to the extent practicable would minimize effects. FAA9816–17, 9867 (BCO at 21–22, 81); *see also* FAA50563 (Sept. 2022 Lighting Mgmt. Plan at 4). FWS also found that a Lighting Management Plan and regular inspections would "help reduce" light effects on sea turtles, FAA9877 (BCO at 82), and "minimiz[e] disorienting effects on migratory birds," FAA9881 (BCO at 86). Agreeing, the FAA incorporated these mitigation measures into its FONSI. FAA10352–53, FAA10364, FAA10368–69 (lighting mitigation measures). And even apart from such lighting mitigation, the FAA expected little to no impact on emerging sea turtles because "Sea Turtle Inc. conducts nesting surveys on Boca Chica Beach to collect sea turtle eggs, so only nests that were missed by surveys would potentially be affected by the nighttime lighting." FAA11496 (PEA at 134). SpaceX

28

supports Sea Turtle Inc.'s work, to the point that Sea Turtle, Inc.'s comments on the draft PEA found "no effects from SpaceX's testing and launch operation activities in 2020 and 2021." FAA12369 (PEA Response to Comments at I-22). The same letter explained that Sea Turtle Inc. reached its highest number of patrol hours in 2021 and that "nesting has remained consistent over 2020 and 2021." *Id.*

As for ocelots, the FAA and FWS pointed out that they have not been seen in the area for more than a quarter-century.[15] FAA11489 (PEA at 127); FAA9849 (BCO at 54). Still, FWS found that the mitigation being used for the wildlife that is present would also minimize any ocelot impacts. *See* FAA9881 (BCO at 86). Just to be sure, the FAA also required monitoring of lighting effects, as well as broader wildfire monitoring, in the FONSI. FAA10352–53, FAA10362, FAA10364–65, FAA10366–67, FAA10368–69, FAA10371.

Plaintiffs disagree with these expert conclusions. To them, the only "proven way" to stop significant harm from lighting is for SpaceX to stop launching rockets—or any other work—at night. Pls. Br. at 24. Setting aside the infeasibility of not working after dark, Plaintiffs' claim ignores the FAA's analysis and FWS's findings, which the FAA incorporated into its FONSI. For that reason alone, Plaintiffs cannot show that the FAA's FONSI was arbitrary or capricious on this point. *See New York v. U.S. Nuclear Regul. Comm'n*, 824 F.3d 1012, 1022 (D.C. Cir. 2016) ("[A] challenge to the agency's assumptions must be more than an effort by a petitioner to substitute its own analysis for the agency's." (quotation marks and brackets omitted)).

---

[15] Plaintiffs claim that the ocelots at the Laguna Atascosa National Wildlife Refuge live "near the SpaceX facility." Pls. Br. at 20. But that part of the refuge is actually more than 20 miles away and across a shipping channel. FAA11489 (PEA at 127). No reasonable person would think (and Plaintiffs do not actually say) that SpaceX's lighting could affect the ocelots there.

Nor is it true that SpaceX "rejected" lighting mitigation. Pls. Br. at 26. To the contrary, the FONSI requires SpaceX to update its Lighting Management Plan so that it includes "[d]irecting, shielding, or positioning facility lighting" and using low-pressure sodium lights to the extent practicable. FAA10364. SpaceX's Lighting Management Plan explains that low-pressure sodium lights and similar amber LED lighting will have "the least impact" on sea turtles. FAA50563 (Sept. 2022 Lighting Mgmt. Plan). Far from rejecting mitigation, the Plan states that "[l]ow pressure sodium or amber LED lighting will be used as operational constraints allow." *Id.* The Plan also describes a raft of other lighting design and operational mitigations to prevent or minimize environmental effects. *See* FAA50563–81. The goal, as the Plan explains, is "to minimize, or where possible, eliminate" lighting effects by using "directional lights, oriented downward, and where possible, away from the beach." FAA50563.

In sum, the FAA recognized, and required mitigation for, potential lighting impacts. Its conclusion that lighting would not have significant effects on wildlife was neither arbitrary nor capricious.

