# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, AMERICAN BIRD CONSERVANCY, SURFRIDER FOUNDATION, SAVE RGV, and THE CARRIZO/COMECRUDO NATION OF TEXAS, INC., | ) ) ) ) ) ) ) | |
| *Plaintiffs,* | ) ) | Civil Case No. 23-cv-1204-CJN |
| v. | ) ) | |
| FEDERAL AVIATION ADMINISTRATION, and BILLY NOLEN, in his official capacity, | ) ) ) | |
| *Defendants,* | ) ) | |
| and | ) ) | |
| SPACE EXPLORATION TECHNOLOGIES CORP., | ) ) ) | |
| *Defendant-Intervenor.* | ) ) | |

# PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' AND SPACEX'S CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENTAND REPLY ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES…………………………………………...……………………....ii

INTRODUCTION ...................................................................................................................1

ARGUMENT …………....................................................................................................2

   I.   The reasonably foreseeable harm from SpaceX's activities to an ecologically critical area and the surrounding community requires an EIS………...…………………………2

      A.  The FAA unlawfully delegated its NEPA duties to SpaceX…………………………5

      B.  The FAA has not provided substantial evidence to support a mitigated FONSI………6

      C.  Impacts to ecologically critical habitat and listed species require an EIS……………13

      D.  The significant impacts of anomalies cannot be mitigated, requiring an EIS………..15

      E.  Harm to Refuge resources from closures requires an EIS……………………………21

      F.  Harm to the Tribe from closures requires an EIS……………………………………25

      G.  The Impacts to wildlife from lighting requires an EIS………………………………27

      H.  The impacts to wildlife from noise requires an EIS…………………………………31

      I.  The FAA failed to take the requisite hard look at the impacts of noise on the community, which requires an EIS……………………………………………………………..33

   II.  The Commercial Space Launch Act does not limit the FAA's NEPA responsibilities….35

   III. Remedy………………………………………………………………………42

      CONCLUSION…………………………………………………………………..43

# TABLE OF AUTHORITIES

## Cases

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993)……………………………………………………...42

*American Rivers and Alabama Rivers Alliance v. Federal Energy Regulatory Commission*,
   895 F.3d 32 (D.C. Cir. 2018) ......................................................................................3, 31

*Anderson v. Evans*,
   314 F.3d 1006 (9th Cir. 2002)……………………………………………………3, 9

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
   462 U.S. 87 (1983)……………………………………………………………………...3

*Brady Campaign to Prevent Gun Violence v. Salazar*,
   612 F. Supp. 2d 1 (D.D.C. 2009)……………………………………………………...39

*Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*,
   685 F.2d 678 (D.C. Cir. 1982)……………………………………………………...12

*Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Com.*,
   449 F.2d 1109 (D.C. Cir. 1971)……………………………………………………36, 40

*Cape Hatteras Access Pres. Alliance v. United States DOI*,
   344 F. Supp. 2d 108 (D.D.C. 2004)……………………………………………...11

*Ctr. for Biological Diversity v. Ross*,
   349 F. Supp. 3d 38 (D.D.C. 2018)……………………………………………………15

*Cigar Ass'n of Am. v. United States FDA*,
   2025 U.S. App. LEXIS 1585 (D.C. Cir. 2025)…………………………………………42

*Citizens against Burlington, Inc. v. Busey*,
   938 F.2d 190 (D.C. Cir. 1991)……………………………………………………...19

*Citizens Against Rails-to-Trails v. Surface Transp. Bd.*,
   267 F.3d 1144 (D.C. Cir. 2001)……………………………………………………38

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971)……………………………………………………………...36

*City of Boston Delegation v. FERC*,
   897 F.3d 241 (D.C. Cir. 2018)……………………………………………………….4

*City of Bridgeton v. F.A.A.*,
212 F.3d 448 (8th Cir. 2000)…………………………………………………………32

*City of Port Isabel v. FERC*,
No. 23-1174, 2025 WL 838540 (D.C. Cir. Mar. 18, 2025)………………………………42

*Clean Wis. V. EPA.*,
964 F.3d 1145 (D.C. Cir. 2020)……………………………………………………..32

*Dakota Res. Council v. United States DOI*,
2024 U.S. Dist. LEXIS 51013 (D.D.C. 2024)………………………………………………9

*Defenders of Wildlife v. Babbitt*,
958 F. Supp. 670 (D.D.C. 1997)……………………………………………………..9

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)…………………………………………………………………...36

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004)…………………………………………………………35, 38

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla*,
426 U.S. 776 (1976)……………………………………………………...11, 35, 41

*Friends of the Capital Crescent Trail v. Fed. Transit Admin.*,
255 F. Supp. 3d 60 (D.D.C. 2017)………………………………………………18

*Friends of Animals v. Culver*,
610 F. Supp. 3d 157 (D.D.C. 2022)……………………………………………….9

*Fund For Animals v. Hall*,
448 F. Supp. 2d 127 (D.D.C. 2006)……………………………………………...9, 15

*Fund for Animals v. Norton*,
281 F. Supp. 2d 209 (D.D.C. 2003)………………………………………………9

*Gerber v. Norton*,
294 F.3d 173 (D.C. Cir. 2002)……………………………………………………...5, 12

*Grand Canyon Trust v. FAA*,
290 F.3d 339 (D.C. Cir. 2002)……………………………………………………….9

*Gov't of the Province of Manitoba v. Norton*,
398 F. Supp. 2d 41 (D.D.C. 2005)…………………………………………………..12, 24

*Idaho v. ICC*,
    35 F.3d 585 (D.C. Cir. 1994)……………………………………………………5, 21

*Indian River Cty. v. DOT*,
    348 F. Supp. 3d 17 (D.D.C. 2018)……………………………………………….39

*Japanese Vill., LLC v. Fed. Transit Admin.*,
    843 F.3d 445 (9th Cir. 2016)……………………………………………………32

*Ky. Riverkeeper, Inc. v. Rowlette*,
    714 F.3d 402 (6th Cir. 2013)……………………………………………………3

*Marin Audubon Soc'y v. FAA*,
    121 F.4th 902 (D.C. Cir. 2024)…………………………………………………..42

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*,
    463 U.S. 29 (1983)……………………………………………………5-6, 23, 33, 37

*Mozilla Corp. v. FCC*,
    940 F.3d 1 (D.C. Cir. 2019)…………………………………………………...36

*Nat'l Audubon Soc'y v. Hoffman*,
    132 F.3d 7 (2d Cir. 1997)………………………………………………………9

*Nat'l Comm. for the New River v. FERC*,
    373 F.3d 1323 (D.C. Cir. 2004)…………………………………………………34

*Nat'l Parks Conservation Ass'n v. Semonite*,
    422 F. Supp. 3d 92 (D.D.C. 2019)……………………………………………….43

*Nat'l Parks Conservation Ass'n v. Semonite*,
    916 F.3d 1075 (D.C. Cir. 2019)……………………………………………7, 8, 28

*Nat'l Wildlife Fed'n v. National Marine Fisheries Serv.*,
    524 F.3d 917 (9th Cir. 2008)…………………………………………………...15

*N.J. Conservation Found. v. FERC*,
    111 F.4th 42 (D.C. Cir. 2024)…………………………………………...12, 23

*Pub. Citizen v. Nuclear Regulatory Comm'n*,
    573 F.3d 916 (9th Cir. 2009)……………………………………………………9

*RB Jai Alai, LLC v. Sec'y of the Fla. DOT*,
    47 F. Supp. 3d 1353 (M.D. Fla. 2014)…………………………………………...39

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947)…………………………………………………………...37

*Sierra Club v. FERC,*
    38 F.4th 220 (D.C. Cir. 2022)…………………………………………………..4

*Sierra Club v. U.S. Army Corps of Eng*.,
    701 F.2d 1011 (2d Cir. 1983)……………………………………………………23

*Sierra Club v. United States Army Corps of Eng'rs*,
    803 F.3d 31 (D.C. Cir. 2015)……………………………………………………15

*S. Fork Band Council of W. Shoshone v. United States DOI*,
    588 F.3d 718 (9th Cir. 2009)…………………………………………………..10

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers,*
    255 F. Supp. 3d 101, 123 (D.D.C. 2017)…………………………………………...39

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
    985 F.3d 1032 (D.C. Cir. 2021)………………………………………...7, 8, 26, 30

*Susquehanna Int'l Grp., LLP v. SEC*,
    866 F.3d 442 (D.C. Cir. 2017)…………………………………………………..5

*Theodore Roosevelt Conservation P'ship v. Salazar*,
    616 F.3d 497 (D.C. Cir. 2010)…………………………………………………..10

*Town of Cave Creek v. FAA*,
    325 F.3d 320 (D.C. Cir. 2003)…………………………………………………...12

*United States v. Lawrence*,
    1 F.4th 40 (D.C. Cir. 2021)……………………………………………………5

*Village of Barrington v. Surface Transp. Bd.*,
    636 F.3d 650 (D.C. Cir. 2011)…………………………………………………40

### Statutes and Regulations

5 U.S.C. § 706……………………………………………………………………6, 42

14 C.F.R. § 450.47…………………………………………………………………40

16 U.S.C. § 1536……………………………………………………………………15

23 U.S.C. § 138……………………………………………………………………19

42 U.S.C. § 4321……………………………………………………………………39

42 U.S.C. § 4331………………………………………………………………………39

42 U.S.C. § 4332…………………………………………………………11, 36, 40

51 U.S.C. § 50905…………………………………………………………40, 41

14 C.F.R. § 450.47…………………………………………………………...40, 41

23 C.F.R. 771.107…………………………………………………………...18

40 C.F.R. § 1501.3…………………………………………………………..7

# INTRODUCTION

As Plaintiffs demonstrated in their opening brief, the FAA violated the National Environmental Policy Act (NEPA) when it determined that it could avoid an Environmental Impact Statement (EIS) by issuing a mitigated finding of no significant impact (FONSI) for the proposed Starship/Superheavy Launch Program. Given the clear record evidence—including, in particular, statements from the U.S. Fish and Wildlife Service (FWS), the Environmental Protection Agency (EPA), and the Texas Parks and Wildlife Department (TPWD), which serve as stewards for the environmental resources at issue—regarding the significant environmental impacts associated with the proposal for a 5-year program to launch the largest rockets known to humankind in the middle of ecologically critical lands, and the inability to render those impacts insignificant through mitigation, there can be no doubt that an EIS was required.

