**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, | ) ) ) |
| *Plaintiffs* | ) ) ) |
| v. | ) ) ) |
| FEDERAL AVIATION ADMINISTRATION, *et al*., | ) ) ) |
| *Defendants* | ) ) ) |
| and | ) ) ) |
| SPACE EXPLORATION TECHNOLOGIES CORP. | ) ) ) ) |
| *Defendant-Intervenor*. | ) ) ) |

Civil Case No. 23-1204

**DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................ 2

I.     Plaintiffs Fail to Engage with the Record Evidence Demonstrating that FAA
       Took a Hard Look at the Proposed Action's Environmental Impacts. ................... 2

       A.     Plaintiffs Ignore FAA's Identification and Evaluation of the
              Proposed Action's Noise and Light Impacts. .............................................. 3

              1.     FAA's Noise Analysis Used the Proper Baseline and a
                     Reasonable Methodology. ................................................................ 4

              2.     FAA's Assessment of Light Impacts on Wildlife Was
                     Thorough and Detailed. .................................................................. 9

       B.     Plaintiffs Failed to Show that FAA's Analysis of Anomalies was
              Arbitrary or Capricious. ............................................................................. 10

       C.     FAA's Multipart Analysis of the Temporary Access Restrictions
              Satisfies the Hard Look Standard. ............................................................. 13

II.    Plaintiffs' Disagreement with the Mitigation Measures in the PEA Does Not
       Amount to a Cognizable Challenge Under NEPA ............................................... 15

       A.     Contrary to Plaintiffs' Claims, NEPA Does Not Contain a
              Presumption Against Mitigation. ............................................................... 16

       B.     FAA Imposed Lighting Mitigation Well-Tailored to the Effects at
              Issue. .......................................................................................................... 18

       C.     The Anomaly Mitigation Set Forth in the PEA is All That NEPA
              Requires. ..................................................................................................... 20

       D.     Plaintiffs Ignore the FONSI/ROD's Substantial Access-Related
              Mitigation Measures. ................................................................................. 21

III.   FAA Did Not Unlawfully Delegate its NEPA Review to SpaceX. ...................... 22

IV.    Should it be Necessary, Defendants Request the Opportunity to Provide
       Further Briefing on Remedy. ............................................................................... 23

CONCLUSION ........................................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Cascadia Wildlands v. Bureau of Indian Affairs*,
   801 F.3d 1105 (9th Cir. 2015) .................................................................. 5

*Citizens Against Burlington, Inc. v. Busey*,
   938 F.2d 190 (D.C. Cir. 1991) ................................................................ 12

*City of Bridgeton v. F.A.A.*,
   212 F.3d 448 (8th Cir. 2000) .................................................................... 6

*City of Williams v. Dombeck*,
   151 F. Supp. 2d 9 (D.D.C. 2001) ............................................................ 14

*Concerned Citizens and Retired Miners Coal. v. U.S. Forest Serv.*,
   279 F. Supp. 3d 898 (D. Ariz. 2017) ........................................................ 5

*Dakota Res. Council v. U.S. Dep't of Interior*,
   No. 22-cv-1853 (CRC), 2024 U.S. Dist. LEXIS 51013 (D.D.C. Mar. 22, 2024) .................... 22

*Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*,
   No. 17-5747, 2019 WL 280001 (W.D. Wash. Jan. 22, 2019) .................................. 24

*Friends of Capital Crescent Trail v. Fed. Transit Admin.*,
   877 F.3d 1051 (D.C. Cir. 2017) ................................................................ 3

*Friends of Clearwater v. Petrick*,
   588 F. Supp. 3d 1071 (D. Idaho 2022) ...................................................... 19

*Government of Manitoba v. Zinke*,
   273 F. Supp. 3d 145 (D.D.C. 2017) .......................................................... 17

*Greater Yellowstone Coal. v. Flowers*,
   359 F.3d 1257 (10th Cir. 2004) .............................................................. 17

*Grunewald v. Jarvis*,
   776 F.3d 893 (D.C. Cir. 2015) ................................................................. 3

*Gulf v. Burgum*,
   — F. Supp. 3d —, 2025 WL 928684 (D.D.C. Mar. 27, 2025) ................................ 23

*Jones v. Mukasey*,
   565 F. Supp. 2d 68 (D.D.C. 2008) ............................................................ 4

*Lee v. U.S. Air Force*,
   354 F.3d 1229 (10th Cir. 2004) ................................................................ 7

*Lowman v. Fed. Aviation Admin.*,
   83 F. 4th 1345 (11th Cir. 2023) ............................................................... 9

*Midwater Trawlers Coop. v. Dep't of Commerce*,
    393 F.3d 994 (9th Cir. 2004) ............................................................. 23

*Mulgrew v. U.S. Dep't of Transp.*,
    750 F. Supp. 3d 171 (S.D.N.Y. 2024) .............................................. 19

*Myersville Citizens for a Rural Cmty., Inc. v. F.E.R.C.*,
    783 F.3d 1301 (D.C. Cir. 2015) ................................................... 7, 16

*N. Alaska Env't Ctr. v. U.S. Dep't of Interior*,
    983 F.3d 1077 (9th Cir. 2020) ........................................................... 4

*Nat'l Audubon Soc'y v. Hoffman*,
    132 F.3d 7 (2d Cir. 1997) ................................................................ 17

*Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior*,
    46 F. Supp. 3d 1254 (M.D. Fla. 2014) .............................................. 9

*Nat'l Parks Conservation Ass'n v. United States*,
    177 F. Supp. 3d 1 (D.D.C. 2016) ............................................... 16, 20

*Nevada v. Dep't of Energy*,
    457 F.3d 78 (D.C. Cir. 2006) ............................................................ 3

*New York v. U.S. Nuclear Regul. Comm'n*,
    824 F.3d 1012 (D.C. Cir. 2016) ...................................................... 22

*O'Reilly v. U.S. Army Corps of Eng'rs*,
    477 F.3d 225 (5th Cir. 2007) .......................................................... 16

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
    45 F.4th 291 (D.C. Cir. 2022) ................................................... 13, 18

*Ohio Valley Env't Coal. v. Hurst*,
    604 F. Supp. 2d 860 (S.D.W.V. 2009) ............................................ 18

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ........................................................................ 16

*Save Our Heritage, Inc. v. F.A.A.*,
    269 F.3d 49 (1st Cir. 2001) ............................................................... 2

*Save Strawberry Canyon v. U.S. Dep't of Energy*,
    830 F. Supp. 2d 737 (N.D. Cal. 2011) .............................................. 6

*Sierra Club v. Fed. Energy Reg. Comm'n*,
    38 F.4th 220 (D.C. Cir. 2022) ................................................... 16, 22

