## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,

        Plaintiffs,

    v.

FEDERAL AVIATION
ADMINISTRATION, *et al.*,

        Defendants,

    and

SPACE EXPLORATION TECHNOLOGIES
CORP.,

        Intervenor-Defendant.

Civil Action No. 1:23-cv-1204-CJN

## INTERVENOR-DEFENDANT SPACE EXPLORATION TECHNOLOGIES CORP.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................... 1

ARGUMENT ................................................................................................................................ 2

   I.   Congress strictly limited the FAA's discretion to apply NEPA when making CSLA licensing decisions. ................................................................................................... 2

      A.   The CSLA does not allow the FAA to consider a broad range of environmental effects under NEPA. ........................................................................................... 3

      B.   The CSLA's timing requirements reinforce the FAA's limited discretion. ................. 5

      C.   Because the CSLA's requirements are statutory, it does not matter whether the FAA has raised them. ................................................................................................ 6

   II.   Plaintiffs cannot escape the APA's arbitrary and capricious standard of review. .......... 7

      A.   Plaintiffs' "may have significant effects" standard conflicts with the APA's arbitrary and capricious standard. .......................................................................... 8

      B.   The APA does not allow courts to second-guess agency factual findings or require "substantial evidence." ........................................................................................ 9

   III.   The FAA's finding of no significant impact was not arbitrary and capricious. ............. 10

      A.   The FAA did not delegate its duties to SpaceX. ....................................................... 10

      B.   Plaintiffs' focus on early-stage comments distorts the agency-review process. .......... 11

      C.   The FAA properly accounted for experience with rocket launches at other launch sites and for SpaceX's previously permitted activities. ..................................... 13

      D.   It was not arbitrary and capricious for the FAA to conclude that none of the impacts Plaintiffs flag warrants an EIS. .................................................................. 15

         1.   SpaceX's launch program will not significantly impact listed wildlife. ................... 16

         2.   Anomalies will not have significant impacts. ........................................................ 17

         3.   Temporary access restrictions are not a significant impact. .................................... 18

         4.   Lighting for SpaceX's launches will not have a significant impact on wildlife. ....... 19

         5.   Noise from SpaceX's launches will not have a significant impact on wildlife. ....... 21

         6.   The FAA took a hard look at noise impacts on people and reasonably found no significant effects. ................................................................................................ 23

   IV.   Even if Plaintiffs prevail, the FAA's decision should not be vacated. ........................... 25

CONCLUSION ............................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alaska Wilderness League v. Jewell*,
   788 F.3d 1212 (9th Cir. 2015) ............................................................................................4

*Alder v. Lewis*,
   675 F.2d 1085 (9th Cir. 1982) ..........................................................................................13

*AT&T Corp. v. FCC*,
   448 F.3d 426 (D.C. Cir. 2006) ............................................................................................8

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
   462 U.S. 87 (1983)................................................................................................................9

*Cascadia Wildlands v. Bureau of Indian Affairs*,
   801 F.3d 1105 (9th Cir. 2015) ..........................................................................................15

*Citizens Action Coal. of Ind., Inc. v. FERC*,
   125 F.4th 229 (D.C. Cir. 2025)........................................................................................4, 7

*Citizens Against Burlington, Inc. v. Busey*,
   938 F.2d 190,201 (D.C. Cir. 1991)....................................................................................12

*Citizens Against Rails-to-Trails v. Surface Transportation Board.*,
   267 F.3d 1144 (D.C. Cir. 2001) ......................................................................................3, 4

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971)..............................................................................................................9

*Coal. on Sensible Transp., Inc. v. Dole*,
   826 F.2d 60 (D.C. Cir. 1987) ............................................................................................15

*Conservation L. Found. v. FERC*,
   216 F.3d 41 (D.C. Cir. 2000)............................................................................................14

*Department of Homeland Security v. Regents of the University of California*,
   591 U.S. 1 (2020)..................................................................................................................7

*Department of Transportation v. Public Citizen*,
   541 U.S. 752 (2004)..........................................................................................................3, 4

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021)............................................................................................................10

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*,
   426 U.S. 776 (1976)..........................................................................................................6, 7

iii

*Jackson v. Mabus*,
   808 F.3d 933 (D.C. Cir. 2015) .................................................................................8

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024).................................................................................................7

*Marin Audubon Soc'y v. FAA*,
   121 F.4th 902 (D.C. Cir. 2024).............................................................................15

*Nat'l Audubon Soc'y v. Hoffman*,
   132 F.3d 7 (2d Cir. 1997).......................................................................................21

*Nat'l Wildlife Fed'n v. Appalachian Reg'l Comm'n*,
   677 F.2d 883 (D.C. Cir. 1981)...............................................................................14

*National Parks Conservation Association v. Semonite*,
   916 F.3d 1075 (D.C. Cir. 2019) ............................................................................11

*Nevada v. Dep't of Energy*,
   457 F.3d 78 (D.C. Cir. 2006) ................................................................................18

*New York v. EPA*,
   413 F.3d 3 (D.C. Cir. 2005) ...........................................................15, 16, 22, 23

*Pomona Valley Hosp. Med. Ctr. v. Becerra*,
   82 F.4th 1252 (D.C. Cir. 2023) .............................................................................10

*Powder River Basin Res. Council v. U.S. Bureau of Land Mgmt.*,
   37 F. Supp. 3d 59 (D.D.C. 2014)..........................................................................17

*Save RGV v. SpaceX*,
   No. 1:24-CV-00148, 2024 WL 5357188 (S.D. Tex. Nov. 21, 2024) .....................25

*Sierra Club v. Van Antwerp*,
   661 F.3d 1147 (D.C. Cir. 2011) ..............................................................................8

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
   985 F.3d 1032 (D.C. Cir. 2021)........................................................................11, 21

*Theodore Roosevelt Conservation P'ship v. Salazar*,
   616 F.3d 497 (D.C. Cir. 2010) ..............................................................................18

*TOMAC v. Norton*,
   240 F. Supp. 2d 45 (D.D.C. 2003) ........................................................................20

*TOMAC v. Norton*,
   433 F.3d 852 (D.C. Cir. 2006) ...........................................................................7, 8

*Vill. of Barrington v. Surface Transp. Bd.*,
   636 F.3d 650 (D.C. Cir. 2011) ................................................................5

*W. Va. v. EPA*,
   362 F.3d 861 (D.C. Cir. 2004) ................................................................9

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ....................................................................................7

*Wisconsin v. EPA*,
   938 F.3d 303 (D.C. Cir. 2019) ................................................................9

**Federal Statutes**

5 U.S.C.
   § 706(2)(E) ..............................................................................................9

16 U.S.C.
   § 1538 ....................................................................................................21

33 U.S.C.
   § 1321(j)(5)(E) ........................................................................................4

42 U.S.C.
   § 4336a(f) ..............................................................................................10

51 U.S.C.
   § 50901 ..........................................................................................1, 2, 5, 6
   § 50905 ...........................................................................................*passim*
   § 50914(a)(3) ........................................................................................24

**Other Authorities**

14 C.F.R.
   § 405.3(b) ..............................................................................................21
   § 406.9 ...................................................................................................21
   § 450.41 ...................................................................................................2
   § 450.45 ...................................................................................................2
   § 450.101(a) .............................................................................................5
   § 450.113-189 ..........................................................................................2
   § 450.123 .................................................................................................5
   § 450.133 .................................................................................................5
   § 450.135 .................................................................................................5
   § 450.137 .................................................................................................5

85 Fed. Reg. 43,304 (July 26, 2020) ........................................................15

90 Fed. Reg. 106,101 (Feb. 25, 2025). ....................................................15

## INTRODUCTION

The National Environmental Policy Act (NEPA) calls for a simple procedural check on a project's environmental harms. If harms are not significant or if Congress has narrowed the scope of an agency's review, NEPA's role is limited.

