**From:** Johnny Adame
**To:** SpaceXBocaChica
**Subject:** Beach Access Closures
**Date:** Saturday, October 16, 2021 4:53:52 PM

My name is Jose Adame and although I appreciate new businesses and the many beneficial opportunities that come with most of them, I'm opposed to any activity, including business activities, that harm The Rio Grande Valley's beautiful and limited natural resources. Although the prospect of having something dealing with space like SpaceX in the RGV sounds very exciting, I've always been opposed to it due to the heavy negative potential impact it would have to our beautiful Boca Chica Beach environment and its wildlife. Furthermore, as an avid fisherman, the overwhelming constant beach access closures have been an inconvenience and nuisance. As a resident of Alamo, Texas, the few times a year I get to get away from work to go enjoy a nice day of fishing at Boca Chica Beach is usually halted due to a SpaceX beach access closure. Most of the time notice of the closures are not posted online and it's not until one physically gets to the final stretch of highway and sees the notice on the roadside digital sign that one finds out that it is closed and are then left with the decision to find another option. It has been brought to the public's attention that SpaceX was given a limit to their beach access closures and their abuse of the agreement made in the matter. I strongly urge that SpaceX be held accountable and their operations halted if they cannot abide by the signed agreement and laws of Texas.

Sincerely,
Jose J. Adame III
Sent from Yahoo Mail on Android

Hi,

My name is Juanita Velazquez and I am writing to oppose SpaceX's Starship/Super Heavy expansion project as it would negatively impact my community. I have been a Brownsville resident my whole life and like many people around here, I grew up visiting Boca Chica beach, enjoyed my time there with my mom and abuela during the weekends, family and summer vacations. In recent years, as SpaceX rapidly constructs it's Starbase launching site, the beach I knew as a child it's not the same—especially as it relates to it's wildlife. This launch site has already brought ecological consequences to the area and impacted certain bird populations that exist and breed here and continues to threaten the life of small mammals and sea animals alike. If SpaceX is authorized to launch large and heavy rockets and expand their facility, different parts of the project will affect the runoff water that's released into the Gulf of Mexico by polluting the water, continuing to impact wildlife indigenous to the area, like the shrimp population that breeds in the ship channel and shrimpers catch—which would consequently also disrupt the shrimp and fishing industry. Much of the land around the site that is already being contaminated by this company, or could be contaminated with it's rockets, is national wildlife refuge land, and it is against the law to be contaminating land that is not yours. Apart from the environmental consequences, the establishment and expansion of the SpaceX facility is part of the on-going modern day colonization and ethnic cleansing of Native original peoples in the Rio Grande Valley region. To my knowledge, SpaceX has never consulted with the Carrizo/Comecrudo Tribe of Texas, whom are the original Indigenous people of the region and have ancestral ties to the land, about the facility and it's operations. The Carrizo/Comecrudo tribe has been actively trying to protect this land for generations, and SpaceX should not be ignoring them. Moreover, as SpaceX attracts outsiders to the area, historically marginalized people of color will be displaced, and the proposed expansion would further strip away their rights to fish and recreate at Boca Chica Beach. This would likely make people will feel like they're unwelcome to the area and be driven away from the few free places to enjoy left in the community.

Thank you for your time.

| From: | Jared Margolis |
|---|---|
| To: | SpaceXBocaChica |
| Subject: | Center for Biological Diversity Comments on SpaceX Draft PEA and BA |
| Date: | Monday, November 1, 2021 12:53:33 PM |
| Attachments: | 10-28-21 SpaceX Comment Letter (final).pdf |

Good morning,

Attached please find a comment letter submitted by the Center for Biological Diversity regarding FAA's Draft Programmatic Environmental Assessment and Biological Assessment for the SpaceX program at Boca Chica. A hard copy of the letter has been sent to: Ms. Stacey Zee, SpaceX PEA, c/o ICF, 9300 Lee Highway, Fairfax, VA 22031, along with a USB key containing all of the exhibits accompanying these comments, and we ask that these documents be included in the administrative record for this matter. Due to the size of the attachments, I am not providing them by email; however, if it would be of assistance I could try emailing them using several separate emails, or place them in a shared drive that you can access - please let me know if that would be helpful.  Thank you –

Sincerely,

Jared M. Margolis
Senior Attorney | Endangered Species Program
Center for Biological Diversity
2852 Willamette St. # 171
Eugene, OR 97405
(802) 310-4054
jmargolis@biologicaldiversity.org

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

CENTER *for* BIOLOGICAL DIVERSITY                                    *Because life is good.*

November 1, 2021

*Submitted via email and certified mail (w/ attachments on USB drive)*

Ms. Stacey Zee
SpaceX PEA, c/o ICF
9300 Lee Highway
Fairfax, VA 22031
SpaceXBocaChica@icf.com

**Re:        Center for Biological Diversity Comments on FAA's Draft Programmatic
        Environmental Assessment and Biological Assessment for SpaceX**

Thank you for the opportunity to comment on the Draft Programmatic Environmental
Assessment (DPEA) and Biological Assessment (BA) for the SpaceX Starship/Super Heavy
Launch Vehicle Program at Boca Chica, TX. These comments are submitted on behalf of the
Center for Biological Diversity (the Center) and our over 1.7 million members and online
activists dedicated to the protection of endangered species and wild places.

While the Center is certainly not opposed to space exploration, we are concerned about the
impacts of SpaceX's activities at the Boca Chica site, particularly given the sensitive ecosystems
and imperiled species that are directly affected by the proposed activities. The Federal Aviation
Administration (FAA) has a duty to ensure that SpaceX's exploratory efforts do not come at the
expense and undue sacrifice of our current home and the wildlife that relies on the habitat in the
Boca Chica area; yet, the FAA has failed to take the requisite hard look at the proposed use of
the Boca Chica Launch Site for Starship/Super Heavy launch operations, and has failed to
require SpaceX to implement reasonable measures to mitigate its impacts and ensure that
endangered wildlife will not be jeopardized by the SpaceX Launch Vehicle Program.

As set forth below, the FAA's failure to fully consider and ensure adequate mitigation for the full
range of impacts associated with the proposed action—including the impacts to wildlife refuge
lands and protected wildlife, as well as the tremendous use of energy and releases of methane
that contribute to the current climate crisis—render the FAA's analyses inadequate, arbitrary and
capricious, in violation of the National Environmental Policy Act, the Endangered Species Act,
the National Wildlife Refuge System Administration Act, the Migratory Bird Treaty Act, and the
Department of Transportation Act.

I.    **Violations of the National Environmental Policy Act**

A.  **The FAA Must Prepare an EIS**

The National Environmental Policy Act (NEPA) requires all agencies of the federal government to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment."[1] To determine whether a proposed action significantly affects the environment and thus requires an EIS, the lead federal agency may first prepare an environmental assessment (EA).[2] An environmental assessment must provide sufficient evidence and analysis to determine whether to prepare an EIS.[3] The lead agency must take a "hard look" at the relevant environmental concerns and alternatives to the proposed action.[4] If an environmental assessment concludes that there are no potentially significant impacts to the environment, the federal agency must provide a detailed statement of reasons why the project's impacts are insignificant and issue a finding of no significant impact (FONSI).[5] However, if an agency action may have significant impacts on the environment, then an EIS must be prepared.[6]

Since 1979 and until the Trump Administration, the CEQ NEPA regulations required that the "significance" of an agency action be evaluated through a consideration of the context and intensity of the proposed action. Despite recent regulatory changes that have attempted to withdraw the CEQ regulations regarding "significance" (which are now being challenged in court and that CEQ has recently indicated it is revisiting), the nature of the impacts of a project on the environment must still be deemed relevant to whether the project is "significant" for purposes of NEPA. Where, as here, the proposed activity will undoubtedly have significant adverse impacts on sensitive habitats and listed species, a full EIS is required.

Indeed, the longstanding NEPA regulations required agencies to consider ten "significance factors" in determining whether a federal action may have a significant impact, thus requiring an EIS.[7] Among other factors, agencies have considered the beneficial and adverse impacts of the action, the effect on public health and safety, unique characteristics of the geographic area impacted (such as park lands, wetlands, or ecologically critical areas), the degree to which possible effects are highly controversial, uncertain, or involve unique or unknown risks, cumulatively significant effects, whether the proposed action will violate any laws or standards

---

[1] 42 U.S.C. § 4332(2)(C).

[2] 40 C.F.R. § 1508.9.

[3] *Id*.

[4] *Id. See also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

[5] 40 C.F.R. § 1508.13.

[6] *Id*. § 1501.4.

[7] See prior version of 40 C.F.R. § 1508.27 set forth in 43 Fed. Reg. 56003 (Nov. 29, 1978), 44 Fed. Reg.  874 (Jan. 3, 1979).

FAA00001817

of environmental protection, and whether it may adversely affect an endangered or threatened species.[8]

The FAA's decision to prepare an EA rather than an EIS for the proposed use of the Boca Chica site for Starship/Super Heavy launch operations is inconsistent with the requirements of NEPA and calls into question whether the agency truly understands the scope of what SpaceX plans to do at the Boca Chica site, and the incredible environmental harm that is likely to occur – and indeed has already occurred – to an area that provides essential habitat for wildlife, including protected migratory birds and sea turtles. SpaceX activities not only have the potential for significant adverse environmental impacts, but those impacts would occur in essential habitat areas (including designated critical habitat) with unique characteristics that are easy to destroy, and very difficult to replace. Furthermore, such activities would certainly have cumulative impacts on the area and the climate, and recent correspondence from the U.S. Fish and Wildlife Service (FWS) indicates that the impacts of the SpaceX activities to the surrounding habitat is not only detrimental to several species, but is highly controversial given that SpaceX has been operating in violation of the prior Biological Opinion and Incidental Take Statement for the facility, which has led to the take of protected wildlife in violation of the ESA.[9]

The FAA itself acknowledges that the construction and operation of the project would result in adverse impacts from noise, light, traffic, heat and debris from rockets (that can explode and cause wildfires), and is therefore likely to adversely affect several ESA-listed species, including piping plovers, red knots, northern aplomado falcons, gulf coast jaguarundi and ocelots, as well as Kemp's ridley, loggerhead, green, hawksbill, and leatherback sea turtles, requiring formal ESA consultation with FWS. That admission alone undermines any argument that the impacts of the project are not "significant" for purposes of NEPA. Furthermore, the DPEA acknowledges the potential for significant environmental harm from SpaceX activities due to the unique and/or unknown risks of rocket launches (including "anomalies"), further undermining any argument that an EA alone is sufficient.

Put plainly, there can be no doubt that the proposed SpaceX activities at the Boca Chica site would have significant environmental impacts, requiring an EIS. The Boca Chica site is a small property surrounded by some of the most important habitat for migratory birds in the U.S. As the U.S. Fish and Wildlife explains, the Lower Rio Grande Valley Refuge (LRGV) — directly adjacent to the Boca Chica launch site — "is considered one of the most biologically diverse

---

[8] *Id.*

[9] *See* Letters from Manuel "Sonny" Perez III, Complex Refuge Manager, South Texas Refuges Complex, U.S. Fish & Wildlife Serv. & Charles Ardizzone, Project Leader, Texas Coastal Ecological Service Office, U.S. Fish & Wildlife Serv. to Daniel P. Murray, Manager, Safety Division, Federal Aviation Administration dated Oct. 2, 2020, Dec. 14, 2020, and Jan. 22, 2021 (attached hereto).

FAA00001818

regions in North America."[10] During migration, species from the Central and Mississippi flyway converge on this area, making it an essential stopover for migratory birds. However, much of the habitat in the region has been lost, relegating these birds to remnant tracts. The Lower Rio Grande Valley National Wildlife Refuge was established in 1979 specifically to connect and protect these isolated tracts of habitat. And the Boca Chica tract of the NWR is "an important link of the Lower Rio Grande Valley 'Wildlife Corridor'."[11] Not only does the Boca Chica tract provide habitat for migratory birds, such as ESA-listed piping plovers and red knots, but it "is one of the few places where the Kemp's Ridley sea turtle, the most critically endangered sea turtle in the world, comes ashore to nest on refuge beaches in the spring and summer."[12]

Other lands in the vicinity of the SpaceX facility that the FAA acknowledges would be impacted by SpaceX activities likewise provide important habitat for wildlife, including federally listed species. For example, the Laguna Atascosa NWR provides habitat for the endangered ocelot, jaguarundi, and northern aplomado falcon as well as threatened and endangered sea turtles and shorebirds.[13] It is also a "premier bird-watching destination with more recorded species of birds than any other refuge in the National Wildlife Refuge System."[14] The Service explains that "today, there is an expanded emphasis [at Laguna Atascosa] that includes endangered species conservation and management for shorebirds."[15] The refuge also provides habitat for the largest population in the United States of ocelots, "making it the center for conservation and recovery efforts for this endangered cat."[16] The nearby South Bay Coastal Preserve, with its wind-tidal flats, shallow depths, associated vegetation, and unique location likewise "provides excellent feeding, resting and wintering habitat for numerous types of migratory bird species."[17]

Simply put, the area surrounding the SpaceX facility at Boca Chica is not some wasteland that can be sacrificed for a private corporation's aspirations of interstellar travel, as Elon Musk appears to believe.[18] Rather, it is a biologically diverse and essential habitat area for many species, including imperiled migratory birds and sea turtles. For the FAA to suggest that an EIS is not warranted for permitting SpaceX to launch the largest rockets known to humankind—

---

[10] https://www.fws.gov/refuge/Lower_Rio_Grande_Valley/about.html

[11] https://www.fws.gov/refuge/Lower_Rio_Grande_Valley/visit/boca_chica_beach.html

[12] *Id.*

[13] *See* Laguna Atascosa NWR Comprehensive Conservation Plan, available at https://www.fws.gov/doiddata/dwh-ar-documents/1266/DWH-ARZ000415.pdf (attached hereto).

[14] https://www.fws.gov/refuge/Laguna_Atascosa/about.html

[15] *Id.*

[16] *Id.*

[17] https://tpwd.texas.gov/landwater/water/conservation/txgems/southbay/index.phtml

[18] In a "SpaceX Update" (May 7, 2020 Via Microsoft Teams), which was released via a Freedom of Information Act request, Mr. Musk is quoted on a slide which shows two large pieces of rocket debris in high value wetlands as stating "We've got a lot of land with nobody around, and so if it blows up, it's cool. – Elon Musk, 2018" (attached hereto)."

4

which may explode causing catastrophic harm to adjacent habitat, and require the burning and/or venting of methane, a potent greenhouse gas—along with ancillary facilities including a desalination plant, power plant, LNG pretreatment system, and other energy intensive infrastructure, with the related noise, lighting, traffic, and other construction and operational harms, is simply ludicrous, and certainly the very definition of arbitrary and capricious agency action.

It also remains entirely unclear why the FAA now believes that an EA is sufficient when it previously prepared an EIS for SpaceX's activities at the Boca Chica facility, particularly given that the proposed activities are even more environmentally damaging than what was previously considered, with larger rockets and more infrastructure. And the issuance of a prior EIS does not provide any basis for an EA/FONSI for the proposed new use of the site for Starship/Super Heavy launch operations. While supplemental EA's *may* have been warranted for prior proposed changes to the SpaceX operations, the new proposed uses of the Boca Chica site are much different from the past use due to the difference in rocket size and technology and the addition of infrastructure including a power plant and desalination plant. Moreover, FAA's regulations implementing NEPA define when a Supplemental EIS is needed or whether an EA will suffice. This was referenced in the 2014 Record of Decision for SpaceX operations at Boca Chica (FAA Order 1050.1F, Sec. 902), which specifically stated that a supplemental EIS is not needed only if one of the following three conditions applies:

> • The proposed Action conforms to plans or projects for which a prior EIS has been filed and there are no substantial changes in the Proposed Action that are relevant to environmental concerns;
>
> • Data and analysis contained in the previous EIS are still substantially valid and there are no significant new circumstances or information relevant to environmental concerns and bearings on the Proposed Action or its impacts;
>
> • All pertinent conditions and requirements of the prior approval have, or will be, met in the current actions.

SpaceX's activities proposed use of the Boca Chica site for Starship/Super Heavy launch operations do not meet any of these conditions. SpaceX is seeking to conduct activities that were not planned and included in the 2014 EIS, which only authorized up to 12 launches of Falcon 9 or Falcon Heavy rockets each year. The use of the site for Starship/Super Heavy launch operations – including up to 20 launches per year – and additional infrastructure is therefore a substantial change to the use of the area.

