

P.O. Box 1770
Manomet, MA 02345 USA
207-721-9040
whsrn.org | manomet.org

1 November 2021

Ms. Stacey Zee
SpaceX PEA, c/o ICF
9300 Lee Highway
Fairfax, VA 22031

Re: Draft Programmatic Environmental Assessment for the SpaceX Starship/Super Heavy Launch Vehicle Program at the SpaceX Boca Chica Launch Site

Dear Ms. Zee,

On behalf of the Executive Office of the Western Hemisphere Shorebird Reserve Network (WHSRN), I would like express our concern that the *Draft Programmatic Environmental Assessment for the SpaceX Starship/Super Heavy Launch Vehicle Program at the SpaceX Boca Chica Launch Site in Cameron County, Texas* (PEA) does not adequately consider all of the potential environmental impacts. To address this concern, we request the completion of a full, detailed Environmental Impact Statement to evaluate the immediate and cumulative effects of SpaceX activities at Boca Chica.

WHSRN is a site-based shorebird conservation initiative launched in 1985 whose mission is to conserve shorebirds and their habitats through a network of key sites across the Americas. The network is comprised of hundreds of partners working at 112 sites in 18 countries to conserve and manage over 38.2 million acres of critical habitats for shorebirds.

With five WHSRN sites, the coast of Texas is well recognized as providing important habitat for hundreds of thousands of shorebirds. One of the most ecologically rich sites is the Laguna Madre WHSRN site, on the Texas-Mexico border, stretching nearly 400 miles from Ports Mansfield, Texas to San Fernando, Mexico. Immediately adjacent to the WHSRN site is Lower Rio Grande Valley National Widllife Refuge, which includes the remote and pristine coastal areas of Boca Chica. Flocks of up to 100 of the federally endangered Piping Plover (*Charadrius melodus*) occur in this area. Several species of beach-nesting bird of conservation concern breed in overwash areas. In addition, Red Knots (*Calidris canutus*), listed as threatened under the Endangered Species Act, and other Arctic-nesting migratory shorebirds use the area as both a stopover site during migration and as wintering habitat.

Boca Chica is also the location of SpaceX's South Texas launch site for commercial space transportation. The original Environmental Impact Statement (EIS) for the launch site was prepared in 2014. As SpaceX's technology has rapidly advanced, there have been at least eight changes to their operations and site design, including increased testing and hours of area closures. These changes were not included considered in the original EIS and have not gone under a full public review. SpaceX's latest proposal for expanded activities at its Boca Chica facility include suborbital and orbital launches; tank tests; static fire engine tests; expansion of the vertical launch area and solar farm; and construction of additional infrastructure including parking lots, a liquid natural gas pretreatment system, a natural gas liquefier, a payload processing facility, a power plant, a desalination plant, and trenching

and pull-offs along State Highway 4. The expansion of the vertical launch area is already under construction, even though it has not been approved.

Each test conducted at the launch site impacts shorebird habitat. The tests include an explosion which generates extreme noise that could potentially deafen birds or cause brain damage; a 'vapor' cloud that contains combusted chemicals of unknown potential impact on the birds and their food resources; and the risk of direct impacts from falling debris. Birds may also be excluded from prime habitat as a result of frequent disturbance. According to an analysis by Coastal Bend Bays & Estuaries Program, the Piping Plover population in the Boca Chica region has decreased by 54% over the past 3 years (2018-2021) since SpaceX began testing and launching rockets. The proposed expansion will mean more launches and thus greater impacts, as well as greater potential disturbance as a result of increased traffic and construction.

With a lack of detail and vague phrases such as "to the extent possible", the PEA is insufficient for the substantial expansion activities that are proposed. A comprehensive EIS is needed to understand the full extent of impacts that this project may cause. This EIS needs to assess the cumulative impacts of all planned components, and not piecemeal as has been the case since 2014. Additionally, the original EIS included monitoring, but there appears to have been poor compliance with the conditions established therein, an issue that needs to be addressed through a new EIS.

Shorebirds are showing the most dramatic declines of any group of birds. Many countries, including the United States, have made significant investments in habitat restoration, management, and protection to ensure that they are providing the best habitat for these shared international species. The extent of the impacts of SpaceX's activities on shorebirds is not fully understood and could cause irreversible damage to important habitat at Boca Chica. The cultural and economic impacts will be felt both in southern Texas and across the Americas where many sites receive cultural and economic benefits from the diverse ecosystems that include the same shorebirds that use the Laguna Madre area.

As habitat loss continues to be a significant threat for shorebirds throughout the Americas, protecting the remaining areas of habitat is critical. If the SpaceX facility is to remain in this location, the WHSRN Executive Office recommends that a complete EIS process be initiated to allow for a public process to review changes, monitor impacts, and identify appropriate mitigation measures. This EIS should also consider the development of an accountability plan.

Please feel free to contact Laura Chamberlin, if you have further questions, at lchamberlin@manomet.org or 302-922-0682.

Sincerely,

Rob P. Clay, Ph.D
Director, WHSRN Executive Office



Friends of the Wildlife Corridor
3325 Green Jay Road
Alamo, TX 78516
(956) 784-7500
VM (956) 784-7502
Email: info@friendsofthewildlifecorridor.org

November 1, 2021

Ms. Stacey Zee
SpaceX PEA, c/o ICF
9300 Lee Highway
Fairfax, VA 22031
Transmitted via electronic mail to SpaceXBocaChica@icf.com

RE: Comments on SPACEX Draft Programmatic Environmental Assessment for Starship/Super Heavy Program

Dear Ms. Zee,

These written comments to the draft Programmatic Environmental Assessment for the SpaceX Starship / Super Heavy Launch Vehicle Program dated September 2021 are submitted by the Friends of the Wildlife Corridor, a non-profit 501(c)3 organization whose mission is to support and further the conservation mission of Santa Ana National Wildlife Refuge and Lower Rio Grande Valley National Wildlife Refuge (the Refuge). The latter Refuge's largest single tract (21,000 acres) is the Boca Chica Unit which is immediately adjacent to SpaceX's launch site. Thus our organization is extremely concerned about impacts to that area and its irretrievable and irreversible commitment of natural resources.

FAA's Chief of Staff Brian Rushforth stated in an email dated June 29 [2020],

> [*f*]*or what it's worth, we do plan on conducting a new EIS* See attached Exhibit 1.

Letter dated July 17, 2020, from Daniel Murray, Manager, Safety Authorization Division, Office of Commercial Space Transportation, Federal Aviation Administration

> *To operate Starship/Super Heavy at the Texas Launch Site, SpaceX must obtain an experimental permit or launch license from the FAA Office of Commercial Space Transportation. Issuing experimental permits and launch licenses is a major federal action under the National Environmental Policy Act (NEPA) and requires a new environmental review beyond the 2014 EIS.* See attached Exhibit 2.

We anticipate FAA's fulfillment of this representation.

Exhibit 1

**Rushforth, Brian (FAA) <Brian.Rushforth@faa.gov>** Mon, Jun 29, 7:53 AM

to me

Mr. Chapman,

As Chief of Staff for the office, you are more than welcome to send the letter to me.

For what it's worth, we do plan on conducting a new EIS.

SpaceX has informed the FAA that its future plans are to eventually conduct suborbital test flights of the Starship prototype and then operate a full-scale Starship launch site at Boca Chica. A full-scale Starship launch site falls outside the scope of the 2014 EIS. The FAA is in the beginning stages of conducting an environmental review of SpaceX's Starship proposal in accordance with the National Environmental Policy Act (NEPA) and the FAA's policies and procedures for conducting a NEPA review (FAA Order 1050.1F). The FAA is working with SpaceX on a project schedule and will put out updates to the FAA project website and environmental distribution list.

The 2014 EIS analyzed the FAA's action of issuing launch licenses and/or experimental permits to SpaceX that would allow SpaceX to conduct launches of the Falcon 9 and Falcon Heavy orbital vertical launch vehicles and a variety of reusable suborbital launch vehicles from SpaceX's Texas Launch Site in Boca Chica, Texas. Since publication of the 2014 EIS, SpaceX started to develop the Starship Prototype (Starship for short), which falls under the "reusable suborbital launch vehicle" category discussed in the 2014 EIS.

The EIS assessed up to 12 commercial launch operations per year, including launches of the Falcon 9, a maximum of two Falcon Heavy launches, and/or associated mission rehearsals and static fire engine testing, through the year 2025. SpaceX's current testing of Starship prototypes, including the planned static fire engine test on May 29, 2020, falls within the scope of the 2014 EIS. The FAA conducted environmental reviews of SpaceX's changes to its original proposal analyzed in the 2014 EIS.

