

**U.S. DEPARTMENT OF TRANSPORTATION**
FEDERAL AVIATION ADMINISTRATION

**ORDER**
**1050.1F**

Effective Date:
7/16/15

**SUBJ:**    Environmental Impacts:  Policies and Procedures

This Order serves as the Federal Aviation Administration's (FAA) policy and procedures for compliance with the National Environmental Policy Act (NEPA) and implementing regulations issued by the Council on Environmental Quality (CEQ).  The provisions of this Order and the CEQ Regulations apply to actions directly undertaken by the FAA and to actions undertaken by a non-Federal entity where the FAA has authority to condition a permit, license, or other approval.  The requirements in this Order apply to, but are not limited to, the following actions: grants, loans, contracts, leases, construction and installation actions, procedural actions, research activities, rulemaking and regulatory actions, certifications, licensing, permits, plans submitted to the FAA by state and local agencies for approval, and legislation proposed by the FAA.  The Order was last revised in 2006.

This Order updates FAA Order 1050.1E to: 1) provide a clear, concise, and up-to-date discussion of the FAA's requirements for implementing NEPA; and 2) clarify requirements in order to facilitate timely, effective, and efficient environmental reviews of FAA actions, including NextGen improvements.

Rich Swayze
Assistant Administrator
Policy, International Affairs & Environment

---

FAA00057631

SPX-0003130

## TABLE OF CONTENTS

*Page*

**Chapter 1: General** ................................................................................................. 1-1

1-1. Purpose of This Order ................................................................................... 1-1

1-2. Audience ....................................................................................................... 1-1

1-3. Where to Find This Order ............................................................................. 1-1

1-4. How to Cite This Order ................................................................................ 1-1

1-5. Cancellation .................................................................................................. 1-1

1-6. Related Publications ..................................................................................... 1-1

1-7. The National Environmental Policy Act and the Council on Environmental Quality
      Regulations ................................................................................................. 1-1

1-8. Federal Aviation Administration Policy ....................................................... 1-2

1-9. Applicability and Scope ............................................................................... 1-3

1-10. Explanation of Policy Changes ................................................................... 1-3

   1-10.1. Appendix A ........................................................................................... 1-3

   1-10.2. Re-organization of Order ...................................................................... 1-3

   1-10.3. Federal Aviation Administration Policy ............................................... 1-4

   1-10.4. Roles of Lines of Business/Staff Offices ............................................. 1-4

   1-10.5. Responsibilities ..................................................................................... 1-4

   1-10.6. Clarification of Policy that Applies to Environmental Assessments ...... 1-4

   1-10.7. Mitigation ............................................................................................. 1-4

   1-10.8. Environmental Management System ..................................................... 1-4

   1-10.9. Actions Normally Requiring an Environmental Assessment ................. 1-4

   1-10.10. Actions Normally Requiring an Environmental Impact Statement ....... 1-5

   1-10.11. Programmatic National Environmental Policy Act Documents and Tiering ........ 1-5

   1-10.12. NEPA Database.  Adds a statement that ............................................. 1-5

   1-10.13. Environmental Impact Categories ....................................................... 1-5

   1-10.14. Significance Determinations ............................................................... 1-5

   1-10.15. Extraordinary Circumstances .............................................................. 1-5

   1-10.16. Categorical Exclusion Documentation ................................................ 1-6

   1-10.17. Categorical Exclusion Public Notification .......................................... 1-6

   1-10.18. Categorical Exclusions ........................................................................ 1-6

   1-10.19. Environmental Assessment Format and Process .................................. 1-6

i

FAA00057632

SPX-0003131

## TABLE OF CONTENTS (continued)

*Page*

1-10.20. Use of Errata Sheets ............................................................................................... 1-6

1-10.21. Privacy ................................................................................................................... 1-6

1-10.22. Termination of Environmental Impact Statement Preparation .............................. 1-6

1-10.23. Adoption of Other Agencies' National Environmental Policy Act Documents .... 1-6

1-10.24. Actions within the United States with Potential Transboundary Impacts ............. 1-6

1-10.25. Environmental Effects of Major Federal Aviation Administration Actions
Abroad ................................................................................................................... 1-7

1-10.26. Emergency Actions ................................................................................................ 1-7

1-10.27. Written Re-evaluations .......................................................................................... 1-7

1-10.28. Review and Approval ............................................................................................ 1-7

1-10.29. Authority to Change This Order ............................................................................ 1-7

1-10.30. Explanatory Guidance ........................................................................................... 1-7

1-10.31. Definitions ............................................................................................................. 1-7

1-11. -1-50.  Reserved ........................................................................................................... 1-7

**Chapter 2: National Environmental Policy Act Planning and Integration ............2-1**

2-1. Applicability of National Environmental Policy Act Procedures to Federal Aviation
Administration Actions ................................................................................................. 2-1

2-1.1. Federal Aviation Administration Actions Subject to National Environmental
Policy Act Review .................................................................................................. 2-1

2-1.2. Federal Aviation Administration Actions Not Subject to National Environmental
Policy Act Review .................................................................................................. 2-1

2-2. Responsibilities ................................................................................................................ 2-2

2-2.1. Responsibilities of the Federal Aviation Administration ........................................... 2-2

2-2.2. Responsibilities of Applicants ................................................................................... 2-6

2-2.3. Responsibilities of Contractors ................................................................................. 2-7

2-3. Planning and Integration ................................................................................................. 2-7

2-3.1. Early Planning ........................................................................................................... 2-7

2-3.2. Initial Environmental Review .................................................................................... 2-7

2-3.3. Environmental Management System Approach ......................................................... 2-9

2-3.4. Reducing Paperwork .................................................................................................. 2-9

2-3.5. Reducing Delay .......................................................................................................... 2-10

FAA00057633

SPX-0003132

## TABLE OF CONTENTS (continued)

*Page*

2-3.6. Mitigation ................................................................................................ 2-10

2-4. Coordination .............................................................................................. 2-10

2-4.1. Internal Federal Aviation Administration Coordination ............................ 2-10

2-4.2. Lead and Cooperating Agencies ............................................................. 2-11

2-4.3. Intergovernmental and Interagency Coordination .................................... 2-11

2-4.4. Tribal Consultation. ............................................................................... 2-12

2-5. Public Involvement ..................................................................................... 2-12

2-5.1. Timing and Extent of Public Involvement. ............................................. 2-12

2-5.2. Federal Aviation Administration Requirements for Public Involvement ............... 2-12

2-5.3. Public Meetings, Workshops, and Hearings. ........................................... 2-14

2-6. Plain Language .......................................................................................... 2-14

2-7. Limitations on Actions Involving Real Property Prior to Completing National
Environmental Policy Act Review .................................................................... 2-15

2-8. -2-50. Reserved .......................................................................................... 2-15

**Chapter 3: Levels of National Environmental Policy Act Review .......................... 3-1**

3-1. Three Levels of National Environmental Policy Act Review .......................... 3-1

3-1.1. Categorically Excluded Actions .............................................................. 3-1

3-1.2. Actions Normally Requiring an Environmental Assessment ...................... 3-1

3-1.3. Actions Normally Requiring an Environmental Impact Statement ............ 3-3

3-2. Programmatic National Environmental Policy Act Documents and Tiering ............... 3-3

3-3. FAA NEPA Database. ................................................................................. 3-4

3-4. -3-50. Reserved .......................................................................................... 3-4

**Chapter 4: Impact Categories, Significance, and Mitigation ................................. 4-1**

4-1. Environmental Impact Categories ................................................................ 4-1

4-2. Consideration of Impacts. ........................................................................... 4-1

4-3. Significance and Significance Thresholds ..................................................... 4-3

4-3.1. General .................................................................................................. 4-3

4-3.2. Context and Intensity ............................................................................. 4-3

4-3.3. Significance Thresholds .......................................................................... 4-3

4-4. Mitigation ................................................................................................. 4-14

FAA00057634

SPX-0003133

## TABLE OF CONTENTS (continued)

*Page*

4-5. -4-50.  Reserved.............................................................................................4-15

**Chapter 5: Categorical Exclusions .........................................................5-1**

5-1. General..............................................................................................5-1

5-2. Extraordinary Circumstances ............................................................5-1

5-3. Categorical Exclusion Documentation ..............................................5-3

5-4. Public Notification.............................................................................5-4

5-5. Other Environmental Requirements ..................................................5-4

5-6. The Federal Aviation Administration's Categorical Exclusions......................5-4

5-6.1. Categorical Exclusions for Administrative/General Actions.......................5-5

5-6.2. Categorical Exclusions for Certification Actions ......................................5-7

5-6.3. Categorical Exclusions for Equipment and Instrumentation .....................5-8

5-6.4. Categorical Exclusions for Facility Siting, Construction, and Maintenance ..........5-10

5-6.5. Categorical Exclusions for Procedural Actions .......................................5-14

5-6.6. Categorical Exclusions for Regulatory Actions.......................................5-16

5-7. -5-50.  Reserved..............................................................................5-17

**Chapter 6: Environmental Assessments and Findings of No Significant Impact.......................................................................................6-1**

6-1. General..............................................................................................6-1

6-2. Preparing Environmental Assessments. ...........................................6-2

6-2.1. Environmental Assessment Format ........................................................6-2

6-2.2. Environmental Assessment Process........................................................6-3

6-2.3. Mitigation Considerations for Environmental Assessments.....................6-6

6-3. Finding of No Significant Impact ......................................................6-7

6-4. Decision Documents for Findings of No Significant Impact ...........................6-9

6-5. -6-50.  Reserved...............................................................................6-9

**Chapter 7: Environmental Impact Statements and Records of Decision.............7-1**

7-1. Preparation of Environmental Impact Statements ............................7-1

7-1.1. Environmental Impact Statement Format ...............................................7-2

7-1.2. Environmental Impact Statement Process...............................................7-6

7-1.3. Decision Not to Prepare an Environmental Impact Statement ................7-12

FAA00057635

SPX-0003134

## TABLE OF CONTENTS (continued)

*Page*

7-2. Environmental Impact Statement Record of Decision ..................................................... 7-12

   7-2.1. Record of Decision Process ...................................................................... 7-12

   7-2.2. Record of Decision Content....................................................................... 7-13

   7-2.3. Environmental Commitments .................................................................... 7-14

7-3. -7-50.  Reserved.................................................................................................... 7-14

**Chapter 8: Federal Aviation Administration Actions Subject to Special Procedures ...................................................................................................... 8-1**

8-1. Commenting on Other Agencies' National Environmental Policy Act Documents ........ 8-1

8-2. Adoption of Other Agencies' National Environmental Policy Act Documents.............. 8-2

8-3. Rulemaking................................................................................................................ 8-3

8-4. Legislative Proposals ............................................................................................... 8-4

8-5. Actions within the United States with Potential Transboundary Impacts ..................... 8-4

8-6. Effects of Major Federal Aviation Administration Actions Abroad .............................. 8-4

8-7. Emergency Actions.................................................................................................. 8-7

8-8. Council on Environmental Quality Referrals .............................................................. 8-8

8-9. -8-50. Reserved....................................................................................................... 8-8

**Chapter 9: Time Limits, Written Re-Evaluations, and Supplemental National Environmental Policy Act Documents....................................................................... 9-1**

9-1. Time Limits ............................................................................................................... 9-1

9-2. Written Re-evaluations ............................................................................................. 9-1

9-3. Supplemental Environmental Assessments and Environmental Impact Statements........ 9-3

9-4. -9-50.  Reserved........................................................................................................ 9-3

**Chapter 10: Review and Approval of National Environmental Policy Act Documents........................................................................................................... 10-1**

10-1. General.................................................................................................................. 10-1

10-2. Review and Approval of Environmental Assessments, Findings of No Significant Impact, and Findings of No Significant Impact/Records of Decision ........................... 10-1

10-3. Review and Approval of Draft Environmental Impact Statements.............................. 10-2

10-4. Review and Approval of Final Environmental Impact Statements ............................. 10-2

10-5. Review and Approval of Supplemental Environmental Impact Statements. .............. 10-3

10-6. Review and Approval of Records of Decision ........................................................ 10-3

FAA00057636

SPX-0003135

## TABLE OF CONTENTS (continued)

*Page*

10-7. -10-50.  Reserved...........................................................................................................10-4

**Chapter 11: Administrative Information .................................................................11-1**

11-1. Distribution.................................................................................................................11-1

11-2. Authority to Change This Order..................................................................................11-1

11-3. Process for Changing This Order ................................................................................11-1

11-4. Explanatory Guidance .................................................................................................11-2

11-5. Definitions ..................................................................................................................11-2

11-6. -11-50.  Reserved........................................................................................................11-4

**Appendix A.  Acronym List .......................................................................................... 1**

**Appendix B.  Federal Aviation Administration Requirements for Assessing Impacts Related to Noise and Noise-Compatible Land Use and Section 4(f) of the Department of Transportation Act (49 U.S.C. § 303) ................................................. 1**

**Appendix C. Federal Aviation Administration Guidance on Third Party Contracting for Environmental Impact Statement Preparation.................................. 1**

**Appendix D. National Environmental Policy Act Process Flowcharts .................... 1**

FAA00057637

SPX-0003136

# Chapter 1:  General

**1-1.  Purpose of This Order.**  This Order provides the Federal Aviation Administration's (FAA) policies and procedures to ensure agency compliance with the National Environmental Policy Act (NEPA) (42 United States Code [U.S.C.] §§ 4321-4335), the requirements set forth in the Council on Environmental Quality (CEQ), Title 40, Code of Federal Regulations (CFR), parts 1500-1508, *Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act* (CEQ Regulations), and Department of Transportation (DOT) Order 5610.1C, *Procedures for Considering Environmental Impacts*.  The CEQ Regulations establish procedures for complying with NEPA.  In accordance with 40 CFR § 1507.3 of the CEQ Regulations, this Order contains the FAA's implementing procedures, which supplement those regulations.

**1-2.  Audience.**  All FAA employees who approve, manage, or otherwise participate in actions requiring FAA compliance with NEPA, the CEQ Regulations, or DOT Order 5610.1C, and all FAA contractors and applicants involved in such actions.

**1-3.  Where to Find This Order.**  This Order can be found on the FAA's website at: https://employees.faa.gov/tools_resources/orders_notices/.  This Order is available to the public at http://www.faa.gov/regulations_policies/orders_notices/ by clicking on the topic "Environment."

**1-4.  How to Cite This Order.**  This Order should be cited as FAA Order 1050.1F.  The body of the Order is organized by paragraphs.  If citing a particular paragraph, the format "FAA Order 1050.1F, Paragraph ___" should be used.  For example, if referencing the definition for Noise Sensitive Area, the proper citation is "FAA Order 1050.1F, Paragraph 11-5.b.(10)."

**1-5.  Cancellation**.  FAA Order 1050.1E, *Environmental Impacts:  Policies and Procedures,* dated June 8, 2004 (as updated by Change 1, dated March 20, 2006), is cancelled.

**1-6.  Related Publications.**  The latest version of referenced publications should be used in conjunction with this order.  The FAA Order 1050.1F Desk Reference (1050.1F Desk Reference) provides details on current guidance and updated technical information.  This includes information about permits, licenses, consultations, and other forms of approval or review; up-to-date details on technical information such as FAA-approved tools for analyzing noise and air emissions; overviews of special purpose laws and requirements; and specific responsibilities and guidance for gathering data, assessing impacts, consulting other agencies, and involving the public.  The 1050.1F Desk Reference can be found on the FAA's website at: http://www.faa.gov/regulations_policies/orders_notices/ by clicking on the topic, "Environment."

**1-7.  The National Environmental Policy Act and the Council on Environmental Quality Regulations.**  NEPA and the CEQ Regulations establish a broad national policy to protect and enhance the quality of the human environment, and require Federal agencies to develop programs and measures to meet national environmental goals.  Section 102(2) of NEPA provides specific direction to Federal agencies, sometimes called "action-forcing" provisions (see 40 CFR §§ 1500.1(a), 1500.3, and 1507, CEQ Regulations) on how to implement the goals of NEPA.  The major provisions include the requirement to use a systematic, interdisciplinary approach and develop implementing methods and procedures.  Section 102(2)(C) requires detailed analysis in the form of Environmental Impact Statements (EISs) for proposed major Federal actions

FAA00057638

SPX-0003137

significantly affecting the quality of the human environment. The CEQ Regulations additionally provide for Environmental Assessments (EAs) to assist agencies in determining whether potential environmental impacts are significant and Categorical Exclusions (CATEXs), which are categories of actions that the FAA has determined, based on previous experience, do not have significant individual or cumulative impact on the quality of the human environment except in extraordinary circumstances. The presence of extraordinary circumstances would preclude the use of a CATEX and would merit additional review in an EA or EIS. In addition to NEPA and the CEQ Regulations, other laws, regulations, and Executive Orders address aspects of the environment and require compliance by Federal agencies. The CEQ Regulations direct Federal agencies to list all Federal permits, licenses, and other approvals that must be obtained in implementing the proposed action, and, to the fullest extent possible, integrate compliance with such requirements with the NEPA process.

This Order implements the mandate of NEPA, as defined and discussed in the CEQ Regulations, within the programs of the FAA. The Order is not a substitute for the CEQ Regulations; rather, it supplements the CEQ Regulations for FAA programs. All FAA Lines of Business and Staff Offices (LOB/SOs) must comply with the CEQ Regulations as further implemented and supplemented by this Order.

**1-8. Federal Aviation Administration Policy**. The FAA's primary mission is to provide the safest, most efficient aerospace system in the world. NEPA compliance and other environmental responsibilities are integral components of that mission. The FAA is responsible for complying with the procedures and policies of NEPA and other environmental laws, regulations, and orders applicable to FAA actions. The FAA decision-making process must consider and disclose the potential impacts of a proposed action and its alternatives on the quality of the human environment. In meeting its NEPA obligations, the FAA should seek to achieve the policy objectives of 40 CFR § 1500.2 to the fullest extent possible. The FAA must integrate NEPA and other environmental reviews and consultations into agency planning processes as early as possible. Funding requirements must be justified and requested in accordance with existing budgetary and fiscal policies. Each FAA LOB/SO is responsible for seeking sufficient funds through the budget process to implement the provisions of this Order.

The Next Generation Air Transportation System (NextGen) involves operational and infrastructure improvements that require the FAA's environmental review in accordance with NEPA. The FAA's goal is to ensure timely, effective, and efficient environmental reviews of proposed NextGen improvements, consistent with Executive Order 13604, *Improving Performance of Federal Permitting and Review of Infrastructure Projects*, 77 *Federal Register* 18887 (March 28, 2012). The FAA is using an environmental management system (EMS) approach to improve the integration of environmental performance into the planning, decision-making, and operation of NextGen in furtherance of the goal of environmental protection that allows sustained aviation growth.

It is FAA policy to ensure the integrity of environmental reviews while emphasizing and implementing instructions in 40 CFR §§ 1500.4 and 1500.5 of the CEQ Regulations to reduce excessive paperwork and environmental process delays. The FAA implements an expedited and coordinated environmental review process for aviation safety projects, aviation security projects, and airport capacity projects at congested airports in accordance with Title III of Vision 100-Century of Aviation Reauthorization Act, also cited as the Aviation Streamlining Approval Process Act of 2003, 49 U.S.C. §§ 47171-47175. The FAA has also established expedited

FAA00057639

SPX-0003138

environmental review procedures and processes for area navigation (RNAV) and required navigation performance (RNP) that offer efficiency improvements. In addition, Section 213 of the FAA Modernization and Reform Act of 2012, Public Law 112-95, established two legislative CATEXs that are included in this Order.

For projects subject to expedited environmental review, the FAA must comply with this Order, maintain the integrity of the environmental process, and respect the environmental responsibilities of other agencies. Expedited environmental reviews will be used to give review priority to certain projects, manage timelines during the review process, improve and expedite interagency coordination, reduce undue delays, and emphasize accountability. Certain airport capacity projects, aviation safety projects, and aviation security projects may be subject to special designation and treatment in accordance with provisions of the Aviation Streamlining Approval Process Act. Airport infrastructure projects may also be selected for review under Executive Order 13274, *Environmental Stewardship and Transportation Infrastructure Project Reviews*, 67 *Federal Register* 59449 (September 23, 2002). In addition, Executive Order 13604, *Improving Performance of Federal Permitting and Review of Infrastructure Projects*, 77 *Federal Register* 18887 (March 28, 2012) calls for the execution of Federal permitting and review processes, including environmental review processes, with maximum efficiency and effectiveness. *The Implementation Plan for the Presidential Memorandum on Modernizing Infrastructure Permitting* provides strategies for agencies to improve the Federal government's role in permitting and review processes, including improved coordination and project planning, and increased use of programmatic approaches and information technology tools. It is the responsibility of the FAA office that has the primary responsibility for a proposed action and that is leading the environmental review to ensure that applicable special review provisions are applied effectively.

**1-9. Applicability and Scope**. The provisions of this Order and the CEQ Regulations apply to actions directly undertaken by the FAA and to actions undertaken by a non-Federal entity where the FAA has authority to condition a permit, license or approval. The requirements in this Order apply, but are not limited, to the following actions: grants, loans, contracts, leases, construction and installation actions, procedural actions, research activities, rulemaking and regulatory actions, certifications, licensing, permits, plans submitted to the FAA by state or local agencies for approval, and legislation proposed by the FAA. Exceptions to these requirements are listed in Paragraph 2-1.2. The procedures in this Order apply to the extent practicable to ongoing activities and environmental documents begun before the effective date. However, procedures contained in this Order should not apply to ongoing environmental reviews where substantial revisions to ongoing environmental documents would be required. This Order does not apply to decisions made and final environmental documents issued prior to the effective date of this Order.

**1-10. Explanation of Policy Changes**. This paragraph briefly highlights significant changes from FAA Order 1050.1E.

**1-10.1. Appendix A.** Moves the information in Appendix A of FAA Order 1050.1E, *Analysis of Environmental Impact Categories*, to the 1050.1F Desk Reference, which can be easily updated, as necessary.

**1-10.2. Re-organization of Order.** Restructures the Order to make environmental compliance more efficient and effective, and to focus the discussion, reduce redundancies,

FAA00057640

SPX-0003139

and provide FAA NEPA practitioners with a more user-friendly and clear document. Revises the numbering and structure to more closely follow FAA Order 1320.1, *FAA Directives Management*. Includes systematic editorial changes to ensure consistency with the FAA's plain language guidelines as established in FAA Order 1000.36, *FAA Writing Standards.*

**1-10.3. Federal Aviation Administration Policy.** Expands and updates the FAA's policy statement to include NextGen. The updated policy also includes an EMS approach to improve the integration of environmental performance into the planning, decision-making, and operation of NextGen in furtherance of the goal of environmental protection that allows sustained aviation growth. Finally, the policy reflects legislative provisions in FAA reauthorization to expedite the environmental review process for certain air traffic procedures and project delivery improvement.

**1-10.4. Roles of Lines of Business/Staff Offices.** Updates the titles and roles of FAA LOB/SOs to reflect changes to the FAA's organizational structure and initiatives since publication of FAA Order 1050.1E (see Paragraph 2-2.1.b).

**1-10.5. Responsibilities.** Clarifies the FAA's responsibilities (see Paragraph 2-2.1) and the role of applicants and contractors in the FAA's NEPA process (see Paragraphs 2-2.2 and 2-2.3). Includes a section on the state's role in the State Block Grant Program (see Paragraph 2-2.1e).

**1-10.6. Clarification of Policy that Applies to Environmental Assessments.** Explains in more detail than FAA Order 1050.1E Paragraphs 405 d, e, and f the differences between EAs and EISs and the requirement to consider connected actions in EAs.

**1-10.7. Mitigation.** Reorganizes and clarifies provisions relating to mitigation (see Paragraphs 2-3.6, 4-4, 6-2.3, and 7-1.1.h). Updates the FAA's policy regarding mitigation to be consistent with CEQ's Guidance on *Appropriate use of Mitigation and Monitoring and Clarifying the Appropriate use of Mitigated Findings of No Significant Impact*, 76 *Federal Register* 3843 (January 21, 2011). Clarifies which projects warrant environmental monitoring and the type and extent of monitoring.

**1-10.8. Environmental Management System.** Adds a discussion of EMS to highlight the importance of EMS and its application to all FAA programs, including NextGen (see Paragraph 2-3.3).

**1-10.9. Actions Normally Requiring an Environmental Assessment.** Adds new and revises existing actions normally requiring an EA to more clearly and accurately describe those FAA actions which normally require preparation of an EA. The new actions normally requiring an EA (see Paragraphs 3-1.2.b(13) and (16)) are:

(13)   Establishment or modification of an Instrument Flight Rules Military Training Route (IR MTRs).

(16)   Formal and informal runway use programs that may significantly increase noise over noise sensitive areas.

Actions normally requiring an EA that were substantively amended are included in Paragraphs 3-1.2.b(2), (10)-(12), and (14)-(15). FAA Order 1050.1E Paragraph 401o has been omitted from FAA Order 1050.1F.

FAA00057641

SPX-0003140

**1-10.10.  Actions Normally Requiring an Environmental Impact Statement.**  Modifies and re-organizes the text in Paragraph 501 of FAA Order 1050.1E and adds specific examples of actions normally requiring an EIS (see Paragraph 3-1.3.b).

**1-10.11.  Programmatic National Environmental Policy Act Documents and Tiering.**  Combines the discussion of programmatic NEPA documents and tiering and revises the text to align with CEQ Regulations and guidance (see Paragraph 3-2).

**1-10.12.  NEPA Database.**  Adds a statement that FAA LOB/SOs should whenever possible, use the FAA NEPA Database to track projects and make final documents available to others in the FAA (see Paragraph 3-3).

**1-10.13.  Environmental Impact Categories.**  Adds a new Paragraph 4-1 to discuss the FAA's Environmental Impact Categories, previously discussed in Appendix A of FAA Order 1050.1E and now found in the accompanying 1050.1F Desk Reference.  Adds Climate to the list of impact categories that must be considered in FAA NEPA documents.  Combines Noise and Noise-Compatible Land Use as it relates to noise compatibility into a single impact category and creates a separate category for non-noise land use issues.  Renames Fish, Wildlife, and Plants as Biological Resources and renames Light Emissions and Visual Impacts as Visual Effects.  Renames Water Quality as Water Resources, which includes Wetlands, Floodplains, Surface Waters, Groundwater, and Wild and Scenic Rivers under the new category.  Removes construction impacts and secondary impacts as separate impact categories; instead, they are to be analyzed within each applicable environmental impact category.

**1-10.14.  Significance Determinations.**  Provides an exhibit in Paragraph 4-3.3 that summarizes the FAA's Significance Thresholds formerly described under individual environmental impact categories in Appendix A of FAA Order 1050.1E.  This table also includes Factors to Consider in making determinations of significant impacts.  Adds "Contaminate a public drinking water supply such that public health may be adversely affected" as a threshold under Surface Waters, and "Contaminate an aquifer used for public water supply such that public health may be adversely affected" as a new threshold under Groundwater (see Exhibit 4-1, Significance Determination for FAA Actions).  The FAA has also added clarifying language to the Air Quality significance threshold to include instances where the increase in frequency or severity of an existing violation would be significant.

**1-10.15.  Extraordinary Circumstances.**  Adds national marine sanctuaries and wilderness areas to the list of resources that must be considered in evaluating actions for extraordinary circumstances that would preclude the use of a CATEX for a proposed action.  Makes other text revisions, including modifying:  (1) the description of wild and scenic rivers to be consistent with CEQ's August 10, 1980, memorandum, *Interagency Consultation to Avoid or Mitigate Adverse Effects on Rivers in the Nationwide Inventory*; and (2) the description of actions likely to cause environmental contamination by hazardous materials, or likely to disturb an existing hazardous material contamination site such that new environmental contamination risks are created.

FAA00057642

SPX-0003141

**1-10.16. Categorical Exclusion Documentation.** Updates the FAA's policy regarding CATEX documentation to be consistent with CEQ's Guidance on *Establishing, Applying, and Revising Categorical Exclusions under the National Environmental Policy Act*, 75 *Federal Register* 75628 (December 6, 2010) (see Paragraph 5-3). These updates include: clarifying when and what level of documentation is needed in the application of a CATEX and explaining what to include in CATEX documentation. Adds discussion of decision documents in connection with CATEXs (known as CATEX/Records of Decision [RODs]), which are not commonly used but may be advisable in unique circumstances.

**1-10.17. Categorical Exclusion Public Notification.** Adds discussion of public notification of CATEX use, consistent with CEQ's Guidance on *Establishing, Applying, and Revising Categorical Exclusions under the National Environmental Policy Act*, 75 *Federal Register* 75628 (December 6, 2010) (see Paragraph 5-4).

**1-10.18. Categorical Exclusions.** Adds new CATEXs and revises existing CATEXs to accommodate actions that do not significantly affect the environment. The new CATEXs are in Paragraphs 5-6.3i, 5-6.4bb, 5-6.4cc, 5-6.4dd, 5-6.4ee, 5-6.4ff, and 5-6.5f. In addition, two legislative CATEXs, consistent with Section 213(c) of the FAA Modernization and Reform Act of 2012, are added (see Paragraphs 5-6.5q and 5-6.5r). CATEXs that are substantively amended are in Paragraphs 5-6.4e (formerly 310e), 5-6.4i (formerly 310i), 5-6.4u (formerly 310u), and 5-6.5l (formerly 311l).

**1-10.19. Environmental Assessment Format and Process.** Revises the discussion of EA format and process to make the process more efficient and effective, explain each element, and clarify that an EA does not have to be as detailed as an EIS (see Paragraph 6-2). Adds cross-references to the EIS section, and makes additional minor revisions.

**1-10.20. Use of Errata Sheets**. The Order clarifies when errata sheets may be used in lieu of a final EA (see Paragraph 6-2.2.i) and final EIS (see Paragraph 7-1.2.f).

**1-10.21. Privacy.** Requires language in notices soliciting public comment on draft EAs and draft EISs stating that personal information provided by commenters (e.g., addresses, phone numbers, and email addresses) may be made publicly available (see Paragraphs 6-2.2.g and 7-1.2.d(1)(a)).

**1-10.22. Termination of Environmental Impact Statement Preparation.** Adds a new paragraph to explain the conditions under which the FAA may choose to terminate preparation of an EIS and clarifies what steps the FAA must take when this situation occurs (see Paragraph 7-1.3).

**1-10.23. Adoption of Other Agencies' National Environmental Policy Act Documents.** Clarifies and expands on requirements relating to FAA adoption of other agencies' NEPA documents (see Paragraph 8-2). Adds requirements for legal sufficiency review of adopted documents to clarify when this review is required (see Paragraph 8-2.c). Also adds a discussion of recirculation requirements to highlight that in some circumstances adopted documents must be recirculated (see Paragraph 8-2.e).

**1-10.24. Actions within the United States with Potential Transboundary Impacts.** Adds discussion of FAA policy with respect to consideration of transboundary impacts resulting from FAA actions (see Paragraph 8-5).

FAA00057643

SPX-0003142

**1-10.25.  Environmental Effects of Major Federal Aviation Administration Actions Abroad.**  Updates the discussion of international actions to include how to coordinate communication with foreign governments within the FAA to clarify the correct practice. (See Paragraph 8-6).

**1-10.26.  Emergency Actions.**  Clarifies an alternative process to consider environmental impacts before taking emergency actions necessary to protect the lives and safety of the public.  These alternative arrangements are limited to actions necessary to control the immediate impacts of an emergency.  Adds text to provide for emergency procedures when a CATEX or an EA would be the appropriate level of NEPA review (see Paragraph 8-7).  FAA Order 1050.1E only addressed emergency procedures for EISs.

**1-10.27.  Written Re-evaluations.**  Modifies and clarifies requirements relating to written re-evaluations.  Adds a statement to explain that written re-evaluations may be prepared even when they are not required.  Adds discussion of decision documents in connection with written re-evaluations (i.e., a "WR/ROD").  (See Paragraph 9-2)

**1-10.28.  Review and Approval.**  Consolidates and clarifies provisions relating to review, approval, and signature authority for FAA NEPA documents (see Chapter 10).

**1-10.29.  Authority to Change This Order.**  Revises text in Paragraph 11-2 to clarify the authority of various parties and to be consistent with other FAA Orders.

**1-10.30.  Explanatory Guidance.**  Clarifies provisions relating to explanatory guidance (see Paragraph 11-4).

**1-10.31.  Definitions.**  Adds definitions of "extraordinary circumstances," "NEPA lead," "special purpose laws and requirements," and "traditional cultural properties."  Deletes definition of "Environmental Due Diligence Audit" because this term is no longer used in FAA Order 1050.1F.  Revises the definitions of "environmental studies," "approving official," and "decisionmaker" to reflect current practice.  Revises the definition of "human environment" to align with the CEQ Regulations.  Changes "launch facility" to "commercial space launch site" to be consistent with 14 CFR part 420.  Revises the definition of "noise sensitive area" to include a reference to Table 1 of 14 CFR part 150 rather than Appendix A of FAA Order 1050.1E, to provide context in light of the removal of Appendix A from this Order.  "Major federal action" was added to the list of definitions as a cross reference to the CEQ Regulations.  (See Paragraph 11-5.)

**1-11.  -1-50.  Reserved.**

FAA00057644

SPX-0003143

## Chapter 2: National Environmental Policy Act Planning and Integration

**2-1. Applicability of National Environmental Policy Act Procedures to Federal Aviation Administration Actions.**

**2-1.1. Federal Aviation Administration Actions Subject to National Environmental Policy Act Review.** Proposed actions and decisions by FAA officials are subject to NEPA review, except as provided in Paragraph 2-1.2 below. Specific FAA actions subject to NEPA review can include, but are not limited to, grants, loans, contracts, leases, construction and installation actions, procedural actions, research activities, rulemaking and regulatory actions, certifications, licensing, permits, plans submitted to the FAA that require the FAA's approval, and legislation proposed by the FAA. Although emergency actions are subject to NEPA review, special procedures may apply (see Paragraph 8-7). The FAA will not approve a proposed action until any required NEPA review has been completed.

**2-1.2. Federal Aviation Administration Actions Not Subject to National Environmental Policy Act Review.**

a. General. Actions are not subject to NEPA review if applicable Federal law expressly prohibits or makes compliance with NEPA impossible.

b. Advisory Actions. Some Federal actions are of an advisory nature. Actions of this type are not considered major Federal actions under NEPA, and NEPA review is therefore not required. If it is known or anticipated that some subsequent Federal action would be subject to NEPA, the FAA must so indicate in the advisory action. Examples of advisory actions include:

(1) Determinations under 14 CFR part 77, *Safe, Efficient Use, and Preservation of the Navigable Airspace*;

(2) Determinations under 14 CFR part 157, *Notice of Construction, Alteration, Activation, and Deactivation of Airports*, which applies to civil or joint-use airports, helipads, and heliports; and

(3) Designation of alert areas and warning areas under FAA Order 7400.2, *Procedures for Handling Airspace Matters*.

c. Judicial or Administrative Civil Enforcement Actions. These actions do not require NEPA analysis (i.e., 14 CFR part 13, *Investigative and Enforcement Procedures*, and other administrative actions pursuant to the following: 14 CFR part 14, *Rules Implementing the Equal Access to Justice Act of 1980*; 14 CFR part 15, *Administrative Claims Under Federal Tort Claims Act*; 14 CFR part 16, *Rules of Practice for Federally-Assisted Airport Enforcement Proceedings*; and 14 CFR part 17, *Procedures for Protests and Contracts Disputes*).

d. Administrative Actions. NEPA review is not required for the promulgation of this Order or similar orders issued by the FAA Administrator or organizational elements as authorized by the FAA Administrator that provide supplemental instructions for agency compliance with NEPA procedures. NEPA review is also not required for administrative actions associated with a NEPA review (e.g., contractor selection).

FAA00057645

SPX-0003144

**2-2. Responsibilities.**

**2-2.1. Responsibilities of the Federal Aviation Administration.**

a.  General FAA Responsibilities:

(1)  Ensuring compliance with NEPA, the CEQ Regulations, this Order, and other environmental requirements;

(2)  Requesting appropriate environmental information and documents (including EAs, where appropriate) from applicants and providing guidance to applicants on providing such information;

(3)  Independently and objectively evaluating applicant-submitted information and EAs and taking responsibility for content and adequacy of any such information or documents used by the FAA for compliance with NEPA or other environmental requirements;

(4)  Selecting contractors to prepare environmental documents, guiding their work, and taking responsibility for contractor-prepared documents used by the FAA for compliance with NEPA or other environmental requirements; and

(5)  Making CATEX determinations, approving EAs and EISs, and issuing Finding of No Significant Impact (FONSIs) and RODs.

b.  Roles of Lines of Business/Staff Offices (LOB/SOs).  The Chief Operating Officer and Assistant or Associate Administrators within the various FAA organizations must ensure their respective offices, regions, service areas, and centers comply with this Order. Responsibilities may be delegated in accordance with appropriate FAA orders, such as FAA Order 1100.154, *Delegations of Authority*.

(1)  *The FAA Administrator* is responsible for managing the FAA with the assistance of the *Deputy Administrator*.  Ultimately, the FAA Administrator is responsible for all NEPA compliance within the FAA.

(2)  Each *FAA Associate and Assistant Administrator, the Chief Counsel, and the Chief Operating Officer* reports to the FAA Administrator and has specific responsibilities for complying with the NEPA process within their LOB/SO.  These responsibilities are outlined below.

(a)  *The Assistant Administrator for Civil Rights (ACR)* is responsible for determining whether projects receiving Federal financial assistance from the FAA comply with the appropriate civil rights laws, regulations, and Executive Orders, including those requirements under Executive Order 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*, 59 *Federal Register* 7629 (February 16, 1994); the accompanying Presidential Memorandum, *Environmental Justice for Minority Populations* (February 11, 1994) (available at http://www.epa.gov/environmentaljustice/resources/policy/index.html) concerning environmental justice; the *Memorandum of Understanding on Environmental Justice and Executive Order 12898* (August 4, 2011), the revised *Department of Transportation Environmental Justice Strategy,* 77 *Federal Register* 18879 (March 28, 2012), and DOT Order 5610.2(a), 77 *Federal Register*

FAA00057646

SPX-0003145

27534 (May 10, 2012), on environmental justice in the context of Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000d-2000d-7.

