**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, AMERICAN BIRD CONSERVANCY, SURFRIDER FOUNDATION, SAVE RGV, and THE CARRIZO/COMECRUDO NATION OF TEXAS, INC., | |
| Plaintiffs, | Civ. No. 23-1204-CJN |
| v. | **[Proposed] Second Amended and Supplemental Complaint for Declaratory and Injunctive Relief** |
| FEDERAL AVIATION ADMINISTRATION and CHRIS ROCHELEAU, in his official capacity, | |
| Defendants. | |

**INTRODUCTION**

1.      This case concerns whether the Nation's commitment to preserving our critical wildlife habitat and treasured coastal landscapes must be sacrificed as we reach out to explore the cosmos—a question with national, global, and even interstellar implications. It is also about whether regulators will hold powerful corporations accountable or allow them to disregard environmental laws simply because of their political and financial influence. As the Nation carries out the modern era of spaceflight, we must decide whether we will protect the wildlife and frontline communities that can be adversely affected by our desire to reach the stars, or whether we will leave a legacy of needless destruction in the scorching wake of rocket plumes.

2.      Here, the Federal Aviation Administration (FAA), which has federal authority over the launching of vehicles into space, has authorized the SpaceX Starship/Super Heavy Launch Vehicle Program at Boca Chica, Texas, without complying with bedrock federal

environmental law, without fully analyzing the significant environmental and community impacts of the SpaceX launch program—including destruction of some of the most vital migratory bird habitat in North America—and without requiring mitigation sufficient to offset those impacts.

3.      On June 13, 2022, FAA issued a Final Programmatic Environmental Assessment and Finding of no Significant Impact/Record of Decision (FONSI/ROD) for the SpaceX Starship/Super Heavy Launch Vehicle Program, which approved SpaceX's plan to launch 20 Starship/Super Heavy rockets per year over the next 5 years, along with tank tests, static fire engine tests, and construction of additional launch related infrastructure. On April 14, 2023, the FAA issued a Commercial Space Transportation License to SpaceX, which, relying on the FONSI/ROD, allowed the company to launch the first flight of the Starship-Super Heavy vehicle, and to undertake pre-flight ground operations, such as tank testing and static fire tests, over the next 5 years.

4.      The Super Heavy is the world's most powerful rocket. It holds up to 3,700 metric tons of liquid methane for propulsion, a potent greenhouse gas that will need to be vented into the atmosphere by SpaceX. The launching of these rockets results in intense heat, noise, light, and debris that adversely affects surrounding habitat areas and communities, which include designated critical habitat for federally protected species as well as National Wildlife Refuge and State Park lands.

5.      SpaceX undertook the first launch of the Starship/Super Heavy rocket on April 20, 2023. Just minutes into the launch, the rocket exploded. The launch pad was destroyed, scattering debris and ash over a large area, including adjacent lands that provide habitat for

endangered species and outside the area that FAA had previously considered when considering the potential impacts of the launch program.

6.      The area surrounding the SpaceX facility at Boca Chica is a biologically diverse and essential habitat area for many species, including federally protected wildlife and animals that are considered sacred to the Carrizo/Comecrudo People, such as the critically endangered ocelot. The SpaceX facility is smack in the middle of publicly owned conservation, park, and recreation lands, including a National Wildlife Refuge, two State Parks, a State Wildlife Management Area, and a State Coastal Preserve. These lands are of extraordinary conservation value for a range of federally and state listed wildlife and other protected species such as migratory birds. Bird species from both the Central and Mississippi flyways converge there, making it an essential wintering and stopover area for migratory birds as they move north and south each year.

7.      SpaceX activities authorized in the FONSI/ROD have and will adversely affect the surrounding wildlife habitat and communities. In addition to harm from construction activities and increased vehicle traffic, rocket launches result in intense heat, noise, and light pollution. Furthermore, the rocket launches and testing result in explosions which spread debris across surrounding habitat and cause brush/forest fires—including one that burned 68 acres of adjacent National Wildlife Refuge. The FAA calls these explosions "anomalies," but in fact they have occurred frequently. The U.S. Fish and Wildlife Service has found that prior SpaceX rocket explosions harmed protected wildlife and designated critical habitat in violation of the Endangered Species Act (ESA).

8.      SpaceX activities also require frequent closures of the nearby Boca Chica Beach, which provides the public free use and enjoyment of a largely undeveloped and secluded

coastline along the Gulf Coast. The only access road has been closed on over 100 different dates per year to accommodate SpaceX activities, and FAA has allowed such closures to continue. These closures have a significant adverse impact on the local community, including the Carrizo/Comecrudo Nation of Texas, which considers Boca Chica a sacred site, and others that rely on the Beach for recreation and subsistence fishing.

9.     FAA's Chief of Staff for the Office of Commercial Space Transportation initially stated that FAA planned to conduct a new environmental impact statement (EIS) for the Starship/Super Heavy Launch Vehicle Program to analyze the environmental impacts of the program pursuant to the National Environmental Policy Act (NEPA); however, FAA subsequently delegated that decision to SpaceX and did not prepare an EIS to analyze the launch program, even though permitting SpaceX to launch the largest rockets known to humankind is the type of significant federal action that requires full analysis in an EIS. Rather, based on SpaceX's preference, FAA relied on a programmatic environmental assessment (PEA) prepared by SpaceX for NEPA compliance—a considerably less thorough analysis intended only to determine whether an EIS is required—and issued a mitigated finding of no significant impact (FONSI). A mitigated FONSI suggests that the proposed action would have significant environmental impacts, but that certain required mitigation efforts would reduce those impacts such that an EIS is not required.

10.     The proposed mitigation measures in the PEA are insufficient in many respects, and the FAA failed entirely to explain how the proposed mitigation measures would reduce the considerable environmental impacts of the launch program below the level of "significance" for purposes of NEPA.

3

11.     Many of the proposed mitigation measures are inadequate to prevent the SpaceX launch program from causing significant environmental harm. For example, FAA failed to ensure that the environmental impacts from "anomalies" would be sufficiently mitigated, requiring only after-the-fact consultation with expert agencies, such as the Fish and Wildlife Service, about recovering exploded rocket fragments from adjacent habitat areas. No mitigation efforts were imposed to prevent or minimize "anomalies" from occurring in the first place, or to reduce the direct impacts from debris raining down on ESA-designated critical habitat or the resulting brush fires. Likewise, the PEA does not include adequate mitigation to address impacts to sensitive wildlife, such as the restoration and enhancement of habitat affected by the noise, heat, debris, and light from rocket launches.

12.     FAA also violated NEPA by failing to consider in the PEA a reasonable range of alternatives. It considered only SpaceX's proposed project and a "no action" alternative.  It did not consider an alternative with fewer launches per year to minimize and mitigate the impacts of the launch program, nor did it provide sufficient support for eliminating the Kennedy Space Center as a viable alternative location to the Boca Chica site, even though SpaceX has apparently been modifying a launch pad at Kennedy Space Center to accommodate Starship rockets and has itself suggested Kennedy as an alternative launch site.

13.     FAA's PEA also failed to take a hard look at the environmental impacts of the SpaceX launch program, as NEPA requires, including increased light, heat, noise, debris, and environmental pollution, as well as risk of wildfires, damage to critical habitat, and the launch program's contribution to climate change.

14.     In sum, the environmental impacts of the Starship/Super Heavy Launch Vehicle Program cannot be reduced through mitigation such that FAA can ensure that there will not be

significant harm from the launch program, and FAA failed entirely to even address how the proposed mitigation could achieve that level of protection. Therefore, the FAA's failure to fully consider and address the impacts of the Starship/Super Heavy Launch Vehicle Program through an EIS, and its failure to consider alternatives that would reduce the impacts of the launch program, was arbitrary and capricious, in violation of NEPA and the Administrative Procedure Act (APA). The Court should vacate the PEA and FONSI and accompanying Record of Decision, and remand with instructions that the FAA perform a full EIS prior to any further launches.

15.     The FAA then compounded its violations of NEPA when it approved the Starship/Superheavy Launch Program by once again failing to comply with the law when approving an increased launch and landing cadence for the Program.

16.     Just over a year into the Launch Program, SpaceX applied to the FAA to increase the cadence of Starship/Superheavy launches and landings to 25 per year – a considerable increase from what was evaluated in the 2020 PEA, which only included five Starship/Superheavy launches per year. This increased cadence will exacerbate many of the impacts associated with SpaceX's activities, including harm from increased noise and lighting; more frequent closures of the area; an increased risk of anomalies (explosions and fires) from more launches and landings at the Boca Chica facility; increased truck and vehicle traffic; and an overall increase in the habitat destruction and direct harm that SpaceX's activities have continued to cause, harming the wildlife (including federal-protected species) that rely on the ecologically critical habitat surrounding the launch facility.

17.     The FAA once again failed to fully analyze—i.e., failed to take the requisite "hard look" that NEPA requires—the community and environmental impacts associated with the

Launch Program, and disregarded the fact that the increased launch and landing cadence would intensify the ongoing harm from SpaceX's activities. Relying on the same misguided and erroneous reasoning and analysis from the 2020 PEA, on April 24, 2025, the FAA issued a new environmental assessment tiered off of the 2020 PEA and a new mitigated FONSI to approve the increased launch and landing cadence for the Starship/Superheavy Launch Program (the "Tiered EA").

18.     Furthermore, even though the significant impacts from the increased launch and landing cadence cannot be reduced through mitigation such that FAA can ensure that there will not be significant harm from the Launch Program—and the FAA once again  failed entirely to even address how the proposed mitigation could achieve that level of protection—it approved the increased cadence without fully considering and addressing the impacts through an EIS. The FAA's review of the increased cadence was therefore, once again, arbitrary and capricious, in violation of NEPA and the APA.