### 3. Noise from SpaceX's operations will not significantly affect the community.

Plaintiffs next take aim at noise impacts on the communities nearest SpaceX's launch site, claiming that the possibility of noise damage to homes in Port Isabel is "clearly" a significant environmental effect. Pls. Br. at 26. Plaintiffs do not develop or even mention any noise concerns other than structural damage, *see id.* 26–27, and thus waive any argument related to the PEA's analysis of cumulative noise and human annoyance.[16] *See, e.g.*, *Nat. Res. Def. Council v. U.S.*

---

[16] While not addressed by Plaintiffs, the Programmatic EA did evaluate cumulative effects from launch, landing, and sonic booms in accordance with FAA NEPA guidance. FAA11425–26 (PEA at 63–64); *see also* FAA11591–94 (PEA Appendix B cumulative noise analysis); FAA12358 (PEA Response to Comments at I-11). The FAA found that the cumulative day-night average sound level (DNL), a measure for evaluating cumulative noise effects on humans, would not exceed the

*Nuclear Regul. Comm'n*, 879 F.3d 1202, 1209 (D.C. Cir. 2018) ("[A] court is not required to plumb the record for novel arguments a [litigant] could have made but did not." (citation and internal quotation marks omitted)); *Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 487–88 (9th Cir. 2010) (issues "argue[d] in passing" and "not specifically and distinctly argued in [an] opening brief" are waived). The arguments Plaintiffs do preserve, like their other arguments, are not borne out by the record. Plaintiffs simply disagree with expert agency conclusions.

The Programmatic EA gauges the significance of noise impacts using several different metrics. *See* FAA11416–30.[17] The FAA considered the noise effects of a launch operation on people using the maximum A-weighted sound level ($L_{Amax}$) and Sound Exposure Level (SEL).[18] To assess potential structural damage, the FAA used $L_{max}$, which measures the maximum overall sound pressure level for an individual event. *See* FAA11416–17 (PEA at 54–55, summarizing SEL, $L_{Anax}$, and $L_{max}$).

In considering effects of launch noise on people, the FAA compared $L_{Amax}$ and SEL estimates from noise modeling to "Occupational Safety and Health Administration (OSHA) hearing

---

[17] A noise study by experts at KBR, Inc. is included as Appendix B to the Programmatic EA and provides more details on rocket noise, metrics for measuring the noise, and analysis of noise from Starship-Super Heavy. FAA11547–602.

[18] The PEA explains: "$L_{Amax}$ represents the highest A-weighted measure of the sound level at any given time during a noise event. A-weighting approximates the natural range and sensitivity of human hearing. SEL represents both the magnitude of a sound and its duration. SEL provides a measure of the cumulative noise exposure from an acoustic event . . . because SEL does not measure the sound heard at any given time during a noise event, it is not used to measure interference of a noise event with human hearing . . . ." FAA11416–17.

significance threshold of 65 dB in areas where humans would be present during launch operations. FAA11425–26 (PEA at 63–64). While the FAA acknowledged that "noise complaints may occur" in response to individual noise events, the FAA concluded that "individual noise events are not expected to cause general annoyance or pose health concerns due to the sound levels and expected frequency of events." FAA12359 (PEA Response to Comments at I-12). The FAA's cumulative noise analysis also showed that cumulative noise effects from sonic booms would not exceed the 65-dB DNL significance threshold. FAA11429 (PEA at 67).

damage criteria from 29 CFR § 1910.95." FAA11417 (PEA at 55); *see also* FAA38222–23 (FAA NEPA guidance explaining that NEPA review for space projects should consider whether OSHA hearing damage criteria would be exceeded). Under those OSHA limits, noise levels must not rise above 115 dBA for more than 15 minutes in a day. *See* 29 C.F.R. § 1910.95(b)(2) Table G-16. The FAA explained that these OSHA "[g]uidelines on permissible noise exposure limits . . . are designed to protect human hearing from long-term, continuous exposures to high noise levels and aid in the prevention of noise-induced hearing loss." FAA11417 (PEA at 55). The Programmatic EA shows that the maximum human noise exposure from SpaceX's operations is 100 dBA for two minutes during launches and 90–95 dBA for one minute during landings. FAA11420–21 (PEA at 58–59). Because these noise exposures fall far below OSHA's 115-dBA-for-15-minutes standard, the FAA found no significant noise impacts. FAA11421, FAA11424–25 (PEA at 59, 62–63).