While the FAA acknowledged that, absent mitigation measures, the Launch Program *would* have significant environmental impacts, SpaceX and Federal Defendants have failed to show that the FAA provided the "hard look" at those impacts that NEPA requires and cannot show that such impacts were sufficiently mitigated to support a FONSI. As explained, the record evidence shows that many of the impacts simply cannot be abated, much less minimized to the degree necessary to avoid an EIS. Furthermore, the FAA expressly delegated the decision as to what level of NEPA review was required to SpaceX. That is unlawful and also explains the FAA's arbitrary and capricious failure to prepare an EIS for a clearly significant action. Lastly, SpaceX's argument that the FAA may avoid the need for an EIS based on a purported conflict with the Commercial Space Launch Act fails, both because no such argument is advanced by the agency itself and, in any event, no such conflict exists. The Court should therefore rule in favor of Plaintiffs.

1

## ARGUMENT

I.    **The reasonably foreseeable harm from SpaceX's activities to an ecologically critical area and the surrounding community requires an EIS.**

Both Federal Defendants and SpaceX spend much of the background portions of their briefs futilely attempting to reframe this case as a review of ongoing activities at Boca Chica, suggesting that the area is already a disturbed industrial zone and that the impacts associated with the proposed Starship/Superheavy Launch Program must only be considered in light of the continuing use of the site for rocket testing and launches. *See* SpaceX Br. (ECF No. 49-1) at 18-19; Fed. Def. Br. (ECF No. 50-1) at 13-14. First and foremost, this ignores that Plaintiffs' arguments focus on the same exact environmental impacts addressed in the PEA, including impacts associated with construction activities, infrastructure, closures, and proposed use of the Boca Chica facility for a 5-year launch program to test and launch the largest experimental rockets known to humankind, which cannot possibly be accomplished without causing significant environmental impacts.

Furthermore, it is ironic that SpaceX and Federal Defendants are attempting to downplay the potential impacts of SpaceX's proposed activities by pointing to the extent to which *SpaceX has already* damaged and harmed the area, including ecologically critical and sensitive habitat for protected wildlife. *See* FAA00011453 and FAA00011491 (maps showing the affected area, including Wildlife Refuge, Parks, and critical habitat). Indeed, these arguments only serve to highlight that SpaceX has been decimating what was once an unspoiled natural area with explosions, fires, debris, and constant noise, lighting and frequent disruptive closures—impacts that will certainly continue and intensify under the new Launch Program. Moreover, the area directly impacted by SpaceX's ongoing and proposed activities is some of the most important habitat for migratory birds in the U.S., considered "one of the most biologically diverse regions

2

in North America" because the Central and Mississippi bird flyways converge there, making it an essential area for protected migratory birds. FAA00043885; FAA00051552, FAA00051572. The impacted mudflats and wetlands surrounding the launch pad are aquatic resources of national importance: unique habitats with limited distributions in the world that support a variety of rare, threatened, and endangered species and thus critical to the survival of many species of shorebirds and waterfowl. *See* FAA00046039-40.

The fact that SpaceX has *already* inflicted extensive damage on this vitally important habitat does not allow the FAA to avoid an EIS in connection with the ongoing and future activities at issue. *See Am. Rivers & Ala. Rivers All. v. FERC*, 895 F.3d 32, 50 (D.C. Cir. 2018) ("For the type of site-specific action at issue in this case, significance typically depends on the action's effects in the immediate locale, rather than in the broader ecosystem or world as a whole."); *accord Anderson v. Evans*, 314 F.3d 1006, 1019 (9th Cir. 2002); *see also Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (In determining whether to prepare an EIS, the agency must "consider every significant aspect of the environmental impact of a proposed action").

In fact, Federal agencies must analyze past actions affecting the same resources as would a proposed action where, as here, the effects of the past action have continuing effects that would combine with the effects of the proposed action and thus result in cumulative impacts, and when information about the effects of past actions would be useful in predicting future effects. *See Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 410 (6th Cir. 2013). Thus, to the extent that the area has already been impacted by SpaceX's activities, that preexisting damage has a direct nexus with the proposed project, since it shows the harm that SpaceX's activities have had, and would continue to have, on the area with FAA's approval. The FAA therefore had an obligation to

consider *all* of the adverse impacts associated with SpaceX's proposed activities, not just the additive impacts, and could not ignore the prior harm as Federal Defendants contend. *See* Fed. Def. Br. at 13-14. Insofar as SpaceX and Federal Defendants are attempting to discount the obligation to consider the cumulative effects of SpaceX's activities, that is contrary to NEPA's hard look requirement. *See Sierra Club v. FERC,* 38 F.4th 220, 234 (D.C. Cir. 2022) ("A cumulative impacts analysis will pass a 'hard look' review if it "contain[s] sufficient discussion of the relevant issues and [is] well-considered") (citing *City of Boston Delegation v. FERC*, 897 F.3d 241, 253 (D.C. Cir. 2018)).

Rather than take the time and effort necessary to consider and analyze – and then truly mitigate – the impacts of the Starship/Superheavy Launch Program, the FAA bowed to pressure from SpaceX to avoid an EIS, and reached that result by applying various minimal or even meaningless mitigation measures to the well-documented significant harm that SpaceX has caused, and would continue to cause, to the surrounding environment. Given the record evidence, replete with statements from the expert wildlife agencies concerning the significant environmental impacts of SpaceX's activities and the inability of the those impacts to be sufficiently mitigated, the FAA's decision to issue a mitigated FOSNI was arbitrary and capricious.

Below, Plaintiffs set forth the most clear-cut violations of NEPA established by the record evidence and discuss the most egregious misrepresentations and untenable arguments made by SpaceX and Federal Defendants. These should leave no doubt that the FAA's 2020 PEA was inadequate, and that an EIS must be required for the Starship/Superheavy Launch Program. *See* FAA00057705 (if "one or more environmental impacts of a proposed action would

be significant and mitigation measures would not reduce the impact(s) below significant levels," the agency must prepare an EIS).

### A. The FAA unlawfully delegated its NEPA duties to SpaceX.

The record shows that the FAA unlawfully delegated to SpaceX the decision as to what level of NEPA review should be required for the Starship/Superheavy Launch Program, which resulted in the FAA agreeing to pursue a mitigated FONSI even though it was clear that the environmental impacts of the Launch Program were significant and could not be rendered insignificant with mitigation measures to support a FONSI. *See* Pls. Br. at 42-44. As explained, the D.C. Circuit has held that an agency's statutory duties, and particularly those imposed by NEPA, cannot be delegated to a self-interested applicant in this manner. *See Idaho v. ICC*, 35 F.3d 585, 595 (D.C. Cir. 1994); *Susquehanna Int'l Grp., LLP v. SEC,* 866 F.3d 442, 446 (D.C. Cir. 2017) (an agency "effectively abdicat[ing]" its responsibility for decisionmaking to the proponent fails the kind of "reasoned decisionmaking" required by the APA); *Gerber v. Norton*, 294 F.3d 173, 184-86 (D.C. Cir. 2002) (holding an agency may not delegate its statutory responsibility to a private party).

Federal Defendants have made no attempt whatsoever to address this issue, thereby waiving any defense.[1] The FAA clearly has no option but to acknowledge that it did in fact delegate the decision as to what level of NEPA review was warranted to SpaceX, and Federal Defendants' failure to provide any argument or justification for this clearly unlawful action is thus dispositive. Their silence speaks volumes. And since it is the agency's obligation to set forth a satisfactory explanation for its decision, *Motor Vehicle Manufacturers Ass'n of the United*

---

[1] Federal Defendants, having failed to address this issue in their Memorandum, cannot now raise any new arguments in their reply brief. *See, e.g., United States v. Lawrence*, 1 F.4th 40, 46 n.3 (D.C. Cir. 2021) (Arguments raised for the first time on reply are forfeited).

*States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 50 (1983), this fundamental legal flaw is sufficient to compel summary judgment for plaintiffs.

SpaceX, for its part, suggests that the obvious did not actually happen, stating that "there is no evidence that FAA let SpaceX make this decision." SpaceX Br. at 42. However, that ignores the specific record evidence that Plaintiffs rely on: documents showing that the FAA intended to prepare an EIS, along with a letter from the FAA stating explicitly that the FAA then let SpaceX make the decision as to what level of NEPA review applied. *See* Pls. Br. at 42-44; FAA00051672 (FAA erroneously stating that under its NEPA policies, "*applicants have the right to choose* whether to conduct an" EA or EIS, and that "[i]f *an applicant believes* the proposed action would have no significant environmental impacts, or that they can mitigate any potential impacts, *then the applicant typically chooses an EA*") (emphasis added). Thus, the FAA's own words more than overcome any "presumption of regularity," SpaceX Br. at 43, and are in fact a smoking gun that confirms Plaintiffs' argument.

Further, SpaceX's argument (at 42) that the FAA' NEPA order allows license applicants like SpaceX to prepare a NEPA document is inapposite, since that has no bearing on whether the agency unlawfully allowed SpaceX to critical determination as to the pertinent *level* of NEPA review. The FAA's ultimate decision to go along with SpaceX's choice and approve a mitigated FONSI cannot salvage what was clearly an unlawful delegation of authority under settled circuit precedent. The Court should therefore find that the FAA's delegation was arbitrary, capricious, and not in accordance with law. *See* 5 U.S.C. § 706(2)(A).

### B. The FAA has not provided substantial evidence to support a mitigated FONSI.

As set forth in Plaintiffs' opening brief, the record is replete with statements from the expert agencies as to ongoing and foreseeable significant environmental harm from SpaceX's

activities, as well as statements showing that the significant impacts associated with the proposed Launch Program have not and cannot be sufficiently mitigated, thus triggering the need for an EIS. SpaceX's and Federal Defendants' arguments regarding Plaintiffs' reliance on the statements made by the expert agencies are misplaced. It does not matter that some of those statements came during the scoping or draft comment periods for the proposal, since they evidence the ongoing harm from SpaceX's activities, which the agencies found likely to continue and even worsen for the new Launch Program. *See e.g.,* FAA00046057-58 (TPWD stating that the "unavoidable and significant" impacts would increase in severity for a new launch program testing even larger vehicles at an increased frequency).

SpaceX's attempt to undermine Plaintiffs' reliance on *National Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019), and *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 985 F.3d 1032 (D.C. Cir. 2021), is misplaced. SpaceX (at 20) argues that those cases are specific to the "highly controversial" intensity factor that is no longer in CEQ's regulations, but ignores the fact that it still appears in the FAA's own NEPA procedures, *see* FAA Order 1050.1F at 4-3 (FAA00057666), and that those cases also dealt with the "uncertainty" factor (*i.e.*, the degree to which the potential effects on the human environment are highly uncertain), which *was* included in the version of 40 C.F.R. § 1501.3(d)(2) that was in effect when the FAA issued the PEA. Further, the "highly controversial" factor was only removed from 40 C.F.R. § 1501.3(d)(2) to eliminate confusion, since it suggested that public outcry itself could be used as a basis to require an EIS, whereas the regulations were intended to require an EIS where

there was sufficient expert disagreement or uncertainty over the intensity of impacts, as evidenced through statements made by other agencies with subject matter expertise.[2]

The cases Plaintiffs' rely on support the proposition that the impacts of a proposed action are "significant" for purposes of NEPA if, as here, a "substantial dispute exists as to the size, nature, or effect" of the action, *National Parks Conservation Association,* 916 F.3d at 1083-85, and that where substantial questions about such impacts remain—which can be determined through the "consistent and strenuous opposition" of expert agencies with subject-matter expertise, *id.*—an EIS is required. *See also Standing Rock Sioux Tribe*, 985 F.3d at1043 ("Congress created the EIS process to provide robust information in situations . . . where, following an environmental assessment, the scope of a project's impacts remains both uncertain and controversial.").