*Sierra Club v. Slater*,
    120 F.3d 623 (6th Cir. 1997) ............................................................ 4

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    464 F. Supp. 2d 1171 (M.D. Fla. 2006) .......................................... 18

*Sierra Club v. U.S. Army Corps of Eng'rs,*
    803 F.3d 31 (D.C. Cir. 2015) .......................................................................... 5

*Sierra Club v. U.S. Dep't of Transp.,*
    753 F.2d 120 (D.C. Cir. 1985) .................................................................. 2, 14

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
    985 F.3d 1032 (D.C. Cir. 2021) .................................................................... 23

*Town of Cave Creek, Ariz. v. F.A.A.,*
    325 F.3d 320 (D.C. Cir. 2003) ........................................................................ 6

*Tri-Valley CAREs v. U.S. Dep't of Energy,*
    671 F.3d 1113 (9th Cir. 2012) ........................................................................ 7

*Wild Fish Conservancy v. Nat'l Park Serv.,*
    8 F. Supp. 3d 1289 (W.D. Wash. 2014) .......................................................... 4

*Wy. Outdoor Council v. U.S. Army Corps of Eng'rs,*
    351 F. Supp. 2d 1232 (D. Wy. 2005) ............................................................ 16

**Statutes**

49 U.S.C. § 303 ......................................................................................................11

49 U.S.C. § 303(d)(1)(B) ......................................................................................11

5 U.S.C. § 706 ......................................................................................................... 8

**Regulations**

14 C.F.R. § 450.47 ................................................................................................ 32

14 C.F.R. § 450.9 .................................................................................................. 24

40 C.F.R. § 1505.3(a) (2020) ............................................................................... 24

40 C.F.R. § 1506.5(6) (2020) ............................................................................... 32

**Other Authorities**

85 Fed. Reg. 43,304 (July 16, 2020) ................................................................... 18

90 Fed. Reg. 10,610 (Feb. 25, 2025) ............................................................. 17, 18

**INTRODUCTION**

Although Plaintiffs vigorously argue to the contrary, the Federal Aviation Administration's ("FAA") conducted a thorough environmental review of Space Exploration Technologies Corporation's ("SpaceX") application to conduct launches and landings of the Starship/Super Heavy ("Starship") vehicle from Boca Chica, Texas (the "Proposed Action"). FAA produced a comprehensive Programmatic Environmental Assessment ("PEA") and issued a Mitigated Finding of No Significant Impact/Record of Decision ("Mitigated FONSI/ROD"). This process fully complied with the National Environmental Policy Act ("NEPA"), and Plaintiffs offer no concrete arguments to the contrary.

Perhaps in acknowledgment that the record repeatedly supports the agency's conclusions, Plaintiffs' reply[1] instead advances a hodgepodge of attacks, many based on conclusory arguments, speculation, inapposite record citations, or caselaw (or some combination thereof). But those criticisms do not amount to viable arguments given the Court's deferential review of an agency's NEPA analysis. The totality of the record instead indicates that FAA took the requisite "hard look" at the environmental issues posed by the Proposed Action, consulted with the relevant federal and state agencies, and reached well-reasoned conclusions, including requiring SpaceX to adopt detailed mitigation measures to ameliorate the adverse effects of Starship launches and landings. Nor, contrary to Plaintiffs' contentions, was the agency under a higher burden given that it chose to proceed with a Mitigated FONSI/ROD. Instead, the Court must still ask only whether the agency's action was reasonable; the record plainly demonstrates it was here.

Accordingly, the Court should grant summary judgment to Defendants.

---

[1]    *See* ECF No. 51, Plaintiffs' Reply Supp. Mot. Summ. J. ("Pls.' Reply").

**ARGUMENT**

The Court's role in reviewing the PEA is circumscribed. Rather than conducting a far-reaching examination of the FAA's wisdom in approving the Proposed Action, the Court must instead simply assure itself that: (1) FAA properly identified and took a hard look at the Proposed Actions' environmental impacts; and (2) FAA required that SpaceX implement enough mitigation measures to sufficiently reduce the effect of any environmental impacts below the threshold of significance. *See Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 127 (D.C. Cir. 1985).

As previously explained, *see* Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem.") (ECF No. 50-1), the FAA more than met these standards. FAA took an appropriately hard look at a range of impacts stemming from the Proposed Action, including analyzing the effects on wildlife, the likelihood and effects of anomalies, and the effects of any proposed temporary access restrictions. *See* Defs.' Mem. at 12-33. FAA also imposed over 75 detailed, binding measures that mitigated any significant impacts that the agency identified. *See id*. at 34-43. Particularly because those measures are incorporated into the Mitigated FONSI/ROD (and ultimately into SpaceX's launch license), the agency's analysis satisfied NEPA's procedural requirements.

## I.    Plaintiffs Fail to Engage with the Record Evidence Demonstrating that FAA Took a Hard Look at the Proposed Action's Environmental Impacts.

As described in Defendants' Memorandum, the record demonstrates FAA engaged in a thorough and detailed review of the potential effects of the Proposed Action. Though Plaintiffs dispute the sufficiency of the agency's analysis, much of their criticism constitutes the type of "[g]auzy generalizations and pin-prick criticisms, [that] in the face of specific findings and a plausible result, are not even a start at a serious assault." *Save Our Heritage, Inc. v. F.A.A.*, 269

F.3d 49, 60 (1st Cir. 2001); *see also Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006) ("It is well settled that the court will not 'flyspeck' an agency's environmental analysis, looking for any deficiency no matter how minor." (citation omitted)).

So too, irrespective of Plaintiffs' vehement opposition, "NEPA is 'not a suitable vehicle' for airing grievances about the substantive polices adopted by an agency, as 'NEPA was not intended to resolve fundamental policy disputes.'" *Grunewald v. Jarvis*, 776 F.3d 893, 903 (D.C. Cir. 2015) (citation omitted). Instead, "[b]ecause NEPA does not mandate particular results, the court's role is [only] to ensure that agencies consider all significant and reasonably foreseeable environmental impacts." *Friends of Capital Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1062 (D.C. Cir. 2017) (quotation omitted). Thus, a court must "simply [ ] ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Nevada*, 457 F.3d at 93 (quotations and citation omitted).

Here, FAA's analysis satisfied that deferential standard. As to noise and light impacts, the agency reviewed the relevant studies and data and reached reasonable conclusions about effects on species and local communities. As to anomalies and access restrictions, the agency's conclusions rested on rational methodologies to which deference is owed.