When Congress passed and President Reagan signed the Commercial Space Launch Act of 1984 (CSLA), they sent a clear message: Licensing commercial space launches must not stymie this country's commercial space industry. Congress found that "private sector" space launches were "consistent with the national security and foreign policy interests of the United States," and essential for the country "to retain its competitive position internationally" in space transportation. 51 U.S.C. § 50901(a)(5), (6). Congress thus declared that "the United States should encourage" commercial space transportation companies like SpaceX, regulating them "only to the extent necessary" to protect "public health and safety, safety of property, and national security and foreign policy interests of the United States," using "stable, minimal, and appropriate regulatory guidelines that are fairly and expeditiously applied." *Id.* § 50901(a)(6), (7). Underscoring its point, Congress ordered the FAA to license launch operations that meet the CSLA's requirements within 120 days of accepting a license application, and never later than 180 days. *Id.* § 50905(a)(1).

Because the CSLA limits the FAA's discretion to deny launch licenses, NEPA demanded little when the FAA reviewed SpaceX's plan to launch Starship from an existing, private launch site in Texas. Still, the FAA's NEPA review studied the full range of potential environmental issues, including effects on wildlife, recreation, and beach access. The FAA thus covered (and went well beyond) the CSLA's narrow, safety-focused review, more than satisfying NEPA.

Even if the CSLA's limits on NEPA review are ignored, Plaintiffs do not meet their burden of showing the FAA's finding of no significant impact under NEPA was arbitrary and capricious. Plaintiffs try to escape this stringent standard of review by arguing that the mere hypothetical

1

possibility of significant effects is enough for them to win. But NEPA and the Administrative Procedure Act allow for just one question here: Was the FAA's finding of no significant impact from SpaceX's proposed launches arbitrary and capricious? The record shows that it was not. The FAA reasonably found that launches from an existing launch facility, accompanied by enforceable mitigation measures, would cause no significant environmental harm.

Plaintiffs' view of the record, and hence their claim of significant impact, rests on statements from other agencies. But those statements were made early in the review process. With time and collaboration, the record shows, the FAA resolved other agencies' concerns. More than that, the record shows that SpaceX's Starbase launch site—just like other spaceports have shown for the last half-century—can keep launching rockets while the environment thrives.

## ARGUMENT

### I.    Congress strictly limited the FAA's discretion to apply NEPA when making CSLA licensing decisions.

Plaintiffs cannot dispute what the CSLA plainly says: The FAA "shall issue" a launch license if an applicant "compl[ies] with" the CSLA's requirements, which Congress found must be "stable, minimal, and . . . fairly and expeditiously applied." 51 U.S.C. §§ 50905(a)(1), 50901(a)(6); *see* Pls. Resp. at 38. These licensing requirements—which involve several technical and primarily quantitative, risk-driven analyses—are designed to protect the "public health and safety, safety of property, and national security and foreign policy interests of the United States." *Id*. § 50905(a)(1), (b); *see* 14 C.F.R. §§ 450.41, 450.45, 450.113-189. The FAA must act quickly in reviewing a license application—within 120 days of accepting an application and no later than 180 days. 51 U.S.C. § 50905(a)(1). This mandate to expeditiously review proposed launches and license them if they meet the CSLA's "minimal" requirements limits the FAA's discretion and thus what the FAA must do under NEPA. Plaintiffs' contrary arguments fall flat.

### A.   The CSLA does not allow the FAA to consider a broad range of environmental effects under NEPA.

Even though the CSLA requires the FAA to issue launch licenses when they are "[c]onsistent with the public health and safety, safety of property, and national security and foreign policy of the United States," 51 U.S.C. § 50905(a)(1), Plaintiffs claim that "[t]he CSLA simply does not present the same limiting language" as cases where "NEPA review was constrained," Pls. Resp. at 37. That claim does not withstand scrutiny.

Plaintiffs' first example, *Department of Transportation v. Public Citizen*, illustrates their mistake. As Plaintiffs see it, *Public Citizen* limited agency NEPA review because the agency had "no discretion to prevent the entry of Mexican trucks." Pls. Resp. at 38. But the statute in *Public Citizen* said that the agency "*shall* register" a motor carrier *if* it would "comply with" safety rules established by the Department of Transportation. 541 U.S. 752, 766 (2004) (quoting 49 U.S.C. § 13902(a)(1)) (emphasis in original). So, the agency could stop the entry of Mexican trucks based on its safety rules. What it lacked was discretion to deny registration based on the environmental effects of increased truck traffic. *Id.* at 761, 766. That is why its NEPA review did not have to include those effects: "Where an agency has no ability to prevent [] certain effect[s] due to its limited statutory authority over the relevant actions, . . . the agency need not consider these effects in its EA when determining whether its action is a 'major Federal action'" under NEPA. *Id.* at 770; *see also id.* at 758–59. The same is true here. The FAA "*shall* issue" launch licenses unless they threaten public health or safety, and it thus lacks discretion to deny licenses based on broader environmental effects. Thus, the FAA did not have to study those effects in an EIS.

The situation was similar in Plaintiffs' other example, *Citizens Against Rails-to-Trails v. Surface Transportation Board*. Plaintiffs portray the Surface Transportation Board's role under the statute in that case as "entirely 'ministerial.'" Pls. Resp. at 38 (quoting *Citizens Against Rails-*

*to-Trails*, 267 F.3d 1144, 1150–51 (D.C. Cir. 2001)). But that portrayal elides the truth. The statute in *Citizens Against Rails-to-Trails*, like the one in *Public Citizen*, used "shall" language to focus the Board's decision on a few specific issues, none of which was environmental. *Citizens Against Rails-to-Trails*, 267 F.3d at 1150 (citing 16 U.S.C. § 1247(d)). This narrow statutory focus "re-move[d]" the Board's decision "from the reach of NEPA." *Id.* at 1152. Again, the CSLA fits this mold. By using "shall" language to mandate launch license issuance, the CSLA limits the FAA's discretion to specific "public health and safety, safety of property, and national security and foreign policy" requirements. *See* 51 U.S.C. § 50905(a)(1). These limits on the FAA's statutory authority mean that the FAA "need not consider" other effects in its NEPA review, *Pub. Citizen*, 541 U.S. at 770. *See also Citizens Action Coal. of Ind., Inc. v. FERC*, 125 F.4th 229, 239 (D.C. Cir. 2025) ("[W]hen the agency has no legal power to prevent a certain environmental effect, there is no decision to inform, and the agency need not analyze the effect in its NEPA review." (citation omit-ted)); *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1225 (9th Cir. 2015) (finding NEPA did not apply where a statute "constrained" an agency's "discretion" by requiring it to approve a plan "that meets [specific] statutory requirements" (citing 33 U.S.C. § 1321(j)(5)(D)–(E)).