It is also evident that SpaceX has not complied with all of the pertinent conditions and requirements of the prior approvals, and that there is new information relevant to environmental

FAA00001820

concerns regarding SpaceX's operations at Boca Chica. As FWS noted in its January 22, 2021, letter to the FAA[19]:

> Since 2014, SpaceX has undertaken activities not covered in FAA's 2014 EIS which addressed only 12 launches per year, not continual experimentation related to the Starship/Super Heavy proposal as is currently being carried out. SpaceX activities not covered include a higher frequency of road closures extending well beyond 180 hours, large explosions from reported anomalies, the appearance of significantly large staffing, 24/7 operations, traffic, and construction activities not analyzed in the 2014 EIS. In addition, SpaceX rocket debris falling onto the Refuge has damaged the sensitive wind tidal flats. And, the vehicles or machinery used to retrieve rocket debris have created ruts and caused other damage that interrupts water sheet flow across these flats. Two SpaceX incidents on July 25, 2019 and again in August 2019 resulted in wildfires of 130-acres and 10-acres respectively burned through coastal prairie and dune habitats on refuge managed land. Anomalies resulting in explosions on November 20, 2019, February 28, 2020, and December 9, 2020 resulted in debris scattered onto refuge managed lands. Retrieval methods damaged the sensitive alkaline flat and refuge cable fencing installed to protect the area from disturbance.

FWS further found that:

> Due to operations by SpaceX, the FWS's ability to maintain the biological integrity, diversity and environmental health of Refuge resources, as well as our ability to ensure the viability of the six wildlife-dependent recreational uses, has been significantly diminished at the Boca Chica tract. This occurs by preventing or constraining public access year-round, hampering biological and monitoring studies including sea turtle patrols, sea turtle cold-stunning responses, hampering refuge management and law enforcement patrol, increased observations of road mortality of wildlife at all hours of daytime and nighttime, damage to sensitive habitats such as the wind tidal flats and to the salt prairie from explosions and fires, as well as adversely impacting nesting habitat for sensitive species.[20]

Hence, even if SpaceX were not seeking to drastically expand its activities at the Boca Chica site – resulting in additional environmental harm – a supplemental EIS would have been necessary because mitigation measures previously committed to were not being carried out and significant

---

[19] Letter from Manuel "Sonny" Perez III, Complex Refuge Manager, South Texas Refuges Complex, U.S. Fish & Wildlife Serv. & Charles Ardizzone, Project Leader, Texas Coastal Ecological Service Office, U.S. Fish & Wildlife Serv. to Daniel P. Murray, Manager, Safety Division, Federal Aviation Administration at 2 (Jan. 22, 2021) ("FWS Jan. 22, 2021 Letter").
[20] *Id.*

FAA00001821

environmental harm is occurring that was not previously considered.[21] With the new activities being proposed, it is even more evident that an EIS is required.

In sum, the FAA is proposing to authorize a new, expanded version of the SpaceX program at Boca Chica, which includes activities that have proven to result in significant harm to the environment, including to endangered species. Courts have specifically held that under NEPA and its implementing regulations, courts "cannot accept [an EA] as a substitute for an EIS — despite the time, effort, and analysis that went into their production — because an EA and an EIS serve very different purposes."[22] "To treat an EA as if it were an EIS would confuse these different roles, to the point where neither the agency nor those outside it could be certain that the government fully recognized and took proper account of environmental effects in making a decision with a likely significant impact on the environment."[23] Under the circumstances here, an EA cannot suffice. Indeed, an EA aims simply to identify (and assess the "significance" of) potential impacts on the environment to see whether an EIS is needed, but it is not intended to provide the full analysis – the "hard look" – that NEPA requires for major federal actions with significant environmental effects.[24] Where, as here, there clearly are significant effects, officials must make their decision "in light of an EIS."[25] Therefore, the FAA's failure to produce an EIS is arbitrary, capricious, and in clear violation of NEPA.

###    B.   The FAA failed to take the requisite "hard look" at the environmental impacts of the project

Even if an environmental assessment would suffice for this project, which it clearly cannot, the FAA has failed to provide a sufficient analysis of the impacts of the proposed action in the DPEA and has therefore failed to take the hard look required under NEPA to fully consider the environmental impacts of the proposed SpaceX activities.[26]

As discussed above, the SpaceX facility is surrounded by publicly owned conservation, park, and recreation lands including Boca Chica State Park, Brazos Island State Park, the Lower Rio Grande Valley National Wildlife Refuge, the South Bay Coastal Preserve, and the Las Palomas Wildlife Management Area (Boca Chica Unit). These lands are of incredible conservation value for a range of federally and state listed species and other protected species such as migratory

---

[21] *See* 40 C.F.R. § 1501.29 (providing that a supplemental EIS is required when there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts").

[22] *Sierra Club v. Marsh*, 769 F.2d 868, 875 (1st Cir. 1985) (Breyer, J.).

[23] *Id*.; *See also Massachusetts v. Watt*, 716 F.2d 946, 951 (1st Cir. 1983).

[24] *Id*.

[25] *Sierra Club v. Marsh*, 769 F.2d 868, 875 (1st Cir. 1985) (noting that "the purpose of an EA is simply to help the agencies decide if an EIS is needed").

[26] *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

7

FAA00001822

birds. The DPEA, however, does not provide a full analysis of the environmental impacts to these areas and the wildlife that rely on them. Rather, it provides only cursory statements about the potential for environmental harm – including passing reference to potentially catastrophic harm from rocket explosions that may cause extensive wildfires – but fails to provide any real analysis of the actual impacts to the people, habitats and wildlife that will be adversely affected.

For example, as discussed in the attached documents obtained through FOIA,[27] there have been several explosions of rockets at the SpaceX facility, and the DPEA acknowledges that FAA anticipates further "anomalies" from the SpaceX Starship/Super Heavy Launch Vehicle Program at Boca Chica. In fact, the DPEA states that SpaceX is proposing to conduct approximately 10 tank tests of its rockets per month and estimates a 10 percent rate of anomalies during tank testing, which "would result in an explosion and the spread of debris. The distance for which debris could spread is considered the blast danger area," which includes the adjacent wildlife refuge and park lands.[28] However, the DPEA totally glosses over what the actual environmental impacts of these explosions could be. It merely mentions offhandedly that there may be monthly explosions but provides no in-depth analysis of how debris from such explosions would affect nearby wildlife and habitats, other than conclusory statements regarding the potential for some unknown amount of harm. The DPEA fails to address the direct harm to wildlife and habitats from the debris, as well as debris recovery efforts, which FWS has stated – as set forth above – are causing undue adverse impacts to wildlife, including listed species.[29] However, "general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided."[30]

The DPEA also fails to address the potential for devastating wildfires and hazardous material contamination from these anomalies.[31] It only briefly notes that "[c]hanges to terrestrial habitat structure might occur from fire in small areas adjacent to the launch mount and landing pad. Vegetative land cover in these areas is classified as barren or grasslands, both of which would recover quickly post-fire."[32] However, SpaceX's activities have resulted in several fires in areas immediately adjacent to the launch site, such as two fires in the LRGV which burned 140 acres of refuge habitat. Moreover, SpaceX's operations are located within piping plover critical habitat, yet the DPEA fails to address how piping plovers would be impacted as a result of these fires. Rather, the FAA merely discusses how SpaceX would respond to a fire, but this does not

---

[27] The Center incorporates these documents by reference and asks that they be included in the administrative record for this matter.
[28] DPEA at 16.
[29] Photos of impacts to piping plover critical habitat from removing rocket explosion debris are attached hereto.
[30] *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998).
[31] A discussion of the potential harm from these incidents can be found in the letter to FAA from Charles Ardizzone, FWS Field Supervisor, dated March 2, 2020 (attached hereto).
[32] DPEA at 112.

FAA00001823

provide a "hard look" at the potential for catastrophic damage to surrounding habitat from an anomaly. This is clearly not enough to satisfy NEPA.[33]

In addition, the FAA failed to address the impacts of SpaceX's activities on the ozone layer. It is well established that the ozone layer plays an important role in protecting the earth (and its inhabitants) from the sun's harmful rays. The EPA has stated that "the ozone layer in the stratosphere absorbs a portion of the radiation from the sun, preventing it from reaching the planet's surface. Most importantly, it absorbs the portion of UV light called UVB. UVB has been linked to many harmful effects, including skin cancers, cataracts, and harm to some crops and marine life."[34] In the DPEA, the FAA claims that it need not consider the impacts of SpaceX activities on the ozone layer, since "the proposed launch activities do not generate ozone depleting substances;"[35] however, the FAA provides no support for this contention. In fact, studies have shown that rocket engine emissions *do* adversely affect the ozone layer. Rocket engine exhaust contains gases and particles that can have important impacts on climate and ozone because rocket engines emit various amounts of submicrometer-sized particles of soot (or black carbon, BC) and alumina (aluminum oxide) directly into the stratosphere.[36] The FAA's failure to consider the impacts of rocket emissions on the ozone layer is a glaring violation of NEPA.

Finally, the FAA violated NEPA because the DPEA does not provide an analysis of all reasonable alternatives to the proposed action. The alternatives analysis is the heart of the NEPA process,[37] and the FAA's own NEPA implementing regulations explicitly state that "The FAA decision-making process must consider and disclose the potential impacts of a proposed action and its alternatives on the quality of the human environment."[38] Yet the only alternative provided for analysis was the proposed action. FAA failed to analyze other options, including a less-intensive use of the Boca Chica site (i.e., fewer launches per year), or the use of other sites for the proposed launches, such as the Kennedy Space Center. The failure to consider a full range of alternatives renders the FAA's NEPA analysis arbitrary and capricious.

---

[33] *See Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864-66 (9th Cir. 2005) (holding the agency failed to take a "hard look" where its assessment included only conclusory assertions and did not discuss contrary evidence); *Alaska Wilderness League v. Kempthorne*, 548 F.3d 815, 831 (9th Cir. 2008) ("This is the type of 'conclusory assertion' that is disfavored by this court because the agency has not provided any scientific data that justifies this position.").
[34] EPA, Basic Ozon Layer Science. Available at https://www.epa.gov/ozone-layer-protection/basic-ozone-layer-science.
[35] DPEA at 43.
[36] M.N. Ross and D.W. Toohey, The Coming Surge of Rocket Emissions. EOS, Sep. 24, 2019) *available at* https://eos.org/features/the-coming-surge-of-rocket-emissions (attached hereto).
[37] *See* 40 C.F.R. § 1502.14.
[38] FAA Order 1050.1E at 1-8.

FAA00001824

**C. The FAA failed to consider SpaceX's contribution to the climate crisis**

NEPA necessitates a consideration of climate impacts because it requires that federal agencies consider the reasonably foreseeable direct and indirect impacts of their actions, even if the extent of these impacts is not known.[39] Climate impacts are an indirect result of the proposed SpaceX activities, and therefore must be considered in the NEPA analysis.[40] However, the FAA has failed to analyze the impacts of SpaceX's emissions on the environment. Indeed, the FAA failed to even include all of the emissions associated with the project in its cursory discussion of climate – such as the methane emissions from the fracking of natural gas to supply the fuel for the rockets and power plant – and therefore its analysis is woefully incomplete.

It is notable that Elon Musk, the CEO of SpaceX, has acknowledged that climate change is the "biggest threat facing humanity."[41] Yet, his company is using an incredible amount of energy and greenhouse gasses to fuel the activities at Boca Chica. Regardless of that inherent contradiction, the FAA certainly has a duty to fully analyze the contribution of the proposed activities to the current climate crisis. However, the FAA provides no analysis in the DPEA as to the impacts the proposed SpaceX activities would have on our climate and how such changes will impact people and the environment, instead claiming that the emissions will not be significant, based only on comparing SpaceX to the total GHG emissions of the US.[42] However, the emissions from SpaceX are certainly not discountable, and the FAA's approach ignores that every contribution of GHGs to the atmosphere causes cumulative harm. Ignoring the incremental

---

[39] *See* 42 U.S.C. § 4332(2)(C), 40 C.F.R. § 1508.8.

[40] *See Center for Biological Diversity v. Bernhardt*, 982 F.3d 723, 736 (9th Cir. 2020) (holding GHG emissions are a 'reasonably foreseeable' indirect effect). Federal agencies evaluating climate impacts of their proposals have frequently claimed that science has not developed the tools to analyze climate impacts of individual proposals. This is not accurate. The social cost of carbon and social cost of methane are two reliable tools that are available and should be utilized by BLM in the PEIS process. Under NEPA's implementing regulations, where "information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known," NEPA regulations direct agencies to evaluate a project's impacts "based upon theoretical approaches or research methods generally accepted in the scientific community." 40 C.F.R. § 1502.21. The social cost of carbon and social cost of methane are based on generally accepted research methods and years of peer-reviewed scientific and economic studies. As the D.C. Circuit recently explained in invalidating the Federal Energy Regulatory Commission's review of a fossil fuel infrastructure project, 40 C.F.R. § 1502.21 requires federal agencies to evaluate the social cost of carbon as one potentially available, scientifically accepted tool for analyzing climate impacts. *Vecinos para el Bienestar de la Comunidad Costera v. Fed. Energy Regul. Comm'n*, 6 F.4th 1321, 1329 (D.C. Cir. 2021).

[41] https://www.npr.org/2021/02/08/965372754/elon-musk-funds-100-million-xprize-for-pursuit-of-new-carbon-removal-ideas

[42] DPEA at 47.

10

contribution of a project like SpaceX will only lead to death by a thousand small cuts, which the FAA has failed to properly consider.[43]

As SpaceX itself notes, the Super Heavy Rocket is the World's most powerful rocket. It holds up to 3,700 metric tons of propellant, while the Starship holds up to 1,500 metric tons. The Raptor engines on these rockets use liquid methane, a potent greenhouse gas that may also need to be vented into the atmosphere by SpaceX. According to the FAA, burst testing would include the "deliberate release" of LN2 and/or LOX to the environment, and such tank tests would occur 10 times per month, releasing a significant amount of greenhouse gasses into the atmosphere.[44] Similarly, the FAA states that during pre-flight operations it is possible that the rocket would not be able to connect to reconnect to the ground systems, requiring the release of up to 814 tons of methane propellant into the atmosphere. While SpaceX claims this would be a rare, unplanned event, the FAA must still assess the impacts of such events on the environment, yet the agency is silent as to the climate impacts of these releases. Same with releases following suborbital launches that would occur 20 times per year, where approximately 10 metric tons of propellants would be vented to the atmosphere after each launch, with the potential for significantly more if there is an "anomaly."

And the "proposed action" includes not only the launching of methane-fueled rockets, but the construction and operation of a desalination plant, a new LNG-fueled power plant to generate power for activities at all SpaceX facilities,[45] and a natural gas pretreatment facility, all of which are energy and greenhouse-gas intensive. Yet, the DPEA is silent as to the implications of the action on climate change. The FAA failed to even address where the methane fuel/LNG is coming from, how it will be shipped, and the upstream impacts associated with fracking or other methods required to obtain the fuel needed for SpaceX rockets and infrastructure. And the FAA ignored emissions from anomalies, which could result in significant methane releases.

---

[43] *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1216-17 (9th Cir. 2008) (holding that, under NEPA, agencies must "discuss the *actual* environmental effects resulting from . . . emissions").

[44] DPEA at 15-16.

[45] The power plant is itself a major action with significant environmental consequences that requires review in an EIS. According to the FAA:

> The power plant would be approximately 5.4 acres in size. Power for the power plant would be generated using a large natural gas turbine and a steam turbine running in a combined cycle, and a small natural gas turbine and a steam turbine running in a combined cycle. The power plant would be comprised of multiple structures, including air intake, compressors, expanders, reflux tanks, surge tank, cold box, and cooling tower. Some of these structures would be less than 30 feet tall; however, some structures would be up to 150 feet tall.

BA at 23.

11

FAA00001826

This is a critical error because methane emissions are particularly alarming. Immediate, deep reductions in methane emissions are critical for lowering the rate of global warming in the near-term, preventing the crossing of irreversible planetary tipping points, and avoiding harms to species and ecosystems from methane's intensive near-term heating effects and ground-level ozone production.[46] Methane is a super-pollutant 87 times more powerful than $CO_2$ at warming the atmosphere over a 20-year period,[47] and is second only to $CO_2$ in driving climate change during the industrial era.[48] Methane also leads to the formation of ground-level ozone, a dangerous air pollutant that harms ecosystems and species by suppressing plant growth and reducing plant productivity and carbon uptake.[49]

Because methane is so climate-damaging but also comparatively short-lived with an atmospheric lifetime of roughly a decade, cutting methane has a relatively immediate effect in slowing the rate of temperature rise in the near-term. Critically, deep cuts in methane emissions of ~45% by 2030 would avoid 0.3°C of warming by 2040 and are considered necessary to achieve the Paris Agreement's 1.5°C climate limit and prevent the worst damages from the climate crisis.[50] Deep cuts in methane emissions that reduce near-term temperature rise are also critical for avoiding the crossing of planetary tipping points—abrupt and irreversible changes in Earth systems to states wholly outside human experience, resulting in severe physical, ecological and socioeconomic harms.[51] The FAA's failure to fully consider the implications of SpaceX's activities, particularly when those activities will result in significant LNG and methane emissions, is a clear violation of NEPA.