These reviews are documented in Written Re-evaluations and can be accessed on the FAA's website:  https://www.faa.gov/about/office_org/headquarters_offices/ast/environmental/nepa_docs/review/launch/spacex_texas_launch_site_environmental_impact_statement/#spacex.

I hope this information is helpful, but of course you are more than welcome to send the letter.

Sincerely,
Brian Rushforth
Chief of Staff
Office of Commercial Space Transportation
Federal Aviation Administration
(202) 267-9617

EXHIBIT 2

U.S. Department of Transportation
**Federal Aviation Administration**

Commercial Space Transportation

800 Independence Ave., SW.
Washington, DC 20591

July 17, 2020

Mr. Jim Chapman
President, Friends of the Wildlife Corridor
613 West St. Charles Street
Brownsville, Texas 78520

Dear Mr. Chapman:

Thank you for your July 3, 2020 letter requesting the Federal Aviation Administration (FAA) conduct a new Environmental Impact Statement (EIS) for Space Exploration Technologies Corporation's (SpaceX's) facility at Boca Chica, Texas.

Before we received your letter, SpaceX proposed operating its Starship/Super Heavy launch vehicle at its Texas Launch Site in Cameron County, Texas. To operate Starship/Super Heavy at the Texas Launch Site, SpaceX must obtain an experimental permit or launch license from the FAA Office of Commercial Space Transportation. Issuing experimental permits and launch licenses is a major federal action under the National Environmental Policy Act (NEPA) and requires a new environmental review beyond the 2014 EIS.

As the lead federal agency, the FAA is responsible for complying with NEPA. Under our NEPA policies, applicants have the right to choose whether to conduct an Environmental Assessment (EA) under FAA oversight or work with the FAA to initiate the EIS process. If an applicant believes the proposed action would have no significant environmental impacts, or that they can mitigate any potential impacts, then the applicant typically chooses an EA. However, all applicants run the potential risk that further review may uncover significant impacts that cannot be mitigated. In those cases, the FAA must conduct an EIS.

SpaceX has begun an EA for the action of issuing experimental permits or launch licenses to SpaceX for Starship/Super Heavy launch operations at the Texas Launch Site.

The FAA has invited the U.S. Fish and Wildlife Service, the National Parks Service, and the National Aeronautics and Space Administration (NASA) to participate as cooperating agencies. In the role of cooperating agency, each agency will actively participate in project meetings and provide comments regarding the description of the proposed action and the proposed action's potential impacts on resources for which it has special expertise and any related mitigation measures.

Again, if the EA identifies one or more significant environmental impacts from the proposed action, and mitigation measures would not reduce the impact(s) below significant levels, the FAA must prepare an EIS.

Your letter also raised several issues on the current mitigation measures, stemming from the 2014 EIS process that SpaceX has conducted. First, that SpaceX no longer conducts bird and vegetation monitoring. Much of the biological resources mitigation stated in the Record of Decision (ROD), including bird and vegetation surveys/monitoring, is also included in the U.S. Fish and Wildlife Service's (USFWS) Biological Opinion for the project. The Biological Opinion (BO) requires the FAA to submit an annual report to the USFWS Coastal Ecological Services Field Office by December 31 of each year. The FAA has submitted an annual report to the USFWS every year since publication of the BO and ROD (2015–2019). The last annual report was submitted to the USFWS in December 2019. SpaceX is continuing active construction biological resource surveys in accordance with the USFWS-approved monitoring plan.

Second, on the ocelot, jaguarundi, and falcon issues, SpaceX has continued to work with the USFWS on how best to conduct monitoring.

Third, SpaceX has and continues to coordinate with the Lower Rio Grande Valley National Wildlife Refuge staff establishing security fencing to protect Refuge lands. SpaceX has contributed funds towards the purchasing of the fence supplies as well as provided storage for the supplies. In addition, SpaceX immediately notifies the Refuge when operations are occurring and in the event of any anomaly or unplanned emergency occurs.

Finally, the FAA coordinated the development and review of the Facility Design and Lighting Management Plan and the Security Plan over several years with the National Historic Preservation Act Section 106 consulting parties. The FAA coordinated the development of the Fire Mitigation and Response Plan with the USFWS and Texas Parks and Wildlife in 2019. SpaceX is currently in the process of updating the Facility Design and Lighting Management Plan given SpaceX's changes to the launch site. As with the mitigation measures described above, these plans stemmed from the 2014 EIS process. All mitigation measures and SpaceX's site plans, including these three plans, will be revisited as part of the FAA's new environmental review for SpaceX's Starship/Super Heavy proposal.

Thank you again for your letter. If you have any questions, please feel free to call me at (202) 407-2381, or send me an email at daniel.murray@faa.gov.

Sincerely,

Howard Searight

for: Daniel Murray
Manager, Safety Authorization Division, (ASA-100)
Office of Commercial Space Transportation
Federal Aviation Administration

P.O. Box 12276
Austin, Texas 78711-2276
512-463-6100
thc.texas.gov

November 1, 2021

Stacey Zee
Federal Aviation Administration, Office of Commercial Space Transportation
c/o ICF International Inc.
9300 Lee Highway
Fairfax, Virginia 22031

Re: *Comments on the Draft Programmatic Environmental Assessment for the SpaceX Starship/Super Heavy Launch Vehicle Program at the Boca Chica Launch Site, Cameron County, Texas (FAA/106, THC #202201186)*

Ms. Zee:

Thank you for the Notice of Availability/Request for Comment on the Draft Programmatic Environmental Assessment (PEA) for the proposed SpaceX Starship/Super Heavy Launch Vehicle Program at the Boca Chica Launch Site in Cameron County, Texas. This letter serves as comment on the Draft PEA from the State Historic Preservation Officer, the Executive Director of the Texas Historical Commission (THC).

In general, the PEA needs to address recent comments that THC provided in response to the Draft Phase I Cultural Resources Survey prepared by SEARCH, Inc., on behalf of the Federal Aviation Administration (FAA). Care should be taken to ensure that both the Cultural Resources Survey and the PEA are consistent, especially regarding the FAA's efforts to identify and evaluate historic properties and to assess the potential effects to historic properties. Updates throughout the PEA may be necessary, but especially in Sections 3.6 Visual Effects, 3.7 Cultural Resources, and 3.8 Department of Transportation Act, Section 4(f).

Attached please find specific comments on the PEA and, for your reference, a copy of our letter of October 22, 2021, in response to the Draft Phase I Cultural Resources Survey.

THC looks forward to further consultation with your office and the other consulting parties to avoid, minimize, or mitigate adverse effects to historic properties. Thank you for your cooperation in this federal review process and for your efforts to preserve the irreplaceable heritage of Texas. For questions concerning our comments on the National Register eligibility of non-archeological resources, please contact Justin Kockritz at 512-936-7403 or justin.kockritz@thc.texas.gov; for questions concerning our comments on effects to non-archeological historic resources, please contact Lydia Woods-Boone at 512-463-9122 or lydia.woods@thc.texas.gov; for questions concerning our comments on terrestrial archeological resources, please contact Emily Dylla at 512-463-5915 or emily.dylla@thc.texas.gov; or, for questions concerning our comments on marine archeological resources, please contact Amy Borgens at 512-463-9505 or amy.borgens@thc.texas.gov.

Sincerely,

Justin Kockritz, Lead Project Reviewer, Federal Programs
For: Mark Wolfe, State Historic Preservation Officer

cc: Amy Hanson, Chelsea Clarkson, Anna Cushman, & Jacob Cantin, Federal Aviation Administration
Katharine Kerr, Advisory Council on Historic Preservation

General Draft Programmatic Environmental Assessment Comments

Please update the Draft Programmatic Environmental Assessment (PEA) throughout to be consistent with the FAA's determinations of eligibility for listing in the National Register of Historic Places and findings of effects on historic properties, together with any comments from consulting parties, including the Texas Historical Commission's (THC) letter of October 22, 2021, in response to the Draft Phase I Cultural Resources Survey. Sections of the PEA to update include, but are not limited to: Sections 3.6 Visual Effects, 3.7 Cultural Resources, and 3.8 Department of Transportation Act, Section 4(f).