(b) *The Office of the Chief Counsel (AGC)* consists of legal staff at FAA Headquarters, FAA regions, and the Mike Monroney Aeronautical Center and William J. Hughes Technical Center (collectively referred to as "Center"). AGC is responsible for providing legal advice on NEPA compliance and legal requirements. AGC reviews actions that involve determinations under Section 4(f), 49 U.S.C. § 303; counsels and assists headquarters staff and regional offices in accomplishing FAA environmental review; and advises on the legal sufficiency of environmental documents. Regional Counsel and Center Counsel are responsible for providing legal counsel, assistance, and review in the conduct of regional actions and environmental activities and advising on the legal sufficiency of regional and Center environmental documents.

(c) *The Assistant Administrator for Human Resource Management (AHR)* is responsible for supporting the training needs associated with this order by leveraging the resources in the Office of Talent Development (AHD). AHD will work collaboratively with the Office of Environment and Energy (AEE) to promote the training and education needed to reinforce the National Environmental Policy Act (NEPA). AHD will work in partnership with the Mike Monroney Aeronautical Center (MMAC) and the LOB/SO learning professionals to deliver designated content.

(d) *The Assistant Administrator for NextGen (ANG)* provides leadership in planning and developing the Next Generation Air Transportation System (NextGen) and coordinates NextGen initiatives, programs, and policy development across the various FAA LOB/SOs.

(e) *The Assistant Administrator for Policy, International Affairs, and Environment (APL)* is responsible for providing policy guidance to the agency on implementing a wide range of environmental laws and regulations. Within APL, AEE provides policy oversight on FAA environmental actions; issues regulations for aircraft noise and emissions under 14 CFR parts 34 and 36; provides assistance in developing guidelines and procedures for FAA program areas; serves as the designated FAA NEPA liaison in accordance with 40 CFR § 1507.2, CEQ Regulations, "to be responsible for overall review of agency NEPA compliance" and Federal Preservation Officer in accordance with Section 110 of the National Historic Preservation Act, 54 U.S.C. §§ 306101(a) and 306102[1]; interprets policies established in this Order; provides assistance with computerized environmental tools, such as the Aviation Environmental Design Tool (AEDT) for aircraft noise and air quality; and provides advice to and supplements NEPA training programs in cooperation with AHT and other applicable organizational elements.

---

[1] The National Historic Preservation Act was previously codified at 16 U.S.C. § 470 et seq.

FAA00057647

SPX-0003146

(f) *The Assistant Administrator for Office of Finance and Management (AFN)* is responsible for considering the environmental impacts of actions arising out of Acquisition Management Operations.

(g) *The Associate Administrator for Airports (ARP)* is responsible for considering the environmental impacts of proposed FAA approvals of Airport Layout Plan (ALP) modifications (regardless of funding sources), FAA-funded airport actions, and ensuring compliance with NEPA requirements and other Federal environmental laws, regulations, and orders. Airports personnel must comply with the NEPA requirements in this Order, supplemented by the current version of FAA Order 5050.4, *National Environmental Policy Act (NEPA) Implementing Instructions for Airport Projects*. ARP's Office of Airport Planning and Programming, APP-400, provides guidance to Regional and District Airports personnel, airport sponsors, and environmental consultants concerning Federal, Departmental, and agency environmental policy regarding airport development actions.

(h) *The Assistant Administrator for Security and Hazardous Materials (ASH)* is responsible for considering the environmental impacts for all actions arising out of ASH initiatives that require compliance with NEPA and Federal environmental laws, regulations, and orders. ASH initiatives involve ensuring and promoting aviation safety in support of national security and the national aerospace system.

(i) *The Associate Administrator for Commercial Space Transportation (AST)* is responsible for considering the environmental impacts for all actions arising out of AST initiatives that require compliance with NEPA and other Federal environmental laws, regulations, and orders. Such initiatives include issuing licenses for the operation of commercial launch sites and licenses and experimental permits for the launch and reentry of commercial space launch vehicles.

(j) *The Chief Operating Officer for Air Traffic Organization (ATO)* is responsible for evaluating the environmental impacts for all actions arising out of ATO responsibilities that require compliance with NEPA and all other relevant Federal environmental laws, regulations, and orders, including changes in airspace and air traffic control procedures and FAA-funded construction and operation of National Airspace System (NAS) facilities.

(k) *The Associate Administrator for Aviation Safety (AVS)* is responsible for considering the environmental impacts of all actions arising out of AVS initiatives that require compliance with NEPA and other Federal environmental laws, regulations, and orders. AVS initiatives include the certification, production approval, and continued airworthiness of aircraft; and certification of pilots, mechanics, and others in safety-related positions.

c. Actions Undertaken by the FAA. The FAA may prepare environmental documentation in-house (i.e., using agency personnel and resources) or use a contractor in accordance with Paragraph 2-2.1.f below. For projects directly undertaken by the FAA and requiring an EA or EIS, the EA or EIS must be prepared at the feasibility analysis (go/no-go) stage and may be supplemented at a later stage.

FAA00057648

SPX-0003147

d.  FAA Approval of Applicant Actions.  When an applicant requests FAA approval for an action, the FAA may request that the applicant submit information and analysis to support the required NEPA review.  The FAA must independently evaluate any information or analysis submitted by an applicant before using it to support a NEPA review.  The FAA may also request that an applicant prepare an EA.  If an applicant prepares an EA, the FAA must ensure that the applicant complies with all requirements set forth in Paragraph 2-2.2, Responsibilities of Applicants.  The FAA must advise and assist the applicant during preparation of the EA, and must independently evaluate and take responsibility for the EA to ensure that: (1) the applicant's potential conflict of interest does not impair the objectivity of the document; and (2) the EA meets the requirements of this Order.

The FAA may ask the applicant to correct any deficiencies in information, analysis, or an EA submitted by the applicant if the FAA is not satisfied with the original submittal or subsequent revisions.  In such cases, the responsible FAA official will defer completion of the environmental review pending satisfactory correction of all identified deficiencies.  Based on final review of an applicant submitted EA, the FAA determines whether to issue a FONSI or prepare an EIS.  See Paragraph 6-2.1.a for a discussion on when an EA becomes a Federal document.

When an EIS is required, the FAA must prepare the EIS or select the contractor that will assist the FAA in preparing the EIS (see 40 CFR § 1506.5(c), CEQ Regulations).  If "third-party contracting" is used to prepare an EIS, the FAA must select and supervise the contractor (see Paragraph 2-2.3).  Third-party contracting refers to the preparation of an EIS by a contractor selected by the FAA and under contract to, and paid for by, an applicant (see Appendix C).[2]  The FAA must take responsibility for contractor-prepared documents used by the FAA and determine that they are in compliance with this Order.

e.  State Block Grant Program Responsibilities for FAA Connected Actions.  The State Block Grant Program participating states must ensure that they coordinate and obtain approval from the appropriate LOB/SO for any proposed action that involves aspects that are not authorized under the State Block Grant Program.  Please see FAA Order 5050.4 for more information.

f.  Use of Contractors.

(1)  General.  When contractors assist the FAA in preparing EAs or EISs, or when contractors directly assist applicants in preparing EAs, the FAA must ensure that the contractor complies with the provisions of this Order.  When an EIS is required, the FAA must select the contractor that will assist the FAA in preparing the EIS (see 40 CFR § 1506.5(c), CEQ Regulations).  If "third-party contracting" is used to prepare an EIS, the FAA must select and supervise the contractor (see Paragraph 2-2.3).

---

[2]  The FAA may use third-party contracting for an EA when there is a high potential that the action may require an EIS.

FAA00057649

SPX-0003148

(2)  Conflict of Interest.  In some circumstances, the FAA may choose to contract consulting services to prepare environmental documents for its direct Federal actions. Under FAA Acquisition Management System policy, procurements may not be awarded to contractors who have unacceptable actual or potential organizational conflicts of interest.  Organizational conflicts of interest result when, because of activities or relationships with other persons, a person is unable or potentially unable to render impartial assistance to the agency, or the person's objectivity in performing the contract work is or might be impaired, or the person has an unfair competitive advantage (the term "person" includes any legal entity including a partnership, corporation, limited liability company, or association).  For example, a contractor selected to prepare an EA or EIS would have a potential conflict of interest if also selected to conduct final design work when the final design work is part of the construction contract.  "Final design work" means a bid-ready, site-specific design package containing drawings, design data handbook, and construction cost estimate. The FAA may select a contractor to prepare an EA or EIS and preliminary design work provided the design work is conceptual in nature.  "Preliminary design work" means design to local criteria based on a national facility design.  When an actual or potential conflict of interest is identified by either the contractor or the agency official, the agency official must consult with AGC or Regional Counsel to determine whether there is a conflict and, if so, whether the conflict can be avoided, mitigated, or waived at the FAA's discretion.  Such determinations are made on a case-by-case basis (see the FAA's Procurement Toolbox Guidance, Section T3.1.7 Organizational Conflict of Interest, dated April 4, 2006).

(3)  EIS Disclosure Statement.  Before a contractor enters into a contract for preparation of an EIS, the FAA must obtain a "disclosure statement" from the NEPA contractor and subcontractors verifying that they have no financial interest in the outcome of the action (see 40 CFR § 1506.5(c), CEQ Regulations).

**2-2.2. Responsibilities of Applicants.**  When an applicant seeks FAA approval for an action that does not require an EIS, the FAA may request that the applicant provide the required environmental analysis to the FAA or the FAA may hire a contractor to provide the analysis. Applicants and contractors may provide data and analysis to assist the FAA in determining whether a CATEX applies (including whether an extraordinary circumstance exists); however, applicants and contractors may not determine the applicability of CATEXs or approve CATEX documentation.  Applicants may prepare EAs, but may not prepare EISs. However, applicants may fund preparation of EISs through third-party contracting.  In such cases, the FAA must select the contractor and supervise the contractor's duties and responsibilities.  For applications to the FAA requiring an EA or EIS, preparation of the EA or EIS must begin immediately after the FAA receives the application or proposal.  If required by the responsible FAA official, applicants must provide sufficient environmental information or analysis to ensure the environmental analysis meets the requirements of this Order.  In a third-party contracting situation, the role of the applicant is limited to providing planning information, environmental studies (including studies to obtain incomplete information that the FAA finds to be required under the standards of 40 CFR § 1502.22, CEQ Regulations), other FAA-requested information, and financing for the EIS consultant's costs. For the FAA's role in applicant actions, see Paragraph 2-2.1.d.

FAA00057650

SPX-0003149

**2-2.3. Responsibilities of Contractors.** Contracted consulting services may be used to prepare environmental documents, technical reports, and other information. Contractors may also prepare background or supplemental material or otherwise assist in preparing draft or final environmental documents for the FAA. When a contractor assists the FAA in preparing an EA or EIS, the contractor must ensure that the EA or EIS meets the requirements of the CEQ Regulations, this Order, other FAA requirements applicable to contractors, and all other appropriate Federal, state, tribal, and local laws. The contractor for an EIS must also execute a disclosure statement specifying that it has no financial or other interest in the outcome of the action (see 40 CFR § 1506.5(c), CEQ Regulations). The disclosure statement must be prepared by the FAA or, where appropriate, a cooperating agency (e.g., where the contractor prepares a portion of an EIS for a cooperating agency under 40 CFR § 1501.6(b), CEQ Regulations).

**2-3. Planning and Integration.**

**2-3.1. Early Planning.** Environmental issues should be identified and considered early in a proposed action's planning process to ensure efficient, timely, and effective environmental review. Initiating the appropriate level of environmental review at the earliest possible time facilitates the NEPA process. Preparation for any applicable permit application and other review process requirements should be part of the planning process to ensure that necessary information is collected and provided to the permitting or reviewing agencies in a timely manner. The FAA or applicant, as applicable, should identify known environmental impact categories that the proposed action and the alternatives could affect, including specially protected resources. These tasks should be completed at the earliest possible time during project planning to ensure full consideration of all environmental impact categories and facilitate the FAA's NEPA process. Sufficient planning and project justification should be available to support the environmental review.

If the FAA is considering a request from an applicant, and the FAA is aware that the applicant is about to take an action within the agency's jurisdiction that would have an adverse environmental impact or limit the choice of reasonable alternatives, the responsible FAA official will promptly notify the applicant that the FAA will take appropriate action to ensure that the objectives and procedures of NEPA are achieved (see number 11 in CEQ's *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 *Federal Register* 18026 (March 23, 1981)). However, this does not preclude development by applicants of plans or designs or performance of other work necessary to support an application for Federal, state, or local permits or assistance.

**2-3.2. Initial Environmental Review.**

a. Review Proposed Action. The responsible FAA official should initially review whether the proposed action:

(1) Is within the scope of a CATEX;

(2) Has been addressed in an existing NEPA document, such as a broad system, program, or regional assessment (see Paragraph 3-2) or a NEPA document prepared by another Federal agency (see Paragraph 8-2);

(3) Could significantly affect the quality of the human environment with respect to noise; land; air; water; wildlife (e.g., threatened and endangered species, migratory

FAA00057651

SPX-0003150

birds); energy supply and natural resources; or cultural, historic, or archeological resources;

(4)  Would be located in wetlands; floodplains; coastal zones; prime or important farmlands; habitat of federally listed endangered, threatened, or other protected species; wild and scenic river areas; areas protected under Section 4(f), 49 U.S.C. § 303,[3] or Section 6(f) of the Land and Water Conservation Fund Act (16 U.S.C. §§ 460l-8(f)(3)); or in or adjacent to minority or low income populations (Executive Order 12898 and DOT Order 5610.2(a)); or

(5)  Would be highly controversial on environmental grounds (see Paragraph 5-2.b.(10)).

b.  Scope of Proposed Action.  To determine the scope of an EA or EIS, the responsible FAA official must consider:

(1)  Connected actions.  Connected actions are closely related actions that:  (a) automatically trigger other actions; (b) cannot or will not proceed unless other actions are taken previously or simultaneously; or (c) are interdependent parts of a larger action and depend on the larger action for their justification (see 40 CFR § 1508.25(a)(1), CEQ Regulations).  Connected actions and other proposed actions or parts of proposed actions that are related to each other closely enough to be, in effect, a single course of action must be evaluated in the same EA or EIS (see 40 CFR §§ 1502.4(a) and 1508.25(a)(1), CEQ Regulations).  A proposed action cannot be segmented by breaking it down into small component parts to attempt to reduce impacts (see 40 CFR § 1508.27(b)(7), CEQ Regulations).

(2)  Cumulative actions.  Cumulative actions, when viewed with other proposed actions, have cumulatively significant impacts.  Cumulative actions should be discussed in the same EIS (see 40 CFR § 1508.25(a)(2), CEQ Regulations). (See Paragraph 4-2.d(3) for a discussion of cumulative impacts).

(3)  Similar actions.  Similar actions, such as those with common timing or geography, should be considered in the same environmental document when the best way to assess their combined impacts or reasonable alternatives to such actions is in a single document (see 40 CFR §§ 1502.4(b) through (c) and 1508.25(a)(3), CEQ Regulations).

c.  Special Purpose Laws and Requirements.  In addition to NEPA compliance, the FAA must comply with all other applicable special purpose laws and requirements.  The FAA and applicants must involve other agencies during the NEPA process and meet the public involvement needs specified in all applicable special purpose laws and requirements.

d.  Permits and Consultations.  Environmental permits, licenses, and other forms of approval, concurrence, consultation, or cooperation may be required from other agencies. Pertinent permit application and other review processes must be included in the planning process to ensure that the necessary supporting information is collected and provided to

---

[3] 49 U.S.C. § 303 was originally enacted as Section 4(f) of the Department of Transportation Act of 1966 and is still commonly referred to as "Section 4(f)".

FAA00057652

SPX-0003151

the permitting or reviewing agencies in a timely manner, especially if the applicable special purpose laws and requirements specify timeframes for these processes.

**2-3.3. Environmental Management System Approach.** EMSs provide a proactive systematic approach for managing and improving environmental performance and stewardship. Executive Order 13423, *Strengthening Federal Environmental, Energy, and Transportation Management,* 72 *Federal Register* 3919 (January 26, 2007), requires Federal agencies to use EMS as the primary management approach for addressing environmental aspects of agency operations and activities, including environmental aspects of transportation functions. The most common framework for an EMS is a plan-do-check-act process, with the goal of continual improvement in environmental performance. A strategic EMS approach provides the foundation for integrating environmental objectives into NextGen and other FAA initiatives in furtherance of the goal of environmental protection that allows sustained aviation growth.

The EMS approach may be used to support the early identification and consideration of potential environmental impacts and concerns in a proposed action's planning phase. EMS data collection, tracking, and analysis may also be useful in the preparation of NEPA documentation, including providing input to the affected environment, assessment of potential impacts, and consideration of appropriate mitigation measures. An EMS approach may also be used for tracking and monitoring mitigation commitments. An EMS approach can produce projects that are better tailored to site-specific circumstances, can benefit from expedited reviews due to reduced impacts (and therefore less NEPA documentation), and experience less public controversy.

CEQ has recognized the potential benefits of aligning EMS with NEPA in the guide *Aligning National Environmental Policy Act Processes with Environmental Management Systems – A Guide for NEPA and EMS Practitioner* (April 2007). The CEQ guide includes examples of ways that an EMS can complement the NEPA process and support the various phases of NEPA review.

**2-3.4. Reducing Paperwork.** The CEQ Regulations (see 40 CFR § 1500.4, CEQ Regulations) encourage the reduction of excessive paperwork by, among other things:

a. Reducing the length of EISs;

b. Preparing analytic rather than encyclopedic EISs;

c. Discussing only briefly issues other than significant issues;

d. Writing EISs in plain language;

e. Following a clear format for EISs;

f. Emphasizing portions of EISs that are useful to decisionmakers and the public and reducing emphasis on background material;

g. Using the scoping process to identify significant environmental issues deserving of study and de-emphasize insignificant issues, narrowing the scope of the EIS accordingly;

h. Incorporating material by reference;

i. Integrating NEPA requirements with other environmental review and consultation requirements; and

FAA00057653

SPX-0003152

j. Eliminating duplication with (1) state and local procedures by providing for joint document preparation, and (2) with other Federal procedures by providing for joint preparation, incorporation by reference, or adoption of appropriate environmental documents prepared by another agency.

The FAA will apply these concepts to all NEPA reviews (analyses and documents).

**2-3.5. Reducing Delay**. The CEQ Regulations (see 40 CFR § 1500.5) encourage the reduction of delay while allowing for public involvement and interagency and intergovernmental consultation by, among other things:

a. Integrating the NEPA process into early planning;

b. Emphasizing interagency cooperation before an EIS is prepared;

c. Ensuring the swift and fair resolution of lead agency disputes;

d. Using the scoping process for early identification of what are and what are not the real issues;

e. Integrating NEPA requirements with other environmental review and consultation requirements; and

f. Eliminating duplication with state and local procedures and with other Federal procedures.

The FAA will apply these concepts to all NEPA reviews (analyses and documents).

**2-3.6. Mitigation.**

a. Incorporation into Project Design.  Throughout the environmental analysis process, the responsible FAA official is encouraged to incorporate mitigation into project design (e.g., by modifying the project) to avoid and minimize environmental impacts. Appropriate mitigation incorporated into project design can also have the advantage of reducing the level of required environmental review from an EIS to an EA and FONSI, or avoiding extraordinary circumstances that would preclude application of a CATEX. Mitigation incorporated into project design should be consistent with the project's purpose and need and must be clearly described in the appropriate alternatives.  For projects involving an applicant, the FAA will coordinate proposed mitigation with the applicant for purposes of ascertaining the feasibility of the proposed mitigation and alternative mitigations.  For further information on mitigation of project impacts see Paragraphs 4-4, 6-2.3, and 7-1.1.h.

b. Expertise.  When identifying mitigation measures for specific environmental impact categories, the responsible FAA official must coordinate with subject matter experts that have expert knowledge, training, and experience related to the resource(s) potentially impacted by the proposed action.

**2-4. Coordination.**

**2-4.1. Internal Federal Aviation Administration Coordination.**  The FAA's internal review process is a means of coordinating NEPA reviews among appropriate management levels and across LOB/SOs.  Internal review ensures effective coordination to (1) address the concerns of other offices in addition to the NEPA lead; (2) to include relevant actions of

FAA00057654

SPX-0003153

other offices within the purview of the NEPA review; (3) to confirm any requirements or commitments of other offices; and (4) to provide for appropriate legal review. Additional information on the internal review and approval of NEPA documents is provided in Chapter 10 of this Order.

**2-4.2. Lead and Cooperating Agencies.** The CEQ Regulations describe (1) the role of the lead agency in preparing EISs when more than one agency is involved in a proposed action; (2) the relationship of the lead agency with cooperating agencies; and (3) the role of the lead agency in the scoping process and in setting time limits (see 40 CFR §§ 1501.5-1501.8, CEQ Regulations). The regulations also allow for joint lead agencies (see 40 CFR § 1501.6(b)).

a. Lead Agency. When the FAA acts as the lead agency, the FAA has the primary responsibility for preparation of an EA or EIS (see 40 CFR §1501.5, CEQ Regulations and CEQ Memorandum, *Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act* (January 30, 2002)). If more than one FAA office is involved in the same action, the approving FAA officials of the FAA offices involved in the action should determine the lead FAA office responsible for the NEPA process. The other FAA offices should assist the FAA NEPA lead as that office deems necessary to prepare the document.

b. Cooperating Agency Invitation. The FAA NEPA lead should invite Federal, state, tribal, and local agencies with special expertise or jurisdiction by law to be cooperating agencies (see 40 CFR §§ 1501.6 and 1508.5, CEQ Regulations, and CEQ Memorandum, *Designation of Non-Federal Agencies to be Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act* (July 28, 1999)).

c. Role as a Cooperating Agency. If the FAA is acting as a cooperating agency, the responsible FAA official should ensure that the FAA's views are adequately reflected in the environmental document (see Paragraph 8-1.b). This should be facilitated by actively communicating with the lead agency early and often in the NEPA process.

**2-4.3. Intergovernmental and Interagency Coordination.** The responsible FAA official, when appropriate, must consult affected Federal and state agencies, tribes, and local units of government early in the NEPA process. Early coordination should include coordinating with operators of facilities (e.g., airport sponsors) affected by proposed FAA actions. Applicants may also engage in intergovernmental and interagency coordination, subject to protocols for government-to-government consultation with tribes. Consultation comments on the potential environmental impacts of the proposed action must be considered in determining whether the proposed action requires an EA or EIS, and can aid in the preparation of the EA or EIS. See Paragraphs 2-3.2.c and 2-3.2.d and the 1050.1F Desk Reference regarding requirements for coordination and consultation that may apply under special purpose laws and requirements.

In accordance with Executive Order 12372, *Intergovernmental Review of Federal Programs,* 47 *Federal Register* 30959 (July 16, 1982) (as supplemented by Executive Order 13132, *Federalism,* 64 *Federal Register* 43255 (August 10, 1999), and 49 CFR part 17, *Intergovernmental Review of Department of Transportation Programs and Activities*), the responsible FAA official must provide the opportunity for state and local officials to review and comment on Federal actions for Federal assistance or actions affecting them. A few states have established a point of contact, often within the governor's office, to coordinate

FAA00057655

SPX-0003154

comments by state agencies. Otherwise, the responsible FAA official should contact appropriate state agencies directly.

**2-4.4. Tribal Consultation.** Government-to-government consultation must be conducted in accordance with the requirements of FAA Order 1210.20, *American Indian and Alaska Native Tribal Consultation Policy and Procedures*. In accordance with Executive Order 13175, *Consultation and Coordination with Indian Tribal Governments*, 65 *Federal Register* 67249 (November 9, 2000), the Federal government continues to work with tribes on a government-to-government basis to address issues concerning tribal self-government, trust resources, and tribal treaty and other rights. For regulations, legislative comments, or proposed legislation, and other policy statements or actions that have substantial direct effects on Federally Recognized Tribes, the appropriate FAA official should initiate consultation with the recognized leader of the Tribe and seek advice on how to proceed based on the tribal culture and the tribal organization as discussed in FAA Order 1210.20. Sources of information for addresses to contact tribes include, for example, State Historic Preservation Offices, the Bureau of Indian Affairs, the FAA's Federal Historic Preservation Officer, and the FAA's National or Regional Tribal Consultation Officials. (See also Paragraph 2-4.3, Intergovernmental and Interagency Coordination).

**2-5. Public Involvement.** NEPA and the CEQ Regulations, in describing the public involvement process, require Federal agencies to: consider environmental information in their decision-making process; solicit appropriate information from the public; fully assess and disclose potential environmental impacts resulting from the proposed action and alternatives; and provide the public with this information and allow it to comment on these findings. Public involvement is also required when the FAA revises its rules, or proposes substantial changes to its NEPA implementing instructions. Strategic planning is needed to successfully integrate public involvement and NEPA. Failure to complete public participation can delay the process and, therefore, the proposed action.

**2-5.1. Timing and Extent of Public Involvement.** The FAA, or when applicable, the applicant, must provide pertinent information to the affected communities and agencies and consider their comments at the earliest appropriate time and early in the process of preparing an EIS. The extent of early coordination will depend on the complexity, sensitivity, degree of Federal involvement, and anticipated environmental impacts. Comments received during early coordination/scoping and during public review of a draft NEPA document on the potential impacts of the proposed action and any reasonable alternatives identified must be considered. Additional information regarding public involvement is discussed in Paragraphs 6-2.2 for EAs and 7-1.2 for EISs. The length of public comment periods is discussed in Paragraphs 6-2.2.g and 7-1.2.d.

**2-5.2. Federal Aviation Administration Requirements for Public Involvement.** The FAA's *Community Involvement Policy Statement* (April 17, 1995) affirms the FAA's commitment to make complete, open, and effective public participation an essential part of its actions, programs, and decisions.

a. Special Purpose Laws and Requirements. The FAA and applicant must involve, and are encouraged to work cooperatively with, other agencies during the NEPA process and meet the public involvement needs specified in all the special purpose laws and requirements applicable to a proposed FAA action. The FAA and applicant should use

FAA00057656

SPX-0003155

available information technologies to inform the public about the progress of environmental reviews, the availability of draft environmental documents for review and the duration of public comment periods, where applicable, and the availability of final environmental documents. NEPA also serves as a framework statute for environmental compliance and the required public notice and comment period should, whenever possible, be completed in alignment with the public notice and participation requirements specified in other applicable special purpose laws and requirements, e.g., Section 106 of the National Historic Preservation Act, 54 U.S.C. § 36108, 36 CFR part 800, *Protection of Historic Properties*, Executive Order 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations,* 59 *Federal Register* 7629 (February 16, 1994) and DOT Order 5610.2(a), *Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*.

b. Environmental Justice. The responsible FAA official must, to the extent practicable, make every effort to notify potentially affected minority populations and low-income populations of proposed actions and their impacts. The FAA should make direct contact with minority and low-income community groups, organizations, and/or leaders in communities affected by the activity. If direct contact is not practicable, the responsible FAA official must take steps to provide the public, including members of minority populations and low-income populations, access to public information concerning the human health or environmental impacts of the proposed action, including information that will address the concerns of minority and low income populations regarding the health and environmental impacts of the proposed action. The responsible FAA official should notify the public at the earliest stages of project planning. The FAA will provide public involvement opportunities and consider the results thereof, including soliciting input from affected minority and low-income populations on the proposed action and any alternatives. The FAA can hold public hearings, meetings, or workshops on NEPA documents to involve the public in the process. Provisions should be made to ensure that non-English speaking populations receive proper notification of the proposed action and any public hearings, meetings or workshops that are held. (See Executive Order 12898 and DOT Order 5610.2(a)).

c. Other Agency Public Involvement Requirements. When another Federal agency disposing of land is the lead agency pursuant to NEPA, the FAA should defer to the public involvement requirements of the agency having jurisdiction over those lands when those requirements do not curtail the FAA requirements.

d. Rulemaking. When the FAA prepares a draft EIS for a rulemaking activity that could cause significant environmental impacts, the responsible FAA official should consult with the Office of Rulemaking (ARM-1) and AGC to coordinate public involvement.

e. Classified Information. When dealing with classified information, the responsible FAA official must consult FAA Order 1600.2, *Safeguarding Classified National Security Information*.

FAA00057657

SPX-0003156

**2-5.3. Public Meetings, Workshops, and Hearings.**

a. Holding Public Meetings, Workshops, and Hearings. The FAA should hold public meetings, workshops, or hearings, when appropriate. Such events can provide timely opportunities to discover potential controversial issues. Some factors that are helpful in deciding if a hearing, workshop, or meeting is appropriate include:

(1) The proposed action's magnitude in terms of environmental impact, environmental controversy, cost, and/or extent of the affected geographical area;

(2) The degree of interest that Federal, state, tribal, or local authorities or the public exhibit; and

(3) The complexity of issues.

The CEQ Regulations also contain criteria for determining whether to hold public meetings or hearings (see 40 CFR § 1506.6(c), CEQ Regulations).

b. Obtaining Comments on a Draft EIS or EA. If the FAA conducts a public meeting or hearing for the purpose of obtaining public comment on a draft EIS or EA, the FAA should ensure that the draft document is available for public review at least 30 days before the event occurs. A public hearing is a formal process that has a designated public hearing officer who presides over the meeting and a court reporter present to compile a transcript of all oral comments. Notice of a public meeting or hearing (including a scoping meeting, see Paragraph 7-1.2.c) should be published (e.g., in local, general circulation newspapers) at least 30 days prior to the event. Notice of actions having national implications must be published in the *Federal Register* and mailed to national organizations having an interest in the matter. The notice should provide the following:

(1) Date, time, place, and interval during which written comments will be accepted;

(2) Description of the proposed action;

(3) Location and availability of the NEPA document; and

(4) Name and contact information of the responsible FAA official.

c. Accommodations. When holding a public meeting or hearing, accommodations must be made for the needs of the elderly, disabled, non-English speaking, minority, and low-income populations in accordance with the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213, Executive Order 12898, and DOT Order 5610.2(a).

**2-6. Plain Language.** The CEQ Regulations at 40 CFR §§ 1500.4(d), 1502.1, 1502.2(c), and 1502.8, Paragraph 14 of DOT Order 5610.1C, and the Executive Orders on environmental justice and intergovernmental consultation encourage the availability of information to the public in a manner that will facilitate public involvement in decisions affecting the human environment. FAA NEPA documentation should be written in plain language and use appropriate graphics so that decisionmakers and the public can readily understand them. The FAA has plain language guidance in FAA Order 1000.36, *FAA Writing Standards*.

FAA00057658

SPX-0003157

7/16/15                                                                                          Order 1050.1F

**2-7. Limitations on Actions Involving Real Property Prior to Completing National Environmental Policy Act Review.**

a.  Restrictions on Acquisitions of Property.  The transfer of title or other interests in real property, including land, may occur prior to the completion of the environmental review for a proposed project unless the acquisition of land is inextricable to the proposed project or effectively limits the choice of reasonable alternatives.  The acquisition of land is inextricable to the proposed project where the acquisition is part of one continuous project leading inevitably to the proposed Federal action.

b.  Other Circumstances.  If the proposed action is not categorically excluded under this Order and acquisition of property is inextricable to the proposed action, no formal action to acquire the property, including any offer, may be taken prior to filing a final EIS or issuance of a FONSI, except for:

(1)  emergency situations (see Paragraph 8-7);

(2)  obtaining rights-of-way for purposes such as preparation for site testing, obtaining data, property surveys, etc.; and

(3)  those cases where the NEPA review process indicates that the proposed site warrants further engineering study.  In such cases, the FAA may obtain an option for future purchase of the property.  No transfer of title occurs as a result of the option, but the option ensures the availability of the property pending completion of the environmental review.  In this event, the environmental document should state that: the FAA has entered into an option and the reason for the option; that alternative sites are being considered; and that a decision whether to exercise the option will not be made until completion of the environmental review.

c.  FAA Review.  The FAA will review a proposed action by an applicant that has acquired land or constructed a facility for operation by the FAA, but without prior approval by the FAA, to determine whether the action was consistent with the policies of this Order and whether it has limited full and objective consideration of alternatives.

**2-8.  -2-50.  Reserved.**

FAA00057659

SPX-0003158

## Chapter 3: Levels of National Environmental Policy Act Review

**3-1. Three Levels of National Environmental Policy Act Review.** Once the FAA determines that NEPA applies to a proposed action, it needs to decide on the appropriate level of review. The three levels of NEPA review are Categorical Exclusion (CATEX), Environmental Assessment (EA), and Environmental Impact Statement (EIS). Each of the three levels of review is briefly described in the following paragraphs.

**3-1.1. Categorically Excluded Actions.** A CATEX refers to a category of actions that do not individually or cumulatively have a significant effect on the human environment, and for which, neither an EA nor an EIS is required. A CATEX is not an exemption or waiver of NEPA review; it is a level of NEPA review. If a proposed action falls within the scope of a CATEX (see Paragraph 5-6, The Federal Aviation Administration's Categorical Exclusions), and there are no extraordinary circumstances (see Paragraph 5-2, Extraordinary Circumstances), an EA or EIS is not required. The FAA may, at its discretion, decide to prepare an EA in order to assist agency planning and decision-making even if a proposed action fits within a CATEX and extraordinary circumstances do not exist, except for actions subject to categorical exclusion under Section 213 of the FAA Modernization and Reform Act (see Paragraphs 5-6.5.q and 5-6.5.r).

**3-1.2. Actions Normally Requiring an Environmental Assessment.** The purpose of an EA is to determine whether a proposed action has the potential to significantly affect the human environment (see Paragraph 4-3 for more information on determining significance). An EA is a concise public document that briefly provides sufficient evidence and analysis for determining whether to prepare an EIS or a FONSI. An EA may facilitate the preparation of an EIS, when one is necessary.

a. Environmental Assessments. An EA, at a minimum, must be prepared when the proposed action does not normally require an EIS (see Paragraph 3-1.3, Actions Normally Requiring an Environmental Impact Statement) and:

(1) does not fall within the scope of a CATEX (see Paragraph 5-6, The Federal Aviation Administration's Categorical Exclusions); or

(2) falls within the scope of a CATEX, but there are one or more extraordinary circumstances (see Paragraph 5-2, Extraordinary Circumstances).

b. Examples. The following FAA actions normally require an EA:

(1) Acquisition of land greater than three acres for, and the construction of, new office buildings and essentially similar FAA facilities.

(2) Issuance of certificates for new, amended, or supplemental aircraft types for which (a) environmental regulations have not been issued; or (b) new, amended, or supplemental engine types for which emission regulations have not been issued; or (c) where a NEPA analysis has not been prepared in connection with a regulatory action.

(3) Establishment of aircraft/avionics maintenance bases to be operated by the FAA.

(4) Authorization to exceed Mach 1 flight under 14 CFR § 91.817, *Civil Aircraft Sonic Boom.*

FAA00057660

SPX-0003159

(5)  Establishment of FAA housing, sanitation systems, fuel storage and distribution systems, and power source and distribution systems.

(6)  Establishment or relocation of facilities such as Air Route Traffic Control Centers (ARTCC), Airport Traffic Control Towers (ATCT), and off-airport Air Route Surveillance Radars (ARSR), Air Traffic Control Beacons (ATCB), and Next Generation Radar (NEXRAD).

(7)  Establishment, relocation, or construction of facilities used for communications (except as provided under Paragraph 5-6.3a) and navigation that are not on airport property.

(8)  Establishment or relocation of instrument landing systems (ILS).

(9)  Establishment or relocation of approach lighting systems (ALS) that are not on airport property.

(10)  Unconditional Airport Layout Plan (ALP) approval of, or Federal financial participation in, the following categories of airport actions:

(a)  Location of a new airport that would serve only general aviation;

(b)  Location of a new commercial service airport that would not be located in a Metropolitan Statistical Area (MSA);

(c)  A new runway at an existing airport that is not located in an MSA;

(d)  Runway strengthening having the potential to significantly increase off-airport noise impacts (see Exhibit 4-1);

(e)  Construction or relocation of entrance or service road connections to public roads that substantially reduce the level of service rating of such public roads below the acceptable level determined by the appropriate transportation agency (i.e., a highway agency); and

(f)  Land acquisition associated with any of the items in (10)(a)–(f).

(11)  Approval of operations specifications or amendments that may significantly change the character of the operational environment of an airport, including, but not limited to:

(a)  Approval of operations specifications authorizing an operator to use aircraft to provide scheduled passenger or cargo service at an airport that may cause significant impacts to noise, air quality, or other environmental impact categories (see Exhibit 4-1); or

(b)  Amendment of operations specifications authorizing an operator to serve an airport with different aircraft that may cause significant impacts to noise, air quality, or other environmental impact categories (see Exhibit 4-1).

(12)  New air traffic control procedures (e.g., instrument approach procedures, departure procedures, en route procedures) and modifications to currently approved procedures that routinely route aircraft over noise sensitive areas at less than 3,000 feet above ground level (AGL) (unless otherwise categorically excluded under Paragraphs (procedures category) 5-6.5q and 5-6.5r).

FAA00057661

SPX-0003160

(13)  Establishment or modification of an Instrument Flight Rules Military Training Route (IR MTR).

(14)  Special Use Airspace (SUA) (unless otherwise explicitly listed as an advisory action (see Paragraph 2-1.2.b, Advisory Actions) or categorically excluded (see Paragraph 5-6, The Federal Aviation Administration's Categorical Exclusions)).

(15)  Issuance of any of the following:

(a)  A commercial space launch site operator license for operation of a launch site at an existing facility on developed land where little to no infrastructure would be constructed (e.g., co-located with a Federal range or municipal airport); or

(b)  A commercial space launch license, reentry license, or experimental permit to operate a vehicle to/from an existing site.

(16)  Formal and informal runway use programs that may significantly increase noise over noise sensitive areas (see Exhibit 4-1).

### 3-1.3.  Actions Normally Requiring an Environmental Impact Statement.

a.  Environmental Impact Statements.  Under NEPA, the FAA must prepare an EIS for actions significantly affecting the quality of the human environment (see Chapter 4 for additional information regarding significance of impacts).  An EIS is a detailed written statement required under Section 102(2)(C) of NEPA when one or more environmental impacts would be significant and mitigation measures cannot reduce the impact(s) below significant levels.  Direct, indirect, and cumulative impacts must be considered when determining significance (see Paragraphs 4-2.d and 4-3).

b.  Examples.  The following are actions that normally require an EIS:

(1)  Unconditional ALP approval, or Federal financial participation in, the following categories of airport actions:

(a)  Location of a new commercial service airport in an MSA;

(b)  A new runway to accommodate air carrier aircraft at a commercial service airport in an MSA; and

(c)  Major runway extension.