## JURISDICTION AND VENUE

19.     This case arises under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq., and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346 (action against the United States). The Court may grant the relief requested under the APA, 5 U.S.C. §§ 701–706, and 28 U.S.C. § 2201-02 (declaratory and injunctive relief).

20.     Venue is appropriate in this Court under 28 U.S.C. § 1391(e)(1) because FAA resides in this judicial district.

# PARTIES

## Plaintiffs

21.    Plaintiff Center for Biological Diversity (the Center) is a national nonprofit organization that works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center has over 89,000 members and 1.7 million members and online activists worldwide. The Center has worked for decades to safeguard habitats for people, plants, and animals. The Center's members value and benefit from rare species' continued existence in the wild and are harmed by industrial development and associated trends like global climate change, water degradation, and habitat loss that threaten wild species' survival and recovery. The Center has worked for years to protect wildlife that will be harmed by SpaceX's Starship/Super Heavy Launch Vehicle Program, including migratory birds and other protected species that rely on the Boca Chica area.

22.    Plaintiff American Bird Conservancy (ABC) is a nonprofit organization dedicated to conserving wild birds and their habitats throughout the Americas. ABC has been working for nearly thirty years to protect threatened birds from population decline. ABC members derive recreational, conservation, aesthetic, and other benefits from the ecosystems and species of the Gulf of Mexico and its coastline, including Boca Chica Beach, the Lower Rio Grande Valley National Wildlife Refuge, Brazos Island State Park, and Las Palomas Wildlife Management Area – Boca Chica Unit, which all surround the SpaceX site.

23.    Plaintiff Surfrider Foundation is a grassroots, nonprofit organization dedicated to the protection and enjoyment of the world's ocean, waves and beaches for all people. Surfrider has more than one million supporters, activists, and members, with more than 200 volunteer-led chapters and student clubs in the United States. Surfrider Foundation maintains five local

chapters in Texas, including the South Texas Chapter based on South Padre Island. Surfrider members reside, recreate, use, and otherwise regularly access Boca Chica Beach and have been negatively impacted by the SpaceX operations, including the frequent beach closures. Surfrider members also look for, study, photograph, and enjoy marine and terrestrial species in Cameron County, including the piping plover and several species of sea turtles that are likely to be harmed by SpaceX activities. For example, Surfrider has members who visit Boca Chica Beach and the South Texas coast often to surf, fish, and otherwise explore the coast. Surfrider member's future use and enjoyment of Boca Chica Beach and the Cameron County coastline depends on healthy coastal ecosystem and accessible beaches.

24. Plaintiff Save RGV is a nonprofit organization that advocates for environmental justice and sustainability through addressing the causes and consequences of habitat loss and climate change that affect the health and well-being of the entire Rio Grande Valley community. Through its advocacy, research, and publications, Save RGV promotes, monitors, and preserves wildlife and its habitat and protects air and water quality and the natural resources of the Rio Grande Valley. Save RGV also serves to protect and defend the public's right to access public lands, which includes Boca Chica State Park and beach.

25. Plaintiff the Carrizo/Comecrudo Nation of Texas, Inc. is a Texas nonprofit membership organization dedicated to serving the cultural, social, educational, spiritual, linguistic, economic, health, and traditional needs of its members and descendants of the Carrizo/Comecrudo Nation of Texas and other indigenous or Native American groups. The Tribe members live by their mission of preserving, maintaining, protecting, and offering services that will better their tribal communities to overcome the erasure of the Original People of Texas. The Tribe promotes wellness and health by providing services in times of crisis. The Tribe seeks to

protect ancestral lands and relatives and to honor their ancestors. Boca Chica Beach and the area surrounding the beach are vital and sacred to the Carrizo/Comecrudo People and their ancestral traditions. The Tribe regularly holds ceremonial life ways at Boca Chica Beach, including during the equinox and solstice. These ceremonies typically involve between 20 and 30 of the Tribe's members, during which the members leave offerings for ancestors at the beach.

26.    In bringing this lawsuit, Plaintiffs stand in the shoes of members who live, work, and recreate in places threatened by SpaceX's activities at Boca Chica and who use, study, and cherish the land, water, wildlife, and other resources that are being, and will continue to be, irrevocably damaged by the activities permitted by FAA. Plaintiffs have numerous members who live in areas directly affected by these activities and/or visit the area to observe wildlife, and Plaintiffs' members and staff include individuals who study and advocate for better protection of wildlife and other resources threatened by SpaceX's activities permitted by FAA. FAA's failure to comply with the requirements of NEPA delays, avoids, and undermines protections that are necessary to secure Plaintiffs' interests in the habitats and wildlife impacted by the SpaceX launch program.

27.    Plaintiffs have members whose interests are adversely affected by direct, indirect, and cumulative harm from FAA-authorized activities to habitat areas that such members use and enjoy, including as habitat for ESA-listed wildlife. For example, Mary Angela Branch—who grew up in Brownsville and is a member of the Center, ABC, and Save RGV—regularly visits the Boca Chica area to enjoy the beach and to swim, picnic, fish, and view wildlife, including protected birds. She plans to continue visiting the area; however, her ability to enjoy Boca Chica beach and the surrounding areas and the wildlife they support has been, and will continue to be, adversely affected by SpaceX activities, including through closures to accommodate SpaceX

construction and launch activities as well as from the noise, heat, light, explosions, debris, and fires associated with such activities.

28.      Plaintiffs also have members that have researched, studied, observed, and sought protection for habitats and species that are adversely affected by the SpaceX activities authorized by FAA. For example, Jim Chapman, a member of Save RGV who lives in Weslaco, TX, works to protect the Santa Ana and Lower Rio Grande Valley National Wildlife Refuges, and advocates for the animals that use the tracks of brush and forest habitat to migrate between populations. Mr. Chapman is highly invested in the preservation of the Boca Chica area, as it is essential for many of the native wildlife which he seeks out and enjoys. Mr. Chapman regularly visits the Boca Chica area to view wildlife, particularly birds such as the protected plovers and other migratory species that rely on the area. Mr. Chapman is passionate about the native wildlife and enjoys exposing people to the unique ecosystems of the region. His interests in observing and protecting the Boca Chica area have been, and will continue to be, adversely affected by the SpaceX activities permitted by FAA, including harm from closures, increased vehicle traffic and resulting collisions with wildlife, the intense noise, heat, and light from rocket launch and testing activities, and "anomalies."

29.      Plaintiffs' members have visited and observed or sought out species that are imperiled by SpaceX activities, and enjoy hiking, fishing, and observing wildlife in areas that are impacted by such activities. Plaintiffs' members intend to continue to visit and observe, or attempt to visit and observe, these areas and species in the near future. For example, Bryan Newman—a member of the Center—lives in Minnesota, but has travelled to south Texas, including the Laguna Atascosa National Wildlife Refuge directly adjacent to the SpaceX facility at Boca Chica, in order to observe wildlife, including ESA-listed piping plovers as well as the

many migratory bird species that rely on the Boca Chica area, and he plans to return to the area

to again observe wildlife. While visiting the area in March of 2021, Mr. Newman watched a

SpaceX rocket launch from Isla Blanca, which ended up exploding in a fiery blast. Mr. Newman

derives personal, aesthetic, moral, and recreational benefits from the continued existence of

wildlife in the Boca Chica area. The degradation of habitat or the loss of wildlife from SpaceX's

activities will harm Mr. Newman's interests in observing and protecting the wildlife of this

critically important area.

30.    FAA's approval of the SpaceX launch program at Boca Chica therefore threatens

the use, enjoyment, and economic value of property owned by Plaintiffs' members, as well as the

lands and waters that members use and enjoy both as a resource and for the habitat they provide

for plants and animals. The impacts from SpaceX construction activities and rocket launches,

including "anomalies," would interfere with members' use and enjoyment of the Boca Chica area

and the wildlife it supports.

31.    Plaintiffs' ability to use and enjoy the area around the SpaceX launch facility—

including public lands and beaches that are intended for public use, such as state parks and

National Wildlife Refuge lands—is also directly impeded by the SpaceX launch program due to

closures of the area to accommodate construction of the facility as well as rocket launches. These

closures adversely affect Plaintiffs' members' interests in continuing to use these areas for

recreation. For example, the closures have adversely affected Mrs. Branch, who regularly visits

Boca Chica Beach, and whose visits have been cut short or cancelled due to unannounced

closures.

32.    The beach closures have also impacted the Carrizo/Comecrudo Nation's ability to

hold their traditional ceremonial life ways and leave offerings for their ancestors. For example,

11

Juan Mancias, a member of the Tribe, has been prevented from accessing the beach, a space sacred to him, to leave offerings to his ancestors, because of the frequent beach closures that have occurred for purposes of SpaceX activities. Participating in activities that are spiritually sacred to him depends upon his ability to access Boca Chica Beach; therefore, the closures directly affect Mr. Mancia's cultural, social, and spiritual interest in the area.

33.    Plaintiffs' members thus derive scientific, recreational, spiritual, and aesthetic benefits from the areas affected by SpaceX activities. Their interest in maintaining the wildlife and habitats that would be affected by SpaceX activities is entirely dependent on the continued existence of healthy, sustainable, and accessible ecosystems and populations. Any activities that degrade or diminish these areas, or that kill, injure, harm, harass, or displace wildlife or that close beach access, interfere with Plaintiffs' members' use and enjoyment of the areas and species.

34.    Plaintiffs' members include scientists who study various threatened and endangered species, and whose interests in studying and enjoying these species and their habitats are entirely dependent on the continued existence of such species. Any action that interferes with and harms these species also harms those members' interests and enjoyment in studying those species. Any loss of individuals or habitat from SpaceX activities would hamper their ability to undertake such research in the future, thereby harming their academic and aesthetic interests in those species.