In considering the potential for structural damage, the FAA compared $L_{max}$ estimates derived from noise modeling to guidelines developed by the National Academy of Sciences and other studies. FAA11421–24 (PEA at 59–62). It found that buildings are likewise safe from significant harm, as studies have shown a "consensus that damage becomes improbable below 140 dB." FAA11421–22 (PEA at 59–60). Plaintiffs dispute those studies, suggesting that "damage is expected" to homes that experience $L_{max}$ levels between 111 and 120 dB. Pls. Br. at 26. But the FAA has explained, based on academic literature, that any damage to buildings that experience these noise levels, should any occur, would be "minor"—minor cracks in older windows or plaster that can easily be repaired, not buildings collapsing as Plaintiffs suggest. FAA11423–24 (PEA at 61–62); FAA11443 (PEA at 81); FAA11459 (PEA at 97). Indeed, the FAA made clear that structural damage to residences on South Padre Island from sonic booms "is expected to be rare with only minor impacts." FAA12358 (PEA Response to Comments at I-11). The Programmatic EA

documents that "FAA and SpaceX have not received any complaints or claims of structural dam-age resulting from SpaceX activities at the Boca Chica Launch Site." FAA12375 (PEA Response to Comments at I-28). The FAA then required mitigation for the only two structures within its 140-dB noise contour: historic wood pilings that barely protrude from the ground and a heavy stone historical marker describing them. FAA11443–44, FAA11447 (PEA at 81–82, 85); FAA103503 (FONSI at 19). The FAA required SpaceX to monitor noise and vibration effects on the historic structures and to stabilize the pilings to prevent damage. *Id.* For other buildings, SpaceX is required to carry insurance to cover structural damage claims by third parties, up to $500 million per launch. FAA11430 (PEA at 68).

Plaintiffs' brief does not develop and thus waives any argument based on sonic boom ef-fects. *Wu*, 626 F.3d at 487–88. All Plaintiffs say—embedded in the middle of a single sentence addressing other issues—is that the FAA "never discusses the potential health and safety effects, particularly as they relate to . . . sonic booms/overpressure . . . ." Pls. Br. 26-27. Even if this pass-ing reference is enough for the court to consider this issue, Plaintiffs are wrong. To assess the effects of sonic booms on people and structures, the FAA used the "PCBOOM" model, which calculates the dispersion and magnitude of the sonic boom that is generated in the atmosphere when a rocket breaks the sound barrier. FAA38221 (FAA Desk Reference at 11-15). That model showed that a Starship orbital landing would cause sonic booms with overpressure (measured in pounds per square foot (psf)) between 1.2 and 2.2 psf, with sonic booms between 1–2 psf poten-tially reaching the southern part of South Padre Island. FAA11428 (PEA at 66). Super Heavy landings would cause sonic booms between 2.5 and 15 psf, but areas that would experience the highest sonic boom levels would be subject to temporary access restrictions. *Id.* As a result, hu-mans will not experience the highest overpressure generated by a landing. In any case, humans

exposed to sonic boom levels as high as 120 psf have not suffered "physical or psychological harm." FAA49663 (study by NASA and the Air Force evaluating sonic boom effects).[19]

As with impacts to other resources, the FAA also imposed mitigation measures related to noise from launch events. SpaceX must implement a notification plan to update the public about upcoming launches and landings to "help reduce human adverse reactions to these noise events." FAA11430 (PEA at 68); FAA10351–52 (FONSI at 17–18); FAA12359 (PEA Response to Comments at I-12). The plan requires SpaceX to "issu[e] statements to news outlets and law enforcement so that when noise is heard, the public would understand what has occurred," which is "consistent with the public notification efforts conducted by SpaceX at Cape Canaveral Space Force Station and Vandenberg Space Force Base." *Id.*

So, as with the FAA's conclusions about noise effects on wildlife, Plaintiffs cannot show that FAA acted arbitrarily or capriciously when it used its expert judgment to assess noise effects on the community, and found the effects are not significant.