SpaceX also argues that Plaintiffs are wrong to assert that an EIS is required if "substantial questions are raised as to whether a project *may* have a significant effect upon the environment," and that a "determination that significant effects will in fact occur is not essential" to trigger NEPA's EIS mandate. SpaceX Br. at 14. Here, the record reflects that significant effects will occur (and have occurred), so SpaceX's objection is immaterial. In any event, Plaintiffs'

---

[2] The preamble to the revised regulations at 40 C.F.R. 1501.3(d) noted that the removal of the term "controversial" was to "make[] clear that the uncertainty of an effect is the appropriate consideration, and not whether an action is controversial." *See* 89 Fed. Reg. 35421, 35467 (May 1, 2024). In other words, the regulations preserved the concept that a "legitimate disagreement on technical grounds may relate to uncertainty," and merely "ma[d]e clear that public controversy over an activity or effect is not a factor for determining significance." *Id*. Therefore, under the revised regulations in effect when the FAA reviewed the Starship/Superheavy Launch Program, the record statements evidencing the disagreement between the FAA and the expert agencies on technical grounds regarding the effects of the Launch Program and the need for an EIS would now constitute "uncertainty" when considering the significance of the action. However, since such disagreements were previously categorized by the regulations and discussed by courts as falling under the "highly controversial" factor, the cases Plaintiffs relied on remain relevant precedent.

argument rests on language taken straight from other rulings in this Circuit as well as other precedents. *See Fund For Animals v. Hall,* 448 F. Supp. 2d 127, 132 (D.D.C. 2006) (holding that to avoid an EIS where there is a potential "impact of true significance" the agency must "convincingly establish[] that changes in the project sufficiently reduced it to a minimum") (citing *Grand Canyon Trust v. FAA*, 290 F.3d 339, 341 (D.C. Cir. 2002)); *Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 171 (D.D.C. 2022) (holding an EIS must be prepared if substantial questions are raised as to whether a project *may* have a significant effect upon the environment) (citing *Pub. Citizen v. Nuclear Regulatory Comm'n*, 573 F.3d 916, 929 (9th Cir. 2009)); *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 233 (D.D.C. 2003) (same) (citing *Anderson v. Evans*, 314 F.3d 1006, 1019-21 (9th Cir. 2002)); *Dakota Res. Council v. United States DOI*, 2024 U.S. Dist. LEXIS 51013, *66. (D.D.C. 2024) (same); Where, as here, the record shows that, at bare minimum, substantial questions remain about significant impacts and the potential to mitigate them, an EIS is required, and the FAA is not entitled to any deference where its conclusions set forth in the PEA are not supported by the record. *See Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 679 (D.D.C. 1997) (for APA review, the court must consider whether the agency based its decision on the facts in the record and considered all relevant factors).

Indeed, while SpaceX attempts to place the burden on Plaintiffs to show that the proposed mitigation is insufficient to support a mitigated FONSI under the APA's arbitrary and capricious standard, SpaceX Br. at 15-16, where an agency has admitted that the impacts of an action would otherwise be significant and require an EIS, but is relying on mitigation to avoid that requirement, it is the *agency* that must provide substantial evidence in its NEPA documents to support that determination. *See Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 17 (2d Cir. 1997) (the adequacy of mitigation measures to reduce the impacts below the level of significance must

be supported by "substantial evidence"); *S. Fork Band Council of W. Shoshone v. United States DOI,* 588 F.3d 718, 727 (9th Cir. 2009) ("An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective . . . [and] whether anticipated environmental impacts can be avoided.") (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351-52 (1989)); FAA Order 1050.1F at 6-7 (FAA00057702) (to support a mitigated FONSI, the FAA must take a "hard look" at the problem and "identif[y] [the] mitigation measures that will be sufficient to reduce potential impacts below applicable significance thresholds and [] ensure[] commitments to implement these measures"). Plaintiffs have met their burden to show that the FAA did not do so, and therefore the agency's determination was arbitrary and capricious.

Nor are Federal Defendants correct that, in the context of a mitigated FONSI, the agency need not "discuss any particular mitigation plans that they might put in place, nor does it require agencies—or third parties—to effect any." *See* Fed. Def. Br. at 33. The cases that Federal Defendants rely on, such as *Theodore Roosevelt Conservation P'ship v. Salazar,* 616 F.3d 497, 503 (D.C. Cir. 2010), provide that specific mitigation plans need not be fully developed *within an EIS*, since by doing an EIS, the agency is committing to fully analyzing the environmental impacts of the proposed action. However, the contention that the FAA need not specify the mitigation measures it is relying on and discuss how they render otherwise significant impacts insignificant to support a *mitigated FONSI* is unsupported by any pertinent precedent. It also makes no legal or practical sense, and would allow an agency to merely claim, without support, that it can avoid the need to do an EIS based on unspecified and/or unproven mitigation measures. Indeed, Federal Defendants' position that an agency relying on a mitigated FONSI need not specify the particular mitigation plans and how they reduce the impacts below the level

10

of significance to avoid the need for an EIS is entirely inconsistent with NEPA's statutory

mandate to comply with Section 102 to the "fullest extent possible." 42 U.S.C. § 4332(C). As the

Supreme Court has explained, "NEPA's instruction that all federal agencies comply with the

impact statement requirement . . . 'to the fullest extent possible' is neither accidental nor

hyperbolic. Rather, the phrase is a deliberate command that the duty NEPA imposes upon the

agencies to consider environmental factors not be shunted aside in the bureaucratic shuffle."

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*, 426 U.S. 776, 787 (1976); *see also Cape*

*Hatteras Access Pres. Alliance v. United States DOI,* 344 F. Supp. 2d 108, 135 (D.D.C. 2004)

("[P]artial fulfillment of NEPA's requirements . . . is not enough" when the act calls for

compliance "to the fullest extent possible") (citation omitted).

It is hard to imagine a clearer instance of "shunt[ing] aside" the EIS requirement than a

case where, as here, an agency concedes significant impacts and yet fails to articulate, let alone

demonstrate, how they will be sufficiently mitigated to bring them below the significance

threshold. This is a fatal flaw in Federal Defendants' position. While the PEA admits that

"[a]bsent implementation of the mitigation measures, significant impacts related to some

environmental impact categories *would occur and an EIS would be required*," FAA00012352

(emphasis added), it never even specifies exactly what those significant impacts are—despite the

record being replete with statements from the expert wildlife agencies about specific significant

impacts, as set forth in Plaintiffs' opening brief. Rather, where it does discuss impacts, the PEA

only provides conclusory statements—such as that noise may startle birds and cause stress,

FAA00011496, or that anomalies may result in debris landing in the Refuge, FAA00011391—but

erroneously attempts to categorize all such impacts as temporary or intermittent, which is not

supported by the record and shows that the FAA failed to take the requisite "hard look" at those

impacts. *See* Pls' Br. at 12-19; *see also Gerber*, 294 F. Supp. 3d at 185 (explaining that merely stating that a factor was considered is not a substitute for actually analyzing it); *N.J. Conservation Found. v. FERC*, 111 F.4th 42, 54 (D.C. Cir. 2024) (An agency has only taken the requisite "hard look" if the analysis "contains sufficient discussion of the relevant issues and opposing viewpoints, and . . . the agency's decision is fully informed and well considered").

Moreover, despite concluding that, absent mitigation, significant impacts would occur, the PEA *never actually analyzes* how the proposed mitigation could possibly render the impacts of the Launch Program insignificant. *See Gov't of the Province of Manitoba v. Norton,* 398 F. Supp. 2d 41, 65 (D.D.C. 2005) ("[A] mitigated FONSI fulfills NEPA's requirements when it 'completely compensates for any possible adverse environmental impacts stemming from the original proposal' or reduces the possibility to a minimum.") (quoting *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 682 (D.C. Cir. 1982)); *Town of Cave Creek v. FAA*, 325 F.3d 320, 327 (D.C. Cir. 2003) (when examining a mitigated FONSI, the court's job is, *inter alia*, to determine whether an EIS is truly unnecessary because "changes or safeguards in the project sufficiently reduce the impact to a minimum") (citation omitted).

In other words, by flatly conceding there would be significant impacts from the Launch Program but then erroneously characterizing them as merely intermittent and/or short-term (and therefore not really significant),[3] the PEA is not only arbitrarily inconsistent but improperly tips the scales. It allowed the FAA to then pass off trivial, meaningless, or hopelessly vague

---

[3] *See e.g.,* FAA00011420, FAA00011460, FAA00011494 (discussing the supposed "intermittent and temporary" or "short duration" nature of noise impacts); FAA00011445 (stating the impacts of closures are not significant because "access restrictions would be intermittent, temporary, and short"); FAA00011460-61 (describing the impacts of debris from anomalies as merely a "temporary occupancy" of Refuge lands).

mitigation measures—such as installing timers and turning lights off "when not needed"[4] even though the record shows they remain on nearly all the time, and empty promises to remediate harm to sensitive tidal flats from debris even though such efforts are futile[5]—as sufficient to support a mitigated FONSI without ever analyzing how/whether the purported mitigation could *actually* minimize the significant impacts of SpaceX's activities. Rather, the FAA was required to fully define and analyze the significant impacts of the Launch Program consistent with the statements made by the expert agencies, determine with substantial evidence whether those significant impacts could truly be minimized with more suitable mitigation measures, and if not (as is the case here, where many of the significant impacts cannot possibly be made insignificant through mitigation), fully flesh out that analysis in an EIS as NEPA requires.

Instead, the FAA flouted NEPA and provided an arbitrary and capricious mitigated FONSI that is not supported by substantial (or, really, any meaningful) evidence. That Federal Defendants have now resorted to erroneously arguing that the FAA need not even *discuss* any particular mitigation plans in the context of a mitigated FONSI only serves to highlight that the PEA does not contain substantial evidence to support the FAA's determination. Thus, Plaintiffs have met their burden to establish that the FAA's refusal to produce an EIS in reliance on a mitigated FONSI was arbitrary and capricious.