### A.    Plaintiffs Ignore FAA's Identification and Evaluation of the Proposed Action's Noise and Light Impacts.

Plaintiffs raise a range of disparate challenges to FAA's analysis of noise and light impacts. But as to the former, the FAA reasonably assessed the impacts of noise starting from a baseline that acknowledged the reality of preexisting SpaceX operations at Boca Chica. As to the latter, the FAA's analysis of light effects on wildlife was fulsome and detailed and thus satisfied NEPA's requirements.

1.    *FAA's Noise Analysis Used the Proper Baseline and a Reasonable Methodology.*

Plaintiffs allege that FAA: (a) used an improper baseline; (b) underrepresented community noise impacts; and (c) overlooked noise effects on wildlife. But as to each, the PEA reflects that FAA undertook a detailed examination of each issue.

As to the baseline issue, Plaintiffs argue that FAA has suggested Boca Chica is "already a disturbed industrial zone" and "the impacts associated with the proposed [Proposed Action] must only be considered in light of the continuing use of the site for rocket testing and launches." Pls.' Reply at 2. But while Plaintiffs are correct that FAA must evaluate the Proposed Action's impacts on Boca Chica as the area currently exists (and this is what the agency did), they are wrong insofar as they attempt to use their current suit to litigated issues that were addressed in the 2014 Environmental Impact Statement ("EIS"), which went unchallenged.

Further, Plaintiffs conflate an agency's use of the proper baseline with an appropriate analysis of cumulative impacts. To that end, Plaintiffs cite to *Kentucky Riverkeeper, Inc. v. Rowlette* for the principle that past impacts can bear on an agency's cumulative impacts analysis. Pls.' Reply at 3 (citing 714 F.3d 402, 410 (6th Cir. 2013)). But Plaintiffs elide that they did not bring a challenge to FAA's cumulative impacts analysis and thus cannot do so in their Reply. *See* Pls.' Mem. Supp. Mot. Summ. J. ("Pls.' Mem.") at i-ii (ECF No. 45-1); *Jones v. Mukasey*, 565 F. Supp. 2d 68, 81 (D.D.C. 2008) ("the D.C. Circuit has consistently held, [that] the Court should not address arguments raised for the first time in a party's reply" (citing cases)).

Moreover, courts have repeatedly found challenges to earlier environmental reviews time-barred when brought outside the applicable statute of limitations. *See, e.g.*, *N. Alaska Env't Ctr. v. U.S. Dep't of Interior*, 983 F.3d 1077, 1096 (9th Cir. 2020); *Sierra Club v. Slater*, 120 F.3d 623, 631 (6th Cir. 1997); *Wild Fish Conservancy v. Nat'l Park Serv.*, 8 F. Supp. 3d 1289, 1296

(W.D. Wash. 2014) (challenge to EIS must be filed within the six-year limitations period set out in 28 U.S.C. § 2401(a)).  As such, to the extent Plaintiffs seek to challenge SpaceX's preexisting activities as authorized under the 2014 EIS, Pls.' Reply at 2-3, that environmental review cannot form the basis of timely claims in this case.

Regardless, the FAA appropriately gauged the noise impacts of the Proposed Action. Specifically, the FAA explained that "[e]xisting sources of sound in the study area include vehicle traffic on [State Highway] 4, day-to-day SpaceX maintenance activities, construction activities, and Starship prototype launch and landing operations (including static fire engine tests and suborbital launches)."  FAA_10038.  That acknowledgement of existing operations was wholly appropriate.  *See Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1111 (9th Cir. 2015) ("An agency . . . may satisfy NEPA by aggregating the cumulative effects of past projects into an environmental baseline, against which the incremental impact of a proposed project is measured."); *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 51 (D.C. Cir. 2015) (existing "effects set the baseline state of affairs and thus the context in which the significance of proposed federal action must be evaluated"); *Concerned Citizens and Retired Miners Coal. v. U.S. Forest Serv.*, 279 F. Supp. 3d 898, 925 (D. Ariz. 2017) ("the Forest Service need only consider the incremental impact of the [project] in relation to the [overall action] to determine if the [project] will have a significant cumulative impact").

Although Plaintiffs recognize that the 2014 EIS already acknowledged a significant impact due to noise, Pls.' Reply at 31, they argue, without citation, that "since the Starship/Superheavy rockets are more powerful and thus louder than the Falcon rockets, the impacts at issue here are even greater than what was analyzed in 2014."  *Id*. at 31-32.  But the record belies those unsupported contentions.

As to community noise impacts, FAA applied the agency's standard noise guidelines and methodology to assess whether the Proposed Action would lead to a significant increase in noise. FAA_10039.  Using that methodology, the agency explained that: (1) due to the "intermittent and temporary nature" of noise from "static fire engine tests," that noise source was not expected to be significant; (2) no members of the public would experience noise exceeding "OSHA's 115-dbA threshold during an orbital launch" or landing, FAA_10041-45; and (3) "[c]umulative noise in these surrounding communities, whether from multiple events of a single operation type or from all these individual events combined, is estimated to be below levels associated with adverse noise exposure."  FAA_10046; *see also* FAA_11547 (PEA Appendix B- Noise Assessment); FAA_11592 ("Cumulative noise in these surrounding communities, whether from multiple events of a single operation type as defined in projected operations scenarios 1 and 2 or from all these individual events combined, is estimated to be below levels associated with adverse noise exposure.").  This methodology is entitled to deference, given courts have consistently found that "agencies are permitted to determine a threshold of significance for noise impacts."  *Save Strawberry Canyon v. U.S. Dep't of Energy*, 830 F. Supp. 2d 737, 749-50 (N.D. Cal. 2011) (citation omitted).  Indeed, the D.C. Circuit has explicitly upheld FAA's noise methodology.  *See Town of Cave Creek, Ariz. v. F.A.A.*, 325 F.3d 320, 328 (D.C. Cir. 2003) ("Under [FAA] guidelines, [agency] actions that do not result in noise level increases of 1.5 dB or more within the 65-or-more DNL contour are, by definition, insignificant under NEPA, because all land use activities at issue here are compatible with noise levels below 65 DNL."); *see also City of Bridgeton v. F.A.A.*, 212 F.3d 448, 460 (8th Cir. 2000) ("[C]ourts have consistently upheld the FAA's discretion to choose its cumulative noise impact methodology instead of single-event noise analysis.").