As a backup, Plaintiffs argue that the CSLA's "public health and safety" language is a "broad mandate" to consider a full range of environmental issues under NEPA. Pls. Resp. at 38–39. But the most they can show is that public health and safety is *one aspect* of a typical NEPA review. *See id.* at 39 (citing cases). Their citation of the FAA's environmental order makes this point clear: Of the 21 categories that the FAA considers when evaluating environmental effects, public health is mentioned just 3 times. FAA57667–76 (FAA Order 1050.1F at 4-4 to 4-13). The CSLA's "public health and safety" language simply does not invite a free-wheeling consideration of environmental impacts. Just the opposite. The CSLA requires the FAA to issue a license if the

CSLA's specific public health and safety requirements are met.[1]

The CSLA's text cuts against Plaintiffs' last-ditch argument in other ways too. Congress's explicit goal in passing the CSLA was to "encourage" private spaceflight and to "regulate" it "only to the extent necessary." 51 U.S.C. § 50901(a)(7). Far from giving the FAA "broad authority," Pls. Resp. at 39, the CSLA limits the FAA's power to impose license requirements by focusing on terms "*necessary* to ensure compliance" with the statute and "protect the public health and safety, safety of property, national security interests, and foreign policy interests of the United States." 51 U.S.C. § 50905(b)(2)(A), (B) (emphasis added). And, contrary to Plaintiffs' bald assertion, those necessities do not "include[] environmental considerations," Pls. Resp. at 40.[2] Rather, the plain meaning of "public health and safety" does not include most of Plaintiffs' claims, which turn not on harms to public health and safety, but on alleged harms to wildlife and recreation.

**B.    The CSLA's timing requirements reinforce the FAA's limited discretion.**

Plaintiffs' separate argument that there is "no 'timing conflict' between the CSLA and NEPA," Pls. Resp. at 40, misses key points. It is not enough to say that the D.C. Circuit held a 180-day deadline for action in a separate statute was compatible with NEPA. *See id.* The agency in that case met its 180-day deadline in the past. *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 663 (D.C. Cir. 2011). The FAA has not. Indeed, Plaintiffs do not dispute that virtually no EIS process by any agency has been completed that quickly in the last 15 years. *See* SpaceX Br. at 11. More importantly, the CSLA's primary deadline is *120* days—if the FAA misses that target, it must tell the applicant how it will "resolve the issue." 51 U.S.C. § 50905(a)(1). The statute

---

[1] Plaintiffs do not dispute that the CSLA's stringent safety and property protections are met. *See* 14 C.F.R. §§ 450.101(a), 450.123, 450.133, 450.135, 450.137.

[2] Because the CSLA limits the FAA's discretion to consider environmental issues, the FAA did not have to exempt launch licenses from NEPA review, as Plaintiffs suggest. *See* Pls. Resp. at 40.

in *Village of Barrington* contained no similar level of urgency.

In any case, the CSLA's 120- and 180-day deadlines simply underscore the FAA's limited discretion in issuing launch licenses.[3] Everything about the CSLA points in the same direction. Congress was clear that it wanted to "encourage" private spaceflight and keep the United States "competitive" through "stable, minimal, and appropriate regulatory guidelines that are fairly and expeditiously applied." 51 U.S.C. § 50901(a)(5)–(7). To that end, the CSLA sets up a regulatory regime that focuses on public health and safety while setting strict deadlines for license issuance. *Id.* § 50905(a)(1). NEPA's applicability must be viewed through that lens.

Plaintiffs also claim that the FAA can end-run Congress's intent by promulgating a rule requiring the entire NEPA process to be done before the CSLA's clock starts. Pls. Resp. at 40–41. But the Supreme Court rejected such a workaround in *Flint Ridge*, holding that even "if the Secretary ordered" a delayed filing—as the FAA has done in its rules—it would be "no more than a circumvention of the statute's language" and "equally violative of its purpose." 426 U.S. 776, 791 n.13 (1976). In any case, dodging the CSLA's deadlines cannot expand agency discretion. Whether the agency has six months or six years to act, its review is bounded by the public health and safety considerations listed in the statute. *See* 51 U.S.C. § 50905(a)(1). Those considerations do not encompass the alleged harms to wildlife and recreation that are the crux of Plaintiffs' NEPA claims.

### C. Because the CSLA's requirements are statutory, it does not matter whether the FAA has raised them.

Plaintiffs' first-line response to SpaceX's CSLA arguments is not substantive; it is to label SpaceX's argument a "post hoc rationalization" that the Court cannot consider. Pls. Resp. at 36.

Plaintiffs' error is their assumption that the scope of an agency's legal duty depends on its

---

[3] True, the FAA's NEPA review here considered an entire launch program. Pls. Resp. at 40 n.16. But the process was triggered by SpaceX's launch license application. FAA11363 (PEA at 1).

express reasons for acting. In *Department of Homeland Security v. Regents of the University of California*, the Supreme Court was addressing "whether agency action was adequately explained," which required understanding the "reason (or reasons)" for the agency's action. 591 U.S. 1, 20–21 (2020). Here, by contrast, the question is what the law required the agency to do. Even if the FAA believed that it had to conduct a full environmental analysis of every launch license, that does not mean the law required as much. NEPA does not punish an agency for a "good deed." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 31 (2008); *see also Citizens Action Coal. of Ind.*, 125 F.4th at 242 ("The APA's prejudicial error rule applies to" NEPA reviews.). Rather, the FAA can violate NEPA only to the extent the law requires it to do more. And "the reviewing court—not the agency whose action it reviews—is to decide all relevant questions of law and interpret statutory provisions." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 398 (2024) (citations, ellipses, and internal quotation marks omitted). Because the CSLA limited the FAA's duties to review of public health and safety, any failure to study other issues under NEPA cannot be held against it.[4]

## II.    Plaintiffs cannot escape the APA's arbitrary and capricious standard of review.

To the extent NEPA applies to the FAA's licensing action here, that action must be reviewed under the APA's arbitrary and capricious standard. Under this standard, courts "will overturn an agency's decision to issue a FONSI—and thus not to prepare an EIS—only if the decision was arbitrary, capricious, or an abuse of discretion." *TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006). Equally important, it is the plaintiff's "burden . . . to show that [the agency] failed" to

---

[4] Plaintiffs' claim that Congress did not intend to allow "massive harm on the surrounding environment" in enacting NEPA is beside the point. Pls. Resp. at 36. NEPA does not "repeal by implication any other statute" and, given a conflict, "NEPA must give way." *Flint Ridge*, 426 U.S. at 788. Here, the CSLA limits NEPA review. This does not mean unchecked environmental harm. Other substantive statutes—like the Clean Water Act, Clean Air Act, and Section 7 of the Endangered Species Act (ESA)—apply. Unlike these laws, "NEPA is a purely procedural statute . . . and does not require an agency 'to take one type of action or another.'" *Citizens Action Coal. of Ind.*, 125 F.4th at 235 (citation omitted).

meet the APA's standard. *AT&T Corp. v. FCC*, 448 F.3d 426, 431 (D.C. Cir. 2006). Yet from the first page of their response brief, Plaintiffs try to shift that burden, arguing that "SpaceX and Federal Defendants have failed to show" their compliance with NEPA. Pls. Resp. at 1. The court must reject this effort to invert the long-established APA standard of review.