---

[46] United Nations Environment Programme and Climate and Clean Air Coalition, Global Methane Assessment: Benefits and Costs of Mitigating Methane Emissions, Nairobi: United Nations Environment Programme (2021) [hereinafter Global Methane Assessment], https://www.unep.org/resources/report/global-methane-assessment-benefits-and-costs-mitigating-methane-emissions, at 11.

[47] Myhre, G. et al., Anthropogenic and Natural Radiative Forcing. In: Climate Change 2013: The Physical Science Basis. Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change [Stocker, T.F. et al. (eds.)] (2013), *available at* https://www.ipcc.ch/report/ar5/wg1/ at Table 8.7.

[48] Global Methane Assessment at 11.

[49] *Id.* at 11, 69.

[50] *Id.* at 11.

[51] Hoegh-Guldberg, O. et al., Impacts of 1.5°C Global Warming on Natural and Human Systems, In: Global Warming of 1.5°C, An IPCC Special Report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways, in the context of strengthening the global response to the threat of climate change, sustainable development, and efforts to eradicate poverty [Masson-Delmotte, V. et al. (eds)] (2018), https://www.ipcc.ch/sr15/chapter/chapter-3/, at 262.

FAA00001827

In sum, the FAA's failure to consider the human health and environmental impacts of SpaceX's emissions in the context of the current climate crisis renders the FAA's NEPA analysis arbitrary and capricious.

### D. The FAA failed to adequately address the impacts of storm damage on aboveground storage tanks.

The FAA states that launch propellant and commodities (including gaseous and liquid methane) will be stored in aboveground tanks at the Boca Chica site. This includes thousands of metric tons of propellants, which by definition are explosive, but also have been shown to be carcinogenic and toxic. The Boca Chica site has the potential to be hit by hurricanes coming off the Gulf of Mexico, which have been increasing in recent year. Furthermore, FEMA's flood risk map (attached hereto) clearly shows that all SpaceX facilities at Boca Chica are at risk of flooding. However, the FAA has failed to consider the potential impacts of storm damage, including from a worst-case scenario tank rupture, and the harm that would result in the habitat areas surrounding the SpaceX site. The FAA has therefore failed to take a "hard look" at the environmental impacts of storing dangerous and toxic chemicals in above-ground tanks at the Boca Chica site.

## II.   The Proposed Mitigation is Insufficient

As set forth herein and in the attached documents – including several letters and emails to FAA from FWS and EPA detailing the agencies' concerns, which are attached and incorporated by reference – there is no doubt that the SpaceX activities at Boca Chica have resulted, and will continue to result, in environmental harm, including to ESA-listed wildlife. FWS has averred that SpaceX already has exceeded the traffic, construction, personnel levels, lighting, noise, and vibration impacts that were contemplated for the prior use of the Boca Chica site, resulting in a violation of the Incidental Take Statement.[52] FWS further stated that rocket launch failures have impacted migratory birds, with "documented evidence that the debris and its removal has impacted and scarred various habitats in the area, including tidal flats which are foraging habitat for the threatened piping plover and red knot."[53] FWS made it very clear that more must be done to mitigate such impacts.[54]

---

[52] FWS Jan. 22, 2021 Letter.

[53] *Id.*

[54] *Id. See also* email from Bryan Winton Re: DRAFT REPORT SN11 Anomaly - Rocket engine explosion @ 0.5-1 mile above the launch site (Mar. 30, 2021) (attached hereto) (describing the impacts of an anomaly); email between Bryan Winton and Mary Orms Re: Information for Informal Scoping FWS Response Letter to FAA per proposal to Draft a new EA (Jan. 21, 2021) (attached hereto) (listing anomalies).

FAA00001828

Likewise, EPA has found that SpaceX's activities at Boca Chica have caused "substantial and unacceptable adverse impacts to aquatic resources of national important (ARNI)," due to the impacts to mudflats, estuarine and non-tidal wetlands, which "support benthic invertebrate communities which make them essential foraging habitats for wintering and migrating shorebirds, including the threatened piping plover and red knot."[55] The EPA further noted that the affected wetland complex "was designated by the Western Hemisphere Shorebird Network as a Site of International Importance," and is "critical to the survival of many species of shorebirds and waterfowl."[56] The EPA expressed concern over the "direct, secondary, and cumulative impacts associated with destruction of the rare and valuable aquatic habitats within the project area," and questioned "whether adequate compensatory mitigation will be provided for project impacts."[57]

These impacts have not been adequately mitigated. Indeed, the Texas Parks and Wildlife Commission has stated that SpaceX has failed to even comply with several of the basic avoidance and minimization measures set forth in the 2014 EIS and ROD for the Boca Chica Launch Site, including limiting construction to 8 a.m. – 5 p.m. to mitigate noise impacts, avoiding lateral light spread and uplighting, and limiting vehicles to 25 mph.[58]

SpaceX is now proposing an even more intensive use of the Boca Chica site, with larger rockets that would cause even more damage if/when they experience launch failures, and that would increase the noise and light pollution already impacting the neighboring habitats, including critical habitat in wildlife refuge lands. And SpaceX intends to build additional infrastructure including a desalination plant, power plant, and LNG processing facility, increasing not only the direct impacts to the area, but also contributing to the climate crisis.

As one of the wealthiest individuals in the world and one of the most well-funded commercial operations in this country, Mr. Musk (the wealthiest person in the world, worth ≈ $250 Billion) and SpaceX (which has raised more than $6 billion in equity to date[59]) have the capacity – and indeed the duty – to ensure that the impacts of their operations are mitigated to the fullest extent possible. Indeed, as discussed further below, 23 U.S.C. § 138 precludes the Secretary of Transportation from approving a program or project unless the action includes all possible planning to minimize harm to an affected refuge. Likewise, the ESA requires the application of reasonable and prudent measures necessary or appropriate to minimize impacts to listed

---

[55] Letter from Maria L. Martinez, EPA, to Joe McMahan, U.S. Army Corps (April 7, 2021) (hereinafter, EPA April 7, 2021 Letter) (attached hereto).
[56] *Id.*
[57] *Id.*
[58] Texas Parks & Wildlife Commission, NEPA Scoping Comments at 3 (January 27, 2021) (attached hereto).
[59] https://spacenews.com/spacex-adds-to-latest-funding-round/

14

species.[60] And the Clean Water Act Section 404(b)(1) Guidelines, which are also applicable to SpaceX's activities at Boca Chica, require SpaceX to incorporate all appropriate and practicable measures to avoid impacts to wetlands, streams, and other aquatic resources and to minimize unavoidable impacts. As the EPA has stated, "given that the proposed project site is located in an environmentally sensitive area with high quality habitats, emphasis should be placed on the importance of avoiding and minimizing impacts to these distinctly sensitive aquatic resources."[61]

However, the mitigation measures outlined in the DPEA and BA are simply inadequate to compensate for the significant impacts that SpaceX is having on the Boca Chica area. As discussed above, this area provides some of the most important habitat for migratory birds in the U.S. The Lower Rio Grande Valley Refuge is one of the most biologically diverse regions in North America, and species from the Central and Mississippi flyway converge on this area, making it an essential stopover for migratory birds. Not only does the Boca Chica tract provide habitat for migratory birds, such as ESA-listed piping plovers, but it is one of the few places where the Kemp's Ridley sea turtle, the most critically endangered sea turtle in the world, nests.

Yet SpaceX is proposing to take very few measures to protect the species that rely on the surrounding habitat, and it remains unclear whether SpaceX will even adhere to those measures.[62] For example, the BA acknowledges that light from the facility would negatively affect nesting sea turtles because it could cause adult females to false crawl or hatchlings to become disoriented and reduce nesting success and hatchling survival. Yet it does not suggest ways to mitigate the effects of that lighting, such as season/time lighting restrictions during the crucial hatching season. Rather, it claims that there may be times when white lights would need to be used continually for several days. Laughably, the BA includes as an "operational measure" to "minimize lighting effects on wildlife" such routine things as "turning the lights off when not needed,"[63] which is meaningless given that SpaceX appears to need such lighting nearly all the time.

At the very least, SpaceX should have to follow the same mitigation as the Kennedy Space Center (KSC) / Cape Canaveral Spaceport, which is likewise situated in an area that provides habitat for sensitive bird and turtle species that are adversely affected by noise and light

---

[60] 50 C.F.R. § 402.14.

[61] EPA April 7, 2021 Letter.

[62] FWS has stated that SpaceX has not adhered to the measures in the 2013 Biological Opinion, but rather "continue[s] to do whatever they want with no concern for the impacts to the natural world their activity causes." Email from Bryan Winton to Chris Perez Re: Boca Chica monitoring (Sep. 16, 2020) (attached hereto).

[63] BA at 27.

15

FAA00001830

pollution.[64] According to the Cape Canaveral Spaceport Development Manual,[65] the KSC
Exterior Lighting Requirements include positioning of lights so that the light source and any
reflective surface are not visible from beach areas, and that all lights be shielded and/or recessed.
It also specifically requires that areas seaward of the frontal dunes (where turtle nests would be
located) are not illuminated. Moreover, the KSC manual states that all facilities that are in close
proximity to the beach and/or cause significant sky glow must prohibit the use of exterior lights
between 9 p.m. and dawn from May 1 through October 31 to protect turtles, and that certain
types of lights (such as metal halide and mercury vapor lights with wavelengths between 320-
560 nm) should not be used for external lighting. KSC requires a plan showing the proposed
location of all exterior lights, with each type of fixture to be used, along with a proposed
operation schedule. The applicant may seek a variance from these requirements, including the
May 1 – October 31 prohibition on exterior lights, if there is a compelling need, but that requires
a process wherein FWS has the opportunity to consider the impacts of any variance on listed
species, and provides that the applicant must mitigate any negative effects that may result from
the variance.

It remains unclear why the FAA has not required the same mitigation measures for the Boca
Chica site, which is no less ecologically important than Cape Canaveral. As discussed further
below, the FAA does not even have the specific information required to analyze light impacts
because no lighting plan has been provided; however, the BA does state that SpaceX would
require "bright spotlighting for periods of time (sometimes days) when illuminating the launch
vehicle on the launch pad," and that "white lighting" would be needed 24 hours a day, 7 days a
week throughout the year for ground support operations.[66] The BA even states that these
spotlights would be metal halide, precisely the type of lighting that has been deemed too
detrimental to wildlife for use at the KSC. The BA does include, as an operational measure, that
low pressure sodium lights could be used, "to the extent practicable," during sea turtle nesting
season, but it qualifies this with by saying that brighter, white lights would be necessary "for
ground support operations performed 24/7 throughout the year," making this a meaningless
mitigation measure.

While SpaceX certainly can do more to protect imperiled birds and sea turtles from light
pollution by, at minimum, following the protocols for the KSC, it can and must go farther than

---

[64] *See, e.g.,* NASA, Environmental Assessment for Exploration Park North at the John F.
Kennedy Space Center, Kennedy Space Center, Florida (August 2021). Attached hereto and
available at https://netspublic.grc.nasa.gov/main/ExpParkNorth_FINAL%20EA%2007-27-
21.pdf.
[65] Space Florida, Cape Canaveral Spaceport Development Manual (Feb. 2, 2016) ("KSC
Development Manual"). *Available at* https://www.spaceflorida.gov/wp-
content/uploads/2018/12/ccs_development_manual_2-2-16_revision-1-1-withsigjk.pdf.
(Attached hereto).
[66] BA at 9.

FAA00001831

that. The best way to protect the listed species in the area is to give them a fighting chance by protecting as much of their habitat as possible. That is particularly the case where ecologically sensitive habitats are being impacted, making compensatory, out-of-kind mitigation less useful. As the EPA noted, "there are concerns if non-contiguous and out-of-kind mitigation through preservation is proposed," and that restoration and enhancement is preferred over creation of new habitat, due to the higher likelihood of success.[67] SpaceX, however, has failed to take any action to increase the habitat available for listed species by protecting and/or enhancing additional lands in the vicinity of the areas that are adversely affected by its activities.

Additional mitigation is also warranted to address the impacts of increased vehicle traffic, which exposes jaguarundis and ocelots to the increased potential for vehicle collisions (according to the BA there will be an extra 505 vehicles per day through potential travel corridors for the Gulf Coast jaguarundi and the ocelot), and is clearly not being controlled by SpaceX.[68] The project will harm Gulf Coast jaguarundis and ocelots by causing them to avoid areas and seek other north-south travel corridors through the lomas, expending additional energy and increasing the potential for vehicular mortality. Protecting additional north-south travel corridors is essential to offset the impacts of the proposed increase in vehicle traffic, yet SpaceX does not appear to have taken any steps to provide for additional protections.

In sum, SpaceX is in a position to mitigate its impacts by expanding and enhancing the surrounding conservation lands and available habitat in the vicinity of Boca Chica, providing additional protection to areas that sensitive species like plovers, ocelot and jaguarundi can move into when they are harassed by the Noise and Light from SpaceX, and to avoid the increased vehicle traffic that the FAA acknowledges may harm these species. SpaceX should work with FWS to determine where land could be purchased to extend the protections of the NWRs and reduce the impacts to the listed species in the region by protecting the habitat functions and values these species rely on. It is simply absurd that a company with the resources of SpaceX and Mr. Musk would not do more to ensure that the conservation values of the surrounding wildlife habitat are protected.

## III.    The FAA's Biological Assessment is inadequate

ESA Section 7 is a vital safeguard that requires each federal agency to "insure"—at the "earliest possible time"—that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat.[69] To effectuate

---

[67] EPA April 7, 2021 Letter.
[68] See email from Ernesto Reyes (FWS) to ███████ (SpaceX) (Feb. 12, 2016) (attached hereto).
[69] 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

17

FAA00001832

that duty, Section 7 and the ESA's implementing regulations provide a detailed process that agencies must follow before approving actions that "may affect" listed species.

First, the action agency must prepare a biological assessment to evaluate whether the proposed action is likely to adversely affect listed species or critical habitat in the "action area."[70] The biological assessment should include the results of on-site inspections, the views of recognized experts, a review of literature and other available information, an analysis of the effects of the proposed action on listed species and habitat including cumulative effects, and an analysis of alternatives to the proposed action.[71] If the agency concludes in the biological assessment that the action is "not likely to adversely affect" listed species, it must seek a concurrence from FWS to complete the consultation process.[72] Conversely, if the action is "likely to adversely affect" listed species, the agency must enter into "formal consultation" with FWS, a more extensive and protective process to consider the action's impacts.[73]

For either a request for concurrence or the initiation of formal consultation, the action agency must provide sufficient information in the biological assessment for FWS to make an informed determination as to the potential impacts to listed species from the proposed action. The regulations therefore require the action agency to provide a description of the proposed action along with any measures intended to avoid or mitigate impacts, which must provide "sufficient detail to assess the effects of the action on listed species and critical habitat."[74] That description must provide not only basic background information—such as the purpose, duration, timing, and location of the action—but also details regarding the "specific components of the action and how they will be carried out," as well as "maps, drawings, blueprints or similar schematics" detailing the specific components, along with any other information pertinent to the action's effects on listed species and critical habitat.[75] The regulations make clear that the action agency *must* provide a "map or description of all areas to be affected," as well as all information that the agency has in its possession, "including available information such as the presence, abundance, density, or periodic occurrence of listed species and the condition and location of the species' habitat, including any critical habitat."[76] Furthermore, the action agency must provide a "description of the effects of the action and an analysis of any cumulative effects."[77] That

---

[70] 50 C.F.R. § 402.02; *see also id.* § 402.12.

[71] 50 C.F.R. § 402.12(f).

[72] 50 C.F.R. § 402.13(c).

[73] 50 C.F.R. §§ 402.12(k), 402.14(a).

[74] 50 C.F.R. § 402.14(c)(1).

[75] *Id.*

[76] *Id.*

[77] *Id.*

FAA00001833

analysis must be based on the "best scientific and commercial data available" in order to properly evaluate impacts to listed species.[78]

As set forth below, the FAA has failed to provide sufficient detailed information in its biological assessment and has not relied on the best available scientific information to determine whether listed species will be jeopardized or critical habitat will be adversely modified by the proposed action, in clear violation of the ESA.[79]

The Center remains very concerned about the impacts to imperiled wildlife from the proposed SpaceX activities, which pose significant risk to Eastern black rails, northern aplomado falcons, piping plovers, red knots, Gulf Coast jaguarundi, ocelots, West Indian manatees, and several sea turtles, including greens, hawksbill, Kemp's Ridley's, leatherbacks and loggerheads. Indeed, SpaceX's activities are completely incompatible with and directly threaten the integrity of the adjacent refuge and park lands that listed species rely on, due to a wide range of direct and indirect adverse impacts to nationally significant shorebird and waterbird habitats. The Starship/Super Heavy program now being considered includes a massive amount of construction activity which would result in a significant increase in the already existing adverse environmental impacts from SpaceX activities. The increased use of the Boca Chica site for rocket launches will cause significant harm to important habitat that listed species rely on, including designated critical habitat, which the FAA has failed to adequately analyze.