Comments on Historic and Terrestrial Archeological Resources

| **Section** | **Page/Location** | **THC Comments** |
|---|---|---|
| General | | Please remove all references to the pilings site historical marker as 41CF117.3. It should only be referred to by its marker number. |
| General | | "Loma" is repeatedly misspelled as "lama." |
| 3.7.3.2 | 69, Final Paragraph | Refers to 41CF117.2 as the pilings site and states it is not eligible. What has been called 41CF117.2 is the associated camp site. |
| 3.7.4 | Page 73, Paragraph 4 | Revise to clarify that the project would have no adverse *visual* effects on the Queen Isabella Memorial Causeway and the Long Island Swing Bridge. As noted in Table 3-8, FAA has found that the two bridges may potentially be adversely affected by vibration. |
| 3.7.4 | 74, Paragraph 4 | One piling has already been severely damaged due to an anomaly. Please acknowledge. Resolution of this adverse effect including any mitigation will need to be addressed. |
| 3.8.2.2 | 79 | "These sites contain intact structural remains that would not warrant them being considered…" Please correct to "These sites do not contain intact structural remains…" |
| 3.8.2.2 | 79, Table 3-9 | The final sentence of this paragraph states there are 12 historic properties that qualify for protection, but Table 3-9 lists 13. Please update as needed to match the FAA's final determinations of eligibility. |
| 3.8.3.2.1 | 82, Paragraph 1 | The THC Historic Sites Division requests to be included in the Closure Notification Plan. Please include:<br><br>Bill Irwin<br>Director of Historic Sites Operations<br>936-878-2214 ext. 237<br>bill.irwin@thc.texas.gov<br><br>We request a 72-hour advanced notice to allow for THC staff to prepared, should they need to travel to the Palmito Ranch Battlefield and/or Port Isabel Lighthouse State Historic Sites. The Palmito Ranch Battlefield State Historic Site was recently established and is within the Soft Checkpoint. |

Comments on Underwater Archeological Resources—Beach Shipwreck Survey

In section 3.7.3.2, the results from the shipwreck magnetometer survey are not included. The beach magnetometer survey detected buried magnetic targets that were identified as having the potential to represent buried shipwreck targets. The presentation of results in the draft archeological report makes it

unclear if there are 4, 7, 12, or 17 such targets recommended as significant. The THC has requested clarification in the draft report review and these revised results need to be summarized in the PEA. Though shipwrecks were not verified, the investigation results were inconclusive as the source of the significant magnetic targets identified as having the potential to represent shipwrecks were too deeply buried and were not discovered (see Cleeland et al. 2021:80-87). These targets retain the potential to be submerged shipwreck sites and must be avoided by 50 m, measured from their outer magnetic contours, by any ground-disturbing activities by this and any other future project. If these targets cannot be avoided, then additional archeological investigation is required. For the purpose of the SpaceX assessment, these need to be considered sensitive areas that could contain shipwrecks – these can become exposed during storms.

In addition, the archeological assessment prepared by SEARCH has included inaccuracies resulting largely from misunderstanding shipwreck data presented in the Texas Archeological Sites Atlas (TASA). These errors are also presented in the Draft PEA and need to be revised and/or removed. The THC has submitted comments for the draft cultural resources assessment to ensure these errors are addressed in that document as well:

1) THC Shipwreck Nos. 1444, 1435, and 968 are reported shipwrecks and not recorded archeological sites. These are known only from primary and secondary documentary sources. The positions presented in the Atlas "Shipwrecks" layer are conjectural and should not be viewed as accurate locations; their positional accuracies listed in Atlas are 1 mi., 1 mi., and 3 mi., respectively. The content on pages 69-70 needs to be revised to explain there are three shipwrecks in the vicinity of the project area but that these are reported from documentary sources and not confirmed archeological sites.
2) All reported, unconfirmed historic shipwrecks in the Marine Archeology Program shipwreck database (presented in Atlas) were listed as SALs during the 1980s, and it was known at the time that these were not validated archeological sites. They will not have an NRHP eligibility assessment as they are not archeological sites. These three shipwrecks need to be removed from Table 3-7 as they are not confirmed cultural resources.
3) Currently the discussion mentions only one shipwreck archeological site in the vicinity of the project area when there are two: Boca Chica Shipwreck No. 1 (41CF125) and Boca Chica Shipwreck No. 3 (41CF232).
4) SEARCH should re-evaluate the distance of 41CF125 from the APE as the site data in Atlas (the "Archeological Site Centroid" layer) is inaccurate for this wreck as it is not updated from the THC's 2018 site revisit form. The position for this shipwreck in the Atlas "Shipwreck" layer is the correct location. Based on Figure 2 presented on page 3 of the draft archeological report by SEARCH, 41CF125 is approximately .28 mi. distant from the project area; the distances listed in Table 3-7 and on page 71 in the PEA all appear to be in error.

P.O. Box 12276
Austin, Texas 78711-2276
512-463-6100
thc.texas.gov

October 22, 2021

Randy Repcheck
Federal Aviation Administration
Office of Commercial Space Transportation
800 Independence Avenue SW
Washington, DC 20591

Re: *Project Review Under Section 106 of the National Historic Preservation Act, Proposed SpaceX Starship/Super Heavy Operations at Boca Chica Launch Site, Draft Phase I Cultural Resources Survey, Cameron County (FAA/106, THC #202200054)*

Mr. Repcheck:

Thank you for your letter of August 31, 2021, transmitting the Management Summary of the Draft Phase I Cultural Resources Survey, and subsequent email of September 22, 2021, from Amy Hanson transmitting the full report. Attached please find comments on the report and the Federal Aviation Administration's findings from the State Historic Preservation Officer, the Executive Director of the Texas Historical Commission (THC).

THC looks forward to further consultation with your office and the other consulting parties to avoid, minimize, or mitigate adverse effects to historic properties. Thank you for your cooperation in this federal review process and for your efforts to preserve the irreplaceable heritage of Texas. For questions concerning our comments on the National Register eligibility of non-archeological resources, please contact Justin Kockritz at 512-936-7403 or justin.kockritz@thc.texas.gov; for questions concerning our comments on effects to non-archeological historic resources, please contact Lydia Woods-Boone at 512-463-9122 or lydia.woods@thc.texas.gov; for questions concerning our comments on terrestrial archeological resources, please contact Emily Dylla at 512-463-5915 or emily.dylla@thc.texas.gov; or, for questions concerning our comments on marine archeological resources, please contact Amy Borgens at 512-463-9505 or amy.borgens@thc.texas.gov.

Sincerely,

Justin Kockritz, Lead Project Reviewer, Federal Programs
For: Mark Wolfe, State Historic Preservation Officer

cc: Stacey Zee, Amy Hanson, Chelsea Clarkson, Anna Cushman, & Jacob Cantin, Federal Aviation Administration
Katharine Kerr, Advisory Council on Historic Preservation
[redacted], SpaceX
[redacted], SEARCH, Inc.
Eric Brunnemann, Rolando Garza, Amy Pallante, Astrid Liverman, & Karen Skaar, National Park Service
Jerry Androy, U.S. Army Corps of Engineers
Sonny Perez, Dawn Gardiner, Bryan Winton, & Mary Orms, U.S. Fish and Wildlife Service
David Kroskie, Reagan Faught, & Ted Hollingsworth Texas Parks and Wildlife Department
Wilson Bourgeois, Cameron County Historical Commission

National Register Eligibility of Non-Archeological Resources
The THC History Programs Division staff, led by Justin Kockritz, has completed its review of the Draft Cultural Resources Survey Report and offers the following comments concerning the Federal Aviation Administration's (FAA) efforts to identify non-archeological historic properties and the determinations of eligibility for listing in the National Register of Historic Places (NRHP).

For the purposes of compliance with Section 106 of the National Historic Preservation Act (NHPA), THC concurs that the following properties were identified as listed in, or eligible for listing in, the NRHP during consultation for the SpaceX Falcon 9/Falcon Heavy launch operations in 2012–2014 and are located within the Area of Potential Effect (APE) for the proposed Starship/Super Heavy launch operations:

- **Palmito Ranch Battlefield** (41CF93)—listed in the NRHP in 1993 and designated as a National Historic Landmark in 1997; and,
- **Palmetto Pilings 1936 Centennial Historic Marker**.