(2)  Issuance of a commercial space launch site operator license, launch license, or experimental permit to support activities requiring the construction of a new commercial space launch site on undeveloped land.

### 3-2.  Programmatic National Environmental Policy Act Documents and Tiering.  A
programmatic review should assist decisionmakers and the public in understanding the environmental impact from proposed large scope federal actions and activities.  A programmatic EIS or EA may be prepared to cover (1) a broad group of related actions; or (2) a program, policy, plan, system, or national level proposal that may later lead to individual actions, requiring subsequent NEPA analysis.  A programmatic document is useful in analyzing the cumulative impacts of a group of related actions and when the proposed actions are adequately analyzed can serve as the NEPA review for those actions.  Programmatic documents may also be useful in

FAA00057662

SPX-0003161

providing the basis for subsequent project-level specific environmental review. A programmatic EIS or EA may contain a broader, less specific, analysis than is done for a specific proposed project. If a programmatic EIS or EA is prepared, the FAA will determine whether project-specific EISs or EAs are needed for individual actions. Broad Federal actions analyzed in a programmatic EIS or EA may be evaluated geographically, generically, or by stage of technological development (see 40 CFR § 1502.4(c), CEQ Regulations).

When a programmatic EIS or EA has been prepared, any subsequent EIS or EA for proposed projects within the scope of the programmatic document only needs to incorporate by reference (40 CFR 1502.21) by summarizing the issues discussed in the programmatic document, providing access to the programmatic EIS or EA, and concentrating the subsequent project specific EIS or EA on site-specific impacts not covered by the programmatic document. The project specific document must state how to obtain a copy of the earlier programmatic document (i.e., a webpage or contact person/office).

The use of a programmatic EIS or EA, and subsequent preparation of a project specific EIS or EA is referred to as "tiering" the environmental review (see 40 CFR §§ 1502.20 and 1508.28, CEQ Regulations). Tiering can also be used to sequence environmental documents from the early stage of a proposed action (e.g., need for the action and site selection) to a subsequent stage (e.g., proposed construction) to help focus on issues that are ripe for decision and exclude from consideration issues not yet ripe or already decided. When this approach is used, the FAA must ensure that the proposed action is not being segmented by describing the independent utility of each stage. Programmatic and tiered EISs and EAs are subject to the same preparation and processing requirements as other EISs and EAs.

**3-3. FAA NEPA Database.** FAA LOB/SOs will whenever possible, use the FAA NEPA Database to track projects and make final documents available to others in the FAA.

**3-4. -3-50. Reserved.**

FAA00057663

SPX-0003162

## Chapter 4: Impact Categories, Significance, and Mitigation

**4-1.  Environmental Impact Categories.**  Environmental impact categories that may be relevant to FAA actions are listed below.  These categories are alphabetized below for ease of reference, but are not intended to impose an alphabetical order on the FAA's NEPA documents. Detailed guidance on evaluating impacts in these categories is located in the 1050.1F Desk Reference.[4]  Construction and secondary (induced) impacts are addressed within the relevant environmental impact category chapters of the FAA 1050.1F Desk Reference.  FAA-specific requirements for assessing impacts are highlighted in Appendix B of this Order and discussed in detail in the 1050.1F Desk Reference.

- Air quality

- Biological resources (including fish, wildlife, and plants)

- Climate

- Coastal resources

- Department of Transportation Act, Section 4(f)

- Farmlands

- Hazardous materials, solid waste, and pollution prevention

- Historical, architectural, archeological, and cultural resources

- Land use

- Natural resources and energy supply

- Noise and compatible land use

- Socioeconomics, environmental justice, and children's environmental health and safety risks

- Visual effects (including light emissions)

- Water resources (including wetlands, floodplains, surface waters, groundwater, and wild and scenic rivers)

**4-2.  Consideration of Impacts.**

a.  Desk Reference.  The 1050.1F Desk Reference provides details on current guidance and updated technical information for each environmental impact category that the FAA examines for its proposed actions and alternatives.  The desk reference is available on the FAA website at http://www.faa.gov/about/office_org/headquarters_offices/apl /environ_ policy_guidance/policy/.  This includes references to current requirements; information about permits, licenses, certificates, or other forms of approval and review; an overview of specific responsibilities for gathering data, assessing impacts, consulting other

---

[4] The Desk Reference is available on the FAA website at
http://www.faa.gov/about/office_org/headquarters_offices/apl/environ_policy_guidance/policy/

FAA00057664

SPX-0003163

agencies, and involving the public; significance thresholds; and factors to consider in evaluating impact significance when there is no significance threshold.

b. FAA-Approved Models. The latest FAA-approved model must be used for both air quality and noise analysis. A list of approved models for each type of analysis is available in the 1050.1F Desk Reference. Prior approval from AEE is required to use other models or methodologies. At the completion of the NEPA process, all input files used in the analysis and corresponding output files must be provided to AEE. Details on requirements for noise analysis are located in Appendix B. In the event a model is updated or replaced after the environmental analysis process is underway, the updated or replacement model may be used to provide additional disclosure concerning noise or air quality impacts, but use of the updated or replacement model is not required.

c. Environmental Impact Category Not Affected. If an environmental impact category is not relevant to the proposed action or any of the reasonable alternatives identified (i.e., the resources included in the category are not present or the category is not otherwise applicable to the proposed action and alternatives), the reason why should be briefly noted and no further analysis is required. Consistent with 40 CFR § 1502.2(b), CEQ Regulations, the responsible FAA official should discuss impacts in proportion to their significance for each applicable environmental impact category.

d. Types of Impacts. Within each applicable environmental impact category, the EA or EIS must address the following types of impacts (for further details, see the 1050.1F Desk Reference):

(1) Direct impacts (see 40 CFR § 1508.8(a), CEQ Regulations);

(2) Indirect (including induced) impacts (see 40 CFR § 1508.8(b), CEQ Regulations); and

(3) Cumulative impacts (see 40 CFR §§ 1508.7, 1508.8, 1508.25, and 1508.27(b)(7), CEQ Regulations, and CEQ Guidance on *Considering Cumulative Effects Under the National Environmental Policy Act* (January 1997)). Cumulative impacts are those that result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions, whether Federal or non-Federal. If the proposed action would cause significant incremental additions to cumulative impacts, an EIS is required.

e. Multiple FAA Actions. Some FAA projects involve actions by multiple FAA LOB/SOs; impacts of such actions, when viewed together, govern whether an EA or an EIS is required. Absent independent utility, such actions must be considered in the same EA or EIS.

f. Special Purpose Laws and Requirements. The responsible FAA official should include in the EA or EIS, under appropriate impact categories, the information required to demonstrate compliance with other applicable requirements and should identify any permits, licenses, other approvals, or reviews that apply and indicate any known problems with obtaining them. The EA or EIS must report on the status of any special consultation required (e.g., under Section 7 of the Endangered Species Act, 16 U.S.C. § 1536, Section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108, Section

FAA00057665

SPX-0003164

4(f), 49 U.S.C. § 303, or the Coastal Zone Management Act, 16 U.S.C. §§ 1451-1466). Agency consultation(s) should occur concurrently with the NEPA process.

## 4-3. Significance and Significance Thresholds.

**4-3.1. General**. An EIS is required when any of the impacts of the proposed action, after incorporating any mitigation commitments, remain significant to the human environment.

**4-3.2. Context and Intensity.** The CEQ Regulations state that the determination of a significant impact, as used in NEPA, requires consideration of both context and intensity (see 40 CFR § 1508.27). The significance of an impact may vary with the context and setting of a proposed action. Depending on the proposed action, the context may be society as a whole, nationwide, an affected region, affected interests, or a locality. For a site-specific action, significance would usually depend upon local impacts. Both short and long-term impacts are relevant. According to the CEQ Regulations, intensity refers to the severity of the impacts and includes, but is not limited to, consideration of the following:

- Unique characteristics of the geographic area (e.g., proximity to historic or cultural resources, parks, prime farmlands, wetlands, wild and scenic rivers, ecologically critical areas);

- Adverse impacts on properties listed or eligible for listing in the National Register of Historic Places;

- Loss or destruction of significant scientific, cultural, or historical resources;

- Adverse impacts on endangered or threatened species or critical habitat;

- Whether an action threatens a violation of Federal, state, or local law or requirements imposed for the protection of the environment;

- Impacts that may be both beneficial and adverse. A significant impact may exist even if the Federal agency believes that on balance the impact will be beneficial;

- The degree to which the effects on the quality of the human environment are likely to be highly controversial; and

- Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance cannot be avoided by terming an action temporary or by breaking it down into component parts.

**4-3.3. Significance Thresholds.** The FAA uses thresholds that serve as specific indicators of significant impact for some environmental impact categories. FAA proposed actions that would result in impacts at or above these thresholds require the preparation of an EIS, unless impacts can be reduced below threshold levels. Quantitative significance thresholds do not exist for all impact categories; however, consistent with the CEQ Regulations, the FAA has identified factors that should be considered in evaluating the context and intensity of potential environmental impacts. If these factors exist, there is not necessarily a significant impact. Some impact categories may have both a significance threshold and significance factors to consider. In these instances, a conclusion of significance can be determined based on the factors to consider even if the impacts do not meet the significance threshold criteria. Depending on the proposed action and potential impacts, other factors may also need to be

FAA00057666

SPX-0003165

evaluated to make a determination of significance. After consideration of all relevant factors, the FAA determines whether there would be a significant impact.

The responsible FAA official should use the most current FAA guidance on consideration of significant impacts for each applicable environmental impact category (identified below in Exhibit 4-1) in the 1050.1F Desk Reference. If the LOB/SO is uncertain whether a proposed action would have significant impacts, it should consult with AEE and AGC for guidance.

Exhibit 4-1 shows the FAA's significance thresholds and factors to consider for each relevant environmental impact category.

**Exhibit 4-1. Significance Determination for FAA Actions.**

| Environmental Impact Category | Significance Threshold | Factors to Consider |
|---|---|---|
| **Air Quality** | *The action would cause pollutant concentrations to exceed one or more of the National Ambient Air Quality Standards (NAAQS), as established by the Environmental Protection Agency under the Clean Air Act, for any of the time periods analyzed, or to increase the frequency or severity of any such existing violations.* | |
| **Biological Resources (including fish, wildlife, and plants)** | *The U.S. Fish and Wildlife Service or the National Marine Fisheries Service determines that the action would be likely to jeopardize the continued existence of a federally listed threatened or endangered species, or would result in the destruction or adverse modification of federally designated critical habitat.*<br><br>*The FAA has not established a significance threshold for non-listed species.* | The action would have the potential for:<br>• A long-term or permanent loss of unlisted plant or wildlife species, i.e., extirpation of the species from a large project area (e.g., a new commercial service airport);<br>• Adverse impacts to special status species (e.g., state species of concern, species proposed for listing, migratory birds, bald and golden eagles) or their habitats;<br>• Substantial loss, reduction, degradation, disturbance, or fragmentation of native species' habitats or their populations; or<br>• Adverse impacts on a species' reproductive success rates, natural mortality rates, non-natural mortality (e.g., road kills and hunting), or ability to sustain the minimum population levels required for population maintenance. |

FAA00057667

SPX-0003166

7/16/15

Order 1050.1F

| Environmental Impact Category | Significance Threshold | Factors to Consider |
|---|---|---|
| **Climate**[5] | The FAA has not established a significance threshold for Climate. | |
| **Coastal Resources** | The FAA has not established a significance threshold for Coastal Resources. | The action would have the potential to: <br>• Be inconsistent with the relevant state coastal zone management plan(s); <br>• Impact a coastal barrier resources system unit (and the degree to which the resource would be impacted); <br>• Pose an impact to coral reef ecosystems (and the degree to which the ecosystem would be affected); <br>• Cause an unacceptable risk to human safety or property; or <br>• Cause adverse impacts to the coastal environment that cannot be satisfactorily mitigated. |

---

[5] Please refer to the 1050.1F Desk Reference for the most up-to-date methodology for examining impacts associated with climate change.

FAA00057668

SPX-0003167

| Environmental Impact Category | Significance Threshold | Factors to Consider |
|---|---|---|
| **Department of Transportation Act, Section 4(f)** | *The action involves more than a minimal physical use of a Section 4(f) resource or constitutes a "constructive use" based on an FAA determination that the aviation project would  substantially impair the Section 4(f) resource.[6]* Resources that are protected by Section 4(f) are publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, state, or local significance; and publicly or privately owned land from an historic site of national, state, or local significance.  Substantial impairment occurs when the activities, features, or attributes of the resource that contribute to its significance or enjoyment are substantially diminished. | |
| **Farmlands** | *The total combined score on Form AD-1006, "Farmland Conversion Impact Rating," ranges between 200 and 260 points.* | The action would have the potential to convert important farmlands to non-agricultural uses.  Important farmlands include pastureland, cropland, and forest considered to be prime, unique, or statewide or locally important land. |

---

[6] A "minimal physical use" is part of the FAA's significance threshold that has been continued from FAA Order 1050.1E.  It is not the same as a *de minimis* impact determination established in Section 6009 of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETY-LU).  A *de minimis* impact determination is described in Appendix B, B-2.2.3.

FAA00057669

SPX-0003168

| Environmental Impact Category | Significance Threshold | Factors to Consider |
|---|---|---|
| **Hazardous Materials, Solid Waste, and Pollution Prevention** | The FAA has not established a significance threshold for Hazardous Materials, Solid Waste, and Pollution Prevention. | The action would have the potential to:<br><br>• Violate applicable Federal, state, tribal, or local laws or regulations regarding hazardous materials and/or solid waste management;<br><br>• Involve a contaminated site (including but not limited to a site listed on the National Priorities List). Contaminated sites may encompass relatively large areas. However, not all of the grounds within the boundaries of a contaminated site are contaminated, which leaves space for siting a facility on non-contaminated land within the boundaries of a contaminated site. An EIS is not necessarily required. Paragraph 6-2.3.a of this Order allows for mitigating impacts below significant levels (e.g., modifying an action to site it on non-contaminated grounds within a contaminated site). Therefore, if appropriately mitigated, actions within the boundaries of a contaminated site would not have significant impacts;<br><br>• Produce an appreciably different quantity or type of hazardous waste;<br><br>• Generate an appreciably different quantity or type of solid waste or use a different method of collection or disposal and/or would exceed local capacity; or<br><br>• Adversely affect human health and the environment. |

FAA00057670

SPX-0003169

| Environmental Impact Category | Significance Threshold | Factors to Consider |
|---|---|---|
| **Historical, Architectural, Archeological and Cultural Resources** | The FAA has not established a significance threshold for Historical, Architectural, Archeological, and Cultural Resources. | The action would result in a finding of *Adverse Effect* through the Section 106 process. However, an adverse effect finding does not automatically trigger preparation of an EIS (i.e., a significant impact). |
| **Land Use** | The FAA has not established a significance threshold for Land Use. | There are no specific independent factors to consider for Land Use. The determination that significant impacts exist in the Land Use impact category is normally dependent on the significance of other impacts. |
| **Natural Resources and Energy Supply** | The FAA has not established a significance threshold for Natural Resources and Energy Supply. | The action would have the potential to cause demand to exceed available or future supplies of these resources. |
| **Noise and Noise-Compatible Land Use** | *The action would increase noise by DNL[7] 1.5 dB or more for a noise sensitive area that is exposed to noise at or above the DNL 65 dB noise exposure level, or that will be exposed at or above the DNL 65 dB level due to a DNL 1.5 dB or greater increase, when compared to the no action alternative for the same timeframe.* For example, an increase from DNL 65.5 dB to 67 dB is considered a significant impact, as is an increase from DNL 63.5 dB to 65 dB. | Special consideration needs to be given to the evaluation of the significance of noise impacts on noise sensitive areas within Section 4(f) properties (including, but not limited to, noise sensitive areas within national parks; national wildlife and waterfowl refuges; and historic sites, including traditional cultural properties) where the land use compatibility guidelines in 14 CFR part 150 are not relevant to the value, significance, and enjoyment of the area in question. For example, the DNL 65 dB threshold does not adequately address the impacts of noise on visitors to areas within a national park or national wildlife and waterfowl refuge where other noise is very low and a quiet setting is a generally recognized purpose and attribute. |

---

[7] Day-Night Average Sound Level (DNL). The 24-hour average sound level, in decibels, for the period from midnight to midnight, obtained after the addition of ten decibels to sound levels for the periods between midnight and 7 a.m., and between 10 p.m., and midnight, local time. The symbol for DNL is $L_{dn}$ (See 14 CFR § 150.7).

FAA00057671

SPX-0003170

| Environmental Impact Category | Significance Threshold | Factors to Consider |
|---|---|---|
| Socioeconomics, Environmental Justice, and Children's Health and Safety Risks | | |
| **Socioeconomics** | The FAA has not established a significance threshold for Socioeconomics. | The action would have the potential to:<br>• Induce substantial economic growth in an area, either directly or indirectly (e.g., through establishing projects in an undeveloped area);<br>• Disrupt or divide the physical arrangement of an established community;<br>• Cause extensive relocation when sufficient replacement housing is unavailable;<br>• Cause extensive relocation of community businesses that would cause severe economic hardship for affected communities;<br>• Disrupt local traffic patterns and substantially reduce the levels of service of roads serving an airport and its surrounding communities; or<br>• Produce a substantial change in the community tax base. |
| **Environmental Justice** | The FAA has not established a significance threshold for Environmental Justice. | The action would have the potential to lead to a disproportionately high and adverse impact to an environmental justice population, i.e., a low-income or minority population, due to:<br>• Significant impacts in other environmental impact categories; or<br>• Impacts on the physical or natural environment that affect an environmental justice population in a way that the FAA determines are unique to the environmental justice population and significant to that population. |
| **Children's Environmental Health and Safety Risks** | The FAA has not established a significance threshold for Children's Environmental Health and Safety Risks. | The action would have the potential to lead to a disproportionate health or safety risk to children. |

FAA00057672

SPX-0003171

| Environmental Impact Category | Significance Threshold | Factors to Consider |
|---|---|---|
| **Visual Effects** | | |
| **Light Emissions** | The FAA has not established a significance threshold for Light Emissions. | The degree to which the action would have the potential to:<br>• Create annoyance or interfere with normal activities from light emissions; and<br>• Affect the visual character of the area due to the light emissions, including the importance, uniqueness, and aesthetic value of the affected visual resources. |
| **Visual Resources / Visual Character** | The FAA has not established a significance threshold for Visual Resources / Visual Character. | The extent the action would have the potential to:<br>• Affect the nature of the visual character of the area, including the importance, uniqueness, and aesthetic value of the affected visual resources;<br>• Contrast with the visual resources and/or visual character in the study area; and<br>• Block or obstruct the views of visual resources, including whether these resources would still be viewable from other locations. |

FAA00057673

SPX-0003172

7/16/15                                                                                    Order 1050.1F

| Environmental Impact Category | Significance Threshold | Factors to Consider |
|---|---|---|
| **Water Resources (including Wetlands, Floodplains, Surface Waters, Groundwater, and Wild and Scenic Rivers)** | | |
| Wetlands | *The action would:* <br><br> *1. Adversely affect a wetland's function to protect the quality or quantity of municipal water supplies, including surface waters and sole source and other aquifers;* <br><br> *2. Substantially alter the hydrology needed to sustain the affected wetland system's values and functions or those of a wetland to which it is connected;* <br><br> *3. Substantially reduce the affected wetland's ability to retain floodwaters or storm runoff, thereby threatening public health, safety or welfare (the term welfare includes cultural, recreational, and scientific resources or property important to the public);* <br><br> *4. Adversely affect the maintenance of natural systems supporting wildlife and fish habitat or economically important timber, food, or fiber resources of the affected or surrounding wetlands;* <br><br> *5. Promote development of secondary activities or services that would cause the circumstances listed above to occur; or* <br><br> *6. Be inconsistent with applicable state wetland strategies.* | |
| Floodplains | *The action would cause notable adverse impacts on natural and beneficial floodplain values.* Natural and beneficial floodplain values are defined in Paragraph 4.k of DOT Order 5650.2, *Floodplain Management and Protection.* | |

FAA00057674

SPX-0003173

| Environmental Impact Category | Significance Threshold | Factors to Consider |
|---|---|---|
| **Surface Waters** | *The action would:*<br><br>*1. Exceed water quality standards established by Federal, state, local, and tribal regulatory agencies; or*<br><br>*2. Contaminate public drinking water supply such that public health may be adversely affected.* | The action would have the potential to:<br><br>• Adversely affect natural and beneficial water resource values to a degree that substantially diminishes or destroys such values;<br><br>• Adversely affect surface waters such that the beneficial uses and values of such waters are appreciably diminished or can no longer be maintained and such impairment cannot be avoided or satisfactorily mitigated; or<br><br>• Present difficulties based on water quality impacts when obtaining a permit or authorization. |
| **Groundwater** | *The action would:*<br><br>*1. Exceed groundwater quality standards established by Federal, state, local, and tribal regulatory agencies; or*<br><br>*2. Contaminate an aquifer used for public water supply such that public health may be adversely affected.* | The action would have the potential to:<br><br>• Adversely affect natural and beneficial groundwater values to a degree that substantially diminishes or destroys such values;<br><br>• Adversely affect groundwater quantities such that the beneficial uses and values of such groundwater are appreciably diminished or can no longer be maintained and such impairment cannot be avoided or satisfactorily mitigated; or<br><br>• Present difficulties based on water quality impacts when obtaining a permit or authorization. |

FAA00057675

SPX-0003174

| Environmental Impact Category | Significance Threshold | Factors to Consider |
|---|---|---|
| **Wild and Scenic Rivers** | The FAA has not established a significance threshold for Wild and Scenic Rivers. | The action would have an adverse impact on the values for which a river was designated (or considered for designation) through:<br><br>• Destroying or altering a river's free-flowing nature;<br><br>• A direct and adverse effect on the values for which a river was designated (or under study for designation);<br><br>• Introducing a visual, audible, or other type of intrusion that is out of character with the river or would alter outstanding features of the river's setting;<br><br>• Causing the river's water quality to deteriorate;<br><br>• Allowing the transfer or sale of property interests without restrictions needed to protect the river or the river corridor (which cannot exceed an average of 320 acres per mile which, if applied uniformly along the entire designated segment, is one-quarter of a mile on each side of the river); or<br><br>• Any of the above impacts preventing a river on the Nationwide Rivers Inventory (NRI) or a Section 5(d) river that is not included in the NRI from being included in the Wild and Scenic River System or causing a downgrade in its classification (e.g., from wild to recreational). |

FAA00057676

SPX-0003175

**4-4.  Mitigation.**  As defined in the CEQ Regulations at 40 CFR § 1508.20, mitigation includes avoiding the impact; minimizing the impact; rectifying the impact by repairing, rehabilitating, or restoring the environment; reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action; and compensating for the impact by replacing or providing substitute resources.

a.  General.  An EA may include discussion of reasonable mitigation measures.  If mitigation is discussed in an EA, the discussion must be in sufficient detail to describe the impacts of the mitigation.  If the responsible FAA official determines that mitigation measures can and will be used to reduce potentially significant adverse impacts below the level of significance, these mitigation measures can be used to support a mitigated FONSI.  An EIS must describe mitigation measures considered or planned to minimize harm from the proposed action and any reasonable alternatives.  For more detailed guidance on the use of mitigation in EAs and EISs, see Paragraphs 6-2.3 and 7-1.1.h, respectively.

b.  Mitigation Incorporated into Project Design.  Mitigation measures incorporated into project design (e.g., by modifying the project) must be clearly described as part of the proposed action or alternatives discussed in an EA or EIS.

c.  Mitigation Made a Condition of FAA Approval.  When specific mitigation is made a condition of project approval, the FAA or another appropriate entity must implement the mitigation.  Prior to project approval, the FAA should verify that:

(1)  The FAA has sufficient legal authority to implement or enforce implementation of the mitigation;

(2)  Funding for implementation of the mitigation is reasonably foreseeable;

(3)  The mitigation is clearly specified in terms of expected outcomes, which may include measurable performance standards;

(4)  Any required mitigation has been clearly identified as a condition of approval in the EA/FONSI or ROD; and

(5)  Appropriate language is used in grant agreements, licenses, contract specifications, operating specifications, directives, other project review or implementation procedures, or in other appropriate mechanisms to ensure mitigation set forth as a condition of approval is implemented.

d.  Monitoring.  If mitigation is a condition of project approval, then in accordance with CEQ's guidance on the *Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact*, 76 *Federal Register* 3843 (January 21, 2011), the FAA will apply professional judgment and the rule of reason in determining important cases where the agency or the applicant should develop a monitoring program.  The agency or entity responsible for mitigation must use the same standards of professional judgment and the rule of reason when determining the type and extent of monitoring to check on the progress made in implementing mitigation commitments as well as their effectiveness.  In cases that are less important, the agency

FAA00057677

SPX-0003176

should exercise its discretion to determine what level of monitoring, if any, is appropriate.

A monitoring program should include both implementation monitoring (i.e., whether mitigation measures are being implemented) and effectiveness monitoring (i.e., whether mitigation measures are producing expected outcomes) and must be clearly described in the decision document (e.g., ROD or FONSI/ROD). Where available and applicable, an EMS may be used for tracking and monitoring mitigation commitments. If monitoring demonstrates that mitigation commitments are not being implemented or that implemented mitigation is failing to mitigate environmental impacts as predicted, the FAA should consider taking remedial steps. If a pending FAA decision on the proposed action remains, the responsible FAA official should also consider whether the preparation of supplemental NEPA documentation is necessary. For more detailed guidance on mitigation monitoring in EAs and EISs, see Paragraphs 6-2.3 and 7-2.3 respectively.

e. Enforcement. When an entity other than the FAA fails to implement mitigation that is a condition of project approval, the FAA should consider appropriate action, as necessary, to ensure that the entity implements the mitigation. For more detailed guidance on mitigation enforcement in EAs and EISs, see Paragraphs 6-2.3 and 7-2.3 respectively.

**4-5. -4-50. Reserved**.

FAA00057678

SPX-0003177

## Chapter 5: Categorical Exclusions

**5-1.  General.**  The CATEXs listed in Paragraphs 5-6.1 through 5-6.6 are for types of actions that the FAA has found do not normally have the potential for individual or cumulative significant impacts on the human environment.

a.  Scope of CATEX.  The responsible FAA official must determine whether a proposed action is within the scope of a CATEX listed in this chapter.  If a proposed action is within the scope of a CATEX, but the responsible FAA official determines that extraordinary circumstances exist, an EA or EIS must be prepared.  If a proposed action is not within the scope of a CATEX, an EA or EIS must be prepared.  The CATEX determination process is described in flowchart form in Exhibit D-1 of Appendix D.

b.  Segmentation.  A CATEX should not be used for a segment or an interdependent part of a larger proposed action.

**5-2.  Extraordinary Circumstances.**

a.  Extraordinary Circumstances.  Extraordinary circumstances are factors or circumstances in which a normally categorically excluded action may have a significant environmental impact that then requires further analysis in an EA or an EIS.  For FAA proposed actions, extraordinary circumstances exist when the proposed action meets both of the following criteria (see 40 CFR § 1508.4, CEQ Regulations):

(1)  Involves any of the circumstances described in Subparagraph b. below; and

(2)  May have a significant impact (see 40 CFR § 1508.4, CEQ Regulations).

An impact involving one or more of the circumstances described below in connection with a proposed action does not require the preparation of an EA or EIS unless the additional determination is made that the proposed action may have a significant environmental impact (i.e., that the circumstances rise to the level of extraordinary circumstances).  The FAA uses screening and other analyses and consultation, as appropriate, to assist in determining extraordinary circumstances (see supporting guidance in the 1050.1F Desk Reference for information to determine the potential for significant environmental impacts and Paragraph 4-3 of this Order for the FAA's significance thresholds and factors to consider in evaluating significance).  When extraordinary circumstances exist and the proposed action cannot be modified to eliminate the extraordinary circumstances, an EA or EIS must be prepared.  If extraordinary circumstances do not exist or are eliminated, a CATEX may be used.  If it is uncertain whether the proposed action involves an extraordinary circumstance, the LOB/SO should consult with AEE and AGC for guidance.

b.  Circumstances.  An extraordinary circumstance exists if a proposed action involves any of the following circumstances and has the potential for a significant impact:

(1)  An adverse effect on cultural resources protected under the National Historic Preservation Act of 1966, as amended, 54 U.S.C. §300101 et seq.;

(2)  An impact on properties protected under Section 4(f);

FAA00057679

SPX-0003178

(3)  An impact on natural, ecological, or scenic resources of Federal, state, tribal, or local significance (e.g., federally listed or proposed endangered, threatened, or candidate species, or designated or proposed critical habitat under the Endangered Species Act, 16 U.S.C. §§ 1531-1544);

(4)  An impact on the following resources:  resources protected by the Fish and Wildlife Coordination Act, 16 U.S.C. §§ 661-667d; wetlands; floodplains; coastal zones; national marine sanctuaries; wilderness areas; National Resource Conservation Service-designated prime and unique farmlands; energy supply and natural resources; resources protected under the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271-1287, and rivers or river segments listed on the Nationwide Rivers Inventory (NRI); and solid waste management;

(5)  A division or disruption of an established community, or a disruption of orderly, planned development, or an inconsistency with plans or goals that have been adopted by the community in which the project is located;

(6)  An increase in congestion from surface transportation (by causing decrease in level of service below acceptable levels determined by appropriate transportation agency, such as a highway agency);

(7)  An impact on noise levels of noise sensitive areas;

(8)  An impact on air quality or violation of Federal, state, tribal, or local air quality standards under the Clean Air Act, 42 U.S.C. §§ 7401-7671q;

(9)  An impact on water quality, sole source aquifers, a public water supply system, or state or tribal water quality standards established under the Clean Water Act, 33 U.S.C. §§ 1251-1387, and the Safe Drinking Water Act, 42 U.S.C. §§ 300f-300j-26;

(10)  Impacts on the quality of the human environment that are likely to be highly controversial on environmental grounds.  The term "highly controversial on environmental grounds" means there is a substantial dispute involving reasonable disagreement over the degree, extent, or nature of a proposed action's environmental impacts or over the action's risks of causing environmental harm.  Mere opposition is not sufficient for a proposed action or its impacts to be considered highly controversial on environmental grounds.  Opposition on environmental grounds by a Federal, state, or local government agency or by a tribe or a substantial number of the persons affected by the action should be considered in determining whether or not reasonable disagreement regarding the impacts of a proposed action exists.  If in doubt about whether a proposed action is highly controversial on environmental grounds, consult the LOB/SO's headquarters environmental division, AEE, Regional Counsel, or AGC for assistance;

(11)  Likelihood to be inconsistent with any Federal, state, tribal, or local law relating to the environmental aspects of the proposed action; or

(12)  Likelihood to directly, indirectly, or cumulatively create a significant impact on the human environment, including, but not limited to, actions likely to cause a significant lighting impact on residential areas or commercial use of business properties, likely to cause a significant impact on the visual nature of surrounding land uses, likely to cause environmental contamination by hazardous materials, or

FAA00057680

SPX-0003179

likely to disturb an existing hazardous material contamination site such that new environmental contamination risks are created.

**5-3. Categorical Exclusion Documentation.**

a. Simple Documentation. Some of the CATEXs listed in Paragraph 5-6 cover actions for which there are no reasonable expectations of any changes in use or other changes that could cause an environmental impact. These are designated with an asterisk (*). Many of the other CATEXs cover actions that have little or no potential for extraordinary circumstances. When using a CATEX for these actions, a LOB/SO may prepare a simple written record (which may already be included in documentation prepared during the course of normal project development) that a specific CATEX was determined to apply to a proposed action.

b. Additional Documentation. Some actions involve greater potential for one or more extraordinary circumstances or otherwise warrant additional CATEX documentation, as described in Paragraph d, below. Factors that may warrant the preparation of additional documentation include actions:

(1) Likely to affect sensitive resources sufficiently to heighten concerns regarding the potential for extraordinary circumstances;

(2) That would result in changes to the routine routing of aircraft that have the potential to result in significant increases in noise over noise sensitive areas;

(3) Involving situations in which the applicability of a CATEX is not intuitively clear;

(4) Involving known controversy or public opposition; or

(5) For which litigation is anticipated.

c. Other Situations. FAA LOB/SOs are responsible for identifying proposed actions within their purview that warrant CATEX documentation. LOB/SOs may additionally exercise professional judgment to document a project-specific CATEX that is not included in Paragraph 5-3.b above. A determination that a proposed action qualifies for a CATEX is not considered deficient due to lack of documentation provided that extraordinary circumstances have been considered.

d. Documentation. Documentation prepared for a CATEX determination in accordance with Paragraph 5-3 should be concise. The extent of documentation should be tailored to the type of action involved and the potential for extraordinary circumstances. There is no prescribed format; however, the documentation should cite the CATEX(s) used, describe how the proposed action fits within the category of actions described in the CATEX, and explain that there are no extraordinary circumstances that would preclude the proposed action from being categorically excluded. The documentation of compliance with special purpose laws and requirements may either be included in a documented CATEX or may be documented separately (see Paragraph 5-5). A CATEX determination that warrants the preparation of additional documentation in accordance with Paragraph 5-3.b should be signed by the responsible FAA official.

FAA00057681

SPX-0003180

e.  Record of Decision.  The preparation of a ROD for a CATEX determination is not required and is uncommon.  There may be instances where it would be advantageous for the FAA to prepare a separate formal decision document (i.e., a "CATEX/ROD") in connection with a CATEX determination.  A CATEX/ROD might be advisable, for example, where there is substantial controversy regarding the applicability of a CATEX and/or the existence of extraordinary circumstances.  When there is doubt whether a CATEX/ROD is appropriate, the responsible FAA official should consult with AGC-600 or Regional Counsel.

**5-4. Public Notification**.  There is no requirement to notify the public when a CATEX is used.  However, CEQ encourages agencies to determine circumstances in which the public should be engaged or notified before a CATEX is used.  The FAA, as a regulatory agency, normally notifies the public when a CATEX is applied to a proposed rulemaking action.  Other appropriate circumstances may be determined on a case-by-case basis.

**5-5. Other Environmental Requirements.**  In addition to NEPA, a proposed action may be subject to special purpose laws and requirements that must be complied with before the action can be approved.  The responsible FAA official must ensure, to the fullest extent possible, that the proposed action is in compliance with such requirements in addition to making the appropriate determination regarding use of a CATEX.  To the extent that these other requirements are relevant to a determination of extraordinary circumstances, they must be addressed before a CATEX is used.  The responsible FAA official must document compliance with applicable requirements, including any required consultations, findings, or determinations.  The documentation of compliance with special purpose laws and requirements may either be included in a documented CATEX or may be documented separately from a CATEX.  Special purpose laws and requirements may also have public notification requirements.  Information on other environmental requirements that may apply to proposed actions is provided in the 1050.1F Desk Reference.

**5-6. The Federal Aviation Administration's Categorical Exclusions.**  The FAA has determined that the actions listed in this paragraph normally do not individually or cumulatively have a significant effect on the human environment.

The CATEXs are organized by the following functions:

- Administrative/General:  Actions that are administrative or general in nature;

- Certification:  Actions concerning issuance of certificates or compliance with certification programs;

- Equipment and Instrumentation:  Actions involving installation, repair, or upgrade of equipment or instruments necessary for operations and safety;

- Facility Siting, Construction, and Maintenance:  Actions involving acquisition, repair, replacement, maintenance, or upgrading of grounds, infrastructure, buildings, structures, or facilities that generally are minor in nature;

- Procedural:  Actions involving establishment, modification, or application of airspace and air traffic procedures; and

- Regulatory:  Actions involving establishment of, compliance with, or exemptions to, regulatory programs or requirements.

FAA00057682

SPX-0003181

To assist the responsible FAA official in identifying the applicable CATEX for a proposed action, the FAA LOB/SO that most commonly uses a CATEX is provided in parentheses following the description of the CATEX. For example, if ATO and the AST are the two LOB/SOs that most commonly use a CATEX, the parenthetical reference (ATO, AST) will follow the description of the CATEX. If a given CATEX is used with equal frequency by all FAA LOB/SOs, the parenthetical reference "(All)" will follow the description of the CATEX. This information is presented for reference only, and must not be construed to limit the use of a CATEX to only the listed LOB/SO.