35.    Plaintiffs have also suffered procedural and informational injuries from Defendants' violations. These injuries are connected to Plaintiffs' substantive recreational, scientific, spiritual, and aesthetic interests. Plaintiffs' members and staff rely on Defendants to comply with the requirements of NEPA. Plaintiffs rely on laws such as NEPA to achieve their

organizational purposes, including monitoring the impacts of agency actions on the environment and species; monitoring legal compliance concerning environmental management; educating members, directors, staff, and the public concerning species management and the state of the environment; and advocating for policies that protect habitats and wildlife.

36.     Defendants' actions have also stifled the flow of data on impacts to the environment from SpaceX activities that are vital to Plaintiffs' efforts to conserve and protect the environment. FAA's failure to comply with its NEPA obligations is therefore harming, and will continue to harm, Plaintiffs by interfering with Plaintiffs' core organizational missions and by requiring them to divert their limited resources and personnel away from other activities in an attempt to fill the gap left by FAA.

37.     These are actual, concrete injuries to Plaintiffs, caused by FAA's failure to comply with NEPA. The interests and organizational purposes of Plaintiffs and members are directly and irreparably injured by Defendants' violations of law as described herein. Unless this Court grants the requested relief, harm to the environment will continue to accrue, and the aesthetic, recreational, educational, professional, scientific, spiritual, and conservation interests of Plaintiffs and their members will continue to be adversely affected.

38.     The relief Plaintiffs seek will redress their injuries by requiring FAA to comply with NEPA. This relief will give Plaintiffs and their members more comprehensive and complete information by requiring FAA to complete an EIS and thereby provide Plaintiffs and their members with more information regarding SpaceX's threats to habitats, protected species, and other valued resources. It will allow Plaintiffs, their members and supporters, and others who are concerned about SpaceX activities, to advocate more effectively for changes to mitigate the adverse impacts of the Starship/Super Heavy Launch Vehicle Program.

**Defendants**

39.     Defendant FAA is the federal agency charged with administering permits for commercial space launch activities. FAA is headquartered in Washington, D.C. It is required to comply with NEPA when taking any action significantly affecting the environment.

40.     Defendant Chris Rocheleau is the Acting Administrator of FAA, and is headquartered in Washington, D.C. Plaintiffs bring this action against Mr. Rocheleau in his official capacity only. The Administrator of FAA is required to comply with NEPA when taking any action significantly affecting the environment.

## LEGAL BACKGROUND

### The National Environmental Policy Act

41.     NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA's goals are to (1) "prevent or eliminate damage to the environment and biosphere," (2) "stimulate the health and welfare" of all people, and (3) "encourage productive and enjoyable harmony between [hu]man[kind] and [the] environment." 42 U.S.C. § 4321.

42.     In creating NEPA, Congress recognized that "each person should enjoy a healthful environment" and the statute therefore requires that the federal government use all practicable means to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." *Id.* § 4331(b)–(c).

43.     To fulfill these purposes, NEPA requires that: (1) agencies take a "hard look" at the environmental impacts of their actions before they occur, thereby ensuring "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information

concerning significant environmental impacts," and (2) "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

44.     NEPA seeks to ensure that environmental information is available to public officials and citizens "before decisions are made and before actions are taken" and to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(b), (c). When the federal government acts before fulfilling its NEPA obligations, courts may set the action aside until the government complies with NEPA.

45.     The purpose of the NEPA process is also to inform federal agency decision-makers and the public of the "reasonable alternatives" that would "avoid or minimize adverse impacts or enhance the quality of the human environment." *Id.* § 1502.1(b). This analysis of alternatives is the "heart" of NEPA, where the agency should "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options." *Id.* § 1502.14. The agency must "[r]igorously explore and objectively evaluate all reasonable alternatives." *Id.* § 1502.14(a), (d).

46.     NEPA accordingly requires all federal agencies to prepare a "detailed statement" for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement—the EIS—must describe the environmental impacts of the proposed action. *Id.* § 4332(2)(C)(i), (ii). The EIS is an "action-forcing device" that ensures NEPA's goals "are infused into the ongoing programs and actions" of the federal government. 40 C.F.R. § 1502.1.

47.     To determine whether a proposed action significantly affects the environment, and therefore whether an EIS is required, the lead federal agency may first prepare an environmental assessment (EA). *Id*. § 1501.5.

48.     The lead agency must take a "hard look" at the relevant environmental concerns and alternatives to the proposed action, and must consider short and long-term effects, both beneficial and adverse effects, effects on public health and safety, and effects that would violate Federal, State, Tribal, or local law protecting the environment.

49.     If the agency determines, after preparing the EA, that the proposed action does not require preparation of an EIS, it must then prepare a finding of no significant impact (FONSI) detailing why the action "will not have a significant effect on the human environment." 40 C.F.R. § 1501.6. Courts have allowed agencies to prepare a "mitigated FONSI" where the action would otherwise have significant impacts if the agency can show that they can be mitigated so that that they no longer pose significant environmental harm. However, if the EA indicates that the federal action may significantly affect the quality of the human environment, the agency must prepare an EIS. *City of Port Isabel v. Federal Energy Regulatory Comm'n*, 111 F.4th 1198, 2024 WL 3659344 (D.C. Cir. Aug. 6, 2024) ("Indeed, NEPA requires an EIS if any significant impacts '*might* result' from the proposed action, not only when [the agency] definitively concludes that a significant impact *will* result.") (citation omitted; emphasis in original).

50.     In determining whether to prepare an EIS, the agency must "consider every significant aspect of the environmental impact of a proposed action." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). A determination that significant effects on the environment will in fact occur is not essential: an EIS must be prepared if substantial

questions are raised whether a project *may* have a significant effect upon the environment. *See* 42

U.S.C. § 4332(2)(C) (requiring an evaluation of "*any* adverse environmental effects which

cannot be avoided should the proposal be implemented," which must examine the environmental

impact of the proposed action "*to the fullest extent possible*") (emphasis added); *id.* § 4332(2)(F)

(requiring agencies to consider the "worldwide and long-range character of environmental

problems").

51.    NEPA requires federal agencies to analyze both the probability of a given harm

occurring and the consequences of that harm if it does occur. *New York v. Nuclear Regulatory

Comm'n*, 681 F.3d 471, 482 (D.C. Cir. 2012). Agencies cannot avoid their responsibility to

consider future effects by claiming they are uncertain, because NEPA requires some element of

predictive behavior. *Sierra Club v. FERC*, 867 F.3d 1357, 1374 (D.C. Cir. 2017) ("NEPA

analysis necessarily involves some 'reasonable forecasting,' and . . . agencies may

sometimes need to make educated assumptions about an uncertain future.") (citation omitted).

52.    NEPA compliance requires federal agencies to provide an opportunity for public

participation. *See* 40 C.F.R. § 1501.9 The purpose of public engagement is to "inform the public

of an agency's proposed action, allow for meaningful engagement during the NEPA process, and

ensure decision makers are informed by the views of the public." *Id.* § 1501.9(a); *see also* FAA

Order 1050.1F, 2-5.

53.    The NEPA regulations also require an agency to supplement its analysis where

new information or circumstances result in significant environmental impacts not evaluated in

the prior documents. 40 C.F.R. § 1502.9(d)., FAA Order 1050.1F, 9-3. Agencies "should

supplement environmental assessments if a major Federal action is incomplete or ongoing, and"

the "agency makes substantial changes to the proposed action that are relevant to environmental

concerns" or there "are substantial new circumstances or information about the significance of the adverse effects that bear on the analysis to determine whether to prepare a finding of no significant impact or an [EIS]." 40 C.F.R. § 1501.5(h).

## The Administrative Procedure Act

54.     The APA provides for judicial review of agency actions such as those at issue here pursuant to NEPA. A reviewing court shall "hold unlawful and set aside" any agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that was promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). In addition, the reviewing court "shall compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

55.     The APA confers a right of judicial review on any person who is adversely affected by agency action or inaction. 5 U.S.C. § 702.

## FACTUAL BACKGROUND

## The Boca Chica Area

56.     The SpaceX facility is surrounded by publicly owned conservation, park, and recreation lands including Boca Chica Beach State Park, Brazos Island State Park, the Lower Rio Grande Valley National Wildlife Refuge, the South Bay Coastal Preserve, and the Las Palomas Wildlife Management Area (Boca Chica Unit). These coastal conservation areas are home to some of the country's most diverse wildlife communities, including wind tidal flats, mid-delta thorn forest, and mid-valley riparian woodlands that support rare, threatened, and endangered species, including imperiled migratory birds and sea turtles.

57.     The Lower Rio Grande Valley National Wildlife Refuge (LRGV)—directly adjacent to the Boca Chica launch site—is considered one of the most biologically diverse

regions in North America and it provides some of the most important habitat for migratory birds in the U.S. During migration, bird species from the Central and Mississippi flyway converge on this area, making it an essential stopover for migratory birds.

58.     The Boca Chica tract of the Refuge is a particularly important link of the Lower Rio Grande Valley Wildlife Corridor. It provides important habitat for migratory birds and is one of the few places where the Kemp's Ridley sea turtle, the most critically endangered sea turtle in the world, comes ashore to nest on refuge beaches in the spring and summer.

59.     The area surrounding the SpaceX launch site contains critically important and sensitive habitat for many wildlife species, including the federally threatened piping plover. The U.S. Fish and Wildlife Service designated critical habitat for piping plovers in 2001. The SpaceX project site, purchased in 2014, directly overlaps with the designated critical habitat. Other federally protected species rely on the area as well, including red knots, northern Aplomado falcons, Gulf Coast jaguarundi, ocelots, and Kemp's Ridley, hawkbill, leatherback, loggerhead, and green sea turtles.

60.     The Boca Chica area and its wildlife are sacred to the Carrizo/Comecrudo People. Boca Chica is considered by the Tribe to be the actual birthing place of their first woman and is therefore a central part of their creation story. Indeed, many of the Tribe's prayers and ceremonies are connected to the Boca Chica area and its wildlife, such as the ocelot, which is a sacred animal to the Tribe.