### E.  The FAA reasonably found that impacts from access restrictions would not be significant given required mitigations.

Plaintiffs next claim to have "no doubt" that temporary, safety-related closures of the areas around the launch site would have significant effects on the Carrizo/Comecrudo Tribe, wildlife, and the local community. Pls. Br. at 27–35. In support of this assertion, they march out a parade of horribles, including the tribe's potential inability to hold traditional ceremonies, the difficulties faced by wildlife managers and researchers in reaching National Wildlife Refuges, and the public's

---

[19] Plaintiffs do not address the effects of sonic booms on structures at all, which waives that issue. *Wu*, 626 F.3d at 487–88. But the FAA addressed it. After considering numerous studies, the FAA determined that "given the limited number of Super Heavy landings per year (some of which would be in the ocean and cause no overpressure on land) and the mitigation described in Section 3.5.5 [of the PEA], including SpaceX's responsibility for claims of structural damage pursuant to FAA-required insurance, impacts to structures below 10 psf are not expected to be significant." FAA11429 (PEA at 67).

distress when it cannot visit the beach. *See id.* But the record shows that none of these claims

qualifies as a significant environmental effect.

The biggest problem with Plaintiffs' claims of harm from access restrictions is that those

restrictions are temporary and managed to minimize disruption. Even if the area around SpaceX's

launch site were closed for 500 hours each year—the maximum amount predicted in the Program-

matic EA—the access restrictions would not be in place around the site almost 95% of the time.[20]

FAA11445, FAA11456 (PEA at 83, 94). Beyond that, any access restrictions require advance no-

tice and are planned to avoid the times of high use. FAA11445 (PEA at 83); FAA11456–57 (PEA

at 94–95); *see* FAA10356–58 (FONSI at 22–24, listing access restriction mitigation measures).

And public use of land in the area was already "low" due to its remote location. FAA11456-57

(PEA at 94-95, discussing public use of the South Bay Coastal Preserve area).

While preventing beach access would have "some unavoidable impacts" on "local resi-

dents," the FAA found that such occasional and temporary restrictions would not cause significant

impacts because (1) other free public beaches in the area remain available; (2) SpaceX will give

the public advanced warning of access restrictions; and (3) launches will be planned to avoid times

when beaches are busiest. FAA11385–87 (PEA at 23–25), FAA11445 (PEA at 83), FAA11533

(PEA at 171). Specifically, the PEA explains that SpaceX must implement a detailed notification

system and predictive schedule in accordance with a Closure Notification Plan. FAA11384–90

(PEA at 22–28); FAA10356–58 (FONSI at 22–24). Additionally, no access restrictions may occur

---

[20] Plaintiffs assert that closures "will likely drastically exceed" 500 hours per year. Pls. Br. at 28 & n.14. But as the FWS letter on which they rely explains, FWS's "more than 1,000 closure hours" estimate was admittedly "conservative" and contrasted with SpaceX's "reported total of 158 hours." FAA10609. This discrepancy apparently arose because FWS was tracking authorized clo- sure hours, not actual closure hours. In any case, the FAA reasonably relied on SpaceX's report of actual closure hours.

on a long list of holidays, on Mondays or Fridays around holidays, on Fridays and weekends from Memorial Day to Labor Day, or on weekends the rest of the year. FAA11387 (PEA at 25), FAA10357–58 (FONSI at 23–24), FAA12378–79 (PEA Response to Comments at I-31 to I-32). The FONSI also requires numerous measures to enhance recreation in the area, such as funding and improving access to fishing, building a wildlife viewing platform at a location identified by FWS, and providing wildlife photography and environmental educational events. FAA10359 (FONSI at 25).

The FAA also specifically found that such limited access restrictions would not stop FWS "staff or their contractors, partners, or guests" from managing refuge lands or "completing habitat or species management activities."[21] FAA12380 (PEA Response to Comments at I-33), FAA11457 (PEA at 95). Even "[o]n days with planned access restrictions, [FWS] personnel . . . will have access to state and federal lands in the vicinity at all times except for a reasonable period associated with ignition events or tests that could pose a safety risk, and when conditions may otherwise be unsafe." FAA12380 (PEA Response to Comments at I-33). Additionally, FAA explained that SpaceX has funded an FWS employee to assist with coordination.