### C. Impacts to ecologically critical habitat and listed species require an EIS.

As set forth in Plaintiffs' opening brief, the fact that SpaceX's activities would cause reasonably foreseeable significant harm to ecologically critical areas and protected species requires an EIS pursuant to Circuit precedent and the FAA's NEPA implementing order. *See* Pls.

---

[4] PEA at 71 (FAA00011433)

[5] *See infra* at 19-20.

Br. at 15. Federal Defendants argue that an EIS is not required because FWS determined that the proposed activities would not jeopardize the continued existence of any listed species, Fed. Def. Br. at 14, 17-18; however, that cannot justify the decision not to produce an EIS here.

The FWS's non-jeopardy determination pertains only to impacts to species listed as endangered or threatened under the Endangered Species Act. *See* FAA00009796-97 (Biological Opinion confirming that it only applies to the potential effects on ESA-listed species and designated critical habitat). Here, the proposed activities directly affect an area that is ecologically critical not only for those species, but for many other migratory birds that rely on the tidal flats during migration. *See* Pls. Br. at 6-7, 13-15. And while the FAA's Order 1050.1F (at 4-4) does state that one of the "significance thresholds" for an EIS is whether the activity would jeopardize the continued existence of an ESA-protected species, that is not the only applicable threshold, since the Order also states that the FAA must consider the potential for adverse impacts to special status species (such as migratory birds protected by the Migratory Bird Treaty Act) and their habitat, as well as for "substantial loss, reduction, degradation, disturbance, or fragmentation of native species' habitats or their populations." FAA00057667. Here, the record shows that – according to the expert agencies – the Starship/Superheavy Launch Program has the potential to degrade ecologically critical habitat and disturb numerous species, including state- and federally-listed species and many protected under the Migratory Bird Treaty Act. *See* Pls. Br. at 6-7, 13-15. Thus, the FAA's own threshold for an EIS was clearly met.

Moreover, any argument that the *only* applicable threshold for an EIS with regards to listed species is where jeopardy to an entire species would occur is nonsensical. If an agency action would jeopardize the continued existence of a species, it would be unlawful under the ESA and the action would not be able to proceed on that basis, so there would be no reason to

14

produce an EIS. *See* 16 U.S.C. § 1536; *Ctr. for Biological Diversity v. Ross*, 349 F. Supp. 3d 38, 42 (D.D.C. 2018) (discussing the substantive ESA obligation to ensure against jeopardy); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 929 (9th Cir. 2008) ("ESA compliance is not optional," and its "no-jeopardy mandate applies to every discretionary agency action—regardless of the expense or burden its application might impose"); *cf. Fund for Animals*, 448 F. Supp. at 136-37 (rejecting the argument that ESA compliance satisfied the agency's NEPA obligations because the ESA's consultation process for avoiding jeopardy is "not the functional equivalent" of the "analysis required by NEPA"). Federal Defendants' position that an EIS is *only* required when the action would jeopardize listed species and thereby violate the ESA creates a meaningless threshold that is inconsistent with Circuit precedent. *See e.g., Sierra Club v. United States Army Corps of Eng'rs*, 803 F.3d 31, 46 (D.C. Cir. 2015) (Allowing an activity that would take (i.e., harm) endangered species, even on the condition that the permittee take mitigating measures, "amount[s] to *significant* federal action" under NEPA).

Federal Defendants have therefore failed to show how the documented significant impacts to ecologically critical areas and protected species from SpaceX's activities does not require an EIS. *See* Pls. Br. at 13-15. As discussed, the record evidence—in particular, statements from the expert agencies—shows that such impacts have already occurred and would continue if not worsen under the proposed new Launch Program. Thus, the FAA's determination was arbitrary and capricious, and an EIS was undoubtedly required.

### D.  The significant impacts of anomalies cannot be mitigated, requiring an EIS.

There is no valid argument that the FAA was unaware that anomalies (i.e., explosions) were more than likely to occur from the proposed Launch Program. While SpaceX now suggests that such events are less likely as the Launch Program progresses, SpaceX Br. at 38-39, that is

irrelevant given the PEA review was being undertaken prior to the initiation of a new Launch Program wherein anomalies were expected to occur.[6] Indeed, as set forth in Plaintiffs' opening brief, the history of explosions at Boca Chica, as well as the various acknowledgments in the PEA itself regarding the potential for anomalies and the need to reserve up to 300 hours per year for access closures to address such events, shows that the FAA was well-aware that explosions were likely to occur. *See* Pls. Br. at 35-40.

Nor could there have been any doubt that such anomalies cause significant environmental harm. *See id*. SpaceX (at 39-40) focusses solely on a few specific anomalies that resulted in brush fires—ignoring the many others that caused significant harm to the surrounding tidal flats from debris and debris recovery, *see* Pls. Br. at 35-40—and uses those instances to suggest that the impacts of anomalies are merely temporary and that the harm was not significant because brush and grasses were able to grow back in affected areas. But that is a red herring.

The *real* concern about anomalies/explosions, as established by the overwhelming record evidence set forth through comments from the expert agencies, is the harm to the adjacent tidal

---

[6] While SpaceX states that prior anomalies "do[] not portend more anomalies in the future," SpaceX Br. at 38-39, that "the risk of anomalies has plunged," *id.*, and that "[a]s of January 16, 2025, SpaceX has launched Starship seven times, collecting data and making improvements with each launch," *id.* at 4, its extra-record factual assertion neglects to mention that the very first of those launches resulted in a significant anomaly where the launch pad exploded, scattering debris—including dust, chunks of concrete, and metal—over a large area, including adjacent sensitive tidal flats that provide critical habitat for endangered species. FWS stated that the "[i]mpacts from the launch include numerous large concrete chunks, stainless steel sheets, metal and other objects hurled thousands of feet away along with a plume cloud of pulverized concrete that deposited material up to 6.5 miles northwest of the pad site." FWS documented 385 acres of debris on SpaceX's facility and at Boca Chica State Park. FWS further documented, as a consequence of the launch, a 3.5-acre fire that started south of the pad site on Boca Chica State Park land. *See* Lora Kolodny, *SpaceX Starship explosion ignited 3.5-acre fire and sent debris thousands of feet, U.S. Fish and Wildlife Service says*, CNBC (Apr. 26, 2023), available at https://www.cnbc.com/2023/04/26/spacex-starship-explosion-caused-3point5-acre-fire-us-fws-says-.html?__source=sharebar|twitter&par=sharebar.

flats from debris and debris recovery efforts. The record contains overwhelming evidence that prior anomalies/explosions have resulted in extensive damage to the sensitive tidal flat habitat that protected migratory birds, including ESA-listed species, rely on. *See* FAA00010609 (FWS noting that "debris that has fallen onto the Refuge has damaged sensitive wind tidal flats"); FAA00051015 (FWS stating "[t]here is documented evidence that the debris and its removal has impacted and scarred various habitats in the area, including tidal flats which are foraging habitat for the threatened piping plover and red knot"); FAA00046054 (TPWD noting "significant secondary and cumulative impacts" from prior anomalies); FAA00010609 (FWS noting that debris removal creates rutting and damage that interrupts tidal water sheet flow across these flats); FAA00014247 (TPWD observing that "[p]ast anomalies demonstrate that debris lands on surrounding conservation lands, including sensitive aquatic habitats," which can "adversely affect" the functions and values of the tidal flat habitat); FAA00014247-48 ("Because such impacts have actually occurred on conservation lands located within the vicinity of the project, it would seem both logical and appropriate for FAA to base its evaluation of potential future anomalies on measurable effects that have yet to be restored."); FAA00043885 ("previous anomalies have resulted in the spreading of debris and other impacts to surrounding lands, including the [Wildlife Refuge]."); FAA00014244 ("Damages [from anomalies] are thus objectively demonstrable and should be considered certainly possible in the future given the nature of past debris fields."); FAA00046294 (TPWD commenting that "[d]ebris removal activities associated with recent anomalies have resulted in the compaction, rutting, trenching, and trampling of algal flats and other special aquatic sites located within public park and refuge lands, designated critical habitat, and cultural resource sites").

Federal Defendants' contention (at 23) that TPWD and FWS ultimately concurred in the FAA's determination that the impacts from debris and debris recovery efforts would be insignificant is incorrect. Federal Defendants cite to the FAA's own Mitigated FONSI/ROD for that proposition (at FAA00010302),[7] which asserts that FWS and TPWD concurred that impacts from debris and debris recovery would be *de minimis*; however, that statement relies on the PEA Appendix E, which contains the FWS and TPWD concurrence letters under what is referred to as Section 4(f) of the U.S. Department of Transportation Act (which provides for consideration of impacts to park and recreation lands, wildlife and waterfowl refuges, and historic sites during transportation project development),[8] and those letters do *not* state that the agencies agreed that the *impacts* from debris and debris recovery would be *de minimis*, but only that the *temporary occupancy* of the 4(f) properties resulting from debris landing on the Refuge lands and debris recovery efforts would be *de minimis*. *See* FAA00012258 (stating that TPWD concurred with the determination that if an anomaly occurs that involves debris and debris-response activities within TPWD-owned lands, such an event would result in a *de minimis* temporary occupancy of the park); FAA00012285-86 (FWS concurring in the finding of a "*de minimis* temporary physical occupanc[y] of the Refuge" from debris).

Importantly, "*de minimis*" is a term of art under the Section 4(f) analysis specific to whether an activity would constitute a "use" of the protected property through temporary occupancy. *See Friends of the Capital Crescent Trail v. Fed. Transit Admin.*, 255 F. Supp. 3d 60,

---

[7] Federal Defendants (at 23) also confusingly cite to FAA-74900-01, but that contains only confidential "aerodynamic data" and is thus irrelevant.

[8] The text of Section 4(f) has now been codified at both 23 U.S.C. § 138 and 49 U.S.C. § 303. The name "Section 4(f)" is no longer indicative of the provision's location, but the term is so widely recognized that it continues to be used to avoid needless confusion. *See* 23 C.F.R. 771.107(e).

71 (D.D.C. 2017). That is *not* equivalent to a determination under NEPA that there would be no significant impacts, allowing the FAA to avoid an EIS. The two statutes have a different focus and are not interchangeable. *See Citizens against Burlington, Inc. v. Busey,* 938 F.2d 190, 204 (D.C. Cir. 1991) (stating that agencies "should bear in mind the differences between NEPA and the Transportation Act"). Pursuant to the Transportation Act, activities affecting public lands may move forward if there "is no feasible and prudent alternative to the use" and "includes all possible planning to minimize harm. . . ." 23 U.S.C. § 138(a). But including all possible planning to minimize harm does *not* ensure that the resulting impacts will be insignificant for purposes of NEPA to support a mitigated FONSI. Therefore, while TPWD and FWS concurred that, for the purposes of the Transportation Act, the presence of debris and debris recovery activities would result in a *de minimis* temporary occupancy of the 4(f) property with the implementation of some basic mitigation measures (none of which can prevent harm to the tidal flat habitat from anomalies), they did *not* concur that the impacts of anomalies would be insignificant for NEPA purposes, and indeed repeatedly stated otherwise. *See* Pls. Br. at 35-40; FAA00014247 ("Past anomalies demonstrate that debris land[ing] on surrounding conservation lands, including sensitive aquatic habitats," can "adversely affect" the functions and values of the tidal flat habitat). The expert agencies *never* concurred that the actual impacts associated with debris and debris recovery would be rendered insignificant through the proposed mitigation, and Federal Defendants' contention that they did so is unfounded.