Next, Plaintiffs misstate the conclusions in the PEA regarding the possibility of structural damage. As Plaintiffs note, FAA acknowledged the potential for damage, FAA_10041-42, and stated that "approximately one damage claim will result per 100 households exposed to 120 dB." FAA_10041. But a 1% chance, and one that the agency explained was determined using a "very conservative threshold," FAA_10042, hardly amounts to the type of significant impact warranting preparation of an EIS. Thus, the agency did not need to assess the "condition" of all homes in the area to take a hard look. Pls.' Reply at 34. Instead, FAA appropriately assessed the risk, using a methodology to which the agency is owed deference. *See Lee v. U.S. Air Force*, 354 F.3d 1229, 1243 (10th Cir. 2004) (citing cases upholding use of noise methodologies). Plaintiffs, on the other hand, would transform a low risk finding of a possibility of damage into a blanket requirement to prepare an EIS. But NEPA simply does not cut so finely. *See Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1125 (9th Cir. 2012) ("If the proposed action does not significantly alter the *status quo*, it does not have a significant impact under NEPA."). Here, FAA appropriately examined the risk, and concluded that any damage would be "minor," notwithstanding that "no structural damage or significant impact to third-party structures is expected from launch operations." FAA_10043-44. Plaintiffs provide no concrete record evidence to rebut this well-supported conclusion. *See Myersville Citizens for a Rural Cmty., Inc. v. F.E.R.C.*, 783 F.3d 1301, 1325 (D.C. Cir. 2015) (finding analysis sufficient where agency "acknowledged three times . . . that property values could be negatively affected by the compressor station . . . [but] chose nevertheless to approve the project").

Finally, as to noise effects on wildlife, Plaintiffs refer to inapposite sections of the 2014 EIS that have nothing to do with impacts on wildlife. Citing FAA_9282, they allege that the FAA already determined noise from SpaceX activities has a significant impact on "the

surrounding areas." Pls.' Reply at 31. But that conclusion referenced the effects of noise on

"compatible land use," FAA_9282, and considered the effects of operational activities using a

baseline of undeveloped land. *Id.* So too, Plaintiffs cite to FAA_9290, but there again the 2014

EIS refers to land use compatibility, not effects on wildlife. *Id.*; *see also id.* (noting the EIS

separately evaluated cumulative impacts on "biological resources"). Indeed, specific to

biological resources, the 2014 EIS concluded that "wildlife species . . . would not be

significantly impacted by short-term construction activities," FAA_9287, and "there would be no

significant impacts on wildlife species" as a result of daily SpaceX operations. *Id.* Thus,

Plaintiffs' attempt to claim the FAA already acknowledged significant impacts on wildlife is a

misleading sleight of hand, Pls.' Reply at 31 (citing Defs.' Mem. at 7), given the prior citations to

the 2014 EIS referred to specific (and non-wildlife) resource areas. Plaintiffs' efforts to conflate

the record should be rejected.

Plaintiffs also attempt to refute FAA's reliance on studies conducted at other launch

sites—again without record support—by arguing those comparisons are "specious." Pls.' Reply

at 32 & n.5.[2] But the FAA's Biological Assessment ("BA") explicitly relied on those studies,

FAA_11709, and indeed recognized the applicability of other studies looking at the effects of

rocket launches on piping plovers. FAA_11725. So too, FWS's Biological Concurrence Opinion

("BCO") explicitly referenced a study of snowy plovers at Vandenberg Air Force Base,

FAA_98730-74; thus, Plaintiffs contention that reliance on that study constitutes *post hoc*

reasoning should be rejected out of hand. Instead, FAA reasonably estimated effects based on

---

[2]    Plaintiffs appear to argue FAA inappropriately relied on studies that were note cited in the
PEA but instead in accompanying environmental review documents. But review under the
Administrative Procedure Act is based on the whole record. *See* 5 U.S.C. § 706. Thus, even if
these studies were not referenced by the agency (and they were), Plaintiffs are simply wrong that
FAA cannot now rely on a document that is in the record, but not explicitly cited in the PEA.

similar studies performed at similar launch locations.  *See, e.g.*, *Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior*, 46 F. Supp. 3d 1254, 1324 (M.D. Fla. 2014) (finding agency's analysis reasonable where it used available data "to extrapolate to the potential impacts").

In sum, as to each issue, the FAA correctly assessed the projected incremental increase in noise from the Proposed Action, which is all it was required to do.  *See Lowman v. Fed. Aviation Admin.*, 83 F. 4th 1345, 1364 n.17 (11th Cir. 2023) (stating "the EA here accurately considered the existing soundscape and aggregated the total noise").

      2.    *FAA's Assessment of Light Impacts on Wildlife Was Thorough and Detailed.*

Plaintiffs make three general arguments regarding the effects of light on wildlife.  First, they seem to argue that FAA underrepresented the effects on bird species by focusing only on ESA-listed species.  *See* Pls.' Reply at 14 (claiming agency overlooked impacts to "other migratory birds").  But Plaintiffs rely on claims that the Proposed Action "has the potential to degrade ecologically critical habitat and disturb numerous species," *see id*., that are contradicted by FAA's finding with respect to numerous species, not just those covered by FWS's BCO.  *See* FAA_10111.  Indeed, FAA even acknowledged that the agency "has not established a significance threshold for unlisted species," but nonetheless identified factors it considered.  *Id*. Applying those factors, the agency examined the impact of operations on wildlife due to new structures, increased vehicle traffic and human presence, and noise and vibrations.  FAA_10114-16.  Thus, Plaintiffs are simply wrong that the PEA's analysis cuts so narrowly.

Moreover, Plaintiffs argue against a strawman by claiming that FAA's position is that "an EIS is *only* required when the action would jeopardize listed species."  Pls.' Reply at 15.  Instead, FAA simply noted that, as Plaintiffs themselves acknowledge, FAA's NEPA procedures identify effects on ESA-protected species as particularly relevant to a finding of significance.  *See id*. at

9

14 (citing FAA_57667). Thus, the agency's analysis was not limited to evaluating effects through the narrow lens of "continued jeopardy"; rather, the PEA assessed whether adverse effects would result, FAA_10120, and imposed mitigation measures to "avoid, minimize, and mitigate the impacts to listed species and critical habitat." *Id*.

Second, Plaintiffs argue that lighting impacts have harmed the piping plover population. But that argument relies on studies that looked at the impact of SpaceX's activities more generally, rather than specifically focused on *lighting*. Indeed, the agency found that adherence to the Lighting Plan would militate against adverse effects from lighting. FAA_10122. To that end, FWS explained that while lighting may generally impact bird species, "[p]lover visual acuity and maneuverability are known to be good . . . suggesting that plovers may be able to identify and avoid structures in flight paths." FAA_9877. Further, "[p]lover collisions with fixed structures in the coastal zones are rarely documented." *Id*. As a result, FWS did not identify adverse effects on plovers specifically from lighting, and FAA's conclusion was, in turn, reasonable as to this issue.