### A.    Plaintiffs' "may have significant effects" standard conflicts with the APA's arbitrary and capricious standard.

Claiming to rely on "language taken straight from other rulings in this Circuit," Plaintiffs double down on their argument that agencies must prepare an EIS "if substantial questions are raised as to whether a project *may* have a significant effect upon the environment." Pls. Resp. at 8–9 (emphasis in original). But their string citation—a line of cases that can be traced back to a purported rule in the Ninth Circuit—fails to address SpaceX's discussion of APA review in NEPA cases. *See* SpaceX Br. at 14–15. In short, the relevant agency decision here is a Finding of No Significant Impact (FONSI). Unless that finding is arbitrary and capricious, it should survive APA review. *TOMAC*, 433 F.3d at 861.

Plaintiffs' idea that a FONSI can be overturned if there are "substantial questions" about possible significant impacts flips the APA's standard on its head. Under NEPA, an agency need not prepare an EIS if it finds a proposed action has no significant effects. Instead of asking whether an agency's finding of no significant impact is arbitrary and capricious, Plaintiffs would ask whether the agency *might* be wrong. Such a rule would abridge the APA and shift the burden from plaintiff to agency. That is why the D.C. Circuit has made clear that—regardless of confusing language in other cases—the proper "scope of review" in cases like this is the "arbitrary, capricious, or an abuse of discretion" standard. *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011); *see also Jackson v. Mabus*, 808 F.3d 933, 936 (D.C. Cir. 2015) ("The question is not . . . whether we agree with the agency action."). Thus, the question here is whether Plaintiffs show

that the FAA's FONSI was arbitrary and capricious.

**B.  The APA does not allow courts to second-guess agency factual findings or require "substantial evidence."**

In deciding whether an agency's decision is arbitrary and capricious, a court often must review factual disputes. Here again, Plaintiffs get the standard of review wrong.

When an agency "is making predictions, within its area of special expertise," like the FAA was here, "a reviewing court must generally be at its most deferential." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983); *see* SpaceX Br. at 17. This deference grows out of the arbitrary and capricious standard. *W. Va. v. EPA*, 362 F.3d 861, 867–68 (D.C. Cir. 2004). And it applies with special force to challenges that target "an agency's predictions and scientific determinations," *Wisconsin v. EPA*, 938 F.3d 303, 320 (D.C. Cir. 2019), as Plaintiffs do here.

Plaintiffs ignore this clear rule. Instead, they repeatedly argue that they should win because "the *agency* . . . must provide substantial evidence in its NEPA documents to support" its FONSI. Pls. Resp. at 9 (emphasis in original); *id.* at 13, 24–25. This argument fails because "[r]eview under the substantial-evidence test is authorized only when the agency action is taken pursuant to a rulemaking provision of the [APA], or when the agency action is based on a public adjudicatory hearing." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *see* 5 U.S.C. § 706(2)(E). The FAA's action here is neither (*see* FAA10336-37 (FONSI at 2-3, describing FAA's licensing action)) and thus review is under the arbitrary and capricious standard.

Even if the substantial evidence standard applied, Plaintiffs mischaracterize it. They frame the issues as whether the FAA *provided* substantial evidence, suggesting the burden rests on the agency. Pls. Resp. at 6, 9. But the standard actually requires plaintiffs to "show that the evidence was so one-sided as to compel the [agency] to resolve the factual issues in its favor—the

administrative equivalent of a directed verdict for the plaintiff." *Pomona Valley Hosp. Med. Ctr. v. Becerra*, 82 F.4th 1252, 1259 (D.C. Cir. 2023). Plaintiffs cannot pretend to meet that standard.

In sum, arbitrary and capricious review "is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Plaintiffs resist this standard because, under it, they lose. But the cases are clear: There is no way around arbitrary and capricious review when a party challenges federal agency action.

## III. The FAA's finding of no significant impact was not arbitrary and capricious.

Plaintiffs cannot prevail under the APA's arbitrary and capricious standard. As SpaceX and the FAA showed in their opening briefs, the record is full of evidence supporting the FAA's conclusion that SpaceX's launch program at an existing launch site will not have significant environmental effects. In response, Plaintiffs' latest brief offers nothing to rebut that showing.

### A. The FAA did not delegate its duties to SpaceX.

Plaintiffs claim that the FAA "unlawfully delegated to SpaceX the decision as to what level of NEPA review" SpaceX's launch program required. Pls. Resp. at 5. Their sole support for this accusation is a snippet from a letter that they characterize as an FAA admission that SpaceX could choose between an EA and an EIS. *Id.* at 6 (citing FAA51672). A more careful read of that letter shows the truth: The FAA said SpaceX could prepare an EA, *but* if the EA shows "significant impacts that cannot be mitigated," then "the FAA must conduct an EIS." FAA51672. This explanation is consistent with agency policies, which have long allowed applicants to prepare EAs under supervision and required EISs if FAA review reveals significant effects. FAA57649 (FAA Order 1050.1F at 2-5); FAA57701 (*id.* at 6-6) (explaining that "the responsible FAA official determines whether any environmental impacts analyzed in the EA are significant.").[5]

---

[5] Congress has since endorsed applicant-prepared EISs under agency supervision, in addition to EAs. 42 U.S.C. § 4336a(f).

Other parts of the record show the same thing. The FAA told SpaceX from the start that the agency would have to prepare an EIS if an EA found significant effects that could not be mitigated. FAA50989. The agency also supervised SpaceX's work throughout. FAA46923–32 (schedule showing FAA involvement). And the FAA's review of the EA and other input led the agency to find no EIS was required. FAA12351–52 (PEA Comment Responses at I-4–I-5).

Plaintiffs try to avoid these record rebuttals by arguing that the FAA waived any defense on this point. Pls. Resp. at 5. But the FAA pointed out that its regulations and procedures authorize applicants to submit environmental impact information to the FAA for independent review, FAA Br. at 47 n.28, and thus did not waive this issue.

**B.  Plaintiffs' focus on early-stage comments distorts the agency-review process.**

Next, Plaintiffs insist that other state and federal agencies took their side. In Plaintiffs' telling, "the record is replete with statements" from these agencies describing "ongoing and fore-seeable significant environmental harm" that "cannot be sufficiently mitigated, thus triggering the need for an EIS." Pls. Resp. at 6–7. This story is wrong on both the law and the facts.

On the law, Plaintiffs point to two D.C. Circuit decisions: *National Parks Conservation Association v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019) and *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 985 F.3d 1032 (D.C. Cir. 2021). Their opening brief argued that, under those cases, "explicit statements" from "expert agencies" made it impossible for the FAA to "reasonably conclude[] that an EIS was not required." Pls. Br. at 18. SpaceX pointed out a flaw in that argument: The cases found that inter-agency disagreement required an EIS because they showed the project was "highly controversial"—an issue Plaintiffs have not raised and is based on a defunct "intensity" factor. SpaceX Br. at 20. Now, Plaintiffs say "those cases also dealt with . . . 'uncertainty.'" Pls. Resp. at 7. But neither case held that agency concerns about effects—particularly early-stage comments like those at issue here—require an EIS. Plaintiffs' contrary view

cannot be reconciled with the rule that NEPA does not require lead agencies "to follow [other agency] comments slavishly—it just has to take them seriously." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 201 (D.C. Cir. 1991).