While the Center understands that the reinitiated ESA Section 7 consultation process remains ongoing and FWS will eventually provide a biological opinion for the project, the Center provides the following comments regarding the FAA's analysis, which fails to fully analyze the impacts to listed species at Boca Chica using the best available science, including from noise and light pollution, traffic, rocket explosions, wildfires, and water withdrawals.

In addition, the issues discussed below also constitute a violation of NEPA, since the FAA relied entirely on its BA to satisfy its duty to address impacts to listed species under NEPA in its DPEA. For the reasons set forth below, the FAA has not only violated the ESA, but has failed to take the requisite hard look at the impacts to listed species from SpaceX activities at the Boca Chica site.[80]

---

[78] 16 U.S.C. § 1536(a)(2); 40 C.F.R. § 402.14(d).

[79] *See Resources Ltd. v. Robertson*, 35 F.3d 1300, 1305 (9th Cir., 1994) (invalidating a consultation where the action agency failed to provide the FWS with all of the data and information required by 50 C.F.R. § 402.14(d) – the best available science mandate).

[80] The EA itself, not a biological assessment, is where the agency's "defense of its position must be found." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998).

19

FAA00001834

### A. The FAA did not, and could not, adequately analyze the impacts from noise and light pollution

The BA acknowledges that the operation of the SpaceX facility will harm listed species through noise and light pollution, including from the firing of booster rockets and intense lighting to support ground operations. As the BA acknowledges, noise and light associated with SpaceX operations can harm or harass listed species, including piping plovers in their critical habitat, sensitive ocelot and jaguarundi in some of their last remaining habitat, and Kemp's Ridley sea turtles, the most critically endangered sea turtle in the world. For example, the Boca Chica Tract of the Lower Rio Grande NWR is one of the few places where the Kemp's Ridley sea turtles comes ashore to nest. As the FAA notes, "[l]ighting could cause adult females to false crawl or hatchlings that were not relocated to become disoriented and reduce nesting success / hatchling survival."[81] Meanwhile, noise from rocket launches and construction activities would adversely affect ocelot and jaguarundi, since their "response to noise could potentially cause the species to expend energy, increase their risk of vehicular collision, or cause individuals to abandon their movements through the area and decrease opportunities to improve genetic diversity within the Texas populations."[82] As discussed above, these impacts have not been adequately addressed with sufficient mitigation.

Moreover, the FAA has not adequately analyzed the impacts of noise and light pollution on listed species, and in fact it could not do so because the FAA acknowledges that "[d]etailed information about some of the launch-related infrastructure (e.g., exact location and design) is not currently available. Therefore, the BA makes assumptions about these unknowns using best available information and professional expertise."[83] However, as discussed above the Services' regulations specifically require a request for concurrence or formal consultation to include a "description of the proposed action" with "sufficient detail to assess the effects of the action on listed species and critical habitat," including not only the "specific components of the action," but "maps, drawings, blueprints, or similar schematics," so that the Service has the information it needs to make a well-reasoned jeopardy determination.[84] Consistent with this requirement, the only other major U.S. spaceport – the Cape Canaveral Kennedy Space Center (KSC) – has a development manual that specifically requires, at minimum, a plan drawing showing "all exterior lighting fixtures and other lights that may be visible at night," which "must include details of each type of fixture to be used, such as lamp type, wattage, installation height, and proposed operation schedule"[85]

---

[81] BA at 69. *See also* NASA, Dark Skies Program https://www.nasa.gov/content/kennedy-space-center-keeps-dark-skies-for-sea-turtle-nesting.

[82] *Id*. at 67.

[83] *Id.* at 3.

[84] 50 C.F.R. § 402.14(c)(1).

[85] KSC Development Manual, KSC Exterior Lighting Requirement at 3 (Section 5.1) (attached hereto). *See also* Kennedy NASA Procedural Requirements, Kennedy Space Center

FAA00001835

Here, however, none of that information has been provided, and so the BA is incomplete. In fact, the BA states that "the number of pole lights would be finalized during the site design process,"[86] confirming that the information needed to analyze the impacts of the lighting has not yet been made available to the FAA or FWS.[87]

Since the actual location of launch-related infrastructure remains unknown, the impacts from noise and light cannot have been fully addressed by the FAA, as these are very site-specific concerns with localized impacts that may defer based on placement of such infrastructure on the site. Moreover, since the SpaceX parcel is so small and is directly adjacent to essential habitat areas – including national wildlife refuges that provide critical habitat for listed species – the placement of infrastructure is of vital import when considering the potential for harm. Without the specific information the regulations require, the BA is incomplete, and the Service cannot make a fully informed jeopardy determination.

Furthermore, the analysis that the FAA does provide regarding noise impacts is woefully inadequate. For example, the BA concludes that noise from operations may temporarily disturb or displace piping plovers, but it does not appear to give appropriate consideration to the full impacts that noise disturbances may have on the species. Indeed, it notes that noise from nearby beachgoers has already existed in the area, implying that noise generated by beachgoers is comparable to the noise generated by construction activities and rocket launches. This ignores the louder, though more infrequent, noise impacts that would result from launches, sonic booms during landings, and noises related to engine testing.

It is undeniable that noise from the rockets is likely to displace sensitive species, and in fact the FAA states in the BA that red knots and piping plovers could be killed if they are within the heat plume created by engine ignition during testing and launches, but suggests that they would probably leave the area due to noise disturbances before that would happen, indicating that such noise *will* displace plovers from their critical habitat. In fact, a recent study submitted to FWS by the Coastal Bend Bays & Estuaries Program (attached hereto) indicates that the piping plover population at Boca Chica has experienced a significant decline, and indeed a rapid and substantial loss of the population, due to SpaceX, and that the area is functioning as a population sink due to the plover's historic reliance on the area coupled with the increased harm from SpaceX activities. Yet the FAA provides no real analysis as to how that may affect the continued existence of the species and the use of the critical habitat.

---

Environmental Requirement (Mar. 6, 2017) (attached hereto) (requiring a lighting management plan to protect marine turtles) (attached hereto).

[86] BA at 9.

[87] In a letter dated March 2, 2020 (attached hereto), FWS confirmed that "lighting, parking, construction times, and anticipated traffic are not clear and not comparable to the original consultation documents."

FAA00001836

There are also significant gaps in the FAA's analysis regarding the impacts of overpressure from SpaceX activities on listed species. For example, the BA notes that "overpressures less than 1 psf are not expected to adversely affect animals," suggesting that pressures over that amount *would* result in adverse effects.[88] The BA goes on to state that overpressures greater than 1 psf would "extend about 13 miles from the launch pad" for Super Heavy booster landings.[89] This would result in overpressures above 1 psf on refuge lands and critical habitat areas. While the FAA admits that the noise would adversely affect listed species, and therefore formal consultation is required, it did not provide any analysis of the actual impacts of this noise pollution on plovers, ocelot, or jaguarundi, which may be forced away from some of their last remaining habitat by such noise.

The Center is hopeful that the FWS will provide a more thorough and complete analysis of noise and light impacts in its biological opinion; however, the FAA's BA fails to provide the requisite information and analysis and is therefore inadequate.

### B. FAA failed to adequately address the impacts to listed species from "anomalies"

The FAA acknowledges that a "Starship/Super Heavy test operation or launch could fail (referred to as an anomaly or mishap). An anomaly on the launch pad represents the greatest risk to the environment. If this occurs, a number of possible outcomes could result, the most likely being a fire on the launch pad. An explosion on the launch pad would spread debris."[90] It further concedes that "in the event of an anomaly, an explosion could injure or kill wildlife species adjacent to the launch pad or within areas impacted by debris. In addition, fires could potentially start from an explosion that could result in a loss of habitat."[91] However, it discounts the impacts of such anomalies, stating only that SpaceX would adhere to its Fire Mitigation and Response Plan to prevent and respond to any fires. This provides no reassurance – particularly given the history of rocket explosions and wildfires discussed herein and in the attached documents.

Moreover, when setting forth the impacts to listed species from an anomaly — such as debris and fires that can kill or adversely modify habitat of piping plovers, ocelots and jaguarundi — the FAA provides no actual analysis of the impacts to listed species from debris and recovery or fires from launch anomalies (other than admitting they could affect the species), even though FWS has found that:

> SpaceX rocket debris falling onto the Refuge has damaged the sensitive wind tidal flats. And, the vehicles or machinery used to retrieve rocket debris have created ruts and

---

[88] BA at 29.
[89] *Id.*
[90] *Id.* at 16.
[91] *Id.* at 61.

FAA00001837

caused other damage that interrupts water sheet flow across these flats. Two SpaceX incidents on July 25, 2019 and again in August 2019 resulted in wildfires of 130-acres and 10-acres respectively burned through coastal prairie and dune habitats on refuge managed land. Anomalies resulting in explosions on November 20, 2019, February 28, 2020, and December 9, 2020 resulted in debris scattered onto refuge managed lands. Retrieval methods damaged the sensitive alkaline flat and refuge cable fencing installed to protect the area from disturbance.[92]

The FAA only spends a few pages discussing the possibility of rocket explosions and the adverse environmental impact of such explosions, but it provides no actual analysis of the impacts of these anomalies, and it fails to provide measures to prevent harm from fires, such as limiting or reducing rocket testing between March 15 and August 15, as FWS has suggested.[93] For example, while the FAA acknowledges that an anomaly could affect ocelot and jaguarundi, "particularly if a wildfire is started and burns many acres of suitable cat habitat," and that the "loss of habitat could affect species movement and potentially affect migration corridors,"[94] it provides no analysis of how this would affect the survival and recovery of the species, such as the impact to the regional population, genetic diversity, and the species' resiliency to climate change. Instead, the FAA appears to discount the potential for catastrophic wildfires by arguing that the loss of habitat is temporary because the vegetation will grow back,[95] ignoring that even short-term impacts could be catastrophic for these species, and further ignoring that the lost habitat may never regenerate due to climate change.

The Center is likewise concerned about the FAA's inadequate consideration of the impacts of anomalies and debris collection on the threatened piping plover's critical habitat. The FAA, while it notes that a launch failure may occur, dismisses the possibility of a crash as "unlikely," regardless of the fact that SpaceX has had several launch failures. It is noteworthy that 8 of the last 10 launches have resulted in the destruction of the rocket. Of particular concern, massive uncontrolled explosions have taken place during the last four rocket launches.

The wide area covered by debris from failed launches raises significant concerns about adverse environmental impacts. The explosion of SN 11 on March 30, 2021, which occurred at altitude and not on the launch pad, merits particular attention, as large amounts of debris uncontrollably fell outside of SpaceX property on to public conservation lands, including high value, ecologically sensitive habitats that are used by the Piping Plover, Wilson's Plover, and Snowy Plover. There was also at least one explosion in 2021 that scattered debris on the Refuge.[96]

---

[92] FWS Jan. 22, 2021 Letter.

[93] FWS Mar. 2, 2020 Letter (attached hereto).

[94] BA at 67.

[95] *Id.*

[96] *See* Email from Bryan Winton, Refuge Manager, Lower Rio Grande Valley National Wildlife Refuge, U.S. Fish & Wildlife Serv. (Mar. 30, 2021, 21:22 CST) (Attached hereto); *see also*

FAA00001838

Operations to retrieve the debris have further damaged the refuge. According to FWS, "debris that has fallen onto the Refuge has damaged sensitive wind tidal flats. The vehicles or machinery used to retrieve debris have created rutting and damage that interrupts tidal water sheet flow across these flats."[97] In the past, SpaceX has used high-capacity tow trucks and a construction dump truck to drag the debris through parts of the refuge. FWS personnel have noted that botched retrieval efforts have further damaged the refuge.[98] Because Service personnel are barred from the refuge following explosions, they have been unable to assess the full extent to which refuge wildlife are harmed. Last month, the Service asserted that "none of the damage to the sensitive tidal flats from debris pickup and motorized equipment and human access has been adequately addressed."[99] Yet the FAA failed to assess the impacts to piping plovers or other listed species from explosions and debris cleanup in the BA.

In addition, while FAA maintains that in the event of an anomaly SpaceX would coordinate with FWS,[100] that is insufficient to meet the FAA's duty to fully consider the impacts of the SpaceX project before it moves forward. Furthermore, the FAA has not indicated that it would undertake emergency ESA consultation in the event of an anomaly. The Services have established a specific consultation process in the case of "emergencies." In an emergency, such as "situations involving acts of God, disasters, casualties, national defense or security emergencies, etc.,"[101] initial consultation may be conducted informally through alternative procedures that are consistent with Section 7 of the ESA (*i.e.* by calling or emailing the Services to discuss the emergency action and any prudent mitigation), *id.*, *and then* "[f]ormal consultation shall be initiated as soon as practicable after the emergency is under control."[102] The Handbook explains that in the initial stages of emergency consultation, the Services "offer recommendations to minimize the effects of the emergency response action on listed species or their critical habitat," and then a full, formal consultation is to take place after the emergency is under control. The emergency formal consultation "is treated like any other formal consultation."[103] However, post-emergency consultations require the agency to provide additional information, including "an evaluation of the response to and the impacts of the emergency on affected species and their habitats, including documentation of how the Services' recommendations were implemented,

---

Email from Stacey Zee, FAA (Mar. 3, 2021) (debris found and collected from LRGV, which was within the "ground hazard area").

[97] FWS Jan. 22, 2021 Letter.

[98] *See e.g.* Email from Bryan Winton (Jan 21, 2021) ("April 21,22 -2019 - Space X employee(s) get stuck with 2 vehicles and a forklift in tidal flats. Causes significant damage to tidal flats").

[99] FWS Aug. 2021 Letter at 3.

[100] BA at 17.

[101] 50 C.F.R. § 402.05(a).

[102] *Id.* § 402.05(b). The Services have expounded on the emergency consultation process in their ENDANGERED SPECIES CONSULTATION HANDBOOK 8-1 to 8-5 (1998) ("Handbook")

[103] *Id.*

FAA00001839

and the results of implementation in minimizing take."[104] The FAA does not appear to have undertaken emergency consultation on prior anomalies, but should make clear that it will comply with this process in the event of a future anomaly.[105]

Regardless, it is readily apparent that the FAA has failed to adequately address the impacts to listed species from anomalies, and therefore the BA is inadequate, arbitrary and capricious, in violation of the ESA.

### C. The FAA failed to analyze the impacts to listed species from SpaceX's contribution to climate change

As discussed above in the context of NEPA, the FAA has failed to consider SpaceX's contribution to the climate crisis. The ESA, however, also requires that the FAA consider the impacts to listed species from SpaceX's contribution to global climate change. "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, *whatever the cost*."[106] Because SpaceX's activities will have an appreciable, cumulative impact on climate-threatened species, the FAA must include climate impacts as part of its consultation. Its failure to do so is a clear violation of the ESA.

Indeed, it is clear that the anticipated greenhouse gas pollution from SpaceX will harm listed species far beyond the immediate area of the proposed activity in a manner that is attributable to the agency action, which must therefore be addressed in the BA; yet, this issue was glossed over by the FAA, which claims that the GHG emissions from SpaceX are not significant (only when compared to total national GHG emissions), without sufficient support to ignore the project's contribution to the climate crisis.

Regardless, the science is overwhelmingly clear that climate change represents a stark threat to the future of biodiversity within the United States and around the world. The Fourth National Climate Assessment warns that "climate change threatens many benefits that the natural environment provides to society," and that "extinctions and transformative impacts on some ecosystems" will occur "without significant reductions in global greenhouse gas emissions."[107] The best available science shows that anthropogenic climate change is causing widespread harm to life across the planet, disrupting species' distribution, timing of breeding and migration,

---

[104] *Id.*

[105] See email from Sonny Perez dated Dec. 17, 2020 (discussing the need to undertake emergency consultation on rocket anomalies) (attached hereto).

[106] *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978); *see also* 16 U.S.C. § 1532(3).

[107] U.S. Global Change Research Program, Climate Science Special Report - Fourth National Climate Assessment, Vol. I at 51 (available at

https://science2017.globalchange.gov/downloads/CSSR2017_FullReport.pdf).