For the purposes of compliance with Section 106 of the NHPA, THC concurs that the following properties, which are inside the Starship/Super Heavy APE but were outside of the Falcon 9/Falcon Heavy APE, are listed in, or are eligible for listing in, the NRHP under the criteria cited:

- **Point Isabel Lighthouse** (41CF10)—Listed in the NRHP in 1976 under Criterion A for Transportation and designated as a State Antiquities Landmark (SAL) in 1983;
- **Queen Isabel Inn**—Eligible for listing in the NRHP under Criterion A for Tourism and Economic Development and awarded an Official Texas Historic Marker (OTHM (Subject Marker)) in 1991;
- **Alta Vista Apartments**—Eligible for listing in the NRHP under Criterion A for Tourism and Economic Development and Criterion C for its architecture and designated as a Recorded Texas Historic Landmark (RTHL) in 1988;
- **Charles Champion House**—Eligible for listing in the NRHP under Criterion A for Economic Development, Criterion B for its historic association with significant local businessperson Charles Champion, and Criterion C for its architecture, and awarded an OTHM (Subject Marker) in 1996;
- **Port Isabel Cemetery**—Eligible for listing in the NRHP under Criterion A for Ethnic History, Criterion C for its design, and Criterion D for its potential to yield important information about nineteenth-century Tejano and Mexican cultural groups, and meeting Criteria Consideration D for its age and distinctive design features. At this time, without further information on the historic significance of specific persons buried at the Cemetery, we cannot concur that the Cemetery is also eligible under Criterion B for its association with significant persons or that it meets Criteria Consideration C as being the last remaining property associated with a person of outstanding importance. Although Major Samuel Ringgold is noted as a significant early burial at the Port Isabel Cemetery, his remains were reinterred shortly thereafter in Green Mount Cemetery in Baltimore, Maryland. However, we recommend that no further evaluation of the Cemetery's National Register eligibility is required at this time. We also note that Port Isabel Cemetery was awarded an OTHM (Subject Marker) in 1990;
- **Old Point Isabel Lighthouse 1936 Centennial Historic Marker**—Eligible for listing in the NRHP under Criterion A for Social History and meeting Criteria Consideration F for Commemorative Properties, as described in the "Monuments and Buildings of the Texas Centennial" National Register Multiple Property Documentation Form;

SPX-0004326

*Proposed SpaceX Starship/Super Heavy Operations at Boca Chica Launch Site* *October 22, 2021*
*Draft Phase I Cultural Resources Survey, THC #202200054* *Page 3 of 13*

- **Queen Isabella Causeway** (BC-AH1, SH 100 over the Laguna Madre)—Eligible for listing in the NRHP under Criterion A for Tourism and Economic Development and Criterion C for Engineering; and,
- **Long Island Swing Bridge** (BC-AH2, South Garcia Street over the Gulf Intracoastal Waterway)—Eligible for listing in the NRHP under Criterion A for Tourism and Economic Development and Criterion C for Engineering. We note that there are at least two other vehicular swing bridges in the state—the Deweyville Swing Bridge in Newton County (SH 12 over the Sabine River on the Louisiana Border), which was listed in the NRHP in 2011, and the East Roundbunch Road Bridge over Cow Bayou in Orange County (1.6 miles downstream of the Cow Bayou Swing Bridge noted in the report)—and several railroad swing bridges remain as well. However, the Long Island Swing Bridge may be the only extant vehicular single-sided cantilever/gate-style swing bridge and the only vehicular pontoon bridge in the state.

The Cultural Resources Survey fails to identify and evaluate several historic-age properties within the APE:

- **Point Isabel Coast Guard Building**, Wallace L. Reed Road, South Padre Island—Constructed in 1923 and used by the U.S. Coast Guard until 1974, this historic-age property should have been evaluated for its potential historic significance to Maritime History and for its architecture. An OTHM (Subject Marker) was placed at the site in 1988. Based on the limited available information, THC recommends that the Coast Guard Building is eligible for listing in the NRHP.
- **Port Isabel Firemen's Hall**, 205 North Longoria Street, Port Isabel—Very little information is readily available on this property, but based on historic aerial photographs, it at least pre-dates 1962, and may possibly date to the 1940s or earlier. THC recommends further research into and evaluation of the Firemen's Hall or treating the property as eligible for listing in the NRHP.
- **Port Isabel Municipal Building**, 305 East Maxan Street, Port Isabel—Although the Municipal Building may not ultimately be eligible for listing in the NRHP, it was constructed in 1968, with W. M. Peterson of Brownsville credited as the architect, and should have been evaluated for its potential historic significance to local government, to Port Isabel's recovery from Hurricane Beulah, and for its architecture.
- **Bahia Mar and Bahia Grande Condominiums**, 6300 Padre Boulevard, South Padre Island—Construction of the first phases began in 1972 and the Bahia Grande Condominium tower—operated initially by a subsidiary of Braniff Airlines and designed by the firm of Swanson, Hiester, Wilson, and Claycomb—opened in 1975. Although the property may not ultimately be eligible for listing in the NRHP, it should have been evaluated for its potential historic significance to Tourism and Economic Development.
- Former **Sea Island Resort Hotel**, 500 Padre Boulevard, South Padre Island—The flanking two-story wings opened circa 1960. Although the property may not ultimately be eligible for listing in the NRHP, it should have been evaluated for its potential historic significance to Tourism and Economic Development.

THC recommends that the determinations for following properties, which were included in the Cultural Resources Survey, be re-considered. Given the importance of tourism to the area, historic-age hotels, motels, and other tourism-based properties should be thoroughly evaluated to determine if they illustrate this area of significance and if they retain sufficient historic integrity to convey that significance. THC recommends that special consideration should be given to properties that pre-date Hurricane Beulah (1967) in Port Isabel and that pre-date the Queen Isabella Causeway on South Padre Island (1974).

FAA00052309

SPX-0004327

*Proposed SpaceX Starship/Super Heavy Operations at Boca Chica Launch Site* *October 22, 2021*
*Draft Phase I Cultural Resources Survey, THC #202200054* *Page 4 of 13*

- Former **Ship Café**, 419–421 East Maxan Street, Port Isabel—Based on historic photographs and newspaper articles, the Ship Café building likely dates to the 1930s or 1940s. The buildings at 413 and 415–417 East Maxan Street were clearly constructed later, which may account for the Cameron Appraisal District's construction date of 1956. The former Ship Café building represents a good, if modest, example of Spanish Colonial Revival commercial architecture, and is not a Craftsman Bungalow as described in Appendix I.
- **White Sands Motel**, 418 West Highway 100, Port Isabel—Although the Cameron Appraisal District lists a construction date of 1968, there are newspaper references to the motel in at least the mid-1950s. Was the adjacent restaurant at 416 West Highway 100 historically associated with the White Sands Motel? If so, it should be evaluated as a potential contributing resource to the motel. The historic integrity of the motel, or lack thereof, may ultimately be the deciding factor in evaluating its NRHP eligibility. The White Sands Motel and the adjacent restaurant at 416 West Highway 100, are not Spanish Colonial Revival as described in Appendix I.

Overall, the Cultural Resource Survey Report's overreliance on data from the Cameron Appraisal District, lack of photographs, lack of business or property name, incomplete addresses, and lack of description beyond a general architectural style category—which, based on spot-checking, is often applied incorrectly or inadequately—make it difficult to review the survey report and to have confidence in the proposed determinations. For instance, the restaurant at 201 North Musina Street is described as a Craftsman Bungalow, the Port Isabel Post Office at 100 Manautou Street is described as Spanish Colonial Revival, the house at 109 East Madison Street is described as Mission Revival, and the property at 407 West Jefferson Street is described as a 1970 Art Moderne building. However, based on extensive desktop research and recent site visits to the area, THC believes that the between the Cultural Resources Survey Report and our comments here, the aboveground historic resources within the APE have been identified, though we welcome any additional information or comments from other consulting parties.

Based on the available information, and barring any additional information to the contrary, THC concurs that the remaining properties evaluated in the Cultural Resources Survey Report are *not* eligible for listing in the National Register.

Assessment of Effects on Non-Archeological Historic Resources

The THC Division of Architecture staff, led by Lydia Woods-Boone concurs with the FAA that the proposed project has the potential to result in adverse effects to the eight (8) historic resources listed in Table 15 from visual and/or auditory/vibratory impacts associated with Starship/Super Heavy operations: Palmito Ranch Battlefield, the Alta Vista Apartments, the Queen Isabel Inn, the Point Isabel Lighthouse and associated Old Point Isabel Lighthouse 1936 Centennial Historic Marker, the Charles Champion Building, the Port Isabel Cemetery, the Queen Isabella Causeway (BC-AH1), and the Long Island Swing Bridge (BC-AH2).

However, as described above, there are additional potential aboveground cultural resources which have not been evaluated for listing in the NRHP. Should any of these additional properties be determined eligible for listing in the NRHP, the potential effects on those historic properties should be assessed.

Finally, we note that under Section 110(f) of the NHPA and 36 CFR §800.10(a), the FAA is required "to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to any National Historic Landmark that may be directly and adversely affected by an undertaking." According to guidance from the Advisory Council on Historic Preservation, in the 2019 case of *National Parks*

FAA00052310

*Conservation Association v. Semonite*, the D.C. Circuit Court concluded "that the meaning of the term 'directly' in Section 110(f) refers to the causality, and not the physicality, of the effect." The FAA should document in the Programmatic Environmental Assessment, or elsewhere as appropriate, the planning undertaken to minimize harm to the Palmito Ranch Battlefield National Historic Landmark, including from visual adverse effects.