**5-6.1. Categorical Exclusions for Administrative/General Actions.** This category includes the list of CATEXs for FAA actions that are administrative or general in nature. *An action included within this list of categorically excluded actions is not automatically exempted from environmental review under NEPA. The responsible FAA official must also review Paragraph 5-2, Extraordinary Circumstances, before deciding to categorically exclude a proposed action.*

a.  Implementation of measures to respond to emergency air or ground safety needs, accidents, or natural events with no reasonably foreseeable significant long-term adverse impacts. (All)

b.  Release of an airport sponsor from Federal obligations incurred when the sponsor accepted: (1) an Airport Improvement Grant; or (2) Federal surplus property for airport purposes. (NOTE: FAA consent to long-term leases (i.e., those exceeding 20 years) converting airport-dedicated property to non-aeronautical, revenue-producing purposes (e.g., convenience concessions such as food or personal services) has the same effect as a release and is part of this CATEX provided that the proposed and reasonably foreseeable uses of the property do not trigger extraordinary circumstances as described in Paragraph 5-2, Extraordinary Circumstances). (ARP, AST)

c.  An FAA action responding to a request for conveying federally owned land, including surplus Federal property and/or joint-use facilities, provided the proposed use of the conveyed land is either unchanged or for a use that is categorically excluded. (ARP, ATO)

d.  Federal funding and approval of amendments to Airport Layout Plans (ALPs) to carry out FAA-approved noise compatibility programs pursuant to 14 CFR part 150. (ARP)

e.  Issuance of Notices to Airmen (NOTAMS), which notify pilots and other interested parties of interim or temporary conditions. (AVS, ATO)

f.  Mandatory actions required under implementing regulation for any treaty or international agreement to which the United States is a party, or required by the decisions of international organizations or authorities in which the United States is a member or participant except when the United States has discretion over implementation of such requirements. (AGC, ARP, APL, ATO, AST, AVS)

g.  Issuance of airport policy and planning documents including the National Plan of Integrated Airport Systems (NPIAS), Airport Improvement Program (AIP) priority

FAA00057683

SPX-0003182

system, and advisory circulars on planning, design, and development that are issued as administrative and technical guidance. (ARP, AST)[*]

h.  Approval of an airport sponsor's request solely to impose Passenger Facility Charges (PFC) or approval to impose and use PFCs for planning studies. (ARP)[*]

i.  Actions that are tentative, conditional, and clearly taken as a preliminary action to establish eligibility under an FAA program, for example, Airport Improvement Program (AIP) actions that are tentative and conditional and clearly taken as a preliminary action to establish an airport sponsor's eligibility under the AIP. (All)[*]

j.  Administrative and agency operating actions, such as procurement documentation, organizational changes, personnel actions, and legislative proposals not originating in the FAA. (All)[*]

k.  Agreements with foreign governments, foreign civil aviation authorities, international organizations, or U.S. Government departments calling for cooperative activities or the provision of technical assistance, advice, equipment, or services to those parties, and the implementation of such agreements; negotiations and agreements to establish and define bilateral aviation safety relationships with foreign governments and the implementation of such agreements; attendance at international conferences and the meetings of international organizations, including participation in votes and other similar actions. (All)[*]

l.  All delegations of authority to designated examiners, designated engineering representatives, or airmen under Section 314 of the FAA Act (49 U.S.C. §§ 44702(d) and 45303). (ATO, AVS)[*]

m.  FAA administrative actions associated with transfer of ownership or operation of an existing airport, by acquisition or long-term lease, as long as the transfer is limited to ownership, right of possession, and/or operating responsibility. (ARP)[*]

n.  Issuance of grants to prepare noise exposure maps and noise compatibility programs (NCPs) under 49 U.S.C. §§ 47503(2) and 47504, and FAA determinations to accept noise exposure maps and approve NCPs under 14 CFR part 150. (ARP)[*]

o.  Issuance of grants that do not imply a project commitment, such as airport planning grants, and grants to states participating in the state block grant program. (ARP, AST)[*]

p.  Conditional approval of an Airport Layout Plan (ALP). (ARP)[*]

q.  Planning and development of training, personnel efficiency, and performance projects and programs. (All)[*]

r.  Issuance of policy and planning documents and legislative proposals not intended for, or that do not cause direct implementation of, project or system actions. (All)[*]

s.  Project amendments (for example, increases in costs) that do not alter the environmental impact of the action. (All)[*]

---

[*] See Paragraph 5-3.a.

[*] See Paragraph 5-3.a.

FAA00057684

SPX-0003183

t. Actions related to the retirement of the principal of bond or other indebtedness for terminal development. (ARP)[*]

u. Approval under 14 CFR part 161, *Notice and Approval of Airport Noise and Access Restrictions*, of a restriction on the operations of Stage 3 aircraft that does not have the potential to significantly increase noise at the airport submitting the restriction proposal or at other airports to which restricted aircraft may divert. (ARP)

**5-6.2. Categorical Exclusions for Certification Actions.** This category includes the list of CATEXs for FAA actions concerning issuance of certificates or compliance with certification programs. *An action included within this list of categorically excluded actions is not automatically exempted from environmental review under NEPA. The responsible FAA official must also review Paragraph 5-2, Extraordinary Circumstances, before deciding to categorically exclude a proposed action.*

a. Approvals and findings pursuant to 14 CFR part 36, *Noise Standards: Aircraft Type and Airworthiness Certification*, and acoustical change provisions under 14 CFR § 21.93. (ATO, AVS, APL)

b. Approvals of repairs, parts, and alterations of aircraft, commercial space launch vehicles, and engines not affecting noise, emissions, or wastes. (All)

c. Issuance of certificates such as the following: (1) new, amended, or supplemental aircraft types that meet environmental regulations; (2) new, amended, or supplemental engine types that meet emission regulations; (3) new, amended, or supplemental engine types that have been excluded by the EPA (see 14 CFR § 34.7, *Exemptions*); (4) medical, airmen, export, manned free balloon type, glider type, propeller type, supplemental type certificates not affecting noise, emission, or waste; (5) mechanic schools, agricultural aircraft operations, repair stations, and other air agency ratings; and (6) operating certificates. (ATO, AVS)

d. Operating specifications and amendments that do not significantly change the operating environment of the airport. "That do not significantly change the operating environment of the airport" refers to minor operational changes at an airport that do not have the potential to cause significant impacts to noise, air quality, or other environmental impact categories. These would include, but are not limited to, authorizing use of an alternate airport, administrative revisions to operations specifications, or use of an airport on a one-time basis. The use of an airport on a one-time basis means the operator will not have scheduled operations at the airport, or will not use the aircraft for which the operator requests an amended operations specification, on a scheduled basis. (ATO, AVS)

e. Issuance of certificates and related actions under the Airport Certification Program (see 14 CFR part 139). (ARP)

f. Issuance of Airworthiness Directives (ADs) to ensure aircraft safety. (ATO, AVS)[*]

---

[*] See Paragraph 5-3.a.

FAA00057685

SPX-0003184

**5-6.3. Categorical Exclusions for Equipment and Instrumentation.** This category includes the list of CATEXs for FAA actions involving installation, repair, or upgrade of equipment or instruments necessary for operations and safety. *An action included within this list of categorically excluded actions is not automatically exempted from environmental review under NEPA. The responsible FAA official must also review Paragraph 5-2, Extraordinary Circumstances, before deciding to categorically exclude a proposed action.*

a. Construction of the following facilities on designated airport property or commercial space launch sites, co-located with other FAA facilities, co-located at a location currently used for similar facilities or equipment, or replacement with essentially similar facilities or equipment: Remote Communications Outlet (RCO), Remote Transmitter/Receiver (RT/R), or Remote Center-Air Ground Communication Facility (RCAG), or essentially similar facilities or equipment identified in, and designed and constructed in accordance with FAA Order 6580.3, *The Remote Communications Facilities Installation Standards Handbook*. These facilities are typically located within a 150 feet by 150 feet parcel with antenna towers reaching approximately 40 feet in height. (ATO)

b. Establishment, installation, upgrade, or relocation of any of the following on designated airport or FAA property: airfield or approach lighting systems, visual approach aids, beacons, and electrical distribution systems as described in FAA Order 6850.2, *Visual Guidance Lighting Systems*, and other related facilities. (ATO, ARP)

c. Federal financial assistance for, or Airport Layout Plan (ALP) approval of, or FAA installation or upgrade of facilities and equipment, other than radars, on designated airport or FAA property or commercial space launch sites. Facilities and equipment means FAA communications, navigation, surveillance, and weather systems. Weather systems include hygrothermometers, Automated Weather Observing System (AWOS), Automatic Surface Observation System (ASOS), Stand Alone Weather Sensors (SAWS), Runway Visual Range (RVR), and other essentially similar facilities and equipment that provide for modernization or enhancement of the service provided by these facilities. Navigational aids include Very High Frequency Omnidirectional Range (VOR), VOR Test facility (VOT), co-located VORs and Tactical Aircraft Control and Navigation (TACAN) (VORTAC), Low Power TACAN, Instrument Landing System (ILS) equipment or components of ILS equipment (establishment or relocation of an ILS is not included; an EA is normally required; see Paragraph 3-1.2.b(8)), Wide Area Augmentation System (WAAS), Local Area Augmentation System (LAAS), other essentially similar facilities and equipment, and equipment that provides for modernization or enhancement of the service provided by that facility, such as conversion of VOR to VORTAC, conversion to Doppler VOR (DVOR), or conversion of ILS to category II or III standards. FAA Order 6820.10, *VOR, VOR/DME and VORTAC Siting Criteria* governs the installation of VOR/VOT/VORTAC-type equipment. These facilities are typically located within a 150 feet by 150 feet parcel, with a total structure height reaching approximately 50 feet in height. (ATO, ARP, AST)

d. Federal financial assistance for, or Airport Layout Plan (ALP) approval of, or FAA installation, repair, replacement, relocation, or upgrade of radar facilities and equipment on designated airport or FAA property or commercial space launch sites, that conform to the current American National Standards Institute/Institute of Electrical and Electronic

FAA00057686

SPX-0003185

Engineers (ANSI/IEEE) guidelines for maximum permissible exposure to electromagnetic fields. Radar facilities and equipment include Terminal Doppler Weather Radar (TDWR), Next Generation Weather Radar (NEXRAD), Precision Runway Monitor (PRM), Airport Surface Detection Equipment (ASDE), Air Route Surveillance Radar (ARSR), Airport Surveillance Radar (ASR), Air Traffic Control Beacon Interrogator (ATCBI), and other essentially similar facilities and equipment. In addition, this includes equipment that provides for modernization or enhancement of the service provided by these facilities, such as Radar Bright Display Equipment (RBDE) with Plan View Displays (PVD), Direct Access Radar Channel (DARC), adding a beacon system onto existing radar, and calibration equipment. (ATO, ARP)

e.  Federal financial assistance for, Airport Layout Plan (ALP) approval of, or FAA installation, repair, relocation, replacement, removal, or upgrade of minor miscellaneous items such as Low Level Wind Shear Alert System (LLWAS), wind indicators, wind measuring devices, landing directional equipment, segmented circles (visual indicators providing traffic pattern information at airports without airport traffic control towers (ATCTs)), mobile ATCTs, Mobile Emergency Radar Facilities (MERF), and associated fencing and calibration equipment. (ARP, ATO)

f.  Installation or replacement of engine generators used in emergencies. (ATO, AST)

g.  Replacement or upgrade of power and control cables for existing facilities and equipment, such as airfield or approach lighting systems (ALS), commercial space launch site lighting systems, visual approach aids, beacons, and electrical distribution systems as described in FAA Order 6850.2, *Visual Guidance Lighting Systems*, or airport surveillance radar (ASR), commercial space launch site surveillance radar, Instrument Landing System (ILS), and Runway Visual Range (RVR). (ATO)

h.  Acquisition of equipment required for the safety or security of personnel and property on the airport or commercial space launch site, including safety equipment required by rule or regulation for certification of an airport (see 14 CFR part 139, *Certification and Operation: Land Airports Serving Certain Air Carriers*), or licensing the operation of a commercial space launch site (see 14 CFR part 420, *License to Operate a Launch Site*) and acquisition of snow removal equipment. (ARP, AST)

i.  Approval of an Airport Layout Plan (ALP), Federal financial assistance for, or FAA projects for:  the installation of solar or wind-powered energy equipment, provided the installation does not involve more than three total acres of land (including the land needed for easements and rights-of-way associated with building and installing the equipment, and any trenching and cabling that would connect the installed solar or wind equipment to other parts of the airport or an existing electrical grid) and would not have the potential to cause significant impacts on bird or bat populations. Construction contracts or leases for this equipment must include requirements to control dust, sedimentation, storm water, and accidental spills. (ARP, ATO)

FAA00057687

SPX-0003186

**5-6.4. Categorical Exclusions for Facility Siting, Construction, and Maintenance.** This category includes the list of CATEXs for FAA actions involving acquisition, repair, replacement, maintenance, or upgrading of grounds, infrastructure, buildings, structures, or facilities that generally are minor in nature. *An action included within this list of categorically excluded actions is not automatically exempted from environmental review under NEPA. The responsible FAA official must also review Paragraph 5-2, Extraordinary Circumstances, before finalizing a decision to categorically exclude a proposed action.*

a. Access road construction, and construction, relocation, or repair of entrance and service roadways that do not reduce the level of service on local traffic systems below acceptable levels. (ATO, ARP, AST)

b. Acquisition of land and relocation associated with a categorically excluded action. (ATO, ARP)

c. Installation, modification, or repair of radars at existing facilities that conform to the current American National Standards Institute/Institute of Electrical and Electronics Engineers (ANSI/IEEE) guidelines for maximum permissible exposures to electromagnetic fields and do not significantly change the impact on the environment of the facility. (All)

d. Federal financial assistance, Airport Layout Plan (ALP) approval, or FAA installation of de-icing/anti-icing facilities that comply with National Pollutant Discharge Elimination System (NPDES) permits or other permits protecting the quality of receiving waters, and for which related water detention or retention facilities are designed not to attract wildlife hazardous to aviation, as defined in FAA Advisory Circular 150/5200-33, *Hazardous Wildlife Attractants on or Near Airports*. (ATO, ARP)

e. Federal financial assistance, licensing, or Airport Layout Plan (ALP) approval for the following actions, provided the action would not result in significant erosion or sedimentation, and will not result in a significant noise increase over noise sensitive areas or result in significant impacts on air quality.

- Construction, repair, reconstruction, resurfacing, extending, strengthening, or widening of a taxiway, apron, loading ramp, or runway safety area (RSA), including an RSA using Engineered Material Arresting System (EMAS); or

- Reconstruction, resurfacing, extending, strengthening, or widening of an existing runway.

This CATEX includes marking, grooving, fillets and jet blast facilities associated with any of the above facilities. (ARP, AST)

f. Federal financial assistance, licensing, Airport Layout Plan (ALP) approval, or FAA construction or limited expansion of accessory on-site structures, including storage buildings, garages, hangars, t-hangars, small parking areas, signs, fences, and other essentially similar minor development items. (ATO, ARP, AST)

g. Construction of Remote Transmitter/Receiver (RT/R), or other essentially similar facilities and equipment, to supplement existing communications channels installed in the Airport Traffic Control Tower (ATCT) or Flight Service Station (FSS). (ATO)

FAA00057688

SPX-0003187

h.  Federal financial assistance, licensing, or Airport Layout Plan (ALP) approval for construction or expansion of facilities—such as terminal passenger handling and parking facilities or cargo buildings, or facilities for non-aeronautical uses at existing airports and commercial space launch sites—that do not substantially expand those facilities (see the FAA's presumed to conform list (72 *Federal Register* 41565 (July 30, 2007))).  (All)

i.  Demolition and removal of FAA buildings and structures, or financial assistance for or approval of an Airport Layout Plan (ALP) for the demolition or removal of non-FAA owned, on-airport buildings and structures, provided no hazardous substances or contaminated equipment are present on the site of the existing facility.  This CATEX does not apply to buildings and structures of historic, archaeological, or architectural significance as officially designated by Federal, state, tribal or local governments.  (ATO, AST, ARP)

j.  Removal or extension of water, sewage, electrical, gas, or other utilities of temporary duration to serve construction.  (ATO, AST)

k.  Placing earthen fill into previously excavated land with material compatible with the natural features of the site, provided the land is not delineated as a wetland; or minor dredging or filling of wetlands or navigable waters for any categorically excluded action, provided the fill is of material compatible with the natural features of the site, and the dredging and filling qualifies for an U.S. Army Corps of Engineers nationwide or a regional general permit.  (ATO, AST, ARP)

l.  Federal financial assistance for, licensing or approval of the grading of land, the removal of obstructions to air navigation, or erosion control measures, provided those activities occur on and only affect airport property, a commercial space launch site, or FAA-owned or leased property.  (ATO, ARP, AST)

m.  Lease of space in buildings or towers.  (ATO, AST)

n.  Minor expansion of facilities, including the addition of equipment such as telecommunications equipment, on an existing facility where no additional land is required, or when expansion is due to remodeling of space in current quarters or existing buildings.  Additions may include antennas, concrete pad, and minor trenching for cable.  (ATO, AST)

o.  Minor trenching and backfilling where the surface is restored and the excavated material is protected against erosion and run-off during the construction period.  (ATO, ARP, AST)

p.  New gardening, landscaping, and/or maintenance of existing landscaping that does not cause or promote the introduction or spread of invasive species that would harm the native ecosystem; use of landscape practices that reflect recommendations provided in *Guidance for Presidential Memorandum on Environmentally and Economically Beneficial Landscape Practices on Federal Landscaped Grounds*, 60 *Federal Register* 40837 (August 10, 1995); and that do not attract wildlife that is hazardous to aviation.  (ATO, ARP, AST)

q.  Construction and installation, on airports or commercial space launch sites, of noise abatement measures, such as noise barriers to diminish aircraft and commercial space

FAA00057689

SPX-0003188

launch vehicle engine exhaust blast or noise, and installation of noise control materials. (All)

r.  Purchase, lease, or acquisition of three acres or less of land with associated easements and rights-of-way for new facilities.  (ATO)

s.  Repairs and resurfacing of existing access to remote facilities and equipment such as Air Route Surveillance Radar (ARSR), Remote Center Air/Ground Communications Facility (RCAG), Remote Communications Outlet (RCO), and VHF Omnidirectional Range (VOR) with Ultra-High Frequency Tactical Air Navigation Aid (VORTAC). (ATO)

t.  Federal financial assistance for, or Airport Layout Plan (ALP) approval of, a new heliport on an existing airport or commercial space launch site that would not significantly increase noise over noise sensitive areas.  (ARP, AST)

u.  Approval of an Airport Layout Plan (ALP) for installation of on-airport, aboveground storage tanks or underground storage tanks (USTs) on airport property or FAA installation, repair, or replacement of USTs and aboveground storage tanks at FAA facilities.  These actions must comply with FAA Order 1050.15, *Fuel Storage Tanks at FAA Facilities,* and EPA regulations, 40 CFR parts 112, 280, and 281, as applicable. This CATEX includes the closure and removal of a fuel storage tank, and remediation of contaminants resulting from a fuel storage tank at an FAA facility or on an airport, provided those actions occur in accordance with the order and the regulations noted above.  The establishment of bulk fuel storage and associated distribution systems is not within the scope of this CATEX.  Those actions are subject to Paragraph 3-1.2.b.(5) of this Order.  (ATO, ARP)

v.  Replacement or reconstruction of a terminal, structure, or facility with a new one of similar size and purpose, where location will be on the same site as the existing building or facility.  (ATO, ARP, AST)

w.  Repair and maintenance of existing roads, rights-of-way, trails, grounds, parking areas, and utilities, including, for example, snow removal, vegetation control, and erosion control work.  (All)

x.  Routine facility decommissioning, exclusive of disposal.  (ATO, AST)

y.  Takeover of non-Federal facilities by the FAA.  (ATO)

z.  Federal financial assistance, licensing, Airport Layout Plan (ALP) approval, or FAA action related to topping or trimming trees to meet 14 CFR part 77, *Safe, Efficient Use, and Preservation of the Navigable Airspace,* standards for removing obstructions which can adversely affect navigable airspace.  (All)

aa.  Upgrading of building electrical systems or maintenance of existing facilities, such as painting, replacement of siding, roof rehabilitation, resurfacing, or reconstruction of paved areas, and replacement of underground facilities.  (ATO, AST)

bb.  Airport Layout Plan (ALP) approval and/or Federal financial assistance for actions related to a fee-simple purchase of land or the purchase of an avigation easement to establish a runway protection zone (RPZ) or for other aeronautical purposes provided

FAA00057690

SPX-0003189

there is no land disturbance and does not require extensive business or residential relocations. (ARP)

cc.  Approval of an Airport Layout Plan (ALP) and/or Federal financial assistance to permanently close a runway and use it as a taxiway at small, low-activity airports, provided any changes to lights or pavement would be on previously developed airport land. (ARP)

dd.  FAA construction, reconstruction, or relocation of a non-Radar, Level 1 airport traffic control tower (a tower that does not use radar) at an existing visual flight rule airport, or FAA approval of an Airport Layout Plan (ALP) and/or Federal funding to do so, provided the action would occur on a previously disturbed area of the airport and not: (1) cause an increase in the number of aircraft operations, a change in the time of aircraft operations, or a change in the type of aircraft operating at the airport; (2) cause a significant noise increase in noise sensitive areas; or (3) cause significant air quality impacts. (ARP, ATO)

ee.  Environmental investigation of hazardous waste or hazardous substance contamination on previously developed airport or FAA-owned, leased, or operated sites including temporary activities such as minor excavation, soil test borings, and installation of groundwater testing and monitoring wells, piezometers and other groundwater well monitoring devices impacting approximately one acre in aggregate surface area.  The work plan or Sampling and Analysis Plan (SAP) for the project must integrate current industry best practices and address, as applicable, surface restoration, well and soil boring decommissioning, and the collection, storage, handling, transportation, minimization, and disposal of investigation-derived wastes.  The work plan or SAP must also address these matters for other Federal or state regulated wastes generated by the investigation.  The work plan or SAP must be coordinated with and, if required, approved by the appropriate or relevant governmental agency or agencies prior to commencement of work. (ATO, ARP)

ff.  Remediation of hazardous wastes or hazardous substances impacting approximately one acre or less in aggregate surface area, including siting, site preparation, construction, equipment repair or replacement, operation and maintenance, remote or on-site monitoring, and removal of remediation-related equipment and facilities, on previously developed FAA-owned, leased, or operated sites.  Remedial or corrective actions must be performed in accordance with an approved work plan (i.e., remedial action plan, corrective action plan, or similar document) that documents applicable current industry best practices and addresses, as applicable, permitting requirements, surface restoration, well and soil boring decommissioning, and the minimization, collection, any necessary associated on-site treatment, storage, handling, transportation, and disposal of Federal or state regulated wastes.  The work plan must be coordinated with, and if required, approved by, the appropriate governmental agency or agencies prior to the commencement of work.  Examples of covered activities include:

- Minor excavation (less than one acre of surface area, or less than 25,000 cubic yards) for removal of contaminated soil or containers (drums, boxes, or other articles);

FAA00057691

SPX-0003190

- Ongoing operation of remedial and removal on-site monitoring and cleanup systems in accordance with an approved work plan (i.e., remedial action plan, corrective action plan, or similar document); and

- Installation, operation and maintenance, and removal of in-situ remediation systems and appurtenances, including (1) groundwater wells for treatment and monitoring of soil and water contamination; or (2) on-site vapor extraction systems. (ATO)

**5-6.5. Categorical Exclusions for Procedural Actions.** This category includes the list of CATEXs for FAA actions involving establishment, modification, or application of airspace and air traffic procedures. *An action included within this list of categorically excluded actions is not automatically exempted from environmental review under NEPA. The responsible FAA official must also review Paragraph 5-2, Extraordinary Circumstances, before finalizing a decision to categorically exclude a proposed action.*

a. Rulemaking actions that designate or modify classes of airspace areas, airways, routes, and reporting points (see 14 CFR part 71, *Designation of Class A, B, C, D, and E Airspace Areas; Air Traffic Service Routes; and Reporting Points*). (ATO)

b. Actions regarding establishment of jet routes and Federal airways (see 14 CFR § 71.15, *Designation of jet routes and VOR Federal airways*); operation of civil aircraft in a defense area, or to, within, or out of the United States through a designated Air Defense Identification Zone (ADIZ) (14 CFR part 99, *Security Control of Air Traffic*); authorizations for operation of moored balloons, moored kites, amateur rockets, and unmanned free balloons (see 14 CFR part 101, *Moored Balloons, Kites, Amateur Rockets and Unmanned Free Balloons*); and, authorizations of parachute jumping and inspection of parachute equipment (see 14 CFR part 105, *Parachute Operations*). (ATO)

c. Actions to return all or part of special use airspace (SUA) to the National Airspace System (NAS), such as revocation of airspace, a decrease in dimensions, or a reduction in times of use (e.g., from continuous to intermittent, or use by a Notice to Airmen (NOTAM)). (ATO)

d. Modification of the technical description of special use airspace (SUA) that does not alter the dimensions, altitudes, or times of designation of the airspace (such as changes in designation of the controlling or using agency, or correction of typographical errors). (ATO)

e. Designation of controlled firing areas. (ATO)

f. Actions to increase the altitude of special use airspace. (ATO)

g. Establishment of Global Positioning System (GPS), Flight Management System (FMS), Area Navigation/Required Navigation Performance (RNAV/RNP), or essentially similar systems that use overlay of existing flight tracks. For these types of actions, the Noise Integrated Routing System (NIRS) Noise Screening Tool (NST) or other FAA-approved environmental screening methodology should be applied. (ATO, AVS)

h. Establishment or modification of helicopter routes that channel helicopter activity over major thoroughfares and do not have the potential to significantly increase noise over noise sensitive areas. (ATO, AVS)

FAA00057692

SPX-0003191

i.  Establishment of new or revised air traffic control procedures conducted at 3,000 feet or more above ground level (AGL); procedures conducted below 3,000 feet AGL that do not cause traffic to be routinely routed over noise sensitive areas; modifications to currently approved procedures conducted below 3,000 feet AGL that do not significantly increase noise over noise sensitive areas; and increases in minimum altitudes and landing minima.  For modifications to air traffic procedures at or above 3,000 feet AGL, the Noise Screening Tool (NST) or other FAA-approved environmental screening methodology should be applied.  (ATO, AVS)

j.  Implementation of procedures to respond to emergency air or ground safety needs, accidents, or natural events with no reasonably foreseeable long-term adverse impacts. (ATO)

k.  Publication of existing air traffic control procedures that do not essentially change existing tracks, create new tracks, change altitude, or change concentration of aircraft on these tracks.  (ATO, AVS)

l.  Federal financial assistance and/or Airport Layout Plan (ALP) approval or other FAA action to establish or remove a displaced threshold on an existing runway, provided the action does not require establishing or relocating an approach light system that is not on airport property (see Paragraph 3-1.2.b(9)) or an instrument landing system (see Paragraph 3-1.2.b(8)).  This CATEX does not apply to displaced thresholds that require runway extensions.  (ARP)

m.  Short-term changes in air traffic control procedures, not to exceed six months, conducted under 3,000 feet above ground level (AGL) to accommodate airport construction.  (ARP, ATO)

n.  Tests of air traffic departure or arrival procedures conducted under 3,000 feet above ground level (AGL), provided that:  (1) the duration of the test does not exceed six months; (2) the test is requested by an airport or launch operator in response to mitigating noise concerns, or initiated by the FAA for safety or efficiency of proposed procedures; and (3) the test data collected will be used to assess the operational and noise impacts of the test.  (ATO)

o.  Procedural actions requested by users on a test basis to determine the effectiveness of new technology and/or possible impacts to the environment.  (ATO)

p.  Establishment of new procedures that routinely route aircraft over non-noise sensitive areas.  (ATO, AVS)

FAA00057693

SPX-0003192

q. The following procedures taken in accordance with Section 213 of the *FAA Modernization and Reform Act of 2012*, conducted at, above, or below 3,000 feet above ground level (AGL), unless there is a determination that extraordinary circumstances exist: [8]

(1) Area Navigation/Required Navigation Performance (RNAV/RNP) procedures proposed for core airports and any medium or small hub airports located within the same metroplex area considered appropriate by the Administrator;[9] and

(2) RNP procedures proposed at 35 non-core airports selected by the Administrator.[10] (ATO)

r. Any navigation performance or other performance based navigation procedure that, in the determination of the Administrator, would result in measurable reductions in fuel consumption, carbon dioxide emissions, and noise, on a per flight basis, as compared to aircraft operations that follow existing instrument flight rules procedures in the same airspace. This CATEX may be used irrespective of the altitude of such procedures.[11] (ATO)

**5-6.6. Categorical Exclusions for Regulatory Actions.** This category includes the list of CATEXs for FAA actions involving compliance with, or exemptions to, regulatory programs or requirements. *An action included within this list of categorically excluded actions is not automatically exempted from environmental review under NEPA. The responsible FAA official must also review Paragraph 5-2, Extraordinary Circumstances, before finalizing a decision to categorically exclude a proposed action.*

a. All FAA actions to ensure compliance with Environmental Protection Agency aircraft emissions standards. (AEE)

b. Authorizations and waivers for infrequent[12] or one-time actions, such as an air show or aviation-related exposition (to include an aerobatic practice area containing one aerobatic practice box or aerobatic contest box) or parachuting or skydiving events, that may result in some temporary impacts that revert back to original conditions upon action completion. (ATO, AVS)

---

[8] This is a legislative CATEX established in Section 213(c) of the *FAA Modernization and Reform Act of 2012*.

[9] See the Guidance Memorandum for this CATEX in the Order 1050.1F Desk Reference for review, notification, and approval processes that are required when utilizing this CATEX.

[10] See the Guidance Memorandum for this CATEX in the Order 1050.1F Desk Reference for review notification, and approval processes when utilizing this CATEX.

[11] This is a legislative CATEX established in Section 213(c) of the *FAA Modernization and Reform Act of 2012*.

[12] See the guidance memo on Aerobatic Practice Areas in the Order 1050.1F Desk Reference titled "Clarification of FAA Order 1050.1 CATEX 312b for Aerobatic Actions" when utilizing this CATEX. For low-weight pistons, mid-weight pistons, high-weight pistons and high weight radials, "infrequent" is defined as 18,000 or fewer annual operations. For aircraft that are categorized as mid-power jets and high-power radials ("warbirds"), "infrequent" is defined as 1,800 or fewer annual operations. Finally, for high-power jets, "infrequent" is defined as 300 or fewer annual operations. In circumstance in which an aerobatic practice box or the aerobatic contest box will be used by more than one aircraft group (i.e., mixed use).

FAA00057694

SPX-0003193

c. Denials of routine petitions for: (1) exemption; (2) reconsideration of a denial of exemption; (3) rulemaking; (4) reconsideration of a denial of a petition for rulemaking; and (5) exemptions to technical standard orders (TSOs). (AEE, AVS, AST, ATO)

d. Issuance of regulatory documents (e.g., Notices of Proposed Rulemaking and issuance of Final Rules) covering administrative or procedural requirements. (Does not include air traffic procedures; specific air traffic procedures that are categorically excluded are identified under Paragraph 5-6.5 of this Order). (All)

e. Issuance of special flight authorizations controlled by operating limitations, specified in the following: 14 CFR § 21.199, *Issue of Special Flight Permits*; 14 CFR § 91.319, *Aircraft Having Experimental Certificates: Operating Limitations*; 14 CFR § 91.611, *Authorization for Ferry Flight with One Engine Inoperative*; and 14 CFR § 91.859, *Modification to Meet Stage 3 or Stage 4 Noise Levels*. (ATO, AVS, AEE)

f. Regulations, standards, and exemptions (excluding those that if implemented may cause a significant impact on the human environment). (All)

**5-7. -5-50. Reserved.**

FAA00057695

SPX-0003194

## Chapter 6:  Environmental Assessments and Findings of No Significant Impact

**6-1.  General**.

a.  Level of Analysis.  EA documents should be concise and prepared with a level of analysis sufficient to:

(1)  understand the purpose and need for the proposed action, identify reasonable alternatives, including a no action alternative, and assess the potential environmental impacts;

(2)  allow the responsible FAA official to determine if:

(a)  an EIS is needed because the proposed action's environmental impacts would be significant;

(b)  a FONSI can be issued because the proposed action's environmental impacts, with no additional mitigation, would not be significant; or

(c)  a mitigated FONSI can be issued because the proposed action's environmental impacts, with additional mitigation, would not be significant (see Paragraph 6-2.3.a);

(3)  identify and comply with applicable special purpose laws and requirements in an efficient manner.  Although the NEPA process does not preclude separate compliance with these other requirements, the responsible FAA official should integrate applicable environmental review, consultation, and public involvement requirements under special purpose laws and requirements into its NEPA planning and documentation to reduce paperwork and delay, in accordance with 40 CFR §§ 1500.4(k) and 1500.5(g), CEQ Regulations; and

(4)  identify any permits, licenses, other approvals, or reviews that apply.

b.  Tiering.  FAA LOB/SOs are encouraged to build upon prior EAs or EISs, to the extent that data and analysis in those documents remain valid, and to incorporate FAA experience in the EA process.  Whenever a broad EA or EIS has been prepared (i.e., a programmatic EA or EIS), the responsible FAA official may use the tiering process to prepare subsequent EAs for actions (e.g., site-specific actions) covered by the programmatic EA or EIS.  Through the tiering process, the subsequent EA may summarize the impacts analyzed in the broader document, incorporate discussions from the broader document by reference, and focus on the issues specific to the subsequent action (see 40 CFR §§ 1502.20 and 1508.28, CEQ Regulations).  The purpose of tiering is to eliminate repetition and facilitate the analysis of issues at the appropriate level of detail.  Tiered and programmatic EAs are prepared, circulated, and filed using the same procedures applicable to other EAs (see Paragraph 3-2 for more information on programmatic and tiered NEPA documents).

FAA00057696

SPX-0003195

**6-2. Preparing Environmental Assessments.**

**6-2.1. Environmental Assessment Format.** An EA must contain the following:

a. Cover Page. This page, labeled "Environmental Assessment," identifies the proposed action and its geographic location. When an applicant or contractor for an applicant prepares EAs, the following notification must be located at the bottom: "This Environmental Assessment becomes a Federal document when evaluated, signed and dated by the responsible FAA official."

b. Proposed Action. This section describes the proposed action with sufficient detail in terms that are understandable to individuals who are not familiar with aviation or commercial aerospace activities.

c. Purpose and Need. This section briefly describes the underlying purpose and need for the Federal action. It presents the problem being addressed and describes what the FAA is trying to achieve with the proposed action. The purpose and need for the proposed action must be clearly explained and stated in terms that are understandable to individuals who are not familiar with aviation or commercial aerospace activities. To provide context while keeping this section of the EA brief, the FAA may incorporate by reference any supporting data, inventories, assessments, analyses, or studies.

d. Alternatives (Including the Proposed Action). The alternatives discussed in an EA must include those that the approving official will consider. There is no requirement for a specific number of alternatives or a specific range of alternatives to be included in an EA. An EA may limit the range of alternatives to the proposed action and no action when there are no unresolved conflicts concerning alternative uses of available resources. Alternatives are to be considered to the degree commensurate with the nature of the proposed action and agency experience with the environmental issues involved. Generally, the greater the degree of impacts, the wider the range of alternatives that should be considered. The preferred alternative, if one has been identified, should be indicated. For alternatives considered but eliminated from further study, the EA should briefly explain why these were eliminated. For more information on alternatives, see Paragraph 7-1.1.e.

e. Affected Environment. This section succinctly describes the environmental conditions of the potentially affected geographic area or areas. The discussion of the affected environment will be no longer than is necessary to understand the impacts of the alternatives; data and analyses should be presented in detail commensurate with the importance of the impact. This section may be combined with the Environmental Consequences section. The FAA may incorporate by reference background data to support the analysis (for more guidance on incorporation by reference, see Paragraph 7-1.c). For more information on data that may be relevant to the affected environment, see Paragraph 7-1.1.f.

f. Environmental Consequences. The EA must discuss, in comparative form, the reasonably foreseeable environmental impacts of the proposed action, the no action alternative, and any other alternatives being considered in detail. This analysis should be conducted for the same timeframe. The discussion of environmental impacts must focus on substantive issues and provide sufficient evidence and analysis for determining

FAA00057697

SPX-0003196

whether to prepare an EIS or a FONSI (see 40 CFR § 1508.9(a)(1), CEQ Regulations). This section must include analysis necessary to address the significance factors in Paragraph 4-3 and 40 CFR § 1508.27, CEQ Regulations. The focus of this analysis is on resources that would be directly, indirectly, and cumulatively affected. The analysis should include consideration of possible conflicts with the objectives of Federal, regional, state, tribal, and local land use plans, policies, and controls for the area concerned, as well as any other unresolved conflicts concerning alternative uses of available resources. To avoid excessive length, the environmental consequences section may incorporate by reference background data to support its effects analysis (for more guidance on incorporation by reference, see Paragraph 7-1.c).

The EA should include the information required to demonstrate compliance with other applicable requirements and should identify any permits, licenses, other approvals, or reviews that apply. To reduce paperwork and delay, and to ensure that the necessary approvals and permits will be issued with or immediately following issuance of the EA and FONSI, the responsible FAA official should: (1) coordinate timeframes for review with the oversight agency; (2) identify with the oversight agency the information needed for its review; and (3) integrate these into the EA process. For more information on environmental consequences, see Paragraph 7-1.1.g.

g. List of Preparers. The EA must include a list of the names and qualifications of personnel who prepared the EA. Contractors will be identified as having assisted in, or having prepared, the EA.

h. List of Agencies and Persons Consulted. The EA must include a list of agencies and persons consulted.

i. Appendices (if any). The EA may include the following appendices, if applicable:

(1) Any documentation that supports statements and conclusions in the body of the EA, including methodologies and references used. Proper citations to reference materials should be provided;

(2) Evidence of coordination or required consultation with affected Federal, state, tribal, and local officials and copies or a summary of their comments or recommendations and the responses to such comments and recommendations; and

(3) A summary of public involvement, including evidence of the opportunity for a public hearing, if required under applicable Federal laws (e.g., the Airport and Airway Improvement Act of 1982, 49 U.S.C. § 47106(c)), regulations, and orders, and a summary of issues raised at any public hearing or public meeting as well as responses to substantive comments.

**6-2.2. Environmental Assessment Process.** The following Environmental Assessment process is described in flowchart form in Exhibit D-2 of Appendix D.

a. Initial Steps. The FAA or applicant (if the FAA has requested that the applicant prepare the EA) formulates the proposed action and reasonable alternatives to achieve the project's purpose and need. The FAA or applicant then gathers data and begins the analysis. If the FAA determines that the proposed action would significantly affect the human environment as the analysis proceeds, the FAA can make a decision to prepare an EIS without first completing the EA.