61.     Boca Chica State Park and Beach is a popular public beach on an 8-mile stretch of sand on the South Texas coast. The Beach is a significant coastal resource for the community to enjoy surfing, fishing, wildlife viewing, beach walking, picnicking and other beachgoing activities and coastal recreation. The Beach offers an open space site for residents of nearby

Brownsville and South Padre Island, as well as other residents and visitors to Cameron County

on the South Texas coast. The Beach provides the public with free wildlife-dependent recreation,

including wildlife observation, photography, fishing, environmental education, and

interpretation.

62.    Other lands in the vicinity of the SpaceX facility that the FAA acknowledges

would be impacted by SpaceX activities likewise provide important habitat for wildlife,

including federally listed species. For example, the nearby Laguna Atascosa National Wildlife

Refuge provides habitat for the endangered ocelot, jaguarundi, and northern aplomado falcon as

well as threatened and endangered sea turtles and shorebirds. It is also a premier bird-watching

destination with more recorded species of birds than any other refuge in the National Wildlife

Refuge System. The Refuge also provides habitat for the largest population in the United States

of ocelots, making it the center for conservation and recovery efforts for this endangered cat.

### The Environmental Impacts of the SpaceX Launch Program

63.    FAA issued its Final PEA and Finding of no Significant Impact/Record of

Decision (FONSI/ROD) on June 13, 2022. The ROD approved SpaceX's plan to launch 20

Starship/Super Heavy rockets per year over the next 5 years, including suborbital launches and

orbital launches, along with tank tests, static fire engine tests, and construction of additional

launch related infrastructure.

64.    The Super Heavy Rocket is the world's most powerful rocket. It holds up to 3,700

metric tons of liquid methane for propulsion, a potent greenhouse gas that would routinely be

vented into the atmosphere by SpaceX.

65.    The operation of the SpaceX facility harms wildlife through noise, heat, debris,

and light pollution, including from the firing of booster rockets and intense lighting to support

20

ground operations. Noise and light associated with SpaceX operations can harm or harass listed species, including piping plovers in their critical habitat, endangered ocelot and jaguarundi in some of their last remaining habitat, and Kemp's Ridley sea turtles, the most critically endangered sea turtle in the world. Light from the facility negatively affects nesting sea turtles because it could cause adult females to false crawl or hatchlings to become disoriented and reduce nesting success and hatchling survival. Endangered red knots and threatened piping plovers could be killed if they are within the heat plume created by engine ignition during testing and launches, and noise disturbances displace plovers from their ESA-designated critical habitat.

66.      Since 2014, SpaceX has operated a rocket launch program at Boca Chica under a prior permit from FAA which addressed only 12 launches per year. SpaceX has undertaken many related activities , including a higher frequency of road closures extending well beyond the allowed 180 hours, large explosions from "anomalies," the appearance of significantly larger staffing than anticipated, as well as 24/7 operations, traffic, and construction activities not addressed by FAA.

67.      Rocket launches and testing often result in explosions. The first launch of the Starship/Super Heavy Rocket on April 20, 2023, ended in a fiery explosion of the rocket just after liftoff. The rocket also destroyed the launch pad, spewing chunks of concrete and metal, as well as ash and sand, over a large area, including adjacent tidal flats that provide habitat for protected species such as piping plovers and other migratory birds.

68.      There have been at least eight other rocket explosions at Boca Chica over the last several years, including one in March of 2021 that spewed debris as far as five miles from the launch site and took nearly three months to partially clean up. FAA acknowledges that several

more "anomalies" from tank tests and launches are expected to occur over the next five years. These explosions spread debris across surrounding habitat and can cause brush/forest fires, putting people and wildlife at great risk. FAA has accordingly acknowledged that an "anomaly" represents the greatest risk to the environment from the SpaceX activities at Boca Chica.

69.     There have been several fires attributable to SpaceX anomalies. For example, two SpaceX incidents on July 25, 2019, and again in August 2019 resulted in wildfires of 150-acres and 11-acres, respectively, burning coastal prairie and dune habitats on National Wildlife Refuge managed land. Explosions in November 2019, February 2020, and December 2020 likewise scattered debris onto Refuge managed lands. Another 68 acres of Refuge were burned in September of 2022, when a rocket exploded during a static fire test.

70.     Operations to retrieve the debris have further damaged the Refuge. According to FWS, falling debris has damaged sensitive wind-tidal flats and debris retrieval methods damaged the sensitive alkaline flat and refuge cable fencing installed to protect the area from disturbance. The vehicles or machinery used to retrieve debris have created rutting and damage that interrupts tidal water sheet flow across these flats.

71.     The U.S. Fish and Wildlife Service (FWS) has found that SpaceX's operations have significantly diminished its ability to maintain the biological integrity, diversity, and environmental health of Refuge resources at the Boca Chica tract. These activities have prevented or constrained public access year-round, hampered biological and monitoring studies including sea turtle patrols, interfered with refuge management and law enforcement patrol, increased road mortality of wildlife at all hours of daytime and nighttime, damaged sensitive habitats such as the wind tidal flats and the salt prairie from explosions and fires, and adversely impacted nesting habitat for sensitive species.

72.     The SpaceX launch program has also increased vehicle traffic causing mortality of wildlife, with carcasses of snowy plover, common nighthawk, Harris's hawk, rose-breasted grosbeak, and eastern meadowlark found over the past two years—all species protected by the Migratory Bird Treaty Act (MBTA) and designated as Birds of Conservation Concern by FWS.

73.     The increased traffic also exposes jaguarundis and ocelots to collisions. According to FAA, there will be an extra 505 vehicles per day from FAA-permitted activities moving through potential travel corridors for the Gulf Coast jaguarundi and ocelot. The project will harm those species by increased collisions and/or by displacing them and causing them to expend additional energy in seeking alternative north-south travel corridors.

74.     FAA itself acknowledges that the construction and operation of the project would result in adverse impacts from noise, light, traffic, heat and debris from rockets (that can explode and cause wildfires), and is therefore likely to adversely affect several protected species, including piping plovers, red knots, northern aplomado falcons, gulf coast jaguarundi and ocelots, as well as Kemp's Ridley, loggerhead, green, hawksbill, and leatherback sea turtles. Furthermore, the PEA acknowledges the potential for significant environmental harm from SpaceX activities due to the unique and/or unknown risks of rocket launches (including "anomalies").

75.     The frequent Beach closures with little or no public notice also cause a large impact on the community. In 2021, Boca Chica Beach was closed or inaccessible for approximately 500 hours or more, based on the notices of closure provided by Cameron County, with a Beach or access point closure occurring on over 100 separate days. This significantly interferes with the ability of the public, including Plaintiffs' members, to recreate, observe wildlife, and otherwise enjoy and derive physical and emotional wellness benefits, at Boca Chica

Beach. The little or no public notice provided also stymies any use of the Beach by those who must travel from inland areas who are discouraged from planning day trips to the Beach for fear that it may be closed at the last minute.

76.    SpaceX activities restrict the ability of the public to access and enjoy the Texas coastline adjacent to the project site, including Boca Chica State Park and Beach, a popular public beach on an 8-mile stretch of sand near the city of Brownsville, Texas. Beach access is guaranteed by local, state, and federal law. This loss of access disproportionately impacts environmental justice communities and infringes upon the ability of the Carrizo/Comecrudo Nation of Texas to access lands and waters that are part of their ancestral heritage.

### FAA's Review of the SpaceX Launch Program

77.    The Commercial Space Launch Act of 1984 authorizes the Secretary of Transportation to regulate commercial launch and reentry activities within the United States. *See* 51 U.S.C. §§ 50901-50923. The Secretary has delegated that authority to the FAA Administrator. *See* 49 CFR § 1.83(b).

78.    In 2014, FAA prepared an EIS and issued a permit to SpaceX to launch so-called Falcon vehicles at the Boca Chica site. Since then, SpaceX has applied to FAA for a new permit to use the Boca Chica Launch Site for the Starship/Super Heavy program. The project includes associated tank tests, static fire engine tests, expansion of the vertical launch area and construction of additional infrastructure.

79.    In June of 2020, FAA's Chief of Staff for the Office of Commercial Space Transportation stated in an email that the agency planned to conduct a new EIS for the Starship/Super Heavy program. However, FAA subsequently deferred to SpaceX and only

analyzed the Starship/Super Heavy program through an EA that was prepared by SpaceX under the purported supervision of FAA.

80.    FAA released a draft PEA on the project for public review on September 17, 2021.

81.    FAA received many comments on the draft PEA from Plaintiffs and others—including local and national organizations—discussing the significant environmental and community impacts of the SpaceX launch program at Boca Chica and setting forth concerns about FAA's failure to adequately analyze those impacts and to require mitigation to protect the environment, including vital wildlife habitat, from undue harm.

82.    FAA issued its Final PEA and Finding of no Significant Impact/Record of Decision (FONSI/ROD) on June 13, 2022. The FONSI/ROD states that FAA finds the action to be consistent with NEPA, and therefore it "directs that action be taken, together with the necessary related and collateral actions, to carry out the agency decisions as detailed in this Mitigated FONSI/ROD, including: A determination under 14 CFR Part 450 as to SpaceX's application for a vehicle operator license."

83.    In deciding whether to prepare an EIS, FAA has a duty to take a hard look at whether the proposed activities will significantly affect the environment. Yet FAA failed to take the requisite hard look at the proposed project and concluded that significant adverse effects will not occur due to purported mitigation measures.

84.    In refusing to prepare an EIS, FAA failed to consider and ensure adequate mitigation for the full range of impacts associated with the proposed action, including impacts to the wildlife refuge lands and protected wildlife, energy use and contribution to climate impacts,

impacts on migration patterns for impacted species, and community impacts due to frequent beach closures.