Further, the Carrizo/Comecrudo Tribe—which, again, is a non-profit organization and not a tribe recognized by the federal government or any state government or religious organization—has waived any claim that it is harmed by access restrictions on unnamed sacred days because it did not raise any such concerns during the comment period. *See E. Band of Cherokee Indians v. U.S. Dep't of the Interior*, 534 F. Supp. 3d 86, 119 (D.D.C. 2021) (arguments not raised during public comment on an EA are "forfeited"). It did not participate in the National Historic

---

[21] The area around the launch site is now managed by TPWD, not FWS. FWS previously leased Boca Chica State Park from TPWD and managed it as part of a wildlife refuge. *See* FAA7574.

Preservation Act Section 106 review process despite having been invited. FAA12360 (PEA Response to Comments at I-13). And its NEPA comments do not identify any sacred days or locations impeded by access restrictions. *See* FAA4088–90, FAA3973–4026, FAA26698–99, FAA27794–95, FAA32740–43, FAA32766–70. Their Chairman's comment letter instead focuses primarily on "protecting Mars," a concern well beyond NEPA's reach. FAA28141.

Finally, federal and state agencies agreed that temporary access restrictions would have no more than de minimis impacts on protected properties and listed species. Regarding historic properties, the FAA and SpaceX entered into a Programmatic Agreement with five federal and state agencies—FWS, TPWD, ACHP, the National Park Service, and the Texas Historic Preservation Officer—to, among other things, resolve adverse effects to historic properties associated with reduced public access. *See* FAA9748–95 (PEA Appendix C – National Historic Preservation Act Section 106 Consultation). These agencies required SpaceX to take steps to enhance the public's enjoyment of these properties, including but not limited to replacing a missing star and wreath on the Palmetto Pilings 1936 Centennial Marker, developing interpretive signage, and funding educational outreach about the affected resources. FAA9755–62 (Programmatic Agreement at 7–14). SpaceX also must limit access restrictions needed in the event of any anomaly response to increase public access. FAA10354 (FONSI at 20).

The FAA also included mitigation measures to respond to access restriction concerns from FWS. To ensure National Wildlife Refuge access for both the public and FWS personnel, SpaceX must avoid road closures on certain holidays and weekends during the summer, with exceptions for anomalies. FAA10616–17 (FWS Section 4(f) concurrence); FAA10357–58 (FONSI at 23–24). Based on these measures, FWS concluded that no more than de minimis impacts on the Refuge would occur. FAA10616–17. FWS also concluded that, with mitigation, access restrictions would

37

not harm listed species or critical habitat. FWS found that access restrictions could prevent monitors on Boca Chica beach from observing sea turtle nesting attempts and collecting eggs, FAA9897 (BCO at 102), but that this "would be minimized by," among other things, SpaceX's development of access restriction notification protocols to "minimize disruption to refuge and land management activities." FAA9890 (BCO at 95). In fact, planned access restrictions can "minimize traffic within the restricted zone during launch activities and [thus] minimize modification of habitat for sea turtles, ocelots, jaguarundis, piping plovers, and red knots." FAA9890 (BCO at 95); *see also* FAA9808, FAA9905 (BCO at 13, 110) (requiring access restriction notification protocols).

Despite this record, Plaintiffs again pluck early-stage statements from these agencies to support their contrary claims. *See* Pls. Br. at 30–33. That strategy does not change the agencies' final conclusions, especially when the FAA adopted their proposed mitigation measures in its FONSI. *See, e.g.*, FAA10353–54 (incorporating mitigation measures from the Programmatic Agreement), FAA10355–56 (incorporating TPWD's recommended mitigation measures), FAA10356–58 (incorporating FWS's recommended mitigation measures).