Moreover, it is readily apparent from the record that the significant impacts associated with debris and debris removal efforts from anomalies/explosions *cannot possibly be mitigated* such that the FAA could reasonably find that an EIS is not required. SpaceX and Federal Defendants make much of the proposed mitigation, which includes requirements to restore

affected areas, including measures set forth in a Memorandum of Agreement (MOA) with

TPWD concerning protocol for responding to anomalies. *See* SpaceX Br. at 40; Fed. Def. Br. at

22.[9] But neither SpaceX nor Federal Defendants address the fact that the expert agencies made

clear that restoration of the tidal flat habitat has never been shown even to be possible, much less

carried out on the ground. As set forth in detail in Plaintiffs' opening brief, FWS, TPWD, and

EPA all made clear that such restoration is unproven, and that tidal flat damage "cannot be

satisfactorily mitigated." FWS00014248-49; *see* Pls. Br. at 41-42.

Indeed, even the MOA that SpaceX (at 21, 40) relies on actually *confirms* that the

significant impacts of anomalies cannot be fully addressed through mitigation because, as the

MOA states, "such restoration efforts are yet unproven," and that while the parties agreed to

make efforts to offset the long-term impacts of an anomaly, the MOA made clear that there is no

assurance that appropriate compensation is available. *See* FAA00007574. The MOA therefore

*reinforces* that the parties are relying on "untested" restoration efforts to address anticipated

impacts to sensitive algal flat habitat, and that there is a likelihood that such efforts will "prove

impractical" or will "not result[] in demonstrable recovery" of the habitat, requiring the parties to

come together to agree to "other means of compensating TPWD for loss of fish, wildlife and

recreation values resulting from damages to the state park." FAA00007576. This cannot be relied

upon to find that the impacts have been rendered insignificant. The total failure of SpaceX and

Federal Defendants to address the record evidence pertaining to the demonstrably inadequate

---

[9] SpaceX (at 17-18) asserts that Plaintiffs have taken the position that the FAA must implement preventative mitigation measures rather than restorative mitigation, and argue that restorative mitigation is sufficient. Not so. Rather, Plaintiffs merely note that *there is no preventative mitigation for anomalies*, and therefore the only way to support a FONSI is if restorative mitigation can reduce the impacts to a minimum. As set forth herein, the proposed restorative mitigation cannot possibly support a FONSI.

mitigation for harm to sensitive tidal flats from anomalies is fatal to their arguments and should

leave the Court with no doubt that the mitigated FONSI was arbitrary and capricious, since the

impacts of anomalies have not, and could not be, reduced to a "minimum." *Idaho*, 35 F.3d at 595.

Further, the fact that adaptive management has been upheld as a basis for a FONSI is

inapposite, *contra* SpaceX Br. at 18, since as discussed above, there is no basis to conclude that

adaptive management can *ever* successfully remediate the harm to sensitive tidal flat habitat. So,

while the FAA can have SpaceX *attempt* to remediate harm to tidal flats and revisit such efforts

when they prove insufficient, this merely creates the potential for a never-ending Sisyphean loop

of repetitive mitigation efforts that may never prove sufficient. *See e.g.,* FAA00052626-27

(stating that SpaceX will develop protocols for restoration of tidal flats, and if such restoration is

determined to be unsuccessful, it would need to repeat the measures); FAA00014243 (TPWD

stating it is not aware of *any* algal flat restoration projects with documented success in Texas and

"[a]ny proposal to restore algal flats at this site would be considered experimental and the

probability of success would be unknown"). Again, this cannot lawfully be relied on to render

the demonstrated impacts of anomalies insignificant.

In sum, the record clearly establishes that the FAA knew that anomalies were likely to

occur; the history of anomalies at Boca Chica confirms that significant harm to sensitive tidal

flats results from such events; and the expert agencies confirmed that such harm cannot possibly

be addressed through mitigation to a degree that the harm can no longer be considered

significant. The FAA's mitigated FONSI was therefore arbitrary and capricious.

### E.  Harm to Refuge resources from closures requires an EIS.

The record is replete with statements from TPWD and FWS that establish beyond any

doubt that the access closures associated with SpaceX's activities have a significant impact on

the neighboring wildlife Refuge and other protected lands, including on the ability of Refuge managers to manage public lands and to conduct essential research and manage Refuge resources. *See* Pls. Br. at 29-33; FAA00056934-35 (FWS discussing how closures "*severely impact*[]" public use and wildlife resources, and "*severely impair*" the ability of FWS to manage Refuge lands) (emphasis added); FAA00010609 ("Frequent closures caused by SpaceX activities are *already substantially impairing* both the Refuge's ability to adequately manage the Refuge and the public's enjoyment of the Boca Chica Beach area for wildlife-dependent recreation.") (emphasis added); FAA00044991-92 (FWS stating that closures impede access to monitor species and described the closures as "excessive"); FAA00013295 (FWS stating that the closures "affect the folks surveying for sea turtles on the beach," and that piping plover researchers are affected by such closures); FAA00051014-15 (stating that "[t]here are both *'adverse'* and *'severe'* impacts to Refuge public use, management, wildlife, and habitat from the SpaceX activities," and that features and attributes of the Refuge "will [continue to] be substantially impaired by increased closures") (emphasis in original); FAA00010609 (FWS sating that the Starship/Superheavy Launch Program "will only exacerbate the levels of impairment of Refuge properties"); FAA00046281 (TPWD noting that "[t]hese [access] restrictions result in actual, measurable impacts"). As TPWD stated, the impacts of the closures "are *significant as that term is defined by NEPA.*" FAA00051015 (emphasis added).

Plaintiffs established that the FAA clearly failed to take the requisite "hard look" at the impacts of closures due to the FAA's unsupported assumption that there would be only 500 hours per year of access closures. Pls. Br. at 31-32. The record simply does not support that conclusion, given statement from FWS and TPWD that this was an "unrealistic" assumption, FAA00045955, and a "gross misstatement" of what will actually occur, FAA00045959;

FAA00046282-83. Indeed, the expert agencies stated that over 1,000 hours of closures were likely to occur. *See e.g.*, FAA00051015. Therefore, the consideration of impacts from closures was based on a faulty premise, which renders the analysis arbitrary because the FAA could not possibly have taken the "hard look" NEPA requires where its assumptions were so wildly inaccurate. *N.J. Conservation Found.*, 111 F.4th at 54 (An agency has only taken the requisite "hard look" if the analysis "contains sufficient discussion of the relevant issues and opposing viewpoints, and . . . the agency's decision is fully informed and well considered").

Federal Defendants' attempts to defend the assumptions in the PEA are unavailing. They focus on the supposed "methodology" that was used to calculate closures and argue that Plaintiffs' argument must fail because they have not suggested an alternative methodology that would have been more precise. Fed Def. Br. at 32. That is a straw man. Plaintiffs' obligation in this APA case is to demonstrate that the agency's finding is unsupported by the record evidence, not to do the agency's job for it. *See State Farm*, 463 U.S. at 52 (agency must offer a "rational connection between the facts found and the choice made") (citation omitted). Here, the record not only lacks support for FAA's assumptions, but establishes that the agency's conclusion regarding the number of closure hours is wildly inconsistent with reality, as evidenced by the statements made by the expert agencies.

Moreover, the FAA did not in fact employ *any* methodology to calculate the number of closure hours, and it fails to describe any such methodology in the PEA or in its briefing. Rather, it is readily apparent that the FAA merely blindly accepted SpaceX's unsupported assertions regarding the projected number of closure hours, which in and of itself was arbitrary and capricious. *See Sierra Club v. U.S. Army Corps of Eng.*, 701 F.2d 1011, 1031 (2d Cir. 1983) (rejecting the "cavalier manner" in which the agency had reached its conclusion and its failure to

make an independent evaluation in light of other agencies' pointed comments). Since no methodology was employed, there is no such methodology to attack, and therefore Federal Defendants' arguments are a baseless red herring intended to distract the Court from the truth: that the assumption made by the FAA regarding closure hours was unrealistic and baseless, and therefore the resulting analysis was arbitrary and capricious.

Regardless, it is readily apparent that the impacts on Refuge resources from closures described by the expert agencies cannot possibly be rendered sufficiently minimal or insignificant through the proposed mitigation to support a mitigated FONSI. The PEA fails entirely to provide *any* evidence, much less the "substantial evidence" that a mitigated FONSI requires, that the proposed mitigation—such as access restriction protocols for notifications, hiring an employee to assist with coordinating between FWS and SpaceX, and allowing researchers access to lands when practicable[10]—could possibly address the "excessive" and "substantial impairment" from closures identified by TPWD and FWS to the features and attributes of the Refuge and the ability to manage refuge resources and provide for wildlife-dependent recreation. While the proposed mitigation measures may alleviate *some* of the impacts of closures on the refuge resources, the FAA failed to show how they could possibly reduce the significant impacts of closures identified by the expert agencies to a "minimum." *See Gov't of the Province of Manitoba,* 398 F. Supp. 2d at 65 ("[A] mitigated FONSI fulfills NEPA's requirements when it 'completely compensates for any possible adverse environmental impacts stemming from the original proposal' or reduces the possibility to a minimum.")*.*

---

[10] *See* Fed. Def. Br. at 41 (listing the mitigation purportedly addressing access restriction impacts on refuge lands).

SpaceX (at 37) and the Federal Defendants (at 43) repeat their inaccurate characterization of record evidence from FWS and TPWD, arguing that those agencies concurred that the overall impacts of closures would be *de minimis*. Again, the documents that SpaceX and Federal Defendants rely on provide TPWD's and FWS's concurrence on the Department of Transportation Act 4(f) determination; however, they *only* concur that the *temporary occupancy* of the 4(f) properties from debris landing on the Refuge lands and debris recovery efforts would be *de minimis*. *See* FAA00052626 (stating that TPWD concurs with the determination that if an anomaly occurs that involves debris and debris-response activities within TPWD-owned lands, such an event would result in a *de minimis* temporary occupancy of the park); FAA00052629-30 (FWS concurring in the finding of a "*de minimis* temporary physical occupanc[y] of the Refuge" from debris). The agencies did *not* concur that the full range of impacts that they had identified— such as the "substantial[] impair[ment]" to "the Refuge's ability to adequately manage the Refuge," FAA00010609, or the "*'adverse'* and *'severe'* impacts to Refuge public use, management, wildlife, and habitat" associated with closures, FAA00051014-15—have been rendered *de minimis* through mitigation measures.