Third, Plaintiffs argue that FAA ignored the impacts to ocelots, even though they "have not been seen in the area in recent years." Pls.' Reply at 29. But Plaintiffs' brief simply speculates, without *any* record support, that SpaceX has caused the decline in ocelot sightings. The Court should again reject Plaintiffs' attempts to create record disputes based only on unsupported arguments.

**B.    Plaintiffs Failed to Show that FAA's Analysis of Anomalies was Arbitrary or Capricious.**

By way of background, and as described previously, FAA considered the likelihood of anomalies and the related effects by looking at historical anomalies, including one that occurred during the test flight of a Starship prototype. *See* Defs.' Mem. at 21-24. Examining anomalies

occurring around the launch site, such as the failure of the prototype's test flight is eminently reasonable given that it occurred at Boca Chica and the similarities between the rockets. *See id*. at 22. FAA also considered the comments submitted by other agencies, all of which ultimately concurred in FAA's conclusion that the impacts of a potential anomaly (together with the mitigation requirements that are discussed *infra*) would be temporary and *de minimis*. *See id*. at 24, 30.

Against that, Plaintiffs raise one, unpersuasive, argument—they criticize FAA's reliance on the Texas Parks and Wildlife Department ("TPWD") and FWS's Section 4(f) concurrence letters. According to Plaintiffs, FAA's citation to these letters is inappropriate because the concurrence analyses were conducted pursuant to the Transportation Act, which focuses on whether "the temporary occupancy of the 4(f) properties . . . would be de minimis," and not NEPA, which focuses on whether the "impacts from debris and debris recovery would be de minimis." Pls.' Reply at 18 (emphasis omitted). In other words, Plaintiffs contend that FAA incorrectly relied on the Section 4(f) analysis because Section 4(f) is not concerned with ensuring that the potential impacts of the regulated activity on the Section 4(f) properties are minimized.

But Plaintiffs misunderstand Section 4(f) (49 U.S.C. § 303). FAA may permit the use of a Section 4(f) property, which otherwise may be forbidden, if FAA "determines . . . that a transportation program or project will have a *de minimis* impact on the area." 49 U.S.C. § 303(d)(1)(B). This includes a determination of whether "the program or project includes all possible planning to minimize harm." *Id*. § (c)(2). Thus, contrary to Plaintiffs' argument, there is not necessarily a distinction between the analysis of a proposed action's impacts under NEPA and a Section 4(f) analysis. Instead, Section 4(f) requires the agency to ensure that a proposed action's impacts, including any steps taken to mitigate those impacts, will be *de minimis*, before

approving that action.  This is what FAA did during the NEPA process, *see, e.g.*, FAA_12258

(TPWD concurring that if "an anomaly occurs that involves debris and debris-responsive

activities within TPWD-owned lands, such an event would result in *temporary occupancy* of the

park, but the impacts would be *de minimis*" (emphasis added)), and is the analysis that

Defendants' brief referenced in the first instance.[3]  *See, e.g.*, Defs.' Mem. at 21, 23-24.

Confusingly, then, Plaintiffs rely extensively on information provided by other agencies

as part of their Section 4(f) analyses.  For example, Plaintiffs cite to TPWD's "Comments and

Recommendations" to the draft PEA's Section 4(f) analysis that stated, "[d]amages are thus

objectively demonstrable and should be considered certainly possible in the future given the

nature of past debris fields."  Pls.' Reply at 17 (quoting FAA_14244).[4]  Indeed, of the nine record

citations Plaintiffs include to support their argument that FAA ignored the "overwhelming

evidence that prior anomalies/explosions have resulted in extensive damage," four are from

consulting agencies' Section 4(f) analyses.  *See id.* (citing FAA_10609, FAA_14244,

FAA_46294).[5]  But Plaintiffs make no attempt to resolve the contradiction between their

---

[3]    To support their position, Plaintiffs cite one case, *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. 1991).  While the D.C. Circuit there criticized FAA for not sufficiently considering the similarities and differences between Section 4(f) and NEPA when the agency relied on its NEPA analysis to satisfy its Section 4(f) obligations, the court ultimately held that FAA complied with Section 4(f) because its use of the NEPA analysis was reasonable. *See id.* at 204.  FAA's use here of the Section 4(f) analysis to support its NEPA conclusion is similarly reasonable.

[4]    TPWD suggested this edit to Section 3.8.3.3 of the draft PEA, which is the "Anomalies" section of the Section 4(f) analysis.  *See* FAA_9641.

[5]    Plaintiffs cite to FAA_10609 twice.  Of the remaining five citations, one is to FWS's Endangered Species Act analysis, *see* FAA_51015, a second is to a Section 401 analysis conducted by TPWD and the Texas Council on Environmental Quality, *see* FAA_46054, and a third is to FWS's BCO, *see* FAA_43885.  Plaintiffs do not explain why they relied on analyses conducted pursuant to these other statutes to support their NEPA claims.

argument that FAA cannot rely on its Section 4(f) analyses to support its NEPA review while they at the same time reference those very same analyses in critique of FAA's NEPA review. Of course, they likely offer no explanation because there is none; it would needlessly put form over substance to silo off portions of an agency's environmental review that go to the same goals.

To that end, Plaintiffs again prioritize the formalism of requiring an agency to divide the substance of its analyses between Section 4(f) and NEPA when there is no basis for doing so. Indeed, the D.C. Circuit has made clear that such needless formalism is not a reason to invalidate an agency's NEPA analysis when "the agency's efforts accomplished [NEPA's] objectives." *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 300 (D.C. Cir. 2022). Because the record makes clear that FAA has met NEPA's objectives with respect to analyzing the impact of anomalies, the Court should reject Plaintiffs' challenges to the anomalies analysis.

### C.    FAA's Multipart Analysis of the Temporary Access Restrictions Satisfies the Hard Look Standard.

Plaintiffs' challenge to FAA's analysis of access restrictions[6] is similarly inapposite. Plaintiffs claim that FAA's analysis was arbitrary and capricious because FAA "blindly accepted SpaceX's unsupported assertions regarding the projected number of closure hours" rather than crediting the opinions of some Federal and state agencies that the 500-hour estimate was "inaccurate." Pls.' Reply at 23. In other words, Plaintiffs fault FAA's methodology. But the

---

[6]    By way of background, the PEA assesses ground access restrictions required by FAA safety regulations and enforced by Cameron County, Texas on the area surrounding the launch site. While the length and scope of a particular restriction will depend on the type of licensed activity conducted, total restrictions are not expected to exceed 500 hours of nominal access per year. Defs.' Mem. at 25. The PEA requires SpaceX to follow an extensive "Access Restriction Notification Plan" to maximize the likelihood that interested parties are aware of (and, therefore, can plan around) upcoming access restrictions. *See id*. at 25-27. Further, FAA analyzed the impacts of the temporary access restrictions on seventeen different cultural resources, numerous Section 4(f) properties, and Native American resources (including the Carrizo/Comecrudo Tribe). *See id*. at 26-32.

record belies that challenge.  Specifically, in analyzing the access restrictions' potential impacts, FAA contextualized those effects and explained that even if SpaceX used all 500 hours of its nominal restrictions, many of the potentially impacted properties would still be publicly accessible over 80% of the time.  Defs.' Mem. at 28.  And FAA established these reasonable restrictions to "ensure public safety."  FAA_10006.  Moreover, FAA examined the record, which (according to Plaintiffs, at least) included two different estimates for the projected time when the access restrictions would be in place and concurred with SpaceX's estimate.  This type of methodological choice was squarely within the agency's discretion.  *See City of Williams v. Dombeck*, 151 F. Supp. 2d 9, 23 (D.D.C. 2001).