On the facts, the agency statements Plaintiffs cite do not show unresolved scientific controversy requiring an EIS. NEPA review is iterative. It typically starts with a lead agency asking other agencies (and the public) what issues should be reviewed. *See* FAA57699, FAA57711 (FAA Order 1050.1F at 6-4, 7-7). This early input shapes the lead agency's review, which leads to a draft document. FAA57699. At this stage, the lead agency asks for more input, which helps it refine its analysis before it issues a final document. FAA57700. In many cases, including here, the NEPA process involves further inter-agency review under complementary laws like the National Historic Preservation Act, ESA, and Section 4(f) of the U.S. Department of Transportation Act. Because this review process facilitates back-and-forth between agencies, it is no surprise that views change. Early-stage comments happen before the lead agency has studied potential effects, much less documented its decision.

Plaintiffs' arguments miss this distinction. They focus almost exclusively on early-stage comments, while ignoring or downplaying later input from the same agencies. To take one example, Plaintiffs urge that the Texas Parks and Wildlife Department's (TPWD) comments about significant impacts on parklands from past anomalies weigh in their favor. Pls. Resp. at 17 (citing FAA46054). But after the FAA's review was complete, TPWD signed a Memorandum of Agreement that found anomalies and anomaly responses would have no more than a "de minimis" impact on those same parklands. FAA7573 (PEA Appendix K – Sept. 2021 MOA). Since de minimis effects cannot be significant, TPWD's view clearly evolved during the review process. And the record shows good reasons for TPWD's conclusion. *See* SpaceX Br. 34–41 (discussing support

for significance findings regarding anomalies and access restrictions). As SpaceX explained in its opening brief, the record shows that other agencies' initial concerns were also addressed. *Id.* at 21–24 (detailing how the FAA resolved early-stage comments from other agencies).

Tacitly admitting this point, Plaintiffs try to distinguish between the other agencies' final comments on ESA and Section 4(f) issues and their views on NEPA significant impacts. *See* Pls. Resp. at 18–19. On at least three levels, that distinction makes no sense. First, if the agencies had intended to make such a fine distinction, they would have done so explicitly. None did. Second, as already noted, the agencies would not have concurred in a de minimis determination under Section 4(f) if they continued to think the effects on those parklands were significant for NEPA purposes—the findings required by the two laws are not that different. *Alder v. Lewis*, 675 F.2d 1085, 1092 (9th Cir. 1982) (drawing "[a]n analogy" between Section 4(f) use determinations and NEPA significance findings). Third, some of the agencies' final findings *do* expressly address significance, especially the U.S. Fish and Wildlife Service's (FWS) Biological and Conference Opinion. FAA9887, FAA9889, FAA9891–92 (BCO at 92, 94, 96–97) (finding no significant effects on ocelot, jaguarundi, sea turtles, and birds).

In short, because the other agencies' views on the effects of SpaceX's launches evolved, Plaintiffs cannot rely on early-stage comments as support for their significance claims.

### C. The FAA properly accounted for experience with rocket launches at other launch sites and for SpaceX's previously permitted activities.

This is not the first time the FAA has considered potential effects of rocket launches from a spaceport near wildlife habitat and conservation areas. The FAA knows from experience that launches are unlikely to significantly affect these resources.

Take Merritt Island National Wildlife Refuge, adjacent to the Kennedy Space Center and the Cape Canaveral Space Force Station. Decades of rocket launches from these sites have brought

"increased noise levels" to Merritt Island. FAA67069. Yet "[t]he refuge's habitats support one of the highest numbers of endangered and threatened species" in the entire National Wildlife Refuge system, including over 350 bird species and 140 fish species.[6] The same is true at Vandenberg Space Force Base, where far more frequent launches than what the FAA licensed at Starbase have caused no significant environmental effects.[7] *See* FAA237343–44, FAA237462. Launch programs at these facilities actually *protect* wildlife habitat by preventing development in the launch zone. This "unique relationship" between spaceports and wildlife is described on Merritt Island National Wildlife Refuge's website as "testimony that nature and technology can coexist."[8] The FAA listened to that testimony when conducting its review here.

Plaintiffs sidestep the success of wildlife at Cape Canaveral and Vandenberg. They argue that because some of the environmental effects studied in the FAA's 2014 EIS were deemed significant, any future activity is too. *See* Pls. Resp. at 2–3. But NEPA and the cases interpreting it confirm that the question is whether the *incremental* effects of a project are significant; existing development serves as a baseline. *See, e.g.*, *Nat'l Wildlife Fed'n v. Appalachian Reg'l Comm'n*, 677 F.2d 883, 889-90 (D.C. Cir. 1981) ("[T]he EIS obligation . . . is realistically qualified by the elements of the program already in place."); *Conservation L. Found. v. FERC*, 216 F.3d 41, 45-46 (D.C. Cir. 2000) (upholding use of existing conditions of an operating dam as the baseline for analyzing the environmental effects of relicensing the dam). Thus, the FAA was right to measure

---

[6] Merritt Island National Wildlife Refuge, Featured Species, *available at* https://www.fws.gov/refuge/merritt-island/species (last accessed May 5, 2025); *see* FAA60275, FAA60279, FAA60285 (monitoring of Delta, Atlas, and Titan Launches from Cape Canaveral shows no animal mortality).

[7] *See* Environmental Assessments, Vandenberg Space Force Base, *available at* https://www.vandenberg.spaceforce.mil/about-us/environmental/eas/ (last accessed Apr. 17, 2025) (numerous EAs prepared in connection with additional launch activities at Vandenberg). Vandenberg is near Channel Islands National Park. FAA237402–05.

[8] Merritt Island National Wildlife Refuge, Featured Species, *available at* https://www.fws.gov/refuge/merritt-island/species (last accessed May 5, 2025).

the impacts of SpaceX's proposed Starship launch program from a baseline of existing activities at Starbase, which includes an approved launch site that SpaceX had been operating for years.

Plaintiffs' related argument—that the FAA should have considered the cumulative effects of past actions at Starbase—also fails. To start, Plaintiffs waived their cumulative effects argument by not raising it in their opening brief. *New York v. EPA*, 413 F.3d 3, 20 (D.C. Cir. 2005). Regardless, the Council on Environmental Quality's then-applicable NEPA regulations did not require consideration of cumulative effects. *See* 85 Fed. Reg. 43,304, 43,331 (July 26, 2020) (striking "references to . . . cumulative effects" from the rules). Since then, the D.C. Circuit has held that CEQ's NEPA regulations were ultra vires, *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 914 (D.C. Cir. 2024), and CEQ has withdrawn them, 90 Fed. Reg. 10,610, 10,613–14 (Feb. 25, 2025).

Even if a cumulative effects analysis had been required, the FAA conducted one by evaluating the incremental effects of the proposed Starship launches against the baseline of existing conditions resulting from past, ongoing, and reasonably foreseeable actions by SpaceX and others. *See, e.g.*, FAA11375, FAA11418, FAA11431-32 (PEA at 13, 56, 69-70) (cataloging other private and public activities in the larger area). In this way, the FAA properly "aggregat[ed] the cumulative effects of past projects into an environmental baseline, against which the incremental impact of a proposed project is measured." *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1111 (9th Cir. 2015); *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 70 (D.C. Cir. 1987) ("It makes sense to consider the 'incremental impact' of a project for possible cumulative effects by incorporating the effects of other projects into the background 'data base' of the project at issue.").