FAA00001840

physiology, vital rates, and genetics—in addition to increasing species extinction risk.[108] Climate change-related local extinctions are widespread and have occurred in hundreds of species, including almost half of the 976 species surveyed.[109] Nearly half of terrestrial non-flying threatened mammals and nearly one-quarter of threatened birds are estimated to have been negatively impacted by climate change in at least part of their range.[110] Furthermore, across the globe, populations of terrestrial birds and mammals that are experiencing greater rates of climate warming are more likely to be declining at a faster rate.[111]

Furthermore, there are no defensible legal rationales for ignoring climate-threatened species that are harmed by the emissions that will result from this proposed action, such as piping plovers. Studies have found that "for small beach dependent populations such as Piping Plovers, even the most subtle changes could have profound affects on survivorship."[112] It is therefore abundantly clear that activities that contribute GHG emissions, such as SpaceX, have real impacts that cross the "may affect" threshold, even if some of those impacts are still of an undetermined character at this point. The purpose of the consultation process, by design, is to allow the expert wildlife agencies to assess these impacts using the best available science, so that they can evaluate the harm that may be caused.

Species extinction risk will accelerate with continued greenhouse gas pollution, such as from SpaceX. One million animal and plant species are now threatened with extinction, with climate change as a primary driver.[113] At 2°C compared with 1.5°C of temperature rise, species' extinction risk will increase dramatically, leading to a doubling of the number of vertebrate and plant species losing more than half their range, and a tripling for invertebrate species.[114]

---

[108] Warren, Rachel et al., Increasing impacts of climate change upon ecosystems with increasing global mean temperature rise, 106 Climatic Change 141 (2011).

[109] Wiens, John J., Climate-related local extinctions are already widespread among plant and animal species, 14 PLoS Biology e2001104 (2016).

[110] Pacifici, Michela et al., Species' traits influenced their response to recent climate change, 7 Nature Climate Change 205 (2017). The study concluded that "populations of large numbers of threatened species are likely to be already affected by climate change, and … conservation managers, planners and policy makers must take this into account in efforts to safeguard the future of biodiversity."

[111] Spooner, Fiona E.B. et al., Rapid warming is associated with population decline among terrestrial birds and mammals globally, 24 Global Change Biology 4521 (2018).

[112] Ruth Boettcher, Tom Penn, Robert R. Cross, Karen T. Terwilliger, and Ruth A. Beck "An Overview of the Status and Distribution of Piping Plovers in Virginia," *Waterbirds* 30(sp1), 138-151, (1 December 2007).

[113] Brondizio, E.S. et al. (eds.), IPBES, Global assessment report on biodiversity and ecosystem services of the Intergovernmental Science-Policy Platform on Biodiversity and Ecosystem Services, IPBES secretariat, Bonn, Germany (2019), *available at* https://ipbes.net/global-assessment.

[114] IPCC Climate Change 2021, Summary for Policymakers.

FAA00001841

Numerous studies have projected catastrophic species losses during this century if climate change continues unabated: 15 to 37% of the world's plants and animals committed to extinction by 2050 under a mid-level emissions scenario[115]; the potential extinction of 10 to 14% of species by 2100[116]; global extinction of 5% of species with 2°C of warming and 16% of species with business-as-usual warming[117]; the loss of more than half of the present climatic range for 58% of plants and 35% of animals by the 2080s under the current emissions pathway, in a sample of 48,786 species[118]; and the loss of a third or more of animals and plant species in the next 50 years.[119] As summarized by the Third National Climate Assessment, "landscapes and seascapes are changing rapidly, and species, including many iconic species, may disappear from regions where they have been prevalent or become extinct, altering some regions so much that their mix of plant and animal life will become almost unrecognizable."[120]

The FAA's total failure to consider impacts to listed species from SpaceX's emissions in the context of the climate crisis renders the FAA's ESA analysis arbitrary and capricious.

### D. FAA failed to address the impacts of water withdrawals on listed species

According to the BA, it is possible that SpaceX would require an enormous amount of water for its operation, particularly if it uses deluge water on the plume during launches to control temperature.[121] The BA notes that "all water (including deluge and potable water) would be either delivered by truck or withdrawn from existing or new wells located adjacent to the launch pad."[122] The BA further states that the desalination plant would treat water "from two new source wells" that would extract groundwater at a rate of 40 gallons per minute.[123]

However, BA is silent as to the impacts of such water withdrawals on listed species and critical habitat. Water withdrawals (onsite or offsite) may alter the adjacent habitat, including by reducing water availability or increasing salinity in certain areas. It is notable that EPA has found that SpaceX's activities at Boca Chica have caused "substantial and unacceptable adverse

---

[115] Thomas, Chris. D. et al., Extinction risk from climate change, 427 Nature 145 (2004).
[116] Maclean, Ilya M. D. & Robert J. Wilson, Recent ecological responses to climate change support predictions of high extinction risk, 108 PNAS 12337 (2011).
[117] Urban, Mark C., Accelerating extinction risk from climate change, 348 Science 571 (2015).
[118] Warren, Rachel et al., Quantifying the benefit of early climate change mitigation in avoiding biodiversity loss, 3 Nature Climate Change 678 (2013).
[119] Román-Palacios, Cristian & John J. Wiens, Recent responses to climate change reveal the drivers of species extinction and survival, 117 PNAS 4211 (2020).
[120] Melillo, Jerry M., Terese (T.C.) Richmond, and Gary W. Yohe, Eds., 2014: Climate Change Impacts in the United States: The Third National Climate Assessment. U.S. Global Change Research Program, 841 pp. doi:10.7930/J0Z31WJ2.
[121] BA at 12.
[122] *Id.*
[123] *Id.* at 23.

FAA00001842

impacts to aquatic resources of national important (ARNI)," due to the impacts to mudflats, estuarine and non-tidal wetlands, which "support benthic invertebrate communities which make them essential foraging habitats for wintering and migrating shorebirds, including the threatened piping plover and red knot."[124] Water withdrawals may further harm the adjacent wetland communities, harming these listed species. The FAA's failure to consider the impacts of water withdrawals on listed species is a glaring violation of the ESA (as well as NEPA).

## IV. The FAA has ignored interrelated actions and indirect effects, unlawfully segmenting its analysis

The FAA has failed to include interrelated and/or interdependent actions in its DPEA and BA and is unlawfully segmenting its analysis. Under both NEPA and the ESA, an agency must consider the full action, including any interdependent or interrelated actions.[125] Here, the FAA has stated in the DPEA and BA that SpaceX is still in the testing stages of the launch vehicle, including ongoing Starship prototype tests that have been approved under a separate license, and that SpaceX will also need to conduct similar tests of Super Heavy prototypes, which has not yet been approved under a separate license.[126] The testing of the Starship and Super Heavy rockets is clearly intertwined with the proposed action. Indeed, the BA specifies that these tests are the foundation for the development and operational phases of the project, since it can only move forward after the testing phase has been completed.[127] Therefore, the testing phase of the Starship and Super Heavy rockets *must* be included with the analysis of the development and operational phases in order to comply with NEPA and the ESA. Since the prior NEPA and ESA analyses were for the falcon rockets, the FAA cannot rely on those documents to fulfill their duty under these bedrock environmental laws.

Several other related actions that must be considered in these NEPA and ESA analyses were ignored by the FAA. For example, while the BA acknowledges that Starship and Super Heavy rockets would be delivered by barge to the Port of Brownsville, there is no discussion of the

---

[124] EPA April 7, 2021 Letter.

[125] *See* 40 C.F.R. § 1508.25 (providing that under NEPA, "connected actions" should be discussed in the same EIS). Connected actions must be considered in a single EIS even under the NEPA regulations promulgated by the Trump Administration. *See* 85 Fed. Reg. 43304, 43322 (stating that 40 C.F.R. §§ 1501.9(e) and 1502.4(a) )providing that agencies must evaluate, in a single EIS, proposals or parts of proposals that are related closely enough to be, in effect, a single course of action). *See also* 50 C.F.R. § 402.02 (the "effects of the action" include all consequences to listed species caused by the proposed action, including the consequences of other activities that are caused by the proposed action); *See ESA Handbook* at 4-27 (directing agencies to apply a "but for" test to determine whether actions are interdependent or interrelated); *see also Ctr. for Biological Diversity v. BLM*, 698 F. 3d 1101, 1113 (9th Cir. 2012) (same).

[126] *See* BA at 8.

[127] *Id*.

28

FAA00001843

impacts of that barge, including potential collisions with listed turtles and marine mammals. Similarly, the FAA does not include any analysis of the LNG and methane fuels that would be needed for the proposed launches, including impacts from fracking and transporting the fuel to Boca Chica. It is our understanding that this project will require the installation of a pipeline through the LRGV to transport LNG to the site, which was not discussed in the DPEA or BA. The FAA also seems to have ignored work by Mountain Valley Electric Cooperative to realign and upgrade a powerline from East Brownsville to the Boca Chica Beach area, intended to serve SpaceX.[128]

All of these connected, interrelated and/or interdependent components of the SpaceX project must be analyzed within the DPEA and BA. The failure to do so is a blatant violation of the ESA and NEPA.

## V.    FAA has failed to show compliance with Section 4(f) of the Transportation Act

Because the operation of the Boca Chica facility for SpaceX rocket launches will result in intense noise and light pollution in adjacent National Wildlife Refuge lands – in particular, the Boca Chica Tract of the Lower Rio Grande Valley NWF – the action will result in a "constructive use" of refuge lands, subjecting FAA to Section 4(f) of the Department of Transportation Act.[129] The Section 4(f) regulations specifically "require rigorous exploration and objective evaluation of alternative actions that would avoid all use of Section 4(f) properties…that would avoid some or all adverse effects."[130] Furthermore, 23 U.S.C. § 138 precludes the FAA from approving a program or project unless there is no feasible and prudent alternative to the using that land and the action includes all possible planning to minimize harm to the refuge.

Here, the FAA has not shown that these requirements have been met. It makes no effort to show that there is no prudent alternative to the Boca Chica site or alternative ways to utilize the site to reduce the impacts to the adjacent refuge lands. Regardless, even if expansion of that site were the only available alternative, the FAA must still consider the impacts to the refuge lands from SpaceX activities in the context of the Refuge's purpose. The LRGV NWR, and the national Refuge System in general, maintains the biological integrity, diversity and environmental health

---

[128] https://www.fws.gov/nwrs/threecolumn.aspx?id=6442470706. *See also* email from Bryan Winton dated Feb. 4, 2021 (confirming that the Mountain Valley Electric Coop line is intended to serve SpaceX, and that the proposed line may adversely affect land administered by FWS) (attached hereto).

[129] Based on the Section 4(f) definitions, a "constructive use" occurs when there is "a temporary occupancy of land that is adverse in terms of the statute's preservation purpose" or when "a project's proximity impacts are so severe that the protected activities, features, or attributes of a property are substantially impaired."

[130] OEPC Section 4(f) Handbook, 23 C.F.R. § 774.

FAA00001844

of natural resources for the benefit of present and future generations of Americans.[131] The LRGV was established in 1979, as a long-term program of acquiring lands to protect and restore the unique biodiversity of the Lower Rio Grande Valley of Texas. The stated purposes and legislative authorities for this Refuge are "for the development, advancement, management, conservation, and protection of fish and wildlife resources…."[132] Using these lands as a sacrificial debris field when blowing up gigantic rockets would seem incompatible with the area's intended use for conservation.

According to FWS, SpaceX's use of the Boca Chica site has already resulted in "adverse" and even "severe" impacts to public use, management, wildlife, and habitat on refuge lands, with FWS going so far as to state that "Due to operations by SpaceX, the FWS's ability to maintain the biological integrity, diversity and environmental health of Refuge resources, as well as our ability to ensure the viability of the six wildlife-dependent recreational uses, has been significantly diminished at the Boca Chica tract."[133] These impacts certainly rise to the level of a substantial impairment and thus constitute a "constructive use," as defined under Section 4(f); Yet, FAA has failed to address the Section 4(f) factors in its DPEA.

FAA must therefore undertake a new or supplemental analysis to provide the required "rigorous exploration" of alternatives to avoid the impacts to refuge lands and must ensure that SpaceX is undertaking all possible mitigatory actions to minimize harm to the adjacent wildlife refuge lands. As set forth above, it is readily apparent that FAA has failed to ensure that SpaceX considered all alternatives and will implement all reasonable mitigation at the Boca Chica site – including, for example, lighting and noise restrictions to protect birds and turtles as well as purchasing conservation lands to offset impacts from SpaceX activities – and therefore as proposed the action does not meet the requirements of Section 4(f).

## VI.   The Project Will Violate the National Wildlife Refuge System Improvement Act of 1997

The National Wildlife Refuge System is managed pursuant to the National Wildlife Refuge System Administration Act of 1966, Pub. L. No. 89-669, 80 Stat. 926 (1966), as amended by the National Wildlife Refuge System Improvement Act of 1997, Pub L. No. 105-57, 111 Stat. 1252 (1997) ("Refuge Act"). The primary Mission of the National Wildlife Refuge System is to administer lands and waters for the conservation of fish, wildlife, and plant resources and their habitats for the benefit of present and future generations of Americans.[134] To achieve the mission of the System, the Refuge Act sets forth one of the strongest legislative mandates for ecosystem protection on public lands and waters, directing the Service to "ensure that the biological

---

[131] National Wildlife Refuge System Improvement Act of 1997, 16 U.S.C. 668dd-668ee.
[132] 16 U.S.C. § 742f (a)(4).
[133] FWS Jan. 22, 2021 Letter.
[134] 16 U.S.C. § 668dd(a)(2).

FAA00001845

integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations of Americans."[135]

To accomplish that mission, the law creates a presumption against public use,[136] and under subsection (d) of the Refuge Act the Service may only permit the use of refuge lands if it determines that such uses are "compatible with the purposes for which these areas are established."[137] The Service therefore cannot "permit a new use . . . or expand, renew, or extend an existing use" without first determining whether that use is compatible.[138] For a use to be "compatible" it must be "a wildlife-dependent recreational use or any other use of a refuge that, in the sound professional judgment of the [Service], will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge."[139]

SpaceX is proposing to use the adjacent refuge lands as a sacrificial debris field and is preventing FWS and the public from accessing important refuge areas, which is clearly an incompatible use. FWS has, in fact, explicitly stated that its "ability to maintain the biological integrity, diversity and environmental health of Refuge resources" has been significantly diminished at the Boca Chica tract," because SpaceX operations prevent and constrain public access year-round, "hampering biological and monitoring studies including sea turtle patrols, sea turtle cold-stunning responses, [and] hampering refuge management and law enforcement patrol…."[140] Once again, according to FWS these limitations have caused "both 'adverse' and 'severe' impacts to Refuge public use, management, wildlife, and habitat."[141] And while the Refuge Improvement Act prioritizes wildlife-dependent recreational uses of refuges (if they are deemed compatible) over other types of uses, such as economic uses,[142] clearly SpaceX (a commercial operation) is interfering with priority recreational uses by forcing closures of the refuge during rocket launches.

FAA, however, has failed entirely to show that the SpaceX activities it is considering are consistent with these legal requirements, and it does not appear possible for it to do so. The Refuge Act requires the Service to administer the System to "ensure that the biological integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations of Americans."[143] However, the Service has explicitly stated: "Due to operations by SpaceX, the FWS's ability to maintain the biological integrity, diversity and

---

[135] *Id*. § 668dd(a)(4)(B).
[136] 50 C.F.R. § 25.21(a).
[137] 16 U.S.C. § 668dd(d)(1)(B).
[138] *Id*. § 668dd(d)(3)(A)(i).
[139] *Id*. § 668ee(1).
[140] FWS Jan. 22, 2021 Letter.
[141] *Id*.
[142] 16 U.S.C. 668dd(a)(3)(C).
[143] 16 U.S.C. § 668dd(a)(4)(B).

FAA00001846

environmental health of Refuge resources… has been significantly diminished at the Boca Chica tract."[144] The proposed action is therefore inconsistent with the requirements of the Refuge Act. If the FAA were to authorize the action under these circumstances this is yet another reason why the agency's decision would be arbitrary and capricious and contrary to law.

## VII.    The Project must obtain a permit for take under the Migratory Bird Treaty Act

In 1918, Congress enacted the Migratory Bird Treaty Act (MBTA) to implement a treaty for the protection of migratory birds between Great Britain (on behalf of Canada) and the United States. The objective of the treaty was to create a "uniform system of protection" to "insur[e] the preservation of such migratory birds," because "a lack of adequate protection" for many migratory birds traveling through the United States left them vulnerable to extinction.[145] The MBTA has helped restore countless populations of birds once on the path to extinction, such as sandhill cranes, snowy egrets, and wood ducks. In fact, the Supreme Court has described the purpose of the MBTA as a "national interest of very nearly the first magnitude."[146]

As a "conservation statute[] designed to prevent the destruction of certain species of birds,"[147] the MBTA protects more than 1,000 species of birds found in the United States.[148] Under this law:

> [u]nless and except as permitted by regulations . . . it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, [or] kill . . . any migratory bird [or] any part, nest, or egg of any such bird . . . included in the terms of the conventions . . . .[149]

Although the Trump Administration adopted an interpretation of the MBTA that eliminated liability for "incidental" take and killing of migratory birds—at variance with decades of prior practice and policy—that interpretation was emphatically rejected by a federal court.[150] Accordingly, the Interior Department and FWS have recently completed a rulemaking that formally revokes the Trump Administration interpretation and reinstates the prior understanding of the statute, pursuant to which the foreseeable incidental take of migratory birds cannot proceed without formal authorization from the FWS.[151]

---

[144] FWS Jan. 2021 Letter at 2-3.