Archeology Division Comments
The THC Archeology Division staff, led by Emily Dylla and Amy Borgens, has completed its review of the Draft Cultural Resources Survey Report and offers the following comments.

**Archeological Assessment.** The THC concurs with the following eligibility determinations:

1) 41CF117
   a) The Palmetto and Cypress Bridge pilings are considered by the THC and the Texas Archeological Research Laboratory (TARL) to be a single trinomial. We concur these components of this site are eligible for listing in the NRHP and as an SAL.
   b) The military encampment component of this site (referred to as 41CF117.2) appears to no longer be extant and therefore is a non-contributing component of this site.
   c) The Palmetto Pilings 1936 Centennial Historic Marker is referred to multiple times by a trinomial (41CF117.3). The trinomial system is used for documenting archeological sites. This is not part of an archeological site and therefore should not be referred to as a trinomial.
2) 41CF124 appears to have been destroyed and therefore is not eligible for listing under federal or state designation.
3) 41CF217 appears to have been destroyed and therefore is not eligible for listing under federal or state designation.
4) 41CF238 is not eligible due its recent age, lack of historical or architectural significance, and lack of research potential.

**Beach Shipwreck Magnetometer Survey.** It is unclear from the results and recommendations if SEARCH has recommended four, seven, or twelve magnetic targets as significant and representative of potential buried shipwreck sites. In the results, seven are listed on page 79 (M001, M003, M026, M088; M030, M057, M106), twelve are described on pages 80–87 (M001, M003, M026, M088; M030, M031, M041, M057, M062, M106, M114, M0123), but only four are labeled as significant in Table 7 (M001, M003, M026, M088). This also affects the Management Summary, Project Summary, the Results and Recommendation for the beach magnetometer shipwreck survey on page 88, and the comprehensive Conclusion and Results on page 148. Until there is clarification on which targets are significant and recommended as potential shipwreck sites, the THC cannot concur with the results or recommendations for this component of the investigation. In addition, the recommendations are incomplete as they do not include the required avoidance margins that are mandated for significant magnetic anomalies identified as having the potential to be shipwreck sites. Regardless of the scope of the project, a 50-meter buffer, commencing from the targets' outer magnetic contours, is to be avoided by all ground-disturbing activities by all projects, current and subsequent, until the sources of the anomalies are identified. For the purpose of the SpaceX project, until these are demonstrated to not be shipwrecks, these locations should be considered sensitive areas that have the potential to contain shipwrecks. Such deeply buried sites can become exposed after storm conditions, such as nearby site 41CF125. As none of the sources of the targets were discovered, a recommendation for avoidance must be presented in the report per the requirements in the Texas Administrative Code, Title 13, Part 2, Chapter 28, Rules §28.2, §28.6, and §28.9.

Please address the following technical comments and submit a revised draft report for review.

SPX-0004329

*Proposed SpaceX Starship/Super Heavy Operations at Boca Chica Launch Site* *October 22, 2021*
*Draft Phase I Cultural Resources Survey, THC #202200054* *Page 6 of 13*

1) **Title Page**
   a. The permit number on the cover page is incorrect. Please replace with the correct permit number, 30223.
   b. Julisa Meléndez is listed on the title page and in the Management Summary as a Principal Investigator (PI), when she is the Project Manager (PM). Please correct this or clarify her PI duties were limited to the non-permitted portions of the project.

2) **Management Summary**
   a. The management summary has omitted the "significant magnetic targets" identified as having the potential to be shipwreck sites. These need to be listed by the refined target numbers (M and not PM). For the purpose of protection and preservation, such targets are considered unvalidated archeological sites until discovery and identification of the source confirms or discounts this hypothesis.
   b. In this and the following sections, please modify the eligibility language in this report to reflect the THC's comments regarding eligibility and remove references to the Palmetto Pilings 1936 Centennial Historic Marker as a trinomial.

3) **Project Review Summary**
   a. Page 6. Revise to include the quantity of buried magnetic targets that were identified as having the potential to represent shipwrecks sites. None of the sources of the targets examined in the beach geophysical survey were identified as they were deeper than probing and testing depths. These targets therefore retain the potential to be archeological shipwreck sites. They may become uncovered following storms, as has already been observed with site 41CF125 (Borgens 2018). Per requirements presented in the Texas Administrative Code, Title 13, Part 2, Chapter 28, Rules §28.2, §28.6, §28.9, these targets are to be avoided by 50 m, measured from their outer magnetic contours, by any ground-disturbing activities. These need to be treated as sensitive areas if anomaly debris is discovered in their proximity.
   b. Staff roles, page 6. Expand this section for the shipwreck magnetometer survey to specifically include the staff that collected, processed, and interpreted the magnetometer data. If this is the same individual, make sure it is clear this person performed all these tasks. Which staff ground-truthed the beach magnetometer targets?

4) **Cultural Context**
   a. The Cultural Setting section is insufficient for a region with such long and varied marine and terrestrial significance. The purpose of this section is to demonstrate a PI's expertise with the unique history and archeology of the area in which the project is occurring. For a long-form report such as this one, please provide a more robust assessment of this area in this section.

5) **Previous Investigations for Underwater/Shipwreck Projects**
   a. Atlas project area polygon sizes. Descriptions of the size of the project areas should be taken from reports and not by generating the acreage using the downloaded Atlas shapefile data. Many of the terrestrial and underwater project areas in Atlas are inexact and sometimes inaccurate—especially from projects that pre-date the requirement to submit shapefiles. They should not be treated as absolute delineations.
   b. TASA No. 8500000589. Page 25. This project, listed in the report and on Atlas as sponsored by TAS in 1973/1974, was not an offshore underwater archeological survey. "TAS" may apply to the Texas Archeological Society or Turpin and Sons, Inc. and neither group has conducted or sponsored an underwater archeological survey (then or now). It may be easier and more accurate

FAA00052312

to describe it as investigation of an unknown type, however not an underwater archeological survey (based on who did the work).

c. TASA No. 8400001270. Page 25. Make this a new paragraph. TASA No. 8500000589 should not be associated with a project that post-dates it by 4 years without evidence suggesting this. The THC Marine Archeology Program (MAP) has not yet located a report that describes an underwater magnetometer survey in this area at this date. Remove the discussion of 1435 and 1444 from this paragraph as they are reported wrecks, not known sites (see 6b below). In answer to the inquiry posed in this paragraph of the report, underwater projects were also sketched on the early quad maps so these were accidentally carried into the terrestrial project layer when they added to Atlas. The MAP is working to finish migrating these projects to the underwater layer.

d. TASA No. 8500000477. Page 27. By the authors' admission they had difficulty understanding the scope of the project as they only reviewed the report abstract available in Atlas and did not consult the report. It is the responsibility of the authors to request these THC permitted reports when they are not available as an Atlas download as most are on file at the THC. Incidentally the 1987 EHA report was uploaded to the Atlas in September. Please review this report and revise this content.

e. TASA No. 8700000282. Page 27.
   i. The summary of the 1980 Texas Antiquities Committee (TAC) beach wreck assessment is highly inaccurate. The Leshikar report is on file at the THC and should be requested from the THC MAP. It will be added to Atlas.
   ii. The size of the TAC project area is conjectural and plotted as a placeholder to represent the general area of the investigation. It was a visual beach assessment. Do not treat the Atlas polygon as the literal project area and do not describe its size.
   iii. The location of the 1980 survey area was based on the previous plot of site 41CF125 from the MAP database (the "Shipwrecks" layer in Atlas), prior to the THC assessment of December 2017. It was inadvertently not replotted after the THC site revisit of 41CF125. It has been revised.
   iv. The THC performed a site visit of site 41CF125 in December 2017 and this work was not included in Atlas underwater layer, though it is in Atlas as the source of the site revisit form. It has now been added to the underwater layer. The Atlas number has not yet been assigned. It is important that this work be reviewed and added to the previous investigations section and not solely mentioned on page 32 in the discussion of the site.

f. Attachment 1, Table 1 and Figure 10 (page 20). Archeological Surveys (Assessments) within 1 mile of the APE need to include the THC investigations conducted by the THC in 1980 (Leshikar 1980) and 2017 (Borgens 2018).