FAA00057698

SPX-0003197

b.  Public Involvement.  The FAA or applicant must involve the public, to the extent practicable, in preparing EAs (see 40 CFR § 1501.4(b) and 1506.6, CEQ Regulations). The appropriate level of public involvement for an EA is determined on a case-by-case basis and will vary based on the proposed action and the potential impacts.  Beyond the required notice of availability (see Paragraph 6-3.d and 40 CFR § 1506.6(b), CEQ Regulations), examples of some optional public involvement methods for EAs that should be considered in appropriate circumstances include: (1) scoping (see Paragraph 6-2.2.c); (2) circulation of a draft EA for public comment (see Paragraph 6-2.2g); and (3) public meetings, workshops, and hearings (see Paragraph 2-5.3).

c.  Scoping.  Scoping, as described in 40 CFR § 1501.7, CEQ Regulations, is optional for EAs.  Scoping can be particularly useful when an EA deals with uncertainty or controversy regarding potential conflicts over the use of resources or the environmental impacts of the proposed actions.  The scoping process can provide a transparent way to identify environmental issues, focusing the analysis on the most pertinent issues and impacts.

d.  Consultation and Coordination.  The FAA or applicant determines issues and alternatives to be addressed and coordinates or consults with other agencies. Consultation includes contacting appropriate Federal, state, tribal, and local officials to obtain information concerning potential environmental impacts and maintaining contact with these parties for the remainder of the NEPA process.  Formal consultation with tribes may be required for specific projects (see Paragraph 2-4.4 for further information on government-to-government consultation).

e.  Impact Analysis.  The FAA or applicant analyzes potential impacts and prepares the EA.  The EA must present a detailed analysis, to the satisfaction of the responsible FAA official, commensurate with the level of impact of the proposed action and alternatives, to determine whether any impacts will be significant.  If the FAA has experience that includes monitoring of the implementation of actions similar to the proposed action and alternatives, the monitoring information may be useful for an assessment of the potential environmental impacts.  EMS data collection, tracking, and analysis may also be useful in the preparation of EAs, including providing input on the affected environment, assessment of potential impacts, and consideration of appropriate mitigation measures. The EA must also include a discussion of any connected or similar actions (see 40 CFR §§ 1508. 25(a)(1), 1508.25 (3), and 1508.27(b)(7), CEQ Regulations).  If the proposed action and alternatives would not cause significant impacts within specific categories of environmental impacts, a brief description of the factual basis for this conclusion with respect to each applicable impact category is sufficient.

f.  Internal Review.  Internal review of the EA is conducted by potentially affected LOB/SOs having an interest in the proposed action or reasonable alternatives identified in the EA to ensure that all FAA concerns have been addressed (see Paragraph 10-2 for more information on Review and Approval of EAs and FONSIs and FONSI/RODs).

g.  Public Comments on a Draft EA.  Circulation of a draft EA for public comment should be considered but is optional at the discretion of the responsible FAA official.  In determining whether to circulate a draft EA, the responsible FAA official should consider the type of proposed action, potential for impacts, and community controversy.

FAA00057699

Examples of situations where circulation of a draft EA may be appropriate include draft EAs prepared for projects involving special purpose laws and requirements that necessitate public input (e.g., Section 106 of the National Historic Preservation Act; Executive Order 11988, *Floodplain Management*, as amended in Executive Order 13690, *Establishing a Federal Flood Risk Management Standard and a Process for Further Soliciting and Considering Stakeholder Input*; Executive Order 11990, *Protection of Wetlands*, etc.) and projects that are highly controversial on environmental grounds (see Paragraph 5-2.b.(10)). If a draft EA is circulated, the responsible FAA official, or applicant as directed by the FAA, must circulate the draft EA to interested agencies and parties, including any who submitted comments on the proposed action. There is no set time limit on public comment periods for EAs; however, they are normally 30-45 days. Public meetings or hearings are not required for EAs, but may be considered in some situations (see Paragraph 2-5.3). Applicants who prepare an EA may not circulate a draft EA until the FAA has reviewed the document and notified the applicant that the FAA is satisfied with the draft. The FAA or applicant must publish a notice of the draft EA's availability in local newspapers, other media, and/or on the Internet. This notice must include the following statement:

> Before including your address, phone number, e-mail address, or other personal identifying information in your comment, be advised that your entire comment –including your personal identifying information –may be made publicly available at any time. While you can ask us in your comment to withhold from public review your personal identifying information, we cannot guarantee that we will be able to do so.

h. Response to Comments. If a draft EA is prepared, the FAA or applicant must then revise the draft EA, as necessary, in response to internal and external comments received on the draft document, and prepare the final EA. Although the FAA is not required to formally respond to public comments concerning EAs, EAs should reflect the FAA's consideration of such comments.

i. Use of Errata Sheet. If the modifications to the draft EA in response to comments are minor and are confined to factual corrections or explanations of why the comments do not warrant additional agency response, the FAA or applicant may prepare an errata sheet in lieu of a final EA. In this situation, the comments, responses, and errata sheet may be considered the final EA. Use of errata sheets is subject to the condition that the errata sheets:

(1) cite the sources, authorities, or reasons that support the position of the FAA; and

(2) if appropriate, indicate the circumstances that would trigger agency reappraisal or further response.

j. Special Purpose Laws and Requirements. When an action involves resources protected by special purpose laws and requirements, EAs should be coordinated, as appropriate, with agencies outside the FAA. Agencies with special expertise may also be consulted. Special purpose laws and requirements may require opportunities for public involvement. The responsible official should consider coordinating these requirements with the NEPA process so that public and agency review periods for these special purpose laws and requirements may run concurrently with any review period provided for an EA.

FAA00057700

SPX-0003199

k.  FAA Determination.  Upon review of the final EA, public comments, and applicable interagency and intergovernmental consultation (see Paragraph 2-4.3, Intergovernmental and Interagency Coordination), the responsible FAA official determines whether any environmental impacts analyzed in the EA are significant.

(1) If, the responsible FAA official concludes that the proposed action would not result in significant impacts to the human environment, the responsible FAA official may prepare a FONSI for the signature of the approving official (see Paragraph 6-3, Finding of No Significant Impact).  A FONSI may also be prepared if the responsible FAA official determines that mitigation will reduce impacts below significant levels (see Paragraph 6-2.3.a for more information on "mitigated" FONSIs).

(2) If, based on the EA, the responsible FAA official concludes that the proposed action would significantly affect the human environment, and mitigation would not reduce the potential impact(s) below significant levels, the responsible FAA official must publish a Notice of Intent (NOI) to prepare an EIS in the *Federal Register* and begin the EIS process (see Paragraph 7-1.2, Environmental Impact Statement Process).

**6-2.3.  Mitigation Considerations for Environmental Assessments**.  An EA may include discussion of reasonable mitigation measures.  If mitigation is discussed in an EA, the discussion must be in sufficient detail to describe the impacts of the mitigation.  EMS data collection, tracking, and analysis may be useful in the consideration of appropriate mitigation measures.  An EMS may also be useful for tracking and monitoring mitigation commitments.

Environmental impacts resulting from mitigation should be considered in the EA and FONSI, when applicable.  Mitigation and other conditions established in the EA and FONSI, or during their review, and included as a condition of the project approval or licensing, must be implemented and/or monitored by the FAA or other entity responsible for implementing and/or monitoring mitigation (see Paragraph 4-4.d regarding mitigation monitoring).[13] Proposed changes in, or deletion of, a mitigation measure that was included as a condition of approval of the FONSI must be reviewed by the same FAA LOB/SO that reviewed the original FONSI and must be approved and signed by the approving official.  If the responsible FAA official determines that changes in mitigation would result in significant impacts and the FAA wants to pursue these changes, the responsible FAA official must initiate the EIS process by issuing an NOI to prepare an EIS unless actions can be taken to reduce the impact(s) below the level of significance.

a.  Mitigated FONSIs.  If the responsible FAA official determines that mitigation measures can reduce potentially significant adverse impacts below the level of significance, these mitigation measures can be used to support a FONSI, provided that:

(1) The agency took a "hard look" at the problem;

(2) The agency identified the relevant areas of environmental concern;

---

[13] CEQ issued a guidance memorandum on mitigation entitled *Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact*, 76 *Federal Register* 3843 (January 21, 2011).  The salient points of the CEQ guidance have been incorporated in this Order.

FAA00057701

SPX-0003200

(3) The EA supports the agency's determination that the potential impacts will be insignificant; and

(4) The agency has identified mitigation measures that will be sufficient to reduce potential impacts below applicable significance thresholds and has ensured commitments to implement these measures.

Mitigation that is used to support a mitigated FONSI must be included as a condition of project approval (see Paragraph 4-4, Mitigation). In these cases, if the FAA's decision to act is not otherwise evidenced by a final decision document such as a rule, license, or approval, the responsible FAA official must use a FONSI/ROD to document the decision (see Paragraph 6-4, Decision Documents for Findings of No Significant Impact). The FONSI/ROD or other decision document must identify those mitigation measures the FAA is adopting and identify any monitoring and enforcement program applicable to such measures (see Paragraph 4-4, Mitigation). If the responsible FAA official determines that a mitigation measure has not been implemented or the implemented mitigation is failing to mitigate environmental impacts as predicted, and as a result a significant impact may occur, the responsible FAA official must initiate the EIS process by issuing a NOI to prepare an EIS if there remains discretionary FAA action to be taken related to the project.

**6-3. Finding of No Significant Impact**.

a. Purpose. The purpose of a FONSI is to document the FAA determination that a proposed action does not have the potential for significant environmental impacts. If none of the potential impacts assessed in the EA are determined to be significant, the responsible FAA official prepares a FONSI, which briefly presents, in writing, the reasons why an action, not otherwise categorically excluded, would not have a significant impact on the human environment. The FONSI documents the basis for the FAA's determination that the proposed action would not have significant environmental impacts. It does not represent the FAA's decision to implement the proposed action.

b. Content. There is no specified format for FONSIs. The FONSI may be attached to an EA, or the EA and FONSI may be combined into a single document. If the FONSI is attached or combined with the EA, it need not repeat the discussion in the EA. If the FONSI is not attached or combined with the EA, the FONSI must include a summary of the EA and note any other environmental documents related to it. The FONSI must:

(1) Briefly describe the proposed action, the purpose and need, and the alternatives considered (including the no action alternative); and assess and document all relevant matters necessary to support the conclusion that the proposed action would not significantly affect the quality of the human environment;

(2) Determine the proposed action's consistency or inconsistency with community planning, and document the basis for the determination;

(3) Present any mitigation measures that are a condition of project approval. The FONSI should also reflect coordination of mitigation commitments (including any applicable monitoring program) with, and consent and commitment from, those entities with the authority to implement specific mitigation measures committed to in the FONSI; and

FAA00057702

SPX-0003201

(4)  Reflect compliance with all applicable environmental requirements, including interagency and intergovernmental coordination and consultation, public involvement, and documentation requirements.  Findings and determinations required under special purpose laws and requirements, regulations, and orders, if not made in the EA, must be included in the FONSI.

c.  Adoption.  If the FONSI is prepared following adoption of all or part of another agency's NEPA document, the FONSI must identify the part(s) of the document being adopted and include documentation of the FAA's independent evaluation of the document.

d.  Public Availability.  The responsible FAA official must make FONSIs and associated EAs available to interested or affected persons or agencies (see 40 CFR § 1506.6(b), CEQ Regulations).  Methods of providing notice of the availability of a FONSI, such as publication in a local newspaper or notice through local media, are also described in 40 CFR § 1506.6(b), CEQ Regulations.  The notice will indicate locations where the FONSI and its associated EA are available.  The responsible FAA official will provide copies of FONSIs and associated EAs on request, free of charge or at a fee commensurate with the cost of reproduction.

(1) In limited circumstances that are identified below, the responsible FAA official will make the EA and FONSI available for public review for 30 days before the final determination is made whether or not to prepare an EIS and before the action may begin (see 40 CFR § 1501.4(e)(2), CEQ Regulations).  The 30-day public review period may run concurrently with any other Federal review.  These circumstances are:

(a) The proposed action is, or is closely similar to, one normally requiring the preparation of an EIS; or

(b) The nature of the proposed action is one without precedent.

(2) Certain special purpose laws and requirements require public notice of specific findings or determinations, apart from the FONSI made under NEPA.  Examples include the following:  Section 2(a)(4) of Executive Order 11988, *Floodplain Management*, 42 *Federal Register* 26951 (May 24, 1977); Section 2(b) of Executive Order 11990, *Protection of Wetlands*, 42 *Federal Register* 26961 (May 24, 1977); Section 7 of the Endangered Species Act, 16 U.S.C. § 1536; and Section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108.

e.  Approval.  All FONSIs must include the following approval statement:

> After careful and thorough consideration of the facts contained herein, the undersigned finds that the proposed Federal action is consistent with existing national environmental policies and objectives as set forth in Section 101 of NEPA and other applicable environmental requirements and will not significantly affect the quality of the human environment or otherwise include any condition requiring consultation pursuant to Section 102(2)(C) of NEPA.
>
> APPROVED:_____          DATE:_____

Following preparation of the FONSI, the approving official, who may also be the responsible FAA official, reviews and signs the FONSI (see Paragraph 10-2 for more

FAA00057703

SPX-0003202

information on Review and Approval of EAs and FONSIs). Issuance of a FONSI signifies that the FAA will not prepare an EIS and has completed the NEPA process for the proposed action. Following the approval of a FONSI, the FAA decisionmaker may decide whether to take or approve the proposed action. Mitigation measures that were made as a condition of approval of the FONSI must be incorporated in the decision to implement the action.

f. Distribution. A copy of the FONSI and EA must be sent to reviewing agencies and organizations or individuals who made substantive comments or specifically requested copies. When a project involves a resource protected under a special purpose law or requirement, or administrative directive (see Paragraph 6-2.2.j), the responsible FAA official should send a signed copy of the FONSI and the EA supporting it to the agency(ies) with whom the FAA consulted to comply with the applicable law or directive and to any party requesting copies of those documents.

**6-4. Decision Documents for Findings of No Significant Impact**.

a. FONSI/RODs. If the FAA decides to proceed with the proposed Federal action, then the decision may be documented in a formal decision document called a ROD, which can be combined with the FONSI (otherwise known as a FONSI/ROD) or prepared separately. A ROD is optional for a FONSI at the discretion of the responsible FAA official because the FAA's decision to act may be evidenced by other documents such as rules, licenses, or approvals. The responsible FAA official should prepare a FONSI/ROD or separate ROD for:

(1) Actions that have been redefined to include mitigation measures necessary to reduce potentially significant impacts below significant levels (see Paragraph 6-2.3.a, Mitigated FONSIs);

(2) Actions that are highly controversial;

(3) Actions that are, or are closely similar to, those normally addressed in an EIS (see Paragraph 6-3.d.(1)(a); or

(4) Actions that have no precedent (see Paragraph 6-3.d.(1)(b)).

In cases of doubt, the responsible FAA official should consult AGC-600 or Regional Counsel.

b. FONSI/ROD Format. The FAA FONSI/ROD or separate ROD has the same general content and format as a ROD that would be prepared following an EIS, as described in Paragraphs 7-2.1 and 7-2.2, while also describing the FAA's FONSI and its required contents. It also includes a paragraph that identifies the document as a decision or order that is, in most cases, subject to exclusive judicial review in the U.S. Courts of Appeals pursuant to 49 U.S.C. § 46110. The FONSI and other findings must be supported by documentation in the project file.

**6-5. -6-50. Reserved.**

FAA00057704

SPX-0003203

## Chapter 7:  Environmental Impact Statements and Records of Decision

**7-1.  Preparation of Environmental Impact Statements**.

a.  General.  LOB/SOs must prepare an EIS when one or more environmental impacts of a proposed action would be significant and mitigation measures would not reduce the impact(s) below significant levels.  Direct, indirect, and cumulative impacts must be considered when determining significance (see Paragraph 4-2.d for more information on direct, indirect, and cumulative impacts).

Although the FAA may use an EA as the basis to prepare an EIS when potentially significant impacts are likely to occur but cannot be mitigated, an EIS is generally prepared without a previous EA.  If an EA has been prepared, the analysis and documentation in the EA should be used to the maximum extent practicable in the EIS and is likely to be sufficient to describe the impacts that are not significant.  The EIS should focus in detail on those impacts that are significant.  The depth of analysis and documentation should be in direct proportion to the significance of the impacts.

b.  Tiering.  When preparing EISs, FAA LOB/SOs are encouraged to build upon prior programmatic or other EISs to the extent that data and analysis in those documents remain valid, and to incorporate FAA experience in the EIS process.  Whenever a broad document has been prepared (such as a programmatic EA or EIS), the responsible FAA official may use the tiering process to prepare subsequent EAs or EISs for actions covered by the programmatic EA or EIS (such as site-specific actions).  Through the tiering process, any subsequent EA or EIS only need summarize the impacts analyzed in the broader document, incorporate impact discussions from the broader document by reference, and focus on the issues specific to the subsequent action (see 40 CFR § 1502.20, CEQ Regulations).  The purpose of tiering is to eliminate repetition and facilitate the analysis of issues at the appropriate level of detail.  Tiered and programmatic EISs are prepared, circulated, and filed using the same procedures for draft and final EISs (see Paragraph 3-2 for more information on programmatic and tiered NEPA documents).

c.  Incorporation by Reference.  The responsible FAA official should incorporate material into an EIS by reference when the effect will be to cut down on bulk without impeding agency and public review of the action.  The incorporated material must be cited in the statement and its content briefly described.  No material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment.  Material based on proprietary data which is itself not available for review and comment must not be incorporated by reference.

d.  Limitation on Actions.  Until any required EIS has been completed and a ROD has been issued, no FAA action may be taken, or irretrievable and irreversible commitment of resources made, that would have an adverse environmental impact or limit the choice of reasonable alternatives (see 40 CFR §§ 1502.2(f) and 1506.1(a), CEQ Regulations) except as provided in 40 CFR § 1506.1(c) (relating to programmatic EISs).

e.  Action Taken Prior to Completion of NEPA.  If the FAA is considering an application from a non-Federal entity, and the FAA is aware that the applicant is about to take an action within the agency's jurisdiction that would have an adverse environmental impact

FAA00057705

SPX-0003204

or limit the choice of reasonable alternatives, the responsible FAA official must promptly notify the applicant that the FAA will take appropriate action to ensure that the objectives and procedures of NEPA are achieved.  However, this does not preclude development by applicants of plans or designs or performance of other work necessary to support an application for Federal, state, or local permits or assistance.

**7-1.1. Environmental Impact Statement Format**.  The FAA's standard EIS format, which follows the format prescribed in CEQ Regulations (see 40 CFR § 1502.10), is outlined below.

a.  Cover Page.  This single page will include:

(1) A list of the responsible lead and cooperating agencies (identifying the lead agency);

(2) The title of the proposed action (together with the state(s) and county(ies) where the action is located);

(3) The name, address, and telephone number of the responsible FAA official;

(4) The designation of the statement as draft, final, or supplement;

(5) A one paragraph abstract of the EIS with a heading as follows:  DEPARTMENT OF TRANSPORTATION, FEDERAL AVIATION ADMINISTRATION; and

(6) For draft EISs, a statement that this EIS is submitted for review pursuant to the following public law requirements and list those that are applicable, such as Section 102(2)(C) of the National Environmental Policy Act of 1969, and Section 4(f).

b.  Executive Summary.  An executive summary will be included to adequately and accurately summarize the EIS.  The summary describes the proposed action, stresses the major conclusions, areas of controversy (including issues raised by agencies and the public), and the issues to be resolved (including the choice among alternatives).  It also discusses major environmental considerations and how these have been addressed, summarizes the analysis of alternatives, and identifies the agency preferred alternative (and sponsor preferred alternative if it differs).  If the agency has identified an environmentally preferred alternative, it may also be included.  It discusses mitigation measures, including planning and design to avoid or minimize impacts.  It identifies interested agencies, lists permits, licenses, and other approvals that must be obtained, and reflects compliance with other applicable special purpose laws and requirements.

c.  Table of Contents.  The table of contents lists the chapters and exhibits (including figures, maps, and tables) presented throughout the EIS.  It will also list the appendices, if any, and the acronym list, glossary, references, and index.

d.  Purpose and Need.  This section briefly describes the underlying purpose and need for the Federal action.  It presents the problem being addressed and describes what the FAA is trying to achieve with the proposed action.  It provides the parameters for defining a reasonable range of alternatives to be considered.  The purpose and need for the proposed action must be clearly explained and stated in terms that are understandable to individuals who are not familiar with aviation or commercial aerospace activities.  Where appropriate, the responsible FAA official should initiate early coordination with cooperating agencies in developing purpose and need.

FAA00057706

SPX-0003205

e.  Alternatives (Including the Proposed Action).  This section is the heart of the EIS (see 40 CFR §§ 1502.10(e) and 1502.14, CEQ Regulations).  It presents a comparative analysis of the no action alternative, the proposed action, and other reasonable alternatives to fulfill the purpose and need for the action, to sharply define the issues, and provide a clear basis for choice among options by the approving official.  Whether a proposed alternative is reasonable depends, in large part, upon the extent to which it meets the purpose and need for the proposed action.  Reasonable alternatives not within the jurisdiction of the lead agency should be considered (see 40 CFR § 1502.14(c), CEQ Regulations).  The FAA may include alternatives proposed by the public or another agency.  However, they must meet the basic criteria for any alternative:  it must be reasonable, feasible, and achieve the project's purpose.  The extent of active participation in the NEPA process by the proponent of the alternative also bears on the extent to which a proffered alternative deserves consideration.  Charts, graphs, and figures, if appropriate, may aid in understanding the alternatives, for example, to depict alternative runway configurations.  To provide a clear basis of choice among the alternatives, graphic or tabular presentation of the comparative impact is recommended.  This section also presents a brief discussion of alternatives that were not considered reasonable (e.g., because they do not meet the purpose and need for the proposed action).  The draft EIS must identify the preferred alternative or alternatives, if one or more exists at the time the draft EIS is issued.  The final EIS must specifically and individually identify the preferred alternative (see 40 CFR § 1502.14 (e), CEQ Regulations).  Criteria other than those included in the affected environment and environmental consequences sections of the EIS may be applied to identify the preferred alternative.  Although CEQ encourages Federal agencies to identify the environmentally preferred alternatives in the EIS (see number 6 in CEQ's *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 *Federal Register* 18026 (March 23, 1981)), the CEQ Regulations do not require that discussion until the ROD.

f.  Affected Environment.  This section describes the environmental conditions of the potentially affected geographic area or areas.  The discussion of the affected environment should be no longer than is necessary.  It should include detailed discussion of only those environmental impact categories affected by the proposed action or any reasonable alternatives to demonstrate the likely impacts; data and analyses should be presented in detail commensurate with the importance of the impact.  This discussion may highlight important background material.  To ensure that this section emphasizes the important aspects of the impacts on the environment, the discussion should summarize and incorporate by reference information or analysis that is reasonably available to the public.  This section describes other relevant activities (past, present, and reasonably foreseeable future actions), their interrelationships, and cumulative impacts.  It may include such items as action by the community or citizen groups pertinent to, or any other unique factors associated with, the proposed action or any reasonable alternatives.  The discussion of the affected environment may include the following, if appropriate:

(l)  Location map, vicinity map, project layout plan, and photographs;

(2) Existing and planned land uses and zoning, including:  industrial and commercial growth characteristics in the affected vicinity; affected residential areas, schools, places of outdoor assemblies of persons, churches, and hospitals; public parks,

FAA00057707

SPX-0003206

wildlife and waterfowl refuges; federally listed or proposed candidate, threatened, or endangered species or federally designated or proposed critical habitat; wetlands; national and state forests; floodplains; farmlands; coastal zones, coastal barriers, or coral reefs; recreation areas; wilderness areas; wild and scenic rivers; Native American cultural sites, and historic and archeological sites eligible for or listed on the National Register of Historic Places;

(3) State or local jurisdictions affected by the proposed action or any reasonable alternatives;

(4) Population estimates and other relevant demographic information for the affected environment, including a census map where appropriate; and

(5) Past, present, and reasonably foreseeable future actions, whether Federal or non-Federal, including related or connected actions (see 40 CFR §§ 1501.7(a), 1502.4(a), 1508.25(a)(1), and 1508.27(b)(7), CEQ Regulations), to show the cumulative effects (see 40 CFR § 1508.7) of these actions on the affected environment (see CEQ Guidance on *Considering Cumulative Effects Under the National Environmental Policy Act* (January 1997) and EPA Guidance on *Consideration of Cumulative Impacts in EPA Review of NEPA Documents* (May 1999)).

g.  Environmental Consequences.

(1) This section forms the scientific and analytical basis for comparing the proposed action, the no action alternative, and other alternatives retained for detailed analysis. The discussion of environmental consequences will include the environmental impacts of the alternatives including the proposed action; any adverse environmental impacts that cannot be avoided should the proposed action or any of the reasonable alternatives be implemented; the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity; any irreversible or irretrievable commitments of resources that would be involved in the proposed action or any reasonable alternatives should  they be implemented; and mitigation (see Paragraph 7-1.1.h).  This analysis should be conducted for the same timeframe.  This section should not duplicate discussions in the alternatives section. It must include considerations of direct, indirect, and cumulative impacts and their significance and possible conflicts with the objectives of Federal, regional, state, tribal, and local land use plans, policies, and controls for the area concerned and other unresolved conflicts (see 40 CFR § 1501.2(c).  (Also see Question 23 in CEQ's *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 *Federal Register* 18026 (March 23, 1981)).  To avoid excessive length, the environmental consequences section may incorporate by reference background data to support the impacts analysis.  Section 1502.22 of the CEQ Regulations sets forth requirements for addressing situations in which information is incomplete or unavailable.

(2) Specific environmental impact categories listed in Paragraph 4-1 must be discussed to the level of detail necessary to support the comparisons of impacts of each alternative retained for detailed analysis, including the no action alternative. The 1050.1F Desk Reference describes laws, regulations, and orders in addition to NEPA that must be complied with for different impact areas before a proposed

FAA00057708

SPX-0003207

Federal action is approved. The section should include the information required to demonstrate compliance with other applicable requirements and should identify any permits, licenses, other approvals, or reviews that apply to the proposed action or any reasonable alternatives, and indicate any known problems with obtaining them. This section should also provide the status of any interagency or intergovernmental consultation required, for example, under the National Historic Preservation Act, 54 U.S.C. §300101 et seq., the Endangered Species Act, 16 U.S.C. §§ 1531–1544, the Coastal Zone Management Act, 16 U.S.C. §§ 1451–1466, the American Indian Religious Freedom Act, 42 U.S.C. § 1996, Executive Order 13084, *Consultation and Coordination with Indian Tribal Governments*, 63 *Federal Register* 27655 (May 14, 1998), the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271–1287, and the Fish and Wildlife Coordination Act, 16 U.S.C. §§ 661–667d.

h.  Mitigation.

(1) An EIS must describe mitigation measures considered or planned to minimize harm from the proposed action and reasonable alternatives. The EIS must discuss mitigation in sufficient detail to disclose that the environmental consequences have been fairly evaluated. Mitigation incorporated into project design must be clearly described in the proposed action and any reasonable alternatives. Environmental impacts resulting from mitigation must be considered in the EIS, when applicable. The following types of mitigation measures should be considered:  design and construction actions to avoid or reduce impacts; management actions that reduce impacts during operation of the facility; and replacement, restoration (reuse, conservation, preservation, etc.), and compensation measures. EMS data collection, tracking, and analysis may be useful in the consideration of appropriate mitigation measures. An EMS may also be used for tracking and monitoring mitigation commitments.

(2) Mitigation and other conditions established in the EIS, or during review of the EIS, and that are committed to in the ROD, must be implemented by the FAA or another appropriate entity with authority to implement the identified mitigation measures or other conditions. The FAA ensures implementation of such mitigation measures through special conditions, funding agreements, contract specifications, directives, other review or implementation procedures, and other appropriate follow-up actions in accordance with 40 CFR § 1505.3, CEQ Regulations (see Paragraph 4-4, Mitigation, regarding monitoring and enforcement of mitigation commitments).

i.  List of Preparers. This list includes the names, and qualifications (e.g., expertise experience, professional disciplines) of the FAA staff that were primarily responsible for preparing the EIS or significant background material, and contractors who assisted in preparing the EIS or associated environmental studies.

j.  List of Agencies, Organizations, and Persons to Whom Copies of the Statement are Sent. This list is included for reference and to demonstrate that the EIS is being circulated, and thus, that the public review process is being followed.

k.  Index. The index reflects the key terms used throughout the EIS for easy reference. The index includes page numbers for each reference.

FAA00057709

SPX-0003208

l.  Appendices (if any).  This section consists of material that substantiates any analysis that is fundamental to the EIS, but would substantially contribute to the length of the EIS or detract from the document's readability, if included in the body of the EIS.  This section should contain information about formal and informal consultation conducted, and related agreement documents prepared, pursuant to other special purpose laws and requirements.

m. Comments.  Comments received on the draft EIS are assessed and responded to in the final EIS.  See Paragraphs 7-1.2.e and 7-1.2.g for more information on responding to comments).

n. Footnotes.  Footnotes include title, author, date of document, page(s) relied upon, and footnote number used to identify where in the text, figures, and charts of the EIS the source is used.

**7-1.2.  Environmental Impact Statement Process.**  The EIS process is described in flowchart form at a high level in Exhibit D-3 of Appendix D.[14]

a.  Cooperating Agencies.  The FAA NEPA lead should identify and invite any affected Federal, state, or local agencies, or tribes with jurisdiction by law or special expertise regarding the FAA's proposed action or any reasonable alternatives to be a cooperating agency and participate in the development of the EIS (see Paragraph 2-4.2).

b.  Notice of Intent to Prepare an EIS.  The responsible FAA official must publish a Notice of Intent (NOI) in the *Federal Register* to initiate the preparation of the EIS (see 40 CFR § 1508.22, CEQ Regulations).  The NOI includes an overview of the proposed action, the alternatives being considered (including no action), and the name and address of the FAA official who can answer questions about the proposed EIS.  If a scoping meeting is planned and sufficient information is available at the time of the NOI, the NOI should also announce the meeting, including the meeting time and location, and other appropriate information such as availability of a scoping document.  If the responsible FAA official is using the NOI to satisfy public notice and comment requirements of other environmental requirements in addition to NEPA that are applicable to the proposed action, the NOI should include a statement to that effect with a reference to the applicable laws, regulations, or Executive Orders.  The responsible FAA official sends the NOI to the docket clerk in the Office of the Chief Counsel (AGC-200).  All NOIs initiated in the regions should be reviewed by the Regional Counsel before being forwarded to AGC-200.  The applicable division manager, designee, or other appropriate FAA official may sign the NOI for the *Federal Register*.  The responsible FAA official should also consider

---

[14] In November 2014, DOT released guidance on implementing Section 1319 of the Moving Ahead for Progress in the 21st Century Act (MAP-21), 42 U.S.C. § 4332a, which alters the EIS process for DOT actions.  Section 1319(a) relates to errata sheets and reflects the CEQ regulations (see 40 CFR § 1503.4(c) and Paragraph 7-1.2(f) of this Order).  Section 1319(b) requires DOT, to the maximum extent practicable, to expeditiously develop a single document that consists of a final EIS and a ROD, unless certain conditions exist.  The DOT guidance is available at http://www.dot.gov/sites/dot.gov/files/docs/MAP-21_1319_Final_Guidance.pdf.  The FAA is preparing additional, FAA-specific guidance on implementing Section 1319 of MAP-21.  LOBs/SOs are encouraged to work with AGC-600 and AEE-400 to ensure compliance with Section 1319(b).

FAA00057710

SPX-0003209

publishing the NOI, notices of scoping meetings, and other information in other formats (see Paragraph 14a of DOT Order 5610.1C and 40 CFR § 1506.6(b), CEQ Regulations).

c.   Scoping Process.  Scoping is a required part of the EIS process.  Scoping is an early and open process for determining the scope of issues to be addressed in the EIS and identifying the significant issues related to a proposed action (see 40 CFR § 1501.7, CEQ Regulations).  The responsible FAA official must take the lead in the scoping process, inviting the participation of affected Federal, state, and local agencies, any potentially affected tribes, applicants, and other interested persons (including those who might oppose the proposed action).  The responsible FAA official initiates scoping in order to determine the scope of issues to be addressed in the EIS and identify the significant issues related to the proposed action (see 40 CFR § 1501.7, CEQ Regulations).  Through scoping, the responsible FAA official will identify the issues the EIS will analyze in depth, identify any other environmental reviews and consultation requirements necessary for the proposed action, and assign responsibilities among lead and cooperating agencies for inputs to the EIS.  Scoping serves the additional purposes of identifying those issues that do not require detailed analysis or that have been covered by prior environmental review, setting the temporal and geographic boundaries of the EIS, determining reasonable alternatives, and identifying available technical information.  During scoping, the FAA or other agencies may identify other EAs or EISs that are being or will be prepared that are related to but not part of the scope of the EIS under consideration.

It is important that the FAA facilitate public participation in the process.  The FAA should tailor public scoping processes to match the complexity of the proposal.  If appropriate, a scoping meeting(s) can be held to collect information regarding environmental concerns from agencies and the public.  Scoping meetings provide the opportunity to present additional background on the proposed action and any reasonable alternatives identified, and solicit input from interested and affected parties.  An NOI or other notice of a scoping meeting must be published at least 30 days prior to the meeting.  However, a scoping meeting is not required.  Depending on the nature and complexity of the proposed action, the scoping process may be carried out by letter, telephone, or other means.  The FAA may prepare scoping materials, although these are not required.  If an EA has been prepared, the FAA may use it as the vehicle for scoping.  Consultation with appropriate agencies having jurisdiction by law or special expertise is also initiated at this point.  Scoping may also be used to assign responsibilities among lead and cooperating agencies for inputs to the EIS.

d.   Review of Draft EIS.  Following the FAA's preparation of the draft EIS, the responsible FAA official must make copies of the draft EIS available for review and comment.  The required comment period for a draft EIS is a minimum of 45 days (see 40 CFR § 1506.10(c), CEQ Regulations).  When the FAA is the lead Federal agency, the EPA, upon a showing by another Federal agency of compelling reasons of national policy, may extend this period for up to 30 days, but no longer than 30 days without the permission of the FAA (see 40 CFR § 1506.10(d), CEQ Regulations).

(1) Public Review.  The draft EIS should be available at local libraries or similar public depositories.  Material used in developing or referenced in the draft EIS must be available for review at the appropriate FAA office(s) or at a designated location.  Upon request, copies of the draft EIS must be made available to the public without

FAA00057711

SPX-0003210

charge to the extent practical or at a reduced charge, which is not more than the actual cost of reproducing copies. The draft EIS may also be placed on the Internet and/or copies may be made available in digital form.

(a) The responsible FAA official should use the following standard language in press releases and notices announcing the draft EIS's availability for comment and any public meetings or hearing(s) associated with the proposed project that will occur:

> The FAA encourages all interested parties to provide comments concerning the scope and content of the draft EIS. Comments should be as specific as possible and address the analysis of potential environmental impacts and the adequacy of the proposed action or merits of alternatives and the mitigation being considered. Reviewers should organize their participation so that it is meaningful and makes the agency aware of the viewer's interests and concerns using quotations and other specific references to the text of the draft EIS and related documents. Matters that could have been raised with specificity during the comment period on the draft EIS may not be considered if they are raised for the first time later in the decision process. This commenting procedure is intended to ensure that substantive comments and concerns are made available to the FAA in a timely manner so that the FAA has an opportunity to address them.
>
> Before including your address, phone number, e-mail address, or other personal identifying information in your comment, be advised that your entire comment – including your personal identifying information – may be made publicly available at any time. While you can ask us in your comment to withhold from public review your personal identifying information, we cannot guarantee that we will be able to do so.

(b) To ensure that local notices of the draft EIS's availability occur on the same date that the EPA publishes the Notice of Availability (NOA) in the *Federal Register*, the responsible FAA official should send a press release to local media and if the EIS is national in scope, national media outlets. The release should request that the media publish a notice of the draft EIS's availability on the same date that the EPA is expected to publish its notice. The local NOA of the draft EIS must provide the same due date for comments as that specified in the *Federal Register* notice.

(c) The FAA should hold public meetings or hearings, when appropriate. If the FAA conducts a public meeting or hearing for the purpose of obtaining public comment on a draft EIS, the FAA should ensure that the draft document is available for public review at least 30 days before the event occurs. (See Paragraphs 2-5.3 for more information on public meetings and hearings.)

(d) Certain special purpose laws and requirements require public notice of specific findings or determinations. Examples include Section 2(a)(4) of Executive Order 11988, *Floodplain Management*, 42 *Federal Register* 26951 (May 24, 1977); Section 2(b) of Executive Order 11990, *Protection of Wetlands*, 42 *Federal Register* 26961 (May 24, 1977); Section 7 of DOT Order 5650.2, *Floodplain Management and Protection* (April 23, 1979); Section 7.b of DOT Order 5660.1A, *Preservation of the Nation's Wetlands* (August 24, 1978); Section 7 of the Endangered Species Act, 16 U.S.C. § 1536; and Section 106 of the National Historic Preservation Act, 54 U.S.C. §306108.

FAA00057712

SPX-0003211

(2) Filing with EPA. Concurrently, the responsible FAA official must file the draft EIS with the EPA (see 40 CFR § 1506.9, CEQ Regulations) through the e-NEPA electronic filing system at: http://www.epa.gov/oecaerth/nepa/submiteis/index.html. As part of the draft EIS filing process, the EPA publishes the official *Federal Register* NOA for the draft EIS. This starts the official comment period for the draft EIS. The responsible FAA official also has the option to publish a more detailed NOA in the *Federal Register*. The FAA must notify EPA if the FAA approves an extension of the public comment period, so that EPA may provide an update in its *Federal Register* notice.

(3) Intergovernmental Coordination. The responsible FAA official must request comments on the draft EIS from appropriate Federal, state, and local agencies (see 40 CFR §§ 1501.2(d)(2) and 1501.7(a)(1), CEQ Regulations), and from tribes when the impacts may be on a reservation or affect tribal interests (see 40 CFR §§ 1502.16(c), 1503.1(a)(2)(ii), 1506.6(b)(3)(ii), CEQ Regulations). See Paragraphs 2-4.3 and 2-4.4 for further information on Intergovernmental and Interagency Coordination.

(a) Federal Agencies. Draft EISs must be coordinated with the appropriate regional offices of other Federal agencies having jurisdiction by law or special expertise. However, draft EISs that are coordinated with any component of the U.S. Department of Commerce (DOC), U.S. Department of Energy (DOE), or U.S. Department of the Interior (DOI) must be coordinated with the Washington, D.C., headquarters of those departments (see details below).

1. Washington, D.C., headquarters of the DOC (one copy) and Ecology and Conservation Division of the National Oceanographic and Atmospheric Administration (one copy).