85.    While the PEA contains a list of around 70 purported "mitigation measures," the proposed measures are inadequate to address the extensive environmental impacts of SpaceX's activities. Many of the measures are not actually mitigation imposed specifically by FAA, but are actions required under other laws, such as stormwater permitting under the Clean Water Act. Other measures are meaningless as a practical matter, such as a requirement to turn off lighting that adversely affects wildlife when the lighting is not needed, since the PEA makes clear that such lighting will likely be required nearly 24/7.

86.    The PEA does not include mitigation measures to address impacts to sensitive wildlife such as the restoration and enhancement of ocelot or plover habitat affected by the noise, heat, and light from rocket launches, as well as the adverse impacts of "anomalies." The PEA provides no mitigation to address the direct impacts of explosions and resulting fires, and only provides for uncertain after-the-fact mitigation—i.e., consultation with other agencies to discuss debris removal—which does nothing to address the extensive direct damage that may occur from explosions and fires.

87.    FAA never explained anywhere in the PEA/FONSI/ROD how the proposed mitigation could or would reduce the anticipated environmental impacts to such a degree that they would not be considered "significant" for purposes of NEPA and thereby require an EIS.

88.    The PEA considered only two alternatives, including the preferred alternative and a "no action" alternative. The FAA failed to analyze other options, including a less-intensive use of the Boca Chica site (i.e., fewer launches per year), or the use of other sites for the proposed

launches, such as the Kennedy Space Center, which SpaceX itself has suggested as an alternative.

89.     FAA provided no analysis in the PEA as to the impacts the proposed project would have on the climate—including through the burning and venting of liquid methane, a potent greenhouse gas—and how that will impact people and the environment. FAA simply claimed that the emissions will not be significant, based only on comparing SpaceX to the total GHG emissions of the US. FAA thereby ignored that every contribution of GHGs to the atmosphere causes cumulative harm, and that NEPA requires a consideration of climate impacts.

90.     The PEA does not provide a full analysis of the environmental impacts to the publicly owned conservation, park, and recreation lands that are of inestimable conservation value for a range of federally and state listed species and other protected species such as migratory birds. Rather, the PEA provides only cursory statements about the potential for environmental harm – including passing reference to potentially catastrophic harm from rocket explosions that may cause extensive wildfires – but fails to provide any real analysis of the actual impacts to the people, habitats and wildlife that will be adversely affected.

91.     The PEA acknowledges that FAA anticipates further "anomalies" from the Starship/Super Heavy program, which will cause explosions and the spread of debris. The blast danger area for the debris spread includes the adjacent wildlife refuge and park lands, though the analysis was limited to a 700-acre debris study area, and the rocket explosion/launch pad destruction on April 20 indicates that debris was not limited to that area. Regardless, the PEA provides no analysis of what the actual environmental impacts of these explosions could be on

nearby wildlife and habitats – just conclusory statements about the potential for some unknown amount of harm.

92.    FAA also failed to address the harm to wildlife and habitats from debris recovery efforts, which have caused undue adverse impacts to wildlife, including listed species. The PEA suggests future debris recovery would be done on foot, rather than using vehicles, but fails to address the potential for harm from having debris removed in that manner, such as increased human presence and the trails that would be created through the sensitive tidal flats.

93.    FAA also failed to address the potential for hazardous material contamination from "anomalies" and storms. Launch propellant and commodities (including gaseous and liquid methane) will be stored in aboveground tanks at the Boca Chica site. This includes thousands of metric tons of propellants, which by definition are explosive, and have been shown to be carcinogenic and toxic. The Boca Chica site may be hit by hurricanes coming off the Gulf of Mexico, which have been increasing in recent years. The Federal Emergency Management Agency's flood risk map shows that all SpaceX facilities at Boca Chica are at risk of flooding. The FAA failed, however, to consider the potential impacts of storm damage, including a worst-case scenario tank rupture, and the harm that would result in the habitat areas surrounding the SpaceX site.

94.    FAA failed to adequately analyze the impacts of noise and light pollution on wildlife, and in fact it could not do so because the FAA acknowledged that detailed information about some of the proposed launch-related infrastructure (*e.g.*, exact location and design) was not made available for review. FAA also failed to require sufficient mitigation for noise and light pollution, such as season/time lighting restrictions during the crucial hatching season for sea

turtles. Rather, FAA acknowledged that harmful white lights may need to be used continually for several days.

95.     FAA failed to consider and analyze the impacts to the surrounding community from the closures that would be necessary to accommodate construction and launch activities. The only access by automobile to Boca Chica Beach is Texas State Highway 4—locally known as Boca Chica Boulevard—which would be closed up to 500 hours per year to accommodate SpaceX construction and launch activities, with additional closures to respond to anomalies. These closures have a significant impact on the local community, including the cultural, social, and spiritual interests of the Carrizo/Comecrudo Nation of Texas, which FAA failed entirely to address in the PEA.

96.     On April 14, 2023, the FAA issued a Commercial Space Transportation License to SpaceX, which allowed the company to launch the first flight of the Starship-Super Heavy vehicle from Boca Chica, Texas, as well as to undertake pre-flight ground operations, such as tank testing and static fire tests, over the next 5 years.

97.     FAA included with the License a Written Re-evaluation of the Final PEA for the SpaceX Starship/Super Heavy Launch Vehicle Program, which provided an analysis of new information regarding the use of deluge water and launch vehicle ocean landings, including information which was not considered in the PEA and never subject to public review and comment. The Written Re-evaluation is intended to consider whether a supplemental EA is warranted; however, it does not re-evaluate the environmental impacts discussed in the PEA and thus does not cure any of the failures identified herein regarding FAA's violations of NEPA.

98.     The April 20, 2023 launch failure resulted in significant environmental impacts that have never been analyzed in an EIS or EA. The U.S. Fish and Wildlife Service (FWS) has

stated that the "[i]mpacts from the launch include numerous large concrete chunks, stainless steel sheets, metal and other objects hurled thousands of feet away along with a plume cloud of pulverized concrete that deposited material up to 6.5 miles northwest of the pad site." The debris field included designated critical habitat for the piping plover, a species protected by both the MBTA and ESA, as well as the communities of Brownsville and Port Isabel. Some of the debris fell outside of the debris study area considered in the FAA's 2022 PEA.

99.     The FWS documented 385 acres of debris on SpaceX's facility and at Boca Chica State Park, which is leased by the FWS and managed as a component of the Lower Rio Grande National Wildlife Refuge. The FWS further documented, as a consequence of the launch, a 3.5 acre fire that started south of the pad site on Boca Chica State Park land.

100.    Following the April 20, 2023 launch event, FWS personnel and wildlife researchers were not able to access the Boca Chica area to investigate the impacts of the launch for 48 hours due to SpaceX's decision to keep the area closed. The delay in accessing the area may have resulted in carcasses being removed by predators/scavengers or otherwise.

101.    In response to the April 20, 2023 launch failure, FAA opened a "mishap investigation," ostensibly to determine the root causes of the explosion and the corrective actions that SpaceX would need to take to prevent it from reoccurring. Rather than conduct its own investigation, the FAA allowed SpaceX to conduct the mishap investigation. On August 21, 2023, the company submitted a report to FAA that identified 63 corrective actions. On September 7, 2023, FAA issued a letter "accept[ing] the root causes and corrective actions described in the [SpaceX] mishap report," and closing the mishap investigation. FAA has not provided any public analysis demonstrating that the corrective actions would prevent further significant environmental harm.

102.    On information and belief, FAA did not conduct any independent analysis of whether additional corrective actions should be required to prevent further explosions and environmental harm. FAA did not solicit or consider any public comment on the proposed corrective actions measures and/or whether alternatives to any of the proposed corrective measures would result in less environmental harm.

103.    On November 14, 2023, FAA issued a "written reevaluation" that, according to FAA, was intended to determine whether a supplemental NEPA analysis was required before issuing a permit for the second launch of the Starship/Superheavy rocket. The reevaluation concluded that no supplemental NEPA analysis was required, and that the "modification of an existing vehicle operator license for Starship/Super Heavy operations conforms to the prior environmental documentation, that the data contained in the 2022 PEA remains substantially valid, that there are no significant environmental changes, and all pertinent conditions and requirements of the prior approval have been met or will be met in the current action."

104.    The November 14, 2023 reevaluation focused on the environmental impacts of SpaceX's deluge water system, including potential harm from runoff that could be contaminated with metals, as well as potential changes to the adjacent saline habitat from freshwater inundation. The reevaluation does not analyze the environmental impacts of the April 20 launch event, including the explosion of the launchpad. The reevaluation does not provide any analysis of the impacts to wildlife from chunks of concrete being hurled thousands of feet into sensitive tidal flats, as well as the impacts of efforts to recover such debris. Nor does it address the environmental and health impacts associated with the dust that blanketed nearby wildlife habitat and towns, which was likely inhaled by thousands of people. Although large pieces of concrete debris have been removed from Boca Chica State Park, smaller rubble remains widespread. The

reevaluation does not address the impact of such debris on wildlife or human use of the affected area and it has never been analyzed in any NEPA document.

105.    The November 14, 2023 reevaluation failed to address the noise levels from the April 20 launch event or issues related to vibration levels or heat from the April 20 launch. On information and belief, these noise, vibration, and heat levels exceeded those considered in the 2022 PEA.

106.    The November 14, 2023 reevaluation did not undertake any analysis of whether the reconfigured launch pad and the deluge water system would be sufficient to prevent further explosions of the launch pad. On information and belief, the steel plate deluge system that SpaceX employed has not been used at any other launch facility and is therefore a novel and unproven design. FAA did not analyze whether the steel plate system would be sufficient to avoid further explosions and did not provide any analysis of alternative designs to protect the launch pad from further explosions. The reevaluation states that FAA does not anticipate further explosions of the launch pad due to the redesign of the pad and implementation of the deluge water system, but that conclusion is unsupported with any analysis or studies conducted by FAA.