In short, the FAA reasonably found that "[l]icensed-related access restrictions would be intermittent, temporary, and short, subject to advance-notice requirements, planned to avoid times of high visitation, and conducted to minimize disruption for agencies that own or manage the properties," and thus insignificant under NEPA. FAA12378 (PEA Response to Comments at I-31). On this record, the FAA did not act arbitrarily or capriciously.

### F.    The FAA reasonably concluded that any impacts from anomalies would not be significant with required mitigation.

Plaintiffs' final significant impact claim is that because unplanned accidents and explosions—known as "anomalies"—have happened at the Boca Chica site before, they will happen again (and cause significant effects). Pls. Br. at 35–40. It is true that some early Starship test

38

launches resulted in anomalies. But that does not portend more anomalies in the future. On the contrary, the risk of anomalies has plunged as the Starship launch system has matured. The same thing happened during SpaceX's development of Falcon 9, which experienced early anomalies during development but now is by far the safest and most reliable rocket in the world. In any case, the PEA acknowledges that anomalies are possible, fully evaluates the effects they would cause, and reasonably explains why they would not be significant given the required mitigations.

With respect to wildlife impacts, the FAA explained that debris and fire effects from anomalies could have temporary effects on wildlife and habitat and that a direct strike from debris would be unlikely. FAA11497 (PEA at 135). This finding is supported by monitoring. For example, when a July 2019 anomaly caused a small grassfire in the limited vegetation near the launch site and some debris in mudflats, a study showed minor impacts to the vegetation, comparable to prescribed burns in similar habitats, and that the vegetation quickly regrew. *See* FAA39417–26. Indeed, "many of the formerly burned grass culms in all areas [already] exhibited new growth." FAA39422. And while the study found that some crustaceans may have been killed, about half of the crab burrows in the burned area "exhibited post-fire activity," indicating that many crabs survived. FAA39423. The study concluded that "direct fire mortality of wildlife appeared to be low" and that "habitat suitability and ecosystem services should recover rapidly upon return of plant cover to pre-burn levels." FAA39424–25; *see* FAA11461 (PEA at 99, describing study). These conclusions were confirmed during a September 2022 study of another small fire, which found that "large areas had revegetated within a few months" after the 2019 fire. FAA50533. In fact, satellite imaging showed that "much of the extent/coverage of vegetation had recovered by

October 2019." FAA50530. The September 2022 study similarly found that fire effects would only temporarily impact habitat and that direct fire mortality to wildlife was low. FAA50532–33.[22]

To prevent significant effects on habitat, the FONSI incorporated the mitigation and resto-ration measures contained in SpaceX's Memorandum of Agreement with TPWD and measures identified by FWS. Those measures include a protocol for responding to anomalies, recovering debris, and taking adaptive steps to restore any affected areas. FAA10355–56 (FONSI at 21–22), FAA7574–76 (Memorandum of Agreement at 1). Following that protocol, SpaceX must carefully enter any anomaly-affected area on foot and remove debris in a way that minimizes disturbance to land, habitat, and species. FAA7574–75. If any area of tidal or algal flats is disturbed, SpaceX must restore it. FAA7576. SpaceX must also fund a study to evaluate algal flat restoration activities and monitor restoration efforts. FAA10355–56 (FONSI at 21–22). By monitoring the effectiveness of its restoration activities, SpaceX will be able "to apply any learned methodologies to restoration of habitats following any future impacts." FAA12381 (PEA Response to Comments at I-34).

Many of SpaceX's other mitigation measures also require monitoring and offsetting any effects that anomalies may have on wildlife or habitat. For example, SpaceX must install barriers along State Highway 4 to prevent vehicles from entering Refuge land and damaging algal flat habitat. FAA11507 (PEA at 145), FAA10365 (FONSI at 31). SpaceX must also continue moni-toring vegetation and birds before and after launches, which allows SpaceX to evaluate the effects of any anomalies and adjust operations to address those impacts. *Id.* And if an anomaly happens, SpaceX must adhere to numerous operational plans—including an Anomaly Response Plan, a

---

[22] Biological monitoring between 2016 and 2020—during which anomalies occurred—found, with one exception (a falcon that has rarely been witnessed in the area), "widespread use of the impact area during the study period." FAA41088. The data also showed that plant cover within nearby mudflats was "within the expected range of inter-annual variability." *Id.*

Security Plan, and a Fire Mitigation and Response Plan—to ensure that its anomaly response has minimal effects. FAA11508 (PEA at 146), FAA10366 (FONSI at 32).