Rather, the record shows that while the FAA did work with TPWD and FWS to address some of their concerns, it does not provide substantial evidence to support the contention that the proposed mitigation fully minimized the "substantial impairment" identified by the expert agencies from closures. The mitigated FONSI was therefore arbitrary and capricious.

### F. Harm to the Tribe from closures requires an EIS.

As explained in Plaintiffs' opening brief, the FAA failed to consider the significant impacts of SpaceX's activities on the Carrizo/Comecrudo Tribe. Contrary to the assertion made by Federal Defendants (at 30), the record *does* in fact show that the FAA was made aware that

the access restrictions for SpaceX's activities impede the ability of members of the Tribe from visiting sacred areas to hold their traditional cultural ceremonies. *See e.g.,* FAA00004088-90 (Group comment letter—including the Tribe—discussing the impacts of closures on areas of "cultural significance" to the Tribe that are "extremely important sacred cultural, ancestral, and historic site[s]"); FAA00003260 (comment letter from Tribal member discussing the "sacred sites" of Boca Chica and how access closures "restrict indigenous access to these sites and sacred lands").

Federal Defendants attempt to sidestep the fact that the PEA never addresses this issue by pointing to the FAA's effort to identify and protect archaeological resources, suggesting that the FAA thereby considered impacts to the Tribe. Fed. Def. Br. at 30. However, that is yet another red herring, since archaeological inventories cannot address the significant impacts to the Tribe's interests from hundreds of hours of closures that impede their ability to access sacred lands, a clearly significant impact. *See Standing Rock Sioux Tribe*, 985 F.3d at 1050 (where impacts will occur in "a place of extraordinary importance to the Tribes," and in a "landscape of profound cultural importance," that context "weighs in favor of requiring an EIS").

The fact that the FAA apparently attempted to contact the Tribe in March of 2022—well after the draft PEA was released—is therefore immaterial. Fed. Def. Br. at 31. In fact, the FAA's supposed efforts to work with the Tribe are contradicted by the Advisory Council on Historic Preservation, which told the FAA that it could not possibly have made a "good faith effort to identify all potential consulting parties . . . given that one Indian tribe (the Carrizo/Comecrudo Tribe of Texas), was identified and invited to participate so late in the process." FAA00048785;

*see also* FAA00003260 (comment from Tribal member discussing lack of consultation with the Tribe).[11]

In any case, Federal Defendants cannot escape the dearth of *any* discussion in the PEA regarding the impacts of closures on the Tribe, even though the issue was brought to the agency's attention through comments. There is no recognition in the PEA that the members of the Tribe are hindered from visiting areas they consider to be sacred, and no mitigation or process for working with the Tribe to avoid conflicts from closures. Defendants have simply provided no argument that this significant impact has been addressed or resolved in any way. Thus, the FAA failed to take a "hard look" at this issue, and an EIS is required.

### G.  The Impacts to wildlife from lighting requires an EIS.

As set forth in Plaintiffs' opening brief, the record—including numerous statements from the expert wildlife agencies—shows that lighting from the SpaceX facility has significant environmental impacts, including by causing harassment and harm to protected wildlife. *See* Pls. Br. at 19-20. [12] Defendants now contend that lighting will not cause any significant harm because there is no evidence that protected birds, such as plovers, have been affected by lighting; that ocelots are not impacted because they no longer inhabit the area; that sea turtles are not impacted because a non-profit collects their eggs; and that any impacts from lighting are addressed by the SpaceX Lighting Management Plan. *See* Fed. Def. Br. at 14-19. However, none of these arguments undermine the fact that the expert wildlife agencies made clear that lighting has

---

[11] The FAA's assertion is also contradicted by the sworn declaration of Mr. Mancias, ECF No. 45-2 at 5.

[12] It is important to note that the FAA does not claim to have any expertise regarding impacts to wildlife, and therefore its determinations regarding harm to wildlife are not deserving of any deference, particularly where they conflict with the statements made by the actual expert agencies such as TPWD, FWS, and EPA.

caused, and would continue to cause, significant harm, and that the purported mitigation measures were insufficient to address such harm. *See* Pls. Br. at 23-26.

With regard to impacts to specific species, Federal Defendants' arguments ignore several key factors. First, Federal Defendants and SpaceX are incorrect that lighting has not already caused harm to the plover population that relies on the Boca Chica area's designated critical habitat. While one study—commissioned by SpaceX itself—found that the plover population has not been affected, Fed. Def. Br. at 18, FWS explained that other surveys *did* show a decline in plovers coinciding with the major buildout and testing of SpaceX infrastructure from 2019-2021, which indicates that SpaceX has "negatively impacted the threatened piping plover and other non-listed shorebirds beyond the applicant's property boundaries." FAA00043854. Indeed, a study by Newstead et. al., showed that in years when launches occurred, there was a "significant and negative" impact on the population of plovers at Boca Chica, and that "the number of birds recruiting into the area decreased during the two years when launch operations were occurring frequently." FAA00049050.[13] Thus, there remains, at the very least, significant uncertainty regarding the impacts of SpaceX's activities on the plover population, and the FAA could not reasonably conclude that no impacts were occurring. *See National Parks Conservation Association,* 916 F.3d at 1083-85 (where substantial questions about impacts remain, an EIS is required).

Second, with regard to FAA's reliance on patrols and surveys to locate sea turtle nests and remove the eggs for hatching in a facility, the argument that this removes any source of

---

[13] *See also* FAA00051514 (comment letter from Coastal Bend Bays and Estuaries Program—which conducted much of the plover monitoring for FWS—stating that studies show a decline in plovers consistent with the major buildout and testing of SpaceX infrastructure, rocket components, and Starship prototypes from 2019-2021, indicating that SpaceX's activities have had negative impacts to wildlife well beyond the applicant's property boundaries).

significant harm is directly undermined by TPWD, which explicitly stated that this does "not justify the use of nighttime lighting during construction and operation activities," which the FAA has allowed, as it still poses a threat to Kemp's Ridley sea turtles, the most highly endangered species of sea turtle in the world. FAA00014247.

Third, the fact that ocelots have not been seen in the area in recent years is not a reason to ignore the impacts to this highly imperiled species from lighting, since it is more than likely that they are no longer using this area as a wildlife corridor specifically *because* of the impacts from SpaceX's activities. Therefore, in order to take a "hard look" at the impacts of lighting, the FAA should have assessed how the ongoing loss of this area as a travel corridor for ocelots affects the species, since it was historically used by one of only two remaining ocelot populations in the U.S. that is "the only breeding population occurring on a US federal or state refuge." FAA00056841; FAA00056835. Thus, that they have been deterred from using the site by SpaceX provides no basis for ignoring the significant impacts of lighting associated with the proposed Starship/Superheavy Launch Program on ocelots.

Furthermore, the FAA's reliance on SpaceX implementing the Lighting Management Plan to avoid the significant impacts of lighting was arbitrary and capricious, since that Plan had not been implemented at the time the PEA was issued, the agency had no basis for concluding that SpaceX would implement the plan in the future, or that the ongoing and continuous impacts from lighting would ever be sufficiently addressed. *See* FAA00046068 (TPWD stating that it "continues to be concerned with the wildlife impacts created by continuous noise and lighting associated with the project area," which "can disrupt ecosystems and alter organisms' behavior and physiology"); FAA00047163 (TPWD stating that night lighting appears to be a "permanent component of operations"). As TPWD explained, SpaceX never even fully implemented the prior

lighting plan, so impacts to wildlife from lighting have been ongoing. FAA0001420.[14] As TPWD found, SpaceX failed to comply with several of the basic avoidance and minimization measures set forth in the 2014 EIS and ROD for the Boca Chica Launch Site, including avoiding lateral light spread and uplighting. FAA00051074. TPWD further noted that while the FAA required similar avoidance and minimization measures in the 2014 EIS to reduce impacts to such resources, including special-status species (*see* FAA00009297), "several of the avoidance and minimization measures associated with the 2014 EIS and ROD have not been fully implemented," including mitigation for impacts from lighting. FAA00046057. *See also* FAA00046285 (noting the "the lack of implementation of mitigation" measures from the 2014 EIS, and that the historical lack of compliance by SpaceX "is relevant to evaluating future authorizations").

Thus, the FAA's reliance on SpaceX implementing the lighting plan to ensure the impacts of the Starship/Superheavy Launch Program would be rendered insignificant for purposes of NEPA was arbitrary and capricious. As the D.C. Circuit Court explained in *Standing Rock Sioux Tribe*, 985 F.3d at 1047, an agency's decision that ignores an operator's past failures is not entitled to deference. There, the court was considering the Army Corps' decision to ignore data regarding the safety of a pipeline operator, but notably the court used the FAA as an example: "it would be strange indeed if we were to defer to the Federal Aviation Administration's decision to renew the operating certificate of an airline with an extremely poor safety record on the basis that the airline industry, on average, is safe." *Id.* The same applies here, where it was clearly arbitrary

---

[14] For example, TWPD noted that the prior lighting plan called for downward directed lighting, but the livestream of the site "shows one or more large construction floodlights directed laterally or upward and occasionally vehicle headlight are directed laterally into refuge/state owned land for long periods of time (i.e., multiple hours)." FAA00047166.

and capricious for the FAA to ignore SpaceX's record of failing to implement measures to protect wildlife from lighting. *See Am. Rivers & Ala. Rivers All.*, 895 F.3d at 53 (Holding that an agency violates NEPA when it fails to take into account prior violations and concerns expressed by expert agencies when licensing an activity, and it was "irrational" to rely on mitigation measures to ignore known environmental impacts that are likely to recur).

Thus, the FAA could not reasonably determine that the significant adverse impacts of lighting would be sufficiently minimized to support a mitigated FONSI, and the FAA's failure to produce an EIS was arbitrary and capricious.