Plaintiffs also contend that FAA failed to "address the significant impacts to the [Carrizo/Comecrudo] Tribe's interests from hundreds of hours of closures that impede their ability to access sacred lands."  Pls.' Reply at 26.  But Plaintiffs again misstate the record.  As explained in Defendants' opening brief, while some comments noted a possibility of archeologically significant sites being located in the vicinity of the Proposed Action, those comments also recognized that there was no definitive study showing the presence of such sites in the area.  *See* Defs.' Mem. at 31-32 (quoting FAA_3260, 4089).  Nor did FAA stand on a review of the comments alone; the agency's assessment included consulting with interested parties and hiring a third-party firm to identify Native American and archaeological resources within the potentially affected area.  *See* Defs.' Mem. at 31.  In other words, though Plaintiffs attempt to frame FAA's argument as one of "conclusive knowledge," in fact there was no such surety in the record.  Instead, FAA reasonably reviewed equivocal information and drew a reasonable and well-supported conclusion given the lack of conclusive data.  That Plaintiffs disagree with this conclusion is of no matter for purposes of this Court's review.  *See Sierra*

*Club*, 753 F.2d at 128 (holding that FAA satisfied NEPA when it considered the "various modes of scientific evaluation and theory and cho[se] the one appropriate for the given circumstances").

## II.    Plaintiffs' Disagreement with the Mitigation Measures in the PEA Does Not Amount to a Cognizable Challenge Under NEPA

As catalogued in Defendants' opening brief, the Mitigated FONSI/ROD included more than 75 specific mitigation measures intended to ensure that the Proposed Action's impact on the environment would not be significant, including noise-related measures, a Lighting Management Plan, and turtle conservation activities. *See* Defs.' Mem. at 34-37.

FAA also imposed an Anomaly Response Plan that prescribes steps for debris removal, impacted area restoration, and required the development of a method to measures the efficacy of SpaceX's mitigation remediation efforts. *See id*. at 38. And, with respect to access-related mitigations measures, FAA imposed overlapping geographic and temporal restraints to minimize potential disruptions stemming from closures. These limitations include barring SpaceX from restricting access to State Highway 4 on major holidays, certain weekends (including those weekends during the peak season for the neighboring beach), and using a public notification system. *See id*. at 39-40.

In response to those measures, Plaintiffs make essentially the same argument to each: the PEA does not contain substantial evidence to support issuing a mitigated FONSI in part because certain impacts can never be mitigated. *See, e.g.*, Pls.' Reply at 6-13, 19-21, 23-24. But this argument makes three errors. First, Plaintiffs press for an improperly stringent test for when mitigation may permit an agency to avoid preparation of an EIS. When viewed against the correct test, the mitigation in the PEA is more than sufficient. Second, consistent with that overarching standard, FAA relied on SpaceX's proposed mitigation with respect to lighting impacts. And third, the Court should reject Plaintiffs' contention that the impacts at issue here

with respect to the Proposed Action can never be mitigated; no decisions support that reading of NEPA

### A.    Contrary to Plaintiffs' Claims, NEPA Does Not Contain a Presumption Against Mitigation.

Courts have consistently found that adequately supported mitigation may permit an agency to avoid preparation of an EIS.  *See, e.g.*, *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 231 (5th Cir. 2007) ("We have consistently accepted the proposition that reliance on mitigation measures may reduce a project's impacts below the level of significance."); *see also Nat'l Parks Conservation Ass'n v. United States*, 177 F. Supp. 3d 1, 22-23 (D.D.C. 2016).

In judging the efficacy of those proposed mitigation measures, the D.C. Circuit has explained that "NEPA does not mandate that the [agency] formulate a specific mitigation plan, only that it discuss mitigation 'in sufficient detail to ensure that environmental consequences have been fairly evaluated.'"  *Sierra Club v. Fed. Energy Reg. Comm'n*, 38 F.4th 220, 233 (D.C. Cir. 2022) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989)); *see also Wy. Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F. Supp. 2d 1232, 1250 (D. Wy. 2005) (mitigation measures only "must meet some minimal standards.").  To that end, the D.C. Circuit has distinguished between the "substantial evidence" standard which Plaintiffs propose, and the more relaxed review applicable under NEPA.  *See, e.g.*, *Myersville*, 783 F.3d at 1311. Here, the PEA, "fulsome in its discussion of potential mitigation measures . . . meets NEPA's mark."  *Sierra Club*, 38 F.4th at 233.

Plaintiffs appear to ask this Court to impose a more stringent standard for evaluating mitigation measures that has been adopted by some Circuits (though not this one).  For example, in the Second Circuit, "the adequacy of proposed mitigation measures [must be] supported by substantial evidence," such as "when based on studies conducted by the agency" or "when they

are likely to be adequately policed." *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 17 (2d Cir. 1997). As to the latter criteria, the Second Circuit has explained that "the efficacy of the mitigation measures were assured because they were included as mandatory conditions in the issued permits. These conditions required implementation of a detailed plan to monitor the effects of the proposed action and the mitigation of those effects." *Id.*; *see also id.* ("the plan required monitoring of the mitigation efforts, if any were made, to ensure that they were effective and required implementation of an alternative mitigation plan, spelled out in detail, if they were not"); *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1276 (10th Cir. 2004) (explaining agency could rely on mitigation measures, including "conditions imposed by FWS" such as "close daily monitoring" to find no significant impact).