### D. It was not arbitrary and capricious for the FAA to conclude that none of the impacts Plaintiffs flag warrants an EIS.

Once their argument that other agencies saw significant impacts is debunked, Plaintiffs have little left. The record shows that the FAA reasonably found no significant environmental

effects from licensing up to five orbital launches and, if needed, five suborbital launches a year at an existing launch site.

### 1.    SpaceX's launch program will not significantly impact listed wildlife.

Both the FAA and FWS reasonably found no significant effects on either ESA-listed species or their critical habitat. Plaintiffs disagree, arguing that the FAA improperly based its NEPA significance finding on the no jeopardy and no adverse modification of habitat findings that were made under the ESA. Pls. Resp. at 14. That is not what happened.

Again, the FAA's starting point for evaluating effects on species was studies of effects on similar species and site-specific monitoring data. SpaceX Br. at 24–26 (discussing studies showing only temporary effects on species); FAA11461, FAA11496 (PEA at 99, 134, discussing study showing no long-term effects from a small fire caused by an anomaly); FAA11494 (PEA at 132, discussing data showing no documented mortality or "statistically significant impact on" bird species). Based on the data, the FAA reasonably found that any effects on species would be temporary and, with mitigation, not significant. FAA11492–97, FAA11501–03 (PEA at 130–35, 139–41). The Biological and Conference Opinion included with the PEA reinforces these findings. FWS found SpaceX's launches would neither jeopardize *nor significantly impact* any ESA-listed species. *See* FAA9887, FAA9889, FAA9891–92 (BCO at 92, 94, 96–97) ("The effect of the take anticipated . . . is not expected to significantly affect" ocelot, jaguarundi, northern aplomado falcon, piping plover, piping plover critical habitat, red knot, or proposed red knot critical habitat, or Kemp's ridley, loggerhead, green, hawksbill, or leatherback sea turtles.). This record evidence is more than enough for the FONSI to pass the arbitrary and capricious test.

Plaintiffs now also complain that species that are not endangered or threatened might suffer significant impacts. Plaintiffs waived that argument by not raising it in their opening brief. *New York*, 413 F.3d at 20. Regardless, the EA found no significant effects on other species. For

example, the EA explains that while the Boca Chica flea beetle exists in the area, it would not be harmed by launch plumes. FAA11496 (PEA at 134); *see also, e.g.*, FAA11492–94 (PEA at 130–32) (discussing effects and mitigations for Texas indigo snakes, Texas tortoises, Wilson's plover, and snowy plover). The FAA complied with NEPA, and Plaintiffs' flyspecking should be rejected.

### 2. Anomalies will not have significant impacts.

Aside from their incorrect claims about other agencies' early comments, *see supra* at 11–13, Plaintiffs' anomalies argument boils down to their idea that it is impossible to mitigate any effects anomalies might have on algal flats. Pls. Resp. at 16–21. That argument is likewise flawed.

To mitigate any effects from anomaly debris on algal flats, SpaceX and TPWD signed a Memorandum of Agreement. FAA7574–77. That agreement acknowledges that there currently is no established protocol for restoring algal flats and, in this sense, restoration measures were "unproven." FAA7574. But "unproven" is not the same thing as "impossible."[9] *See* Pls. Resp. at 19. If restoration becomes necessary, the circumstances are ideal for a process of "adaptive management" that involves "implementing, monitoring, and learning from" restoration strategies under the agreement to figure out what works best. FAA7574. The FAA thus endorsed this agreement, calling it "a dynamic, working document" that allowed adjustment for "changing conditions, new data and information, and lessons learned." FAA12363 (PEA Comment Responses at I-16).

Adaptive management is a common mitigation measure, especially when dealing with effects (like anomaly debris in algal flats) that may never happen. *See Powder River Basin Res. Council v. U.S. Bureau of Land Mgmt.*, 37 F. Supp. 3d 59, 80–83 (D.D.C. 2014). The whole point

---

[9] Experience shows the algal flats recover after disturbance. The FAA explained, "the public has regularly driven on and across Boca Chica State Park and other surrounding areas for decades, without causing any permanent adverse impacts." FAA11463, FAA11505 (PEA at 101, 143). SpaceX agreed to erect barriers along State Highway 4 "to prevent trucks or ATVs from entering the NWR," thus reducing overall impacts to algal and other tidal flats. FAA10365 (FONSI at 31).

of adaptive management is to address the uncertainty inherent in projects like this one. As the D.C. Circuit has held, "[a]llowing adaptable mitigation measures is a responsible decision in light of the inherent uncertainty of environmental impacts, not a violation of NEPA. It is certainly not arbitrary or capricious." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 517 (D.C. Cir. 2010). So too here. The FAA and TPWD reasonably chose an adaptive management approach to develop and implement best practices for restoration over time.

### 3.    Temporary access restrictions are not a significant impact.

Turning to a different sort of impact—but still not an impact to public health and safety—Plaintiffs argue that access restrictions are a significant effect, especially to the Carrizo/Comecrudo Tribe, a group which Plaintiffs now claim conduct ceremonies in areas that are off-limits during SpaceX's launches. Pls. Resp. at 26. This argument fails both procedurally and substantively.

The tribe waived this argument by not raising it during the public comment period. *See* SpaceX Br. 36–37. Comments on NEPA documents must "alert[] the agency to the parties' position and contentions" so the agency can "give the issue meaningful consideration." *Nevada v. Dep't of Energy*, 457 F.3d 78, 88 (D.C. Cir. 2006) (citation and quotations omitted). If comments fall short of that goal, the issue is waived because the agency had no chance to respond. The two letters Plaintiffs cite did not provide the required alert.[10] Pls. Resp. at 26. Neither claims the tribe is worried about its members' abilities to access land on sacred days, nor even mentions any specific land or days. They speak only of general concerns about the tribe's ability to use land. *See* FAA3260–62; FAA4088–90. Nor does it help Plaintiffs that the FAA did not initially reach out to the tribe, which is not federally recognized. When the FAA found out about the tribe, it invited its participation. FAA52526–27. But the tribe did not participate. FAA12360.

---

[10] Plaintiffs' reference to an extra-record declaration filed with their opening brief must be ignored and struck. *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 514.

On the merits, Plaintiffs ignore that both federal and state agencies considered the impact of temporary access restrictions and found them insignificant. *See* FAA9748–95 (PEA Appendix C – Section 106 Consultation); FAA10616–17 (FWS Section 4(f) concurrence); FAA9890 (BCO at 95). This finding rests in part on the many steps SpaceX must take to mitigate such impacts: public notice of launches (FAA11384–90 (PEA at 22–28), FAA10356–58 (FONSI at 22–24)); avoiding launches when beaches are busiest, including holidays, weekends, and all Fridays from Memorial Day to Labor Day (FAA11387 (PEA at 25), FAA10357–58 (FONSI at 23–24)); enhancing recreational activities like wildlife viewing and fishing (FAA10359 (FONSI at 25)); facilitating access to refuge lands by wildlife workers (FAA12380 (PEA Comment Responses at I-33)); funding a new FWS employee (FAA11457 (PEA at 95)); and enhancing access to historic resources with signage, other physical improvements, and education events (FAA10358–59 (FONSI at 24–25), FAA9755–62 (Programmatic Agreement at 7–14)).[11] For all these reasons, the FAA's finding of no significant impact from temporary access restrictions was neither arbitrary nor capricious.