[145] Convention for the Protection of Migratory Birds, 39 Stat. 1702 (Aug. 16, 1916).

[146] *Missouri v. Holland*, 252 U.S. 416, 435 (1920).

[147] *Andrus v. Allard*, 444 U.S. 51, 52 (1979).

[148] *See* 50 C.F.R. § 10.13.

[149] 16 U.S.C. § 703(a).

[150] *See Natural Res. Def. Council v. U.S. Dep't of the Interior*, 478 F. Supp. 3d 469 (S.D.N.Y. 2020).

[151] *See* 86 Fed. Reg. 54643 (Oct. 4, 2021).

FAA00001847

Here, there is little doubt that the proposed activities may foreseeably kill or take migratory birds. Indeed, the FWS in a Jan. 22, 2021, letter explained that "[o]n three separate occasions in 2020, rocket launch failures resulted in explosions and the spread of debris on and off Refuge lands" and that "[v]ideos of these events show evidence of different species of birds being impacted by the blast." Although the FWS could not ascertain what species of migratory birds and/or birds listed as threatened or endangered under the ESA were harmed or harassed," the Service found that "[t]here is documented evidence that the debris and its removal has impacted and scarred various habitats in the area, including tidal flats which are foraging habitat for the threatened piping plover and red knot."

There is, therefore, a strong likelihood that the extensive activities in migratory bird habitat that are contemplated here—especially if undertaken during the breeding season—will result in the mortality and taking of migratory birds. For this reason, it would be unlawful for FAA to authorize the activities to proceed in the absence of authorization from the FWS pursuant to the MBTA.

## VIII.    Conclusion

For the foregoing reasons, the FAA has failed to comply with NEPA, the ESA, the Transportation Act, the Refuge Act, and the Migratory Bird Treaty Act. SpaceX's activities at the Boca Chica site continue to have undue adverse impacts on surrounding habitat and the wildlife that relies on those areas, including federally protected species, and those impacts have not been adequately analyzed by FAA or mitigated by SpaceX. Please contact me if you have any questions regarding these comments.

Sincerely,

Jared Margolis

Jared M. Margolis
Senior Attorney
Center for Biological Diversity
2852 Willamette St. # 171
Eugene, OR 97405
jmargolis@biologicaldiversity.org
(802) 310-4054

33

FAA00001848



# Cape Canaveral Spaceport Development Manual

# VERSION 1.1

| REVISION | DATE |
|---|---|
| Version 0 | August 21, 2015 |
| Version 1.0 | December 14, 2015 |
| Version 1.1 | February 2, 2016 |
|  |  |
|  |  |
|  |  |
|  |  |

FAA00002964

## SECTION 5.0    GENERAL EXTERIOR LIGHTING DESIGN GUIDELINES

5.1    The LMP must, at a minimum, identify on a plan drawing all exterior lighting fixtures and other lights that may be visible at night. The plan must include details of each type of fixture to be used, such as lamp type, wattage, installation height, and proposed operation schedule.

5.2    Facilities that are in close proximity to the beach, have lighting directly visible from the beach, and/or may cause significant sky glow will prohibit use of exterior lights between 9 p.m. and dawn from May 1 through October 31. If night activities that are essential to safety/security, support launch-related activities at active launch complexes, or night operations training require exterior lighting at night the PM may apply for a variance from these lighting restrictions as described in Section 6.0.

5.3    Lights with wavelengths from 585 - 590 nm and lowest wattage possible should be used for all exterior lighting applications. Lights with wavelengths between 320 and 560 nm, such as metal halide and mercury vapor lights, should not be used in any exterior lighting applications. Low-pressure sodium (LPS) lights are preferred if LPS can meet operational requirements. In cases where there are specific requirements calling for the discernment of colors, the PM may apply for a variance from the LMP as described in Section 6.0 below.

5.4    Energy conservation standards will be incorporated into all lighting designs.

5.5    All exterior light fixtures should be positioned so that:

5.5.1    The point source of light or any reflective surface of the light fixture is not directly visible from the beach.

5.5.2    Areas seaward of the frontal dune are not illuminated. Frontal dune is defined as the first natural or manmade mound of sand that is located landward of the beach and has sufficient vegetation, height, continuity, and configuration to offer protective value.

5.5.3    Light is directed downward and away from the beach at beachfront facilities and downward and in the direction of the task being performed at non-beachfront facilities.

5.5.4    All lights should be shielded and/or recessed.

5.5.5    Photocells should only be used to support security or other mission-specific requirements that occur on a regular schedule each night (e.g., parking lots will not routinely utilizephotocells unless mission operations occur 24 hours a day, 7 days a week). Automatic tiers can be used instead of, or in addition to, photocells to control lighting during actual hours of operation. Timers can also be used in locations where personnel are not readily available to manually extinguish lights. Where random security

FAA00003022

| | |
|---|---|
| **From:** | Christopher Basald? (christopher.basaldu@sierraclub.org) Sent You a Personal Message |
| **To:** | SpaceXBocaChica |
| **Subject:** | Re: Draft Programmatic Environmental Assessment for the SpaceX Starship/Super Heavy Launch Vehicle Program |
| **Date:** | Monday, November 1, 2021 7:01:11 PM |

Dear Federal Aviation Administration,

I live in Brownsville, TX, and I grew up in Brownsville and Corpus Christi, Texas. I am indigenous to this area, and I am a descendent of the original Native people of the Rio Grande Valley and the Coast.

The original EIS for the SpaceX project at Boca Chica Beach, within the National Wildlife Refuge was incomplete and inadequate and reflects a failure of the company to do its due diligence.

One key issue overlooked in both the original EIS and in the current process to expand the project is the lack of consultation with the original indigenous people of the land upon which the SpaceX project occupies. The Carrizo Comecrudo Tribe of Texas represents the original and ancestral indigenous people of the land in question. SpaceX has neglected to speak with and to consult with the Indigenous people of the land. The Carrizo Comecrudo Tribe of Texas are Esto?k Gna, the Human Beings original to the land. Their ancestors are buried in this land. Sacred sites exist in this land. There are multiple ancestral village sites throughout the region and area and are connected to one another through these ancestral ties. The SpaceX project and its proposed expansion will threaten to further damage these sites as well as restrict indigenous access to these sites and sacred lands. For these reasons, I ask the FAA to reject the permits for the SpaceX project expansion.

SpaceX has also ignored the city of Matamoros, Tamaulipas, Mexico. Even though there is an international boundary placed in the center of the Rio Grande, environmental impacts and pollution do not ?stop at the border?. It is extremely shortsighted of SpaceX to not communicate nor consult on this project with our sister city across the river. The SpaceX project can impact people and communities and environment on the south side of the river also. This permit for expansion should be denied.

SpaceX has not provided language in Spanish nor in American Sign Language ( ASL ) in order to properly communicate its projects and intentions to this area and our diverse communities. Many people who live in Brownsville and the surrounding communities speak Spanish. SpaceX did not provide adequate materials in Spanish, nor did they provide adequate nor fully adequate translation services throughout their public hearings and processes. This is both unfair and offensive. Please deny the permit for expansion of the SpaceX project.

SpaceX proposes to drill for gas in order to fuel its experimental rocket ships. They propose to use hydraulic fracturing, ?fracking? in order to access these gasses from underground underneath the launch site and the surrounding area. Fracking is an extremely environmentally damaging practice that has been linked to non-natural earthquakes, and to contaminating water. Fracking also destroys natural rock formations that are vital to protecting both soil integrity and fresh water quality. We do not want, nor do we consent to the poisoning of our water and wetlands. Please deny any and all permits to the SpaceX project. The SpaceX company has not thoroughly conducted both environmental and community impact studies in good faith. Again, SpaceX has not consulted with the Indigenous people and community of the land which is further evidence of their disregard of their responsibility to conduct their due diligence.

There are many plant and animal species that are and will continue to be negatively impacted by the SpaceX project. Especially noteworthy animal species are the ocelot, the jaguarundi, the piping plover, the aplomado falcon, and several species of sea turtle, such as the Kemps Ridley Sea Turtle. The original EIS did not do a thorough enough job in studying then potential and now real impacts. The several rockets that have exploded at the launch site have scattered pollution and dangerous debris across the delicate coastal wet land environment. If SpaceX is pretending that this impact is harmless, then they are delusional. Moreover, SpaceX is required to mitigate land loss of wet lands if they destroy delicate wet lands. They must replace and mitigate the same amount of wet lands. They cannot be permitted if they have not provided a mitigation plan, such a plan is missing or inadequate in their current statements.

SpaceX wishes to expand by also making a desalination plant. Such a plant would create hyper saline waste that would negatively impact the delicate ecosystems of these coastal wetlands. Excess salt/salinity can poison the land and endanger any and all plant and animal and marine life. This permit must be denied.

SpaceX is a private company. It is trying to colonize space and make money. This venture is not about providing for the common good nor to better society. SpaceX is a colonizing project that is damaging our community and environment and sacred lands here.

At the very least, the FAA must demand a new and more robust Environmental Impact Statement from SpaceX. It is in SpaceX?s interest to make an incomplete and misleading EIS at the lowest bid possible. FAA must demand a full EIS before moving forward with any new permitting. SpaceX brags about launching the largest rocket in human history. How could such a project have minimal to no impact on the area? The carbon emissions alone from one attempted launch would continue to add to atmospheric greenhouse gasses and pollution thus perpetuating climate change and climate catastrophe. I encourage the FAA to simply deny the permit for expansion.

It bears repeating that SpaceX has not yet done their due diligence and has obscured the truth about its environmental and community impacts, or SpaceX simply ignores their negative impacts. Also, SpaceX has grossly exceeded the number of hours it was allowed to close Highway 4 and deny residence access to Boca Chica Beach. SpaceX has proven that it will chose to be dishonest about its functions, and that it will not hold itself accountable to the agreements that it has made. The FAA much therefore hold SpaceX accountable. Again this is yet another reason to deny the permit for the proposed expansion of the SpaceX project.

I am writing in opposition to SpaceX?s proposed Starship/Super Heavy Launch Vehicle expansion project on Boca Chica Beach.

The SpaceX expansion project would be incredibly detrimental not only to the wildlife habitat and wetland ecosystems around it, but to the nearby communities of Brownsville, South Padre Island, and Port Isabel as well.

This project will require a massive scale of new industrialization that includes a rocket launch pad, gas power plants, desalination plant, gas drilling, and more near residential communities, between wildlife refuges, and at a public beach. Not to mention, the explosive rocket launch operations are less than six miles away from two highly flammable proposed liquefied natural gas (LNG) and a pre-existing gas pipeline.

An accident on the scale of a Starship/SuperHeavy launch vehicle would be a devastating catastrophe for the Laguna Atascosa Wildlife refuge, the Lower Rio Grande Valley Wildlife refuge as well as for nearby communities of color and endangered species like the ocelot and aplomado falcon.

At the very least, the FAA should conduct a comprehensive Environmental Impact Statement because of the size and scale of SpaceX?s new launching operations. This Environmental Assessment is extremely inadequate, because it only evaluates an ?initial mission profile,? and does not address:

1. The FAA's claims that SpaceX?s mission is to launch larger rockets in pursuit of National Space Policy goals, which were updated by Trump in 2020. These policy goals should be evaluated by the new Biden Administration, and actually reflect whether space exploration is in the interest of the public rather than private corporations seeking to profit.
2. The already damaged land and wildlife that SpaceX has already caused, in addition to the new plans that will permanently destroy acres wetlands and floodplains,
3. SpaceX?s rocket launching schedule results in beach closures that would further strip away people of color?s rights to fish and recreate at Boca Chica Beach by up to 800 hours per year, about an entire month.
4. Elon Musk, using his social media platforms to attract outsiders to displace a historically marginalized community. Already, longtime residents are being forced away from their beach and homes, and it doesn?t help when outsiders, attracted by Elon Musk and his social media presence, displace residents by moving here or soliciting comments and opinions from people who've never even been to the region.
5. SpaceX has never consulted with the Carrizo/Comecrudo Tribe of Texas, who have ancestral ties to the region, about operations. Under the United Nation?s Free, Prior, and Informed Consent, SpaceX should not be authorized without consultation and consent of the Tribe.

Additionally, the FAA should have to redo its regulatory process to accommodate the Spanish-speaking population because the public hearings and materials are not translated.

About 80% of the Rio Grande Valley community, which is directly impacted by SpaceX, speaks primarily Spanish at home. The FAA should not allow SpaceX to continue to expand to launch the Starship/Super Heavy project at Boca Chica Beach because the potential for further wildlife and land damage along with the potential explosions it could cause is just not safe for the residents of the area and is not safe for the environment.

Sincerely,

Christopher Basald?
3041 S Buckingham Ct
Brownsville, TX 78526
christopher.basaldu@sierraclub.org
(520) 271-3960

This message was sent by KnowWho, as a service provider, on behalf of an individual associated with Sierra Club. If you need more information, please contact Lillian Miller at Sierra Club at core.help@sierraclub.org or (415) 977-5500.

FAA00003262



November 1, 2021

Ms. Stacy Zee, SpaceX PEA
c/o ICF
9300 Lee Highway
Fairfax, VA 22031
Email: SpaceXBocaChica@icf.com

Dear Ms. Zee,

The Lower Rio Grande Valley Group of the Sierra Club hereby submits the following comment regarding the Draft Programmatic Environmental Assessment for the Boca Chica Texas SpaceX Starship/Super Heavy Launch Vehicle Program (Draft PEA). This comment was drafted in coordination with the non-profit organization Save RGV, thus contains much of the same content as Save RGV's comment regarding the PEA, however, there may be differences. The Lower Rio Grande Valley Group is a local group of the Texas Lone Star Chapter of the national Sierra Club organization. Most members of the Lower Rio Grande Valley Group reside in the Rio Grande Valley in Cameron County  and Hidalgo County.

## NEED FOR AN EIS AND ACCOUNTING FOR ALL INFRASTRUCTURE, OPERATIONS, AND CUMULATIVE IMPACT (NOT JUST AN EA)

The FAA's NEPA procedures implementing the National Environmental Policy Act define when a Supplemental Environmental Impact Statement (EIS) is needed, or not. This was cited in the FAA's 2014 SpaceX EIS. [FAA Order 1050.1F, Section 9-2] "A Supplemental EIS is not needed if:

1

FAA00003726

give a more complete analysis of air quality issues for children and others with compromised health issues as well as the cumulative effects of pollutants that tend to be present in areas with lower economic opportunities.


# ENVIRONMENTAL JUSTICE & SOCIOECONOMICS

BEACH ACCESS

PEA Section 3.15.4.2 Closing Boca Chica Beach is an environmental justice issue. With a population of 186,738, the 2020 census reports Brownsville residents are 95.2% Hispanic and other minorities. The median income in 2019 dollars was $38,588, with a poverty rate of 29.3%. For many Hispanic and low-income residents of Brownsville, Boca Chica is "their" beach, as it is closer than the beaches on South Padre Island. It is easily accessible, except for the closure hours, and especially in the summer months and during holiday weekends, when traffic to/from South Padre Island routinely backs-up on State Hwy 48 and State Hwy 100. And most importantly to a low-income community, entrance to Boca Chica Beach is free compared to $14 (March-Sept., off season $12) per daily visit to Cameron County Beach Access 5, which allows drive-on visits and best replicates the natural beach experience at Boca Chica. Cameron County Beach Access 6 is free off-season, but requires use of a 4x4 vehicle which is not an available or affordable option for many. The other free SPI Beach Access points located behind the beachfront hotels, are not drive-on beaches and are much more challenging (in-season parking availability near access points is very, very limited) for day visitors. The approximate driving time from Brownsville to Beach Access 5 is approximately 50 minutes during the off-season and at times when there are no traffic back-ups. When traffic backs-up, driving time for the trip could extend to approximately 2.5-3 hours. The conclusion that there are other cost-free public beach access locations within the vicinity of local communities does not accurately and appropriately consider the actual logistics involved in getting to the other beach locations, especially for a low-income minority community. The PEA lists 500 closure hours for launches and tests and an additional 300 closure hours for the clean up of anomalies (predicted to be one per month). Using this plan, the beach will be closed a considerable number of partial days, making the number of days that this Brownsville minority group of residents will be denied beach access very high. Therefore, the proposed action, which includes the closing of State Hwy 4 and Boca Chica Beach, would result in disproportionately high and adverse impacts to

lower income indigenous populations who for generations have relied on access to the waters for economic and familial subsistence.