6) **Previously Recorded Archeological Resources**
   a. Pages 27, 29 and Table 3. Please do not use "SW" to indicate shipwreck. Use "THC Shipwreck No." or "THC No." so it directly correlates to Atlas and the THC shipwreck database; "SW" does not indicate the source of the data.
   b. Pages 30, 33. THC Nos. 1444, 1435, and 968 are reported and not recorded shipwrecks. They are not cultural resources and should not be listed in Table 3 (since they are not archeological sites). These are known from primary and secondary sources (newspapers, books, life-saving station records) and are not validated archeological sites. Include the positional accuracy for each of these reported shipwrecks that is shown in Atlas. Page 44 accurately describes these as reported shipwrecks and not archeological sites; please revise to be consistent with page 44.
   c. 41CF125

      i. Location, Table 3. There are two plots for the location of 41CF125: the THC MAP data (shipwreck layer) and TARL site form data (Archeology Site Centroid). Shipwreck archeological sites should occur in both layers and, as a general rule, the MAP data is the correct location and almost without exception more accurate than the TARL locations. The THC 2018 site revisit form for 41CF125, available in Atlas, includes the accurate coordinates. The shapefile has not yet been revised in Atlas and TARL has been notified. There are three wrecks named after Boca Chica Beach—this is known as Boca Chica Shipwreck No. 1.

      ii. The storm that uncovered the shipwreck was in December 2017 not 2018; this was the time of the THC assessment. It was uncovered again in 2018 though not visited by the THC. Please request the THC annual permit report for No. 2035 for FY 2018 and revise this section so that it is accurate to the THC report and site form. Correct SHL to SAL.

d. 41CF127. See comment 5(e)(iv) above.

e. 41CF232. Add this site to the discussion. It is the secondary deposit of 44 shipwreck timbers from an unknown nearshore shipwreck that has not been relocated. They were brought ashore during a storm. These timbers were discovered throughout the beach, from Brazos Santiago Pass and into Mexico. The THC did a cursory assessment of these timbers and another example that later became lodged in the jetties. Request the annual reports for permit No. 2035 for FY 2016 and 2018.

f. Shipwreck SW-968, SW-1435, SW-1444. Pages 33–34.

      i. Refer them as "THC No." and not "SW" (see 6(a) above).

      ii. Please do not state that there is no additional data for these Atlas shipwreck entries as each shipwreck in the THC Shipwreck Database has a reference card that can be requested from the agency. Atlas only displays 11 fields of data when there are more than 30 possible categories of information for each in the database including the source of the information. As an example, THC No. 968 lists a map from the Naval Museum Madrid as the source of the data. The pre-1766 date indicates the wreck occurred earlier than the map date. Shipwrecks with "pre" in the dates are almost always plotted from maps and navigation charts. Please request information on the shipwrecks when needed.

      iii. Remove discussion of NRHP eligibility.

      iv. Do not associate these reported shipwrecks with any of the underwater remote-sensing investigation as they are unrelated.

      v. Please ensure the distance of the archeological sites and reported shipwrecks from the project areas are redacted from the public version of the report.

7) **Methods**

a. Paragraph 1. Please list the positional accuracies for THC Nos. 968, 1435, and 1444. There are many shipwrecks in the database that have positional accuracies of 10 or 20 miles.

b. Page 44. Provide the date(s) of the beach magnetometer survey.

c. Magnetometer Data Processing and Interpretation. Pages 45–50.

      i. Please add discussion of Charles Pearson's amplitude/duration model—still one of the most widely used interpretative models for the detection of shipwreck sites. Please include how he has refined his model in recent years so that smaller targets are selected.

      ii. The interpretative model discussion mostly covers how this is applied to submerged shipwrecks in a comparatively deeper underwater survey. How might the results change based on a beach survey, when the sensor is only 5 to 10 feet from the target? Are there other examples of beach magnetic targets that can be introduced, that are continuous

SPX-0004332




sites, to better illustrate the adaptation of these models to the beach environment? Gearhart (2011:99) includes 41CF125 at Boca Chica in Table 4.1.

d. The methodology used to ground-truth the targets is summarized in three sentences. Please expand this section:
   i. On page 78, the results mention that there was preliminary data processing in the field that resulted in detection of the PM-labeled magnetometer targets. Those identified as significant magnetic targets were probed. On page 79, the report describes more refined data processing and that this led to additional targets, better positioning of the preliminary anomalies (the PM targets), and more probes/shovel tests (ST). It also resulted in target relabeling (M vs PM). This needs to be described in the methodology section, with the dates for each of the field investigations.
   ii. Was each probe location geo-referenced? What was the total number of probes at each target, generally? The number of probes per each target needs to be included in the results for each target's discussion.
   iii. For targets not in the surf zone or under the water table, was more than one shovel test executed as suggested by the table in Appendix C? If all the targets were probed, then this also needs to be mentioned. This section needs more detail and clarification.

e. Magnetometer Target Selection. Consultation with the THC regarding the selection of significant magnetic targets is supposed to occur prior to ground-truthing. This is typically presented as a letter report submitted for review with a resultant THC concurrence necessary prior to testing the targets. Failure to do so can result in the THC requiring additional fieldwork if the agency disagrees with the preliminary target recommendations. For future beach or underwater magnetometer shipwreck surveys, please coordinate with the THC MAP prior to ground-truthing.

8) **Archaeological Survey Results**

a. General. All shovel tests should have an assigned number and be plotted with their ST number on a map. Please correct this in Figure 15 (you may want to break it into a map series) and in Appendix C, where the tables presented on pages C-6 through C-12 lack ST numbers.

b. Previously Recorded Sites in the High-Sensitivity Zone
   i. 41CF117. It is unclear why the 1846 pilings recorded as part of this survey were recorded approximately 200 feet from where they were recorded in 2015. Page 62, paragraph 4 addresses only the discrepancy between 2015 and 2021 plotted locations for the 1864–1865 pilings, despite a further offset. Please address.

c. Magnetometer Survey Area
   i. Because the data was processed twice and target positions were refined and then renumbered (PM vs. M), it appears only 12 targets were investigated, not 17 (page 79), but seven (?) targets were investigated a second time after the target centroids were adjusted. This is confusing and needs clarification.
   ii. The complicated organization of this section and target renumbering has led to a confusing presentation of the number of targets investigated and related results. This section needs complete reorganization and an improved presentation of results so it can be more clearly understood.
   iii. According to the investigative summary on pages 80–87 of the draft archeological report, four targets were considered as potentially intact, continuous buried archaeological sites (M001, M003, M026, and M088) and eight targets (M030, M031, M041, M057, M062, M106, M114, M0123) are under consideration as noncontinuous archeological sites. This information differs from the summary list presented on page 79

SPX-0004333

*Proposed SpaceX Starship/Super Heavy Operations at Boca Chica Launch Site* *October 22, 2021*
*Draft Phase I Cultural Resources Survey, THC #202200054* *Page 10 of 13*

of the draft archeological report which lists four continuous targets (M001, M003, M026, and M088) and only three discontinuous targets (M030, M057, and M106). Though the magnetic sources were not detected for any of these targets, why are only the non-continuous anomalies in this list eliminated from consideration as potential significant in shipwrecks in Table 7? An explanation is not provided. If the sources were not identified they should not be precluded as potential shipwrecks after being recommended as such by the authors. Table 7 should be revised to list these as potentially significant. This will affect the recommendations.

iv. Since the original PM targets were refined and reassigned new "M" target numbers, to avoid confusion, Table 7 needs to be reorganized so that the refined "M" renumbering is used as the primary column with a secondary column that shows its original PM number and coordinates. The current organization of this portion of the report makes it difficult to ascertain how many targets are considered significant, since, for example PM001/M001 occurs twice under "Target ID" and is also in the "Refined Location" column. Do not duplicate the same targets twice in the table under different target numbers. As an example:

| Final Target ID | Centroid (UTM83 Zone 14N) | | Original Preliminary Target ID | Centroid (UTM83 Zone 14N) | | Continuous Target | Potentially Significant |
|---|---|---|---|---|---|---|---|
| | Easting | Northing | | Easting | Northing | | |
| M001 | | | PM001 | | | Yes | Yes |
| M003 | | | N/A | | | Yes | Yes |
| M026 | | | PM002 | | | Yes | Yes |
| M030 | | | PM004 | | | No | ? |
| M031 | add from App. F | "" | PM005 | | | No | ? |
| M041 | add from App. F | "" | PM010 | | | No | ? |
| M057 | | | N/A | | | No | ? |
| M062 | add from App. F | "" | PM006 | | | No | ? |
| M088 | | | PM003 | | | Yes | Yes |
| M106 | | | PM007 | | | No | ? |
| M114 | add from App. F | "" | PM008 | | | No | ? |
| M123 | add from App. F | "" | PM008 | | | No | ? |

v. Figure 15 is missing 41CF125. Remove THC No. 968.

vi. According to Table 7, all the PMs were reassigned a "M" number, yet only the coordinates for seven "M" numbers are included. Did the refined data recontouring not result in adjusted centroid coordinates for M031, M041, M062, M114, and M123? There are coordinates for these in Appendix F so please add these to Table 7. Make sure this table is redacted from the public copy.