2. Washington, D.C., headquarters of the DOE, if the project has major energy-related consequences.

3. DOI, Office of Environmental Policy and Compliance (One copy of the document(s) in electronic format (CD/DVD, or any other widely used electronic storage media) and the URL for review documents available on the Internet. If no electronic version is available, then 12 to 18 copies of the draft EIS depending on the proposed action's geographic location and scope) at the following address: Director, Office of Environmental Policy and Compliance, U.S. Department of the Interior, Main Interior Building, MS 2462, 1849 C Street, N.W., Washington, D.C. 20240.

4. Advisory Council on Historic Preservation (ACHP) only if they have been invited and have agreed to participate in the Section 106 process.

5. EPA regional office of interest (one copy).

(b) State and Local Agencies. Draft EISs must be coordinated with appropriate state and local agencies including cooperating agencies, agencies that commented substantively on the Intergovernmental Review of Federal Programs, affected cities and counties, and others known to have an interest in the action.

FAA00057713

SPX-0003212

(c) Tribal Governments. Draft EISs must be coordinated with appropriate tribal governments when the impacts may be on a reservation or affect tribal interests. Various laws, regulations, and orders in addition to NEPA, may also require coordination with tribes that are not federally recognized, and with traditional cultural leaders. Consult with AEE, AGC, and ACR for more information. See Paragraph 2-4.4, Tribal Consultation, for additional information on consultation with tribes.

e. Responses to Comments. The responsible FAA official must take into consideration all comments received on the draft EIS and comments recorded during public meetings or hearings, and respond to the substantive comments in the final EIS. All substantive comments received on the draft EIS (or summaries where the comments are voluminous) must be attached to the final EIS (see 40 CFR § 1503.4(b), CEQ Regulations) and must accompany the final EIS through the FAA's internal review process. Comments must be responded to in one or more of the following ways:

(1) Written into the text of the final EIS;

(2) Stated in an errata sheet attached to the final EIS; or

(3) Included or summarized and responded to in an attachment to the final EIS, and if voluminous, may be compiled in a separate supplemental volume for reference.

f. Errata Sheets. In lieu of preparing a final EIS, the FAA may, subject to the conditions set forth below, attach errata sheets to the draft EIS. If the modifications to the draft EIS in response to comments are minor and are confined to factual corrections or explanations of why the comments do not warrant additional agency response, then only the comments, responses, and errata sheet need be circulated and the draft EIS and errata sheet may be filed as the final EIS as set out in 40 CFR § 1503.4(c), CEQ Regulations. Use of errata sheets is subject to the condition that the errata sheets:

(1) cite the sources, authorities, or reasons that support the position of the FAA; and

(2) if appropriate, indicate the circumstances that would trigger agency reappraisal or further response.

The draft EIS must be reviewed and approved as designated in Paragraph 7-1.2.h.

g. Final EIS. In preparing the final EIS, the draft EIS must be revised to reflect comments received, issues raised through the public involvement and public meeting or hearing process, and other considerations. The final EIS must identify and discuss any unresolved environmental issues and efforts to resolve them through further consultation. The FAA has discretion to solicit additional comments on all or portions of final EISs that would then be addressed in any final decision (see 40 CFR § 1503.1, CEQ Regulations). The preferred alternative must be identified in the final EIS. The final EIS must reflect compliance with the requirements of all applicable special purpose laws and requirements, including Section 4(f). If such compliance is not possible by the time of final EIS preparation, the final EIS must reflect consultation with the appropriate agencies and provide reasonable assurance that the requirements can be met. Required compliance must be completed before issuance of the ROD.

FAA00057714

SPX-0003213

h. Review and Approval. The final EIS must be reviewed and approved in accordance with Chapter 10. The cover page or summary of the final EIS or a draft EIS with errata sheets in lieu of a final EIS must include the following declaration.

> After careful and thorough consideration of the information contained herein and following consideration of the views of those Federal agencies having jurisdiction by law or special expertise with respect to the environmental impacts described, the undersigned finds that the proposed Federal action is consistent with existing national environmental policies and objectives as set forth in Section 101(a) of the National Environmental Policy Act of 1969.

Other required environmental findings and conclusions must be included in the summary, if not included in the body or at the end of the EIS. Signature and date blocks should be provided for the decisionmaker's approval and may also be provided for the concurrences of other appropriate offices.

i. Availability of Approved Final EIS. The responsible FAA official must file the final EIS with the EPA through the e-NEPA electronic filing system at: http://www.epa.gov/oecaerth/nepa/submiteis/index.html. The EPA will issue a NOA for the final EIS in the *Federal Register.* The FAA may also publish a more detailed availability notice in the *Federal Register*, but the FAA notice cannot be substituted for the EPA *Federal Register* notice. The final EIS must be sent to:

  (1) The appropriate regional office of EPA;

  (2) The originating FAA LOB/SO director; Regional FAA Administrator; and AEE (one copy each);

  (3) The DOT Office of the Assistant Secretary for Transportation Policy, Office of Safety, Energy, and Environment (P-30) (one copy);

  (4) Each Federal, state, and local agency, tribe, and private organization that made substantive comments on the draft EIS and to individuals who requested a copy of the final EIS or who made substantive comments on the draft EIS (one copy each);

  (5) DOI (One copy in electronic format (CD/DVD, or any other widely used electronic storage media) and the URL for review documents available on the Internet. If no electronic version is available, then 6 to 9 copies depending on the action's geographic location and scope, (see U.S. Department of the Interior Environmental Review Distribution Requirements dated June 6, 2012) at the following address: Director, Office of Environmental Policy and Compliance, U.S. Department of the Interior, Main Interior Building, MS 2462, 1849 C Street, N.W., Washington, D.C. 20240;

  (6) DOE headquarters for projects having major energy-related consequences (one copy); and

  (7) The appropriate state-designated single point of contact (or specific agency contacts when states have not designated a single contact point), unless otherwise designated by the governor (adequate number of copies [varies by state]).

Additional copies must be sent to accessible locations to be made available to the general public, including headquarters and regional offices, and state, metropolitan, and local

FAA00057715

public libraries to facilitate accessibility. The final EIS, comments received, and supporting documents must be made available to the public without charge to the fullest extent practical or at a reduced charge, which is not more than the actual cost of reproducing copies, at appropriate agency office(s) or at a designated location.

j.  Timing of Decision. Except where a combined final EIS/ROD is required under Section 1319(b) of the Moving Ahead for Progress in the 21st Century Act (MAP-21), 42 U.S.C. § 4332a(b), the FAA must wait a minimum of 30 days after the EPA NOA of the final EIS is published in the *Federal Register* (and at least 90-days after filing of the draft EIS) before making a decision on the proposed action and issuing a ROD (see 40 CFR § 1506.10, CEQ Regulations). The waiting period is not for receiving public comments (although the FAA may request comments on a final EIS, see Paragraph 7-1.2.g); rather, it provides time for the decisionmaker to consider the final EIS and other pertinent information and make a decision. At the conclusion of the waiting period, the decisionmaker issues the final decision in a ROD (see Paragraph 7-2) and implementation of the selected action may begin.

When the FAA is the lead Federal agency, the EPA, upon a showing by another Federal agency of compelling reasons of national policy, may extend prescribed periods up to 30 days, but no longer than 30 days without the permission of the FAA (see 40 CFR § 1506.10(d), CEQ Regulations). The responsible FAA official may also extend the waiting period or request the EPA to reduce this period for compelling reasons of national policy (see 40 CFR § 1506.10(d), CEQ Regulations). The 90-day waiting period after filing the draft EIS cannot be altered by the EPA.

If the FAA unilaterally approves an overall extension of the comment period, the EPA must be notified so that the EPA may provide an update in its *Federal Register* notice.

**7-1.3. Decision Not to Prepare an Environmental Impact Statement.** Under certain circumstances, the FAA may choose to terminate an EIS. This could occur, for example, when an applicant has decided not to go forward with the action or it is determined to be no longer needed. The FAA may also terminate an EIS and revert to an EA if the environmental analysis shows that there would not be significant impacts from the project.

The FAA should provide *Federal Register* notice of the determination to no longer conduct an EIS. The *Federal Register* notice should cite the date of the original NOI to Prepare an EIS and state the reasons why the FAA has chosen to terminate the EIS.

**7-2. Environmental Impact Statement Record of Decision.**

**7-2.1. Record of Decision Process.**

a.  General. Following the time periods described in Paragraph 7-1.2.j, as applicable, the decisionmaker may make a decision on the proposed action. The FAA must prepare a ROD that contains the information referenced in Paragraph 7-2.2.

b.  Internal Review. The decisionmaker must obtain concurrence in accordance with the FAA's internal review procedures before approving the ROD (see Paragraph 10-4, Review and Approval of Final EISs and Paragraph 10-6, Review and Approval of RODs). The LOB/SO must circulate the draft ROD for internal coordination and concurrence with the same FAA LOB/SOs that reviewed the final EIS. These LOB/SOs may concur without comment, concur on the condition that specific mitigation measures

FAA00057716

SPX-0003215

be incorporated in the ROD, request that a supplement to the final EIS be prepared and circulated, or non-concur. Supplements to final EISs may be necessary and must be reviewed and approved in the same manner as the original document, and a new draft ROD should be prepared, circulated, and approved. The decisionmaker cannot approve the Federal action over a LOB/SO's non-concurrence.

c. Selection of Alternative. The decisionmaker may select any alternative within the range of alternatives analyzed in the final EIS. The selected alternative may be an alternative other than the agency's preferred alternative or the environmentally preferred alternative. The selected action may not be implemented until the decisionmaker has approved and signed the ROD.

d. Selection of Alternative Other than the Preferred Alternative. If the decisionmaker selects an alternative other than the preferred alternative in the final EIS that involves special purpose laws and requirements, such as those related to Section 4(f) land, federally listed endangered species, wetlands, or historic sites, the agency must first complete any required evaluation and consultation not already completed and make the appropriate finding prior to taking the action.

e. Public Notice. The responsible FAA official must provide public notice of availability of the ROD through appropriate means as required in 40 CFR § 1506.6(b), CEQ Regulations. Such means may include publication in the *Federal Register,* other media, and/or on the Internet (see 40 CFR § 1506.6(b), CEQ Regulations), although publication in the *Federal Register* is only required for actions of national concern.

f. Internal Distribution. A copy of the ROD should be forwarded with the final EIS to AEE-1 for their files.

**7-2.2. Record of Decision Content.** The ROD must:

a. Present the FAA's decision on the proposed action, and identify and discuss all factors, including any essential considerations of national policy, that were balanced by the agency in making its decision and state how those considerations entered into the decision;

b. Identify all alternatives the FAA considered and which alternative(s) is/are considered to be environmentally preferable. The FAA may discuss preferences among alternatives based on relevant factors including economic and technical considerations, and agency statutory missions;

c. Identify any mitigation measure(s) committed to as part of the decision and summarize any applicable mitigation monitoring and enforcement program. This must include any mitigation measure that was committed to as a condition of the approval of the final EIS;

d. State whether all practicable means to avoid or minimize environmental harm from the selected alternatives have been adopted, and if not, why; and

e. Include any findings required by Executive Order, regulation, or special purpose law or requirement (e.g., wetlands, Section 4(f), etc.).

As necessary, the ROD can be used to clarify and respond to issues raised on the final EIS.

FAA00057717

SPX-0003216

If the ROD is prepared following adoption of all or part of another agency's NEPA document, the ROD must identify the part(s) of the document being adopted and include documentation of the FAA's independent evaluation of the document.

**7-2.3. Environmental Commitments.**  Mitigation and other conditions described in the EIS and committed to in the ROD must be implemented and/or monitored by the FAA or another appropriate entity that has committed to implementing and/or monitoring mitigation. Proposed changes in, or deletion of, a mitigation measure that was included as a condition of approval of the final EIS must be reviewed by the same FAA LOB/SO that reviewed the final EIS and be approved and signed by the approving official.  The FAA ensures implementation of such mitigation measures through special conditions, funding agreements, contract specifications, directives, other review or implementation procedures, and other appropriate follow-up actions in accordance with 40 CFR § 1505.3, CEQ Regulations (see Paragraph 4-4, Mitigation, regarding monitoring and enforcement of mitigation commitments).

**7-3. -7-50.  Reserved.**

FAA00057718

SPX-0003217

## Chapter 8:  Federal Aviation Administration Actions Subject to Special Procedures

**8-1.  Commenting on Other Agencies' National Environmental Policy Act Documents.**  In accordance with 40 CFR § 1503.2, CEQ Regulations, the FAA must comment on draft EISs prepared by other Federal agencies if the FAA has jurisdiction by law or special expertise with respect to any environmental impact involved or is authorized to develop and enforce environmental standards (e.g., 14 CFR part 36).  In these situations, the responsible FAA official may, if appropriate, reply that the FAA has no comment.  If the responsible FAA official comments on the lead agency's predictive methodology, the comments should describe any preferred alternative methodology and explain why the FAA prefers this methodology.

a.  Requests from Other Agencies or Tribes.  Other Federal, state, or local agencies, or tribes, may consult the FAA for assistance in analyzing environmental impacts that fall within the FAA's statutory responsibility, mission, or related program expertise.  The FAA should provide its special expertise on proposals impacting aviation and other FAA responsibilities as follows:

(1) Comments should be specific in nature and organized in a manner consistent with the structure of the NEPA document and may identify alternatives or modifications that might enhance environmental quality or avoid or minimize adverse environmental impacts, and should correct inaccuracies or omissions;

(2) Any agency project that is environmentally or functionally related to the proposed action in the NEPA document should be identified so that inter-relationships can be discussed in the NEPA document.  In such cases, the agency should consider serving as a joint lead agency or cooperating agency;

(3) Environmental monitoring for which the agency has special expertise may be suggested and encouraged during construction, startup, or operation phases;

(4) Other agencies will generally be requested to forward their NEPA documents directly to the appropriate FAA Regions, Centers, or Service Areas.  The following types of matters, however, must be referred to the appropriate LOB/SO in Washington headquarters for comment:  actions with national policy implications; proposed actions that involve natural, ecological, cultural, scenic, historic, or park or recreation resources of national significance; legislation; or regulations having national impacts, or national program proposals.  Draft EISs in these categories must also be referred to Office of the Assistant Secretary for Transportation Policy (P-1) for preparation of DOT comments.  In referring these matters to headquarters, the region or center is encouraged to prepare a proposed Departmental response;

(5) Regions, Centers, or Service Areas review NEPA documents that do not have national implications.  Comments should be forwarded directly to the office that the originating agency designates for receipt of comments.  If the FAA receiving office believes that another DOT office also has an interest or is in a better position to respond, the FAA office should transmit the NEPA document to the appropriate DOT office in a timely fashion.  If the FAA and other DOT offices comment at the regional level, the Regional Administrator or designee may coordinate the comments;

(6) When appropriate, the FAA should coordinate a response with other DOT offices having special expertise in the subject matter; and

FAA00057719

SPX-0003218

(7) Comments should be submitted within the time limits set forth in the request, unless the office responsible for submitting comments seeks and receives an extension of time. Comments must be concise and specify any changes desired either in the action proposed and/or in the NEPA document.

b. When the FAA is a Cooperating Agency. If the FAA is acting as a cooperating agency:

(1) The responsible FAA official should, if satisfied that the FAA's views are adequately reflected in the environmental document, reply that the FAA has no comment;

(2) If the responsible FAA official or AEE prepares comments that request additional information, the request should be as timely and specific as possible. The comments must specify any additional information (including information relating to other applicable environmental reviews or consultation requirements), analyses, public involvement, or consideration of alternatives or mitigation measures the FAA considers necessary; and

(3) If comments of the responsible FAA official or AEE object or express a reservation about the proposed action based on potential environmental impacts, the comments must specify what mitigation measures the responsible FAA official or AEE considers necessary to allow the LOB/SO to grant or approve applicable permit, license, or related requirements or concurrences.

**8-2. Adoption of Other Agencies' National Environmental Policy Act Documents.** The FAA may adopt, in whole or in part, another Federal agency's draft or final EA, the EA portion of another agency's EA/FONSI, or EIS in accordance with 40 CFR § 1506.3 of the CEQ Regulations and the following procedures:

a. FAA Independent Evaluation. The responsible FAA official must determine, based on an independent evaluation, that the document, or portion(s) thereof, to be adopted: (1) adequately address(es) the relevant FAA action(s); and (2) meet(s) the applicable standards (i.e., for an EA or EIS) in the CEQ Regulations and this Order. In adopting all or part of another agency's NEPA document, the FAA takes full responsibility for the scope and content that addresses the relevant FAA action(s). To the extent that another agency's NEPA document does not adequately address the FAA's proposed action or meet the applicable standards in the CEQ Regulations and this Order, the EA or EIS must be supplemented.

b. Written Re-evaluation. If more than three years have elapsed since the other agency issued its FONSI or its EIS, the responsible FAA official must prepare a written re-evaluation of the relevant portion of the other agency's EA or EIS in accordance with the procedures of Paragraph 9-2, Written Re-evaluations.

c. Legal Review. Before the FAA adopts all or part of another agency's EA or EIS, the document or portion thereof to be adopted must be reviewed by AGC-600 (for actions approved at FAA Headquarters) or Regional Counsel to determine if it is legally sufficient for adoption purposes. This requirement applies to an EA for an airport action only if the action: (1) is opposed by a Federal, state, or local agency or a tribe on environmental grounds, or opposed by a substantial number of people the project affects;

FAA00057720

SPX-0003219

(2) would affect resources protected under Section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108; or (3) involves a determination of use of resources protected under Section 4(f). When another agency requests that the FAA be a cooperating agency, or the responsible FAA official otherwise anticipates adoption of another agency's EA or EIS, the responsible FAA official should consult with AGC-600 or Regional Counsel, as appropriate, as soon as possible regarding the timing and extent of the legal review.

d. FAA Documentation. After adopting all or part of another agency's NEPA document, the FAA must issue its own FONSI or FONSI/ROD when relying upon an EA or ROD when relying upon an EIS. The FONSI, FONSI/ROD, or ROD must identify, and may summarize, the portion(s) of the document being adopted, and must comply with other applicable requirements in this order (see Paragraph 6-3 and 7-2.2). It must also include documentation of the FAA's independent evaluation of the adopted portion(s).

e. Circulation of NEPA Documents.

(1) If the FAA is a cooperating agency on another agency's EIS and concludes that its comments and suggestions on the EIS have been satisfied, it may adopt the EIS, or a portion thereof, without recirculating it (see 40 CFR § 1506.3(c), CEQ Regulations). If the FAA is not a cooperating agency, it must recirculate the adopted EIS, or portion thereof, in accordance with 40 CFR § 1506.3(b), CEQ Regulations.

(2) The FAA may adopt an EA without circulating the EA for public comment regardless of whether the FAA was a cooperating agency. Circulation of an adopted EA for public comment is optional at the discretion of the responsible FAA official (see Paragraph 6-2.2.g). Examples of situations where this may be appropriate include projects that are highly controversial on environmental grounds (see Paragraph 5-2.b.(10)) and those involving special purpose laws and requirements (e.g., Section 106 of the National Historic Preservation Act; Executive Order 11988, *Floodplain Management*; Executive Order 11990, *Protection of Wetlands*; etc.) that necessitate additional public involvement beyond that already provided by the lead agency.

f. Notice to EPA. The FAA must notify EPA when it adopts an EIS prepared by another agency (see *Amended Environmental Impact Statement Filing System Guidance for Implementing 40 CFR 1506.9 and 1506.10 of the Council on Environmental Quality's Regulations Implementing the National Environmental Policy Act*, 76 *Federal Register* 2681 (January 14, 2011)).

**8-3. Rulemaking.** For a rulemaking subject to an EA or EIS, the draft EA or draft EIS will normally accompany the proposed rule and be made available with the proposed rule on Regulations.gov. The EA should be issued for public comment concurrent with the public comment period on the proposed rule to the extent practicable (see 40 CFR § 1501.4(b), CEQ Regulations). The NOA of the draft EIS must be published at least 90 days or the NOA of the final EIS must be published at least 30 days, whichever is later, prior to publishing a final rule (see 40 CFR § 1506.10, CEQ Regulations). The FAA may waive the 30 day period and publish

FAA00057721

a final rule concurrently with a NOA of the final EIS when engaged in rulemaking under the Administrative Procedure Act, 5 U.S.C. §§ 551-559, or other statute for the purpose of protecting public health or safety (see 40 CFR § 1506.10(b)(2), CEQ Regulations).

**8-4. Legislative Proposals.** The FAA must prepare and circulate a draft Legislative EIS (LEIS) for a legislative proposal that could cause significant environmental impacts (see 40 CFR §§ 1506.8, 1508.17, and 1508.18(a), CEQ Regulations). Unless a final LEIS is required under 40 CFR § 1506.8(b)(2), CEQ Regulations, the draft LEIS along with comments received from circulation of the draft LEIS are included in the formal transmittal of the legislative package to Congress. The draft LEIS (un-revised) and associated comments constitute the detailed statement required by Section 102(2)(C) of NEPA, 42 USC § 4332(2)(C) for legislative proposals to Congress. The office originating the legislation is responsible for preparing, circulating, and filing the draft LEIS and, if required, the final LEIS. The LEIS is prepared and processed in the same manner as an EIS except that scoping is not required (see 40 CFR § 1506.8(b)(1), CEQ Regulations).

a. The draft LEIS and any public comments received by the FAA, and the final LEIS if required, must be transmitted to Congress within 30 days after transmittal of the legislative proposal, or within sufficient time to allow review for associated hearings and debates on the proposed legislation. The responsible FAA LOB/SO must clear the draft LEIS and associated comments, and the final LEIS if required, with the Office of the Assistant Secretary for Transportation Policy (P-1) and DOT Assistant General Counsel for Legislation (C-40). C-40 will submit the environmental documents to the Office of Management and Budget for circulation in the normal legislative clearance process.

b. Questions concerning legislation should be directed to the FAA Office of Government and Industry Affairs (AGI).

**8-5. Actions within the United States with Potential Transboundary Impacts**. Transboundary impacts would occur when an FAA action within the United States results in impacts that extend across the border and affect another country's environment. The FAA should include analysis of any reasonably foreseeable transboundary effects in their analysis of proposed actions (see CEQ's *Guidance on NEPA Analyses for Transboundary Impacts*, July 1, 1997).

**8-6. Effects of Major Federal Aviation Administration Actions Abroad.** If the FAA anticipates communication with a foreign government concerning environmental studies or documentation, the responsible FAA official must consult with the appropriate headquarters LOB/SO. The LOB/SO must notify AEE-400, coordinate with the Office of International Aviation (API), and then consult with the Office of the Assistant Secretary for Transportation Policy (P-1) to coordinate communication through the State Department.

a. Consideration of Effects. In accordance with Executive Order 12114, *Environmental Effects Abroad of Major Federal Actions*, 44 *Federal Register* 1957 (January 9, 1979), and DOT Order 5610.1C, Paragraph 16, the responsible FAA officials should determine whether certain FAA actions would have a significant effect outside the United States, its territories and possessions. FAA officials should consider whether the Federal action involves:

FAA00057722

SPX-0003221

(1) Effects on the environment of the global commons outside the jurisdiction of any nation (e.g., the ocean or Antarctica);

(2) Effects on the environment of a foreign nation not participating with the United States and not otherwise involved in the action;

(3) Provision of certain products (or emissions/effluents) which in the United States are strictly prohibited or strictly regulated because their effects on the environment present a serious public health risk;

(4) A physical project which, in the United States, would be prohibited or strictly regulated by Federal law to protect the environment against radioactive substances; or

(5) Effects on natural or ecological resources of global importance designated for protection by the President or resources protected by international agreement binding on the United States designated for protection by the Secretary of State.

b. Determination. Before deciding to approve any action having potential effects in the categories described in Paragraph 8-6.a, the responsible FAA official must determine whether the proposed action would have a significant environmental effect abroad.

c. No Significant Effect. If the responsible FAA official determines that the action will not have a significant environmental effect abroad, he or she must prepare a memorandum for the record that states the underlying reasons for the determination.

d. Significant Effect. If the responsible FAA official determines that the action would have a significant effect abroad, he or she should determine what type of document must be prepared and considered in accordance with Section 2-4 of Executive Order 12114, *Environmental Effects Abroad of Major Federal Actions*, 44 *Federal Register* 1957 (January 9, 1979). As determined by the agency, documents should be taken into consideration in taking actions as follows:

(1) For major FAA actions significantly affecting the global commons – an EIS (including programmatic EISs);

(2) For major Federal actions significantly affecting the environment of a foreign nation not participating with the United States and not otherwise involved in the action or major Federal actions significantly affecting the environment of a foreign nation which provide to that nation products or physical projects as described in Paragraphs 8-6.a(3) or 8-6.a(4):

(a) Bilateral or multilateral environmental studies, relevant or related to the proposed action, by the United States and one or more foreign nations, or by an international body or organization in which the United States is a member or participant; or

(b) A concise review of the environmental issues involved, including EAs, summary environmental analyses, or other appropriate documents; and

(3) For major Federal actions outside the United States, its territories and possessions which significantly affect natural or ecological resources of global importance or protected by international agreements as set forth in Paragraph 8-6.a(5) -- an EIS,

FAA00057723

SPX-0003222

bilateral or multilateral environmental studies, or a concise review of environmental issues.

e.  Need for Additional Documentation.  An agency need not prepare a new document to comply with Executive Order 12114 when a document described in Paragraph 8-6.d already exists.

f.  Coordination of Communications.  The responsible FAA official must first coordinate communications concerning environmental studies or documentation with API, followed by the State Department through the DOT Office of the Assistant Secretary for Transportation Policy (P-1).

g.  Additional Coordination.  With respect to requests for FAA action, after the State Department's notification, all FAA requests to a foreign applicant for information the FAA needs to prepare an environmental study or an EIS should be forwarded through the civil aviation authority of the applicant's government.  Copies of the environmental study or EIS and notices of any public hearings planned on the proposed action should be furnished to the:

(1)  Applicant;

(2)  Appropriate foreign civil aviation authority;

(3)  Washington, D.C., embassy for the country where the applicant is located or the country that the proposed action would affect;

(4)  API; and

(5)  AEE-400.

h.  Other Requirements.  Other environmental laws, regulations, and Executive Orders have specific requirements regarding consideration of potential effects of Federal actions overseas.  Important examples include, but are not limited to, the following:

(1)  Under Executive Order 12088, *Federal Compliance with Pollution Control Standards*, 43 *Federal Register* 47707 (October 13, 1978), the FAA must ensure that construction or operation of FAA facilities outside the United States complies with the environmental pollution control standards of general applicability in the host country or jurisdiction; and

(2)  Under Section 402 of the National Historic Preservation Act (54 U.S.C. § 307101(e)), "[p]rior to the approval of any Federal undertaking outside the United States which may directly and adversely affect a property which is on the World Heritage List or on the applicable country's equivalent of the National Register [of Historic Places], the head of a Federal agency having direct or indirect jurisdiction over such undertaking shall take into account the effect of the undertaking on such property for purposes of avoiding or mitigating any adverse effect."

i.  Issue Identification and Resolution.  Any substantial differences arising in the course of the environmental study or EIS between the originating FAA organization and a foreign applicant or the affected foreign country should be referred to AEE (for proposed Airport actions, APP-400), which will consult with APL to resolve any problems.

FAA00057724

SPX-0003223

**8-7. Emergency Actions.** Emergency circumstances may require immediate actions that preclude following standard NEPA processes. Alternative arrangements for NEPA compliance are permitted as described in this paragraph. Such alternative arrangements are limited to those actions that are necessary to control the immediate impacts of the emergency.

In the event of emergency circumstances, the LOB/SO should coordinate with AEE-400 and AGC-600 as soon as practicable. When time permits, environmental documentation should be prepared in accordance with this Order and the CEQ Regulations. Immediate emergency actions necessary to protect the lives and safety of the public or prevent adverse impacts to ecological resources and functions should never be delayed in order to comply with NEPA. These actions should be taken as soon as is necessary to ensure the protection and safety of the public and the protection of ecological resources and functions. Alternative arrangements for NEPA compliance are permitted for emergency actions pursuant to the following:

  a. CATEXs. Where emergency circumstances make it necessary to determine whether an extraordinary circumstance would preclude the use of a CATEX, the responsible FAA official must make the determination as soon as practicable. If an extraordinary circumstance exists, the responsible FAA official must comply with Paragraphs 8-7.b or 8-7.c below, as applicable.

  b. Environmental Assessments. Where emergency circumstances make it necessary to take an action that requires an EA before the normal EA process can be completed in accordance with this Order and the CEQ Regulations, the responsible FAA official must consult with AEE and AGC-600 to develop alternative arrangements. Alternative arrangements for such actions should focus on minimizing adverse environmental impacts of the FAA's action and the emergency. To the maximum extent practicable, the alternative arrangements should include the interagency coordination and public notification and involvement that would normally be undertaken for an EA for the action at issue. The alternative arrangements may not alter the requirements of 1508.9(a)(1) and (b), CEQ Regulations, but the level of evidence, analysis, and discussion may be limited to what is practicable under the emergency circumstances. The Director of AEE may grant alternative arrangements. Any alternative arrangements must be documented. AEE will inform CEQ of the alternative arrangements at the earliest opportunity.

  c. Environmental Impact Statements. CEQ may grant alternative arrangements for, but not eliminate, NEPA compliance where emergency circumstances make it necessary to take actions with significant environmental impacts without observing other provisions of this Order and the CEQ Regulations (see 40 CFR § 1506.11, CEQ Regulations). In these situations, the processing times may be reduced or, if the emergency situation warrants, preparation and processing of EISs may be abbreviated. A request for alternative arrangements must be submitted to CEQ and notice of a potential request should be provided to CEQ at the earliest opportunity. Before making the request, the responsible FAA official must consult with AEE-400 and the AGC-600 for evaluation to ensure national consistency. For projects undertaken by an applicant, the responsible FAA official must inform AEE-400 and AGC-600 about the emergency. AEE will notify the Office of the Assistant Secretary for Transportation Policy (P-1) of any situations when alternative arrangements will be requested and will consult CEQ requesting the alternative arrangements for complying with NEPA.

FAA00057725

SPX-0003224

**8-8. Council on Environmental Quality Referrals.** The CEQ may serve as a mediator in interagency disagreements over proposed FAA actions that might cause unsatisfactory environmental impacts or actions conducted by other Federal agencies that may affect FAA interests. If an agency determines that a proposed FAA action is environmentally unsatisfactory, the EPA or an agency commenting on an FAA draft and final EIS may refer the matter to CEQ by delivering the referral to CEQ no later than 25 days after publication by EPA of the notice of availability of the final EIS (unless the FAA grants an extension of time under 14 CFR § 1504.3(b), CEQ Regulations). The FAA must comply with CEQ's procedures for making referrals and responding to referrals, which are provided at 40 CFR part 1504, CEQ Regulations. The FAA-specific procedures for responding to referrals are as follows:

a. If the responsible FAA official receives a notice of intended referral from a commenting agency, the responsible FAA official must provide AEE and the Office of the Assistant Secretary for Transportation Policy (P-1) with a copy of the notice (FAA airports personnel must provide a copy of the referral notice to APP-400, which will then contact AEE and P-1).

b. Once a referral to CEQ has been made by a commenting agency, the responsible FAA official must send a proposed response to AEE within 10 days of the referral. The response must fully address the issues raised in the referral and be supported by evidence. AEE then obtains P-1's concurrence on the proposed response (APP-400 must also obtain P-1 concurrence for Airports' actions). This response then must be sent to CEQ within 25 days of receipt of the referral.

**8-9. -8-50. Reserved.**

FAA00057726

SPX-0003225

## Chapter 9: Time Limits, Written Re-Evaluations, and Supplemental National Environmental Policy Act Documents

**9-1. Time Limits.**  There are established time limits for EAs and EISs consistent with time limits established in DOT Order 5610.1C.  These time limits do not apply to programmatic EAs and EISs, which may be valid for longer time periods.

a.  Draft EA.  A draft EA may be assumed valid for a period of three years.  If the approving official has not issued a FONSI within three years of receipt of the final draft EA, a written re-evaluation must be prepared in accordance with Paragraph 9-2 of this Order (unless a decision has been made to prepare a new or supplemental draft EA).

b.  FONSI.  For FONSIs, two time limits are established:

(1) If major steps toward implementation of the proposed action (such as the start of construction, substantial acquisition, or relocation activities) have not commenced within three years from the date of issuance of the FONSI, a written re-evaluation must be prepared in accordance with Paragraph 9-2 of this Order (unless a decision has been made to prepare a new or supplemental EA); or

(2) If the proposed action is to be implemented by the FAA in stages or an action implemented by an applicant requires successive FAA approvals, a written re-evaluation of the continued adequacy, accuracy, and validity of the EA must be made at each major stage or approval point that occurs more than three years after issuance of the FONSI and a new or supplemental EA prepared, if necessary.

c.  Draft EIS.  A draft EIS may be assumed valid for a period of three years.  If the proposed final EIS is not submitted to the approving official within three years from the date of the draft EIS circulation, a written re-evaluation must be prepared in accordance with Paragraph 9-2 of this Order (unless a decision has been made to prepare a new or supplemental draft EIS).

d.  Final EIS.  For final EISs, two time limits are established:

(1) If major steps toward implementation of the proposed action (such as the start of construction, substantial acquisition, or relocation activities) have not commenced within three years of approval of the final EIS, a written re-evaluation must be prepared in accordance with Paragraph 9-2 of this Order (unless a decision has been made to prepare a new or supplemental EIS); or

(2) If the proposed action is to be implemented by the FAA in stages or an action implemented by an applicant requires successive FAA approvals, a written re-evaluation of the continued adequacy, accuracy, and validity of the EIS must be made at each major stage or approval point that occurs more than three years after approval of the final EIS.

**9-2. Written Re-evaluations.**  A written re-evaluation is a document used to determine whether the contents of a previously prepared environmental document (i.e., a draft or final EA or EIS) remain valid or a new or supplemental environmental document is required.  There is no specified format for a written re-evaluation.  A written re-evaluation should be concise and the

FAA00057727

SPX-0003226

level of analysis should be commensurate with the potential for environmental impacts of a nature or extent not evaluated in the EA or EIS.

    a.   Written Re-evaluation Required.  Unless a decision has been made to prepare a new or supplemental EA or EIS, the responsible FAA official must prepare a written re-evaluation:

    (1) If required under Paragraph 8-2.b or 9-1 of this Order; or

    (2) Before further FAA approval may be granted for an action if, after the FAA has approved an EA or EIS for the action:

        (a) There are changes to the action, or new circumstances or information, that could trigger the need for a supplemental EA or EIS (see Paragraphs 9-2.c and 9-3); or

        (b) All or part of the action is postponed beyond the time period analyzed in the EA or EIS.

    b.   Other Circumstances.  The responsible FAA official may also prepare a written re-evaluation in other circumstances, including, for example, where there is a lack of clear and convincing evidence that major steps toward implementation of the proposed action have commenced.

    c.   Supplemental EA or EIS Not Required.  A new or supplemental EA or EIS need not be prepared if a written re-evaluation indicates that:

    (1) The proposed action conforms to plans or projects for which a prior EA and FONSI have been issued or a prior EIS has been filed and there are no substantial changes in the action that are relevant to environmental concerns;

    (2) Data and analyses contained in the previous EA and FONSI or EIS are still substantially valid and there are no significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts; and

    (3) Pertinent conditions and requirements of the prior approval have been, or will be, met in the current action.

    d.   Process.  The responsible FAA official must sign the written re-evaluation.  Written re-evaluations should be reviewed internally and may be made public at the discretion of the responsible FAA official.

    e.   Decision Document.  There may be instances where it would be appropriate for the responsible FAA official to issue a separate formal decision document in connection with a written re-evaluation (i.e., a "WR/ROD").  A WR/ROD might be appropriate, for example, where there is substantial controversy regarding the need for a supplemental EA or EIS.  A WR/ROD may also be appropriate when the written re-evaluation involves an action covered in an EA where any of the factors listed in Paragraphs 6-4.a.(1)-(4) apply.  When there is doubt whether a WR/ROD is appropriate, the responsible FAA official should consult with AGC-600 or Regional Counsel.

FAA00057728

SPX-0003227

**9-3. Supplemental Environmental Assessments and Environmental Impact Statements.**
The responsible FAA official must prepare a supplemental EA, draft EIS, or final EIS if either of
the following occurs:  (1) there are substantial changes to the proposed action that are relevant to
environmental concerns, or (2) there are significant new circumstances or information relevant to
environmental concerns and bearing on the proposed action or its impacts (see 40 CFR §
1502.9(c)(1), CEQ Regulations).  Significant information is information that paints a
dramatically different picture of impacts compared to the description of impacts in the EA or
EIS.  The FAA also may prepare supplements when the purposes of NEPA will be furthered by
doing so (see 40 CFR § 1502.9(c)(2), CEQ Regulations).  If a supplement changes a FONSI or a
ROD, the FAA must issue a new FONSI or ROD.  If a new ROD is required, it must be
combined with the supplemental final EIS if a combined final EIS/ROD would be required under
Section 1319(b) of the Moving Ahead for Progress in the 21st Century Act (MAP-21), 42 U.S.C.
§ 4332a(b).

   a.  Process.  The FAA prepares, circulates, issues, and files, as appropriate, a supplement
   to an EA, draft EIS, or final EIS in the same fashion as the original EA, draft EIS, or final
   EIS, unless CEQ approves alternative procedures.  If, however, there are compelling
   reasons of national policy to shorten time periods, the FAA must consult with the EPA
   (see Paragraph 7-1.2.d).  Scoping may be considered, but is not required.

   b.  Timing.  Except where a combined final EIS/ROD is required under Section 1319(b)
   of the Moving Ahead for Progress in the 21st Century Act (MAP-21), 42 U.S.C.
   § 4332a(b), if a new ROD is required, it cannot be issued sooner than 30 days after the
   NOA of the supplemental EIS has been published in the *Federal Register.*

**9-4.  -9-50.  Reserved.**

FAA00057729

SPX-0003228

7/16/15                                                                 Order 1050.1F

## Chapter 10: Review and Approval of National Environmental Policy Act Documents

**10-1. General.** The FAA's internal review process is a means of coordinating the review of NEPA documents among appropriate management levels and across LOB/SOs. Internal review is to ensure that: (1) NEPA documents are technically and legally sufficient; (2) the concerns of other FAA offices and any related foreseeable agency actions by other FAA offices are properly discussed in NEPA documents; and (3) any commitments that are the responsibility of other FAA offices are coordinated with the appropriate action office so that these commitments will be implemented. LOB/SOs should have in place processes to provide evidence of appropriate coordination and legal sufficiency review. The responsible FAA official must contact affected LOB/SOs for guidance on program-specific coordination procedures. This Order establishes special instructions for proposed actions that cross regional boundaries or LOBs, and for final EISs that are highly controversial (see Paragraph 10-4.c).