107.    The deluge water system that SpaceX designed for the Starship/Superheavy launch pad relies on steel plates with small holes, through which water is pumped during the launch in an attempt to reduce the heat impacting the concrete pad. FAA acknowledges that up to 190 pounds of steel will be ablated (i.e., eroded) during each launch and rocket test, which results in metals such as nickel and chromium being discharged in a plume or in ground flow. In a July 2024 investigation, the Texas Commission on Environmental Quality found that SpaceX "has been operating Starbase Launch Pad and discharging industrial wastewater without proper authorization" and that "[i]ndustrial wastewater was discharged without a [discharge] permit on

March 14, 2024, April 5, 2024, April 5, 2024, May 8, 2024, and July 26, 2024." According to the investigatory report, the unpermitted "[d]ischarges are expected to contain dissolved solids, sulfate, chloride, fluoride, aluminum, cadmium, chromium, copper, cyanide, and zinc." The investigatory report indicates that the U.S. Environmental Protection Agency previously "issued an Administrative Order" concerning additional "discharges up to March 13, 2024."

108.    The November 14, 2023 reevaluation states that SpaceX intends to reuse the steel plate, but it contains no analysis of how the loss of up to 5,700 pounds of the steel plate each year through ablation will affect its ability to remain functional and prevent further explosions. The reevaluation contains no discussion of a monitoring protocol for the steel plate and sets forth no plan for replacing the steel plate in the future.

109.    The SpaceX launches have continued to cause significant environmental impacts. A report issued by the Coastal Bend Bays & Estuaries Program on June 6, 2024—immediately following the fourth launch—documents extensive damage to active migratory bird nests at Boca Chica State Park. *See Shorebird nest fates at Boca Chica after rocket test launch.* The June 6 report states that "[a]ll 9 shorebird nests monitored following the rocket launch were either missing eggs, had damaged eggs, or both" as a result of debris caused by the launch. According to the report, the "combination of fast flying debris associated with the launch, lack of any predator signs in-person or on-camera, and presence of cracked and/or missing eggs in every nest checked within 5 hours of the rocket test launch indicates that most, and likely all, of the 9 nests were likely damaged directly by debris that had been projected outwards during the test launch." The birds harmed—the Snowy Plover and Wilson's Plover—are legally protected by the MBTA and international treaties that the MBTA implements. On information and belief, the documented

nest destruction is very likely to constitute a small fraction of the harmful impacts to protected migratory birds caused by the launch since only a small fraction of nests in the area were studied.

110.    In addition to the documented nest destruction, the June 6, 2024 report discloses additional environmental impacts. According to the report, the "soil in much of the South Launch sandflat appeared a darker color than the day before and also appeared slightly bumpy and crunchy, indicating that water, vapor and/or sand and mud may have been projected out over the landscape and begun to dry already in the hot sun." In addition, "[b]urned remnants of a small wildfire about 400 sq. feet in size was observed in the grass southwest of the rocket launchpad within Boca Chica State Park" and "game cameras that were placed near nests were found to be heavily coated in clumped sand/mud on their launchpad-facing sides" and the lens on one camera "had been shattered by a pea-sized piece of concrete debris that was found wedged between the game camera and its protective metal housing."

111.    The June 6, 2024 report documents environmental impacts—including violations of federal environmental law—that were not analyzed in FAA's PEA. Such impacts are in addition to those resulting from the April 20, 2023 explosion, and confirm that even in the absence of catastrophic events such as that one, significant adverse impacts on migratory birds and ecosystems have and will result from the regular operation of the launch site. A May 1, 2023 letter from FWS to SpaceX described additional such impacts, pointing to video evidence of hovercraft used to transport SpaceX personnel displacing shorebirds and other waterbirds from South Bay, a "globally important shorebird area" and "within designated critical habitat for the piping plover and proposed critical habitat for the red knot." The May 1, 2023 letter states that "[i]f red knots or piping plovers were flushed during the operation of the hovercraft and it is

34

happening 8 times a day, 5 days a week, this could be considered take in the form of harassment of listed species."

112.    FAA's Final PEA states that "SpaceX will continue contracting a qualified biologist to conduct pre-and post-launch biological monitoring (vegetation and birds)" and that "[m]onitoring reports will be sent to the [FWS] within two weeks following compilation and analysis of the data." The nest destruction documented in the June 6, 2024 report indicates that SpaceX's own purported monitoring is either not being carried out as set forth in the PEA, or is being carried out in such a manner that adverse impacts on migratory birds are not being adequately detected and/or avoided.

113.    FAA's Record of Decision states that measures identified in a Biological Opinion issued by FWS "would help avoid, minimize, or mitigate any taking of migratory birds protected by the Migratory Bird Treaty Act" and that "SpaceX is responsible for MBTA compliance." The nest destruction documented in the June 6, 2024 report confirms that the measures relied on by FAA are not working to "avoid, minimize, or mitigate any taking of migratory birds" and that SpaceX cannot be relied on to ensure MBTA compliance.

114.    By letter dated July 16, 2024, Plaintiffs explained to FAA Michael Whitaker that the "conclusive evidence of MBTA violations underscores the need for additional review under NEPA," that it is "now clearer than ever that the SpaceX launches are having significant, unmitigated adverse environmental impacts," and that a "full Environmental Impact Statement with appropriate public input from FWS and all those affected by the launches is essential before any further launches can be authorized . . . ." To date, Plaintiffs have received no response to their July 16, 2024 letter.

115.    On information and belief, FAA has no intention of preparing an EIS or in otherwise revisiting its inadequate PEA. To the contrary, FAA announced its intention to "tier" off the inadequate PEA in order to significantly expand the authorization for SpaceX launches from the Boca Chica site.

**The FAA's NEPA Analysis for the Increased Launch Cadence**

116.    In November of 2024, the FAA released a Draft Tiered Environmental Assessment for SpaceX Starship/Super Heavy Vehicle Increased Cadence at the SpaceX Boca Chica Launch Site in Cameron County, Texas, which considered SpaceX's proposal to increase the launch and landing cadence of the Starship/Superheavy Launch program to 25 per year.

117.    Many groups and individuals, including Plaintiffs, provided comments on the Draft NEPA analysis, setting forth concerns about the ongoing impacts of SpaceX's activities and the FAA's failure to comply with NEPA by not producing an EIS for the proposed increase in launch/landing cadence, which would exacerbate the already significant community and environmental impacts of the Launch Program.

118.    On April 24, 2025, the FAA released the Final Tiered Environmental Assessment for SpaceX Starship/Super Heavy Vehicle Increased Cadence at the SpaceX Boca Chica Launch Site in Cameron County, Texas (the "Tiered EA"), along with a Mitigated Finding of No Significant Impact (FONSI) and Record of Decision (ROD).

119.    The Tiered EA once again failed to take the requisite "hard look" at many of the community and environmental impacts associated with SpaceX's activities and how the already significant impacts of the launch program would be exacerbated by the increased launch and landing cadence.

120.    For example, noise and lighting associated with SpaceX's activities are already causing significant environmental impacts that will be exacerbated by the proposed increase in launch cadence, yet the Tiered EA fails to take a "hard look" at the impacts of noise and lighting from 25 launches and landings per year, which would increase not only the overall amount of noise and number of hours that detrimental lighting would be employed, but the frequency of such impacts. The FAA erroneously argued that the impacts of noise and lighting would not be any different from what was proposed and analyzed for the 2020 PEA (continuing to suggest that the impacts are infrequent and temporary), and that noise and lighting still would not result in significant impacts, even though no additional mitigation has been proposed to address the increased impacts associated with the increase in launch/landing cadence.

121.    In the Tiered EA, the FAA erroneously argued that lighting does not lead to false crawls of nesting sea turtles, which is inconsistent with statements made in the 2020 PEA, as well as statements in the record from the expert wildlife agencies and studies confirming that lighting does indeed lead to false crawls. It is also belied by the fact that there has been an increased detection of false crawls at the Boca Chica facility, resulting in three times the amount of anticipated "take" of sea turtles. The need for increased take authorization for protected sea turtles confirms that the existing mitigation measures for lighting impacts were not successful. Yet, the Tiered EA erroneously states that with the implementation of the Light Monitoring Plan, no significant impacts are anticipated from the increased launch cadence, which ignores that increasing the program's cadence will exacerbate the impacts of lighting, especially since the FAA still has not imposed any seasonal restrictions to avoid turtle nesting times.

122.    The Tiered EA erroneously states that noise and lighting impacts are only temporary or intermittent, which is inconsistent with statements from the expert agencies that

such impacts have been continuous and ongoing, and the Tiered EA failed to adequately analyze the increased impacts from more frequent and consistent use of harmful spotlighting and more disturbance from noise associated with preparing for and undertaking launches and landings. The FAA's conclusions regarding lighting and noise impacts are not supported by any actual data or analysis, and the FAA therefore failed to take a hard look at the significant impacts of noise and lighting on protected wildlife from 25 launches per year.

123.    The Tiered EA fails to fully address the impacts associated with SpaceX's proposal to conduct 3 night-launches per year (defined as after 7:00 pm, which ignores that much of the year the sun sets around 5:30 at Boca Chica, and thus lighting akin to what would be needed for a "nighttime" launch would be necessary for an untold number of "daytime" launches), without any seasonal restrictions to protect nesting birds and hatching turtles. These night launches require additional lighting that the expert wildlife agencies have stated cause significant adverse effects on wildlife.

124.    The Tiered EA fails to fully analyze the harm from disturbance, displacement, and harassment of wildlife from the continuous and regular impacts of 25 launches per year, including not only from noise and lighting, but from heat and ground vibrations as well, which can cause direct harm and can disturb nesting turtles and birds, causing them to abandon nests.