Plaintiffs do not raise and thus waive any argument about anomaly effects on historic resources. Plfs. Br. 36-40. To the extent that this issue is considered, the FAA studied potential debris effects on historic resources in a 700-acre area around the launch pad. Because the historic resources within that area, including the pilings and historic marker noted above, do not contain glass or plaster that are more susceptible to damage from debris, the FAA found that debris from anomalies would not significantly affect historic resources. *See* FAA11446–47 (PEA at 84–85). But the FAA required SpaceX to monitor the effects of launch operations on these historic resources and stabilize them to protect against launch effects, which SpaceX has done. *See* FAA11443–44 (PEA at 81–82). If anomaly debris damages these resources, SpaceX must restore them to pre-disturbance conditions following the Secretary of the Interior's Standards for the Treatment of Historic Properties. FAA11446 (PEA at 84).

Once again, based on this spectrum of monitoring and mitigation, other agencies agreed with the FAA's conclusion that anomaly impacts would not be significant. FWS, TPWD, and THC all found that, with mitigation, anomalies would not cause more than a de minimis use of protected properties and would not significantly affect listed species or their critical habitat. FAA10569–70 (THC Section 4(f) concurrence that anomalies would constitute only a temporary occupancy); FAA10589–91 (TPWD Section 4(f) concurrence that anomaly effects would be de minimis); FAA10616–17 (FWS Section 4(f) concurrence).[23]

---

[23] FWS also agreed in its BCO that, because of the "protective measures" SpaceX and the FAA were taking, "the effect of the take anticipated in this BCO is not expected to significantly affect the species considered." FAA9887. The BCO also includes terms and conditions to further reduce potential anomaly effects, such as constructing a barrier on the launch site. FAA9906.

For all these reasons, the FAA did not act arbitrarily or capriciously when it concluded that anomalies would not cause significant environmental effects under NEPA.

## G. The FAA did not delegate any decision-making power to SpaceX.

Plaintiffs close their argument by claiming that the FAA "unlawfully" let SpaceX decide to prepare an EA instead of an EIS. Pls. Br. at 42–44. On this front, Plaintiffs admit that the relevant FAA order allows license applicants like SpaceX to prepare a NEPA document. Pls. Br. at 43 (citing FAA Order 1050.1F at 3-1).[24] The problem, as Plaintiffs see it, is that the FAA improperly "delegated" to SpaceX "the determination of what *level* of NEPA review was required." Pls. Br. at 43 (emphasis added). But this allegation is wrong.

The FAA made clear from the start that it would prepare an EIS if it found significant effects. *See, e.g.*, FAA50989–90 ("If the FAA identifies significant impacts that cannot be mitigated to below significant levels, then the FAA must prepare an EIS."); FAA13274–77 (explaining to other agencies that "applicants can begin by preparing an EA, and if impacts are determined to be significant and cannot be mitigated to insignificant levels, then an EIS will be prepared"). The FAA made sure SpaceX did not miss anything, iteratively reviewing and commenting on SpaceX's work throughout the process. FAA46923–32 (PEA schedule detailing FAA involvement). It explained, "the FAA conducted an independent review of the PEA [and] . . . believes that the PEA accurately describes the Proposed Action, defines the purpose and need, evaluates alternatives, and represents the potential effects associated with the Proposed Action." FAA12351 (PEA Response to Comments at I-4). And the FAA made the final call in issuing the FONSI based on the PEA, public and agency input, and other studies and data. FAA12351–52 (PEA Response to Comments at I-4 to I-5). There is no evidence the FAA let SpaceX make this decision. Plaintiffs' bare

---

[24] CEQ's rules also allow applicant-prepared documents, 40 C.F.R. § 1506.5(b)(3), as does the amended NEPA statute, 42 U.S.C. § 4336a(f).

accusations of a corrupted process come nowhere near overcoming the heavy "presumption of regularity" afforded agency decisionmakers. *See Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 174 (2004) (citing *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926)).