### H.  The impacts to wildlife from noise requires an EIS.

There can be no serious debate that noise from SpaceX activities has a significant impact on the surrounding wildlife habitat, which includes Wildlife Refuge lands that provide ecologically critical habitat to protected migratory birds, including species protected under the ESA and MBTA. In fact, the 2014 EIS for SpaceX's proposed Falcon rocket program at Boca Chica specifically determined that noise from SpaceX's activities has a significant impact on the surrounding areas—including to the surrounding parks and the National Wildlife Refuge, which is considered a "sensitive noise receptor." FAA00009282. Thus, the FAA *already determined* that the impacts of noise from SpaceX's activities are significant. Indeed, the 2014 EIS specifically stated that SpaceX's activities "would significantly impact land use compatibility as a result of increased noise during launches," which therefore required an EIS. FAA00009290. Federal Defendants (at 7) even acknowledge that the "2014 EIS determined, in relevant part, that unavoidable adverse effects would result from noise impacts, impacts to visual resources, and impacts to habitats, among others." And since the Starship/Superheavy rockets are more powerful and thus louder than the Falcon rockets, the impacts at issue here are even greater than

31

what was analyzed in 2014. Thus, the FAA was well-aware that noise from the proposed activities would have significant impacts, particularly given statements in the record from the expert agencies regarding the ongoing and continuous impacts of noise on wildlife, which "can disrupt ecosystems and alter organisms' behavior and physiology." FAA00046068; Pls. Br. at 21-22.

Plaintiffs have not argued that noise impacts can *never* be mitigated, *contra* Fed. Def. Br. at 34. There are certainly circumstances where noise impacts can be alleviated, such as the cases that Federal Defendants rely on, *Japanese Vill., LLC v. Fed. Transit Admin.*, 843 F.3d 445, 459 (9th Cir. 2016), and *City of Bridgeton v. F.A.A.*, 212 F.3d 448, 459 (8th Cir. 2000), where noise impacts to homes from trains or planes could be addressed through engineering changes or noise barriers and insulation. But that is not the case here. Rather, for the proposed rocket launches taking place directly adjacent to ecologically critical habitat and Wildlife Refuge lands, there is no engineering or physical mechanism that could possibly reduce or otherwise mitigate the noise, and no such mitigation has been proposed. The only measures Federal Defendants are able to refer to pertain to noise from generators and a vibration monitoring plan along with launch notifications. *See* Fed. Def. Br. at 34. But none of those measures address the significant impact that rocket launch noise has on the surrounding habitat, which has *already* been acknowledged by the FAA as a significant environmental impact pursuant to the 2014 EIS.

Therefore, despite Federal Defendants' attempt to make comparisons to the studies done at Cape Canaveral and Vandenberg Space Force Base[15]—which concerned smaller rockets,

---

[15] Federal Defendants' reliance on the study of plovers at Vandenberg Air Force Base is specious, since while that study may be referenced in the record (as Federal Defendants state at 18), it is not actually discussed in the PEA and therefore the reliance on it now is post hoc reasoning. *See Clean Wis. V. EPA.*, 964 F.3d 1145, 1161 (D.C. Cir. 2020) (courts may not rely on post

habitat further from the launch pad, and different bird species—it cannot escape the fact that, consistent with the 2014 EIS and statements in the record from the expert wildlife agencies, noise from SpaceX's activities clearly has significant impacts on wildlife that have not been, and cannot be, mitigated. Nor is it relevant that some noise from ongoing SpaceX production, manufacturing, or other testing/launch activities would continue even under the "no action" alternative, *see* SpaceX Br. at 18-19; Fed. Def. Br. at 9-10, 13, since those activities produce much less noise and/or are no longer being pursued by SpaceX because permits have or will expire soon. *See* Fed. Def. Br. at 9 (license for prototype launches expired in 2023); SpaceX Br. at 19 (noting the license for the Falcon rockets, which SpaceX has never launched from Boca Chica, expires in 2025). Rather, at issue here is the extraordinarily loud noise from the proposed Starship/Superheavy launches and the proposal for a new 5-year launch program, and therefore the supposed "baseline" created by other noise sources is not relevant.

As in 2014, an EIS is required to fully analyze the impacts of noise on wildlife from the proposed launch activities, as NEPA requires.

> **I. The FAA failed to take the requisite hard look at the impacts of noise on the community, which requires an EIS.**

As Plaintiffs explained, the Noise Study included with the PEA indicates that homes in Port Isabel and South Padre Island are likely to be harmed by noise associated with SpaceX's activities, which is a significant impact requiring further analysis in an EIS. SpaceX (at 31-32) spends much of its response presenting irrelevant information about OSHA noise limits and noise-induced hearing loss. However, as Federal Defendants acknowledge, according to the Noise Study included with the PEA, structural damage can be expected to occur at exposure over

---

hoc rationalizations and agency action "must be upheld, if at all, on the basis articulated by the agency itself") (citing *State Farm*, 463 U.S. at 50).

111 dB (1 damage claim per 1,000 households) and 120 dB (1 damage claim per 100 households), and the 120 dB contour includes Port Isabel and South Padre Island. *See* Fed Def. Br. at 20 n. 10 (noting the 120 dB extends north of Port Isabel and South Padre Island). That area incorporates many homes and businesses, and thus damage is expected to occur. *See* FAA00011418 ("Noise sensitive areas within Port Isabel and South Padre Island include schools, churches, cemeteries, and residences, among other receptors typically seen in urban areas.").

The FAA's conclusion that "no structural damage or significant impact to third-party structures is expected from launch operations," FAA00011423, is simply not supported by the Noise Study. Indeed, the FAA provided no analysis of the actual number of homes in the area, what condition they are in, and how the community would therefore be impacted, and thus did not take the "hard look" that NEPA requires. Federal Defendants' attempt to reframe this as Plaintiffs merely arguing that more mitigation is required, Fed. Def. Br. at 20-21, is misplaced. Rather, this is a clearcut case of a potentially significant impact that has not been thoroughly analyzed, as NEPA requires. *See Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004) (the agency must take a hard look at the environmental consequences of its decision).

SpaceX's claim (at 32) that Plaintiffs merely "dispute" the studies regarding harm to structures from noise is mistaken. Indeed, the study that SpaceX relies on, Guest and Slone, "did not characterize damage." FAA00011423–24 (PEA at 61–62); FAA00011443 (PEA at 81). Therefore, the FAA did not base its analysis on actual studies concerning rockets similar to the Starship/Superheavy rocket, but rather on assumptions that are not supported by those studies. Regardless, the PEA itself acknowledges not only that "it is possible there could be damage claims for structures in the 111 dB and 120 dB contours," but that "[b]uildings that are in a poor

state of repair will tend to be more vulnerable to the possibility of damage arising from vibration." *Id*. However, the PEA only addresses this within the context of historic structures, FAA00011443 (PEA at 81), and does not provide *any* analysis of whether/how many homes in Port Isabel or South Padre Island are in a "poor state of repair," and thus at risk of damage. Thus, it fails to provide the hard look NEPA requires.

In sum, SpaceX's own noise study shows that harm to structures is likely to occur, which is evidenced by the need for a $500 million per launch insurance policy to address such harm. The fact that at the time of the PEA the FAA and SpaceX had not received any complaints or claims of structural damage from SpaceX's activities, SpaceX Br. at 33, is inapposite, since SpaceX had not yet begun launching the larger Starship/Superheavy rockets, which create noise well in excess of prior testing and launch activities. The failure to fully address noise impacts on the community renders the PEA arbitrary and capricious, and the potential for significant harm requires a full analysis of noise impacts in an EIS.

## II.    The Commercial Space Launch Act does not limit the FAA's NEPA responsibilities.

SpaceX has attempted to concoct a conflict between the Commercial Space Launch Act (CSLA) and NEPA to suggest that the FAA need not ever comply with NEPA—or, at least, not ever be required to prepare an EIS—when issuing a license for a commercial space launch. Those arguments, premised on the Supreme Court's rulings in *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004) and *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla,* 426 U.S. 776 (1976), are misplaced and must fail. Congress gave the FAA broad authority over its review of launch licenses under the CSLA, and there is no conflict with NEPA that could warrant this Court to find that the agency lacked the authority to comply with the express requirements of NEPA.

To begin with, this novel argument—raised only by the Intervenor, SpaceX, for the first time in this litigation—is *not* the position that was taken by the federal agency when it reviewed the proposed Starship/Superheavy Launch Program. The PEA contains no language asserting that the FAA considers itself constrained by the CSLA in reviewing the proposed activities pursuant to NEPA, nor did the FAA ever in any way suggest that it was going beyond its NEPA duties in analyzing the environmental impacts of the Launch Program, as SpaceX now asserts. SpaceX's arguments for limited or even no NEPA review for launch licenses are therefore impermissible post hoc rationalizations. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020) (arguments are limited to the agency's original reasons, and may not be upheld on the basis of impermissible *post hoc* rationalization proffered in litigation) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)); *Mozilla Corp. v. FCC*, 940 F.3d 1, 62 (D.C. Cir. 2019) (courts may not accept counsel's *post hoc* rationalization for agency action because longstanding Supreme Court precedent "requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself") (citations omitted)). Indeed, such *post hoc* rationalization would be unacceptable if made by the agency itself, *id.*, much less counsel for the non-agency intervenor. And, as a practical matter, SpaceX's arguments suggest that it should be allowed to inflict massive harm on the surrounding environment without any need even to study the impacts under NEPA, let alone adopt *any* mitigation for the damage they cause. That is clearly not what Congress intended in enacting NEPA. *See Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Com.,* 449 F.2d 1109, 1112-15 (D.C. Cir. 1971) (noting that NEPA makes environmental protection a part of the mandate of every federal agency given it must be complied with to the "fullest extent possible"); 42 U.S.C. § 4332.

Rather, the FAA conceded that NEPA applies here, that an EIS would be warranted if the Launch Program would result in significant environmental impacts, and Federal Defendants have defended the FAA's decision to issue a mitigated FONSI based on the NEPA analysis provided in the PEA. Because SpaceX's rationale is not the one proffered by the agency—and, moreover, is irreconcilable with it— it should be disregarded as a matter of elementary administrative law. "It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50. Indeed, SpaceX's position is also directly contradicted by the FAA's NEPA review for SpaceX's activities in 2014, which determined that the use of the Boca Chica launch site for testing and launching rockets results in unavoidable and significant impacts requiring an EIS, FAA00046057, confirming that the FAA is well-aware that it has a duty to comply with NEPA to its full extent when considering applications for launch programs. Consequently, SpaceX's justification for truncating or avoiding NEPA review entirely must be disregarded by the Court. *Id.*; *see also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("emphasiz[ing] a simple but fundamental rule of administrative law . . . that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.").