Thus, even if the Court were to apply this more stringent standard, the mitigation measures in the Mitigated FONSI/ROD pass muster. The measures are incorporated directly into SpaceX's license, and thus are "mandatory" conditions. FAA_9264-69; *see also* 14 C.F.R. § 450.9 (providing FAA may add license terms to a vehicle operator license to ensure compliance with regulations). Further, many measures include monitoring provisions, and others are (as described further below) based on recommendations from expert agencies such as FWS. Thus, the mitigation associated with FAA's findings in the PEA satisfies the requirements of NEPA, and the Court should reject Plaintiffs' contention that any presumption favors production of an EIS. *See* 40 C.F.R. § 1505.3(a) (2020) (Council on Environmental Quality ("CEQ") regulations providing that agency should "[i]nclude appropriate conditions in grants, permits, or other approvals" to "assure" mitigation is "carried out")[7]; *Government of Manitoba v. Zinke*, 273 F.

---

[7]     On February 25, 2025, CEQ issued an Interim Final Rule rescinding all iterations of the agency's NEPA regulations effective April 11, 2025, and removing 40 C.F.R. part 1500 from the Federal Register. 90 Fed. Reg. 10,610 (Feb. 25, 2025). The Interim Final Rule states, however,

Supp. 3d 145 (D.D.C. 2017) (rejecting plaintiff's challenge to an agency's proposed mitigation measure because plaintiff "essentially ask[ed] the Court to assume that [the agency] will ignore" its own analysis); *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 464 F. Supp. 2d 1171, 1225 (M.D. Fla. 2006) ("Here, the Court has found that the mitigation is scientifically supported . . . and sufficiently enforceable through the permit's special conditions. While the plaintiffs have offered contrary evidence as to both of these points, the record provides substantial evidentiary support for the Corps' determination.").

**B.      FAA Imposed Lighting Mitigation Well-Tailored to the Effects at Issue.**

Plaintiffs specifically dispute the efficacy of SpaceX's Lighting Management Plan, arguing that FAA could not rely on that plan because: (1) it had not yet been implemented when the PEA was issued; (2) there was insufficient evidence the Plan would be effective; and (3) there was insufficient mitigation for sea turtles.  Pls.' Reply at 29.  As to the first criticism, a mitigation measure need not be fully implemented before the agency reaches a final determination.  *See Oglala Sioux*, 45 F.4th at 305 ("Fairly evaluating mitigating strategies does not, however, require an agency to have actually formulated and adopted a fully developed plan that will mitigate harm before an agency can act." (quotation, citation, and alteration omitted)).  Moreover, FAA's reliance was wholly reasonable; implementation of the Lighting Plan was included as a term of SpaceX's launch permit, as well as in the Mitigated FONSI/ROD.  *Cf. Ohio Valley Env't Coal. v. Hurst*, 604 F. Supp. 2d 860, 891 (S.D.W.V. 2009) ("Because [the action]

---

that "agencies should, in defending actions they have taken, continue to rely on the version of CEQ's regulations that was in effect at the time that the agency action under challenge was completed." *Id*. at 10,614.  Here, that version is the iteration of CEQ's regulations published in 2020.  *See* 85 Fed. Reg. 43,304 (July 16, 2020).

does not include a monitoring plan nor require the development of a monitoring plan, I cannot

find that the Corps has shown that its . . . mitigation measures will be adequately policed.").

As to Plaintiffs' second criticism, they raise the issue of SpaceX's alleged noncompliance

with mitigation measures in the 2014 EIS as a reason to doubt the efficacy of mitigation imposed

on the Proposed Action. Pls.' Reply at 29-31. But Plaintiffs overlook that while TPWD raised

concerns regarding SpaceX's compliance with mitigation going forward, the state agency was

also provided with various iterations of SpaceX's Lighting Plan, FAA_39282-97, and indeed

raised no comments at one meeting. FAA_13256-57. Similarly, while Plaintiffs reference

concerns from TPWD (submitted at the scoping stage), they leave out that one comment from the

state agency "recommend[ed] developing a new Lighting Management Plan that eliminates or

minimizes site lighting from being directed toward the beach or into land managed for wildlife."

FAA_46068; *see also* FAA_47163 (recommending the same). That is exactly what happened;

thus, the Lighting Plan satisfies even a more stringent review of mitigation measures. *See*

*Mulgrew v. U.S. Dep't of Transp.*, 750 F. Supp. 3d 171, 245 (S.D.N.Y. 2024) (holding that an EA

that included "binding mitigation plans accompanied by monitoring . . . fits comfortably within

[Second Circuit] precedents").[8]

Third, Plaintiffs feint at challenging the efficacy of the planned mitigation with respect to

sea turtles. Pls.' Reply at 27-29. But there, too, the agency's conclusion was supported by

substantial evidence. *See Friends of Clearwater v. Petrick*, 588 F. Supp. 3d 1071, 1100 (D. Idaho

2022) ("this case is relatively simple because the relationship between the environmental impact

---

[8]     Plaintiffs cite to FAA_1420 for the proposition that "SpaceX never even fully
implemented the prior lighting plan, so impacts to wildlife from lighting have been ongoing."
Pls.' Reply at 29-30. But that citation does not appear to support Plaintiffs' point, or indeed
contain any discussion at all regarding lighting or mitigation.

and the mitigation measure is fully quantitative").   As FWS explained, this mitigation was credited with "help[ing] reduce the effects [ ] lights have on turtles."  FAA_9877.  Indeed, the Service made clear that because "[a]ll sea turtle nests detected on Texas beaches are collected," the only adverse effect would be if a "sea turtle nest event" were missed by the personnel conducting the surveys.  FAA_9876.

### C.    The Anomaly Mitigation Set Forth in the PEA is All That NEPA Requires.

The PEA recognizes that the Proposed Action may result in accidents that impact the surrounding environment.  It then sets forth a series of plans to mitigate these impacts, including plans aimed at minimizing impacts from debris recovery, removal, and cleanup.  As explained in Defendants' brief, this satisfies NEPA.  *See* Defs.' Mem. at 38.

In their Opposition, Plaintiffs merely repeat their argument that an EIS is required because the "impacts associated with debris and debris removal efforts form anomalies/explosions cannot possibly be mitigated."  Pls.' Reply at 19 (emphasis omitted).  But Plaintiffs cite no case in support of this position.  As explained above, agency mitigation analysis is entitled to substantial deference.  So long as the agency "discuss[es] mitigation measures in sufficient detail to ensure that [the] environmental consequences have been fairly evaluated," the agency satisfied NEPA.  *See Nat'l Parks Conservation Ass'n*, 177 F. Supp. 3d at 23 (cleaned up). The analysis in the record clearly meets this standard.  At best, Plaintiffs establish that FAA did not implement every mitigation recommendation of the consulting agencies.  *See* Pls.' Reply at 15-17.  But, this "slavish[ ]" adherence to another agency's comments is not required "under the rule of reason."  *Nat'l Parks Conservbation Ass'n*, 177 F. Supp. 3d at 31 (cleaned up).