### 4. Lighting for SpaceX's launches will not have a significant impact on wildlife.

Plaintiffs next make a four-part argument that lighting associated with SpaceX's launches will have a significant effect on wildlife. All four parts lack any support in the record.

First, Plaintiffs claim "expert wildlife agencies"—presumably FWS and TPWD—found that lighting would have significant effects. Pls. Resp. at 27. They did not. FWS found the opposite: effects on wildlife from SpaceX's operations, including lighting, would not be significant with mitigation. FAA9887, FAA9889, FAA9891–92 (BCO at 92, 94, 96–97). For sea turtles, FWS required SpaceX to update its lighting management plan with measures that would minimize effects.

---

[11] Plaintiffs' repeated argument that "the number of closure hours [discussed in the PEA] is wildly inconsistent with reality" is mistaken. Pls. Resp. at 30; *see* SpaceX Br. at 35 & n.20. Moreover, the limits on access restrictions are not just estimates, they are license requirements. FAA10346 (FONSI at 12); FAA9264 (license, requiring compliance with FONSI).

FAA10364 (FONSI at 30) (requiring specific updates to the plan); FAA11263-75 (plan); FAA9890 (BCO at 95) (explaining that the plan "will minimize the modification of sea turtle habitat by light pollution and minimize the likelihood of false crawls and disoriented hatchlings").[12]

Second, Plaintiffs lean on documents about effects on birds to argue that lighting effects may be significant. Pls. Resp. at 28. Those documents include an April 2022 study on piping plover (FAA49045); a comment on the draft EA attaching 2021 piping plover studies (FAA51513); and a FWS statement in a draft BCO about the 2021 studies (FAA43854). None of these documents attributes a decline in bird populations to lighting. Nor does any say that the alleged decline in bird populations is a significant effect. In fact, the FAA and FWS relied on a different report documenting problems with the 2021 studies, in finding no statistically significant impact on bird species. FAA35084; FAA12368–69 (discussing methodological problems); FAA11494 (PEA at 132). Especially because courts "must accord particular deference to agencies in choosing among conflicting experts' reports on matters requiring technical expertise," *TOMAC v. Norton*, 240 F. Supp. 2d 45, 50 (D.D.C. 2003), the studies Plaintiffs cite cannot show arbitrary and capricious action.

Third, Plaintiffs claim that lighting will significantly impact ocelots. They do not mention that ocelots have not been seen near Starbase for over a quarter-century. FAA11489 (PEA at 127), FAA9849 (BCO at 54) (documenting last known ocelot sighting in the area, 3.5 miles from the then-proposed control center). The nearest ocelots today are over 20 miles away. FAA11489 (PEA at 127). Worse, Plaintiffs suggest, without evidence, that SpaceX activities that started just ten years ago somehow caused the ocelots to leave. Pls. Resp. at 29. This speculation makes no sense from a temporal perspective, and so it cannot be a reason for overturning the FAA's decision.

---

[12] Plaintiffs' argument that lighting effects on nesting "Kemp's Ridley [*sic.*] sea turtles" cannot be mitigated is not supported by the record or biological facts. *See* Pls. Br. 28–29. "Kemp's ridleys are predominately daytime nesters." FAA9830 (BCO at 35).

Finally, Plaintiffs argue that the FAA cannot rely on SpaceX to update and enforce its lighting management plan. Pls. Resp. at 29–31. But this mitigation does not depend on SpaceX's goodwill. SpaceX is legally required to follow the lighting plan by its FAA license, which implements terms and conditions of FWS's Incidental Take Statement.[13] FAA9264 (license requiring compliance with the FONSI and BCO); FAA9904, FAA9906–07 (BCO at 109, 111–12). Mitigation is adequate when it is "likely to be adequately policed," which is shown where, for example, its implementation is "included as mandatory conditions imposed upon licenses." *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 17 (2d Cir. 1997). Because the FAA made lighting mitigation mandatory and can revoke SpaceX's license or take other enforcement actions if SpaceX fails to comply, 14 C.F.R. §§ 405.3(b), 406.9, the mitigation is adequate.[14]

The D.C. Circuit's decision in *Standing Rock* is not to the contrary. The court found that agency reliance on industry-wide safety data rather than operator-specific data showing poor performance rendered an action "highly controversial" and thus required an EIS. 985 F.3d at 1046–47. Plaintiffs' claim here—that the FAA cannot rely on mandatory mitigation because a lighting management plan prepared under the 2014 EIS allegedly was not "fully implemented"—was not before the court. And other cases hold that mitigation is sufficiently certain when a license requires it, as SpaceX's license does here. *See Nat'l Audubon Soc'y*, 132 F.3d at 17.

### 5.   Noise from SpaceX's launches will not have a significant impact on wildlife.

Plaintiffs' allegations of significant noise impacts to wildlife likewise lack merit. Plaintiffs

---

[13] Plaintiffs again rely on agency statements made in the early stages of the environmental review process that were resolved. *See, e.g.*, Pls. Resp. at 30 n.14 (citing FAA47166 (TPWD comment)).

[14] SpaceX could also face liability under the ESA if its failure to implement lighting mitigation results in the unauthorized take of listed species. 16 U.S.C. § 1538; *see* FAA9904 (BCO at 109) ("In order to be exempt from the prohibitions of section 9 of the [ESA], the FAA and/or SpaceX must comply with these terms and conditions," including lighting mitigation.).

are wrong on the record and the law in arguing that noise effects must be significant now because the FAA found noise significant in a 2014 EIS. Pls. Resp. at 30–31. Regarding the record, Plaintiffs mischaracterize the EIS, which nowhere finds that noise will significantly impact wildlife.[15] *See, e.g.*, FAA36321 (2014 EIS at ES-23) ("Construction and operational activities . . . would not have significant impacts on the piping plover and its critical habitat, northern aplomado falcon, jagua- rundi, ocelot, West Indian manatee, and sea turtles."). Regarding the law, existing noise levels— even if they qualified as significant—are the starting point. That baseline does not make the *added* noise from the Starship launches evaluated in the PEA significant. *See supra* at 13–15.