## IMPACT ON INFRASTRUCTURE

The Draft PEA (PEA Section 3.5, p. 52) authors admit there is structural damage potential due to orbital launch events and predicts the percent of the people from South Padre Island, Laguna Vista, and Tamaulipas, Mexico who will likely file a damage complaint: *KBR assessed the potential for structural damage due to orbital launch events using the potential for structural damage claims. An applicable study of structural damage claims from rocket static firing tests indicates that, based on Maximum Unweighted Sound Level (Lmax), approximately one damage claim will result per 100 households exposed at 120 dB and one damage claim per 1,000 households exposed at 111 dB (Guest and Slone 1972)*. SpaceX does not, however, address possible damage to current and proposed infrastructure at the Port of Brownsville and the Brownsville Channel as is required in Code of Federal Regulations § 450.110 Physical containment. Sonic booms, in particular from Super Heavy landings will cause structural damage: *Predicted overpressure levels for a Super Heavy landing range from 2.5 psf to 15 psf. Brazos Island State Park, Boca Chica Bay, Boca Chica State Park, portions of the NWR, Boca Chica Village, and Tamaulipas, Mexico would experience levels up to 15 psf. Boca Chica Beach and the southern tip of South Padre Island are within the 6.0 psf contour. South Padre Island, including residences, Port Isabel, and the Port of Brownsville ship channel are included in the 4.0 psf contour* (PEA p. 57). These psf values cause "regular failures" of glass and plaster at the least, and damage to sinks, roofs, walls and water pipes at the higher levels (PEA pp. 58-9). Significantly, the single bridge from Port Isabel to South Padre Island is not mentioned in the noise damage (long and short term) assessment in Appendix B.

## LOCATION

Section 2.1.1: Location only mentions distances from the Launch and Loading Control Center (LLCC) and the Vertical Launch Area (VLA) to Mexico, which are only 1.3 miles and 2.2 miles respectively. Full analysis of distances to closest points of populated land, (e.g. Matamoros, City of South Padre, Port Isabel, Long Island Village, Laguna Vista, Port of Brownsville), as well as South Bay Coastal Preserve is necessary information. Other necessary information is the distance to the causeway-- most importantly the highest point of the causeway, as well as data

13

FAA00003738

| | |
|---|---|
| **From:** | Benny Hernandez |
| **To:** | SpaceXBocaChica |
| **Subject:** | Space exploration=Endangered wild life and tribe at risk! |
| **Date:** | Saturday, January 23, 2021 12:03:14 AM |

Federal Aviation Administration,

To whom it may concern.

I Benny J. Hernandez of (The Estok' Gna Nation) The Carrizo/Comecrudo Tribe of Texas feel that is unjust and down right wrong to expand on sacred land. It will posin endangered/at risk plants,endangered/at risk wild life, and people/native tribes of that land.

The tribe at risk is us The carrizo comecrudo Tribe of Texas and every day peaple.

Its not right for are land to be stolen and its not right to be passed on person to person with out our permission.

The list of animals and and plants that will be destroyed are endless and there is nothing that yall can do to fix that if yall proceeds in your plan.

by rapid urbanization most of the rio grand or if not all will be destroyed and all its wildlife. Sanctuary is given to 115 species of wildlife and to some of the rarest animals and plants native to the United States. Endangered animals include the ocelot and jaguarundi. Exotic birds include the green jay and the chachalaca. Threatened plants include barreta and Esenbeckia runyonii. the Tamaulipan Biotic Province, topological and climatic influences have been identified as eleven different biotic communities. The Chihuahuan Thorn Forest contains the largest remaining stand of subtropical thorn forest in the United States. The Ramadero has periodically wet arroyos that act as protected corridors from the Rio Grande to adjacent highlands. Thick thorn forest offers safe passage to ocelots, jaguarundis, and other endangered species. The Upper Valley Flood Forest supports riverine species, including the Moctezuma bald cypress. The Barretal, on the Bordas Escarpment, supports groves of barreta, a native citrus relative, and preserves fossil oyster beds. The Upland Thorn Scrub displays a dense growth of trees, shrubs, and cacti adapted to arid conditions. The Woodland Potholes and Basins contains ephemeral wetlands with many species of seasonal waterfowl. The Mid Delta Thorn Forest supports a jungle-like growth of trees and shrubs, including brasil, Texas ebony, and anacua. The Mid Valley Riparian Woodland is an area of lush growth and large trees, including cedar elm, Rio Grande ash, and Texas palm. Formerly watered by annual overflows of the Rio Grande, the area has been drying, with the loss of many trees, since the upriver construction of Falcon Dam. The Coastal Brushland Potholes are depressions of wind formation, rich in waterfowl after rainy seasons. The Sabal Palm Forest contains jungle-like stands of Sabal texana, the palm for which the Rio de las Palmas (Rio Grande) was named in 1519. Justicia runyonii, Trixis radialis, and Passiflora filipes carpet the forest floor. The Loma/Tidal Flats are tidal areas surrounding hills of eolian formation covered by a dense thicket of acacias, granjeno, and fiddlewood that protects many species of cacti

FAA00003973

and offers cover for ocelots, jaguarundi, and tortoises. Many animal species, including parrots and the large cats, have found sanctuary in this wildlife region on the United States side of the Rio Grande.

While yall find out in formation in space its not ok to destroy earth and everything in it in the process.

Please don't do don't destroy earth it doesn't deserve it the punishment.

LRGV Amphibians
SIRENIDAE
Rio Grande Lesser Siren Siren intermedia texana
AMBYSTOMATIDAE
Barred Tiger Salamander Ambystoma tigrinum mavortium
SALAMANDRIDAE
Black-spotted Newt Notophthalmus meridionalis
PELOBATIDAE
Plains Spadefoot Scaphiopus bombifrons
Couch's Spadefoot Scaphiopus couchi
Hurter's Spadefoot Scaphiopus holbrookii hurteri
LEPTODACTYLIDAE
Rio Grande Chirping Frog Syrrhophus cystignathoides campi
White-lipped Frog Leptodactylus labialis
HYLIDAE
Blanchard's Cricket Frog Acris crepitans blanchardi
Green Treefrog Hyla cinerea
Strecker's Chorus Frog Pseudacris streckeri
Spotted Chorus Frog Pseudacris clarki
Mexican Treefrog Smilisca baudinii
BUFONIDAE
Eastern Green Toad Bufo debilis
Red-spotted Toad Bufo punctatus
Woodhouse's Toad Bufo woodhouseii woodhousii
Giant (Cane or Marine) Toad Bufo marinus
Texas Toad Bufo speciosus
Gulf Coast Toad Bufo valliceps valliceps
RANIDAE
Rio Grande Leopard Frog Rana berlandieri
Bullfrog Rana catesbeiana
RHYNOPHRYNIDAE
Mexican Burrowing Toad Rhinophrynus dorsalis
MICROHYLIDAE
Great Plains Narrowmouth Toad Gastrophryne olivacea
Sheep Frog Hypopachus variolosus

FAA00003974

Federal Aviation Administration

In the Matter of
SpaceX

COMMENTS ON THE PROGRAMMATIC ENVIRONMENTAL ASSESSMENT FOR THE
SPACEX STARSHIP/SUPER HEAVY LAUNCH VEHICLE PROGRAM


Lone Star Chapter Sierra Club, Another Gulf Is Possible Collaborative,
Carrizo/Comecrudo Tribe of Texas, South Texas Environmental Justice Network, Las
Imaginistas, Voces Unidas, Trucha RGV, Fuera SpaceX, and the 956 Radical Library
(collectively, "Commenters") submit these comments regarding the Federal Aviation
Administration's ("FAA") draft programmatic environmental assessment ("DPEA") for the
SpaceX Starship/Super Heavy Launch Vehicle Program at the SpaceX Boca Chica Launch Site
in Cameron County.

Space Exploration Technologies Corporation ("SpaceX") seeks authorization to operate
the Starship/Super Heavy launch vehicle at its existing Boca Chica Launch Site in Cameron
County, Texas and to conduct launches originating from this site. SpaceX is requesting a vehicle
operator licence(s) from the FAA.

As commenters explain below, the DPEA for SpaceX's proposal fails to satisfy the
obligations imposed by the National Environmental Policy Act ("NEPA"). The DPEA contains
numerous informational gaps. These deficiencies are severe enough that they must be
corrected with a comprehensive draft environmental impact statement ("EIS") and a fresh
opportunity for public comment. Ultimately, however, it is clear that SpaceX's proposal will have
such severe adverse impacts on the local environment and surrounding communities that the
proposal is contrary to the public interest and must be denied.

---

I.    **FAA Has Not Provided Sufficient Opportunity for Public Participation**

A.    **The DPEA Is Missing Extensive Information Precluding the Opportunity For
      Meaningful Public Comment**

The DPEA fails to satisfy NEPA's basic requirements because it omits analysis of many
key issues, citing that SpaceX does not have the full details of all its planned operations at this
time. This precludes meaningful public involvement and violates NEPA. NEPA serves to protect
the environment by ensuring clarity and transparency to federal decisions affecting the
environment. Public participation is a two-way street that requires NEPA to inform the public and
to allow the public to play a role in the decision-making process. Enlisting the public serves to
develop high quality information on the issues that are truly significant to the action in question,
so as to guide agencies to "take actions that protect, restore, and enhance the environment."
40 C.F.R. §§ 1500.1, 1506.6 (public involvement), 1502.1 (purpose of impact statements).

Public participation cannot serve these purposes unless relevant and accessible
information is available to the public for comment. Here, the FAA's decision to release the DPEA
is premature, because analyses of numerous environmental issues are, by the FAA's own
admission, incomplete or missing. By circulating a DPEA without complete information, the FAA
has violated NEPA because the DPEA must satisfy the requirements of the final EA to the fullest

*DPEA Comments of Lone Star Chapter Sierra Club, Another Gulf Is Possible Collaborative, and others on the SpaceX
Starship/Super Heavy Launch Vehicle Program Page 1*

FAA00004082

inform and invite them to any stakeholder meetings and other efforts addressing the Civil Rights violations set forth herein. If the FAA does not come into compliance voluntarily, Complainants request that the US DOT and the FAA restart SpaceX's permitting review process, fully complying with Title VI and agency notice and public participation mandates.

## II.    The DPEA Fails to Adequately Assess SpaceX's Impacts on Local Communities

### A.  Introduction to the National Environmental Policy Act (NEPA)

The National Environmental Policy Act (NEPA) requires an environmental impact assessment (EIS) to examine all potential impacts of a proposal, including "ecological . . . aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative."[24] Agencies must consider the environmental justice impacts of their actions on low-income, minority communities in accordance with Executive Order 12898.[25][26]

### B.  The DPEA Fails to Consider the Impact of Boca Chica Beach Closures on Nearby Residents and Researchers

Although the mouth of the Rio Grande that empties into the Gulf of Mexico is not listed under the Wild and Scenic Rivers Act, it is still an important local tourist destination and is of cultural significance to the Carrizo/Comecrudo Tribe of Texas that should not be restricted from public beach access by SpaceX. Boca Chica Beach also serves as a food source and important recreation site for many residents who use the beach to fish. The excessive beach closures would also bar essential study of the area by wildlife experts and researchers. According to a non-profit that is tracking the amount of beach closures, SpaceX has exceeded the original 300 hours of beach closures and detailed the need for 800 hours in the DEPA, which they have also exceeded. SpaceX should not restrict residents from a food source. SpaceX is near a neighborhood called Boca Chica Village that is also impacted by road and beach closures. Many of the residents in this neighborhood have expressed concerns with the closures, stating that they are unable to drive to their houses, experience power and internet outages, and feel unsafe because emergency vehicles are often unable to get into the area.[27] The FAA should conduct an EIS because of the significant public controversy of current operations.

### C.  The DPEA Fails to Adequately Consider the Environmental Justice Impacts of Existing and Proposed SpaceX Operations

This proposal will directly and indirectly adversely impact the surrounding city of Brownsville, TX and the Laguna Madre communities which are primarily low-income and majority minority. SpaceX activities already impact locals socially, economically, culturally, and historically, and an approval to expand construction and operations would continue to exacerbate these issues. The community has already seen issues with wildlife being adversely affected, has borne the brunt of the negative impacts from road closures like being denied access to the beach, and has now begun to deal with the cumulative impacts of SpaceX's creation with the influx of newcomers eager to gentrify.

---

[24] 40 C.F.R. § 1508.8.

[25] *Coliseum Square, Inc. v. Jackson*, 465 F.3d 215, 232 (5th Cir. 2006).

[26] https://www.epa.gov/laws-regulations/summary-executive-order-12898-federal-actions-address-environmental-justice

[27] https://www.borderreport.com/hot-topics/exclusive-faa-is-investigating-south-texas-launch-facility-after-change-in-rocket-tests-by-spacex/

Additionally, Elon Musk announced earlier this year that he plans to incorporate the SpaceX site area to create a city called "Starbase."[28] The FAA should require SpaceX to include plans for Starbase and an analysis in an EIS of the impacts the planned city would have on nearby residents and future operations. The FAA should also consult with the residents of the surrounding communities at the very least,  as the renaming of a beach is a negative cultural impact with many having strong cultural and emotional ties to the name Boca Chica.

### D.  Carrizo/Comecrudo Tribe of Texas

The legacy of Indian displacement in Texas is one of the most thorough examples of land dispossession in the Americas. The disregard for sovereignty, access to land, land rights has been denied to virtually all indigenous peoples throughout Texas history. No existing tribe or nation with ancestral ties to the land in Texas has federal Indian recognition. The three existing federally recognized reservations in the state serve peoples who were forcibly displaced from other homelands. Despite the state-driven erasure of the Native population there exists a thriving indigenous population with histories, languages and culture. One tribe, the Esto'k Gna commonly referred to as the Carrizo/Comecrudo, has ancestral ties to the immediate region of the Lower Rio Grande Valley. The Esto'k Gna recognizes the project area and its surroundings to be an extremely important sacred cultural, ancestral, and historic site. Although) the Esto'k Gna have not yet been granted recognition. That does not invalidate Esto'k Gna's cultural affiliation with the lands of their ancestors, nor their sacred sites, among which are the Mouth of the Rio Grande and the river itself, including access to the river and the area surrounding the mouth of the river. The protection of sacred sites is a Human Rights issue under the United Nations Declaration on the Rights of Indigenous Peoples (UNDRIP). Expansion of SpaceX would continue this unfortunate colonial legacy of erasure and disregard. Furthermore, neither SpaceX, nor the FAA, and other regulators have respected and secured Free Prior and Informed Consent (FPIC) of the Esto'k Gna people, which is also recognized as a Human Right by the UNDRIP.

While there has been no archeological study in the immediate construction site of SpaceX, patterns of archaic burials in the area show a need for more protections in the area.  It is likely that there are burials or artifacts or remains of villages in the construction site of SpaceX. The law has been slow to act for cultural protection. Although the tribe is currently not recognized, the Native American Graves Protection and Registration Action (NAGPRA) still applies, we must not deny that culturally informed archeological studies and cultural data that include direct consultation with the Esto'k Gna need to be conducted and assessed before any more building permits are granted.

There has not yet been a thorough enough archeological survey nor study of the current SpaceX site nor the area proposed for the project's expansion. There is high probability that archaic and archeological sites may be disturbed by SpaceX expansion and high probability that the current SpaceX project has disturbed and unearthed archeological and historic material significant to the original people of the land, the Esto'k Gna. As previously stated, SpaceX has not consulted with the Esto'k Gna, nor informed them if they have encountered material or human remains in the construction of their projects. Although the Esto'k Gna do not hold Federal recognition currently, it is still a violation of the Native American Graves Protection and Repatriation Act to ignore the responsibility to inform and consult with culturally affiliated tribes, even if they lack Federal recognition.

---

[28]

https://www.houstonchronicle.com/news/houston-texas/space/article/Elon-Musk-seeks-to-create-the-city-of-Starbase-in-15995110.php

*DPEA Comments of Lone Star Chapter Sierra Club, Another Gulf Is Possible Collaborative, and others on the SpaceX Starship/Super Heavy Launch Vehicle Program Page 8*

FAA00004089

The Esto'k Gna (Carrizo Comecrudo Tribe of Texas) would prefer that ancestral human and material remains be undisturbed. However, SpaceX has neither sought nor received free prior and informed consent from the Esto'k Gna, and are thus in violation of NAGPRA, if they have disturbed human remains and/or objects of cultural patrimony, and/or funerary items and have neglected to inform the Esto'k Gna. As there are many ancestral village sites near the river and throughout the so called Rio Grande Valley, it is likely that SpaceX's activity has disturbed and damaged sites in the area. One noted Esto'k Gna village site lies within an area known as Garcia Pasture.