vii. Pages 80–87. How many probes and/or shovel tests occurred at each target? Make sure this is discussed here and reference that the tabular data is in Appendix F.

viii. The report is missing a tabular summary of the individual probes, depths of probes, target numbers, etc., which need to be presented, even if these were negative findings. This should be included in Appendix F

ix. Figures 37–43. As is typical for probing results presented for "shipwreck" magnetic targets in THC-permitted reports, the magnetometer target illustrations should depict the locations of the probes. Each probed target described in this section should have a

FAA00052316

SPX-0004334

figure. Please revise these figures to include the ST/probe locations and the coordinate centroids for both the PM and M centroids.

x. In the anomaly discussions on pages 80–87, it is not always clear if the maximum probing depth is occurring as additional depth from the bottom of the excavation pit or as the overall maximum depth. For each target, list each of the three items for clarity: maximum ST excavation, additional probing beyond excavation, and maximum depth of testing. This is described clearly for M003 but not often for the other targets.

xi. Reorganize pages 80–87 so that each target is described by the M number first, with the PM following, so that both analyses are grouped. For example:

> "Magnetic Anomaly M001/PM001
> Magnetic Anomaly PM001 was identified within the preliminary processed magnetic data. Anomaly PM001 is a dipolar anomaly spanning four transects. The recorded declination was -67 degrees, but contouring parameters placed the positive pole in water and may not have been fully captured; therefore, the magnetic characteristics of Anomaly PM001 cannot be assessed fully due to the limited survey coverage. It shares some characteristics of verified shipwreck magnetic signatures (e.g., spatial extent, general dipolar complexity with the main negative lobe oriented in the northern hemisphere, an amplitude/duration ratio of 1:2.5, and an amplitude gradient similar to iron/steel and/or steam/gasoline-powered vessels [97 gammas/m]). The anomaly centroid is in the surf zone, which precluded shovel testing; therefore, on [DATE], SEARCH, utilized a 1.5 m (5.0 ft.) hand probe. Probing occurred at the anomaly's centroid and radially in cardinal directions at 1.5 m (5.0 ft) and 3 m (10 ft) intervals for a total of [X] probes. No subsurface features were encountered. During reprocessing of the data, the location of PM001 was refined and assigned a new contact identification, M001 (see Appendix F).
>
> The adjusted position of PM001, Magnetic Anomaly M001, is a dipolar anomaly recorded on one survey transect (Figure 37). Anomaly M001 is located at the northern end of the survey area near the edge of the surf zone and may not have been fully captured; therefore, the magnetic characteristics of Anomaly M001 cannot be assessed fully due to the limited survey coverage. It shares many characteristics with verified shipwreck magnetic signatures (e.g., spatial extent, general dipolar complexity with the main negative lobe oriented in the northern hemisphere, a main pole-to-pole declination of 2.0 degrees from magnetic north, an amplitude/duration ratio of 1:2.5, and an amplitude gradient similar to iron/steel and/or steam/gasoline-powered vessels [57 gammas/m]). On [DATE], SEARCH excavated to a depth of 70.0 cm (27.5 in) bs before water intrusion made the excavation too unstable to continue. The excavated pit was probed [how many] to a maximum depth of 160.0 cm (62.9 in) bs with no cultural material encountered, suggesting that the source of the magnetic anomaly is deeply buried."

xii. Include the peak-to-peak amplitude and duration for each the targets discussed on pages 80–87. This should be for the overall target and not for each individual anomaly comprising the target.

xiii. The magnetometer figures in Appendix F need to be revised to illustrate the avoidance boundaries for the significant magnetic targets per requirements in the Texas Administrative Code, Title 13, Part 2, Chapter 28, §28.9.

FAA00052317

SPX-0004335

*Proposed SpaceX Starship/Super Heavy Operations at Boca Chica Launch Site* *October 22, 2021*
*Draft Phase I Cultural Resources Survey, THC #202200054* *Page 12 of 13*

9) **Recommendations**
The recommendations on page 88 are in error regarding THC Shipwreck No. 968 and are incomplete and inconclusive regarding the 12 anomalies identified as significant magnetic targets and recommended as potential buried shipwreck sites on pages 80–87. Though the sources of these targets were too deeply buried to be discovered, they have not been discounted as shipwreck sites and the mandatory 50-meter avoidance buffer is required for all ground-disturbing activities for this and future projects. For the purpose of the current SpaceX investigation, these should be considered sensitive areas as storm activity has uncovered 41CF125 on this very beach, which is similarly deeply buried. The authors have not provided an explanation for why eight of the targets described as significant and potential discontinuous wrecks on pages 80–87 are listed in Table 7 as not significant.

10) **Conclusions and Results**
Pages 146–149. Paragraph 1, Page 148. Based on the authors' descriptions, the 12 significant magnetic targets described on pages 80–87 still retain the potential to be archeological sites as the sources were too deeply buried to be discovered and identified. It is inaccurate and incorrect to say the beach magnetometer did not find archeological sites, rather it identified targets that still have this potential. The summary of the shipwreck beach remote-sensing survey is to be rewritten to list the targets the authors described as potential shipwrecks. Describe the THC's required 50-meter avoidance boundary (See 9 above). Per requirements in the Texas Administrative Code, Title 13, Part 2, Chapter 28, §28.9(8), the specific "shipwreck" magnetometer targets recommended for avoidance are to be presented in a clearly marked summary table, this is usually presented as part of a non-disclosure appendix. In the table also please include the radius of the avoidance boundary, as measured from the anomaly centroid and out an added 50 meters from the maximum outer magnetic contours.

11) **Appendix C**
   a. Please double-check that all STs were listed on the table in Appendix C, it appears a few were not listed.
   b. All STs should have an assigned number and be plotted with their ST number on a map. Please correct this in Figure 15 (you may want to break it into a map series) and in Appendix C, where the tables presented on pages C-6 through C-12 lack ST numbers.
   c. Please clarify the data field discrepancy between the ST tables presented on pages C-1 through C-5 versus C-6 through C-12 versus C-13 through C-14. Is there a reason for this discrepancy?

| C-1 through C-5 | C-6 through C-12 | C-13 through C-14 |
|---|---|---|
| UTM N | Coords N | |
| UTM E | Coords E | |
| Strat | Stratum | Stratum |
| | Depth | Depth |
| Color | Soil color | Soil color |
| Texture | Soil texture | Soil texture |
| | Water table | |
| | Status | Status |
| Comments | Comments | Comments |
| Excavators | Excavators | Excavators |
| Date | Dates | Date |
| STP ID | | |
| Munsell | | |

FAA00052318

SPX-0004336

*Proposed SpaceX Starship/Super Heavy Operations at Boca Chica Launch Site* *October 22, 2021*
*Draft Phase I Cultural Resources Survey, THC #202200054* *Page 13 of 13*

| | | |
|---|---|---|
| Inclusions | | |
| Positive or negative | | |
| Artifacts | | |
| Artifact type | | |
| Counts | | |
| Depth of artifacts | | |
| Reason for termination | | |
| Vegetation | | |
| | | Location |

d. Please clarify what a "negative" shovel test pit means. Negative for historical cultural material or negative for all cultural material?
e. The "shovel test" results for the beach magnetometer targets should be removed from the shovel test appendix C and added to Appendix F. Please ensure that the tabular data for the shipwreck target assessments are presented together under a single appendix (F) with the magnetometer tables.

FAA00052319



U.S. Department of Transportation
**Federal Aviation Administration**

Office of Commercial Space Transportation

800 Independence Ave., SW.
Washington, DC 20591

March 9, 2022

Chairman Juan Mancias
Carrizo/Comecrudo Tribe of Texas
1250 Roemer Lane, Unit C
Floresville, TX 78114
Submitted to: juanmancias@carrizocomecrudonation.com

**RE: Invitation to Consult under Section 106 of the National Historic Preservation Act for SpaceX Starship/Super Heavy Launch Operations at the SpaceX Boca Chica Launch Site in Cameron County, Texas**

Dear Chairman Juan Mancias:

The purpose of this letter is to formally invite the Carrizo/Comecrudo Tribe of Texas to consult with the FAA in accordance with 36 CFR § 800.2.c.5 during the ongoing Section 106 National Historic Preservation Act (NHPA) review process for the above-referenced project. FAA respects the ancestral ties of the Esto'k Gna, commonly referred to as the Carrizo/Comecrudo, to the immediate region of the Lower Rio Grande Valley. FAA understands the Carrizo/Comecrudo filed a Letter of Intent to Petition on 7/6/1998 with the Office of Federal Acknowledgment within the Office of the Assistant Secretary - Indian Affairs of the U.S. Department of the Interior (DOI). If and when the DOI grants the Carrizo/Comecrudo status as a federally recognized tribe, that status will formally enable the tribe to have a consultative role in the Section 106 process of the National Historic Preservation Act, specifically explained at 36 CFR § 800.2.c.2.