**10-2. Review and Approval of Environmental Assessments, Findings of No Significant Impact, and Findings of No Significant Impact/Records of Decision.**

a. EAs and FONSIs Originating and Approved in FAA Regions, Centers, or Service Areas. The NEPA lead in the Region, Center, or Service Area must coordinate review of the EA and FONSI with affected LOB/SOs. The NEPA lead must also coordinate legal sufficiency review of the EA and FONSI with applicable Regional or Center Counsel; however, for airport actions, Regional Counsel legal sufficiency review is only required if the action: (1) is opposed by a Federal, state, or local agency or a tribe on environmental grounds or opposed by a substantial number of people the project affects; (2) would affect resources protected under Section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108; or (3) involves a determination of use of resources protected under Section 4(f). Following coordination with interested LOB/SOs and any required legal sufficiency review, the approving official may approve and sign the FONSI.

b. EAs and FONSIs Originating or Approved in Washington, D.C. Headquarters. The NEPA lead LOB/SO must coordinate review of the EA and FONSI with affected LOB/SOs. The NEPA lead must also coordinate legal sufficiency review of the EA and FONSI with Headquarters AGC; however, for airport actions, legal sufficiency review is only required if the action: (1) is opposed by a Federal, state, or local agency or a tribe on environmental grounds or opposed by a substantial number of people the project affects; (2) would affect resources protected under Section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108; or (3) involves a determination of use of resources protected under Section 4(f). Following coordination and any required legal sufficiency review by AGC, the approving official may approve and sign the FONSI.

c. Supplemental EAs. For supplemental EAs, the NEPA lead should follow the coordination procedures described in Paragraphs 10-2.a and 10-2.b.

d. FONSI/RODs. The NEPA lead must coordinate review of the FONSI/ROD with affected LOB/SOs and Headquarters AGC (or Regional or Center Counsel for FONSI/RODs originating and approved in FAA Regions, Centers, or Service Areas); however, for airport actions, legal sufficiency review is only required if the action: (1) is opposed by a Federal, state, or local agency or a tribe on environmental grounds or opposed by a substantial number of people the project affects; (2) would affect resources

FAA00057730

protected under Section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108; or (3) involves a determination of use of resources protected under Section 4(f). Following coordination and review for legal sufficiency, the decisionmaker may approve and sign the FONSI/ROD. When the FAA prepares a FONSI/ROD for a proposed action meeting the criteria described in Paragraph 6-4.a and where the proposed action crosses regional boundaries or involves more than one LOB, the Regional Administrator, Center Director, or Service Area Director must sign the decision documents. When the FAA prepares a FONSI/ROD for a proposed action that crosses regional boundaries or involves more than one LOB, but that does not meet the criteria described in Paragraph 6-4.a, the decisionmaker for the NEPA lead in the Region, Center, or Service Area may sign the decision document provided that the decisionmaker for any other office with an action covered by the FONSI also signs the grid indicating concurrence.

e. Request to Waive Review. Regional Counsel and/or Headquarters AGC review of an EA and FONSI can be waived for LOBs other than ARP as long as the proposed action is not opposed on environmental grounds by a Federal, state, or local government, or by a tribe. At the regional level, a Division Manager may request a waiver of Regional Counsel's legal sufficiency review. Such requests must be submitted to AGC-600, as only AGC-600 may waive Regional Counsel's review of an EA and FONSI. At the headquarters level, AGC may waive its review of an EA and FONSI upon request by a Program or Office Director.

**10-3. Review and Approval of Draft Environmental Impact Statements.**

a. Draft EISs Originating in Regions, Centers, or Service Areas (Except Those Having National Interest or Involving Section 4(f) Determinations). The NEPA lead Region, Center, or Service Area must coordinate review of the preliminary draft EIS or its relevant parts with affected LOB/SOs, with the appropriate LOB/SO (e.g., APP-400 for airport program draft EISs), and with Regional or Center Counsel for legal sufficiency review. Following coordination and legal sufficiency review, the responsible FAA official may publish, distribute, and file the draft EIS with EPA.

b. Draft EISs Originating in Washington, D.C. Headquarters, Having National Interest, or Involving Section 4(f) Determinations. The NEPA lead LOB/SO must coordinate review of the preliminary draft EIS or its relevant parts with affected LOB/SOs and with Headquarters AGC for legal sufficiency review. Following coordination and legal sufficiency review, the responsible FAA official may publish, distribute, and file the draft EIS with EPA.

**10-4. Review and Approval of Final Environmental Impact Statements.**

a. Final EISs Originating in Regions, Centers, or Service Areas.

(1) Where authority to approve the final EIS is in the Region, Center, or Service Area. The NEPA lead Region, Center, or Service Area must coordinate review of the final EIS with affected LOB/SOs and Regional or Center Counsel for legal sufficiency review. Following coordination and review for legal sufficiency, the approving official may approve, sign, and file the final EIS with EPA. If

FAA00057731

SPX-0003230

headquarters concurrence is required by an LOB/SO on a final EIS, the NEPA lead must obtain that concurrence prior to approval.

(2) Where authority to approve the final EIS is retained in Washington, D.C. Headquarters. The NEPA lead must coordinate the final EIS with affected LOB/SOs and Headquarters AGC for legal sufficiency review and concurrence. Unless specifically requested, coordination with AEE is not required; however, the responsible FAA official must provide AEE with a copy of the final EIS for informational purposes. Following AGC legal sufficiency review and concurrence, the approving official may approve and sign the final EIS, and the responsible FAA official may file the final EIS with EPA.

b. Final EISs Originating in Washington, D.C. Headquarters. The NEPA lead LOB/SO must coordinate the final EIS with affected LOB/SOs and Headquarters AGC for legal sufficiency review. Unless specifically requested, coordination with AEE is not required; however, the responsible FAA official must provide AEE with a copy of the final EIS for informational purposes. Following Headquarters AGC legal sufficiency review, the approving official may approve and sign the final EIS, and the responsible FAA official may file the final EIS with the EPA.

c. Highly Controversial Final EISs. If a final EIS is highly controversial, AEE must notify P-1 and the DOT Office of General Counsel (C-1) that the final EIS is under review and must provide each with a copy of the summary section of the final EIS. P-1 and C-1 must also be given at least two weeks' notice before approval of the highly controversial final EIS.

**10-5. Review and Approval of Supplemental Environmental Impact Statements**. For supplemental EISs, the NEPA lead should follow the coordination procedures described in Paragraphs 10-4.a, and 10-6.a, as applicable.

**10-6. Review and Approval of Records of Decision.**

a. RODs originating in Regions, Centers, or Service Areas.

(1) Where authority to approve the ROD is in the Region, Center, or Service Area. The NEPA lead Region, Center, or Service Area must coordinate review of the ROD with affected LOB/SOs and Regional or Center Counsel for legal sufficiency review. Following coordination and review for legal sufficiency, the decisionmaker may approve and sign the ROD. If headquarters concurrence is required by an LOB/SO on a ROD, the NEPA lead must obtain that concurrence prior to approval of the ROD. For proposed actions that cross regional boundaries or involves more than one LOB, the Regional Administrator is responsible for signing the ROD.

(2) Where authority to approve the ROD is retained in Washington, D.C. Headquarters. The NEPA lead must coordinate the ROD with affected LOB/SOs and Headquarters AGC for legal sufficiency review. Unless specifically requested, coordination with AEE is not required; however, the responsible FAA official must provide AEE with a copy of the ROD for informational purposes. Following legal sufficiency review, the decisionmaker may approve and sign the ROD.

b. RODs originating in Washington, D.C. Headquarters. The NEPA lead LOB/SO must coordinate the ROD with affected LOB/SOs and Headquarters AGC for legal sufficiency

FAA00057732

SPX-0003231

review. Unless specifically requested, coordination with AEE is not required; however, the responsible FAA official must provide AEE with a copy of the ROD for informational purposes. Following legal sufficiency review, the decisionmaker may approve and sign the ROD.

**10-7. -10-50. Reserved.**

FAA00057733

SPX-0003232

## Chapter 11:  Administrative Information

**11-1.  Distribution.**  Notice of promulgation and availability of this Order is distributed to the FAA Assistant or Associate Administrators and their office and service directors, the Chief Operating Officer and vice-presidents of ATO, and the Chairs of the Environmental Network. This Order should be forwarded to all division and facility managers and NEPA practitioners.

A member of the public may obtain an electronic copy of this Order using the Internet by:

    a.  Visiting the FAA's Regulations and Policies website at http://www.faa.gov/regulations_policies/;

    b.  Searching the Federal eRulemaking Portal at http://www.regulations.gov; or

    c.  Accessing the Government Printing Office's website at http://www.gpo.gov/fdsys/.

A member of the public who does not have access to the Internet or is not able to use an electronic version may obtain a CD or hard copy of this Order, for a fee, by sending a request to the FAA, Office of Rulemaking (ARM-1), 800 Independence Avenue S.W., Washington, DC 20591, or by calling (202) 267-9680.  Requestors should identify the docket number, notice number, or change number of this Order.

A member of the public may also access all documents the FAA considered in developing this Order through the Internet via the Federal eRulemaking Portal referenced in Paragraph 11-1.b.

**11-2.  Authority to Change This Order.**

    a.  FAA Administrator.  The Administrator reserves the authority to establish or change policy, delegate authority, or assign responsibility.

    b.  Executive Director of the Office of Environment and Energy (AEE-1).  AEE-1 has the authority to add new chapters or appendices or change existing chapters or appendices after appropriate coordination with internal stakeholder organizations.  AEE-1 also has the authority to update and amend the 1050.1F Desk Reference.

    c.  Organizational Elements.  Changes proposed by an organizational element within the FAA must be submitted to AEE-1, who will evaluate, or assign a designee to evaluate the changes for incorporation.  The LOB/SO must provide AEE with a memorandum describing the proposed change, a detailed justification for the change, and comments from other program offices if the proposed changes or revisions affect them.

**11-3.  Process for Changing This Order.**  AEE must, in addition to the formal clearance procedures prescribed in FAA Order 1320.1, *FAA Directives Management*, formally coordinate with AGC, the Office of the Assistant Secretary for Transportation Policy (P-1), and the Office of the General Counsel (C-1), consult with CEQ, and then publish the proposed changes or revisions to this Order in the *Federal Register* for public comment.  After receiving all required FAA and DOT concurrences and after a finding of conformity is made by CEQ in accordance with 40 CFR § 1507.3(a), CEQ Regulations, the FAA may publish the final change or revision in the *Federal Register* and implement the revised Order.

FAA00057734

SPX-0003233

**11-4. Explanatory Guidance.** FAA LOB/SOs may develop program-specific explanatory guidance (e.g., orders, guidance documents, handbooks, training) consistent with the CEQ Regulations and this Order (see 40 CFR § 1507.3, CEQ Regulations). All FAA LOB/SOs that have previously issued such explanatory guidance must update those documents to be consistent with this Order. This Order supersedes any inconsistent explanatory guidance.

    a. Development of Explanatory Guidance. A LOB/SO must consult with AEE-400 and AGC-600 in developing explanatory guidance related to this Order. During consultation, AGC and AEE will determine the extent and type of review.

    b. Review. If required, the LOB/SO must submit its proposed explanatory guidance to AEE and AGC for a 60-day review period. If AEE-1 finds the explanatory guidance to be consistent with this Order, after joint consultation with AGC for legal sufficiency, when appropriate, AEE will notify the LOB/SO and the LOB/SO may adopt its final explanatory guidance.

    c. Federal Register. LOB/SOs are encouraged to publish an NOA and request for comment on proposed explanatory guidance in the *Federal Register*, and take other steps to seek public input during the development of explanatory guidance. If an LOB/SO chooses to publish its explanatory guidance in the *Federal Register*, that office must notify the parties with whom it has consulted and publish availability of that explanatory guidance in the *Federal Register*.

**11-5. Definitions.**

    a. The definitions in 40 CFR part 1508 of the CEQ Regulations and in Title 49 and Title 51 of the U.S.C. are applicable to this Order. In the event of any differences between the definitions in the CEQ Regulations and this Order, the CEQ Regulations will be applied.

    b. In addition, this paragraph defines basic terms used throughout this Order, as follows:

        (1) Applicant. A person, entity, organization, or government agency seeking the FAA's approval of a major Federal action. Examples include, but are not limited to, airport sponsors, grant applicants, airlines, and commercial space license and permit applicants.

        (2) Approving Official. The FAA official with authority to approve and sign FONSIs or EISs. LOB/SOs should designate approving officials consistent with FAA Order 1100.154, *Delegations of Authority,* and any other applicable FAA directives.

        (3) Commercial Space Launch Site. The location on earth from which a commercial space launch takes place (as defined in a license the Secretary of Transportation issues or transfers under FAA Commercial Space Transportation Regulations, 14 CFR parts 400-460) and necessary facilities at that location.

        (4) Decisionmaker. The FAA official with authority to approve and sign a ROD or other type of formal decision document for the FAA. LOB/SOs should designate decisionmakers consistent with Chapter 10 of this Order, FAA Order 1100.154, *Delegations of Authority,* and any other applicable FAA directives.

        (5) Environmental Studies. The investigation of potential environmental impacts.

FAA00057735

SPX-0003234

(6) Extraordinary Circumstances. Factors or circumstances that raise the potential for a proposed action included in a CATEX (see Paragraphs 5-6.1 through 5-6.6) to have a significant environmental impact and therefore require further analysis in an EA or an EIS (see Paragraph 5-2).

(7) Human Environment. Includes the natural and physical environment and the relationship of people with that environment. This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an EIS is prepared and economic or social and natural or physical environmental effects are interrelated, then the EIS will discuss all of these effects on the human environment (see 40 CFR § 1508.14, CEQ Regulations).

(8) Major Federal Actions. This term is defined in 40 CFR § 1508.18 of the CEQ Regulations. Federal action is defined in 40 CFR § 1508.18(a) and (b) of the CEQ Regulations.

(9) NEPA Lead. The FAA LOB/SO, Regional Operating Division, Center, or Service Area that has primary responsibility for complying with NEPA, including preparation and approval of NEPA documents.

(10) Noise Sensitive Area. An area where noise interferes with normal activities associated with its use. Normally, noise sensitive areas include residential, educational, health, and religious structures and sites, and parks, recreational areas, areas with wilderness characteristics, wildlife and waterfowl refuges, and cultural and historical sites. For example, in the context of noise from airplanes and helicopters, noise sensitive areas include such areas within the DNL 65 dB noise contour. Individual, isolated, residential structures may be considered compatible within the DNL 65 dB noise contour where the primary use of land is agricultural and adequate noise attenuation is provided. Also, transient residential use such as motels should be considered compatible within the DNL 65 dB noise contour where adequate noise attenuation is provided. A site that is unacceptable for outside use may be compatible for use inside of a structure, provided adequate noise attenuation features are built into that structure (see table 1 in Appendix A of 14 CFR part 150, *Airport Noise Planning, Land Use Compatibility Guidelines*). The FAA recognizes that there are settings where the DNL 65 dB standard may not apply. In these areas, the responsible FAA official should determine the appropriate noise assessment criteria based on specific uses in that area (see also the 1050.1F Desk Reference for further guidance). In the context of facilities and equipment, such as emergency generators or explosives firing ranges, but not including aircraft, noise sensitive areas may include such sites in the immediate vicinity of operations, pursuant to the Noise Control Act of 1972, 42 U.S.C. §§ 4901–4918 (see state and local ordinances, which may be used as guidelines for evaluating noise impacts from operation of such facilities and equipment).

(11) Responsible FAA Official. The FAA employee designated with overall responsibility to independently evaluate the environmental issues, furnish guidance and participate in the preparation of NEPA documents, and evaluate and take responsibility for the scope and content of the documents.

FAA00057736

SPX-0003235

(12) Special Purpose Laws and Requirements. Federal laws, regulations, Executive Orders and DOT and FAA administrative directives that protect certain aspects of the environment (e.g., air quality, water quality, wetlands, endangered species, and historic sites). The FAA must comply with applicable special purpose laws and requirements in addition to NEPA. The 1050.1F Desk Reference provides more information on these items and how to address their requirements for all FAA organizations.

(13) Traditional Cultural Property. A traditional cultural property as used in this Order is a property that is eligible for inclusion in the National Register because of its association with cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuing cultural identity of the community.

(14) Tribe. An American Indian or Alaska Native Tribe, Band, Nation, Pueblo, Village, or Community the Secretary of the Interior recognizes as an Indian Tribe under the Federally Recognized Indian Tribe List Act of 1994, 25 U.S.C. § 479a. A Federally Recognized Tribe is eligible for the programs, services, and other government-to-government relationships established by the United States for Indians because of their status as Indian Tribes. The DOI, Bureau of Indian Affairs, annually publishes a list of Federally Recognized Tribes in the *Federal Register* and maintains this list on its website. The term "tribe" may also refer to state-recognized tribes under specific authorities for certain DOT programs, especially related to surface transportation that may be associated with a particular FAA project.

**11-6. -11-50. Reserved.**

FAA00057737

SPX-0003236

## Appendix A.  Acronym List

| | | |
|---|---|---|
| ABU | - | Office of Budget |
| ACHP | - | Advisory Council on Historic Preservation |
| ACR | - | Office of Civil Rights |
| ADs | - | Airworthiness Directives |
| ADIZ | - | Air Defense Identification Zone |
| AEDT | - | Aviation Environmental Design Tool |
| AEE | - | Office of Environment and Energy |
| AEE-1 | - | Director of the Office of Environment and Energy |
| AGC | - | Office of Chief Counsel |
| AGC-200 | - | Dockets |
| AGC-600 | - | Office of Chief Counsel, Airports and Environmental Law Division |
| AGI | - | Office of Government and Industry Affairs |
| AGL | - | Above Ground Level |
| AHD | - | Office of Talent Development |
| AHR | - | Office of Human Resource Management |
| AIP | - | Airport Improvement Program |
| ALP | - | Airport Layout Plan |
| ALS | - | Approach lighting systems |
| ANG | - | Office of NextGen |
| ANSI/IEE | - | American National Standards Institute/Institute of Electrical and Electronic Engineers |
| AOC | - | Office of Communications |
| APA | - | Aerobatic Practice Area |
| API | - | Office of International Aviation |
| APL | - | Office of Policy, International Affairs, and Environment |
| APP-400 | - | Office of Airports, Airport Planning and Environmental Division |
| ARM-1 | - | Office of Rulemaking |
| ARP | - | Office of Airports |
| ARSR | - | Air Route Surveillance Radar |
| ARTCC | - | Air Route Traffic Control Centers |
| ASDE | - | Airport Surface Detection Equipment |
| ASH | - | Office of Security and Hazardous Materials |

FAA00057738

SPX-0003237

| | | |
|---|---|---|
| ASOS | - | Automatic Surface Observing System |
| ASR | - | Airport Surveillance Radar |
| AST | - | Office of Commercial Space Transportation |
| ATCB | - | Air Traffic Control Beacons |
| ATCBI | - | Air Traffic Control Beacon Interrogator |
| ATCT | - | Airport Traffic Control Towers |
| ATO | - | Air Traffic Organization |
| AVS | - | Office of Aviation Safety |
| AWOS | - | Automated Weather Observing System |
| C-1 | - | Department of Transportation Office of the General Counsel |
| C-40 | - | Department of Transportation Office of the Assistant General Counsel for Legislation |
| CATEX | - | Categorical Exclusion |
| CEQ | - | Council on Environmental Quality |
| CFR | - | Code of Federal Regulations |
| DARC | - | Direct Access Radar Channel |
| dB | - | Decibel |
| DNL | - | Day-Night Average Sound Level |
| DOC | - | U.S. Department of Commerce |
| DOE | - | U.S. Department of Energy |
| DOI | - | U.S. Department of the Interior |
| DOT | - | U.S. Department of Transportation |
| DVOR | - | Doppler VOR |
| EA | - | Environmental Assessment |
| EIS | - | Environmental Impact Statement |
| EMAS | - | Engineered Material Arresting System |
| EMS | - | Environmental Management System |
| EPA | - | U.S. Environmental Protection Agency |
| FAA | - | Federal Aviation Administration |
| FHWA | - | Federal Highway Administration |
| FICON | - | Federal Interagency Committee on Noise |
| FMS | - | Flight Management System |
| FONSI | - | Finding of No Significant Impact |

FAA00057739

SPX-0003238

| FONSI/ROD | - | Finding of No Significant Impact/Record of Decision |
|---|---|---|
| FTA | - | Federal Transit Administration |
| FSS | - | Flight Service Station |
| GPS | - | Global Positioning System |
| ILS | - | Instrument Landing System |
| INM | - | Integrated Noise Model |
| IR MTR | - | Instrument Flight Rules Military Training Route |
| LAAS | - | Local Area Augmentation System |
| LEIS | - | Legislative Environmental Impact Statement |
| LLWAS | - | Low Level Wind Shear Alert System |
| LOB/SO | - | Line(s) of Business/Staff Office(s) |
| MERF | - | Mobile Emergency Radar Facilities |
| MMAC | - | Mike Monroney Aeronautical Center |
| MOU | - | Memorandum of Understanding |
| MSA | - | Metropolitan Statistical Area |
| NAAQS | - | National Ambient Air Quality Standards |
| NAS | - | National Airspace System |
| NCP | - | Noise Compatibility Programs |
| NEPA | - | National Environmental Policy Act |
| NEXRAD | - | Next Generation Radar |
| NextGen | - | Next Generation Air Transportation System |
| NIRS | - | Noise Integrated Routing System |
| NOA | - | Notice of Availability |
| NOI | - | Notice of Intent |
| NOTAMs | - | Notices to Airmen |
| NPDES | - | National Pollutant Discharge Elimination System |
| NPIAS | - | National Plan of Integrated Airport Systems |
| NPS | - | National Park Service |
| NRHP | - | National Register of Historic Places |
| NST | - | Noise Screening Tool |
| P-1 | - | Office of the Assistant Secretary for Transportation Policy |
| P-30 | - | Office of Safety, Energy, and Environment |
| PFC | - | Passenger Facility Charge |

FAA00057740

SPX-0003239

PRM        -  Precision Runway Monitor
PVD        -  Plan View Displays
RBDE       -  Radar Bright Display Equipment
RCAG       -  Remote Center Air/Ground Communication Facility
RCO        -  Remote Communications Outlet
RFP        -  Request for Proposal
RNAV/RNP - Area Navigation/Required Navigation Performance
ROD        -  Record of Decision
RPZ        -  Runway protection zone
RSA        -  Runway safety area
RT/R       -  Remote Transmitter/Receiver
RVR        -  Runway Visual Range
SAP        -  Sampling and Analysis Plan
SAWS       -  Stand Alone Weather Sensors
SHPO       -  State Historic Preservation Officer
SUA        -  Special Use Airspace
TACAN      -  Tactical Aircraft Control and Navigation
TDWR       -  Terminal Doppler Weather Radar
THPO       -  Tribal Historic Preservation Officer
TSOs       -  Technical standard orders
U.S.C.     -  United States Code
UST        -  Underground storage tank
VOR        -  Very High Frequency Omnidirectional Range
VORTAC     -  Co-located VOR and TACAN (See VOR and TACAN)
VOT        -  VOR Test Facility (See VOR)
WAAS       -  Wide Area Augmentation System
WR         -  Written Re-evaluation
WR/ROD     -  Written Re-evaluation/Record of Decision

FAA00057741

SPX-0003240

## Appendix B.  Federal Aviation Administration Requirements for Assessing Impacts Related to Noise and Noise-Compatible Land Use and Section 4(f) of the Department of Transportation Act (49 U.S.C. § 303)

This appendix contains the Federal Aviation Administration (FAA) requirements for Noise and Noise-Compatible Land Use as well as compliance with Section 4(f), and describes related requirements to provide appropriate context.  These requirements are also included in the 1050.1F Desk Reference[15], which provides comprehensive guidance regarding the analysis of impacts in specific environmental impact categories.  Practitioners should use the 1050.1F Desk Reference in analyzing these impacts.

### B-1.  Noise and Noise-Compatible Land Use

For aviation noise analyses, the FAA has determined that the cumulative noise energy exposure of individuals to noise resulting from aviation activities must be established in terms of Yearly Day Night Average Sound Level (DNL), the FAA's primary noise metric.  The Community Noise Equivalent Level (CNEL) may be used in lieu of DNL for FAA actions in California.  The compatibility of existing and planned land uses with proposed aviation actions is usually determined in relation to the level of aircraft noise.  Federal compatible land use guidelines for a variety of land uses are provided in Table 1 in Appendix A of 14 Code of Federal Regulations (CFR) part 150, *Land Use Compatibility with Yearly Day-Night Average Sound*.  These guidelines are included in the Noise and Noise-Compatible Land Use Chapter of the 1050.1F Desk Reference.

No noise analysis is needed for projects involving Design Group I and II airplanes (wingspan less than 79 feet) in Approach Categories A through D (landing speed less than 166 knots) operating at airports whose forecast operations in the period covered by the NEPA document do not exceed 90,000 annual propeller operations (247 average daily operations) or 700 annual jet operations (2 average daily operations).  Also, no noise analysis is needed for projects involving existing heliports or airports whose forecast helicopter operations in the period covered by the NEPA document do not exceed 10 annual daily average operations with hover times not exceeding 2 minutes.

#### B-1.1.  Aircraft Noise Screening.

Aircraft noise screening may rule out the need for more detailed noise analysis and provide documented support for a Categorical Exclusion (CATEX) if screening shows no potential for significant noise impacts.  The FAA has multiple noise screening tools (NSTs) and methodologies.  A list of available FAA screening tools is provided in the 1050.1F Desk Reference.  To use screening tools or equivalent screening methodologies that are not listed in the 1050.1F Desk Reference, prior written approval from the Office of Environment and Energy (AEE) is required.

---

[15] The Desk Reference is available on the FAA website at
http://www.faa.gov/about/office_org/headquarters_offices/apl/environ_policy_guidance/policy/

FAA00057742

SPX-0003241

### B-1.2. Federal Aviation Administration Approved Models for Detailed Noise Analysis.

AEE has approved models for use for detailed noise analysis. Prior written approval from AEE is required to use another equivalent methodology or computer model. When requesting the use of an alternative model, justification of appropriateness of the use of that model over the use of the models listed in the 1050.1F Desk Reference is required. Unless it can be justified, all noise analyses must be performed using the standard and default data. Modification to standard or default data in FAA-approved models requires prior written approval from AEE. Guidance for submitting changes to the standard or default data is included in the 1050.1F Desk Reference.

Input documentation for the noise analysis with one copy of the input data files and corresponding output files used in the noise analysis should be provided to the responsible FAA official on electronic media specified by that official. If other equivalent methodologies or the use of non-standard or non-default data are approved, a description of the methodology or additional, non-standard or non-default data must be submitted along with a copy of AEE's approval to the responsible FAA official.

Noise monitoring data is not required for FAA noise analyses, but may optionally be included in a National Environmental Policy Act (NEPA) document. Noise monitoring data should not be used to calibrate the noise model.

### B-1.3. Affected Environment.

The study area for noise is the three dimensional geographic area with the potential to be impacted by noise from the proposed project. The study area can vary in size from an airport's environs to a larger scale airspace redesign that includes multiple airports. An airport environs study area must be large enough to include the area within the DNL 65 decibels (dB) contour, and may be larger. The study area for the noise analysis of a proposed change in air traffic procedures or airspace redesign may extend vertically from the ground to 10,000 feet above ground level (AGL), or up to 18,000 feet AGL if the proposed action or alternative(s) are over a national park or wildlife refuge where other noise is very low and a quiet setting is a generally recognized purpose and attribute.

Noise compatibility or non-compatibility of land use is determined by comparing the aircraft DNL values at a site to the values in the land use compatibility guidelines in 14 CFR part 150, Appendix A, Table 1. Special consideration needs to be given to noise sensitive areas within Section 4(f) properties (including, but not limited to, noise sensitive areas within national parks; national wildlife and waterfowl refuges; and historic sites, including traditional cultural properties) where the land use compatibility guidelines in 14 CFR part 150 are not relevant to the value, significance, and enjoyment of the area in question. For example, the land use categories in the guidelines are not sufficient to determine the noise compatibility of areas within a national park or national wildlife refuge where other noise is very low and a quiet setting is a generally recognized purpose and attribute.

Local land use jurisdictions may have noise and land use compatibility standards that differ from the FAA's land use compatibility guidelines with respect to DNL 65 dB in 14 CFR part 150, Appendix A, Table 1. Such local standards must be disclosed to the extent required under 40 CFR 1502.16(c) and 1506.2(d), the CEQ Regulations. However, the FAA does not use local land use compatibility standards to determine the significance of noise impacts. Pertinent land use plans and a general overview of existing and planned uses of the land should be described.

FAA00057743

SPX-0003242

The description of current noise conditions includes:

- DNL contours or noise grid points showing existing aircraft noise levels. Noise exposure contours must include DNL 65, 70, and 75 dB levels (additional contours may be provided on a case-by-case basis). Noise grids are sized to cover the study area for noise analysis. Multiple grids may be created, but at least one grid consists of population centroids from the U.S. Census blocks. The differences in noise analysis for proposed airport development and other actions in the immediate vicinity of an airport and for air traffic airspace and procedure actions in a larger study area are described more fully in the 1050.1F Desk Reference under the Environmental Consequences paragraph (section 11.3);

- The number of residences or people residing within each noise contour where aircraft noise exposure is at or above DNL 65 dB; or for a larger scale air traffic airspace and procedure action, the population within areas exposed at or above DNL 65 dB, at or above DNL 60 but less than DNL 65 dB, and at or above DNL 45 dB but less than DNL 60 dB;

- The location and number of noise sensitive uses in addition to residences (e.g., schools, hospitals, parks, recreation areas) that could be significantly impacted by noise; and

- Maps and other means to depict land uses within the noise study area. The addition of flight tracks may be helpful. Illustrations should be sufficiently large and clear to be readily understood.

The description of current noise conditions is usually confined to aircraft noise. However, the inclusion of other noise data, such as background or ambient noise or notable levels of noise in the study area from other sources (e.g., highways, industrial uses) is appropriate where such noise data is pertinent to understanding the affected environment and to considering the environmental impacts of the proposed action and alternative(s).

### B-1.4. Environmental Consequences.

The environmental consequences section of the NEPA document will include the analysis of the potential noise impacts of the proposed action and alternative(s) for each timeframe evaluated. The noise analysis will include DNL contours, grid point, and/or change-of-exposure analysis for the proposed action and each alternative compared to the no action alternative for the same future timeframe.

For proposed airport development and other actions in the immediate vicinity of an airport, the AEDT is used to provide noise exposure contours at the DNL 65, 70, and 75 dB levels (additional contours may be provided on a case-by-case basis). For all comparisons analyzed, the analysis will identify noise increases of DNL 1.5 dB or more over noise sensitive areas that are exposed to noise at or above the DNL 65 dB noise exposure level, or that would be exposed at or above the DNL 65 dB level due to a 1.5 dB or greater increase, when compared to the no action alternative for the same timeframe.

For actions in the immediate vicinity of an airport, the following information must be disclosed for each modeled scenario that is analyzed:

FAA00057744

SPX-0003243

- The number of residences or people residing within each noise contour where aircraft noise exposure is at or above DNL 65 dB and the net increase or decrease in the number of people or residences exposed to that level of noise;

- The location and number of noise sensitive uses in addition to residences (e.g., schools, hospitals, parks, recreation areas) exposed to DNL 65 dB or greater;

- The identification of noise sensitive areas within the DNL 60 dB contour that are exposed to aircraft noise at or above DNL 60 dB but below DNL 65 dB and are projected to experience a noise increase of DNL 3 dB or more, only when DNL 1.5 dB increases are documented within the DNL 65 dB contour;

- Discussion of the noise impact on noise sensitive areas within the DNL 65 dB contour; and

- Maps and other means to depict land uses within the noise study area. The addition of flight tracks is helpful. Illustrations should be sufficiently large and clear to be readily understood.

For air traffic airspace and procedure actions where the study area is larger than the immediate vicinity of an airport, incorporates more than one airport, and/or includes actions above 3,000 feet AGL, an FAA-approved model must be used. The noise analysis will focus on a change-in-exposure analysis, which examines the change in noise levels as compared to population and demographic information at population points throughout the study area. This is normally a noise grid analysis. Multiple grids may be created, but at least one grid must consist of population centroids from the U.S. Census blocks. Discrete receptor points[16] can also represent select noise sensitive area(s) or comprise a general receptor grid over the study area, either densely or sparsely spaced. Noise contours may be created at the FAA's discretion; however, noise contours are not required and are not normally used for the analysis of larger scale air traffic airspace and procedure actions. If the study encompasses a large geographical area, it is not recommended that contours be created for the representation of results below DNL 55 dB due to fidelity of receptor sets needed to create an accurate representation of the contour.

For air traffic airspace and procedure actions evaluated as described above, change-of-exposure tables and maps at population centers are provided to identify where noise will change by the following specified amounts:

- For DNL 65 dB and higher: $\pm1.5$ dB

- For DNL 60 dB to <65 dB: $\pm3$ dB[17]

- For DNL 45 dB to <60 dB: $\pm5$ dB[18]

---

[16] Receptors are locations where noise is modeled. A collection of receptors are known as receptor sets. Grid points are an example of a receptor set.

[17, 19] The FAA refers to noise changes meeting these criteria as "reportable."

FAA00057745

SPX-0003244

The location and number of noise sensitive uses (e.g., schools, churches, hospitals, parks, recreation areas, etc.) exposed to DNL 65dB or greater must be disclosed for each modeling scenario that is analyzed.

The noise compatibility of land use is determined by comparing the aircraft DNL values at a site to the values in the land use compatibility guidelines in 14 CFR part 150, Appendix A, Table 1. EAs and EISs must disclose newly non-compatible land use regardless of whether there is a significant noise impact (see Paragraph B-1.5). Special consideration needs to be given to noise sensitive areas within Section 4(f) properties (including, but not limited to, noise sensitive areas within national parks; national wildlife and waterfowl refuges; and historic sites, including traditional cultural properties) where the land use compatibility guidelines in 14 CFR part 150 are not relevant to the value, significance, and enjoyment of the area in question. For example, the land use categories in the guidelines are not sufficient to determine the noise compatibility of areas within a national park or national wildlife refuge where other noise is very low and a quiet setting is a generally recognized purpose and attribute.

### B-1.5. Significance Determination.

Exhibit 4-1 of FAA Order 1050.1F provides the FAA's significance threshold for noise: *The action would increase noise by DNL 1.5 dB or more for a noise sensitive area that is exposed to noise at or above the DNL 65 dB noise exposure level, or that will be exposed at or above the DNL 65 dB level due to a 1.5 dB or greater increase, when compared to the no action alternative for the same timeframe.* For example, an increase from DNL 65.5 dB to 67 dB is considered a significant impact, as is an increase from DNL 63.5 dB to 65 dB. The determination of significance must be obtained through the use of noise contours and/or grid point analysis along with local land use information and general guidance contained in Appendix A of 14 CFR part 150.

Special consideration needs to be given to the evaluation of the significance of noise impacts on noise sensitive areas within Section 4(f) properties (including, but not limited to, noise sensitive areas within national parks; national wildlife and waterfowl refuges; and historic sites, including traditional cultural properties) where the land use compatibility guidelines in 14 CFR part 150 are not relevant to the value, significance, and enjoyment of the area in question. For example, the DNL 65 dB threshold does not adequately address the impacts of noise on visitors to areas within a national park or national wildlife and waterfowl refuge where other noise is very low and a quiet setting is a generally recognized purpose and attribute.

When the proposed action or alternative(s) would result in a significant noise increase and the proposed action or alternative is highly controversial on this basis, the EIS should include, as appropriate in light of the specific proposal under analysis, information on the human response to noise. Inclusion of data on background or ambient noise, as well as other noise in the area, may be helpful.

Compatible or non-compatible land use is determined by comparing the aircraft DNL values at a site to the values in the part 150 land use compatibility guidelines (see Appendix A of 14 CFR part 150). The part 150 guidelines include uses that may be protected under Section 4(f). The part 150 guidelines may be used to determine the significance of noise impacts on properties protected under Section 4(f) to the extent that the land uses specified in the guidelines bear relevance to the value, significance, and enjoyment of the lands in question. Special consideration needs to be given to noise sensitive areas within Section 4(f) properties (including,

FAA00057746

SPX-0003245

but not limited to, noise sensitive areas within national parks; national wildlife and waterfowl refuges; and historic sites, including traditional cultural properties) where the land use compatibility guidelines in 14 CFR part 150 are not relevant to the value, significance, and enjoyment of the area in question. For example, the part 150 land use categories are not sufficient to determine the noise compatibility of areas within a national park or national wildlife refuge where other noise is very low and a quiet setting is a generally recognized purpose and attribute, or to address noise impacts on wildlife. When instances arise in which aircraft noise is a concern with respect to wildlife impacts, established scientific practices, including review of available studies dealing with specific species of concern, should be used in the analysis. With respect to historic sites, the FAA may rely upon the part 150 guidelines to determine noise impacts on historic properties that are in use as residences. However, the part 150 guidelines may not be sufficient to determine the impact of noise on historic properties where a quiet setting is a generally recognized purpose and attribute, such as a historic village preserved specifically to convey the atmosphere of rural life in an earlier era or a traditional cultural property.

If the noise and noise-compatible land use analysis concludes that there is no significant impact, usually a similar conclusion may be drawn with respect to land use in general. However, if the proposal would result in other impacts that have land use ramifications, for example, disruption of communities, relocation, or induced socioeconomic impacts, the impacts on land use should be analyzed in this context and described accordingly under the appropriate impact category.

### B-1.6. Supplemental Noise Analysis.

DNL analysis may optionally be supplemented on a case-by-case basis to characterize specific noise impacts. There is no single supplemental methodology that is preferable in all situations and these metrics often do not reflect the magnitude, duration, or frequency of the noise events under study.