125.    The Tiered EA also failed to take a hard look at the significant impacts of the deluge water system, stating that there is no concern regarding metals or chemicals in the deluge water runoff, based on minimal sampling from the first few launches. However, initial sampling is likely not capturing the potential for contamination from ablation of the steel plate, which will increase as more launches take place, making it more likely that the runoff will contain metals or other contaminants. As much as 190 pounds of steel can be ablated per launch, and the resulting

discharge of copper, hexavalent chromium, mercury, and zinc have the potential to adhere to sediments and bioaccumulate in fish and birds.

126.    The Tiered EA also failed to fully analyze the alterations to the surrounding habitat from the deluge water runoff. The discharge of deluge water has the potential to damage or permanently change the nature of the tidal flats, since the addition of freshwater could alter the salinity regime and create channels that interrupt sheet flow. These changes in salinity and hydrology could alter the existing algal and vegetation communities that are part of the designated critical habitat of the piping plover and important habitat for other shorebirds.

127.    The Tiered EA fails to fully consider and address the community and environmental impacts of increased truck and vehicle traffic associated with the increased launch cadence. Traffic associated with SpaceX's activities already has a significant environmental impact, which will be exacerbated by the proposed increase in launch cadence.

128.    The Tiered EA acknowledges that the proposed increase in launch cadence would result in a drastic increase in truck traffic for water and fuel deliveries—from 6,000 trucks per year to 23,771 trucks per year—but it fails to provide any actual analysis of the impacts of the increase in traffic on wildlife and the community. The FAA once again relies on posted speed-limit signs and the availability of a shuttle that SpaceX encourages employees to use as mitigation, but it provides no analysis of whether those measures have been effective to reduce the impacts of traffic below the level of significance.

129.    The Tiered EA further fails to note that the current level of traffic associated with SpaceX is already causing problematic traffic conditions, which will only be exacerbated by the increased launch cadence. The increased truck and employee traffic on SH4 associated with the proposed increased launch cadence would have a significant impact on the community,

increasing what is already an intolerable situation that makes it difficult for people to visit public lands; yet the Tiered EA fails to address this significant impact.

130.    The noise modeling provided by SpaceX, which the FAA relies on in the Tiered EA for its conclusions regarding the impacts of noise from the proposed activities, is inadequate and misleading. The noise modelling (which was done using a noise model that is not approved by the FAA) is premised on unrealistic and invalid assumptions about ground cover and impedance/noise absorption, with many areas that are water erroneously modeled as land, which resulted in flawed results regarding the noise levels that people in areas such as Port Isabel will be exposed to even more frequently if the proposed increased cadence is approved.

131.    The Noise Assessment also failed to provide confidence intervals; failed to consider landing noise and sonic boom noise from landings in the Gulf of Mexico; failed to assess the cumulative effects of the full-range of noise sources from the proposed activities (including the cumulative impacts of launch/landing and sonic boom noise); failed to consider the actual noise from sonic boom events (discussing only the overpressure from those events); relied on a supplemental noise metric (CDNL) and failed to use the applicable primary noise metric (the DNL 65 dB significance threshold); relied on outdated and insufficiently protective noise thresholds; ignored the impacts of low frequency noise from launches/landings and thereby ignored impacts to the community, including health impacts to children; misapplied and misrepresented the OSHA guidelines and ignored more useful guidelines from the EPA and WHO; and failed to adequately assess the impacts of noise from SpaceX's activities on children's health as well as on sleep interference. As a result of the many deficiencies, errors, and misrepresentations made in the Noise Assessment, the analysis of noise health impacts and land use compatibility was flawed and inadequate.

132.    Furthermore, the Tiered EA and accompanying noise study show that noise sensitive areas *would* experience noise above the FAA's significance threshold. Therefore noise, including sonic boom noise impacts, are "significant," and an EIS is required to fully analyze such impacts.

133.    The Tiered EA fails to address harm to the nests and eggs of birds protected under the MBTA from the June 2024 launch event. A report issued by the Coastal Bend Bays & Estuaries Program immediately following the fourth launch documents extensive damage to active migratory bird nests at Boca Chica State Park, finding that "[a]ll 9 shorebird nests monitored following the rocket launch were either missing eggs, had damaged eggs, or both" as a result of debris caused by the launch. According to the report, the "combination of fast flying debris associated with the launch, lack of any predator signs in-person or on-camera, and presence of cracked and/or missing eggs in every nest checked within 5 hours of the rocket test launch indicates that most, and likely all, of the 9 nests were likely damaged directly by debris that had been projected outwards during the test launch." The birds harmed by that event are legally protected by the MBTA and international treaties that the MBTA implements. FWS stated that with the proposed increase to 25 launches per year (with some of those occurring at night), and with the plan to land many of those rockets at the VLA, "it is likely that additional impacts to breeding migratory birds similar to the egg destruction documented in June 2024 will occur."

134.    The Tiered EA fails to discuss or analyze the documented harm to MBTA-protected birds/nests and only mentions that a camera lens was damaged by the concrete debris from the June 2024 launch event. Indeed, the Tiered EA fails to even mention the MBTA as one of the laws that the FAA and SpaceX must comply with. The FAA admits that a gravel plume

such as this was *not* previously analyzed in the PEA, yet it fails to do so again here. Thus, the FAA has never addressed the potential for harm to nests and eggs from a debris strike, and how such debris strikes may affect wildlife, including protected birds.

135.    While the Tiered EA discusses the need for further monitoring of debris impacts and that SpaceX would experiment with techniques to protect nests, such as installation of sheltering objects, it provides no discussion of the efficacy of such actions or the potential harmful impacts from such measures in terms of disturbances from the installation and removal of "shields," which could cause harassment of birds as well as harm to fragile algal mats from foot traffic to install and remove them. Indeed, the entire discussion of such "Minimization and Mitigation Measures" indicates that there is insufficient information available at this time to determine the likelihood of success of these measures. Therefore, the Tiered EA does not indicate that sufficient mitigation is in place to address harm to MBTA-protected birds/nests.

136.    While the Tiered EA states that the impacts to listed species from the increased cadence will be "similar" to what was described in the 2020 PEA, the FAA admits that an additional six species of listed birds will be impacted that were not evaluated in the PEA due to the expansion of the proposed action. And the discussion in the Tiered EA regarding these new impacts is limited to just an acknowledgment that harassment of animals will occur, without any actual analysis of the impacts of such harassment. The fact that so many more endangered species will be affected by SpaceX's activities shows that the impacts are certainly *not* the same as what was previously considered in the PEA and are indeed more significant.

137.    The Tiered EA fails to address the environmental harm—including to designated critical habitat in the adjacent wildlife refuge—from the many visitors that show up to witness launches of the Starship/Superheavy rockets or search for debris after a launch, which would be

exacerbated by the proposed increased launch cadence, with more visitors coming to the area to witness launches.

138.    The Tiered EA also fails to consider and analyze the impacts of hovercrafts being used to access the Boca Chica launch facility by SpaceX personnel. According to FWS, SpaceX's hovercraft operations—which are directly connected to the activities that the FAA has permitted at the Boca Chica facility, as the hovercrafts are being used to get SpaceX personnel to the launch site for such activities—may be resulting in "take" of protected wildlife and harming a globally important shorebird area designated as a Texas Coastal Preserve that provides feeding, resting, and wintering habitat for numerous types of migratory bird species as well as threatened and endangered species. The Tiered EA fails to even mention the use of hovercrafts by SpaceX to access the site.

139.    The Tiered EA also fails to sufficiently consider and analyze the increased risk of anomalies from the increase in launch and landing cadence. The Tiered EA states that even though SpaceX proposes increasing the number of launches drastically, there would be no correlated increase in the potential for anomalies and even asserts that the likelihood actually decreases as the launch program progresses because SpaceX learns from each launch. That is not supported with any data from other launch programs and is belied by the recent history of Starship/Super Heavy launches, several of which have resulted in explosions/anomalies.

140.    The Tiered EA erroneously assumes that only 300 hours per year will be required to address anomalies—thus it acknowledges the potential for anomalies remains high—yet it fails to fully consider that increasing the launch and landing cadence means more opportunities for catastrophic failures and significant environmental impacts.

141.    The Tiered EA's complete reliance on the 2020 PEA to address the impacts of anomalies for the increased cadence also ignores that the 2020 PEA did not address the potential for anomalies when *landing* over 20 rockets per year at the VLA, which is a major component of the proposed changes to the launch program. Reports on the first attempt to land the rocket at the VLA show that it was a close call, with a high potential for an anomaly, and the second attempt to land the rocket at the VLA was scrubbed because of safety concerns. Therefore, the proposal to increase the landings at the VLA – which have not been proven safe – increases the potential for an anomaly, which undermines the FAA's assertion that the chances of an anomaly occurring are reduced.

142.    The FAA failed to provide any analysis in the Tiered EA of the environmental impacts of recent anomalies, even though it now has the opportunity to consider the actual harm from the explosion that occurred during the first launch of the Starship/Superheavy rocket and several other explosions and fires that occurred from subsequent launches, which should have been used as examples to assess the potential harm from future anomalies to fully analyze the potential for harm from SpaceX's activities.

143.    The expert wildlife agencies have stated unequivocally that debris from anomalies and debris recovery efforts cause significant harm to the sensitive tidal flats that provide ecologically critical habitat for many species, including birds protected under the ESA and MBTA. However, the Tiered EA fails to fully address the harm from troughs created by ejected debris and the subsequent interruption of tidal flow/hydrology, as well as impacts from efforts to recover debris from an anomaly. Moreover, the record for the PEA shows that such harm cannot be mitigated, since restoration of the tidal flats is uncertain and unproven, which is not addressed in the Tiered EA.

144.    The Tiered EA also fails to adequately consider the impacts of the increased launch/landing cadence on the community from more frequent access restrictions and road closures. This includes the impacts of closures on the Carrizo/Comecrudo Tribe, which has ancestral ties to the immediate region of the Lower Rio Grande Valley and recognizes the project area and its surroundings to be an extremely important sacred cultural, ancestral, and historic site.