## IV.    Even if Plaintiffs prevail, the FAA's decision should not be vacated.

Plaintiffs' last point goes to remedy. They say that the APA's "plain language" requires the court to vacate the FAA's decision approving SpaceX's launch program if it finds that the FAA should have prepared an EIS instead of an EA. Pls. Br. at 44. But things are not that simple.

As Plaintiffs concede, the seminal D.C. Circuit case on APA remedies allows courts to remand an agency decision without vacating it when "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993). The Court of Appeals adopted this rule because it would make little sense to vacate an agency action for a minor transgression when doing so would cause serious public harms. *Id.* at 150–51. Vacating the FAA's decision approving SpaceX's launch program—which represents the future of space transportation for NASA, national security agencies, and the private sector—would readily fit that bill.

The meaning of APA's direction to "set aside" unlawful agency actions is not as clear as Plaintiffs suggest. As Justice Gorsuch, joined by two other Justices, recently explained, "set aside" is not a synonym for "vacate." *United States v. Texas*, 599 U.S. 670, 695–99 (2023) (Gorsuch, J., concurring). Beyond that, the APA contains equally plain language telling courts to take "due account" of "the rule of prejudicial error" when deciding whether to "set aside" agency action. 5 U.S.C. § 706. That language fits with the D.C. Circuit's remand-without-vacating rule.

The D.C. Circuit's longstanding remand-without-vacating approach is also consistent with the equity principles underlying the APA in cases like this in which vacating the FAA's decision would amount to an injunctive remedy stopping the Starship program in its tracks. Injunctive relief

is "a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (citation omitted) (addressing remedy for violations of NEPA and the APA); *see also Winter*, 555 U.S. at 32 (addressing remedy for alleged violations of NEPA, the ESA, and the APA). Rather, a plaintiff seeking a permanent injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto*, 561 U.S. at 156–57.

Plaintiffs have not tried to meet their burden and can't. Indeed, the Southern District of Texas recently found that one of the Plaintiffs here—Save RGV—did not meet its burden to show relief that would stop Starship launch operations was merited. *Save RGV v. Space Expl. Techs. Corp*, No. 1:24-CV-00148, 2024 WL 5357188 (S.D. Tex. Nov. 21, 2024). The court explained that "[t]he significant harm that would occur [to the public interest and SpaceX] if an injunction were to issue greatly outweighs any technical harm Plaintiff suffers" from alleged Clean Water Act permitting violations related to the deluge water system needed to launch Starship. *Id.* at *8– 9. The court explained:

> Being unable to launch would create various consequences for not only Defendant, but also the public at large. It would significantly delay and possibly destroy Defendant's contracts with NASA to further the Artemis Program and Human Landing System Program—worth billions of dollars. It would impact national security by halting the "Rocket Cargo" program under the Vanguard Initiative and delaying progress in Defendant's Starlink/Starshield programs—relied on by multiple government agencies including the Department of Defense. And, it would hinder Defendant's ability to provide disaster relief to those in need—such as those impacted by Hurricanes Helene and Milton. These very real consequences significantly outweigh any technical harm in Defendant operating its deluge system . . . .

*Id.* at *9 (citations omitted).

44

In any case, SpaceX asks that the Court reserve considering remedy until it decides whether the FAA violated NEPA in the first place. If needed, the parties can address remedy in separate briefing.

## CONCLUSION

Plaintiffs' motion for partial summary judgment should be denied, and SpaceX's and the FAA's cross-motions for partial summary judgment should be granted.

Dated: February 21, 2025                    Respectfully submitted,


By:  */s/ Tyler Welti*

Tyler Welti (D.C. Bar No. 1015691)
VENABLE LLP
101 California Street, Suite 3800
San Francisco, CA 94111
415.653.3714
415.653.3755 (fax)
tgwelti@venable.com

Jay C. Johnson (D.C. Bar No. 487768)
VENABLE LLP
600 Massachusetts Avenue NW
Washington, DC 21
202.344.4698
jcjohnson@venable.com

Attorneys for Intervenor-Defendant Space Exploration Technologies Corp.