But even if the Court were to consider SpaceX's argument, it should be rejected as inconsistent with the relevant case law and the plain language of the CSLA and implementing regulations. First, SpaceX's argument that the CSLA constrains the FAA's discretion is misplaced. The CSLA simply does not present the same limiting language as the cases that SpaceX relies on, wherein courts found that NEPA review was constrained because the agencies lacked discretion over particular actions under the governing statute. For example, in *Public Citizen*, the Supreme Court ruled that the Federal Motor Carrier Safety Administration (FMSCA)

37

did not violate NEPA when it did not consider the environmental effect of the increase in cross-border operations of Mexican motor carriers in its Environmental Assessment because the President, not FMCSA, retained the discretion to authorize (or not) cross-border operations from Mexican motor carriers (and the President is not an "agency" subject to NEPA). Because FMCSA had no discretion to prevent the entry of Mexican trucks, and NEPA's purpose is to inform agency discretion, the agency's EA did not need to consider the environmental effects arising from the entry of such trucks into the country. *Pub. Citizen*, 541 U.S. at 770. Similarly, in *Citizens Against Rails-to-Trails*, the statute at issue (the Trails Act) stated that if a qualified trail sponsor submits a statement of willingness and a railroad is willing to negotiate a trail use agreement, the Board "shall" approve the agreement, which rendered the Board's role as entirely "ministerial." *Citizens Against Rails-to-Trails v. Surface Transp. Bd.,* 267 F.3d 1144, 1150-51 (D.C. Cir. 2001). In those cases, there were clear statutory limitations on the lead agency's discretion that restricted their authority to address effects of particular proposed actions.

In contrast, the CSLA does not contain any such specific, limiting language that curtails the FAA's discretion in issuing launch licenses to narrow concerns, and, as the FAA itself has recognized, its FAA's role in ensuring the safety of rocket launches is certainly more than "ministerial." Rather, while the CSLA does use the words "shall issue," it does so in the context of *extensive* agency discretion, providing that the FAA must consider concerns over "public health and safety, safety of property, and national security and foreign policy interests of the United States." 51 U.S.C. § 50901(a)(7). This broad mandate is plainly distinct from the narrow statutory provisions at issue in *Public Citizen* and *Citizens Against Rails-to-Trails*. Thus, Congress has not proscribed a limited role for the FAA that in any way suggest that the agency

has "no discretion" to take the environmental effects of commercial space launches into consideration in its decision making.

Indeed, the CSLA mandate to consider the "public health and safety" and the "safety of property" when issuing launch licenses is *consistent* with NEPA's statutory language. *See* 42 U.S.C. § 4321 ("To declare a national policy which will . . .  stimulate the health and welfare of man); 42 U.S.C. § 4331 ("[T]o the end that the Nation may . . . assure for all Americans safe, healthful . . . surroundings; attain the widest range of beneficial uses of the environment without . . . risk to health or safety); *see also Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 18 (D.D.C. 2009) ("Public safety and protection of natural resources are indisputably encompassed within the definition of 'environmental impacts' that must be considered pursuant to NEPA."); *Indian River Cty. v. DOT*, 348 F. Supp. 3d 17, 43 (D.D.C. 2018) ("Under NEPA, an agency must take a 'hard look' at any impact the proposed action may have on 'public health or safety'") (citing *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers,* 255 F. Supp. 3d 101, 123 (D.D.C. 2017)); *RB Jai Alai, LLC v. Sec'y of the Fla. DOT,* 47 F. Supp. 3d 1353, 1362-1363 (M.D. Fla. 2014) ("NEPA's zone of interests can be said to include the environment, quality of life, land use and resource management, economic growth, *and public health and safety.*") (emphasis added). In fact, the FAA's own NEPA implementing rules note that public health and safety are essential considerations for the EIS significance thresholds (*i.e.*, to determine whether an EIS is required), including for various environmental concerns related to the impacts of rocket launch activities. *See* FAA00057667-76 (Order 1050.1F at 4-4 to 4-13).

Moreover, unlike the statutes at issue in the cases SpaceX relies on, here the FAA has been granted by Congress broad authority to prescribe "*any term necessary* to ensure compliance with this chapter," and to impose "*any additional requirement* necessary to protect the public

health and safety, safety of property, national security interests, and foreign policy interests of the United States," which includes environmental considerations. 51 U.S.C. § 50905(b)(2)(A), (B) (emphasis added). And while it allows the FAA to prescribe "by regulation that a requirement of a law of the United States not be a requirement for a license or permit," 51 U.S.C. § 50905(b)(2)(C), the FAA not only chose *not* to exempt launch licenses from NEPA review, but rather reiterated in the implementing regulations that "[t]he FAA is responsible for complying with the procedures and policies of the National Environmental Policy Act (NEPA)," including the need for an EIS where applicable. *See* 14 C.F.R. § 450.47(a), (b). Therefore, no substantive conflict exists between the CSLA and NEPA, and the FAA's discretion is not limited in the manner that SpaceX maintains, which is contrary NEPA's mandate to comply to the "fullest extent possible." *See* 42 U.S.C. § 4332; *Calvert Cliffs,* 449 F.2d at 1112-15.

There is also no "timing conflict" between the CSLA and NEPA, and SpaceX's attempt to invent one is inconsistent with settled case law and the FAA's regulations governing launch license applications. While the CSLA has a 180-day timeframe for licensing decisions,[16] that provides no basis for avoiding or constraining NEPA review given that—as SpaceX even acknowledges—the D.C. Circuit has specifically found that a 180-deadline does not create a clear and unavoidable conflict with NEPA. *See Village of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 662–63 (D.C. Cir. 2011). But regardless of even that binding precedent, here there is no timing conflict because the FAA requires the NEPA process to be completed *prior* to the license application being deemed fully submitted. *See* 14 C.F.R. § 450.47(d) ("An application

---

[16] The 180-day timeframe is specific to the FAA's review of an application for an individual launch license, whereas here the FAA was considering an entire 5-year launch program in the PEA, which is specifically intended to be used to support subsequent applications for individual launch licenses by tiering off the PEA. FAA00009983. To apply that same timeframe to the programmatic review of a 5-year launch program at issue here makes no legal or practical sense.

must include an approved FAA Environmental Assessment [or] Environmental Impact Statement…"). Therefore, the 180-day review timeframe specifically does *not* include NEPA review, since the clock does not begin to run until NEPA compliance has concluded.

SpaceX is mistaken that this somehow "flouts" the CSLA's deadlines, and its reliance on *Flint Ridge* is misplaced. SpaceX Br. at 11 n.5. As explained above, the Court in that case emphasized the importance of satisfying the EIS requirement to the "fullest extent possible." Further, in *Flint Ridge*, it was the *respondent* that had suggested that the timing conflict could be avoided if the agency required the NEPA process to be completed prior to the agency's review, 426 U.S. at 791, which the Court found to be inconsistent with the statutory process set forth in the Interstate Land Sales Full Disclosure Act. Here, however, it is the FAA's *own regulations* that specifically require the NEPA process to be complete in order for the CSLA application to be submitted. This is consistent with the broad Congressional authority provided to the FAA over license applications: the CSLA specifically states that FAA may prescribe "regulations establishing criteria for accepting or rejecting an application for a license or permit under this chapter." 51 U.S.C. § 50905(b)(2)(E). Therefore, the regulation at 14 C.F.R. § 450.47(d) is well within the FAA's statutory authority, which undermines SpaceX's erroneous attempt to contrive a timing conflict with NEPA that simply does not exist.

To the extent that SpaceX takes issue with the FAA's regulations and would prefer the 180-day timeframe in the CSLA to include the NEPA process, that is simply not what the plain language of the regulations provides. If SpaceX is displeased with the regulations, it has the option to petition for a change to the FAA's regulations. However, the validity of the regulations is not at issue in this litigation, and SpaceX may not use this as an opportunity to engage in an unwarranted collateral attack on binding regulatory requirements. SpaceX's arguments should

41

therefore be rejected, both because they are contrary to the agency's own position and because they are wrong.

## III.    Remedy

The D.C. Circuit has stated, time and again, that pursuant to the plain language of the APA, 5 U.S.C. § 706(2), vacatur is the presumptive remedy for unlawful agency action, and that remand without vacatur is an "exceptional remedy" that applies only in "limited circumstances." *See Cigar Ass'n of Am. v. United States FDA*, 2025 U.S. App. LEXIS 1585, *12 (D.C. Cir. 2025); *Marin Audubon Soc'y v. FAA*, 121 F.4th 902 (D.C. Cir. 2024). Remand without vacatur is therefore warranted *only* where specific criteria are met pursuant to *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993), which allows the court to weigh the "seriousness" of the agency's error against the "disruptive consequences of vacatur." But as the D.C. Circuit noted in *Marin Audubon*, that weighing of the equities is only warranted where the agency can show "at least a serious possibility" that it will be able to reach the same outcome on remand. *See Marin Audubon,* 121 F.4th at 918.

Here, the FAA's failure to conduct a clearly required EIS is not "curable," and the agency cannot demonstrate a "serious possibility" that it could take the same approach to its NEPA obligations on remand. Thus, the Court need not consider whether any disruptive consequences would result from vacatur within the meaning of *Allied-Signal*. *See also City of Port Isabel v. FERC,* No. 23-1174, 2025 WL 838540 at *2 (D.C. Cir. Mar. 18, 2025) (reaffirming that vacatur is appropriate where there is a "truly 'fundamental' procedural error" such as an agency's decision to proceed with an action "without issuing any environmental impact statement whatsoever").

Regardless, should the Court be inclined to consider the *Allied-Signal* factors, Plaintiffs agree with Federal Defendants that further briefing should be allowed to consider such arguments. However, Plaintiffs note that if the Court determines that the FAA's NEPA analysis violated the APA, the burden would be on SpaceX and Federal Defendants to convince the Court that the default remedy of remand with vacatur should not apply. *See Nat'l Parks Conservation Ass'n v. Semonite,* 422 F. Supp. 3d 92, 99 (D.D.C. 2019) ("Because vacatur is the default remedy, plaintiffs are correct that defendants bear the burden to prove that vacatur is unnecessary."). SpaceX's contention (at 44) that the burden would somehow be on Plaintiffs to show that the factors for a permanent injunction are met confuses the applicable remedy for an APA violation (i.e., vacatur) with injunctive relief that has not been sought by Plaintiffs, and should be disregarded.

## CONCLUSION

For the foregoing reasons and those set forth in Plaintiffs' opening brief, Plaintiffs respectfully requests that the Court grant its motion for summary judgment and deny SpaceX's and Federal Defendants' cross-motion for summary judgment.

April 4, 2025                                          Respectfully submitted,

/s/ Jared Margolis
Jared Margolis (Pro Hac Vice)
Center for Biological Diversity
2852 Willamette St. # 171
Eugene, OR 97405
(802) 310-4054
jmargolis@biologicaldiversity.org

/s/ Eric Glitzenstein
Eric Glitzenstein (D.C. Bar No. 358287)
Center for Biological Diversity
1411 K Street, NW, Suite 1300

43

Washington, DC 20005
(202) 849-8401
eglitzenstein@biologicaldiversity.org

/s/ Dinah Bear
Dinah Bear (D.C. Bar No. 351817)
300 N. Indian House Road
Tucson, Arizona 85711
(202) 906-9407
bear6@verizon.net

*Attorneys for Plaintiffs*