### D.    Plaintiffs Ignore the FONSI/ROD's Substantial Access-Related Mitigation Measures.

Plaintiffs only discuss two types of access-related mitigation measures in their Reply, the measures specific to the Refuge and the Carrizo/Comecrudo Tribe.  Their critiques of these measures are the same as their critiques of mitigation elsewhere: FAA did not provide sufficient mitigation and, in any event, the sufficiency of the measures is irrelevant as the impacts cannot be mitigated.  *See* Pls.' Reply at 24-25 (discussing the Refuge-related mitigation), 25-27 (discussing the Tribe-related mitigation).  Plaintiffs' arguments must fail because they are divorced from the binding measures FAA imposed.

As to the potential impacts to the Refuge, Plaintiffs claim that the mitigation measures do not address the "'substantial impairment' from closures . . . to features and attributes and the ability to manage refuge resources and provide for wildlife-dependent recreation."  *Id*. at 24.  Once again, though, Plaintiffs just assert this conclusion.  They provide no explanation or analysis as to why the substantial mitigation measures imposed by FAA and discussed in Defendants' Memorandum are inadequate.  This is unsurprising as the mitigation measures specifically address the concerns Plaintiffs raise.  For example, the responsible agencies can manage the Refuge's resources because SpaceX must give the agencies notice of access restrictions at least 48 hours prior to the restriction's imposition, FAA_10085-86, thus giving the agencies time to prepare.  Even during periods when access restrictions are imposed, agency personnel can still pass through certain checkpoints to access the Refuge.  FAA_10077.  Similarly, SpaceX agreed to take all necessary steps to ensure the Federal and state agencies have access to the Refuge, FAA_10589-90, and also agreed to provide funds to FWS to assist the agency with hiring an employee, FAA_10077.  Plaintiffs never engage with the substance of these mitigation measures and, thus, cannot show why they are arbitrary and capricious.  *See*

*Sierra Club*, 38 F.4th at 232 (upholding the agency's mitigation measures when petitioners' critique "does not accurately reflect the" mitigation in the NEPA analysis); *see also Dakota Res. Council v. U.S. Dep't of Interior*, No. 22-cv-1853 (CRC), 2024 U.S. Dist. LEXIS 51013, at *82-83 (D.D.C. Mar. 22, 2024) ("More importantly, it is plaintiffs' duty to come forward with evidence demonstrating that BLM acted in an arbitrary and capricious manner by not properly mitigating the environmental impact of its leases.").

As to the impacts to the Tribe, Plaintiffs assert there is "no mitigation or process for working with the Tribe to avoid conflicts from closures."  Pls.' Reply at 27.  This is inaccurate. FAA imposed significant measures to mitigate the potential impacts from access restrictions, including limits on when SpaceX can impose its access restrictions and the provision of advance notice to third parties (such as the Tribe), which should allow for prior planning.  *See* Defs.' Mem. at 40.  These measures are reasonable, and Plaintiffs never explain otherwise.  *See New York v. U.S. Nuclear Regul. Comm'n*, 824 F.3d 1012, 1018 (D.C. Cir. 2016) (rejecting petitioners' claims that the agency did not discuss mitigation and finding that the proposed mitigation was reasonable).

## III.    FAA Did Not Unlawfully Delegate its NEPA Review to SpaceX.

In addition, Plaintiffs claim that "[t]he record shows that the FAA unlawfully delegated to SpaceX the decision as to what level of NEPA review should be required," and that because FAA "made no attempt whatsoever to address this issue," FAA has "waiv[ed] any defense."  Pls.' Reply at 5.  While FAA may not have addressed Plaintiffs' argument explicitly, it made clear that FAA complied with the relevant regulations.  SpaceX informed FAA that it sought a vehicle operator license, FAA next determined that the 2014 EIS could not support the issuance of a new license, SpaceX then submitted an application with its analysis, which FAA reviewed and issued

a draft PEA (on which FAA sought public comment and consultations with other Federal and state agencies), and, finally, FAA issued a PEA and a Mitigated FONSI/ROD.  *See* Defs.' Mem. at 8-10.  Throughout, FAA maintained ultimate responsibility for NEPA analysis, even though SpaceX submitted environmental information.  *See* 14 C.F.R. § 450.47; 40 C.F.R. § 1506.5(6) (2020).  And though Plaintiffs now seem to make clear their true disagreement is with SpaceX's input as to whether an EA or EIS was appropriate, Pls.' Reply at 6, that argument, too, is belied by FAA's NEPA procedures.  *See, e.g.*, FAA_50989 (FAA explaining will make ultimate determination regarding impacts and the level of review required).

IV.    **Should it be Necessary, Defendants Request the Opportunity to Provide Further Briefing on Remedy.**

If necessary (and for the foregoing reasons it is not), further briefing as to the appropriate remedy is the proper course of action.  While Plaintiffs presume the nature of the Court's finding, whether vacatur is warranted is a necessarily fact-specific inquiry.  *See, e.g.*, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (applying *Allied-Signal* factors to determine whether to vacate agency action); *see also Gulf v. Burgum*, — F. Supp. 3d —, 2025 WL 928684, at *26 (D.D.C. Mar. 27, 2025) (ordering additional briefing on remedy).

Additional briefing particularly would be warranted because, while this matter has been pending, FAA has issued a subsequent tiered EA for an increase in Starship launch cadence from Boca Chica.[9]  Thus, to the extent that FAA's subsequent analysis in the new tiered EA addresses any deficiencies identified by the Court, remand may be unnecessary.  *See Midwater Trawlers Coop. v. Dep't of Commerce*, 393 F.3d 994, 1006-07 (9th Cir. 2004) (deeming remand

---

[9]        *Available at* https://www.faa.gov/media/94346.

"unnecessary" where the agency had "already conducted" actions necessary to remedy any violations); *see also Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, No. 17-5747, 2019 WL 280001, at *2-3 (W.D. Wash. Jan. 22, 2019).

## CONCLUSION

For the foregoing reasons, as well as those set forth in Defendants' Memorandum, the Court should grant summary judgment to Defendants.

Respectfully submitted this 20th day of May, 2025,

<div style="margin-left:40%">

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

*/s/ Gregory M. Cumming*
Gregory M. Cumming (D.C. Bar No. 1018173)
Matthew P. Rand (N.Y. Bar No. 4937157)
Environment & Natural Resources Division
Natural Resources Section
150 M St., N.E.
Washington, D.C. 20002
(202) 305-0457 (office)
(202) 598-0414 (cell)
gregory.cumming@usdoj.gov

*Counsel for Defendants*

</div>

24