The FAA's incremental noise analysis logically relied on, among other support, experience with noise at Cape Canaveral and Vandenberg, where rockets have been launched for decades. Plaintiffs are dissatisfied with this comparison because SpaceX's rockets are larger. Pls. Resp. at 32–33. But this argument overlooks the far greater launch frequency at Cape Canaveral and Van- denberg.[16] That the evidence shows no significant noise effects from launching rockets at ten to twenty times the frequency SpaceX proposed is strong support for the FAA's findings. The FAA's finding of no significant impact was further supported by site-specific monitoring, which showed no injury to birds from launches and only a short-term "startle response." FAA11458–60, FAA11494–95, FAA11501 (PEA at 96–98, 132–33, 139) (discussing noise effects). The FAA

---

[15] The only noise effect the EIS characterized as significant without mitigation was nighttime launches annoying residents of Boca Chica village. FAA36515 (2014 EIS at 4-19). Plaintiffs have waived any argument concerning this effect by not raising it. *New York*, 413 F.3d at 20. Regardless, the PEA mitigates these impacts. Of the ten remaining residences in Boca Chica, "eight homes are seasonal or have been vacant in recent years." FAA11418 (PEA at 56). By agreement, no Boca Chica residents are present during launch operations. *See* FAA11425 (PEA at 63). Thus, unlike the operations addressed in the EIS, nobody is exposed to significant noise levels. *Id.*

[16] There were 51 launches from Vandenberg and 93 launches from Cape Canaveral in 2024 alone. *See* Staff Sgt. Joshua LeRoi, *VSFB achieves historic milestone with 51 launches in 2024*, https://www.vandenberg.spaceforce.mil/News/Article-Display/article/4034711/vsfb-achieves- historic-milestone-with-51-launches-in-2024/ (Jan. 21, 2025).

found that "impacts are not expected to substantially harm or disturb wildlife, which are expected to resume normal behavior after a launch operation." FAA11495 (PEA at 133). Bolstered by such support, the FAA's findings cannot be found arbitrary and capricious.

### 6. The FAA took a hard look at noise impacts on people and reasonably found no significant effects.

Plaintiffs' last argument—that noise would have significant effects on the community—also fails. This argument turns on Plaintiffs' claim that launch and landing noise could cause significant structural damage to homes and buildings.[17] Pls. Resp. at 33–35. FAA experts, backed by other agencies and several scientific studies, disagree. *See* SpaceX Br. at 30–34.

Plaintiffs correctly point out that a noise study included in the PEA shows that parts of Port Isabel and South Padre Island may be exposed to Maximum Unweighted Sound Levels ($L_{max}$) up to 120 dB. Pls. Resp. at 33–34. But Plaintiffs then misstate the record in arguing that this means property damage amounting to a significant impact is expected. *Id.* The FAA acknowledged that one 50-year-old study (Guest and Slone 1972) estimated that "approximately one damage claim will result per 100 households exposed at 120 dB and one damage claim per 1,000 households exposed at 111 dB." FAA11421 (PEA at 59). But the FAA explained that this study is not representative of launches. The study considered "sound levels . . . for static ground tests from rocket engines that were generally of greater durations than the exposure expected during a launch event." FAA11422 (PEA at 60). Moreover, the study could not be used to gauge significance because it "did not characterize the nature of the damage," and only a small fraction of damage claims was judged valid. FAA11421–22, FAA11424 (PEA 59–60, 62). At most, as the study's authors noted, "the $L_{max}$ values of 111 dB and 120 dB may be used as a very conservative threshold for potential

---

[17] Plaintiffs still do not make any argument concerning noise impacts on people other than structural damage. Plaintiffs have thus waived any argument concerning cumulative noise and annoyance. *New York*, 413 F.3d at 20.

risk of structural damage claims." FAA11422 (PEA at 60).[18]

The FAA considered two other studies by the National Academy of Sciences (1977) and the United Kingdom Ministry of Defense Land Ranges (Fenton and Methold 2016). FAA11421–22 (PEA 59–60); *see* FAA65708. The first found that "one may conservatively consider all sound lasting more than one second with levels exceeding 130 dB (unweighted) as potentially damaging to structures." FAA11421 (PEA 59). South Padre Island and Port Isabel are well outside of this noise contour. *See* FAA11562 (PEA Appx. B at 11 (figure 8)). The second study, which the FAA used to characterize the potential for damage at different sound levels, found "there is consensus that damage becomes improbable below 140 dB." FAA11422 (PEA 60). It found "[n]o glass or plaster damage is expected below 140 dB [and] [n]o damage is expected below 134 dB." *Id.* As the FAA explained, "there are no third-party structures in the 140 dB contour." FAA11423 (PEA at 61). Plaintiffs dismiss these studies because they involved smaller rockets. But that distinction is irrelevant. The relevant consideration is the noise Starship generates, not Starship's size.

Based on these studies and its own considerable expertise in regulating launches, the FAA concluded that "no structural damage or significant impact to third-party structures is expected from launch operations." FAA11423 (PEA 61). Even if damage were to occur, it would be "minor," and SpaceX would be required to pay to fix it.[19] FAA11423–24, FAA11430 (PEA 61–62, 68). Nothing about the FAA's approach or conclusion qualifies as arbitrary or capricious.

---

[18] Plaintiffs acknowledge the study did not characterize damage in incorrectly stating that "SpaceX relies on . . . Guest and Slone." Pls. Reply 34. The noise appendix to the PEA on which Plaintiffs rely references this study. FAA11566, FAA11595 (PEA Appx. B at 5, 44). Plaintiffs thus concede this study should not be used to characterize the significance of potential noise-induced damage.

[19] Plaintiffs' claim that SpaceX's liability insurance is some kind of concession about structural damage from noise is absurd. The CSLA requires this insurance. 51 U.S.C. § 50914(a)(3).

**IV.    Even if Plaintiffs prevail, the FAA's decision should not be vacated.**

SpaceX's Starship launch program at issue has been operating successfully for more than two years. Plaintiffs have never sought a preliminary injunction in this case, and they have no evidence of irreparable harm. Indeed, when Plaintiff Save RGV filed for a preliminary injunction on SpaceX's Starship launch operations, another district court denied the motion due to a lack irreparable harm and because neither the balance of equities nor the public interest favored stopping the launch program. *Save RGV v. SpaceX*, No. 1:24-CV-00148, 2024 WL 5357188, *2-4 (S.D. Tex. Nov. 21, 2024). So, even if the Court finds that the FAA was subject to NEPA's full procedural burdens and that it failed to comply with some of those NEPA procedures, the Court need not vacate the FAA's decision while it updates its NEPA documentation. Notably, the FAA already updated its NEPA review of the Starship launch program in connection with approving an increase in launch cadence.[20] Still, to ensure full consideration of these points, SpaceX joins the FAA and Plaintiffs in requesting remedy briefing if Plaintiffs prevail on any of their arguments.

## CONCLUSION

Plaintiffs' summary judgment motion should be denied, and SpaceX's and the FAA's cross-motions granted for two independent reasons: (1) the CSLA limits the FAA's NEPA obligations, and (2) Plaintiffs fail to show that the FAA's finding of no significant impact was arbitrary and capricious.

---

[20] FAA, Final Tiered Environmental Assessment for SpaceX Starship/Super Heavy Vehicle Increased Cadence at the SpaceX Boca Chica Launch Site in Cameron County, Texas (April 24, 2025), https://www.faa.gov/media/94346.

Dated:  May 20, 2025                              Respectfully submitted,


                                                 By:  _/s/ Tyler Welti_

                                                 Tyler Welti (D.C. Bar No. 1015691)
                                                 VENABLE LLP
                                                 101 California Street, Suite 3800
                                                 San Francisco, CA 94111
                                                 415.653.3714
                                                 415.653.3755 (fax)
                                                 tgwelti@venable.com

                                                 Jay C. Johnson (D.C. Bar No. 487768)
                                                 VENABLE LLP
                                                 600 Massachusetts Avenue NW
                                                 Washington, DC 21
                                                 202.344.4698
                                                 jcjohnson@venable.com


                                                 Attorneys for Intervenor-Defendant Space
                                                 Exploration Technologies Corp.