Garcia Pasture, which is noted on the Federal Register of historic sites, includes archeological remains of the indigenous people of the land, including pre-contact material. This area of concern, known as Garcia Pasture, is another sacred site of the Esto'k Gna, the Carrizo Comecrudo. A proposed fracked gas export terminal project known as Texas LNG would destroy this sacred site and the archeological and historic remains still there. From this site, the current SpaceX launch facility and rockets are clearly visible. This has a negative aesthetic impact on the view and surrounding landscape to which the Esto'k Gna did not consent nor were they consulted. The proposed Super Heavy rockets would be an even greater challenge to the aesthetic and view of the landscape, not to mention the danger of the largest rocket ever created exploding, setting off chain explosions in the surrounding gas and oil industries. Again the land and the are sacred to the Esto''k Gna. Any expansion of SpaceX would erase what little sacred and archeological sites left to the Esto'k Gna who are culturally affiliated to the Lower Rio Grande Valley including the areas SpaceX is using and destroying. The permit for expansion should be denied and the Esto'k Gna should be consulted regarding any further expansion projects or any industrial projects planning to colonize the area. .

### E.  The DPEA Fails to Consider Increases of Vehicular Traffic on State HWY 4

During construction and operations, there will continue to be a significant increase in vehicular traffic, particularly on State HWY 4. This is due to an increase in imported skilled workforce. The DPEA fails to consider the effect that this increased traffic and resulting change in traffic patterns will have on the low-income minority communities closest to the site. This increase in traffic will impact the ability of nearby residents to reach their workplaces, medical services in Brownsville in a timely manner, or visit Boca Chica Beach or recreate nearby.[29] The increase in vehicular traffic on the HWY 4 has also negatively impacted wildlife in the area, with residents of Boca Chica Village stating that they have seen many deceased animals, including some endangered species, on HWY 4 clearly from a vehicular impact[30]. The DPEA fails to include a plan to mitigate increased traffic flows along HWY 4.

### F.  The Proposal Fails to Account for the Adverse Impacts of High-Paid, Skilled Workers on Low-Income Areas, and Social Costs Incurred by Neighboring Communities

SpaceX and its supporters consistently claim that their existence and expansion will lead to more jobs and economic prosperity for the local population. SpaceX expects a maximum of 450 full-time employees or contractors on site but does not commit to providing employment opportunities to locals, nor does it define a "local hire." If locals are being hired, the DPEA

---

[29] https://www.expressnews.com/sa-inc/article/Environmentalists-lawsuit-Space-X-beach-closures-16533436.php

[30] https://www.houstonchronicle.com/news/houston-texas/space/article/Federal-regulators-hear-pros-cons-of-SpaceX-plans-16547020.php

*DPEA Comments of Lone Star Chapter Sierra Club, Another Gulf Is Possible Collaborative, and others on the SpaceX Starship/Super Heavy Launch Vehicle Program Page 9*

FAA00004090

Appendix K.
# Memorandum of Agreement between SpaceX and TPWD

FAA00007573

## MEMORADUM OF AGREEMENT
### between
## Texas Parks and Wildlife Department and Space Exploration Technologies Corporation

This Memorandum of Agreement (Agreement) is entered into between Texas Park and Wildlife Department (TPWD) with an address of 4200 Smith School Road, Austin, Texas, 78744, and Space Exploration Technologies Corporation (SpaceX) with an address of Rocket Road, Hawthorne, California, 90250 (collectively the Parties).

### I. PURPOSE

1.1     The Parties own adjacent properties at Boca Chica, Texas. TPWD owns Boca Chica State Park, which is managed through a lease with the U.S. Fish and Wildlife Service (USFWS) in conjunction with its Lower Rio Grande Valley National Wildlife Refuge. SpaceX owns adjacent properties on which it has constructed and is constructing facilities for the purpose of designing, constructing, testing, launching, and landing rockets. The nature of SpaceX development-related anomalies has resulted in and may result in future impacts to the state park should further anomalies occur. The purpose of this Agreement is to serve as guidance to the Parties for developing protocols to respond to events that result in impacts to the state park and/or necessitate entry to the state park for any reason, including but not limited to fire suppression, reconnaissance, rocket debris retrieval, post-response site restoration, and impact mitigation.

The Parties acknowledge the need to restore impacts to TPWD lands following certain rocket test and launch activities. While such restoration efforts are as yet unproven, the Parties are committed to implementing, monitoring, and learning from such restoration efforts in order to develop adaptive management strategies that will minimize or offset long-term impacts to the natural, cultural, and recreational values of TPWD lands. The Parties agree that the benefits realized from these restoration efforts should provide appropriate compensation for the associated damages, including damages associated with the March 30, 2021 explosion of the rocket designated SN11.

This Agreement is intended to be a dynamic, working document and the Parties agree to periodically amend and update the Agreement in response to changing conditions, new data and information, and lessons learned. The Parties are committed to working together in good faith to meet the intent of this Agreement.

### II. ANOMALY RESPONSE

2.1     In the event of an anomaly TPWD staff will be notified as per the procedures outlined in the current Federal Aviation Administration (FAA) Anomaly Response Plan for Boca Chica.

FAA00007574

2.2    Following an anomaly, SpaceX will release the closure area west of the All Hard Checkpoint to allow visitors to continue to access the Palmito Ranch Battlefield NHL and the Lower Rio Grande Valley National Wildlife Refuge while anomaly response actions are taken. SpaceX will keep the All Hard Checkpoint in place to protect public safety and implement the measures outlined in the Anomaly Response Plan.

2.3    Debris removal will occur by means that will result in the least amount of impact as determined by TPWD and as agreed by SpaceX.

2.4    SpaceX will enter the state park at its discretion to retrieve batteries, explosives, or other debris that might be proprietary or pose risks for public health and safety. Otherwise, timing of debris removal will be determined by TPWD to minimize potential impacts as much as possible and may be based upon soil conditions, presence of rare or sensitive species, or other natural resource or operational concerns. It is the goal of the Parties that all debris be retrieved as expeditiously as is practical.

2.5    TPWD and/or USFWS staff do not need to be present for SpaceX staff to proceed with site reconnaissance and debris retrieval, provided SpaceX staff comply with retrieval protocols established and agreed to by TPWD, USFWS, and SpaceX during the SN11 anomaly response as may be amended in writing from time to time by TPWD and USFWS as circumstances or best practices dictate. Any such amendments will take effect immediately upon delivery to SpaceX. As of the initial date of execution of this Agreement, anomaly response protocols consist of the following:

    2.5.1   Dragging or winching of debris is prohibited.

    2.5.2   No vehicles or other equipment may access state park or national wildlife refuge property without the express written consent of an authorized representative of the respective landowner or the landowner's lessee.

    2.5.3   Except in cases where the use of vehicles has been authorized in writing by TPWD or USFWS, large pieces of debris are to be accessed on foot and dismantled or cut up using tools carried on foot.

    2.5.4   Tarps or liners should be placed under areas where cutting occurs to limit shavings and particulates from contaminating the ground, and such tarps and liners are to be removed from the state park or national wildlife refuge upon retrieval of associated debris. Shavings/particulates must be properly disposed of off-site.

    2.5.5   Except in emergency, or unless otherwise authorized in writing by TPWD or USFWS, retrieval of debris from the state park or national wildlife refuge should take place only during daylight hours.

## III. STATE PARK RESTORATION

3.1      The Parties agree that the appropriate mitigation for impacts to the state park will be coordinated efforts to restore damaged algal flat and loma habitats to pre-anomaly conditions. TPWD will identify subject matter experts to assist SpaceX or a contractor with development and implementation of a restoration plan. It is understood that restoration of these habitats is untested. SpaceX agrees to include monitoring protocols in the restoration plan, to adopt an adaptive management approach to restoration until the most beneficial restoration methodologies have been determined, and to apply those methodologies to restoration of habitats following any future impacts to the state park resulting from SpaceX activities.

3.2      The Parties anticipate that initial restoration efforts may include grooming of tracks and other scars using hand tools and native soils, establishing desired slopes and contours, and potentially inoculating the soils with appropriate species of algae and microbes, or other approach(es) as determined by the subject matter experts and TPWD and agreed to by SpaceX.

In addition, a good faith effort will be made to restore lost upland vegetation in state park uplands by seeding or transplanting appropriate grasses and other indigenous vegetation from seed or plant sources approved by TPWD. All recovery and restoration efforts will be monitored for introduction of non-native species, which will be removed by SpaceX using methods approved by TPWD. All soil disturbance resulting from anomaly impact or recovery efforts will be monitored for the presence and/or disturbance of cultural resources.

3.3      SpaceX agrees that in the event restoration measures prove impractical or agreed monitoring protocols indicate that restoration activities have not resulted in demonstrable recovery of native pre-anomaly species compositions and ecological services, the Parties will come together in good faith to agree on other means of compensating TPWD for loss of fish, wildlife and recreation values resulting from damages to the state park.

## IV. ACCESS AND CLOSURES

4.1      SpaceX will perform notifications prior to a planned closure and in accordance with the current FAA Closure Notification Plan for Boca Chica.

4.2      SpaceX will provide TPWD a forecast of planned closures two weeks in advance when possible. Information about proposed closures will be available on Cameron County's website and through real time status and updates via a text message alert service.

SpaceX will send closure notifications to the regulatory and public land-managing agencies as closure plans finalize (typically 24–48 hours prior to the closure). The agencies will continue to receive updates immediately when the closures go into place and when the closures end, as well as cancellations of requested closures. SpaceX personnel will timely send these notifications to ensure the most up-to-date information is distributed.

This Agreement is effective upon the date of the last signature herein.

Space Exploration Technologies Corp.          Texas Parks and Wildlife Department

By: ███████████████████          By: _____

Title: Sr Director-Starship Ops          Title: Chief Operating Officer

Date: _9/1/2021_____          Date: __9/2/31_____

FAA00007577

# Commercial Space Transportation License

License No. VOL 23-129

## Space Exploration Technologies, Corp.

is authorized, subject to the provisions of 51 U.S.C. Subtitle V, chapter 509, and the orders, rules, and regulations issued under it, to conduct launches of the Starship-Super Heavy vehicle.

This license is granted subject to the terms, conditions, and limitations set forth in licensing orders A and B, and any subsequent orders and other written stipulations, issued by the Office of Commercial Space Transportation, which are hereby incorporated by reference.

The Licensee shall at all times conduct its operations in accordance with the regulations prescribed by the Office of Commercial Space Transportation for the activities authorized by the license.

| | |
|---|---|
| Original Issue Date: | April 14, 2023 |
| Issued: | April 14, 2023 |
| Effective: | April 14, 2023 |



US Department
of Transportation
**Federal Aviation
Administration**

800 Independence Ave., SW
Washington, D.C. 20591

MICHELLE S MURRAY
Digitally signed by MICHELLE S MURRAY
Date: 2023.04.14 17:32:34 -04'00'

**Michelle S. Murray
Manager, Safety Authorization Division**

FAA00009261

# LICENSE AND ORDERS REVISION HISTORY

| Rev No. | Date | Section | Description |
|---------|------|---------|-------------|
| 0 | April 14, 2023 | | Original Issuance |

FAA00009262

License No. VOL 23-129 Order A-1

# Office of Commercial Space Transportation License Order A-1 Regarding

## LAUNCH

AUTHORIZED BY LICENSE NO. VOL 23-129
ISSUED TO:

### Space Exploration Technologies, Corp.

License No. VOL 23-129 Order A-1 establishes the orders regarding the launch of Space Exploration Technologies, Corp.'s Starship-Super Heavy vehicle from SpaceX Boca Chica Launch Complex, Boca Chica, Texas.

1. **Authority:** This Order is issued to Space Exploration Technologies, Corp. (SpaceX) under 51 U.S.C. Subtitle V, chapter 509, and 14 CFR chapter III.

2. **Purpose:** This Order modifies License No. VOL 23-129 issued concurrently by the Federal Aviation Administration's Office of Commercial Space Transportation, authorizing Space Exploration Technologies, Corp. to conduct launch of its Starship-Super Heavy vehicle as identified in the license application; and prescribes as conditions to License No. VOL 23-129 certain requirements applicable to launch.

3. **Definitions:** For purposes of License No. VOL 23-129 and any orders issued by the FAA pertaining to activities covered by License No. VOL 23-129:

    a. "Pre-flight ground operations" shall mean Space Exploration Technologies, Corp.'s pre-flight preparations of the Starship-Super Heavy vehicle at Boca Chica, Texas, beginning at the start of Autonomous Flight Termination System ordnance installation for the Starship upper stage vehicle or Super Heavy booster vehicle, whichever occurs first.

    b. "Flight" shall commence with the ignition of the first stage with the intention of liftoff of a Space Exploration Technologies, Corp. Starship-Super Heavy vehicle from SpaceX Boca Chica Launch Complex, Boca Chica, Texas. A flight ends upon Space Exploration Technologies, Corp. vehicle or vehicle component impact or landing on Earth, after activities necessary to return the vehicle or vehicle component to a safe condition on the ground after impact or landing, or after activities necessary to return the site to a safe condition, whichever occurs latest.

4. **Authorization**: In accordance with the representations in the Space Exploration Technologies, Corp. application as of the date of this license, and any amendments to the license application or waivers approved by the FAA, in writing, Space Exploration Technologies, Corp. is authorized to conduct launch consisting of:
    a. Pre-flight ground operations:
        i. Using the Starship-Super Heavy vehicle.
        ii. At SpaceX Boca Chica Launch Complex, Boca Chica, Texas.
    b. Flight Operations:
        i. Using the Starship-Super Heavy vehicle.
        ii. From SpaceX Boca Chica Launch Complex, Boca Chica, Texas.
        iii. To Gulf of Mexico and Pacific Ocean locations specified in its application.
        iv. For the first flight only, unless this license is modified to remove this term.

FAA00009263

License No. VOL 23-129 Order A-1

5. **Environmental Mitigations:** SpaceX must comply with the measures listed in the Conditions and Mitigation section of the Mitigated Finding of No Significant Impact/Record of Decision for the SpaceX Starship/Super Heavy Launch Vehicle Program at the SpaceX Boca Chica Launch Site in Cameron County, Texas, issued June 13, 2022.

6. **Compliance Monitoring**: An FAA Safety Inspector must be present at SpaceX's Boca Chica Launch Complex for flight operations.

7. **Verification of Hazard Area Publication**: SpaceX must confirm, no later than 24 hours prior to flight, that maritime warnings have been issued.

8. **Special Reporting Requirement:**
   a. SpaceX must provide FAA with the location and fate of expended vehicle stages within 30 days of each launch using an approved plan that is submitted to the FAA at least 7 days prior to launch.
   b. SpaceX must identify and report any anomaly during any pre-flight ground operations of the vehicle that could be material to public health and safety and the safety of property within 90 days.

9. **License Term**:  License No. VOL 23-129 terminates five (5) years from April 14, 2023.

**OFFICE OF COMMERCIAL SPACE TRANSPORTATION**
**FEDERAL AVIATION ADMINISTRATION**

FAA00009264

# Office of Commercial Space Transportation License Order B-1 Regarding

**FINANCIAL RESPONSIBILITY REQUIREMENTS**

AUTHORIZED BY LICENSE NO. VOL 23-129
ISSUED TO:

**Space Exploration Technologies, Corp.**

License No. VOL 23-129 Order B-1 establishes the orders regarding the financial responsibility requirements of Space Exploration Technologies, Corp.'s Starship-Super Heavy vehicle launch from SpaceX Boca Chica Launch Complex, Boca Chica, Texas.

1. **Authority**:  This Order is issued to Space Exploration Technologies, Corp. (SpaceX) under 51 U.S.C. Subtitle V, chapter 509, and 14 CFR part 440.

2. **Purpose**:  This Order modifies License No. VOL 23-129 issued concurrently by the Federal Aviation Administration's Office of Commercial Space Transportation, by prescribing financial responsibility requirements for licensed launch activities in accordance with 14 CFR part 440. VOL 23-129 issued concurrently by the Federal Aviation Administration's Office of Commercial Space Transportation, by prescribing financial responsibility requirements for licensed launch activities in accordance with 14 CFR part 440.

3. **Definitions**:  For purposes of this Order, "licensed launch activities" shall mean activities authorized by the License. Other terms used in this Order are defined in accordance with 14 CFR § 440.3.

4. **Liability Insurance**:  Space Exploration Technologies, Corp. shall maintain a policy or policies of liability insurance in accordance with 14 CFR § 440.9(b) in the amount of:

   a. Forty-Eight Million Dollars ($48,000,000) for covered claims resulting from pre-flight ground operations performed from SpaceX Boca Chica Launch Complex, Boca Chica, Texas; and
   b. Five Hundred Million Dollars ($500,000,000) for covered claims resulting from the flight of the Starship-Super Heavy launch vehicle from SpaceX Boca Chica Launch Complex, Boca Chica, Texas.

**OFFICE OF COMMERCIAL SPACE TRANSPORTATION**
**FEDERAL AVIATION ADMINISTRATION**

FAA00009265