Space Exploration Technologies Corporation (SpaceX) is proposing to operate Starship/Super Heavy launch vehicles at its Boca Chica Launch Site in Cameron County, Texas (see Attachment 1, Project Description and Attachment 2, SpaceX Boca Chica Figures). To operate Starship/Super Heavy at the Boca Chica Launch Site, SpaceX must obtain an experimental permit or launch license from the FAA. Issuing an experimental permit or launch license is considered a major federal action under the National Environmental Policy Act (NEPA) of 1969 and requires an environmental review. The FAA is in the process of preparing a final environmental assessment to assess the potential environmental impacts of the proposed issuance of launch licenses and/or experimental permits to SpaceX that would allow SpaceX to launch the Starship/Super Heavy from the Boca Chica Launch Site. The issuance of permits and licenses is considered an undertaking under Section 106 of the NHPA (36 CFR 800.16(y)). The FAA plans to coordinate the Section 106 process concurrent with the FAA's NEPA process.

The FAA has recognized that your Tribe has possible interests within the Area of Potential Effects (APE) for this undertaking. The FAA is inviting your Tribe to be a consulting party to the NHPA Section 106 review through the mechanism of a Programmatic Agreement currently being drafted by FAA. Please let us know if the Carrizo/Comecrudo Tribe of Texas attaches religious and cultural significance to historic properties that may be affected by the SpaceX Boca Chica Launch Site undertaking and if your Tribe

would like to consult with FAA further by participating in the Programmatic Agreement. It has come to FAA's attention that an Esto'k Gna village site lies within an area known as Garcia Pasture. For your awareness, Garcia Pasture is located outside of the archeological resources study area for the ground-disturbing activities of the project and would not be impacted by ground-disturbing activities or potential launch anomalies.

The Draft Programmatic Environmental Assessment (PEA) and other background materials and resources can be viewed at the FAA's website at https://www.faa.gov/space/stakeholder_engagement/spacex_starship/. For your reference, the APE is described in Section 3.7 and Appendix C within the Draft PEA.

If the Carrizo/Comecrudo Tribe of Texas intends to formally consult on the SpaceX Boca Chica Launch Site undertaking, please respond to Ms. Amy Hanson, FAA Office of Commercial Space Transportation, Environmental Protection Specialist, at Amy.Hanson@faa.gov or 202-243-7609. We respectfully request your response to this invitation no later than 30 days after receipt of this letter to ensure that your participation can be included in the ongoing Section 106 consultation process. If you are interested in being a consulting party under the Programmatic Agreement, please designate one representative and one alternate from your Tribe to receive correspondence and attend meetings.

If you have any comments or questions regarding the SpaceX Starship/Super Heavy undertaking, please contact Amy Hanson of my staff at 202-243-7609, or via email at Amy.Hanson@faa.gov.

We look forward to working with you.

Sincerely,

JAMES R REPCHECK
Digitally signed by JAMES R REPCHECK
Date: 2022.03.09 11:15:30 -05'00'

Randy Repcheck
Manager, Safety Authorization Division



Life's better outside.®

Commissioners

Arch "Beaver" Aplin, III
Chairman
Lake Jackson

Dick Scott
Vice-Chairman
Wimberley

James E. Abell
Kilgore

Oliver J. Bell
Cleveland

Paul L. Foster
El Paso

Anna B. Galo
Laredo

Jeffery D. Hildebrand
Houston

Robert L. "Bobby" Patton, Jr.
Fort Worth

Travis B. "Blake" Rowling
Dallas

Lee M. Bass
Chairman-Emeritus
Fort Worth

T. Dan Friedkin
Chairman-Emeritus
Houston

Carter P. Smith
Executive Director

May 11, 2022

Ms. Stacey M. Zee
Federal Aviation Administration Environmental Specialist
800 Independence Ace, SW
Washington, D.C. 20591

Re: Section 4(f) of the Department of Transportation Act Consultation, SpaceX Starship/Super Heavy Launch Operations, Boca Chica, TX

Dear Ms. Zee:

The Texas Parks and Wildlife Department (TPWD) is in receipt of your letter addressed to Mr. Ted Hollingsworth and dated April 27, 2022. The letter requests concurrence with the determination of the Federal Aviation Administration (FAA) that if, as a result of the FAA's proposed action of issuing future permits or licenses to SpaceX for Starship/Super Heavy launch operations, an anomaly occurs that involves debris and debris-response activities within TPWD-owned lands, such an event would result in a *temporary occupancy* of the park, but the impacts would be *de minimis*.

As of the date of this letter, staff from both TPWD and Texas A&M University-Corpus Christi are working together on a research study as called for in the Memorandum of Agreement (MOA) between TPWD and SpaceX, in order to fulfill the requirement for mitigation of impacts to TPWD-owned lands that have occurred under FAA permits and licenses to-date. SpaceX has been kept apprised of progress on the scoping of this project. In the context of this MOA, TPWD concurs with the specific *de minimis* determination predicated on inclusion of the following special conditions in any permit or license involving testing or launching of rockets that might potentially result in debris and/or response activities impacting TPWD-owned lands.

1. Strict compliance with all terms and conditions of the Memorandum of Agreement executed September 2, 2021, between TPWD and SpaceX.
2. Completion and maintenance of bollard-and-cable traffic control fencing along State Highway 4 demarcating the boundaries of TPWD lands. SpaceX at its sole cost will survey the Highway 4 boundary and will leave two or three gaps in the western portion of the fence only as necessary to provide reasonable access to privately owned inholdings at access points recorded in the real property records of Cameron County. Signage will be placed at each gap with contact information for legitimate landowners to gain access to their property.

4200 SMITH SCHOOL ROAD
AUSTIN, TEXAS 78744-3291
512.389.4800
www.tpwd.texas.gov

To manage and conserve the natural and cultural resources of Texas and to provide hunting, fishing and outdoor recreation opportunities for the use and enjoyment of present and future generations.

FAA00052626



**United States Department of the Interior**
FISH AND WILDLIFE SERVICE
**South Texas Refuge Complex**
**Lower Rio Grande Valley National Wildlife Refuge**
3325 Green Jay Road
Alamo, Texas 78516
(956) 784-7500

June 2, 2022

Michelle S. Murray
Federal Aviation Administration (FAA)
800 Independence Ave.,
SW Washington, D.C. 20591

Dear Ms. Murray:

This responds to your letter dated April 27, 2022, regarding the FAA's finding that the SpaceX proposed Starship/Super Heavy launch operations project will not result in a constructive use of the Lower Rio Grande Valley National Wildlife Refuge (Refuge) and finding *de minimis* temporary physical occupancies of the Refuge under Section 4(f) of the U.S. Department of Transportation Act of 1966.

The U.S. Fish and Wildlife Service concurs in the FAA's Section 4(f) findings provided that mitigation measures already incorporated in the Programmatic Environmental Analysis, along with the measures described below, and the terms of the Texas Parks and Wildlife Department's conditioned concurrence and Memorandum of Agreement with SpaceX, dated September 2, 2021, are included in project plans, final environmental documents, and terms of SpaceX's permits and licenses.

Measures that must be incorporated include predictive scheduling that accommodates weekend and holiday public use of the Refuge and SpaceX compliance with Fish and Wildlife Service regulations, including acquisition of requisite permits for any activities on Refuge lands.

Specifically, in order to ensure public access to the Refuge, project activities must comply with the following:

1. No SH4 road closures on the following holidays: Memorial Day, Labor Day, July 4th, MLK Day, Presidents' Day, Texas Independence Day, Cesar Chavez Day, Emancipation Day in Texas (also referred to as Juneteenth), Veteran's Day, Good Friday, Easter, Father's Day, Mother's Day, Thanksgiving Day, Christmas Day, New Year's Day ("Holidays").

a. Where any of the Holidays falls annually on a Monday or Friday, no Weekend Closures, as defined in paragraph 4, shall be permitted.
b. Where any of the Holidays does not fall annually on a Monday or Friday, but falls on a Monday or Friday in a particular year, no Weekend Closures, as defined in paragraph 4, shall be permitted for that year.
c. For Thanksgiving, no closures shall be permitted from Thanksgiving Day through the Sunday immediately following Thanksgiving.

2. Except as provided in paragraph 4, from Memorial Day to Labor Day (the times of greatest visitor beach uses and enjoyment), no Weekend Closures from Friday at 6:00