In addition, the FAA will consider the use of appropriate supplemental noise analysis when it identifies, within the study area of a proposed action or alternative(s), one or more Section 4(f) properties (including, but not limited to, noise sensitive areas within national parks; national wildlife and waterfowl refuges; and historic sites including traditional cultural properties) where a quiet setting is a generally recognized purpose and attribute. In considering the use of supplemental noise analysis for such properties, the FAA will consult with the officials having jurisdiction over the properties. Such supplemental noise analysis is not, by itself, a measure of adverse aircraft noise or significant aircraft noise impact. The Line(s) of Business/Staff Office(s) (LOB/SOs) within the FAA must consult with and receive approval from AEE in determining the appropriate supplemental noise analysis for use in such cases.

Potential metrics for supplemental noise analyses are listed in the 1050.1F Desk Reference.

### B-1.7. Noise from Sources Other than Aircraft Departures and Arrivals.

For some noise analyses, it may be necessary to include noise sources other than aircraft departures and arrivals in the noise analysis. Some examples are engine run-ups, aircraft taxiing, construction noise, and noise from related roadway work and roadway noise. The inclusion of these sources should be considered on a case-by-case basis, as appropriate.

If engine run-ups or aircraft taxiing noise are analyzed as part of the study, an FAA-approved model must be used. If an alternative model or methodology is desired, prior AEE approval is needed. If appropriate, an analysis of surface transportation impacts, including construction

FAA00057747

SPX-0003246

noise, should be conducted using accepted methodologies from the appropriate modal administration, such as the Federal Highway Administration for highway noise. Further guidance on acceptable methodologies for surface transportation projects is provided in the 1050.1F Desk Reference.

For information on facility and equipment noise emissions see Paragraph B-1.11 below. For noise associated with commercial space actions see Paragraph B-1.10 below.

### B-1.8.  14 CFR Part 150 Noise Proposals.

If the proposal requiring an Environmental Assessment (EA) or Environmental Impact Statement (EIS) is the result of a recommended noise mitigation measure included in an FAA-approved part 150 noise compatibility program (NCP), the noise analysis developed in the program will normally be incorporated in the EA or EIS. The responsible FAA official must determine whether this is sufficient for EA or EIS noise analysis purposes.

### B-1.9.  Airport Actions.

For airport actions, documentation must be included to support the required airport sponsor's assurance under 49 United States Code (U.S.C.) § 47107(a)(10), formerly Section 511(a)(5) of the Airport and Airway Improvement Act of 1982, that appropriate action, including the adoption of zoning laws, has been or will be taken, to the extent reasonable, to restrict the use of land adjacent to or in the immediate vicinity of the airport to activities and purposes compatible with normal airport operations, including takeoff and landing of aircraft. The assurance must be related to existing and planned land uses. The NEPA document should address what is being done by the jurisdiction(s) with land use control authority, including an update on any prior assurance.

### B-1.10.  Commercial Space.

If the project involves commercial space launch vehicles reaching supersonic speeds, the potential for sonic boom impacts should be discussed.[19]

### B-1.11.  Facility and Equipment Noise Emissions.

For facility and equipment noise emissions, the provisions of the Noise Control Act of 1972 (42 U.S.C. §§ 4901-4918), as amended, apply. State and local standards can be used as a guide for particular activities if these standards are at least as stringent as Federal standards.

### B-1.12.  Flight Standards.

### B-1.12.1.  Operations Specifications.

In preparing a noise analysis, the Flight Standards District Office (FSDO) personnel normally will collect information from the operator that includes the airport, types of aircraft and engines, number of scheduled operations per day, and the number of day/night operations. The information should also include the operator's long-range plans and operation assumptions that are sufficiently conservative to encompass reasonably foreseeable changes in operations.

---

[19] Please note that part 91 prohibits supersonic flight for civil aircraft. Part 91, Appendix B provides guidance for applying for a special flight authorization to exceed Mach 1.

FAA00057748

SPX-0003247

If the carrier declines to furnish the information, or if the furnished information on operations at the airport does not realistically address night operations (in view of the carrier's proposal and pattern of activity at that airport), or if the information otherwise patently understates the potential operations (when compared with carrier's operations at other airports or with other carrier's operations at that airport), the responsible FAA official will develop an operational assumption that includes night operations and is otherwise consistent with the typical operations of similar carriers at similar airports. This operational assumption will be used in the NEPA review after coordination with the affected air carrier. If the air carrier objects to the use of this operational assumption in the NEPA review, the carrier may specify that a lesser level of operations be used in the analysis, provided that the carrier agrees that this lesser level will serve as a limit on the operations specifications. If the carrier refuses such a limitation, the FAA will include all reasonably foreseeable operations in the analysis. In this situation, the NEPA review should state that the operational assumption was developed solely for the purpose of environmental analyses and that it is not to be viewed as a service commitment by the carrier.

If an EIS is required, the affected operator should be advised as soon as possible and should be requested to provide any additional required information. District Office personnel will coordinate, as necessary, any activity with the operator. The operations specifications will not be approved until all issues and questions associated with the EIS are fully resolved and the regional Flight Standards Division manager has concurred with the approval.

### B-1.12.2.  Aerobatic Practice Areas.

Due to the unique nature of the practice routines used in aerobatic practice areas (APA), the standard and default data in the Integrated Noise Model (INM) is not appropriate for use when modeling the noise consequences of the aircraft performing in the APA. For guidance on performing noise analysis for APAs, see the October 17, 2012 FAA guidance memorandum titled, "Approval of Aerobatic Practice Area (APA) noise equivalent methodology."

### B-1.13.  Noise Mitigation.

Common measures to mitigate noise are listed in the 1050.1F Desk Reference.

Local land use actions are within the purview of local governments. The FAA encourages local governments to take actions to reduce and prevent land uses around airports that are not compatible with airport operation and aircraft noise. Airports receiving grant funding have a compatible land use obligation.

When a noise analysis in the immediate vicinity of an airport identifies noise sensitive areas that would have an increase of DNL 3 dB or more from DNL 60 dB up to DNL 65 dB noise exposure, the potential for mitigating noise in those areas should be considered, including consideration of the same range of mitigation options available at DNL 65 dB and higher and eligibility for Federal funding. This is not to be interpreted as a commitment to fund or otherwise implement mitigation measures in any particular area.[20]

---

[20] Federal Interagency Committee On Noise: Federal Agency Review of Selected Airport Noise Analysis Issues (August 1992), page 3-7.

FAA00057749

SPX-0003248

## B-2.  Section 4(f), 49 U.S.C. § 303

Section 4(f) of the U.S. Department of Transportation Act of 1966 (now codified at 49 U.S.C. § 303) protects significant publicly owned parks, recreational areas, wildlife and waterfowl refuges, and public and private historic sites.  Section 4(f) provides that the Secretary of Transportation may approve a transportation program or project that requires the use of any publicly owned land from a public park, recreation area, or wildlife or waterfowl refuge of national, state, or local significance, or land from any publicly or privately owned historic site of national, state, or local significance, only if there is no feasible and prudent alternative to the use of such land and the program or project includes all possible planning to minimize harm resulting from the use.

The Federal Highway Administration (FHWA) and the Federal Transit Administration (FTA) issued Section 4(f) implementing regulations in 23 CFR part 774 that are not binding on the FAA.  However, the FAA may use them as guidance to the extent relevant to aviation.

Section 4(f) applies only to agencies within the U.S. Department of Transportation (DOT).  Following consultation and assessment of potential impacts, the FAA is solely responsible for Section 4(f) applicability and determinations for projects within its purview.  If the FAA is engaged with a non-DOT agency on the NEPA review of a proposed project involving Section 4(f), the FAA must take the lead on Section 4(f) compliance.

### B-2.1.   Affected Environment.

The FAA should identify as early as practicable in the planning process section 4(f) properties that implementation of the proposed action and alternative(s) could affect.

A property must be a significant resource for Section 4(f) to apply.  Any part of a Section 4(f) property is presumed to be significant unless there is a statement of insignificance relative to the entire property by the Federal, state, or local official having jurisdiction over the property.  Any statement of insignificance is subject to review by the FAA.

Section 4(f) protects only those historic or archeological properties that are listed, or eligible for inclusion, on the National Register of Historic Places (NRHP), except in unusual circumstances.  Historic sites are normally identified during the process required under Section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108, and its implementing regulations (36 CFR part 800).  If an official formally provides information to indicate that a historic site not on or eligible for inclusion on the NRHP is significant, the responsible FAA official may determine that it is appropriate to apply Section 4(f).  If the responsible FAA official finds that Section 4(f) does not apply, the NEPA document should include the basis for this finding (which may be based on reasons why the property was not eligible for the NRHP).

Where Federal lands are administered for multiple uses, the Federal official having jurisdiction over the lands shall determine whether the lands are in fact being used for park, recreation, wildlife, waterfowl, or historic purposes.  National wilderness areas may serve similar purposes and shall be considered subject to Section 4(f) unless the controlling agency specifically determines that the lands are not being used for Section 4(f) purposes.

When a property is owned by and currently designated for use by a transportation agency and a park or recreation use of the land is being made only on an interim basis, the property would not ordinarily be considered to be subject to Section 4(f).  The responsible FAA official or applicant should ensure that any lease or agreement includes specific terms clarifying that the use of the

FAA00057750

SPX-0003249

property for a park or recreational purpose is temporary. A use that extends over a period of years may be sufficiently long that it would no longer be considered to be interim or temporary, if challenged.

Where the use of a property is changed by a state or local agency from a Section 4(f) type use to a transportation use in anticipation of a request for FAA approval, Section 4(f) will be considered to apply, even though the change in use may have taken place prior to the request for approval or prior to any FAA action on the matter. This is especially true where the change in use appears to have been undertaken in an effort to avoid the application of Section 4(f).

### B-2.2.    Environmental Consequences.

An initial assessment should be made to determine whether the proposed action and alternative(s) would result in the use of any of the properties to which Section 4(f) applies. If physical use or constructive use of a Section 4(f) property is involved, as further described in B-2.2.1 and B-2.2.2 below, the potential impacts of the proposed action and alternative(s) on the Section 4(f) property must be described in detail. The description of the affected Section 4(f) property should include the location, size, activities, patronage, access, unique or irreplaceable qualities, relationship to similarly used lands in the vicinity, jurisdictional entity, and other factors necessary to understand and convey the extent of the impacts on the resource. Maps, plans, photos, or drawings may assist in describing the property and understanding the potential use, whether physical taking or constructive use. Any statements regarding the property's significance by officials having jurisdiction should be documented and attached.

### B-2.2.1.    Physical Use of Section 4(f) Property.

A Section 4(f) use would occur if the proposed action or alternative(s) would involve an actual physical taking of Section 4(f) property through purchase of land or a permanent easement, physical occupation of a portion or all of the property, or alteration of structures or facilities on the property.

A temporary occupancy of a Section 4(f) property for project construction-related activities is usually so minimal that it does not constitute a use within the meaning of Section 4(f). However, a temporary occupancy would be considered a use if:

- The duration of the occupancy of the Section 4(f) property is greater than the time needed to build a project and there is a change in ownership of the land;

- The nature and magnitude of changes to the 4(f) property are more than minimal;

- Anticipated permanent adverse physical impacts would occur and a temporary or permanent interference with Section 4(f) activities or purposes would occur;

- The land use is not fully returned to existing condition; or

- There is no documented agreement with appropriate agencies having jurisdiction over the Section 4(f) property.

If a project would physically occupy an NRHP-listed or eligible property containing archeological resources that warrant preservation in place, there would be a Section 4(f) use. However, although there may be some physical taking of land, Section 4(f) does not apply to NRHP-listed or eligible archeological properties where the responsible FAA official, after consultation with the State Historic Preservation Officer (SHPO)/Tribal Historic Preservation

FAA00057751

SPX-0003250

Officer (THPO), determines that the archeological resource is important chiefly for data recovery and is not important for preservation in place.

### B-2.2.2.    Constructive Use of Section 4(f) Property.

Use, within the meaning of Section 4(f), includes not only the physical taking of such property, but also "constructive use." The concept of constructive use is that a project that does not physically use land in a park, for example, may still, by means of noise, air pollution, water pollution, or other impacts, dissipate its aesthetic value, harm its wildlife, restrict its access, and take it in every practical sense. Constructive use occurs when the impacts of a project on a Section 4(f) property are so severe that the activities, features, or attributes that qualify the property for protection under Section 4(f) are substantially impaired. Substantial impairment occurs only when the protected activities, features, or attributes of the Section 4(f) property that contribute to its significance or enjoyment are substantially diminished. This means that the value of the Section 4(f) property, in terms of its prior significance and enjoyment, is substantially reduced or lost. For example, noise would need to be at levels high enough to have negative consequences of a substantial nature that amount to a taking of a park or portion of a park for transportation purposes.

The responsible FAA official must consult all appropriate Federal, state, and local officials having jurisdiction over the affected Section 4(f) properties when determining whether project-related impacts would substantially impair the resources. Following consultation and assessment of potential impacts, the FAA is solely responsible for Section 4(f) applicability and determinations.

The land use compatibility guidelines in 14 CFR part 150 (the part 150 guidelines) may be relied upon by the FAA to determine whether there is a constructive use under Section 4(f) where the land uses specified in the part 150 guidelines are relevant to the value, significance, and enjoyment of the Section 4(f) lands in question. The FAA may rely on the part 150 guidelines in evaluating constructive use of lands devoted to traditional recreational activities. The FAA may primarily rely upon the DNL in part 150 rather than single event noise analysis because DNL: (1) is the best measure of significant impact on the quality of the human environment, (2) is the only noise metric with a substantial body of scientific data on the reaction of people to noise, and (3) has been systematically related to Federal compatible land use guidelines.

The FAA may also rely on the part 150 guidelines to evaluate impacts on historic properties that are in use as residences. The part 150 guidelines may be insufficient to determine the noise impact on historic properties where a quiet setting is a generally recognized purpose and attribute, such as a historic village preserved specifically to convey the atmosphere of rural life in an earlier era or a traditional cultural property. If architecture is the relevant characteristic of a historic neighborhood, then project-related noise would not substantially impair the characteristics that led to eligibility for or listing on the NRHP. As a result, noise would not constitute a constructive use, and Section 4(f) would not be triggered. A historic property would not be considered to be constructively used for Section 4(f) purposes when the FAA issues a finding of no historic properties affected or no adverse effect under Section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108. Findings of adverse effects do not automatically trigger Section 4(f) unless the effects would substantially impair the affected resource's historical integrity. Although there may be some physical taking of land, Section 4(f) does not apply to NRHP-listed or eligible archeological properties where the responsible FAA official, after

FAA00057752

SPX-0003251

consultation with the SHPO/THPO, determines that the archeological resource is important chiefly for data recovery and is not important for preservation in place.

When assessing use of Section 4(f) properties located in a quiet setting and where the setting is a generally recognized feature or attribute of the site's significance, the FAA carefully evaluates reliance on the part 150 guidelines. The FAA must weigh additional factors in determining whether to apply the thresholds listed in the part 150 guidelines to determine the significance of noise impacts on noise sensitive areas within Section 4(f) properties (including, but not limited to, noise sensitive areas within national parks; national wildlife and waterfowl refuges; and historic sites including traditional cultural properties). The FAA may use the part 150 land use compatibility table as a guideline to determine the significance of noise impacts on Section 4(f) properties to the extent that the land uses specified bear relevance to the value, significance, and enjoyment of the lands in question. However, the part 150 guidelines may not be sufficient for all historic sites as described above, and the part 150 guidelines do not adequately address the impacts of noise on the expectations and purposes of people visiting areas within a national park or national wildlife refuge where other noise is very low and a quiet setting is a generally recognized purpose and attribute. When determining constructive use, noise resulting from the proposed project would need to be at levels high enough to have negative consequences of a substantial nature that amount to a taking of a park or portion of a park for transportation purposes.

### B-2.2.3.    *De Minimis* Impact Determination.

The FAA may make a *de minimis* impact determination with respect to a physical use of Section 4(f) property if, after taking into account any measures to minimize harm, the result is either:

- A determination that the project would not adversely affect the activities, features, or attributes qualifying a park, recreation area, or wildlife or waterfowl refuge for protection under Section 4(f); or

- A Section 106 finding of no adverse effect or no historic properties affected.

The FAA's NEPA document must include documentation sufficient to support the above results, including the measures to minimize harm that the FAA is relying on to make the *de minimis* impact determination. The FAA must ensure that mitigation measures are implemented. A *de minimis* impact determination is not a full and complete Section 4(f) evaluation. It does not require an analysis and finding that there are no feasible and prudent alternatives or a finding that all possible planning has been done to minimize harm.

A *de minimis* impact determination is not appropriate for constructive use of a Section 4(f) property because constructive use is defined as substantial impairment, and substantial impairment cannot be considered to be a *de minimis* impact.

A *de minimis* impact determination requires agency coordination and public involvement. For parks, recreation areas, and wildlife and waterfowl refuges, the officials with jurisdiction over the property must be informed of the FAA's intent to make a *de minimis* impact determination, after which the FAA must provide an opportunity for public review and comment. After considering any public comments and if the officials with jurisdiction concur in writing that the project would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection, the FAA may finalize a *de minimis* impact determination. For historic sites, the FAA must consult the consulting parties identified in accordance with 36

FAA00057753

SPX-0003252

CFR part 800, and inform the officials with jurisdiction of the intent to make a *de minimis* impact determination and must concur in a finding of no adverse effect or no historic properties affected. Compliance with 36 CFR part 800 satisfies the public involvement and agency coordination requirement for *de minimis* findings for historic sites.

### B-2.3.    Section 4(f) Evaluation.

When a project would involve the use of a Section 4(f) property and the FAA cannot make a *de minimis* impact determination, the FAA must prepare a Section 4(f) evaluation. The FAA should incorporate the evaluation into the FAA's NEPA review and process to the fullest extent possible, but may prepare a stand-alone Section 4(f) evaluation (referred to as a Section 4(f) statement).

The Section 4(f) evaluation must sufficiently explain the purpose and need for the project. The Section 4(f) evaluation must also include adequate discussion of alternatives to support an FAA determination regarding the availability of feasible and prudent alternatives to the use of the Section 4(f) property. The no action alternative is one avoidance alternative. An alternative that would involve any use of Section 4(f) property is not an avoidance alternative.

The evaluation must determine if there is a feasible and prudent alternative that would avoid the use of the Section 4(f) property. According to the FHWA/FTA regulation at 23 CFR § 774.17:

(1) *a feasible and prudent* alternative is one that avoids using Section 4(f) property and does not cause other severe problems of a magnitude that substantially outweighs the importance of protecting the Section 4(f) property. In assessing the importance of protecting the Section 4(f) property, it is appropriate to consider the relative value of the property (i.e., some Section 4(f) properties are worthy of a greater degree of protection than others).

(2) an alternative is not feasible if it cannot be built as a matter of sound engineering judgment.

(3) an alternative is not prudent if it:

- Compromises the project to such a degree that it is unreasonable to proceed with the project in view of its stated purpose and need (i.e., the alternative does not address the purpose and need of the project);
- Results in unacceptable safety or operational problems;
- Causes, after reasonable mitigation:
  - o Severe social, economic, or environmental impacts,
  - o Severe disruption to established communities,
  - o Severe or disproportionate impacts to minority or low-income populations, or
  - o Severe impacts to environmental resources protected under other Federal statutes;
- Results in additional construction, maintenance, or operational costs of an extraordinary magnitude;
- Causes other unique problems or unusual factors; or
- Involves multiple factors above that, although individually minor, cumulatively cause unique problems or impacts of extraordinary magnitude.

FAA00057754

SPX-0003253

Supporting documentation is required in the Section 4(f) evaluation for findings of no feasible and prudent alternatives. If the Section 4(f) evaluation identifies a feasible and prudent alternative that avoids Section 4(f) properties, the FAA may not select an alternative that uses a Section 4(f) property. If there is no feasible and prudent alternative that avoids all Section 4(f) property, the FAA may approve only the alternative that meets the purpose and need and causes the least overall harm to Section 4(f) property. The FHWA/FTA regulation at 23 CFR § 774.3(c) identifies the following factors to be balanced in determining the alternative that causes the least overall harm:

- The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);

- The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;

- The relative significance of each Section 4(f) property;

- The views of the official(s) with jurisdiction over each Section 4(f) property;

- The degree to which each alternative meets the purpose and need for the project;

- After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and

- Substantial differences in costs among the alternatives.

In evaluating the degree of harm to Section 4(f) properties, the FAA will consider the views of officials having jurisdiction over each Section 4(f) property. The Section 4(f) evaluation will describe how the FAA considered the seven factors to determine the least overall harm, including the extent to which each alternative meets the project purpose and need. The final Section 4(f) evaluation must document the analysis and identification of the alternative that has the least overall harm.

If the Section 4(f) evaluation concludes there are no feasible and prudent alternatives to the use of Section 4(f) property, it must also document that the project includes all possible planning to minimize harm to Section 4(f) property. As defined in 23 CFR § 774.17, *all possible planning* means that all reasonable measures to minimize harm or mitigate adverse impacts must be included in the project. Mitigation measures may include those described in Paragraph B-2.7 below. In evaluating the reasonableness of measures to minimize harm, the responsible FAA official will consider the preservation purpose of the statute, the views of officials having jurisdiction over the Section 4(f) property, whether the cost of measures is a reasonable public expenditure in view of the adverse impacts on the Section 4(f) property and the benefits of the measures to the property, and impacts or benefits of the measures to communities or environmental resources outside the Section 4(f) property.

### B-2.4.    Section 4(f) Finding.

In order for the FAA to approve an action that would use Section 4(f) property, the Section 4(f) evaluation must conclude with the required finding that there is no feasible and prudent alternative that would avoid the use of Section 4(f) property and that the project includes all possible planning to minimize harm resulting from the use. Where a Finding of No Significant Impact (FONSI) is prepared, this finding must be included in the FONSI, if not included in the

FAA00057755

SPX-0003254

EA (see FAA Order 1050.1F, Paragraph 6-3.b(4)). Where an EIS is prepared, this finding must be included in the final EIS if possible, and in the Record of Decision (ROD) (see FAA Order 1050.1F, Paragraphs 7-1.2.g and 7-2.2.e). When a CATEX is used for an action (see FAA Order 1050.1F, Chapter 5), the Section 4(f) finding may either be included in documentation prepared to support the use of the CATEX (see FAA Order 1050.1F, Paragraph 5-3) or documented separately.

### B-2.5. Requirements under Section 6(f) of the Land and Water Conservation Fund Act.

A project that would use Section 4(f) parks or recreation areas must also comply with Section 6(f) of the Land and Water Conservation Fund, 16 U.S.C. §§ 4601-8(f), if the property was acquired or developed with financial assistance under the Land and Water Conservation Fund State Assistance Program. Section 6(f), administered by the National Park Service (NPS), requires that areas funded through the program remain for public outdoor recreation use or be replaced by lands of equal value, location, and recreation usefulness.

A request to convert Land and Water Conservation Fund-assisted properties in whole or in part to uses other than public outdoor recreation must be submitted to the appropriate NPS Regional Director in writing. NPS approval is required to convert Section 6(f) lands. The NPS will consider conversion requests if the request complies with Section 4(f), information is provided that is needed to make findings required under Section 6(f), and coordination is carried out with the NPS and the state agency responsible for the Section 6(f) property. The Section 4(f) evaluation should also include evidence that applicable requirements of Section 6(f) have been met.

### B-2.6. Section 4(f) Significance Determination.

Exhibit 4-1 of FAA Order 1050.1F provides the FAA's significance threshold for Section 4(f) properties. A significant impact would occur when: *The action involves more than a minimal physical use of a Section 4(f) resource or constitutes a "constructive use" based on an FAA determination that the aviation project would substantially impair the Section 4(f) resource.*[21] A significant impact under NEPA would not occur if mitigation measures eliminate or reduce the impacts of the use below the threshold of significance. If a project would physically use Section 4(f) property, the FAA is responsible for complying with Section 4(f) even if the impacts are less than significant for NEPA purposes.

### B-2.7. Section 4(f) Mitigation.

Section 4(f) use requires all possible planning to minimize harm. The NEPA document should provide detailed measures to minimize harm and include evidence of concurrence or efforts to obtain concurrence of appropriate officials having jurisdiction over the affected Section 4(f)

---

[21] A "minimal physical use" is part of the FAA's significance threshold that has been continued from FAA Order 1050.1E. It is not the same as a *de minimis* impact determination established in Section 6009 of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETY-LU). A *de minimis* impact determination is described in Appendix B, B-2.2.3.

FAA00057756

SPX-0003255

7/16/15                                                                       Order 1050.1F

property regarding such measures.  Some examples of potential measures to mitigate impacts to Section 4(f) properties include:

- Changing project design to lessen the impact on the Section 4(f) property;

- Replacement of land or facilities (e.g., replacement of a neighborhood park);

- Monetary compensation to enhance the remaining segments of the affected Section 4(f) property;

- Building noise walls or installing visual or vegetative buffers to lessen adverse impacts; or

- Enhancing project access the jurisdictional agency supports (i.e., disabled access ramps).

Mitigation of historic sites usually consists of measures necessary to preserve the historic integrity of the site and agreed to in accordance with 36 CFR part 800 by the FAA, the SHPO/THPO, and other consulting parties.  Equal replacement of a Section 6(f) property that will be converted is required to satisfy Section 6(f) requirements.  The replacement area must be at least equal to that of the converted property, including equal location and usefulness.

FAA00057757

SPX-0003256

### Appendix C. Federal Aviation Administration Guidance on Third Party Contracting for Environmental Impact Statement Preparation

**1. Introduction.**

a.  Section 1506.5(c) of the Council on Environmental Quality's Regulations for Implementing the Provisions of the National Environmental Policy Act (CEQ Regulations) states that any environmental impact statement (EIS) prepared pursuant to the requirements of the National Environmental Policy Act (NEPA) shall be prepared directly by a lead agency; by a cooperating agency upon request of the lead agency; or by a contractor selected by the lead or a cooperating agency.

b.  The intent of Section 1506.5(c) is to avoid conflicts of interest by those preparing EISs. Contractors must be able to sign a disclosure statement specifying that they have no financial or other interest in the outcome of the project.

c.  The following guidance is provided to ensure the FAA's continued compliance with the CEQ Regulations and NEPA.

**2. General Guidance.**

a.  The FAA must either prepare an EIS in-house (utilizing agency personnel and resources) or select a contractor to prepare the EIS. One method of selecting a contractor that may be used is known as "third party contracting."

b.  "Third party contracting" refers to the preparation of an EIS by a contractor selected by the FAA and under contract to and paid by an applicant. Through the statement of work, the contractor is responsible for assisting the FAA in preparing an EIS that meets the requirements of the CEQ Regulations, the FAA's NEPA procedures, and all other appropriate Federal, state, and local laws. Since this process is purely voluntary, it is recommended that a Memorandum of Understanding (MOU) among the FAA, contractor, and the applicant be used to establish a scope of work, and delineate the FAA, contractor, and applicant responsibilities. In such situations, the FAA retains oversight of the EIS. CEQ recognizes the third party contracting arrangement as a legitimate method of EIS preparation in which the non-Federal applicant actually executes the contract and pays for the cost of preparing the EIS (see number 16 in CEQ's *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 *Federal Register* 18026 (March 23, 1981) and CEQ Guidance Regarding NEPA Regulations, 48 *Federal Register* 34263 (July 28, 1983) available at http://energy.gov/nepa/downloads/guidance-regarding-nepa-regulations).

c.  The FAA may select a contractor under this process by evaluating a pre-selection list ("short list") of contractors submitted to the FAA by an applicant based on the applicant's request for proposal (RFP) and evaluation. The applicant may submit the list of candidates to the FAA ranked according to the applicant's evaluation of the contractor's qualifications. The FAA, however, is under no obligation to make a selection based on this ranking. The applicant also may submit the list of candidates to the FAA in an unranked form. The FAA recommends the selection procedures summarized below:

FAA00057758

SPX-0003257

(1)  The FAA should provide the proposed scope of work.

(2)  If the applicant prepares a short list of contractors, the FAA should concur with the evaluation criteria prepared by the applicant.

(3)  Using the previously agreed upon evaluation criteria, the FAA should independently evaluate and rank the contractors on the short list in order of preference, based on qualifications.

(4)  The FAA should advise the applicant and the contractor of the FAA's selection, and the applicant can then advise and initiate discussions with the selected contractor regarding project cost and scope.

(5)  The FAA should prepare an internal selection report for the project administrative file, which should include the disclosure statement executed with the selected contractor.

d.   The applicant pays the costs for preparing the EIS.  For airport development projects and related activities, the EIS may be funded by either Airport Improvement Plan (AIP) funds or local funds including Passenger Facility Charge (PFC) revenues.  While AIP funds may be used to pay for costs associated with EIS preparation by a contractor selected by the FAA, Federal procurement requirements do not apply.  Federal agencies are permitted under 40 CFR part 18 to substitute their judgment for that of the grantee (i.e., airport) if the matter is primarily a "Federal concern" (i.e., consultant selection by the FAA to comply with the requirements of the CEQ Regulations 40 CFR § 1506.5(c) is a "Federal concern").

e.   Guidance provided in the most current version of FAA Advisory Circular 150/5100-14, *Architectural, Engineering and Planning Consultant Services for Airport Grants Projects*, must be followed in selecting a contractor for EIS preparation.

f.   When a contractor prepares an EIS, the FAA is still responsible for:

(1)  Obtaining a "disclosure statement" from the contractor;

(2)  Exercising oversight of the contractor to ensure that a conflict of interest does not exist;

(3)  Taking the lead in the scoping process;

(4)  Furnishing guidance and participating in the preparation of the EIS;

(5)  Independently evaluating the EIS and verifying environmental information provided by the applicant, or others, adding its expertise through review and revision;

(6)  Approving the EIS; and

(7)  Taking responsibility for the scope and content of the EIS.

FAA00057759

SPX-0003258

7/16/15

Order 1050.1F

Appendix D

## Appendix D. National Environmental Policy Act Process Flowcharts

### Exhibit D-1.  Typical Categorical Exclusion Process



Step 1. Planning.

Step 2. The FAA or Applicant formulates a proposed action.

Step 3. The Responsible FAA Official determines that the proposed action is within the scope of a CATEX.

Step 4. The Responsible FAA Official reviews the proposed action for extraordinary circumstances (see paragraph 5-2 of FAA Order 1050.1F).

No Extraordinary Circumstances

There are extraordinary circumstances

Step 5a. The action may be categorically excluded, with documentation as needed (see paragraph 5-3 of FAA Order 1050.1F).

Step 5b. Prepare an EA or EIS as appropriate. (see Exhibit D-2 or D-3).

The NEPA process is complete.

D-1

FAA00057760

SPX-0003259

7/16/15

Order 1050.1F

Appendix D

**Exhibit D-2.  Typical Environmental Assessment Process**



**FAA00057761**

SPX-0003260

7/16/15

Order 1050.1F

Appendix D

## Exhibit D-3. Typical Environmental Impact Statement Process[22]



**Step 1**. Planning.

**Step 2**. The FAA or Applicant formulates a proposed action and a preliminary range of alternatives.

**Step 3**. The FAA or Applicant collects background data and analyzes information.[1]

**Step 4**. The Responsible FAA Official determines the need for an EIS.

**Step 8**. Circulate copies of the draft EIS to the public for review and comment.

**Step 7**. Prepare the draft EIS, including analysis of any proposed mitigation.[2]

**Step 6**. Initiate Scoping (see paragraph 7-1.2c of FAA Order 1050.1F).

**Step 5**. The FAA publishes NOI to prepare an EIS in the *Federal Register*.

**Step 9**. Publish NOA of draft EIS in the *Federal Register* and file with the EPA. This begins the required minimum 45-day public comment period.

**Step 10**. The Responsible FAA Official receives and evaluates comments.

**Step 11**. Revise the draft EIS as needed after consideration of public comments.

**Step 12**. Make copies of the final EIS available to the public.

The NEPA process is complete.

**Step 15**. Issue ROD and make it available to the public.

**Step 14**. Wait a minimum of 30 days before issuing a ROD.

**Step 13**. Publish the NOA of the final EIS in the *Federal Register* and file with the EPA.

[1] Current Environmental Management Systems can provide information to help determine potential impacts in similar situations.

[2] Environmental Management Systems can be used to monitor mitigation.

[22] In November 2014, DOT released guidance on implementing Section 1319 of the Moving Ahead for Progress in the 21st Century Act (MAP-21), 42 U.S.C. § 4332a, which alters the EIS process for DOT actions. Section 1319(a) relates to errata sheets and reflects the CEQ regulations (see 40 CFR § 1503.4(c) and Paragraph 7-1.2(f) of this Order). Section 1319(b) requires DOT, to the maximum extent practicable, to expeditiously develop a single document that consists of a final EIS and a ROD, unless certain conditions exist. The DOT guidance is available at http://www.dot.gov/sites/dot.gov/files/docs/MAP-21_1319_Final_Guidance.pdf. AEE is preparing additional, FAA-specific guidance on implementing Section 1319 of MAP-21. LOBs/SOs are encouraged to work with AGC-600 and AEE-400 to ensure compliance with Section 1319(b).

FAA00057762



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
Silver Spring, MD 20910

OCT - 2 2017

**Refer to NMFS No: FPR-2017-9231**

Mr. Daniel Murray
Space Transportation Development Division
U.S. Department of Transportation
Federal Aviation Administration
Office of Commercial Space Transportation
800 Independence Avenue Southwest
Washington, DC 20591

> Re: Request for Initiation of Informal Consultation under Section 7(a)(2) of the
> Endangered Species Act for the SpaceX Landing and Recovery Operations in
> the Atlantic Ocean, Gulf of Mexico, and Pacific Ocean.

Dear Mr. Murray:

On August 25, 2017, NOAA's National Marine Fisheries Service (NMFS) received your
request for written concurrence that the Federal Aviation Administration's (FAA),
proposed issuance of licenses to the Space Exploration Technologies Corporation
(SpaceX) to launch and recover spacecraft in the Atlantic Ocean, Gulf of Mexico, and
Pacific Ocean, is not likely to adversely affect species listed (or proposed for listing) as
threatened or endangered or critical habitats designated under the Endangered Species
Act (ESA). This response to your request was prepared by NMFS pursuant to section
7(a)(2) of the ESA, implementing regulations at 50 CFR 402, and agency guidance for
preparation of letters of concurrence.

**Background**

The mission of the FAA Office of Commercial Space Transportation is to ensure
protection of the public, property, and the national security and foreign policy interests of
the United States (U.S.) during commercial launch or reentry activities, and to encourage,
facilitate, and promote U.S. commercial space transportation. In carrying out its mission,
the FAA issues licenses to commercial space launch providers for the launch of launch
vehicles (rockets) and reentry of spacecraft (i.e., spacecraft reentering Earth's atmosphere
from space). One such commercial space launch provider is SpaceX.

SpaceX operates a family of rockets collectively known as "Falcon." The Falcon family
of vehicles, includes the Falcon 9 and soon-to-be launched Falcon Heavy. They operate
these from launch complexes at three sites: the National Aeronautics and Space





FAA0005851

SPX-0016020

***Effects from a Sonic Boom***

The sonic boom produced during a Dragon reentry may affect animals located on land (in-air) or underwater. The sound produced from a sonic boom is not expected to transmit from air through water (discussed further below); therefore, the only marine mammal with the potential to be affected by an in-air sonic boom would be the Guadalupe fur seal, from the Dragon reentry operations that would occur over the Pacific Ocean. However, any sonic boom generated during Dragon reentry, would be generated at an altitude of approximately 55,000–65,000 ft in the air. SpaceX conducted a sonic boom analysis for Dragon-1 landings at CCAFS using the single-event prediction model, PCBOOM (BRRC 2015). Based on the analysis and the fact that the reentry trajectories (Mach, altitude, and angle-of-attack profiles) are the same between sites, a maximum predicted sonic boom overpressure of 0.41 pound per square foot (psf) could be expected. This peak overpressure could extend approximately 19 miles from the splashdown site. An overpressure of 0.35 psf could extend approximately 50 miles from the splashdown site. For comparison, an overpressure of 1.0 psf is similar to a thunder clap. For these reasons, a sonic boom is unlikely to injure a fur seal; at most a sonic boom may potentially result in a short-duration startle response. NMFS' current in-air acoustic threshold for pinnipeds (except for harbor seals) is 100 dBA RMS re: 1 μPa.

All of the sonic boom pressure signals measured in an experiment conducted by Sohn et al. (2000) decayed to ambient levels in all frequency bands by 40-50 m (131-164 ft). Therefore, the amount of pressure that would damage hearing for Guadalupe fur seals would decay to non-harmful levels before reaching areas on land where seals may be hauled-out. Moreover, prior VAFB rocket launch operations have shown that reactions to sonic booms are correlated to the level of the sonic boom. Low energy sonic booms (<1.0 pounds psf) have resulted in little to no behavioral responses from harbor seals (*Phoca vitulina*) and California sea lions (*Zalophus californianus*). These species are considered more skittish than Guadalupe fur seals, thus Guadalupe fur seals are less likely to be disturbed by sonic booms compared to harbor seals or California sea lions as they are rarely observed showing any kind of behavioral reaction even when harbor seals or California sea lions have reacted to a sonic boom (NMFS 2016).

For animals located underwater, the overpressures from the sonic boom are not expected travel through the water column and affect and marine species underwater. Acoustic energy from in-air noise does not effectively cross the air/water interface; therefore, most of the noise is reflected off the water surface (Richardson 1995). In addition, underwater sound pressure levels from in-air noise are not expected to reach or exceed threshold levels for injury to any marine species. Previous research conducted by the USAF supports this conclusion with respect to sonic booms, indicating there is no risk of harassment for protected marine species in water (U.S. Air Force Research Laboratory 2000). Therefore, sonic booms would have no effect on ESA-listed marine species located underwater. Therefore, we consider the effect on ESA-listed species from sonic boom exposure to be insignificant and discountable.

In summary, based on the discussion above, the stressors associated with the SpaceX Program such as direct striking of an individual by rocket, fairings or radiosondes, and/or

FAA00058604