145.    The Tiered EA also fails to discuss the impacts from access closures on peak weekends and holidays, despite the PEA stating that no such closures would occur as a mitigation measure. For example, SpaceX recently scheduled closures of Hwy 4 on peak weekend days, including the Saturday and Sunday before Memorial Day, and delays were scheduled for Father's Day weekend.

146.    The FAA failed to address the fact that the Boca Chica area is the sacred ancestral birthplace of the Carrizo/Comecrudo people and that the activities it has authorized are adversely impacting these sacred lands, which would be exacerbated by the proposed increase in launch cadence. The FAA has further failed to discuss, analyze, and consult with the Carrizo/Comecrudo Tribe on the impacts of SpaceX's proposed operations—including to the lands and wildlife that are sacred to the Tribe, and from access restrictions that prevent the Tribe from visiting their ancestral lands.

147.    In the Tiered EA, the FAA has accepted SpaceX's baseless assertion that the number of closure hours would not need to be increased to accommodate the drastic increase in SpaceX's activities from the increased launch/landing cadence, including from anomalies. Thus, the Tiered EA failed to take the requisite "hard look" at the actual number of likely access restrictions and closures, which result in significant environmental impacts.

148.    The FAA's failure to fully analyze the significant environmental impacts of the SpaceX Starship/Superheavy Launch Program, and in particular how increasing the cadence to 25 launches per year will exacerbate those impacts as discussed above, also means that the agency has failed to fully analyze the cumulative effects of the proposed action.

149.    The Tiered EA also fails to address the cumulative effects of several nearby projects, including LNG facilities, such as the Rio Grande LNG and Next Decade LNG and other such facilities that are planned, in construction, or operating, several of which are very close to the Space X facility, as well as the SpaceX air separator/liquid oxygen and liquid nitrogen factory that was recently approved by Cameron County. These projects have similar impacts on wildlife from construction noise, lighting, habitat loss and the potential for catastrophic harm from an anomaly and spill.

150.    The Tiered EA fails to address alternatives, including an alternative with fewer than 25 launches per year. The FAA appears to have blindly accepted SpaceX's unsupported claim that 25 launches per year at Boca Chica is necessary to support SpaceX's purported purpose and goals, and has thereby ignored obvious alternatives that should have been fully considered, as NEPA requires.

151.    Not only will the environmental impacts of the Launch Program be greatly exacerbated by the increased launch cadence, but no additional mitigation has been proposed that could possibly support the FAA's failure to produce an EIS for what is clearly a major federal action with significant environmental impacts. The FAA has failed to show that the impacts of launching and landing 25 of the largest rockets in world would be insignificant even with the proposed mitigation. Rather, significant unmitigated impacts have *already* occurred and are

ongoing and would only be intensified by increasing the launch cadence. Thus, there can be no

doubt that an EIS was required to assess the impacts of the increased cadence.

## FIRST CLAIM FOR RELIEF

**The FAA has violated the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706**

152.    Plaintiffs reallege, as if fully set forth herein, each and every allegation contained

in the preceding paragraphs.

153.    FAA's authorization of the Starship/Super Heavy Launch Vehicle Program at

Boca Chica, Texas is a major federal action that requires compliance with NEPA. *See* 42 U.S.C.

§ 4332(2)(C). FAA determined in the FONSI/ROD that the SpaceX Starship/Super Heavy

Launch Vehicle Program was consistent with NEPA without the need for an EIS, and further

stated that the agency was making an affirmative decision to approve SpaceX's application for a

vehicle operator license and to allow the activities as detailed in the FONSI/ROD, which include

20 launches over the next 5 years as well as ground operations such as tank and static fire tests

(which also may result in explosions and otherwise cause environmental harm).

154.    FAA issued the PEA and FONSI/ROD even though the action will have

significant adverse environmental impacts, requiring the preparation of an EIS. FAA's Chief of

Staff for the Office of Commercial Space Transportation acknowledged that a new EIS was

warranted for the Starship/Super Heavy Launch Vehicle Program, but the agency subsequently

allowed SpaceX to conduct an EA rather than an EIS, thereby unlawfully delegating this

important determination under NEPA to the self-interested applicant.

155.    The mitigation measures set forth in the PEA are inadequate to compensate

for the significant adverse impacts that SpaceX launch program will cause. The Boca Chica

area provides some of the most important habitat in the U.S., yet FAA failed to require meaningful measures to protect the species that rely on the surrounding habitat.

156.    FAA violated NEPA by failing to take the requisite hard look at the significant environmental effects of the project.  Among other things, FAA failed to adequately analyze the project's contribution to climate change; the impacts of beach closures on the community, including on environmental justice communities and the Carrizo/Comecrudo Nation of Texas; the impacts of "anomalies" including the potential for highly destructive wildfires; and the impacts to wildlife from increased traffic, lighting, and the noise, debris, and heat associated with rocket launches.

157.    FAA failed to consider an adequate range of alternatives, as NEPA requires, including an alternative with fewer launches per year to mitigate the impacts of the launch program by reducing harm from noise, heat, lighting, and closures of public lands directly related to launch activities, and an alternative launch site altogether.

158.    FAA's FONSI/ROD for the launch program was arbitrary and capricious since the agency failed to set forth a reasonable basis for concluding that the impacts of the launch program can and will be mitigated such that they would no longer be considered "significant" under NEPA. The environmental impacts associated with the SpaceX launch program are undoubtedly "significant," even with the proposed mitigation, including from ongoing "anomalies"—and thus by preparing an EA/FONSI rather than an EIS for its issuance of a permit for the SpaceX launch program, the FAA violated NEPA, 42 U.S.C. § 4332(2)(C), and its implementing regulations.

159.    Because the environmental impacts associated with the SpaceX launch program are undoubtedly significant, by failing to prepare an EIS, the FAA has violated, and is continuing to violate, NEPA and the APA, 5 U.S.C. §§ 706(1), (2).

## SECOND CLAIM FOR RELIEF

**The FAA has violated the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706**

160.    Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

161.    The FAA's approval of the increased launch and landing cadence for the Starship/Superheavy Launch Vehicle Program at Boca Chica, Texas is a major federal action that requires compliance with NEPA. *See* 42 U.S.C. § 4332(2)(C).

162.    The FAA issued the Tiered EA and mitigated FONSI/ROD for the increased launch/landing cadence even though the launch program will have significant adverse environmental impacts, requiring the preparation of an EIS.

163.    The mitigation measures set forth in the Tiered EA (and those relied upon from the 2020 PEA) are inadequate to compensate for the significant adverse impacts that SpaceX launch program will cause, particularly given the increased launch/landing cadence and the exacerbation of the associated community and environmental impacts.

164.    The FAA violated NEPA by failing to take the requisite hard look at the significant environmental effects of increasing the cadence of the project. Among other things, the FAA failed to adequately analyze the noise associated with the launches and landings, since the noise assessment was inaccurate and misleading; failed to analyze the increased cadence's impacts of beach closures on the community, including on environmental justice communities and the Carrizo/Comecrudo Nation of Texas; failed to assess the impacts of "anomalies"

including the potential for highly destructive wildfires and debris; failed to take a hard look at the increased impacts to protected species, including to the nests and eggs of protected birds that have been harmed by launch debris; and failed to fully address the impacts from increased traffic, lighting, and the noise and heat associated with rocket launches and landings, as well as the use of hovercraft to access the site.

165.    The FAA failed to analyze the cumulative effects of several nearby projects, including LNG facilities that are planned, in construction, or operating, in close proximity to the Space X facility, as well as the SpaceX air separator/liquid oxygen and liquid nitrogen factory that was recently approved by Cameron County.

166.    The FAA failed to consider an adequate range of alternatives, as NEPA requires, including an alternative with fewer launches per year to mitigate the impacts of the Launch Program by reducing harm from anomalies, noise, heat, lighting, and closures of public lands directly related to launch and landing activities, and an alternative launch site altogether.

167.    The FAA's FONSI/ROD for the increased cadence was arbitrary and capricious since the agency failed to set forth a reasonable basis for concluding that the impacts of the Launch Program can and will be mitigated such that they would no longer be considered "significant" under NEPA. The environmental impacts associated with the SpaceX launch program are undoubtedly "significant," even with the proposed mitigation, and thus by preparing an EA/FONSI rather than an EIS for the increased cadence for the SpaceX Launch Program, the FAA violated NEPA, 42 U.S.C. § 4332(2)(C), and its implementing regulations.

168.    Because the environmental impacts associated with the SpaceX launch program are undoubtedly significant, by failing to prepare an EIS, the FAA has violated NEPA and the APA, 5 U.S.C. §§ 706(1), (2).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

a)    Declare that FAA's PEA/FONSI/ROD for the Starship/Super Heavy Launch Vehicle

Program violates NEPA and applicable regulations;

b)    Declare that the FAA's Tiered EA for the increased launch cadence and the accompanying

FONSI/ROD violate NEPA and applicable regulations;

c)    Vacate and remand the FAA's decision to approve SpaceX's application for a vehicle

operator license and decision to approve the increased launch cadence for compliance with

NEPA and applicable regulations; and

d)    Award Plaintiffs their costs, expenses, and attorneys' fees under applicable law; and

e)    Provide for such other relief as the Court deems just and appropriate.


July __, 2025                              Respectfully submitted,

                                          /s/ Jared Margolis
                                          Jared Margolis (pro hac vice)
                                          Center for Biological Diversity
                                          2852 Willamette St. # 171
                                          Eugene, OR 97405
                                          (802) 310-4054
                                          jmargolis@biologicaldiversity.org

                                          /s/ Dinah Bear
                                          Dinah Bear (D.C. Bar No. 351817)
                                          300 N. Indian House Road
                                          Tucson, Arizona 85711
                                          (202) 906-9407
                                          bear6@verizon.net

                                          *Attorneys for Plaintiffs*